Table of Contents

FAS 106-2 did not differ materially from FSP FAS 106-1. On January 21, 2005, the Department of Health and Human Services' Centers for Medicare & Medicaid Services (CMS) released final regulations regarding the Medicare prescription drug benefit and other key elements of the Act. While Maytag has not re-tested its plans under the actuarial equivalence test described in the final regulations, it still believes the current plans will meet the actuarial equivalence requirements necessary to receive the Medicare reimbursement.

Maytag estimates the net effect on current post-65 per capita medical and prescription drug costs to be a reduction of approximately 11-14% due to the Medicare reimbursement. The changes are assumed to have no impact on future participation rates in Maytag's post-65 prescription drug programs.

The Company has reduced its accumulated benefit obligation (ABO) for the subsidy related to benefits attributed to past service by $52.8 million. A portion of this reduction was recognized on the Consolidated Balance Sheet in 2004 through amortization with the remainder to be recognized in future years. The effect of the subsidy on the measurement of net periodic postretirement cost for 2004 was $8.6 million recognized evenly throughout the fiscal year. The effect included lower amortization of actuarial losses of $4.3 million, lower service costs of $0.8 million, and lower interest costs on the ABO of $3.5 million. For further information on postretirement costs, see "Postretirement Benefits" section in the Notes to Consolidated Financial Statements.

## Inventory Costs

In the fourth quarter of 2004, the FASB issued Statement No. 151, "Inventory Costs", an amendment of Accounting Research Bulletin No. 43, Chapter 4. The amendments made by Statement No. 151 clarify that abnormal amounts of idle facility expense, freight, handling costs, and wasted materials (spoilage) are to be recognized as current-period charges and will require the allocation of fixed production overheads to inventory based on the normal capacity of the production facilities. The guidance is effective for inventory costs incurred during fiscal years beginning after June 15, 2005. Earlier application is permitted for inventory costs incurred during fiscal years beginning after November 23, 2004. Maytag expects the adoption to have little impact on its consolidated financial position, results of operations, or cash flows.

## Share Based Payments

In the fourth quarter of 2004, the FASB issued Statement No. 123 (revised 2004), or SFAS No. 123R, "Share-Based Payment", which replaces Statement No. 123 "Accounting for Stock-Based Compensation", and supersedes ABP Opinion No. 25, "Accounting for Stock Issued to Employees." SFAS No. 123R establishes accounting standards for equity instruments that an entity exchanges for goods or services. It also addresses transactions where an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. This Statement focuses primarily on accounting for share-based payment transactions as it relates to employee services. SFAS No. 123R requires a public entity to measure an award of equity instruments based on the grant-date fair value of the award. That cost is to be recognized over the period during which an employee is required to provide service in exchange for the award (usually the vesting period). If an employee terminates before the vesting period expires, any compensation cost recognized to date for that individual's equity instrument is to be reversed at the date of termination. The grant-date fair value of share options and similar instruments is to be estimated using option-pricing models adjusted for the unique characteristics of those instruments.

SFAS No. 123R eliminates the alternative to use ABP Opinion 25's intrinsic value method of accounting that was provided in Statement No. 123 as originally issued. Under ABP Opinion 25, issuing stock options to employees generally resulted in recognition of no compensation cost. Statement No 123 also required pro forma disclosure showing the effect on net income and earnings per share as if the Company had applied the fair value recognition provision of Statement No. 123. After a phase-in period for Statement No. 123R, this type of disclosure will no longer be allowed.

Alternative phase-in methods are allowed under Statement No. 123R, which is effective as of the beginning of the first interim or annual reporting period that begins after June 15, 2005. While Maytag has not yet determined the phase-in method, it does not believe that any of the phase-in methods will have a material effect on the Company's Consolidated Statement of Operations or Balance Sheet.

35

A262

Table of Contents
Discontinued Operations

During 2001, the Company committed to a plan to dispose of its 50.5 percent owned joint venture in China, Rongshida–Maytag. A charge was recorded in the fourth quarter of 2001 of approximately $42.3 million to write down the Company's interest in the net assets of Rongshida–Maytag to its fair value less cost to dispose. In 2003, the Company recorded an additional after–tax loss of $3.3 million to further write down its investment in Rongshida–Maytag to an adjusted fair value less costs to dispose. In the third quarter of 2004, Maytag completed the sale of its interest in the joint venture for net proceeds of $11.2 million, resulting in an after–tax gain on sale of $10.8 million which was recorded as income from discontinued operations.

During 2001, a $59.5 million net loss was recorded on the sale of Blodgett. The sale included $18.2 million of notes receivable for which the Company recorded a valuation reserve of $9.7 million due to the credit status of the buyer ($8.5 million, net). In 2003, Maytag received payments of $16.2 million in principal and $3.3 million of accrued interest against these notes receivable. Based on the cash payments received and the improved financial position of the buyer, the Company reversed the $9.7 million reserve and recognized a gain in discontinued operations in 2003.

Restructuring Charges

The tables below show an analysis of the Company's reserves for restructuring charges:

| Description of reserve | Balance December 29, 2001 | Charged to Earnings 2002 | Reversal of Prior Period Charges | Cash Utilization | Non–Cash Utilization | Balance December 28, 2002 |
|---|---|---|---|---|---|---|
| | (in thousands) | | | | | |
| Severance and related expense | $ 6,903 | $ 4,128 | $ — | $ (4,629) | $ (2,292) | $ 4,110 |
| Asset write–downs and accelerated depreciation | — | 28,627 | — | — | (28,627) | — |
| Reserve on asset held–for–sale | 1,570 | — | — | — | — | 1,570 |
| Total | $ 8,473 | $ 32,755 | $ — | $ (4,629) | $ (30,919) | $ 5,680 |

| Description of reserve | Balance December 28, 2002 | Charged to Earnings 2003 | Reversal of Prior Period Charges | Cash Utilization | Non–Cash Utilization | Balance January 3, 2004 |
|---|---|---|---|---|---|---|
| | (in thousands) | | | | | |
| Severance and related expense | $ 4,110 | $ 26,842 | $ — | $ (15,626) | $ — | $ 15,326 |
| Moving of equipment | — | 3,364 | — | (3,364) | — | — |
| Asset write–downs and accelerated depreciation | — | 29,532 | — | — | (29,532) | — |
| Reserve on asset held–for–sale | 1,570 | — | — | — | — | 1,570 |
| Total | $ 5,680 | $ 59,738 | $ — | $ (18,990) | $ (29,532) | $ 16,896 |

| Description of reserve | Balance January 3, 2004 | Charged to Earnings 2004 | Reversal of Prior Period Charges | Cash Utilization | Non–Cash Utilization | Balance January 1, 2005 |
|---|---|---|---|---|---|---|
| | (in thousands) | | | | | |
| Severance and related expense | $ 15,326 | $ 37,999 | $ (1,985) | $ (30,822) | $ — | $ 20,518 |
| Moving of equipment | — | 981 | — | (981) | — | — |
| Asset write–downs and accelerated depreciation | — | 30,174 | — | — | (30,174) | — |
| Excess inventory | — | 1,453 | — | — | (1,453) | — |
| Purchase commitment | — | 1,610 | — | — | — | 1,610 |
| Other | — | 1,096 | — | (1,096) | — | — |
| Reserve on asset held–for–sale | 1,570 | — | (1,570) | — | — | — |
| Total | $ 16,896 | $ 73,313 | $ (3,555) | $ (32,899) | $ (31,627) | $ 22,128 |

36

Table of Contents

In the fourth quarter of 2002, Maytag announced that it would close its refrigeration manufacturing facility in Galesburg, Illinois by December 2004. It ceased production there in September 2004. In connection therewith, the Company recorded $36.5 million, $48.4 million and $67.1 million in 2004, 2003 and 2002, respectively, in pre–tax restructuring and related charges, including $33.0 million, $44.7 million and $32.8 million for asset impairments, accelerated depreciation and severance and related costs. The remaining $34.3 million charge in 2002 involved pension and postretirement health care benefit curtailments that were charged to the Accrued pension cost and Postretirement benefit liability on the Consolidated Balance Sheets. Cash expenditures related to the facility closing were $16.3 million and $8.0 million in 2004 and 2003, respectively. There were no cash expenditures in 2002. The closure of the facility has resulted in a workforce reduction of approximately 1,400 positions through the end of 2004. Hourly production workers held the majority of these positions. Approximately 90 positions with an associated distribution center remain, but are expected to be eliminated by the end of the first quarter of 2005. Refrigeration production has been moved to an existing facility in Amana, Iowa and a new factory in Reynosa, Mexico. Also, the manufacturing of certain other refrigeration products has been sourced to a third party. All of these charges were recorded within the Home Appliances segment.

In the second quarter of 2003, Maytag implemented a restructuring program consisting primarily of a salaried workforce reduction of 510 jobs. A pre–tax charge of $16.5 million was recorded in the second quarter of 2003, including $11.3 million of severance and related costs. The remaining $5.2 million charge was for early retirement incentives recorded as an increase in Accrued pension cost. Total cash expenditures related to this charge were approximately $0.2 million and $11 million in 2004 and 2003, respectively. The Company recorded $16.3 million and $0.2 million of these charges in the Home Appliances and Commercial Products segments, respectively.

In the first quarter of 2004, the Company sold a former cooking appliance manufacturing facility in Indianapolis, Indiana. In 1996, the Company had ceased production at the facility, classified the net assets as held–for–sale and reduced the property's carrying value to its estimated realizable value. The ultimate amount realized resulted in a $1.6 million reversal of the reserve recorded against those net assets. This reversal was netted against the pre–tax restructuring and related charges within the Home Appliances segment.

In the second quarter of 2004, the Company announced a comprehensive restructuring plan to consolidate the Hoover floor care, Maytag Appliances, and corporate headquarters organizations. Pre–tax restructuring and related charges of $34.9 million were recorded in 2004, primarily for severance and related costs as well as impaired assets. Cash expenditures in 2004 were $16.6 million. The restructuring plan will result in an overall workforce reduction of approximately 1,100 positions, of which 90 percent had been eliminated by the end of 2004. The remaining reductions are expected to be completed by the end of the first quarter of 2005. Nearly all of the expenses were recorded in the Home Appliances segment. The Company expects to incur total restructuring and related charges of $40 million related to this plan, with the remainder (approximately $5 million) to be incurred in 2005.

## Loss on Investments

In the fourth quarter of 2003, Maytag ceased funding the operations of a company with robotic technology for the floor care industry in which it had a remaining investment of $7.2 million accounted for under the equity method. Because of continuing projected negative cash flows, the investment would have required on–going financial support. Therefore, Maytag determined that the impairment of the investment was other than temporary and recorded the $7.2 million charge as a loss on investment in the Consolidated Statements of Operations.

## Asset Impairment

In the fourth quarter of 2003, Maytag negotiated a new union contract covering the employees at its North Canton, Ohio, facility, a primary location for floor care production. As a result of certain contract provisions, the Company exited a product line in the first quarter of 2004. Maytag recorded within the Home Appliances segment an $11.2 million non–cash impairment charge in the fourth quarter of 2003 for the assets employed in that product line. These assets were written down to fair value based on prices for similar assets.

37

Table of Contents
Goodwill and Other Intangibles

Goodwill and intangible assets deemed to have indefinite lives are subject to annual impairment tests. Maytag's policy for goodwill impairment testing is to calculate the fair value of reporting units on an annual basis in the fourth quarter. The fair value is calculated as the net present value of future cash flows that are determined from Maytag's annual business planning process. Because the commercial cooking reporting unit experienced significant unanticipated operating losses in the first half of 2004, the Company performed a goodwill impairment test based on present value of future cash flows in the second quarter. As a result of this test, goodwill in the commercial cooking business was reduced from $14.1 million to $4.5 million and Maytag recorded a $9.6 million charge for goodwill impairment related to the commercial cooking equipment business. The charge was reported as a separate line item in the Consolidated Statements of Operations and was recorded in the Commercial Products segment. During the fourth quarters of 2004, 2003 and 2002, Maytag performed the required impairment tests of goodwill across all reporting units and determined that no additional adjustment was necessary to the carrying value.

Maytag currently has no indefinite lived intangible assets other than goodwill. For intangibles that remain subject to amortization provisions, amortization expense is expected to be approximately $1.7 million per year for 2005 and 2006, $1.8 million for 2007, $1.9 million for 2008, and $1.1 million for 2009.

In 2001, the Company acquired Amana Appliances. The purchase contract contained a price adjustment mechanism that was ultimately settled in 2003, resulting in a payment to Maytag of $13.5 million. The $13.5 million settlement included $1.6 million of interest with the remaining $11.9 million of the settlement recorded as a reduction to the originally recorded $20.5 million of goodwill.

Inventories

Inventories consisted of the following:

|  | January 1 2005 | January 3 2004 |
|---|---|---|
|  | In thousands | |
| Raw materials | $ 86,416 | $ 76,024 |
| Work in process | 40,600 | 51,422 |
| Finished goods | 476,588 | 415,767 |
| Supplies | 11,791 | 9,423 |
| Total FIFO cost | 615,395 | 552,636 |
| Less excess of FIFO cost over LIFO | 100,074 | 84,291 |
| Inventories | $515,321 | $468,345 |

Inventory costs are determined by the last–in, first–out (LIFO) method for approximately 89 percent and 91 percent of the Company's inventories at January 1, 2005 and January 3, 2004, respectively.

A265

Table of Contents
Income Taxes

Deferred income taxes reflect the expected future tax consequences of temporary differences between the book carrying amounts and the tax basis of assets and liabilities. Deferred tax assets and liabilities consisted of the following:

|  | January 1 2005 | January 3 2004 |
|---|---|---|
|  | In thousands | |
| Deferred tax assets (liabilities): | | |
| Property, plant and equipment | $(126,633) | $(132,696) |
| Postretirement benefit liability | 204,610 | 200,427 |
| Product warranty/liability accruals | 75,829 | 56,451 |
| Pensions and other employee benefits | 155,605 | 124,410 |
| Advertising and sales promotion accruals | 8,219 | 7,836 |
| Capital losses | 38,574 | 32,650 |
| Other — net | 8,102 | 1,888 |
|  | 364,306 | 290,966 |
| Less valuation allowance for deferred tax assets | 55,016 | 44,096 |
| Net deferred tax assets | $ 309,290 | $ 246,870 |
| Recognized in Consolidated Balance Sheets: | | |
| Deferred tax assets — current | $ 55,862 | $ 63,185 |
| Deferred tax assets — noncurrent | 253,428 | 183,685 |
| Net deferred tax assets | $ 309,290 | $ 246,870 |

The Company has both recognized and unrecognized capital loss carryforwards for tax purposes. These capital losses can only be offset against capital gains and expire five years after they are realized. The Company has $102.2 million of capital loss carryforwards at January 1, 2005 that will begin to expire at December 31, 2006. The change in the valuation allowance in 2004 compared to 2003 shown in the table above resulted primarily from the generation of capital losses in 2004 with no tax benefit as well as U.S. losses with no tax benefit.

Components of the provision for income taxes consisted of the following:

|  | Year Ended | | |
|---|---|---|---|
|  | January 1 2005 | January 3 2004 | December 28 2002 |
|  | In thousands | | |
| Current provision (benefit): | | | |
| Federal | $(16,627) | $ (4,702) | $  26,719 |
| State | (979) | (1,586) | 2,654 |
| Foreign | 2,997 | 8,010 | (490) |
|  | (14,609) | 1,722 | 28,883 |
| Deferred provision (benefit): | | | |
| Federal | 5,629 | 50,524 | 64,714 |
| State | (1,936) | 6,781 | 6,926 |
| Foreign | (1,057) | (645) | — |
|  | 2,636 | 56,660 | 71,640 |
| Income tax expense (benefit) | $(11,973) | $ 58,382 | $  100,523 |

39

Table of Contents

The reconciliation of income tax expense (benefit) applying the United States federal statutory tax rate as compared to the Company's effective tax rate consisted of the following:

| | Year Ended | | |
|---|---|---|---|
| | January 1 2005 | January 3 2004 | December 28 2002 |
| Income tax expense (benefit) applying U.S. statutory rates to income (loss) before income taxes and minority interests: | $ (7,461) | $ 60,466 | $ 103,480 |
| Increase (reduction) resulting from: | | | |
| U.S. tax credits | (3,005) | (4,038) | (3,506) |
| Medicare reimbursement not subject to tax | (3,000) | — | — |
| Export sales U.S tax benefit | (2,950) | (2,450) | (3,257) |
| State income taxes, net of federal tax benefit | (1,840) | 3,377 | 6,176 |
| Difference between foreign and U.S. rates | (1,592) | (617) | 5 |
| Audit settlement | (1,166) | (1,824) | — |
| Difference due to minority interest | — | — | (2,281) |
| U.S. losses with no tax benefit | 6,016 | 2,672 | 819 |
| Generation/(utilization) of capital loss | 3,088 | 2,135 | (2,821) |
| Other—net | (63) | (1,339) | 1,908 |
| Income tax expense (benefit) | $(11,973) | $ 58,382 | $ 100,523 |

Maytag's income (loss) before taxes from foreign entities was $13.3 million, $9.6 million and $(3.8) million in 2004, 2003, and 2002, respectively. Since the Company plans to continue to finance expansion and operating requirements of subsidiaries outside the United States through reinvestment of the undistributed earnings of these subsidiaries (approximately $31.8 million at January 1, 2005), taxes that would result from potential distributions have only been provided on the portion of such earnings projected to be distributed in the future. If such earnings were distributed beyond the amount for which taxes have been provided, additional taxes payable would be eliminated substantially by available tax credits arising from taxes paid outside the United States.

Income tax refunds received, net of all federal, state and foreign taxes paid, during 2004 and 2003 were $34 million and $29 million, respectively. Federal, state and foreign income taxes paid, net of refunds received, during 2002 were $54 million. The cumulative tax effect of the minimum pension liability adjustment component of comprehensive income was $311.2 million and $255.3 million in 2004 and 2003, respectively. For 2004 and 2003, the tax effects of the cumulative foreign currency translation adjustment loss component of comprehensive income (loss) was recorded as a deferred tax asset with corresponding valuation allowance. For 2003, the tax effects of the cumulative
unrealized gain and loss on securities component of comprehensive income (loss) was recorded as a deferred tax liability with corresponding valuation allowance.

### Notes Payable

The Company had no notes payable outstanding as of January 1, 2005. At January 3, 2004, notes payable were $71.5 million and consisted of commercial paper borrowings. The weighted-average interest rate on commercial paper borrowings was 1.1 percent at January 3, 2004.

Maytag has a three-year $300 million credit agreement that expires March 5, 2007. The credit agreement includes financial covenants related to interest coverage and the ratio of debt to earnings before interest, taxes, depreciation and amortization. During 2004, Maytag obtained amendments to the credit agreement that provided it with additional flexibility for compliance with the financial covenants. The Company was in compliance with these covenants at the end of 2004 and expects to remain in compliance with these covenants in 2005 based on its current operating plans. However, if Maytag's business performance does not meet these expectations, Maytag may need to seek further amendments to the credit agreement. A failure to comply with the covenants in the credit agreement or any other event of default under the credit agreement

40

Table of Contents

would adversely impact Maytag's ability to borrow funds under the credit agreement or through the sale of commercial paper. As of January 1, 2005, there was no balance outstanding on this credit agreement.

Long–Term Debt

Long–term debt consisted of the following:

|  | January 1 2005 | | January 3 2004 |
| --- | --- | --- | --- |
|  | | In thousands | |
| Medium–term notes, maturing from 2005 to 2015, from 5% to 9.03% with interest payable semiannually | $       726,230 | $ | 643,230 |
| Public Income NotES, with interest payable quarterly: | | | |
| Due August 1, 2031 at 7.875% | 250,000 | | 250,000 |
| Employee stock ownership plan notes payable semiannually through July 2, 2004 at 5.13% | — | | 3,530 |
| Other | 2,381 | | 2,575 |
| Total | 978,611 | | 899,335 |
| Less current portion of long–term debt | 6,043 | | 24,503 |
| Long–term debt | $       972,568 | $ | 874,832 |

Interest paid on notes payable and long–term debt during 2004, 2003 and 2002 was $57.3 million, $65.0 million and $72.5 million, respectively. When applicable, the Company capitalizes interest incurred on funds used to construct property, plant and equipment. Interest capitalized during 2004, 2003 and 2002 was $0.9 million, $2.7 million and $1.1 million, respectively.

The aggregate maturities of long–term debt in each of the next five years and thereafter are as follows (in thousands): 2005—$6,043; 2006—$412,297; 2007—$8,000; 2008—$0; thereafter—$552,271.

In 2004, the Company issued $100 million in medium–term notes with a fixed interest rate of 6.45 percent due August 15, 2014.

In 2003, the Company issued $200 million in medium–term notes with a fixed interest rate of 5.0 percent due May 15, 2015.

The Public Income NotES grant the Company the right to call the notes, at par, upon 30 days' notice, after August 6, 2006.

The Company enters into interest rate swap contracts to exchange the interest rate payments associated with long–term debt to variable rate payments based on LIBOR plus an agreed upon spread. For additional disclosures regarding the Company's interest rate swap contracts, see "Financial Instruments" section in the Notes to Consolidated Financial Statements.

Accrued Liabilities

Accrued liabilities consisted of the following:

|  | January 1 2005 | | January 3 2004 |
| --- | --- | --- | --- |
|  | | In thousands | |
| Warranties | $       80,632 | $ | 74,873 |
| Advertising and sales promotion | 87,359 | | 70,797 |
| Other | 139,933 | | 100,265 |
| Accrued liabilities | $       307,924 | $ | 245,935 |

Other accrued liabilities primarily contain accruals for restructuring reserves, litigation, extended service plans, taxes, interest payable and insurance.

41

A268

Table of Contents
Warranty Reserve

Maytag provides a basic limited warranty for all of its major appliance, floor care and commercial products. Changes in warranty liability during fiscal 2004, 2003 and 2002 are as follows:

| Warranty reserve (in thousands) | Year ended | | |
| --- | --- | --- | --- |
| | January 1, 2005 | January 3, 2004 | December 28, 2002 |
| Balance at beginning of period | $    103,226 | $    100,489 | $    111,725 |
| Warranties accrued during the period | 126,908 | 115,032 | 108,416 |
| Settlements made during the period | (121,162) | (121,109) | (112,884) |
| Changes in liability for adjustments during the period, including expirations | 5,933 | 8,814 | (6,768) |
| Balance at end of period | $    114,905 | $    103,226 | $    100,489 |
| Warranty reserve–current portion | $    80,632 | $    74,873 | $    74,284 |
| Warranty reserve–noncurrent portion | 34,273 | 28,353 | 26,205 |
| Total warranty reserve at January 1, 2005 | $    114,905 | $    103,226 | $    100,489 |

In addition to the basic limited warranty, an optional extended warranty is offered to retail purchasers of the Company's major appliances. Sales of extended warranties are recorded as deferred revenue within accrued and noncurrent liabilities on the Consolidated Balance Sheet. Certain costs directly associated with sales of extended warranties are deferred within other current and noncurrent assets on the Consolidated Balance Sheet. The deferred revenue and associated costs are amortized into income on a straight–line basis over the length of the extended warranty contracts. Payments on extended warranty contracts are expensed as incurred.

Pension Benefits

The Company provides noncontributory defined benefit pension plans for most employees. Plans covering salaried, management and some nonunion hourly employees generally provide pension benefits that are based on an average of the employee's earnings and credited service. Plans covering union hourly and other nonunion hourly employees generally provide benefits of stated amounts for each year of service. The Company's funding policy for the plans is to contribute amounts sufficient to meet the minimum funding requirement of the Employee Retirement Income Security Act of 1974, plus any additional amounts that the Company may determine to be appropriate. In 2003, certain Maytag employees were given a one–time opportunity to transfer their pension to a cash balance pension plan. Approximately 45 percent of all the Company's employees participate in the cash balance plan.

A269

Table of Contents

The reconciliation of the beginning and ending balances of the projected benefit obligation, reconciliation of the beginning and ending balances of the fair value of plan assets, funded status of plans and amounts recognized in the Consolidated Balance Sheets consisted of the following:

| | January 1 2005 | | January 3 2004 |
|---|---|---|---|
| | | In thousands | |
| **Change in projected benefit obligation:** | | | |
| Benefit obligation at beginning of year | $ 1,624,709 | $ | 1,495,255 |
| Service cost | 28,887 | | 31,365 |
| Interest cost | 103,220 | | 101,479 |
| Amendments | (5,721) | | 820 |
| Actuarial loss | 177,537 | | 121,686 |
| Benefits paid | (127,485) | | (133,313) |
| Curtailments/settlements | (381) | | 5,854 |
| Other (foreign currency) | 1,080 | | 1,563 |
| Benefit obligation at end of year | 1,801,846 | | 1,624,709 |
| **Change in plan assets:** | | | |
| Fair value of plan assets at beginning of year | 1,044,777 | | 854,005 |
| Actual return on plan assets | 104,162 | | 129,134 |
| Employer contributions through measurement date | 224,472 | | 193,119 |
| Benefits paid | (127,485) | | (133,313) |
| Other (foreign currency) | 975 | | 1,832 |
| Fair value of plan assets at end of year | 1,246,901 | | 1,044,777 |
| Funded status of plan | (554,945) | | (579,932) |
| Unrecognized actuarial loss | 879,210 | | 725,179 |
| Unrecognized prior service cost | 49,051 | | 66,615 |
| Unrecognized transition assets | (233) | | (240) |
| Employer contributions subsequent to measurement date | — | | 130,000 |
| Net amount recognized | $ 373,083 | $ | 341,622 |

| | January 1 2005 | | January 3 2004 |
|---|---|---|---|
| | | In thousands | |
| Amounts recognized in the Consolidated Balance Sheets consisted of: | | | |
| Prepaid pension cost | $ 1,492 | $ | 1,666 |
| Intangible pension asset | 49,051 | | 66,615 |
| Accrued pension cost (net of contributions subsequent to measurement date) | (496,480) | | (398,495) |
| Accumulated other comprehensive income (pretax) | 819,020 | | 671,836 |
| Net pension asset | $ 373,083 | $ | 341,622 |

The cumulative tax effect of the minimum pension liability adjustment component of accumulated comprehensive income was $311.2 million and $255.3 million in 2004 and 2003, respectively. These were recorded as deferred tax assets on the Consolidated Balance Sheets. On a net of tax basis, the minimum pension liability components of accumulated comprehensive income within shareowners' equity were $507.8 million and $416.5 million as January 1, 2005 and January 3, 2004, respectively.

As allowed by FASB Statement No. 87, "Employers' Accounting for Pensions," the Company uses a September 30 measurement date to compute its minimum pension liability. Subsequent to the measurement date in 2003, Maytag made a cash contribution of $130 million to the pension plan that reduced accrued pension cost on the Consolidated Balance Sheets as of January 3, 2004.

Assumptions used in determining net periodic pension cost for the plans in the United States consisted of the following:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Discount rates | 6.50% | 7.00% | 7.50% |
| Rates of increase in compensation levels | | | |
| Salaried locations | 4.00% | 4.25% | 4.75% |
| Nonunion hourly locations | 3.00% | 3.00% | 3.25% |
| Expected long–term rate of return on assets | 8.75% | 8.75% | 9.00% |

43

Table of Contents

Maytag's overall expected long–term rate of return on assets is 8.75%. This is based on the asset allocation within the plan assets as well as the historical and future expected returns for each of the asset classes within the portfolio. The future expected returns on the asset classes are based on current market factors such as interest rates and expected market returns. Maytag determines the asset return component of pension expense on a market–related valuation of assets that smoothes actual returns and reduces year–to–year net periodic pension cost volatility. As of January 1, 2005, Maytag had cumulative asset losses of approximately $145 million, which remain to be recognized in the calculation of the market–related value of assets.

Assumptions used in determining projected benefit obligations for the plans in the United States consisted of the following:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Discount rates | 6.00% | 6.50% | 7.00% |
| Rates of increase in compensation levels |  |  |  |
| Salaried locations | 4.00% | 4.00% | 4.25% |
| Nonunion hourly locations | 3.00% | 3.00% | 3.00% |

Due to an increase in the fair market value of the assets in 2004, the under–funded status of the pension plan decreased from $579.9 million at January 3, 2004 to $554.9 million at January 1, 2005. This was partially offset by an increase in the pension benefit obligation. The fair market value of the assets increased due to employer contributions and gains on plan assets which more than offset benefit payments. The primary reasons for the increase in the pension benefit obligation were interest costs and $177.5 million in actuarial losses. The actuarial losses were primarily the result of a revision to the discount rate assumption.

The components of net periodic pension cost consisted of the following:

|  | Year Ended | | |
|---|---|---|---|
|  | January 1 2005 | January 3 2004 | December 28 2002 |
|  | | In thousands | |
| Components of net periodic pension cost: |  |  |  |
| Service cost | $ 28,887 | $ 31,365 | $ 33,352 |
| Interest cost | 103,220 | 101,479 | 96,902 |
| Expected return on plan assets | (114,413) | (100,939) | (96,580) |
| Amortization of transition assets | (26) | 2 | (163) |
| Amortization of prior service cost | 11,872 | 13,272 | 15,399 |
| Recognized actuarial loss | 33,865 | 19,000 | 3,651 |
| Curtailments/settlements | (381) | 5,791 | 26,284 |
| Net periodic pension cost | $ 63,024 | $ 69,970 | $ 78,845 |

Net periodic pension cost for 2003 included a curtailment charge of $5.2 million for early retirement incentives related to a salaried workforce reduction. Net periodic pension cost for 2002 included a curtailment charge of 26.3 million related to the announced closing of the Galesburg manufacturing facility (see "Restructuring Charges" section in the Notes to Consolidated Financial Statements).

The accumulated benefit obligation for all pension plans as of the 2004 and 2003 measurement dates was $1,741,747 and $1,571,534, respectively (in thousands).

| Pension plans with an accumulated benefit obligation in excess of plan assets | Year ended | |
|---|---|---|
|  | January 1 2005 | January 3 2004 |
|  | (in thousands) | |
| Projected benefit obligation | $ 1,801,846 | $ 1,624,709 |
| Accumulated benefit obligation | 1,741,747 | 1,571,534 |
| Fair value of plan assets | 1,246,901 | 1,044,777 |

44

A271

Table of Contents

Maytag employs a total investment return approach whereby a mix of equity and debt securities are used to maximize the long–term return of plan assets for a prudent level of risk. The investment portfolio contains a diversified blend of equity and debt securities. Furthermore, equity investments are diversified across domestic and international stocks as well as large and small capitalizations. Investment risk is measured and monitored on an ongoing basis through quarterly investment portfolio reviews, annual liability measurements and periodic asset/liability studies. The target allocation of equity securities is 68 percent of the plan assets. The target allocation of debt securities is 32 percent of the plan assets. The asset allocation as of the measurement date reflects the target allocation.

Below is a table summarizing Maytag's expected future pension benefit payments over the next ten years (in thousands):

| | |
|---|---:|
| 2005 | $ 138,072 |
| 2006 | 137,241 |
| 2007 | 141,469 |
| 2008 | 141,702 |
| 2009 | 142,894 |
| 2010 to 2014 | 746,101 |

In 2005, Maytag plans to make approximately $100 million in voluntary contributions to the pension plan.

**Postretirement Benefits**

The Company provides postretirement health care and life insurance benefits for certain employee groups in the United States. Most of the postretirement plans are contributory and contain certain other cost sharing features such as deductibles and coinsurance. The plans are unfunded and these benefits are subject to change. Death benefits for certain retired employees are funded as part of, and paid out of, pension plans.

The reconciliation of the beginning and ending balances of the accumulated benefit obligation, the unfunded status of plans and the amounts recognized in the Consolidated Balance Sheets consisted of the following:

| | January 1 2005 | January 3 2004 |
|---|---:|---:|
| | In thousands | |
| Change in accumulated benefit obligation: | | |
| Benefit obligation at beginning of year | $ 793,250 | $ 729,202 |
| Service cost | 10,531 | 20,137 |
| Interest cost | 43,077 | 46,539 |
| Actuarial loss | 164,085 | 82,648 |
| Curtailments | (236) | — |
| Amendments | (87,500) | (35,400) |
| Benefits paid | (57,610) | (49,876) |
| Benefit obligation at end of year | 865,597 | 793,250 |
| Change in plan assets: | | |
| Fair value of plan assets at beginning of year | — | — |
| Employer contributions | 57,610 | 49,876 |
| Benefits paid | (57,610) | (49,876) |
| Fair value of plan assets at end of year | — | — |
| Unfunded status of plan | (865,597) | (793,250) |
| Unrecognized actuarial loss | 437,307 | 289,079 |
| Unrecognized prior service benefit | (103,705) | (33,934) |
| Postretirement benefit liability | $ (531,995) | $ (538,105) |

New collective bargaining agreements at the North Canton, Ohio, floor care production facility and the Newton, Iowa, laundry production facility, effective in 2004, provided for the elimination of postretirement medical benefits for affected employees on a transitional basis. Maytag also recorded a decrease in ongoing postretirement medical expenses associated with the Galesburg, Illinois refrigeration production facility. In 2003, Maytag eliminated the postretirement benefits for salaried employees. The impact of these changes in benefits is reflected in the amendments and unrecognized prior service benefits in the above table. This benefit will be amortized and recognized as a reduction in expense in current and future years.

45

A272

Table of Contents

As allowed by FASB Statement No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," the Company uses a September 30 measurement date to compute its postretirement benefit liability.

Assumptions used in determining net periodic postretirement benefit cost consisted of the following:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Health care cost trend rates (1): | | | |
| Current year | 8.00% | 10.0% | 6.50% |
| Rate to which the cost trend rate is assumed to decline (ultimate trend rate) | 5.00% | 5.00% | 5.00% |
| Year in which the ultimate trend rate is reached | 2007 | 2007 | 2005 |
| Discount rates | 6.50% | 7.00% | 7.50% |

(1)    Weighted–average annual assumed rate of increase in the per capita cost of covered benefits.

Assumptions used in determining accumulated benefit obligation consisted of the following:

| | 2004 | 2003 |
|---|---|---|
| Health care cost trend rates (1): | | |
| Next fiscal year | 10.00% | 8.00% |
| Rate to which the cost trend rate is assumed to decline (ultimate trend rate) | 5.00% | 5.00% |
| Year in which the ultimate trend rate is reached | 2010 | 2007 |
| Discount rates | 6.00% | 6.50% |

(1)    Weighted–average annual assumed rate of increase in the per capita cost of covered benefits.

The actuarial losses of $164.1 million and $82.6 million in the reconciliation of the 2004 and 2003 accumulated benefit obligation primarily represent the impact of the change in the assumptions described above. The plans were amended in 2004, 2003 and 2002 to include additional cost–sharing features for employees.

The components of net periodic postretirement cost consisted of the following:

| | Year Ended | | |
|---|---|---|---|
| | January 1, 2005 | January 3, 2004 | December 28, 2002 |
| | In thousands | | |
| Components of net periodic postretirement cost: | | | |
| Service cost | $ 10,531 | $ 20,137 | $   17,973 |
| Interest cost | 43,077 | 46,539 | 36,114 |
| Amortization of prior service benefit | (17,730) | (7,030) | (1,234) |
| Recognized actuarial loss | 15,622 | 11,063 | — |
| Curtailment (gains) losses | (237) | — | 8,073 |
| Net periodic postretirement cost | $ 51,263 | $ 70,709 | $   60,926 |

Net periodic postretirement medical expense decreased in 2004 as the result of new collective bargaining agreements described above and the decrease in postretirement medical expenses associated with the closing of the refrigeration production facility in Galesburg, Illinois. Maytag's adoption of FSP 106–b in conjunction with the change in Medicare prescription drug coverage further reduced these costs (see "Impact of Recently Issued Accounting Standards" section in the Notes to Consolidated Financial Statements). The net periodic postretirement cost in 2002 included a curtailment charge related to the announced closing of the Galesburg facility (see "Restructuring and Related Charges" section in the Notes to Consolidated Financial Statements).

The assumed health care cost trend rates have a significant effect on the amounts reported for the health care plans. The effect of a one–percentage–point change in assumed health care cost trend rates consisted of the following:

| | 1–Percentage–Point Increase | 1–Percentage–Point Decrease |
|---|---|---|
| | In thousands | |
| Increase/(decrease) in total postretirement service and interest cost components | $ 6,779 | $    (6,049) |
| Increase/(decrease) to postretirement benefit obligation | 86,906 | (78,318) |

A273

Table of Contents

Below is a table summarizing Maytag's expected future postretirement benefit payments over the next ten years (in thousands):

| | | |
|---|---|---|
| 2005 | $ | 60,000 |
| 2006 | | 61,000 |
| 2007 | | 64,000 |
| 2008 | | 67,000 |
| 2009 | | 69,000 |
| 2010 to 2014 | | 345,000 |

## Leases

The Company leases real estate, machinery, equipment and automobiles under operating leases, some of which have renewal options. Generally, the Company's leases do not have contingent rentals, significant restrictions or penalties or residual value guarantees. Generally, Maytag's real estate leases do not contain termination rights and therefore, the Company may be required to attempt to sublease a facility it vacates. Rental expense for operating leases amounted to $36.9 million, $34.3 million, and $33.3 million for 2004, 2003, and 2002, respectively.

Future minimum lease payments for operating leases as of January 1, 2005 consisted of the following:

| Year Ending | In thousands | |
|---|---|---|
| 2005 | $ | 31,312 |
| 2006 | | 26,792 |
| 2007 | | 20,080 |
| 2008 | | 13,548 |
| 2009 | | 8,906 |
| Thereafter | | 25,417 |
| Total minimum lease payments | $ | 126,055 |

## Financial Instruments

The Company uses foreign currency exchange forward contracts to manage the currency exchange risk related to sales denominated in foreign currencies. The counterparties to the contracts are high credit quality international financial institutions. Forward contracts used by the Company primarily include contracts for the exchange of Canadian dollars to U.S. dollars to hedge the sale of appliances manufactured in the United States and sold to customers in Canada. The fair values of the contracts gave rise to a loss of $4.8 million as of January 1, 2005, and a loss of $3.5 million as of January 3, 2004. The cumulative decline in the fair value of these contracts is recorded in Other accrued liabilities on the Consolidated Balance Sheets. The gains and losses on contracts were not significant in 2004 and 2002. In 2003, a $5.9 million loss was recorded from foreign currency exchange rate fluctuation. As of January 1, 2005 and January 3, 2004, the Company had open foreign currency forward contracts, all with maturities of less than twelve months, in the amount of $108.5 million and $131.2 million, respectively.

The Company periodically uses commodity swap agreements to manage the risk related to changes in the underlying prices for direct and indirect materials used in the manufacture of its products. The fair value of these contracts approximated cost as of January 1, 2005 and a gain of $1.3 million as of January 3, 2004 was recognized in Other current assets on the Consolidated Balance Sheets. For 2004, 2003 and 2002, $1.2 million of losses, $0.7 million of gains, and $0.5 million of losses, respectively from these contracts were recognized in Other–net in the Consolidated Statement of Operations. As of January 1, 2005 and January 3, 2004, the Company had open commodity swap contracts, all with maturities of less then twelve months, in the amount of $4.3 million and $3.5 million respectively.

The Company uses interest rate swap contracts to adjust the proportion of total debt that is subject to variable and fixed interest rates. To manage associated cost of this debt, the Company enters into interest rate swaps, in which the Company agrees to exchange, at specified intervals, the difference between interest amounts calculated by reference to an agreed upon notional principal amount. These swap contracts are used to hedge the fair value of certain medium term notes. The contracts are a perfect hedge as their terms, interest rates and payment dates exactly match the underlying debt. At January 1, 2005 and January 3, 2004, the Company had outstanding interest rate swap agreements with notional amounts totaling $450 million and $375 million, respectively. Under these agreements, the Company receives weighted average fixed interest rates of 6.46 percent and pays floating interest rates based on LIBOR rates plus an agreed upon spread, or a weighted average interest rate of 6.27 percent, as of January 1, 2005. Maytag had interest rate swaps designated as fair value hedges of underlying fixed

47

A274

Table of Contents

rate debt obligations with a fair market value as of January 1, 2005 and January 3, 2004 of $5.0 million and $8.8 million less than the initial fair value, respectively, with the change due mainly to increases in interest rates. The fair value of the hedge instruments and the underlying debt obligations are reflected as Other noncurrent liabilities and a reduction of Long–term debt on the Consolidated Balance Sheets, respectively, with equal and offsetting unrealized gains and losses in the Interest expense component in the Consolidated Statements of Operations. Payments made or received are recognized in Interest expense.

Financial instruments that subject the Company to concentrations of credit risk primarily consist of accounts receivable from customers. The majority of the Company's sales are derived from the Home Appliances segment that sells predominantly to retailers. These retail customers range from major national chains to independent retail dealers and distributors. In some instances, the Company retains a security interest in the product sold to customers. The assessed credit risk for existing accounts receivable is provided for in the allowance for doubtful accounts.

The Company used various assumptions and methods in estimating fair value disclosures for financial instruments. The carrying amounts of cash and cash equivalents, accounts receivable and notes payable approximated their fair value due to the short maturity of these instruments. The fair values of long–term debt were estimated based on quoted market prices, if available, or quoted market prices of comparable instruments. The fair values of interest rate swaps, foreign currency contracts and commodity swaps were estimated based on amounts the Company would pay to terminate the contracts at the reporting date.

The carrying amounts and fair values of the Company's financial instruments, consisted of the following:

|  | January 1, 2005 | | January 3, 2004 | |
|---|---|---|---|---|
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|  | In thousands | | | |
| Cash and cash equivalents | $ 164,276 | $ 164,276 | $ 6,756 | $ 6,756 |
| Accounts receivable | 629,901 | 629,901 | 596,832 | 596,832 |
| Notes payable | — | — | (71,491) | (71,491) |
| Long–term debt | (978,611) | (1,014,286) | (899,335) | (944,292) |
| Interest rate swaps–non–trading | (4,967) | (4,967) | (8,751) | (8,751) |
| Foreign currency contracts | (4,838) | (4,838) | (3,499) | (3,499) |
| Commodity swap contracts | (34) | (34) | 1,278 | 1,278 |

For additional disclosures regarding the Company's notes payable and long term debt, see the "Notes Payable" and "Long–Term Debt" sections in the Notes to Consolidated Financial Statements.

Stock Plans

In 2002, the shareowners approved the 2002 Employee and Director Stock Incentive Plan that authorizes the issuance of up to 3.3 million shares of common stock of which no more than 0.5 million shares may be granted as restricted stock, freestanding Stock Appreciation Rights, performance shares or other awards. The Board of Director's Compensation Committee establishes the vesting period and terms of stock options granted. Generally, the options become exercisable one to three years after the date of grant and have a maximum term of 10 years. There are stock options outstanding that were granted under previous plans with terms similar to the 2002 plan. Stock options granted under a previous Non–Employee Directors' Stock Option Plan are immediately exercisable upon grant and generally have a maximum term of five years.

In the event of a change of Company control, all outstanding stock options become immediately exercisable under the above described plans. There were 696,441 and 1,462,347 shares available for future stock grants under the 2002 plan at January 1, 2005 and January 3, 2004, respectively.

The Company has elected to follow APB 25, "Accounting for Stock Issued to Employees," and recognizes no compensation expense for stock options as the option price under the plan equals or is

48

Table of Contents

greater than the fair market value of the underlying stock at the date of grant. Pro forma information regarding net income and earnings per share is required by FASB Statement No. 123, "Accounting for Stock–Based Compensation," and has been determined as if the Company had accounted for its employee stock options under the fair value method of that Statement. The fair value of these stock options was estimated at the date of grant using a Black–Scholes option pricing model. For a table showing the effect on net income (loss) and earnings (loss) per share if the Company had applied the fair value recognition provision of FASB Statement No. 123, see "Summary of Significant Accounting Policies" section in the Notes to Consolidated Financial Statements.

The Company's weighted–average assumptions consisted of the following:

|  | 2004 | 2003 | 2002 |
|---|---|---|---|
| Risk–free interest rate | 3.89% | 3.50% | 3.52% |
| Dividend yield | 3.84% | 2.75% | 2.55% |
| Stock price volatility factor | 0.38 | 0.38 | 0.35 |
| Weighted–average expected life (years) | 5 | 5 | 5 |
| Weighted–average fair value of options granted–stock price equals grant price | $5.47 | $7.63 | $7.64 |

For purposes of pro forma disclosures, the estimated fair value of options granted is amortized to expense over the options' vesting period.

Stock option activity consisted of the following:

|  | Average Price | Option Shares |
|---|---|---|
| Outstanding December 29, 2001 | 32.16 | 8,674,446 |
| Granted–stock price equals grant price | 27.18 | 834,750 |
| Exercised | 21.44 | (1,101,875) |
| Canceled or expired | 38.04 | (647,519) |
| Outstanding December 28, 2002 | 32.65 | 7,759,802 |
| Granted–stock price equals grant price | 25.93 | 1,040,600 |
| Exercised | 16.52 | (90,047) |
| Canceled or expired | 41.26 | (705,383) |
| Outstanding January 3, 2004 | 31.20 | 8,004,972 |
| Granted–stock price equals grant price | 20.29 | 714,800 |
| Exercised | 18.17 | (165,880) |
| Canceled or expired | 34.21 | (508,276) |
| Outstanding January 1, 2005 | 30.31 | 8,045,616 |
| Exercisable options: |  |  |
| December 28, 2002 | 35.11 | 5,061,748 |
| January 3, 2004 | 32.98 | 5,513,604 |
| January 1, 2005 | 32.20 | 6,222,987 |

Information with respect to stock options outstanding and stock options exercisable as of January 1, 2005 consisted of the following:

|  | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| $17.63–$24.86 | 1,673,470 | 5.0 | 19.18 | 998,922 | 18.69 |
| $25.25–$26.65 | 1,584,131 | 8.4 | 25.86 | 461,814 | 25.56 |
| $27.34–$35.56 | 3,032,071 | 5.5 | 29.94 | 3,017,573 | 29.94 |
| $40.47–$47.21 | 1,727,985 | 4.5 | 45.39 | 1,716,719 | 45.40 |
| $56.88–$70.94 | 27,959 | 4.1 | 57.25 | 27,959 | 57.25 |
|  | 8,045,616 |  |  | 6,222,987 |  |

A276

Table of Contents

In 2004, the Company issued restricted stock units to certain executives, a portion of which vests and is exercisable based on Maytag's stock price three years from the date of grant with the remaining units exercisable three years from the date of grant. The stock units allow the holder to convert one stock unit into one common share at exercise. The fair value of $4.0 million was calculated based on the market value of the stock units at the date of grant and is being amortized as expense ($0.1 million incurred in 2004) over the three–year vesting period. As of January 1, 2005, there were 203,300 of these restricted stock units outstanding.

In 2003, the Company issued restricted stock units to various directors in conjunction with the termination of a director pension plan. The stock units allow the holder to convert one stock unit into one common share at the later of retirement or age 70. All of these stock units are vested and dividends are paid out in the form of additional stock units. The fair value of $2.7 million was recognized as expense based on the fair market value of the stock units at the date of grant. As of January 1, 2005, there were 62,075 of these restricted stock units outstanding.

Employee Stock Ownership Plan

The Company established an Employee Stock Ownership Plan (ESOP) and a related trust issued debt and used the proceeds to acquire shares of the Company's stock for future allocation to ESOP participants. ESOP participants generally consist of all United States employees except certain groups covered by a collective bargaining agreement. The remaining ESOP debt was paid in 2004. The Company had guaranteed the ESOP debt and reflected it on the Consolidated Balance Sheets as Long–term debt with an offsetting amount shown in the Shareowners' equity section on the Consolidated Balance Sheets. Dividends earned on the allocated and unallocated ESOP shares were used to service the debt. The Company was obligated to make annual cash contributions to the ESOP trust to the extent the dividends earned on the shares were less than debt service requirements. As the debt was repaid, shares were released and allocated to plan participants based on the ratio of the current year debt service payment to the total debt service payments over the life of the loan. If the shares released were less than the shares earned by the employees, the Company contributed additional shares to the ESOP trust to meet the shortfall. Following repayment of the ESOP debt, Maytag is required to make monthly contributions to the trust based on its employer matching obligation. All shares held by the ESOP trust are considered outstanding for earnings per share computations and dividends earned on the shares are recorded as a reduction to retained earnings. In 2004, the ESOP was merged into Maytag's Salaried Savings Plan; and Maytag uses treasury shares to match a portion of the employee's contribution.

The ESOP shares held in trust consisted of the following:

|  | January 1 2005 | January 3 2004 |
|---|---|---|
| Original shares held in trust: |  |  |
| Released and allocated | 2,857,143 | 2,667,937 |
| Unreleased shares (fair value; 2003—$5,248,574) | — | 189,206 |
|  | 2,857,143 | 2,857,143 |
| Additional shares contributed and allocated | 1,883,474 | 1,487,940 |
| Shares withdrawn | (2,025,277) | (1,436,087) |
| Total shares held in trust | 2,715,340 | 2,908,996 |

50

Table of Contents

The components of the total contribution to the ESOP trust consisted of the following:

| | Year Ended | | |
| --- | --- | --- | --- |
| | January 1 2005 | January 3 2004 | December 28 2002 |
| | In thousands | | |
| Debt service requirement | $ 7,332 | $ 7,652 | $ 3,983 |
| Dividends earned on ESOP shares | (2,074) | (1,983) | (1,014) |
| Cash contribution to ESOP trust | 5,258 | 5,669 | 2,969 |
| Fair market value of additional shares contributed | 7,831 | 8,587 | 8,194 |
| Total contribution to ESOP trust | $13,089 | $ 14,256 | $ 11,163 |

The components of expense recognized by the Company for the ESOP contribution consisted of the following:

| | Year Ended | | |
| --- | --- | --- | --- |
| | January 1 2005 | January 3 2004 | December 28 2002 |
| | In thousands | | |
| Contribution classified as interest expense | $ 272 | $ 654 | $ 453 |
| Contribution classified as compensation expense | 12,817 | 13,602 | 10,710 |
| Total expense for the ESOP contribution | $13,089 | $ 14,256 | $ 11,163 |

51

A278

Table of Contents
**Shareowners' Equity**

The share activity of the Company's common stock consisted of the following:

| | Year Ended | | |
| | January 1 2005 | January 3 2004 | December 28 2002 |
|---|---|---|---|
| | | In thousands | |
| **Common stock** | | | |
| Balance at beginning and end of period | 117,151 | 117,151 | 117,151 |
| **Treasury stock** | | | |
| Balance at beginning of period | (38,411) | (38,863) | (40,287) |
| Purchase of common stock for treasury | — | (43) | — |
| Stock issued under stock option plans | 166 | 90 | 1,102 |
| Stock issued under restricted stock awards, net | — | — | (31) |
| Additional ESOP shares issued | 396 | 378 | 353 |
| Other | 112 | 27 | — |
| Balance at end of period | (37,737) | (38,411) | (38,863) |

During 2003, the Company repurchased shares at a cost of $1 million from a nonqualified benefit plan.

Pursuant to a Shareholder Rights Plan approved by the Company's Board of Directors in 1998, each share of common stock carries with it one Right. Until exercisable, the Rights are not transferable apart from the Company's common stock. When exercisable, each Right entitles its holder to purchase one one-hundredth of a share of preferred stock of the Company at a price of $165. The Rights will only become exercisable if a person or group acquires 20 percent (which may be reduced to not less than 10 percent at the discretion of the Board of Directors) or more of the Company's common stock. In the event the Company is acquired in a merger or 50 percent or more of its consolidated assets or earnings power are sold, each Right entitles the holder to purchase common stock of either the surviving or acquired company at one-half its market price. The Rights may be redeemed in whole by the Company at a purchase price of $0.01 per Right. The preferred shares will be entitled to 100 times the aggregate per share dividend payable on the Company's common stock and to 100 votes on all matters submitted to a vote of shareowners. In 2004, the Company amended the Plan so that the Shareholder Rights Plan expires on December 31, 2005.

**Supplementary Expense Information**

Advertising costs and research and development expenses consisted of the following:

| | Year Ended | | |
| | January 1 2005 | January 3 2004 | December 28 2002 |
|---|---|---|---|
| | | In thousands | |
| Advertising costs | $      126,899 | $      140,971 | $      150,374 |
| Research and development expenses | 98,194 | 106,931 | 110,554 |

52

Table of Contents
Earnings (Loss) Per Share

The following table sets forth the components for computing basic and diluted earnings (loss) per share:

|  | Year Ended | | |
|---|---|---|---|
|  | January 1 2005 | January 3 2004 | December 28 2002 |
|  |  | In thousands | |
| Numerator for basic and diluted earnings (loss) per share—income (loss) from continuing operations | $ (9,345) | $114,378 | $ 191,401 |
| Numerator for basic and diluted earnings (loss) per share—discontinued operations | $   339 | $  5,755 | $   (2,607) |
| Numerator for basic and diluted earnings (loss) per share—net income (loss) | $ (9,006) | $120,133 | $ 188,794 |
| Denominator for basic earnings (loss) per share—weighted–average shares | 79,078 | 78,537 | 77,735 |
| Effect of dilutive securities: | | | |
| Stock option plans | — | 209 | 769 |
| Denominator for diluted earnings per share—adjusted weighted–average shares | 79,078 | 78,746 | 78,504 |

In 2004, the effect of stock options (0.2 million shares) were antidilutive and, therefore, not included in the calculation of diluted earnings (loss) per share. For additional disclosures regarding stock plans, see the "Stock Plans" section in the Notes to Consolidated Financial Statements.

Environmental Remediation

The operations of the Company are subject to various federal, state and local laws and regulations intended to protect the environment, including regulations related to air and water quality and waste handling and disposal. The Company has received notices from the U.S. Environmental Protection Agency (EPA), state agencies and/or private parties seeking contribution, that it has been identified as a "potentially responsible party" (PRP), under the Comprehensive Environmental Response, Compensation and Liability Act, and may be required to share in the cost of cleanup with respect to such sites. The Company's ultimate liability in connection with those sites may depend on many factors, including the volume of material contributed to the site, the number of other PRPs and their financial viability, and the remediation methods and technology to be used. The Company also has responsibility, subject to specific contractual terms, for environmental claims for assets or businesses that have previously been sold.

While it is possible the Company's estimated undiscounted obligation of approximately $6.4 million for future environmental costs may change in the near term, the Company believes the outcome of these matters will not have a material adverse effect on its consolidated financial position, results of operations or cash flows. The accrual for environmental liabilities is reflected in Other noncurrent liabilities on the Consolidated Balance Sheets. Recoveries of environmental remediation costs from other parties are recorded as assets when their receipt is realized. Within this accrual, Maytag has one environmental case in the latter stages of a remediation plan that it has filed with the EPA. While the Company believes the $2.7 million reserve is adequate, the estimated range of costs of remediation is between $0.4 million and $6.7 million.

Commitments and Contingencies

In the normal course of its business, the Company is involved in contractual disputes, environmental, administrative and legal proceedings and investigations of various types. Some of the legal proceedings include claims for substantial compensatory or exemplary damages or claims for indeterminate amounts of damages. Although any litigation, proceeding or investigation has an element of uncertainty, the Company believes, after taking into account legal counsel's present evaluation of

53

Table of Contents

such actions, that the outcome of any proceeding, lawsuit or claim which is pending or threatened, or all of them combined, will not have a material adverse impact on its consolidated financial condition.

At January 1, 2005, the Company has outstanding commitments for capital expenditures of $29.8 million. As of January 1, 2005, the Company had approximately $61.3 million in stand–by letters of credit to back workers compensation claims, extended service plans and other business items in the event Maytag fails to fund these obligations.

Maytag has entered into long–term purchase agreements for various key raw materials and finished products. The minimum purchase obligations covered by these agreements aggregate approximately $19 million for each of the periods 2005 to 2006, $14 million for each of the periods 2007 and 2008, and $6 million for 2009 and for periods thereafter. Maytag made purchases in conjunction with these agreements of $35.5 million, $27.3 million, and $10.6 million in 2004, 2003 and 2002, respectively.

In connection with the normally recurring examination by the Internal Revenue Service (IRS) of Maytag's federal income tax returns for 1998 through 2001, the IRS has proposed adjustments to its income and tax credits that would result in additional tax. One of the proposed adjustments relates to a transaction originally entered in 1997 of which certain tax benefits have continued to be recognized through 2004. These benefits were originally recognized in part, in 2001, after the conclusion of a previous IRS examination. Maytag disagrees with most of the proposed adjustments and plans to contest all the disputed adjustments through the appropriate levels of appeals, if necessary. The outcome of these tax related matters is not expected to have a materially adverse effect on the Company's consolidated financial position, results of operations, or cash flows.

In 2003, a $12.1 million judgment (composed of $2.1 million compensatory and $10 million punitive damages) was entered against Amana Company, L.P, the entity from which Maytag purchased the Amana businesses in 2001. The case involved the termination of a Commercial distributorship for Amana products prior to Maytag's acquisition of the Amana business. In May 2004, the 8th Circuit Court
of Appeals upheld the earlier judgment. As a result, Maytag recorded a charge of $10.5 million in the second quarter of 2004, increasing the reserve to cover this matter to $12.8 million. The charge is disclosed as a separate line item in the Consolidated Statements of Operations and is reflected in Other noncurrent liabilities on the Consolidated Balance Sheets. Maytag is pursuing an appeal of this decision.

Pretax charges of $33.5 million were recorded in Home Appliances in 2004 in connection with product–related litigation, primarily involving early generation front–load washers. An $18.5 million charge was recorded in the second quarter and a $15 million charge was recorded in the fourth quarter following court approval of a settlement relating to litigation filed in the United States and receipt of preliminary claim data. The settlement includes a fixed $8.25 million for attorney fees and contingent amounts based on an estimate of administrative costs and anticipated repair and reimbursement expenses. The additional charge in the fourth quarter reflects the most current estimate of costs of settlement of the U.S. litigation based on statistical sampling of claims received to date. The estimate is subject to fluctuations in claim volume, claim amount, claim type, claim validity and takeup rates related to purchase credits and potential exposure related to front–load litigation in Canada that was not resolved by the U.S. settlement. The claim periods in the U.S. settlement remain open until the third quarter of 2005 and the settlement is the subject of an appeal. Adjustments may be recorded as additional information becomes available. The Company, based on the information available at this time, is unable to determine a range of total possible costs. The charge is disclosed as a separate line item in the Consolidated Statements of Operations and the accrual is reflected in Accrued liabilities on the Consolidated Balance Sheets.

Maytag has matters pending before the Consumer Product Safety Commission, including a previously announced recall of cooking products and an inquiry concerning a floor care product. Based on the information currently available, the Company does not believe that either of these matters will have a material impact on its consolidated financial position, results of operation or cash flows.

Segment Reporting

In the third quarter of 2004, Maytag changed its segment reporting to reflect a reorganization

54

A281

Table of Contents

announced in the second quarter. Segment information in these financial statements has been reclassified for comparative purposes to reflect the reporting change.

Maytag has two reporting segments: Home Appliances and Commercial Products. Its Home Appliances segment manufactures and sells major appliances and floor care products that are sold primarily to major national retailers and independent retail dealers in North America and targeted international markets. This segment services major appliances manufactured by the Company and by other major appliance manufacturers. This segment also services floor care products manufactured by Maytag. The Company's Commercial Products segment manufactures and sells vending equipment and commercial cooking products. These products are sold primarily to distributors and soft drink bottlers in North America and targeted international markets.

The Company's reportable segments are distinguished by the nature of products manufactured and sold and types of customers.

The Company evaluates performance and allocates resources to reportable segments primarily based on operating income. The accounting policies of the reportable segments are the same as those described in the summary of significant policies except that the Company allocates pension expense associated with its pension plan to each reportable segment while recording the pension assets and liabilities in the Home Appliances segment. In addition, the Company records its federal and state deferred tax assets and liabilities in the Home Appliances segment. Intersegment sales are not significant.

Financial information for the Company's reportable segments consisted of the following:

| | Year Ended | | |
|---|---|---|---|
| | January 1 2005 | January 3 2004 | December 28 2002 |
| | In thousands | | |
| **Net sales** | | | |
| Home Appliances | $ 4,458,696 | $ 4,498,655 | $ 4,377,485 |
| Commercial Products | 262,842 | 293,211 | 288,546 |
| Consolidated total | $ 4,721,538 | $ 4,791,866 | $ 4,666,031 |
| **Operating income (loss)** | | | |
| Home Appliances | $  47,465 | $  212,274 | $  341,528 |
| Commercial Products | (7,117) | 16,019 | 17,967 |
| Consolidated total | $  40,348 | $  228,293 | $  359,495 |
| **Capital expenditures** | | | |
| Home Appliances | $  90,342 | $  192,191 | $  215,952 |
| Commercial Products | 4,078 | 7,109 | 13,812 |
| Consolidated total | $  94,420 | $  199,300 | $  229,764 |
| **Depreciation and amortization** | | | |
| Home Appliances | $  162,666 | $  159,603 | $  158,715 |
| Commercial Products | 7,116 | 6,182 | 4,993 |
| Consolidated total | $  169,782 | $  165,785 | $  163,708 |
| **Goodwill, net** | | | |
| Home Appliances | $  253,863 | $  253,863 | $  265,802 |
| Commercial Products | 5,550 | 15,150 | 15,150 |
| Total for reportable segments | $  259,413 | $  269,013 | $  280,952 |
| **Total assets** | | | |
| Home Appliances | $ 2,896,916 | $ 2,753,914 | $ 2,848,545 |
| Commercial Products | 123,108 | 134,715 | 117,600 |
| Total for reportable segments | 3,020,024 | 2,888,629 | 2,966,145 |
| Discontinued operations | — | 135,511 | 138,104 |
| Consolidated total | $ 3,020,024 | $ 3,024,140 | $ 3,104,249 |

55

A282

Table of Contents

In 2004, the Company recorded restructuring and related charges in operating income of $69.8 million with $69.4 million and $0.4 million in Home Appliances and Commercial Products, respectively. The Home Appliances segment also recorded a charge of $33.5 million for front–load washer litigation and a $9.7 million gain on sale of property. The Commercial Products segment recorded a charge of $9.6 million for goodwill impairment.

In 2003, the Company recorded restructuring and related charges in operating income of $64.9 million with $64.7 million and $0.2 million in Home Appliances and Commercial Products, respectively. The Home Appliances segment also recorded charges for asset impairment of $11.2 million and a loss on investment of $7.2 million.

In 2002, application of the nonamortization provisions of FASB Statement No. 142, "Goodwill and Other Intangible Assets," effective for fiscal years beginning after December 15, 2001, resulted in an increase in operating income of $9.1 million and $0.9 million for Home Appliances and Commercial Products, respectively. In 2002, the Company recorded restructuring and related charges of $67.1 million and an $8.3 million gain on the sale of a distribution center in operating income of Home Appliances. Home Appliances included a full year of net sales from Amana that was acquired effective August 1, 2001. Maytag integrated Amana activities within its existing appliance organization during 2002, and Amana's 2002 earnings were not distinguishable.

For additional disclosures regarding the restructuring and related charges, see the "Restructuring and Related Charges" section in the Notes to Consolidated Financial Statements. The Home Appliances segment assets include such items as deferred tax assets, intangible pension assets and other assets.

During 2002, Maytag finalized the valuation of Amana's net assets that were purchased, in 2001. As a result, $20.5 million of goodwill was recorded in 2002. The purchase contract contained a price adjustment mechanism that was ultimately settled in 2003, resulting in an $11.9 million reduction to the originally recorded goodwill.

The reconciliation of segment profit to consolidated income (loss) from continuing operations before income taxes and minority interests consisted of the following:

| | Year Ended | | |
| --- | --- | --- | --- |
| | January 1 2005 | January 3 2004 | December 28 2002 |
| | | In thousands | |
| Total operating income for reportable segments | $ 40,348 | $228,293 | $ 359,495 |
| Interest expense | (56,274) | (52,763) | (62,390) |
| Loss on investment | — | (7,185) | — |
| Adverse judgment on pre–acquisition distributor lawsuit | (10,505) | — | — |
| Other—net | 5,113 | 4,415 | (1,449) |
| Income (loss) from continuing operations before income taxes and minority interests | $(21,318) | $172,760 | $ 295,656 |

56

A283

Table of Contents

Financial information related to the Company's continuing operations by geographic area consisted of the following:

|  | Year Ended | | |
|---|---|---|---|
|  | January 1 2005 | January 3 2004 | December 28 2002 |
|  | In thousands | | |
| Net sales |  |  |  |
| United States | $ 4,149,139 | $ 4,289,314 | $ 4,191,399 |
| Other countries | 572,399 | 502,552 | 474,632 |
| Consolidated total | $ 4,721,538 | $ 4,791,866 | $ 4,666,031 |

|  | Year Ended | | |
|---|---|---|---|
|  | January 1 2005 | January 3 2004 | December 28 2002 |
|  | In thousands | | |
| Long-lived assets |  |  |  |
| United States | $ 858,718 | $ 995,250 | $ 1,046,263 |
| Other countries | 62,444 | 51,685 | 19,845 |
| Consolidated total | $ 921,162 | $ 1,046,935 | $ 1,066,108 |

Net sales are attributed to countries based on the location of customers. Long-lived assets consist of total property, plant and equipment. Sales to Sears, Roebuck and Co. represented 13%, 15% and 13% of consolidated net sales in 2004, 2003 and 2002, respectively. Sales to Home Depot represented 10% of consolidated net sales in 2004. These customer sales are all within the Home Appliances segment. Within the Commercial Products segment, the Company's vending equipment sales are dependent upon a few major soft drink suppliers. The loss of one or more of these large customers could have a significant adverse effect on the Commercial Products segment.

The Company uses basic raw materials such as steel, copper, aluminum, rubber and plastic in its
manufacturing processes in addition to purchased motors, compressors, timers, valves and other components. These materials are supplied by established sources and the Company anticipates that such sources will, in general, be able to meet its future requirements.

The number of employees of the Company in the Home Appliances segment as of January 1, 2005 and January 3, 2004 were 16,900 and 19,630, respectively. Approximately 40 percent of these employees were covered by collective bargaining agreements as of January 1, 2005 and January 3, 2004, respectively. The number of employees of the Company in the Commercial Products segment as of January 1, 2005 and January 3, 2004 were 1,100 and 1,240, respectively.

A284

Table of Contents
Quarterly Results of Operations (Unaudited)

The unaudited quarterly results of operations consisted of the following:

|  | 4th Quarter* | 3rd Quarter | 2nd Quarter | 1st Quarter |
|---|---|---|---|---|
|  |  | In thousands, except per share data | | |
| **2004** |  |  |  |  |
| Net sales | $ 1,164,347 | $ 1,186,018 | $ 1,152,229 | $ 1,218,944 |
| Gross profit | 142,707 | 157,888 | 148,503 | 211,121 |
| Income (loss) from continuing operations (1), (2), (3) & (4) | (14,120) | 7,135 | (41,084) | 38,724 |
| Basic earnings (loss) per share | (0.18) | 0.09 | (0.52) | 0.49 |
| Diluted earnings per (loss) share | (0.18) | 0.09 | (0.52) | 0.49 |
| Net income (loss) (1), (2), (3), (4) & (5) | (14,120) | 7,474 | (41,084) | 38,724 |
| Basic earnings (loss) per share | (0.18) | 0.09 | (0.52) | 0.49 |
| Diluted earnings (loss) per share | (0.18) | 0.09 | (0.52) | 0.49 |
| **2003** |  |  |  |  |
| Net sales | $ 1,271,700 | $ 1,221,267 | $ 1,162,893 | $ 1,136,006 |
| Gross profit | 224,400 | 220,998 | 214,013 | 200,120 |
| Income from continuing operations (6) & (7) | 18,943 | 35,318 | 25,519 | 34,598 |
| Basic earnings per share | 0.24 | 0.45 | 0.33 | 0.44 |
| Diluted earnings per share | 0.24 | 0.45 | 0.32 | 0.44 |
| Net income (6), (7) & (8) | 23,853 | 36,565 | 25,234 | 34,481 |
| Basic earnings per share | 0.30 | 0.47 | 0.32 | 0.44 |
| Diluted earnings per share | 0.30 | 0.46 | 0.32 | 0.44 |

---

\*    The 4th quarter of fiscal 2003 consisted of 14 weeks compared to 13 weeks in all other quarters presented.

(1)    Includes restructuring charges of $5.4 million ($8.0 million pre-tax), $18.8 million ($27.9 million pre-tax), $12.9 million ($19.1 million pre-tax) and $10.0 ($14.8 million pre-tax) for the first, second, third and fourth quarters of 2004, respectively.

(2)    The second quarter of 2004 includes a $9.6 million ($9.6 million pre-tax) goodwill impairment, a $12.5 million ($18.5 million pre-tax) charge related to front-load washer litigation and a $7.1 million ($10.5 million pre-tax) charge related to an adverse judgment on a pre-acquisition distributor lawsuit.

(3)    The third quarter of 2004 includes a $7.8 million ($9.7 million pre-tax) gain on sale of property.

(4)    The fourth quarter of 2004 includes a $10.1 million ($15.0 million pre-tax) charge related to front-load washer litigation.

(5)    Includes the results of discontinued operations that were a $0.3 million gain in the third quarter of 2004.

(6)    Includes restructuring charges of $6.2 million ($9.4 million pre-tax), $18.8 million ($27.9 million pre-tax), $8.8 million ($13.1 million pre-tax) and $9.8 ($14.5 million pre-tax) for the first, second, third and fourth quarters of 2003, respectively.

(7)    The fourth quarter of 2003 includes a $7.6 million ($11.2 million pre-tax) asset impairment and a $7.2 million ($7.2 million pre-tax) loss on investments.

(8)    Includes the results of discontinued operations that were a $.1 million loss, $0.3 million loss, $1.2 million gain and $4.9 million gain for the first, second, third and fourth quarters of 2003, respectively.

A285

Table of Contents

**Item 9.**     Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

None

**Item 9A.**     Controls and Procedures.

*Disclosure Controls and Procedures*

As required by Rule 13a–15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company's management carried out an evaluation, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures, as of the end of the last fiscal quarter. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of January 1, 2005, the Company's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Company (including its consolidated subsidiaries) in the reports the Company files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.

*Internal Control Over Financial Reporting*

*Scope of Management's Report on Internal Control Over Financial Reporting*

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a–15(f) under the Exchange Act. As required by Rule 13a–15(c) under the Exchange Act, the Company's management carried out an evaluation, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of its internal control over financial reporting as of the end of the last fiscal year. The framework on which such evaluation was based is contained in the report entitled "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Report").

*Management's Assessment of the Effectiveness of the Company's Internal Control over Financial Reporting*

Based upon the evaluation described above under the framework contained in the "COSO Report", the Company's management concluded that the Company's internal control over financial reporting was effective as of January 1, 2005.

Ernst & Young LLP, the Company's independent registered public accounting firm, have issued an attestation report on the Company's Management's Assessment of the Effectiveness of the Company's Internal control over Financial Reporting as of January 1, 2005. This attestation report is included at page 23 of this Form 10–K.

59

Table of Contents

PART III

Item 10.    Directors and Executive Officers of the Registrant.

Information concerning directors and officers included in the definitive Proxy Statement of the Company for the Annual Meeting of Stockholders scheduled to be held on May 12, 2005 (the "Proxy Statement") is incorporated herein by reference. Additional information concerning executive officers of the Company is included under "Executive Officers of the Registrant" included in Part I, Item 4.

Audit Committee Financial Expert

The Company has determined that Neele E. Stearns, Jr., chairman of the Audit Committee of the Board of Directors, qualifies as an "audit committee financial expert" as defined in Item 401 (h) of Regulation S-K, and that Mr. Stearns is "independent" as the term is used in Item 7(d)(3)(iv) of Schedule 14A under the Securities Exchange Act.

Code of Business Conduct

The Company has adopted a Code of Business Conduct applicable to all employees. This Code is applicable to Senior Financial Executives including the principal executive officer, principal financial officer and principal accounting officer of the Company. Maytag's Code of Business Conduct is available on the Company's Web site at www.Maytagcorp.com under "About Maytag Corporation—Corporate Governance." The Company intends to post on its web site any amendments to, or waivers from its Code of Business Conduct applicable to Senior Financial Executives.

Item 11.    Executive Compensation.

Information concerning executive compensation included in the Proxy Statement is incorporated herein by reference; provided that the information contained in the Proxy Statement under the heading "Compensation Committee Report on Executive Compensation" is specifically not incorporated herein by reference. Information concerning director compensation included in the Proxy Statement is incorporated herein by reference, provided that the information contained in the Proxy Statement under the headings "Shareholder Return Performance" and "Other Matters" is specifically not incorporated herein by reference.

Item 12.    Security Ownership of Certain Beneficial Owners and Management.

The security ownership of certain beneficial owners and management is incorporated herein by reference from the Proxy Statement. Information as of January 1, 2005 concerning compensation plans for which equity securities of the Company are authorized for issuance is incorporated herein by reference to the information contained under the heading "Equity Compensation Plan Information" in the Proxy Statement.

Item 13.    Certain Relationships and Related Transactions.

Information concerning certain relationships and related transactions is incorporated herein by reference from the Proxy Statement.

Item 14.    Principal Accounting Fees and Services

This information is in the Proxy Statement under the heading "Independent Registered Public Accounting Firm Information" and is incorporated by reference.

PART IV

Item 15.    Exhibits, Financial Statement Schedules

(a) (1) and (2) The response to this portion of Item 15 is submitted as a separate section of this report in the "List of Financial Statements and Financial Statement Schedules" on page 62.

(3) The response to this portion of Item 15 is submitted as a separate section of this report in the "List of Exhibits" on pages 63 through 65.

(b) Exhibits—The response to this portion of Item 15 is submitted as a separate section of this report in the "List of Exhibits" on pages 63 through 65.

(c) Financial Statement Schedules—The response to this portion of Item 15 is submitted as a separate section of this report in the "List of Financial Statements and Financial Statement Schedules" on page 62.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15 (d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

MAYTAG CORPORATION

(Registrant)

/s/ Ralph F. Hake

Ralph F. Hake
Chairman and Chief Executive Officer
Director

Pursuant to the requirement of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the date indicated.

| | |
|---|---|
| /s/ George C. Moore | /s/ Roy A. Rumbough, Jr. |
| George C. Moore<br>Executive Vice President and<br>Chief Financial Officer | Roy A. Rumbough, Jr.<br>Vice President and Controller |
| /s/ Barbara R. Allen | /s/ Howard L. Clark Jr. |
| Barbara R. Allen<br>Director | Howard L. Clark, Jr.<br>Director |
| /s/ Lester Crown | /s/ Ralph F. Hake |
| Lester Crown<br>Director | Ralph F. Hake<br>Director, Chairman and Chief Executive Officer |
| /s/ Wayland R. Hicks | /s/ William T. Kerr |
| Wayland R. Hicks<br>Director | William T. Kerr<br>Director |
| /s/ James A. McCaslin | /s/ W. Ann Reynolds |
| James A. McCaslin<br>Director | W. Ann Reynolds<br>Director |
| /s/ Bernard G. Rethore | /s/ Neele E. Stearns, Jr. |
| Bernard G. Rethore<br>Director | Neele E. Stearns, Jr.<br>Director |
| /s/ Fred G. Steingraber | |
| Fred G. Steingraber<br>Director | |

A288

Table of Contents

ANNUAL REPORT ON FORM 10–K

Item 15(a)(1), (2) and (3), (c) and (d)

LIST OF FINANCIAL STATEMENTS AND FINANCIAL STATEMENT SCHEDULES

LIST OF EXHIBITS

FINANCIAL STATEMENT SCHEDULES

Year Ended January 1, 2005

MAYTAG CORPORATION
NEWTON, IOWA

FORM 10–K—ITEM 15(a)(1), (2) AND ITEM 15(d)

MAYTAG CORPORATION

LIST OF FINANCIAL STATEMENTS AND FINANCIAL STATEMENT SCHEDULES

The following consolidated financial statements and supplementary data of Maytag Corporation and subsidiaries are included in Part II, Item 8:

| | Page |
|---|---|
| Management's Report on Internal Control Over Financial Reporting | 22 |
| Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting | 23 |
| Reports of Independent Registered Public Accounting Firm | 24 |
| Consolidated Statements of Operations—Fiscal Years 2004, 2003 and 2002 | 25 |
| Consolidated Balance Sheets—January 1, 2005 and January 3, 2004 | 26 |
| Consolidated Statements of Shareowners' Equity (Deficit)—Fiscal Years 2004, 2003 and 2002 | 28 |
| Consolidated Statements of Comprehensive Income (Loss)—Fiscal Years 2004, 2003 and 2002 | 30 |
| Consolidated Statements of Cash Flows—Fiscal Years 2004, 2003 and 2002 | 31 |
| Notes to Consolidated Financial Statements | 32 |
| Quarterly Results of Operations—Fiscal Years 2004 and 2003 | 58 |

The following consolidated financial statement schedule of Maytag Corporation and subsidiaries is included in Item 15(d):

| | |
|---|---|
| Schedule II   Valuation and Qualifying Accounts | 66 |

All other schedules for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are not required under the related instructions or are inapplicable and therefore have been omitted.

A289

Table of Contents

FORM 10–K—ITEM 14(a) (3) AND ITEM 14(c)
MAYTAG CORPORATION
LIST OF EXHIBITS

The following exhibits are filed herewith or incorporated by reference. Items indicated by (1) are considered a compensatory plan or arrangement required to be filed pursuant to Item 14 of Form 10–K.

| Exhibit Number | Description of Document | Incorporated Herein by Reference to | Filed with Electronic Submission |
|---|---|---|---|
| 3(a) | Restated Certificate of Incorporation of Registrant. | 1993 Annual Report on Form 10–K | |
| 3(b) | Certificate of Amendment of Restated Certificate of Incorporation | Quarterly Report on Form 10–Q for the quarter ended June 30, 2003, Exhibit 3. | |
| 3(c) | Certificate of Designations of Series A Junior Participating Preferred Stock of Registrant. | 1988 Annual Report on Form 10–K. | |
| 3(d) | Certificate of Increase of Authorized Number of Shares of Series A Junior Participating Preferred Stock of Registrant. | 1988 Annual Report on Form 10–K. | |
| 3(d) | Certificate of Amendment to Certificate of Designations of Series A Junior Participating Preferred Stock of Registrant. | 1997 Annual Report on Form 10–K | |
| 3(f) | By–Laws of Registrant, as amended through August 12, 2004. | Report on Form 8–K dated November 18, 2004. | |
| 4(a) | Rights Agreement dated as of February 12, 1998 between Registrant and Harris Trust and Savings Bank. | Form 8–A dated February 12, 1998, Exhibit 1. | |
| 4(b) | Letter to Shareholders dated February 12, 1998 relating to the adoption of a shareholders rights plan with attachments. | Current Report on Form 8–K dated February 12, 1998, Exhibit 1. | |
| 4(c) | Amendment to Rights Agreement dated as of November 15, 2004 between Registrant and Harris Trust and Savings Bank, as Rights Agent. | Form 8–A/A dated November 18, 2004. | |
| 4(d) | Indenture dated as of June 15, 1987 between Registrant and The First National Bank of Chicago. | Quarterly Report on Form 10–Q for the quarter ended June 30, 1987. | |
| 4(e) | First Supplemental Indenture dated as of September 1, 1989 between Registrant and The First National Bank of Chicago. | Current Report on Form 8–K dated Sept. 28, 1989, Exhibit 4.3. | |
| 4(f) | Second Supplemental Indenture dated as of November 15, 1990 between Registrant and The First National Bank of Chicago. | Current Report on Form 8–K dated November 29, 1990. | |
| 4(g) | Third Supplemental Indenture dated as of August 20, 1996 between Registrant and The First National Bank of Chicago. | Current Report on Form 8–K dated August 20, 1996. | |
| 4(h) | Fifth Supplemental Indenture dated as of June 3, 1999 between Registrant and The First National Bank of Chicago. | Current Report on Form 8–K dated June 3, 1999, Exhibit 4.1. | |

63

| Exhibit Number | Description of Document | Incorporated Herein by Reference to | Filed with Electronic Submission |
|---|---|---|---|
| 4(i) | Eighth Supplemental Indenture dated as of August 8, 2001 between the Registrant and Bank One, National Association, formerly known as The First National Bank of Chicago. | Current Report on Form 8–K dated August 9, 2001, Exhibit 4.1. | |
| 4(j) | Ninth Supplemental Indenture dated as of October 30, 2001 between the Registrant and Bank One, National Association. | Current Report on Form 8–K dated October 31, 2001, Exhibit 4.1. | |
| 4(k) | Credit Agreement Dated as of March 5, 2004 among Registrant, the lenders party thereto and Bank One, NA, as administrative agent for the lenders. | Quarterly Report on Form 10–Q for the quarter ended April 3, 2004, Exhibit 4.1. | |
| 4(l) | Aggregate Commitment Increase Agreement dated April 1, 2004. | Quarterly Report on Form 10–Q for the quarter ended April 3, 2004, Exhibit 4.2. | |
| 4(m) | First Amendment to Credit Agreement dated as of March 5, 2004 among Registrant, the lenders party thereto and Bank One, NA, as administrative agent for the lenders. | Quarterly Report on Form 10–Q for the quarter ended July 3, 2004, Exhibit 4(a). | |
| 4(n) | Second Amendment to Credit Agreement dated as of March 5, 2004 among Registrant, the lenders party thereto and Bank One, NA as administrative agent for the lenders. | Current Report on Form 8–K dated October 8, 2004, Exhibit 4.01. | |
| 10(a1) | Three–year and Two–year Change of Control Agreements dated April 2002(1). | 2001 Annual Report on Form 10–K | |
| 10(b) | 1989 Non–Employee Directors Stock Option Plan (1). | Exhibit A to Registrant's Proxy Statement dated March 18, 1990. | |
| 10(c) | 1992 Stock Option Plan for Executives and Key Employees (1). | Exhibit A to Registrant's Proxy Statement dated March 16, 1992. | |
| 10(d) | Directors Deferred Compensation Plan (1). | Amendment No. 1 on Form 8 dated April 5, 1990 to 1989 Annual Report on Form 10–K. | |
| 10(e) | 1996 Employee Stock Incentive Plan (1). | Exhibit A to Registrant's Proxy Statement dated March 20, 1996. | |
| 10(f) | Maytag Deferred Compensation Plan, as amended and restated effective January 1, 1996 (1). | 1995 Annual Report on Form 10–K | |
| 10(g) | Directors Retirement Plan (1). | Amendment No. 1 on Form 8 dated April 5, 1990 to 1989 Annual Report on Form 10–K. | |
| 10(h) | 1998 Non–Employee Directors' Stock Option Plan (1). | Exhibit A to Registrant's Proxy Statement dated April 2, 1998. | |
| 10(i) | 2000 Employee Stock Incentive Plan (1). | Exhibit A to Registrant's Proxy Statement dated April 3, 2000. | |

64

A291

Table of Contents

| Exhibit Number | Description of Document | Incorporated Herein by Reference to | Filed with Electronic Submission |
|---|---|---|---|
| 10(j) | Maytag Corporation Deferred Compensation Plan (as adopted effective January 1, 2003) (As amended January 17, 2003) (1). | 2002 Annual Report on 10K, Exhibit 10(m). | |
| 10(k) | 2002 Employee and Director Stock Incentive Plan (as amended August 8, 2002) (1). | 2002 Annual Report on 10K, Exhibit 10(n). | |
| 10(l) | Form of Stock Option Award Agreement (1). | Current Report on Form 8–K dated November 18, 2004, Exhibit 1.01 (A). | |
| 10(m) | Form of Performance Unit Award Agreement (1). | Current Report on Form 8–K dated November 18, 2004, Exhibit 1.01 (B). | |
| 10(n) | Separation Agreement with William L. Beer (1) | Current Report on Form 8–K dated January 18, 2005, Exhibit 99.01. | |
| 10(o) | Separation Agreement with Thomas A. Briatico (1) | Current Report on Form 8–K dated January 18, 2005, Exhibit 99.02. | |
| 10(p) | Maytag Corporation Deferred Compensation Plan II (As Adopted Effective December 1, 2004) (1). | Current Report on Form 8–K dated December 6, 2004, Exhibit 1.01 (A). | |
| 10(q) | Maytag Corporation Supplemental Retirement Plan II (As Adopted Effective December 1, 2004) (1). | Current Report on Form 8–K dated December 6, 2004, Exhibit 1.01 (B). | |
| 10(r) | Summary of Non–employee Director Compensation (1). | | X |
| 21 | List of Subsidiaries of the Registrant. | | X |
| 23 | Consent of Independent Registered Public Accounting Firm. | | X |
| 31.1 | Certification by Ralph F. Hake, Chief Executive Officer, required by Rule 13a–14(a) or Rule 15d–14(a) of the Securities Exchange Act of 1934. | | X |
| 31.2 | Certification by George C. Moore, Chief Financial Officer required by Rule 13a–14(a) or Rule 15d–14(a) of the Securities Exchange Act of 1934. | | X |
| 32.1 | Certification by Ralph F. Hake, Chief Executive Officer pursuant to Section 1350 of Chapter 63 of Title 18 of the United States Code. | | X |
| 32.2 | Certification by George C. Moore, Chief Financial Officer pursuant to Section 1350 of Chapter 63 of Title 18 of the United States Code | | X |

65

A292

Table of Contents

S chedule II—Valuation And Qualifying Accounts
Maytag Corporation
Thousands of Dollars

| COL. A | COL. B | COL. C | | COL. D | COL. E |
|---|---|---|---|---|---|
| | | Additions | | | |
| Description | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts– Describe | Deductions– Describe | Balance at End of Period |
| **Year ended January 1, 2005** | | | | | |
| Allowance for doubtful accounts receivable | | | | $   3,701(2) (104)(3) | |
| | $ 15,752 | $ (2,477)(1) | $   — | $   3,597 | $ 9,678 |
| Deferred tax asset–valuation allowance | | | | | |
| | $ 44,096 | $10,064 | $   — | $   (856)(5) | $55,016 |
| **Year ended January 3, 2004** | | | | | |
| Allowance for doubtful accounts receivable | | | | $  12,174(2) (113)(3) | |
| | $ 24,451 | $ 3,362 | $   — | $  12,061 | $15,752 |
| Deferred tax asset–valuation allowance | | | | | |
| | $ 42,207 | $ 5,431 | $   — | $   3,542(5) | $44,096 |
| **Year ended December 28, 2002** | | | | | |
| Allowance for doubtful accounts receivable | | | | $  10,223(2) (6)(3) | |
| | $ 24,121 | $14,104 | $  (3,557)(4) | $  10,217 | $24,451 |
| Deferred tax asset–valuation allowance | | | | | |
| | $ 43,425 | $(1,341) | $   — | $   (123)(5) | $42,207 |

Footnotes:

(1)   Credit amount is a result of reversal of allowance for bad debt reserve

(2)   Uncollectible accounts written off

(3)   Effect of foreign currency translation

(4)   Result of acquisition of Amana effective August 1, 2001 and finalization of purchase accounting in 2002

(5)   Netted against tax effect on charges included in "Accumulated other comprehensive income" on the Consolidated Balance Sheet

66

A293

Exhibit 10(a1)

Change of control

The following executives are covered by this change of control agreement:

3–Year

Ralph F. Hake
George C. Moore
Roger K. Scholten
Mark Krivoruchka
Ernest Park
Thomas J. Piersa
Karen Lynn
James R. Caldwell
Robert C. Breese
Douglas Huffer

2–Year

Steve Benton
Paul Bognar
Annette Bravard
Robert Hardin
Stephen Ingham
Steve Klyn
Arthur Learmonth
Patricia Martin
Roy Rumbough
James Starkweather
Christopher Wignall

Exhibit 10(r)

MAYTAG CORPORATION BOARD OF DIRECTORS
COMPENSATION
2005

| | |
|---|---|
| Annual Retainer | $35,000 per annum |
| Meeting and Committee Fees | $2,500 per committee and board meeting |
| Committee Chair Fee | $5,000 per annum |
| Executive and Audit Committee Chair Fee | $7,000 per annum |
| Telephone Meeting or Attendance Via Telephone | $1,000 per meeting |
| Deferred Compensation Plan: | All non–employee directors may elect to defer all or a portion of their director's compensation. |
| Stock Options: | Each current director receives an option to purchase 3,000 shares of Maytag stock annually on the day after the Annual Meeting of Shareholders at the market value of the stock on that date, pursuant to the 2002 Employee and Director Stock Incentive Plan. Each new Director to receive 10,000 stock options when they join the Board; this grant would be in lieu of the normal first year grant. Option terms would be same as for current employees—vesting one–third of the grant each year. |
| Appliances: | Corporation products are available under the Directors' Appliance Program; Directors are taxed at the fair market cost. |

Exhibit 21

MAYTAG CORPORATION

List of Subsidiaries of the Registrant

The following schedule lists the subsidiaries of Maytag Corporation, a Delaware corporation, as of January 1, 2005.

| Corporate Name | State or Country of Organization |
|---|---|
| Maytag Sales Inc. | Delaware |
| Maytag Holdings, Inc. | Delaware |
| Dixie–Narco, Inc. | Delaware |
| Amana Financial Services, Inc. | Delaware |
| Amana Finance Partnership (50%) | Illinois |
| Maytag Foreign Sales Corporation | Virgin Islands |
| Maytag Services, LLC | Delaware |
| The Hoover Company | Delaware |
| The Hoover General, LLC | Delaware |
| The Hoover Limited, LLC | Delaware |
| Hoover Company I LP | Delaware |
| Maytag International, Inc. | Delaware |
| Maharashtra Investment, Inc. | Delaware |
| Maytag Manufacturing, LLC | Delaware |
| Maytag Mexico Appliance Products, S. de R.L. de C.V. | Mexico |
| Maytag Mexico Administration, S. de R.L. de C.V. | Mexico |
| Jade Products Company | Delaware |
| Maytag Comercial, S.de R.L. de C.V. | Mexico |
| Maytag Servicios, S.de R.L. de C.V. | Mexico |
| Hoover Holdings Inc. | Delaware |
| Juver Industrial S.A. de C.V. | Mexico |
| Maytag Limited | Canada |
| Maytag Europe Ltd. | United Kingdom |
| Maytag (Australia) Pty., Ltd. | Australia |
| Maytag Worldwide N.V. | Netherlands Antilles |
| Maytag International Investments, Inc. | Delaware |
| Anvil Technologies LLC | Delaware |

NOTE: Ownership in subsidiaries is 100% unless otherwise indicated.

Other subsidiaries in the aggregate would not constitute a significant subsidiary.

Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the Registration Statement Number 333–103688, Registration Statement Number 333–103687, Registration Statement Number 333–103685, Registration Statement Number 333–103683, Registration Statement Number 333–101995, Registration Statement Number 333–102002, Registration Statement Number 333–102001, Registration Statement Number 333–101998, Registration Statement Number 333–88186, Registration Statement Number 333–46752, Registration Statement Number 333–36054, Registration Statement Number 333–116445 and Registration Statement Number 333–121368 all on Form S–8 of Maytag Corporation and in the related Prospectus of our reports dated February 11, 2005, with respect to the consolidated financial statements and schedule of Maytag Corporation, Maytag Corporation management's assessment of the effectiveness of internal control over financial reporting, and the effectiveness of internal control over financial reporting of Maytag Corporation, included in this Annual Report (Form 10–K) for the year ended January 1, 2005.

/s/  Ernst & Young LLP

Chicago, Illinois
February 14, 2005

Exhibit 31.1

## CERTIFICATION REQUIRED BY RULE 13a–14(a) OR RULE 15d–14(a) OF THE SECURITIES EXCHANGE ACT OF 1934

I, Ralph F. Hake, certify that:

1. I have reviewed this annual report on Form 10–K of Maytag Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and we have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date and presented in this report our conclusions about effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report base on such evaluation; and

   d) disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of the annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over the financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 18, 2005

/s/   Ralph F. Hake
_____

Ralph F. Hake
Chairman and Chief Executive Officer

Exhibit 31.2

## CERTIFICATION REQUIRED BY RULE 13a–14(a) OR RULE 15d–14(a) OF THE SECURITIES EXCHANGE ACT OF 1934

I, George C. Moore, certify that:

1. I have reviewed this annual report on Form 10–K of Maytag Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and we have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date and presented in this report our conclusions about effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report base on such evaluation; and

   d) disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of the annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting: and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal controls over the financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

   a) all significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information: and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 18, 2005

/s/ George C. Moore

_____

George C. Moore
Chief Financial Officer

EXHIBIT 32.1

Certification Pursuant to Section 1350 of Chapter 63
Of Title 18 of the United States Code

I, Ralph F. Hake, the Chief Executive Officer of Maytag Corporation, certify that (i) the Form 10–K for the year ended January 1, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the foregoing report fairly presents, in all material respects, the financial condition and results of operations of Maytag Corporation.

/s/ Ralph F. Hake

Ralph F. Hake, Chief Executive Officer

February 18, 2005
Date

A300

EXHIBIT 32.2

**Certification Pursuant to Section 1350 of Chapter 63**
**Of Title 18 of the United States Code**

I, George C. Moore, the Chief Financial Officer of Maytag Corporation, certify that (i) the Form 10-K for the year ended January 1, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) the information contained in the foregoing report fairly presents, in all material respects, the financial condition and results of operations of Maytag Corporation.

/s/ George C. Moore

George C. Moore, Chief Financial Officer

February 18, 2005
Date

Created by 10KWizard Technology    www.10KWizard.com

A301