# UNREPORTED OPINIONS

Westlaw.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

Page 1

# H

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
CREO PRODUCTS INC., Plaintiff,
v.
PRESSTEK, INC., Defendant.
PRESSTEK, INC., Counterclaim Plaintiff,
v.
CREO PRODUCTS, INC., Counterclaim Defendant.
No. C.A. 99-525-GMS.

May 11, 2001.

Josy W. Ingersol, and Christian Douglas Wright, of Young Conway Stargatt & Taylor, LLP, Wilmington, Delaware, Robert G. Krupka, Boaz M. Brickman, and Mark H. Cohen, of Kirkland & Ellis, Los Angeles, California; Emily Bab, of Kirkland & Ellis, New York, New York, for Plaintiff and Counterclaim Defendant, of counsel.

David S. Eagle, and Denise S. Kraft, of Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Delaware, Daniel S. Ebenstein, Ira E. Silfin, and W. Scott McClave, of Amster, Rothstein & Ebenstein, New York, New York, for Defendant and Counterclaim Plaintiff, of counsel.

*MEMORANDUM OPINION*

SLEET, J.

## I. INTRODUCTION

*1 On August 12, 1999, Creo Products, Inc. ("Creo") filed a declaratory judgment action claiming that (1) two patents belonging to Presstek, Inc. ("Presstek"), U.S. Patent Nos. 5,163,368 ("the '368 patent") and 5,174,205 ("the '205 patent") are not enforceable and (2) that it does not infringe them. Presstek filed counterclaims on September 22, 1999, alleging contributory and inducing infringement. [FN1] The court has issued two *Markman* orders construing the patents at issue (D.I.64-65) and the case is set down for a five day bench trial to commence on June 25, 2001.

> FN1. Both parties timely answered and subsequently amended their pleadings.

Presently before the court are Creo's three motions for summary judgment. In its first motion (D.I.111), Creo first argues that the on-sale bar of 35 U.S.C. § 102(b) renders claims 1-4, 7, 16-19 of the '368 patent and claims 11, 15, 16, 23 and 26 of the '205 patent invalid. Creo also contends that Presstek's inequitable conduct before the Patent Trademark Office ("P.T.O.") makes the '368 and '205 patents unenforceable. Creo's second motion (D.I.107) seeks a declaration of non-infringement of both patents. Finally, in its third motion (D.I.92), Creo contends that since Presstek impermissibly broadened the '368 patent during reexamination before the P.T.O., it is invalid and unenforceable. [FN2] The first and second motions present genuine issues of material fact which will result in their denial. The court will take Creo's third motion for summary judgment under advisement. [FN3]

> FN2. Creo requested the P.T.O. reexamine both the '368 and the '205 patents. The P.T.O. issued Reexamination Certificates on August 24, 1999, and October 5, 1999, respectively. Since the court will not discuss the differences between the original '205 patent and the Reexamined '205 patent in detail, all references to the " '205 patent" and the " '368 patent" in this memorandum opinion refer to the reexamined patents unless otherwise indicated.

> FN3. As is explained below in section IIIC, the court declines to rule on any impermissible broadening of the original '368 patent on reexamination. Instead, the court will grant the outstanding requests for oral argument and hear counsel on this issue at a later point in the proceedings.

## II. STANDARD OF REVIEW

The court can only grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Atmel Corp. v. Information Storage Devices, Inc.,* 198 F.3d 1374, 1378 (Fed.Cir.1999). An issue is "genuine" if, based on the evidence, a reasonable jury could return a verdict in favor of the non-moving party. *See Pfizer Inc. v. Elan Pharmaceutical Research Corp.,* 812 F.Supp. 1352, 1358 (D.Del.1993) (citing *Anderson v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if, under the governing law, it might affect the outcome of the case. *See Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 61 F.Supp.2d 102, 106 (D.Del.1996) (citing same). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson*, 477 U.S. at 250; *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994). With these standard in mind, the court will address Creo's motions seriatim. [FN4]

> FN4. Since the court will issue findings of fact at the conclusion of the bench trial in this case, it declines to characterize the record at this point beyond pointing out issues relevant to the instant motions. As a result, this memorandum opinion does not contain a background section.

III. DISCUSSION

A. Creo's Motion on Invalidity and Unenforceability

1. The On-Sale Bar of 35 U.S.C. § 102(b)

*2 Creo asserts that Presstek violated 35 U.S.C. § 102(b) which prohibits granting a patent for an invention that was "on sale" in the United States more than one year before the patent application was filed. *See* 35 U.S.C. § 102(b). The "critical date" in a Section 102(b) inquiry is exactly one year before a patent application is filed. *See id.* The on-sale bar applies when two conditions are satisfied before the critical date of one year before the filing date of the application: (1) a product embodying the claimed invention is the subject of a commercial offer for sale and (2) the claimed invention is ready for patenting. *See Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998). A claimed invention is ready for patenting if it is reduced to practice or if there is "proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *See id.* Whether an invention was on sale more than one year before the patent's application date is a question of law for the court to decide based on underlying factual

determinations. *See Abbot Lab. v. Geneva Pharm., Inc.*, 182 F.3d 1315, 1317 (Fed.Cir.1999); *Ferag AG v. Quipp Inc.*, 45 F.3d 1562, 1566 (Fed.Cir.1995).

Since Presstek applied for the '368 and '205 patents on January 9, 1991, the relevant date for the court is January 9, 1990. Presstek's patents are invalid if, prior to that date, Presstek put the products at issue "on sale". In support of its motion, Creo first identifies two January 31, 1989 letter agreements between Presstek and Multigraphics. Next, it cites a January, 1989 draft agreement between Presstek and Multigraphics. Creo also highlights a statement by the head Research and Development for Heidelberg, Wolfgang Pfizenmaier, that Presstek offered for sale its Direct Imaging System for incorporation into Heidelberg's press. Finally, Creo points to a December 7, 1989 agreement between Presstek and Heidelberg.

The court's task, at this stage in the proceedings, is not to determine which party's view of the facts is more persuasive. Rather, the court should deny summary judgment if, based on the underlying facts, it finds that Creo has not established by clear and convincing evidence that "there was a definite sale or offer to sell more than one year before the application of the subject patent [s], and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *See STX, LLC v. Brine, Inc.*, 211 F.3d 588, 589 (Fed.Cir.2000) (internal quotations omitted) (citing cases).

As previously noted, the court may not find an on-sale bar unless convinced that Creo has satisfied the two prong test established by the Court in *Pfaff*. Initially, it does not appear that the first *Pfaff* condition has been satisfied. That is, it is not clear that there were definite offers for sale between Presstek and Multigraphics. The court will first look at the letter agreements between Multigraphics and Presstek. One of the January 31, 1999, letters appears to be for the sale of Eagle subassemblies and parts by Multigraphics for a press being developed by Presstek. The other letter discusses an agreement between Multigraphics and Presstek for incorporation of two Presstek systems into a Multigraphics Press. Although these agreements are signed, the court finds that Presstek has presented sufficient evidence at this stage in the proceedings to overcome Creo's § 102(b) contention. [FN5] For example, the schedules mentioned in the letter agreements, which appear to flesh out the terms and conditions, are not included in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the record. Furthermore, there is at least an issue of fact as to whether the letter which discusses Multigraphics providing Presstek with equipment is a "sale" or "offer" by Presstek. There are even more questions regarding the January, 1989 draft agreement between Presstek and Multigraphics. First, and most obviously, the agreement is a "draft". It was never signed or dated. Second, although the draft mentions (and includes) several schedules, they are all blank. Although Creo makes several arguments in an attempt to convince the court that these agreements trigger the on-sale bar, the record does not present a "clear and convincing" picture of the extent and nature of the interactions between Multigraphics and Presstek.

> FN5. In its opposition to Creo's motion, Presstek presents affidavits from Richard A. Williams and Robert Howard. The affidavits highlight several areas of dispute concerning Creo's arguments as to the on-sale bar. In its reply brief, Creo argues that the court should ignore these affidavits since they are "eleventh hour declarations", contradict prior statements by the witnesses, violate discovery practices, and are "self-serving." Creo has not, however, filed a motion to strike the affidavits. The court believes that these affidavits raise evidentiary issues more properly dealt with by motions in limine or trial objections. Even then, while the court need not decide the issue at this time, it is not clear that the testimony of the affidavits is properly excludable. For example, Creo maintains that Williams' and Howard's declaration contains parol evidence about the state of the Presstek/Multigraphics relationship. First, Howard's affidavit does not challenge or augment the terms of the agreement; it merely provides additional evidence clarifying the meaning of the agreement's terms. Second, as mentioned below, there is a question as to whether these agreements are actually integrated.

*3 The court next turns to Creo's evidence describing Presstek's relationship with Heidelberg. Creo offers the Pfizenmaier affidavit which claims that during an October, 1989 visit to Presstek, the company "offered to sell me [sic] its direct imaging system to Heidelberg." In response, Williams and Howard "flatly deny" that such a statement was ever made. Furthermore, Presstek asserts there are credibility issues surrounding the Pfizenmaier affidavit. In fact, Presstek recites some of the same arguments made by

Creo regarding the affidavits of Williams and Howard. [FN6] Finally, Creo states that the December 7, 1989, agreement between Presstek and Heidelberg was a "sale" or definite offer. The terms of the agreement, however, raise the possibility that the relationship between the parties was less mature. For example, the agreement states "[t]he purpose of these tests is to enable HEIDELBERG [sic] to *decide on cooperation* regarding joint development, manufacturing, and marketing of equipment utilizing the PRESSTEK [sic] Printing System." (emphasis added). Additionally, Williams and Howard characterize the agreement as nothing more than a "demonstration" which was intended to create "samples."

> FN6. Presstek asserts that Pfizenmaier's affidavit contradicts earlier testimony in an arbitration proceeding involving Presstek and Heidelberg. This alleged discrepancy only underscores the court's earlier observation that these issues are best resolved at trial.

As the above discussion demonstrates, there are genuine issues of material fact as to whether the four transactions identified by Creo satisfy the first prong of the *Pfaff* test. Although the court will not discuss the second *Pfaff* step in detail, it finds that Presstek has at least raised a 'scintilla' of evidence to suggest that the products that were the subject of the four transactions did not embody the technology at issue in this case. For example, Williams' affidavit states that "the devices which we had under development during 1988 and 1989, including our laboratory impression cylinder feasibility press, did not include the features or functions of the '368 or '205 Patent [sic] inventions, which were made after that period." [FN7] In response, Creo states that Williams' assertion contradicts testimony of other Presstek employees. The court agrees and concludes that this alleged difference is another of the reasons why it must deny Creo's motion.

> FN7. Williams' affidavit contains further averments that the technology that was the subject of the four transactions was not embodied in the products at issue. Indeed, Williams states that the image control system and surrounding techniques were not developed until 1990. Although much of Williams' affidavit compares the patent claims to the technology (something the court, as the finder of fact, ultimately must do), he does present a sufficient basis for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

Page 4

denial of Creo's motion.

2. Inequitable Conduct

An applicant for a patent commits inequitable conduct before the P.T.O. when he withholds or misrepresents information material to the patentability of his invention with an intent to deceive. See _J.P. Stevens & Co. v. Lex Tex Ltd._, 747 F.2d 1553, 1559-60 (Fed.Cir.1984). Inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive. See _Baxter Int'l, Inc. v. McGaw Inc._, 149 F.3d 1321, 1327 (Fed.Cir.1998) (citing _Nobelpharma AB v. Implant Innovations, Inc._, 141 F.3d 1059, 1068-71 (Fed.Cir.1998)). To establish unenforceability based on inequitable conduct the challenger must prove, by clear and convincing evidence, that material information was intentionally withheld for the purpose of misleading or deceiving the patent examiner. See _Allied Colloids, Inc. v. American Cyanamide Co._, 64 F.3d 1570, 1578 (Fed.Cir.1995).

*4 A determination of inequitable conduct requires a two step analysis. First, the trial court must determine whether the withheld information meets a threshold level of materiality. A reference is deemed material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. See _id.; see also Manville Sales Corp. v. Paramount Sys., Inc._, 917 F.2d 544, 552 (Fed.Cir.1990) (stating "materiality does not presume intent, which is a separate and essential component of inequitable conduct").

After considering whether withheld information is material, the trial court must next determine whether the evidence establishes a threshold level of intent to mislead the P.T.O.. See _Baxter_, 149 F.3d at 1327; _Hebert v. Lisle Corp._, 99 F.3d 1109, 1116 (Fed.Cir.1996) (stating that "[i]ntent to deceive can not be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent"). Thus, to satisfy the intent to deceive element of inequitable conduct, the conduct when viewed in light of all of the evidence (including evidence of good faith), must indicate sufficient culpability to require a finding of intent to deceive. See _Paragon Podiatry Laboratory, Inc. v. KLM Labs, Inc._, 984 F.2d 1182, 1189 (Fed.Cir.1993).

The initial determinations of materiality and intent to deceive are questions of fact. See _Halliburton Co. v. Schlumberger Tech. Corp._, 925 F.2d 1435, 1439 (Fed.Cir.1991). Once findings of fact are established, the court should then weigh the findings and their premises and decide, in the exercise of the court's discretion, whether to hold the patent is unenforceable. See _ATD Corp. v. Lydall, Inc._, 159 F.3d 534, 547 (Fed.Cir.1998). If a court decides that inequitable conduct has occurred with respect to one or more claims during prosecution of the patent application, the entire patent is unenforceable. See _Jack Frost Labs., Inc. v. Physicians & Nurses Mfg. Corp._, 901 F.Supp. 718, 729 (S.D.N.Y.1995), aff'd, 124 F.3d 299 (Fed.Cir.1997). In this case, Creo identifies several instances in which it believes that Presstek engaged in inequitable conduct before the P.T.O.. The court need only discuss these areas briefly since it finds that Creo has failed to meet its burden in each situation.

First, Creo alleges that Presstek's violation of the on-sale bar means that the products at issue became part of the prior art. Since Presstek had a duty to present the P.T.O. with all prior art references, Creo maintains that failure to do so is inequitable conduct. As mentioned above, the court finds there are genuine issues of material fact regarding the on-sale bar. Since Creo has failed to meet its burdens under _Pfaff_, it must follow that it fails to meet its burden of demonstrating inequitable conduct insofar as it relates to the on-sale bar.

Second, Creo points to Presstek's failure to tell the P.T.O. about a Securities and Exchange Commission ("S.E.C.") registration statement which identified the January 31, 1989 agreements with Multigraphics as material for Presstek's sales and marketing activity. According to Creo, "Presstek should not be heard to argue that although these sale agreements were deemed material enough for the S.E.C., the inventors actually believed they were not material enough for the P.T.O. during prosecution." As mentioned above, however, Presstek has presented a 'shred of evidence' to suggest that the subject matter of the Presstek/Multigraphics agreements was different than the '368 and the '205 patents. Thus, the court cannot conclude, on the record before it, that the only interpretation of Presstek's failure to notify the P.T.O. about the S.E.C. registration statement was that it intended to deceive.

*5 Creo's third alleged instance of inequitable conduct is that Presstek changed the names of the inventors of the '368 patent to mirror the inventors of a prior patent. [FN8] This argument is by negative

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

Page 5

inference. The prosecution history of the '368 patent reveals that the P.T.O. initially rejected several claims as obvious in light of the prior art. Presstek then removed the '211 patent from the prior art by changing the inventors of the '368 patent. In so doing, Presstek acted in accordance with 35 U.S.C. § 102(a), (e), (f), and (g). According to Creo, Presstek's change of the inventive entry of the '368 patent rather than attempting to overcome the prior art objections on the merits demonstrates an intent to deceive the P.T.O.. Although Presstek has not proffered an explanation as to why it changed the inventors of the '368 patent, doing so was consistent with § 102. The P.T.O. was aware of the switch of inventors and did not challenge Presstek's action. It appears to the court that Creo is attempting to paint conduct contemplated by § 102 and accepted by the P.T.O. (and Creo) as inequitable. [FN9] To find Presstek engaged in inequitable conduct for following the dictates of § 102 would present it with a Hobson's Choice; merely following § 102 could lead to a finding of inequitable conduct. Since Creo offers no evidence to suggest that the change of inventors either violated § 102 or did not conform to the fact of invention, the court declines to enter summary judgment on this issue.

> FN8. The patent referred to as "the prior patent" is U.S. Patent No. 4,936,211 ("the '211 patent"). Although Creo only made this argument explicit in the inequitable conduct section of its reply brief, it also made the identical argument regarding the on-sale bar. The court did not address it, however, since found that there were genuine issues of material fact as to whether the Presstek Imaging System was commercialized.

> FN9. For example, in its reply brief Creo states "... there is *nothing* in the record to deny that Williams, the other inventors or the prosecuting attorney were all on notice that the *Examiner* believed that the '211 patent was a material prior art reference to the '368 patent" (emphasis in original). This statement may be true but is beside the point. Although the P.T.O. may have considered the '211 patent prior art at some point in the prosecution, Presstek properly removed it. Subsequent to the change of inventors in the '368 patent, Creo does not point to anything in the record to suggest that the P.T.O. continued to believe the '211 patent was prior art.

The court finds that Creo has failed to carry its burden of demonstrating, by clear and convincing evidence, inequitable conduct by Presstek in prosecuting the '368 and '205 patents. Since there are genuine issues of material fact on the record--including the credibility of witnesses--the court cannot find Presstek engaged in conduct which would make the '205 and '368 patents invalid and unenforceable.

B. Creo's Motion for Non-Infringement

Creo's second motion for summary judgment is on Presstek's counterclaim for contributory or inducing infringement of the '205 and the '368 patents. As Creo correctly points out, Presstek must demonstrate that the Heidelberg presses incorporating Creo's direct press imaging system directly infringe the asserted patents. [FN10] Literal infringement of a claim occurs when every limitation [FN11] recited in the claim appears in the accused device, i.e., when "the properly construed claim reads on the accused device exactly". See *KJC Corp. v. Kinetic Concepts, Inc.,* 223 F.3d 1351, 1358 (Fed.Cir.2000). A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every limitation in the claim is literally or equivalently present in the accused device. See *Sage Products, Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423 (Fed.Cir.1997). A claim limitation is equivalently present in an accused device if only "insubstantial differences" distinguish the missing claim limitation from the corresponding elements of the accused device. See *id.* A determination of infringement, whether literal or under the doctrine of equivalents, is a factual matter normally reserved for a fact finder. See *Tate Access Floors, Inc. v. Maxcess Techs., Inc.,* 222 F.3d 958, 964 (Fed.Cir.2000). Although the court's *Markman* order construed various claims and limitations, the court will address only those aspects of the '205 and '368 patents which the parties discuss in their briefs in deciding the present motion.

> FN10. Although this may seem like an extra step, the heart of the court's analysis is still a comparison of the accused product with the patents in suit; the only difference is that the infringed product does not stand alone. Simply put, if the record demonstrates that Creo's DOP system does not include at least one claim limitation in an asserted patent, then it cannot be found to have infringed that patent. See *Spectrum Int'l, Inc. v. Sterlite Corp.,* 164 F.3d 1372, 1379

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

Page 6

(Fed.Cir.1998).

FN11. The Federal Circuit recently stated "[i]n our prior cases, we have used both the term 'element' and the term 'limitation' to refer to words in a claim. It is preferable to use the term 'limitation' when referring to claim language and the term 'element' when referring to the accused device." See *Festo Corp. v. Shoketsu Kinzoku Kabushiki Co., Ltd.,* 234 F.3d 558, 564 n. 1 (Fed.Cir.2000) (en banc), *petition for cert filed* April 9, 2001, No. 00-1543 (internal citations omitted). Although the court will follow the Federal Circuit's lead and use "element" and "limitation" differently, it will not correct quotes from the parties' briefs or from pre-*Festo* cases.

1. The '205 Patent

**\*6** Presstek asserts Creo's DOP system infringes claims 11, 15-16, 23 and 25 of the '205 patent. Since the independent claims--11 and 23--share a common limitation, if the court finds non-infringement of that limitation, none of the claims can be infringed. [FN12] Among all the limitations in claims 11 and 23, Creo highlights "a series of axially sequential, circumferential imaging swaths". The court, in its *Markman* order, construed the aforementioned term to mean "a series of image swaths formed sequentially along the axis of the plate cylinder." See D.I. 65 at ¶ 5. Since the court finds that there are genuine issues of material fact as to whether Creo's DOP system reads literally or under the doctrine of equivalents on the identified language, the motion must fail.

FN12. Claims 15-16 are dependent on claim 11. Claim 25 is dependent on claim 23. Since dependent claims contain all the limitations of independent claims (plus others), if the court finds the accused product does not infringe claims 11 and 23, then it is must follow that the accused product does not infringe claims 15-16, and 25. *See generally,* Robert L. Harmon, *Patents in the Federal Circuit* 246 (4th ed.1999); *cf. Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251 (Fed.Cir.1989) (articulating "All Limitations Rule" which requires that every limitation in claim must be infringed for finding of infringement).

a. Literal Infringement

The parties spend much time discussing the differences between the '205 patent and a prior art reference--U.S. Patent No. 4,591,880 ("the '880 patent" or "the Mitsuka reference"). [FN13] Although it is clear that the '205 and the '880 patent operate differently, the record does not support the statement that the Creo's DOP imaging system is sufficiently similar to the Mistuka reference to dispel all issues of material fact regarding any infringement of the '205 patent. [FN14]

FN13. The '880 patent was not before the P.T.O. as prior art during the original patent examination. During the reexamination, the P.T.O. originally rejected claims 11 and 23 of the '205 patent- in light of the Mitsuka reference. In response, Presstek amended claims 11 and 23. See *infra* for a discussion of the '205 patent prosecution history as it regards the '880 patent.

FN14. Although Creo points to the deposition testimony of John Kline, an inventor of the '205 patent, his testimony merely establishes that the '880 and '205 patents describe two different techniques of imaging. It is beside the point whether the '205 patent and the Mitsuka reference have significant differences; the '880 patent is not accused of infringing the '205 patent. Therefore, the court cannot conclude that Kline's statement that there are two different ways of imaging eliminates all genuine issues of material fact regarding the accused product and the patent at issue.

At this juncture in the litigation, the court finds that Presstek has adduced evidence which could suggest that Creo's DOP system operates more like the '205 patent than the '880 patent. The facts are not "undisputed" as Creo suggests. [FN15] For example, the parties disagree as to whether Creo's DOP head moves continuously along the axis of the plate cylinder. Although Creo points to a deposition by James A. Madeley, a principal engineer at Creo, his statements regarding cylinder movement are conclusory and do not explain the underlying technology. Instead, he merely states that Creo's DOP imaging process is "similar" to the '880 patent. [FN16] In reply, Presstek offers deposition testimony from Madeley and Daniel Gelbart, Creo's president, to suggest that imaging is not "continuous". This disagreement leads to a dispute over whether the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

Page 7

"swaths" in Creo's DOP system are created sequentially or in a helical pattern. [FN17] Finally, Presstek points to other aspects of Creo's DOP system--such as firmware functions and swath counters--which Creo does not address. The operation of these other components of the DOP system also creates an issue of material fact.

> FN15. Although it did not move for summary judgment, Presstek also asserts Creo does not dispute several key aspects of the operation of the accused product. By denying Creo's motion, the court is not adopting Presstek's arguments. On the contrary, the court notes that both sides have proffered sufficient evidence to warrant a trial on the merits.

> FN16. Madeley's declaration also states that "[t]he motor used in Creo's DOP system cannot be run in stepped mode unless the software is modified to allow stepped operation" but that at present it cannot so operate (and there are no plans to implement stepped operation). Although Presstek did not address this issue, the court believes the ability of the accused product to "run in stepped mode" raises a genuine issue of material fact regarding infringement.

> FN17. Part of this disagreement appears to be over how Creo's DOP system defines a swath and how it relates to a "stroke" and a "stripe". Presstek points to a Creo document entitled, "Digital Imaging Press, Geometric Correction" which defines a "swath" as "[t]he set of pixels written in one rotation of the plate cylinder" but defines a "stroke" as [t]he set of pixels written in parallel by the head." Creo highlights a document entitled, "DOP Project Glossary" which defines a "swath" as "[o]ne drum rotation of the spiral image written by the optics" and a "stroke" as "[o]ne horizontal stip one pixel high by one swath width stroke." The DOP Project Glossary also defines a "stripe" as "[o]ne vertical band of pixels equal to the width of the stroke." The parties do not discuss the relationship between a "swath," "stripe," and "stroke". Such evidence might assist the court in determining either literal infringement or infringement under the doctrine of equivalents.

b. The Doctrine of Equivalents

Creo argues that Presstek cannot maintain its claims of infringement under the doctrine of equivalents in light of the recent Federal Circuit pronouncement that:

> When a claim amendment creates prosecution history estoppel with regard to a claim element, there is no range of equivalents available for the amended claim element. Application of the doctrine of equivalents is completely barred....

_Festo, 234 F.3d at 569._ In _Festo,_ the Federal Circuit held that "once an element of a claim is narrowed for a reason related to patentability, that element's scope of coverage will not extend beyond its literal terms." _See id._ In an attempt to provide guidance, the _Festo_ court established a four part test district courts must follow: (1) the court must determine which claim limitations are alleged to be met by equivalents, (2) the court must ascertain whether those limitations were amended during prosecution of the patent, (3) for amended claims, the court must consider whether the amendments "narrowed the literal scope of the claim" and (4) the patentee may use the patent prosecution history to show that the amendment was unrelated to one of the statutory requirements for patentability. _See id._ at 586-87.

*7 As with all broad pronouncements, the devil is in the details. In the immediate aftermath of _Festo,_ district courts (and litigants) are struggling to interpret its breadth and applicability. Although the number of courts examining _Festo_ is slowly growing, none of them have directly addressed the issues raised in this case. Upon reading the parties submissions, researching the evolving case law, and, most important, considering the broader policies implicated by the Federal Circuit's decision, the court believes Creo reads _Festo_ too broadly. Therefore, it will allow Presstek to assert a doctrine of equivalents theory for the '205 patent. [FN18]

> FN18. Although _Festo_ does not require patent prosecution issues to be decided before trial, other courts have suggested doing so is the better procedure in jury cases. _See Alcara Biosciences, Inc., v. Calpier Tech. Corp., 125 F.Supp.2d 391, 399, n. 7 (N.D.Cal.2000)_ (commenting that deciding pre-trial whether party can pursue doctrine of equivalents theory would be more efficient since it would prevent having jury find literal infringement and then having court consider a _Festo_ motion which could result in the court directing a verdict).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

Page 8

The parties to not dispute that Presstek amended the original '205 patent during the P.T.O. Reexamination. The P.T.O. initially rejected several claims of the '205 patent as failing to distinguish the '880 patent. In an "Office Action" dated December 8, 1997, the Examiner stated:

> It is noted that in Patentee's [Presstek's] disclosed device, the cylinder completes multiple rotations while the imaging head slowly scans parallel to the cylinder's axis. In the Lewis and Mitsuka devices, the imaging head is driven over multiple scans while the cylinder completes one rotation. However, despite Patentee's assertion ... that these are completely different problems, there is no language in any of the claims which addresses the difference. For example, claim 11 recites 'means for providing relative motion between the cylinder and the discharge means' which is broad enough to cover both situations.

It appears, therefore, that the Examiner was concerned that the '205 patent, as written, was too broad and required Presstek to limit the claims regarding the motion of the imaging head and cylinder. In response to the Examiner's rejection, Presstek amended (for the second time) claims 11 and 23 to read, in part, "... a series of axially sequential, circumferential imaging swaths, each swath comprising a series of circumferentially spaced-apart image spots formed during one revolution of said cylinder, the array of image spots corresponding to the image represented by the image information."

Since Presstek explained this amendment in two ways, the court is a bit unclear what prior art Presstek's action was supposed to address. First, Presstek, quoting the Examiner's aforementioned statement, replied:

> We assume that the Examiner intended to refer to Moyroud et al. rather than Lewis, and we have introduced language into the original independent claims specifying multiple rotations and imagined in a series of axially sequential, circumferential imaging swaths. For the following reasons, we submit that these claims, as amended fully distinguish over [sic] the prior art.

From the above, it is unclear whether Presstek's amendment was designed, in part, to overcome the Moyroud et al. reference. Addressing the Mitsuka reference later in the same document, Presstek stated:

> *8 The Mitsuka reference appears to contemplate periodic delay in the onset of imaging in order to correct for cumulative positional deviations between scanning and recording heads. That is, [sic] because of mismatch between the beam

widths of the scanning and recording devices, their mutual alignment varies; accordingly, every few lines the onset of recording is delayed to bring the position of the recording head into line with that of the scanning head. As the Examiner notes, Mitsuka contemplates s[sic] system wherein 'the imaging head is driven over multiple scans while the cylinder completes one rotation.' This mode of operation differs from the sequential, circumferential scans that characterize the present invention and are set forth in the foregoing amendment.

Given these two different citations to prior art references, the court, at this stage in the proceedings, cannot say that the additional language Presstek added was merely to overcome the Mitsuka reference.

Finally, the Examiner's Notice of Intent to Issue Reexamination Certificate cites different (but similar) language from a later revised amendment. The only difference between the language the Examiner cites-- the revised amendment--and an earlier amendment is a further explanation of the difference between how specific claims differ from the Mitsuka reference. In particular, the cited language includes a passage stating, "[t]his language [the additional limitation] represents a clear departure from the disclosure of Mitsuka et al .... furthermore, Mistuka et al.-- contemplates synchronous, analog recording and output ... This is inconsistent with the notion of discrete image spots, intervals between spots, positional correction of individual spots, and spot offset in accordance with present claims."

Based upon the above mentioned '205 patent prosecution history, Creo argues Presstek's amendment to claims 11 and 13 distinguished the Mitsuka reference because the "helical swaths created by the continuous motion of Mitsuka's imaging head along the axis of the cylinder 'differ[s] from the sequential, circumferential scans that characterize the present invention." In response, Presstek states that although it amended claims 11 and 23 to overcome the Mitsuka reference it did so for a specific purpose unrelated to swath creation. In support of this proposition, Presstek notes that the patent prosecution history does not disclose that the Examiner or Presstek discussed what the imaging head creates as it moves along the cylinder. In other words, Presstek claims that although the Mitsuka invention may create helical swaths, the result of the movement of the imaging head and the cylinder concerned the Examiner less than the fact of motion.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A309

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

Page 9

Putting aside the issue of whether the amendment responded to the '880 patent or Moyroud et al, the court accepts Presstek's argument that the patent prosecution history does not disclose any reference to overcoming prior art regarding the shape of swaths. Nevertheless, Presstek did amend the '205 patent to limit the scope of claims 11 and 23 to overcome a prior art reference. Furthermore, there does not appear to be any dispute that the amendment was related to patentability. [FN19] Rather than argue that the additional language was not intended to overcome a prior art reference, Presstek essentially argues that they should be selectively estopped from using the doctrine of equivalents. The Federal Circuit, however, stated in Festo that "... a narrowing amendment *made for any reason* related to the statutory requirements for a patent will give rise to prosecution history estoppel _with respect to the amended claim element." 234 F.3d at 567 (emphasis added). Given this language, at first glace, it would appear that as to claims 11 and 23 of the '205 patent, Presstek may only assert a claim of literal infringement.

> FN19. Presstek's first response to the Examiner's rejection was to argue that the original claims were different than the prior art. The Examiner explicitly considered and rejected this argument. As a result, Presstek added additional language to the claims. Adding further limitations to a claim is the clearest indication that the patentee is limiting the scope of the patent. *See, e.g., Bai v. L & W Wings, Inc.,* 160 F.3d 1350, 1355 (Fed.Cir.1998) (stating that addition of claim limitation during patent application process which clearly differentiates prior art conclusively invokes prosecution history estoppel).

*9 Notwithstanding the language in *Festo*, the court is not convinced that the Federal Circuit intended such a harsh result. In *Festo*, the subject matter of the amendment and the doctrine of equivalents argument was the same. The dispute was less over the results of the amendment than the reasons for (and result of) including it. *See Festo*, 234 F.3d at 566-78. Creo's position appears to be that the court should extend *Festo* to include estoppel by implication. That is, the court should conclude that the limitation of the movement of the imaging head vis a vis the cylinder means that the image created must be a helical (as opposed to circumferential) swath. The Federal Circuit's choice of the "complete bar" approach over the "flexible bar" approach" does little to resolve the distinction that centers on the "range of equivalents" available for a limitation after amendment. [FN20] Simply put, the issue in this case is not the "range of equivalents" for a particular limitation but whether the *Festo* bar covers implicit changes in a limitation. [FN21]

> FN20. By way of illustration, suppose a patent originally taught that the speed of a motor must be at least 50 miles per hour. During the patent prosecution history, however, the inventors changed the limitation to read 25 miles per hour in order to overcome prior art. Under the "flexible bar approach," the patentees would not be able to use the doctrine of equivalents for motors running 26 to 50 miles per hour, but the court would decide whether it could claim equivalence for motors running 25 miles per hour or less. In contrast, the complete bar--which *Festo* adopted--disallows equivalence arguments all together; only motors which run at 25 miles per hour could infringe. *See, e.g., Control Resources, Inc. v. Delta Elec., Inc.,* 133 F.Supp.2d 121, 135-37 (D. Mass 2001) (discussing amendment which changed fan speed).

> FN21. As one commentator noted, "[w]hile the *Festo* decision purports to eliminate uncertainty regarding the reach of prosecution history estoppel, it raises other uncertainties as to the application of the decision itself. At least part of the uncertainty created by the *Festo* opinion relates to the reach of the phrase[ ] 'substantially related to patentability." ' Bruce J. Rose & John A. Wasleff, *Was Festo Really Necessary?,* 83 J. Pat. & Trademark Off. Soc'y 111, 127 (Feb.2001). No post-*Festo* decision has explicitly addressed the situation presented in this case. *See, e.g, Lockheed Martin Corp. v. Space Sys./Loral, Inc., - F.3d -,* No. 00-1310, 2001 WL 436028, at *11 (Fed.Cir. Apr. 30, 2001) (applying *Festo* to reject "flexible bar" approach advocated by appellants); *Biovail Corp. Int'l, v. Andrx Pharma, Inc.,* 239 F.3d 1297, 1303-04 (Fed.Cir.2001) (holding case "falls squarely within the reach of *Festo*" where reason for amendment and question of equivalence was same); *Pioneer Magnetics, Inc. v. Micro Linear Corp.,* 238 F.3d 1341, 1345-46 (Fed.Cir.2001)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

(rejecting patentee's proffered reasons for amending claim as unrelated to patentability); *Control Resources, 133 F.Supp.2d at 135-37* (applying *Festo* since amendment, which limited speed of fan, explicitly disclaimed prior art); *Pinkholtz v. Rainbow Tech., Inc.,* 125 F.Supp.2d 1156, 1163 (N.D.Cal.2000) (finding amendment narrowed scope of claim where prior art and amendment both explicitly addressed location of claimed device); *Honeywell Int'l, Inc. v. Hamilton Sunstrand Corp.,* Civ.A.No. 99-309-GMS, 2001 WL 66348, at *3- *7 (D.Del. Jan. 8, 2001) (declining to apply *Festo* since patentee merely changed dependent claims to independent claims rather than surrendering them).

Rather than woodenly applying *Festo,* the court will adopt the more nuanced approach articulated by Judge Breyer of the United States District Court for the Northern District of California in *Alcara Biosciences, Inc., v. Calpier Tech. Corp.,* 125 F.Supp.2d 391 (N.D.Cal.2000). In addition to discussing *Festo,* Judge Breyer cogently describes the state of prosecution history estoppel prior to *Festo,* the rationales underlying the doctrine, and the relevant Supreme Court precedent. Judge Breyer also conducted both a "preliminary" and a more detailed *Festo* analysis. He first discussed the prosecution history of the claim in dispute and found that although Alcara did amend one limitation of the claim, it did not amend another limitation. *See Alcara* 125 F.Supp.2d at 399. Since the amendment limited the claim and was related to patentability, *Festo*'s bar appeared to apply. *See id.* Next, Judge Breyer posited a question the Federal Circuit did not address in *Festo:* whether the "complete bar" to the doctrine of equivalents applies when only a portion of claim language was amended during the patent prosecution and the parties dispute whether the amendment altered one limitation within a claim or a series of limitations? *See id. at 401.* Finding *Festo* provided no "explicit direction" on this issue, Judge Breyer examined the underlying policy considerations as announced by the Federal Circuit. *See id. at 401- 03.*

Similarly, the court has already found that the patent prosecution history demonstrates that Presstek's amendments to the language of claims 1 and 11 of the '205 patent explicitly limit the movement of the imaging head--not the image subsequently created. Therefore, the court--like Judge Breyer--will look to see whether barring Presstek from asserting the doctrine of equivalents for the shape of the image on

the cylinder will further the policy considerations underlying *Festo.*

*10 In adopting the "complete bar" approach, the *Festo* court focused on the public notice function of patents and the desirability of not having the public speculating on the subject matter of a narrowing amendment. *See Festo, 234 F.3d at 576-77.* By limiting patentees to literal infringement whenever a limitation is changed during patent prosecution, parties can "ascertain the true scope and the value of the patent without having to resort to litigation to obtain a case by case analysis of what subject matter the claims can cover ... and neither ... [party] is required to pay the [associated] transaction costs to determine the exact scope of the subject matter the patentee abandoned...." *See id. at 577.* The key to the entire analysis, therefore, is that the public should not be left to guess the result of amendments made during patent prosecution.

Presstek's amendment during patent prosecution does not trigger the concerns raised in *Festo.* Ironically, estoppel by implication circles back to the problems the Federal Circuit identified regarding the "flexible bar". Recognizing such a rule would open the door to allow accused infringers to claim that even a minor and narrowly focused amendment would limit patentees to asserting literal infringement of an entire claim. Additionally, such a rule would have the unintended consequence of dissuading potential patentees from amending their claims in any way since the potential result would be that an accused infringer could easily prevent the assertion the doctrine of equivalents. This would ultimately lead to fewer patents being issued and perhaps eventually stifle innovation. Indefiniteness not only harms the public, but it also fails to adequately protect patentees when defending their inventions against unlawful infringement.

Courts need to strike an appropriate balance between the legitimate needs of both the public and inventors. The *Alcara* court's statement regarding a different-- but analogous--result is apt:

If ... an indiscriminate application of *Festo* were proper, perhaps the Federal Circuit would have extended the opinion beyond individual claim limitations. The court could have held that any amendment to any limitation in a claim bars any range of equivalents as to all limitations in a claim, even those that were not amended. Under such an expansive rule, once a patent applicant amended any portion of any claim for any reason related to patentability, the patentee could only claim literal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

Page 11

infringement as to all of the limitations in the claim and would not be entitled to any range of equivalents whatsoever. That the court declined to reach so far indicates that *the court was comfortable with making the public read the prosecution history carefully to see which precise segment of a claim was amended* and that the court envisioned a narrower understanding of prosecution history estoppel. *Alcara,* 125 F.Supp.2d at 402 (emphasis added). Adopting Creo's broad reading of *Festo* would result in giving accused infringers a virtually unlimited weapon with which to attack otherwise valid patents and avoid otherwise infringing activities. Until directed otherwise, the court declines to sanction such a result. The court believes doing so would violate the spirit, if not the letter, of the Federal Circuit's holding in *Festo.*

*11 Finally, although the parties do not address the theory of argument based estoppel in their briefs, the court believes this doctrine is applicable in this situation. *Cf. Alcara,* 125.F.Supp .2d 391, 398 n. 6 (citing *Festo* and stating "[a]lthough the absence of an amendment precludes the application of amendment based estoppel, a court still may need to consider whether the statements made during the prosecution history give rise to argument based estoppel") (internal quotations and citations omitted). There is no question that Presstek is estopped from using the doctrine of equivalents as to the movement of the cylinder via a vis the imaging head since Presstek explicitly disclaimed the movement associated with the Mitsuka reference. Indeed, Presstek does not argue that the amendment was made for any other reason than overcoming prior art.

b. The '368 Patent

In contrast to the '205 patent, the parties only briefly address the ' 368 patent. In its motion, Creo's argues that it does not infringe the '368 patent because, given the court's interpretation of limitation c(i) of claim 1 of the '368 patent, its DOP system does contain a "dot position look up table that stores the X and Y coordinates corresponding to substantially all dot positions on each plate." Creo believes that since its system lacks this "essential element" it cannot either literally infringe any of the claims asserted against it or infringe under the doctrine of equivalents. [FN22] Based upon these contentions, Creo asserts its entitlement to summary judgment. Presstek, of course, opposes the motion on the grounds that Creo's DOP system does, indeed, contain a "dot position look up table."

FN22. Presstek has alleged Creo has infringed claims 1-4, 7, and 16- 19 of the '368 patent. Creo states that since claims 2-19 are all dependent (either directly or indirectly) on claim 1, it is entitled to a summary finding of non-infringement on all claims of the '368 patent asserted against it.

The court has already ruled that the term "dot position look up table" takes its ordinary meaning (D.I. 64 at ¶ 7). [FN23] Therefore, the court's present task is to apply its construction to the accused invention to determine whether there is any genuine issue of material fact regarding infringement. At this point in the case, there are genuine issues of material fact as to whether Creo infringes the '368 patent literally or under the doctrine of equivalents. Although the parties lump literal infringement and the doctrine of equivalents together in their submissions, the court will briefly discuss each subject separately.

FN23. Creo asserts that the court's order found that the entire phrase "dot position look up table that stores the X and Y coordinates corresponding to substantially all dot positions on each plate" takes its ordinary meaning. The court's order stated "[c]laim 1 paragraph c.i requires no construction beyond the claim language itself. The term 'dot position look-up table' takes its ordinary meaning."

Creo's central argument appears to be that a "dot position look-up table" must be different from an "image signal" since the former relates to pre-stored information, while the latter refers to data relating to the image to be printed. Since the DOP system only contains an image signal, Creo contends that it cannot infringe limitation c(i) of claim 1 of the '368 patent. The court finds that Presstek has adduced enough evidence to put the relationship between the accused device and the patent limitation "dot position look-up table" at issue. First, the parties' experts differ on characterizing how the DOP operates in terms of translating information. *Compare* Madeley Decl. ¶ 4 *with* Bernbary Decl. ¶ ¶ 6 and 8-18. [FN24] Second, Creo does not adequately rebut Presstek's arguments by specific reference to the DOP system operation. [FN25] Therefore, the court will not grant Creo's motion for summary judgment as to literal infringement.

FN24. Although Creo spends much time

parsing the language of the patent and emphasizing the deposition testimony of a named inventor of the '368 patent, its own expert, Madeley, merely makes a conclusory assertion that the DOP system does not fit within the court's definition of a "dot position look-up table". Presstek's expert, in contrast, offers a detailed analysis of how the DOP system allegedly operates. The court notes that the deposition testimony of Kline cited by Creo may offer yet another interpretation. At minimum, the court is not convinced that Creo has demonstrated the absence of any genuine issues of material fact.

FN25. As mentioned above, Creo spends much of its brief analyzing the language of claim 1 to demonstrate that the DOP system does not contain a "dot position look-up table". The court has already construed the limitation c(i) of claim 1 in its *Markman* order and declines to do so again.

*12 Furthermore, the court believes that it cannot grant summary judgment on doctrine of equivalents grounds just because the accused invention allegedly does not contain a "dot position look-up table." On the contrary, the purpose of the doctrine of equivalents is to prevent a finding of non-infringement if the accused device merely contains "insubstantial differences" from the claims asserted. Creo has not demonstrated why the allegedly separate storing of dot position and image data by its DOP system is 'substantially different' from the method contained in claim 1 of the '368 patent. For example, although Kline testified that a "dot position look-up table" is a file describing pixel locations and "image data" is stored in a different file, Creo does not explain--from an equivalence perspective--how or why this distinction is important. Although Presstek and Creo argue about the relationship of the DOP system's "Image Control Buffer" [FN26] and five geometric correction parameters to claim 1 of the '368 patent, the court declines to attempt to resolve the issues raised at this time. Instead, the parties will have an opportunity to present their evidence and arguments to the court at trial (and beyond).

FN26. The court notes that Presstek uses this term to describe an aspect of Creo's DOP system but that Creo does not so refer to any aspect of its product. However, the court--like Creo--will, for the moment, use this term since merely doing so does not appear

to create any material issues of dispute.

C. Creo's Motion on Claim Broadening of the '368 Patent on Reexamination

In its third motion for summary judgment, Creo advances the argument that Presstek impermissibly broadened claim 1 of the '368 patent to overcome a P.T.O. rejection during the reexamination procedure by altering limitation c(iii) and adding limitation c(iv). [FN27] As Creo correctly noted, the court declined to address this issue in its *Markman* order and left it open for Creo to reargue its position at a later date. *See* D.I. 64 at n. 1 (explaining contours of dispute and refusing to rule on issue). Since the court is not obligated to decide the issue now and believes further discussion would assist it in reaching its decision, the court will take the motion under advisement, entertain oral argument, and rule on the issue before the issuance of a final order in this case. [FN28]

FN27. To compare the original c.iii with the reexamined c.iii, the court will italicize the new language and bracket the deleted language. Limitation c.iii teaches, "means for offsetting, with respect to said x and y coordinates, the action of the discharge-source actuation means in *accordance with the angular offset parameters to correct* [imaging errors] *the angular inconsistencies.* Limitation c.iv, added on reexamination, teaches, "*means for altering the length of the scan in accordance with the size difference parameters to correct the image-size inconsistencies.*"

FN28. Although Creo is correct that determining the scope of a reexamined claim is a question of law (i.e. claim construction), the court does not have to decide the matter at present. *See generally Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed.Cir.1995).* Since this case is a bench trial, the court believes any prejudice to the parties in declining to address this issue is outweighed by the potential benefits of oral argument. Furthermore, the court gave the parties an opportunity to have a *Markman* hearing on claim construction. It seems the court can properly afford a similar opportunity on a similar issue.

In general terms, Creo's argument is that since "original claim 1 required the ability to correct *all*

Not Reported in F.Supp.2d
2001 WL 637397 (D.Del.)
(Cite as: 2001 WL 637397 (D.Del.))

imaging errors disclosed in the specification ... [but r]eexamined claim 1 only requires the ability to correct a subset of imaging errors." (emphasis in original). Presstek responds that "there is no requirement in the claim language that all imaging errors discussed in the preferred embodiment or any specific imaging error or specific set of such errors must be corrected--the claim is intentionally generic." Essentially, the court must determine what the specification and prosecution history reveal [FN29] and then consider the extent to which it should read the specification into claim 1 of the '368 patent. The court will discuss these issues, and others raised by the briefing, with the parties at an appropriate time.

> FN29. As Creo notes in its reply brief, both parties focus their arguments on the '368 patent specification, Presstek's May, 1992 amendment, and U.S. Patent No. 4,911,075 (the "Lewis '075 patent").

## IV. CONCLUSION

At this stage of the case, the court declines to find that the on-sale bar of 35 U.S.C. § 102(b) renders the '205 and '368 patents invalid. The court is similarly not convinced that Presstek engaged in inequitable conduct before the P.T.O., making the patents unenforceable. The court will not grant Creo summary judgment as to infringement of the '205 and the '368 patents. Furthermore, Presstek is free to assert the doctrine of equivalents at trial with respect to the '205 patent (with the exception of the movement of the imaging head) and the '368 patent. Finally, the court will take Creo's motion regarding impermissible claim broadening of the '368 patent under advisement.

2001 WL 637397 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1988 WL 155634
1988 WL 155634 (D.Del.)
(Cite as: 1988 WL 155634 (D.Del.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
JOHNSON & JOHNSON CONSUMER
PRODUCTS, INC., Plaintiff,
v.
ORMCO CORPORATION, Defendant,
v.
JOHNSON & JOHNSON CONSUMER
PRODUCTS, INC., Counterclaim Defendant.
Civ.A. Nos. 87-341-JJF, 87-547-JJF.

Sept. 29, 1988.

Stephen P. Judlowe, Francis J. Murphy, Eve Kunen, and Rita Irani, of Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, James M. Mulligan, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for plaintiff and counterclaim defendant.

Paul C. Van Slyke, of Pravel, Gambrell, Hewitt, Kimball & Krieger, Houston, Tex., Bruce M. Stargatt, and Richard H. Morse, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant.

OPINION

FARNAN, District Judge.

INTRODUCTION

*1 Johnson & Johnson Dental Products Company ("Dental Products") brought an action in this Court on June 23, 1987, seeking a declaratory judgment that Ormco Corporation's ("Ormco") United States Patent No. 4,415,330 ("the Daisley Patent") is invalid. Ormco then brought a counterclaim against Dental Products, Johnson & Johnson, and "A"- Company (referred to collectively as "Johnson & Johnson") alleging that Johnson & Johnson's new STARFIRE (R) orthodontic bracket infringes the Daisley Patent.

On June 24, 1987, Dental Products filed an action in the Central District of California alleging that Ormco willfully infringed United States Patent No. 4,639,218 ("the Jones Patent") which is owned by Dental Products, and requested certain injunctive and monetary relief. The California action was

transferred to this Court on October 6, 1987. This Court consolidated the cases for purposes of discovery and for trial scheduled to commence on October 3, 1988.

Both Johnson & Johnson and Ormco have filed motions for a preliminary injunction. Johnson & Johnson seeks an Order preventing Ormco from manufacturing and selling Ormco's GEMorthodontic bracket. Johnson & Johnson asserts that the GEM (R) bracket infringes the Jones Patent. Similarly, Ormco requests that Johnson & Johnson be prevented from manufacturing and selling its STARFIRE (R) orthodontic bracket. Ormco asserts that the STARFIRE (R) bracket infringes on the Daisley Patent. For the reasons that follow, both requests for a preliminary injunction will be granted.

FACTS

Both Ormco and Johnson & Johnson are manufacturers and sellers of various orthodontic products. The products of importance in these actions are Johnson & Johnson's STARFIRE (R) bracket and Ormco's GEM (R) bracket. Both are orthodontic brackets made of synthetic sapphire (monocrystalline alumina).

Orthodontic brackets are used to straighten or move teeth that have an improper position or orientation in the mouth. The brackets are attached to each tooth and a wire called the arch wire is "woven" through the brackets and used to exert forces to move the teeth. Traditionally, brackets were made of metal. The orthodontic industry has long sought a bracket made of either a clear substance such as plastic or a substance closer in color to the tooth such as ceramic so that braces would not be so unsightly. The sapphire brackets such as the STARFIRE (R) and GEM (R) brackets are clear brackets which apparently have more potential than metal, plastic or ceramics both aesthetically and in their strength.

Generally, the Jones Patent claims an orthodontic bracket made of single crystal alumina. Claims 1, 2, 3 and 4 are representative of the patent and read as follows:

1. An orthodontic bracket comprising a base member for attaching to a tooth and a body member extending from the base member, said body member including walls defining an arch wire groove, wherein said walls comprise crystalline

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alumina.

2. The orthodontic bracket of Claim 1 wherein said bracket is made entirely of crystalline alumina.

*2 3. The orthodontic bracket of Claim 1 wherein said crystalline alumina is crystalline alpha-alumina.

4. The orthodontic bracket of Claim 2 wherein said crystalline alumina is crystalline alpha-alumina.

The Jones Patent encompasses various types of brackets all made of crystalline alumina.

The Daisley Patent does not claim an orthodontic bracket made of any specific material, but teaches a certain configuration of the bracket which shows a rhomboidal shape. The bracket has one or two tie wings which define a slot through which the archwire is introduced. The entire bracket assembly is then affixed to the tooth. While the binding pad is generally rectangular, the bracket assembly and the tie wings form a rhomboidal configuration. The shape of the tie wings allows for easier reference to the tooth long axis and the occlusal plane without sacrificing strength. The rhomboidal shape allows the orthodontist to affix the bracket to the tooth more easily than a bracket of rectangular shape because the angles provide references for alignment of the bracket with the occlusal plane and the crown long axis while still properly placing the bracket on the tooth. Thus, the orthodontist is able to place the orthodontic bracket more accurately. The Daisley Patent specifies certain recommended angles for placement of the bracket for each maxillary (upper) and mandibular (lower) tooth. The Daisley Patent has only one claim and it reads as follows:

1. An orthodontic bracket assembly for use with an archwire to impart corrective forces on a tooth, including: a base pad for attachment to the tooth, a distal tie wing fixed to said base pad and including a gingival tip and an occlusal tip defining between them an arch wire slot, a mesial tie wing fixed to said base pad and including a gingival tip and an occlusal tip defining between them an arch wire slot, each of said distal and mesial tie wings having parallel distal and mesial sides, said arch wire slots being in mutual alignment and providing a reference line for orientation parallel to the occlusal plain of a patient, said sides of said tie wings are inclined at an oblique angle to said reference line, whereby said tie wings can be generally vertically disposed parallel to the tooth long axis and still be inclined at an oblique angle to said reference line,

said gingival and said occlusal tips of said tie wings having respectively top and bottom surfaces

which are in mutual alignment parallel to said reference line and substantially equidistant therefrom,

whereby said tie wings together form a rhomboidal configuration and the axis of said arch wire slots bisects said tie wings so that said gingival tips and said occlusal tips are of equal size.

Johnson & Johnson's STARFIRE (R) bracket is made of sapphire and it is of rhomboidal shape. Ormco claims that the rhomboidal shape infringes on the Daisley Patent. The GEM (R) bracket, manufactured by Ormco, is not of rhomboidal shape but is made of sapphire. Johnson & Johnson claims that since the GEM (R) bracket is made of sapphire it infringes on the Jones patent. However, rather than a patent infringement dispute, the case appears to be a cross-licensing disagreement as each party wants to use the subject of the other party's patent in order to make an aesthetically better orthodontic bracket.

### STANDARD FOR GRANTING PRELIMINARY INJUNCTION

*3 Although traditionally a strict standard has been invoked to evaluate whether a preliminary injunction should be granted in patent infringement cases, the Federal Circuit has definitively stated that the standards applied in patent cases should be no more stringent than those applied in other areas of the law. _H.H. Robertson, Co. v. United Steel Deck, Inc._, 820 F.2d 384, 387 (Fed. Cir.1987). To be successful on a motion for a preliminary injunction the movant must show (1) a reasonable likelihood of success on the merits and (2) that the movant will suffer irreparable harm if a preliminary injunction is not granted. The court should also take into consideration the possible harm to others if the preliminary injunction is granted (more generally known as balancing the hardships) and the public interest. _Id. See also Upjohn Co. v. Riahom Corp._, 641 F.Supp. 1209, 1217 (D. Del.1986) (citing _Roper Corp. v. Litton Systems, Inc._, 757 F.2d 1266 (1985)).

In this action, then, it is each patentee's burden to show a reasonable likelihood that it will prevail at trial on the issues of validity and infringement. In addition, each patentee must show that it will suffer irreparable harm in the absence of granting a preliminary injunction and that the balance of the hardships and the public interest favor the granting of a preliminary injunction. The presumptions and the burdens that would inure at trial on the merits must also be used when considering a motion for a preliminary injunction. _H.H. Robertson, Co._, 820 F.2d at 388 (citing _Anderson v. Liberty Inc._, 106

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 155634                                                                                          Page 3
1988 WL 155634 (D.Del.)
(Cite as: 1988 WL 155634 (D.Del.))

S.Ct. 2505, 2512 (1986)). At trial the party who is claiming the patent is invalid has the burden to prove that the patent is invalid. However, on a motion for a preliminary injunction, the patentee must show that there is a reasonable likelihood that the other party will not carry that burden. As for infringement, it is the patentee's burden both at preliminary injunction and at trial to show that its patent is infringed.

The Court of Appeals for the Federal Circuit has established that "where validity and continuing infringement have been clearly established ... immediate irreparable harm is presumed." *Smith International v. Huges Tool Co., 718 F.2d 1573, 1581 (1983).* This presumption will not be invoked if only a reasonable likelihood of success on the merits is proven. *Roper Corp. v. Litton Systems, Inc., 757 F.2d at 1271.* Therefore, if the patentee shows that there is a reasonable likelihood of success on validity and infringement, but not a clear showing of success on the merits, the patentee must make a separate showing of irreparable harm. *Roper, 757 F.2d at 1272. See also Upjohn Co. v. Riahom Corp., 641 F.Supp. at 1217.* Finally, all four of the factors must be considered and weighed.

### DISCUSSION

Since both parties have moved for a preliminary injunction, each party must show the likelihood of success on the merits of both the validity and the infringement issues. In this case, Johnson & Johnson must show that Ormco will not carry its burden of proving the invalidity of the Jones Patent and that Ormco, by manufacturing and selling the GEM (R) bracket, has infringed on the valid Jones Patent. Similarly, Ormco must show that Johnson & Johnson will not carry its burden at trial of proving that the Daisley Patent is invalid, and that by manufacturing the STARFIRE (R) bracket, Johnson & Johnson has infringed on the valid Braisley Patent. Since each party has asserted an action against the other party's patent, the Court will analyze each patent separately. However, the applicable law in each case is identical, with the exception of Ormco's claim that the Jones Patent is unenforceable due to Johnson & Johnson's alleged breach of their duty of candor when prosecuting the Jones Patent.

*4 A patent is presumed valid and one who challenges the validity of a patent has the burden of establishing its invalidity. 35 U.S.C. § 282. *See Roper Corp. v. Litton Systems, Inc., 757 F.2d 1266, 1270 (Fed. Cir.1985).* However, this presumption of validity is procedural and not substantive. It requires "the decision maker to employ a decisional approach

that starts with acceptance of the patent claims as valid and that looks to the challenger for proof of the contrary." *Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1534 (Fed. Cir.1983).* The burden of persuasion is always upon the party asserting invalidity. *American Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350, 1358 (Fed. Cir.1984).* In a motion for a preliminary injunction, therefore, the movant has the burden of showing that there is a reasonable likelihood that the attack on validity will fail. *H.H. Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 387 (Fed. Cir.1987).*

There are a number of ways to attack the validity of a patent. However, in this action both parties claim that the inventions challenged were obvious under 35 U.S.C. § 103 in light of the prior art, and, therefore, the patents are invalid under 35 U.S.C. 5282(2). In addition, Ormco claims that the Jones Patent is invalid because Johnson & Johnson breached its duty of candor when it presented the prior art to the Patent and Trademark Office ("PTO"). Of course, each party counters that the most significant prior art was before the Patent Office at the time of application, and that the inventions were not obvious in light of the prior art.

Section 103 of Title 35 of the United States Code provides, in part, that "a patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. An analysis under § 103 must begin with the criteria set forth in *Graham v. John Deere Co., 383 U.S. 1 (1965).*

> Under Section 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

383 U.S. at 17, 18. The challenger's burden of persuasion is less easily carried when the prior art

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 155634
1988 WL 155634 (D.Del.)
(Cite as: 1988 WL 155634 (D.Del.))

Page 4

relied upon consists only of that considered by the patent examiner. *Hughes Aircraft Co. v. United States,* 717 F.2-d 1351, 1359 (Fed. Cir.1983) (citing *Solder Removal Co. v. ITC,* 582 F.2d 628, 633 (Cust. & Pat. App.1978)). However, the challenger's burden may be more easily carried if the prior art introduced is more relevant than that which was before the examiner. *Stratoflex,* 713 F.2d at 1534. Furthermore, evidence of secondary considerations must always be considered before the final determination of obviousness if such evidence is presented. *Id.* at 1538 (citing *In Re Sernaker,* 702 F.2d 989 (Fed. Cir.1983)).

*5 When a court evaluates whether a patent is valid in light of prior art, "a court must view the prior art without reading into that art the patent's teachings ... and must analyze and consider the references as a whole." *Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1564 (Fed. Cir.1984) (citing *In Re Sponoble,* 405 F.2d 578, 585 (C.C.Pa.1969); *In Re Shuman,* 361 F.2d 1008, 1012 (C.C.Pa.1966)). Any facts that support a determination of obviousness must be proven by clear and convincing evidence. *Carella v. Starlight Archery and Proline Co.,* 804 F.2d 135, 138 (Fed. Cir.1986) (citing *RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440, 1444 (Fed. Cir.1984)).

The second step in the analysis of likelihood of success on the merits is to analyze the issue of infringement. There are essentially three steps to determining whether a patent is being infringed. The court must (1) interpret the language of the patent claim; (2) assess the nature of the accused infringer's acts; and (3) apply the claims as construed to those acts. *Upjohn Co. v. Riahom Corp.,* 641 F.Supp. 1209, 1219 (D.Del.1986) (citing *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d at 1270-71)). It is the burden of the patentee to show that its patent has been infringed.

If the court determines that there has been a clear showing of validity and infringement then irreparable harm may be presumed. *Smith International v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed. Cir.1983). However, if the patentee merely carries its burden of showing that there is a reasonable likelihood of success on the merits, and does not offer enough evidence for a clear showing of validity and infringement then a separate showing of irreparable harm is necessary. Finally, the Court must consider the balance of the hardships as well as the public interest before the Court can grant a preliminary injunction. All four factors must then be

considered and weighed against one another.

A. *The Daisley Patent.*

1. *Likelihood of Success on the Merits.*

*Validity.*

Johnson & Johnson states that Ormco cannot demonstrate a likelihood of success on the merits on the issue of validity because Johnson & Johnson will introduce at trial prior art and prior sales more relevant than the prior art considered by the Patent Office. Johnson & Johnson states that its maxillary first molar convertible combination bracket/triple buccal tube ("TBT"), which is rhomboidal in shape, was used as early as 1975, as evidenced by a catalog of "A" Company's. The TBT is an orthodontic bracket mounted on the maxillary first molar. Johnson & Johnson has submitted with its affidavits pictures of the TBT allegedly showing its rhomboidal shape. Johnson & Johnson states that since this evidence was not considered by the patent examiner as prior art and clearly shows a rhomboidal shaped bracket that predates the issuance of the Daisley Patent, it proves the invalidity of the Daisley Patent.

Ormco counters, however, that the evidence offered by Johnson & Johnson is not valid because it is inadmissible at trial. Furthermore, Ormco asserts that neither the TBT nor the catalog offers the teachings of the Daisley Patent.

*6 The Daisley Patent itself sets forth an entire system of placement of its rhomboidal shaped brackets, and an explanation of how the rhomboidal shape assists in orthodontics. Furthermore, the evidence offered by Ormco particularly states that the rhomboidal shaped bracket assists in the placement of orthodontic appliances particularly on the incisors and the cuspids since those teeth are rhomboidal. The molars, on the other hand, are generally rectangular in shape and, therefore, the rhomboidal configuration is not as advantageous on the molars as it is on the front teeth. The TBT is designed exclusively for the first molar, a tooth which the evidence shows does not necessarily benefit by the rhomboidal shape.

Although the TBT may generally show a rhomboidal shape, Johnson & Johnson offers no evidence that this rhomboidal shape was to provide the function that the Daisley Patent provides. The Daisley Patent offers two tie wings which also facilitate in the placement of the bracket as well as various

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 155634
1988 WL 155634 (D.Del.)
**(Cite as: 1988 WL 155634 (D.Del.))**

Page 5

angulations for each particular tooth. There is no mention in Johnson & Johnson's literature that the TBT's rhomboidal shape has any function whatsoever, if the rhomboidal shape actually exists. (The Court cannot state conclusively that the photographs offered show a rhomboidal shaped bracket). The photographs and catalog excerpts that Johnson & Johnson offers as evidence are not nearly sufficient to show that prior art existed which rendered the invention obvious. At this juncture the Court cannot find that the TBT had any bearing on the Daisley invention or that it encompasses the claim of the Daisley invention. In comparing the TBT to the Daisley Patent claim, it is clear that the TBT does not anticipate each element of the Daisley Patent as would be required under 35 U.S.C. § 102(g). *Hybritech v. Monoclonal Antibodies, Inc.,* 802 F.2d 367, 379 (Fed. Cir.1986).

The evidence of the TBT is all that Johnson & Johnson offers at this juncture to establish the invalidity of the Daisley Patent. The Court finds that Ormco has shown a likelihood of success on the merits on the issue of validity because Johnson & Johnson's evidence of the TBT is not sufficient to rebut the presumption of validity under § 282. Furthermore Ormco also shows substant ial direct technical evidence that establishes the validity of the patent. Ormco has offered various affidavits evidencing expert opinion of the patent's novelty and usefulness. Finally, Ormco has introduced evidence of public acquiescence since Ormco has granted at least four licenses under the patent and, in fact, Johnson & Johnson has negotiated for a license in the past. The Court concludes that this evidence is enough to establish a strong showing of validity.

*Infringement.*

Ormco asserts that the sale of the STARFIRE (R) bracket manufactured by Johnson & Johnson infringes the Daisley Patent. Ormco initially asserted in its motion for a preliminary injunction that Johnson & Johnson would concede infringement. Recently Ormco has introduced that Johnson & Johnson's answers to certain interrogatories also conceded infringement. However, Johnson & Johnson strenuously disputes that the STARFIRE (R) bracket infringes on the Daisley Patent. Johnson & Johnson claims that since the STARFIRE (R) bracket is one extruded piece it does not have a base pad which is an element of the Daisley claim. However, the Jones Patent makes direct reference to a base and although the STARFIRE (R) bracket is one piece, it is obvious that it has a base for attachment to the tooth. There

is no requirement in the Daisley Patent that the base pad be a component completely separate from the rest of the bracket assembly. There is no indication in the claim itself that a bracket made of one piece would not satisfy the elements of the patent claim. The Court finds persuasive Ormco's assertion that the STARFIRE (R) bracket directly infringes on the Daisley Patent. Ormco has demonstrated this infringement by supplying the Court with a tracing of Johnson & Johnson's product that clearly shows the rhomboidal configuration and the evidence that each bracket has a degree of angulation suggested by Johnson & Johnson that is within the tolerances of those suggested in the Daisley Patent. Ormco has supplied to the Court a copy of this tracing and next to it has placed the claim of the Daisley Patent. By way of illustration, Ormco placed numerical references on the tracing which correspond directly to each element of the Daisley claim. At this juncture, for the purposes of preliminary injunction, the Court finds this evidence persuasive and concludes that it clearly establishes that the STARFIRE (R) bracket infringes on the Daisley Patent.

*2. Irreparable Harm.*

**\*7** Having determined that Ormco has shown a reasonable likelihood to succeed on the merits and has provided evidence to clearly establish both validity and infringement, the Court concludes that the presumption of irreparable harm under *Smith International v. Hughes Tool Co.,* 718 F.2d 1573 (Fed. Cir.1983), should be invoked. Of course, the presumption is rebuttable if Johnson & Johnson can show that irreparable harm to Ormco would not occur if the motion for a preliminary injunction is denied.

The Court disagrees with Johnson & Johnson's statement that the grant of licenses is incompatible with the right to exclude that is fundamental to every patent owner. While Johnson & Johnson may be correct that Ormco is not now selling a comparable product and therefore is not losing market share on this specific product, Ormco's argument that Johnson & Johnson is gaining in the market and that Ormco's reputation may be harmed by the continuation of the sale of the STARFIRE (R) bracket is more persuasive to the Court. The evidence offered by Johnson & Johnson is not sufficient to rebut the presumption of irreparable harm. Ormco is correct in stating that just because it is a licensor does not mean that they and, in fact, all licensors have given up the right to a preliminary injunction. *See Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233 (1985). Finally, the law in *Smith International, supra,* clearly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 155634
1988 WL 155634 (D.Del.)
(Cite as: 1988 WL 155634 (D.Del.))

Page 6

states the policy of the United States Court of Appeals for the Federal Circuit that a strong showing of validity and infringement is enough to show presumption of irreparable harm.

### 3. Balance of Hardships.

Ormco has shown that it will suffer harm without the injunction.  While the Court believes that Johnson & Johnson will certainly be affected by the grant of the preliminary injunction, the Court does not believe that the balance of hardships weighs in its favor to the extent that the preliminary injunction should be denied..  Johnson & Johnson will simply have to cease selling its STARFIRE (R) bracket in the rhomboidal shape.       Since Ormco has shown evidence that Johnson & Johnson directly infringes the Daisley Patent through its production of the STARFIRE (R) bracket, the balance of equities clearly indicates that a preliminary injunction should be granted.  Johnson & Johnson's claim that Ormco is trying to keep Johnson & Johnson out of the sapphire bracket business is blatantly incorrect since Johnson & Johnson holds the patent for the sapphire bracket and, in fact, could produce the bracket in another shape.  Since the Court has found a strong showing of validity and infringement' the balance of the equities weighs in favor of granting the preliminary injunction.

### 4. Public Interest.

While the public may have an interest in a rhomboidal shaped sapphire bracket, which at present is produced only by Johnson & Johnson, the public interest here is not strong enough to warrant denying the preliminary injunction when all the other evidence so strongly points in favor of granting the injunction.  Furthermore, the public has a strong interest in preventing infringement of valid patents.  Finally, even if the public has equal interests in both the grant and the denial of a preliminary injunction, the balance of the public interest with all the other elements clearly indicates that the preliminary injunction should be granted.

### B. The Jones Patent.

### 1. Likelihood of Success on the Merits.

### Validity.

*8  The Jones Patent discloses and claims an orthodontic bracket that is made of synthetic sapphire.    Synthetic sapphire is a single crystal

(monocrystalline) form of aluminum oxide (alumina).  The product currently produced as a result of this patent is Johnson & Johnson's STARFIRE (R).  Ormco challenges the validity of the Jones Patent stating that it is overbroad, that it is invalid under 35 U.S.C. § § 102(a), (g), and that its invention was obvious in light of the prior art.   To substantiate its claim of invalidity, Ormco states that certain persons in the Ormco research and development division had already produced prototypes of a sapphire bracket in 1979, approximately three years prior to the beginning of the research at Johnson & Johnson.  Furthermore, Ormco states that the Hirabayashi invention, which is a patent for sapphire dental implants, also shows that the Jones invention was obvious.     In addition, Ormco claims that the Hirabayashi Patent shows that Johnson & Johnson breached its duty of candor when it presented its patent application to the examiner.

The Court has examined all of the papers and supporting affidavits, as well as the evidence of prior art submitted by the parties in support of their positions on the motions for preliminary injunction.  First, there is no evidence offered by Ormco to substantiate the claim that the Jones Patent is overbroad.  Ormco never specifically addressed this allegation and, in fact, in its papers Ormco claims only that the Jones invention is a substitution of the sapphire for a known material.    The Court cannot accept as true Ormco's statement that Dr. Jones knew the strength of the material and only set out to find how to mass produce the end product.   In fact, it appears that the strengths were not known to the industry and sapphire's properties were never tested nor used in orthodontics.      The Court therefore concludes that Ormco's arguments that the Jones Patent is overbroad and a mere substitution of materials cannot rebut the presumption of validity.

Ormco's second argument, that it had actually produced the sapphire bracket before the Jones application was even made, thereby rendering the patent invalid under § § 102(a), (g), is meritless.  Ormco claims that one of its employees, Mr. Andreikio, purchased sapphire and made prototype brackets in 1979.    Mr. Andreikio bonded the brackets onto his teeth to determine reactions to the material's aesthetics.   However, Ormco conducted a feasibility study and decided later in 1980 that it would not pursue the sapphire bracket;  it instead pursued developing and marketing the lingual orthodontic system.

Title 35, Sect ion 102(a) bars a patent where "the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 155634                                                                    Page 7
1988 WL 155634 (D.Del.)
**(Cite as: 1988 WL 155634 (D.Del.))**

invention was known or used by others in this country ... before the invention thereof by the applicant for the patent.  " The "known or used" language means knowledge or use that is accessible to the public. *Carella v. Starlight Archery and Pro Line Co.,* 804 F.2d 135, 139 (Fed. Cir.1986). Prior knowledge or use must also be reduced to practice. *See Connecticut Valley Enterprises, Inc. v. United States,* 348 F.2d 949, 951-52 (Ct.Cl.1965). At this stage of the proceedings, Ormco has offered no evidence whatsoever that the Andreikio research was presented to the public or that Johnson & Johnson had access to this information. Moreover, there is no evidence that the brackets were ever used for their intended purpose--to aid in the movement of teeth--which leads the Court to conclude that the "prior invention" was never reduced to practice. Thus, the Court concludes that the Andreikio experiments do not satisfy the criteria under § 102(a).

*9 Section 102(g) bars a patent where "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). Reduction to practice is a factor in determining priority of invention. *Id.* However, there is no personal knowledge requirement under § 102(g). *See E. I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1436-37 (Fed. Cir.1988). Again, the Court finds that the Andreikio prototypes were not reduced to practice. In addition, the Andreikio work was obviously abandoned or suppressed because it was first pursued in 1979 and not resurrected until 1983 or 1984. Ormco made whatever business decisions were necessary when the Andreikio work was first done and, as a result, that work was abandoned. Therefore, the Court concludes that Ormco has not rebutted the presumption of validity to which the Jones Patent is entitled.

Ormco also asserts that the Hirabayashi Patent, U.S. Patent No. 4,122,605 operates as prior art which renders the invention in the Jones Patent obvious. Ormco argues that the Hirabayashi Patent was not fully before the patent examiner because Johnson & Johnson did not disclose its full claim. The Court finds this argument 'unpersuasive. First, Johnson & Johnson clearly listed the Hirabayashi Patent in the prior art section of the Jones Patent. Ormco claims that describing the Hirabayashi Patent as a "somatic element" as opposed to a "dental implant" is misleading. However, Mr. Peshock, the patent examiner for the Jones Patent, states in his affidavit his familiarity with this area of inventions. Finally, even if the Court found that somehow Johnson &

Johnson had misled the patent examiner, the Court would still have to conclude at this juncture that the Hirabayashi Patent has no effect on the invention claimed in the Jones Patent. The invention in the Hirabayashi Patent appears to be only a screw type implant pin. It teaches nothing about the stress factors important to the orthodontic bracket, nor does it make any reference to the desirability to have this type of material in an orthodontic bracket. The patent gives no indication of the material's feasibility in orthodontics. The Court therefore must conclude that in examining the Hirabayashi prior art there is no evidence that it makes the Jones invention obvious.

Subsumed in this discussion of the Hirabayashi invention is Ormco's assertion that the Jones Patent is unenforceable because the inventors breached their duty of candor to the Patent and Trademark Office. The Court rejects this assertion. The Court concludes that there is no evidence of any fraud, or any intention to mislead the Patent Office especially considering that the Hirabayashi Patent was listed as prior art. As the United States Court of Appeals for the Federal Circuit stated in *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*:

> Conduct before the PTO that may render a patent unenforceable ["inequitable conduct"] is broader than "common law fraud". It includes failure to disclose material information, or submission of false material information, with an intent to mislead.... "Inequitable conduct" requires proof by clear and convincing evidence of a threshold degree of materiality of the nondisclosed or false information.... Inequitable conduct also requires proof of a threshold intent.... Once the thresholds of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conducted occurred.

*10 *J.P. Stevens & Co.,* 747 F.2d at 1559-60 (citations omitted). It is impossible at this juncture to conclude that Ormco has presented clear and convincing evidence of a threshold degree of materiality of the so-called nondisclosed or false information. On the evidence, the Court is convinced that there is not any undisclosed or false information at all.

On the issue of validity and enforceability, therefore, the Court must conclude that there is a reasonable likelihood that Johnson & Johnson will carry its burden at trial. Johnson & Johnson has also offered evidence to establish that there is a strong showing of validity. Johnson & Johnson states that the most

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1988 WL 155634                                                                  Page 8
1988 WL 155634 (D.Del.)
**(Cite as: 1988 WL 155634 (D.Del.))**

significant prior art was before the Patent Office, the
patent examiner was very experienced, having
researched these classes of patents on numerous
occasions, that the testimony of Ormco's own
witnesses indicates the validity of the patent, and that
all the secondary considerations point to the clear
validity of the patent.    At this juncture, especially
since Ormco has offered no substantive evidence to
rebut these assertions of Johnson & Johnson, the
Court agrees with Johnson & Johnson.    The
secondary considerations are particularly strong in
this case and as stated in *W.L. Gore & Assoc., Inc. v.
Garlock, Inc.*,

> The objective evidence of nonobviousness, i.e., the
> "indicia" of *Graham* ... may in a given case be
> entitled to more weight or less. depending on its
> nature and its relationship to the merits of the
> invention. it may be the most pertinent, probative,
> and revealing evidence available to aid in reaching
> a conclusion on the obvious/nonobvious issue.    It
> should when present always be considered as an
> integral part of the analysis.

*W.L. Gore, 721 F.2d 1540, 1555 (Fed. Cir.1983).*
The secondary considerations offered in this case are
Ormco's witnesses who state the desirability and
long-felt need in the industry for a clear orthodontic
bracket. as well as the immediate demand for the
sapphire bracket, and Ormco's inability to keep up
with demand on its own GEM (R) sapphire bracket.
The clear bracket is undoubtedly an immediate
commercial success.    Finally, it is well known in the
industry that a search for a clear, more aesthetically
appealing bracket has existed for over a decade, and
that all previous attempts to produce a such a bracket
have failed.    The invention claimed in the Jones
Patent has indeed met this long-felt need in the
industry.    In conclusion, the Court finds that
considering Ormco's challenges to the validity of the
Jones Patent together with the evidence offered by
both Ormco and Johnson & Johnson. that Johnson &
Johnson has not only met its burden of showing that
there is a reasonable likelihood of success on the
merits, but has also provided a strong showing of the
validity of the Jones Patent.

*Infringement.*

Ormco    has    on    many    occasions    admitted
infringement of the Jones Patent through the
production and sale of the GEM (R) bracket.
Therefore, there is no need for the Court to analyze
the infringement issue.    Since Ormco has conceded
infringement, the Court finds that Johnson & Johnson
has met the required showing for this element.

*2. Irreparable Harm.*

**\*11** Johnson & Johnson has met its burden of
showing a reasonable likelihood of success on the
merits both as to validity and infringement.    In
addition, Johnson & Johnson has offered evidence to
satisfy the requirement under *Smith International v.
Hughes Tool Co.* and, therefore, irreparable harm is
presumed.    Ormco's assertion that there is a lack of
irreparable harm is insufficient to rebut the
presumption.    Ormco raises the argument that
Johnson & Johnson was late in its motion and
therefore cannot possibly be irreparably harmed if the
injunction is not granted.    An examination of the
Complaint shows that Johnson & Johnson sought
preliminary relief at the time that it filed the
Complaint.    Furthermore, the Court concludes that the time of
bringing the motion for a preliminary injunction is
irrelevant in considering the actual harm that will be
suffered.

*3. Balance of Hardships.*

While Ormco raises legitimate concerns about the
affect that a preliminary injunction would have on its
business, the Court does not find that they are
sufficient to outweigh the other factors which
indicate that a preliminary injunction should be
granted.    Although the Court recognizes that Ormco
has no substitute product and that it cannot even
produce a sapphire bracket while the injunction is in
place,:he Court has found that the patent is more than
likely valid and cannot condone the admitted
continuing infringement of a valid patent.

*4. Public Interest.*

Once again, the public interest weighs in favor of
enforcing a patent that has been shown to be valid at
this preliminary juncture.    While the Court is
sympathetic to Ormco's concerns of ceasing the
manufacturing process and laying off employees,
they are not concerns that weigh heavily enough to
cancel either the public's interest in enforcing the
patent, nor in the other findings that indicate that a
preliminary injunction is proper.

CONCLUSION
The court has carefully considered all of the
supporting papers and affidavits and other evidence
submitted by the parties in support and against the
pending motions for preliminary injunction.    Having
evaluated all of this information and analyzed the
legal standards, the Court concludes that both

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A322

1988 WL 155634
1988 WL 155634 (D.Del.)
(Cite as: 1988 WL 155634 (D.Del.))

Page 9

preliminary injunctions should be granted. There is strong indicia that both patents are valid and both patents are infringed. None of the remaining factors weigh strongly enough to overcome the conclusion that each patentee will succeed on the merits and that irreparable harm has been suffered. After considering the four factors which must be weighed in a preliminary injunction motion with respect to each patent, the Court concludes on the preliminary evidence with which it has been provided for the purposes of these motions that Johnson & Johnson should be prevented from continuing to sell its STARFIRE (R) bracket as long as it maintains the infringing rhomboidal shape and Ormco should be prevented from continuing to sell its GEM (R) sapphire bracket.

The parties are requested to submit a proposed form of order consistent with this Opinion, and may submit memoranda on the issue of bond.

1988 WL 155634 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A323