

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

DYSON TECHNOLOGY LIMITED and
DYSON, INC.,

              Plaintiffs,

      v.

MAYTAG CORPORATION,

            Defendant.

C.A. No. 05-434 (GMS)

## AFFIDAVIT OF JAMES DYSON

COUNTRY OF ENGLAND  )
                  :   ss.
COUNTY OF WILTSHIRE  )

      JAMES DYSON, being duly sworn, deposes and says:

      1.      I am a Director and the majority shareholder of Dyson James Limited, which is the direct parent of plaintiff Dyson Technology Limited and the indirect parent of plaintiff Dyson, Inc. (collectively, "Dyson"), and submit this affidavit in support of Dyson's motion for a preliminary injunction. Dyson Technology Limited owns the patent rights to certain technology that I (and in some instances I and others) invented for use in vacuum cleaners. Dyson, Inc. sells Dyson branded vacuum cleaners in the United States. As is shown below and as I believe will be shown in the accompanying affidavit of Gareth Jones, defendant's "Hoover Fusion" vacuum cleaner infringes the four patents in suit and, unless defendant Maytag Corporation ("Maytag") is

enjoined from importing that vacuum cleaner from China and selling it in the United States, Dyson faces irreparable injury.

## Personal Background

2.    I was born in Norfolk, in the English countryside in 1947. During my youth, I attended, on partial scholarship, the boarding school at which my late father (who died when I was 9) taught.

3.    After leaving school in 1965 I studied art at the Byam Shaw Art School in London for a year before studying at the Royal College of Art. I attended the Royal College of Art for four years studying both furniture and interior design. During this time, I became interested in structural engineering as a result of the fact that I realized its importance in product design.

4.    Whilst still at the Royal College of Art, I became involved with a company called Rotork plc (run by a Mr. Jeremy Fry) which had very successfully made motorized valve actuators. Jeremy had also developed a new form of boat, a very wide flat-bottomed craft. He and I worked together designing, developing and building a prototype of what came to be known as the Sea Truck, a boat designed to carry a one ton payload at up to 50 mph. Rotork set up a subsidiary company to develop and sell the Sea Truck. Upon leaving the Royal College of Art, I joined that company. I spent several years developing the boat and demonstrating it to potential buyers around the world, building up a company with a turnover of many millions of pounds.

5.    In 1974 I left Rotork to set up a business of my own. This business was to develop an improved design of the device commonly known as a wheelbarrow.

A8

My new design became known as the "Ball Barrow." Together with other investors, I set up a company, Kirk Dyson Limited, to design and develop this project. After initial difficulties, we very successfully took a share of the market traditionally occupied by wheelbarrows, selling some 45,000 Ball Barrows a year. Although the product was successful, the company experienced difficulties in licensing agreements and in trying to break into the United States market. With interest rates rapidly rising, all this led to cash flow problems. I left the company in 1979.

## Inspiration for the Development of a Vacuum Cleaner Using Cyclonic Technology

6.      In or around 1978, after developing a number of other products with varying degrees of success, I came up with the idea of developing a vacuum cleaner employing cyclonic technology. My innovation was the result of two personal experiences.

7.      The first of these experiences occurred when manufacturing the Ball Barrow. The metal frames of the barrows were sprayed with an epoxy powder which melted when heated and formed a coat of paint. The powder was sprayed out of a gun in electrically charged form so that it would cling to the metal frame. Large amounts of the spray would miss the frame and had to be collected for re-use by means of a large fan powered by an electric motor behind a cloth screen. The fan provided enormous suction which drew the air and powder into the cloth which filtered the air. The problem was that production had to stop every hour or so because the cloth screen filled and clogged, whereupon it had to be emptied, brushed down, and the powder gathered up to be re-used. This was time consuming, inefficient and messy.

-3-

8.      We raised this problem with the supplier of the epoxy spray equipment and were told that large industrial users of their equipment used a cyclone to recover the unused powder. This was the first time I had heard of such a device. I found out that this was a very large cone typically 30 feet high. The powder-laden air would be sucked into the cone and spun down it. The powder or particles would be separated from the air by centrifugal force and dropped out the bottom of the cone. Such devices were to my understanding large scale industrial devices used for collecting paint powder, for example, or saw dust in saw mills.

9.      The price for the installation of this type of cyclone was more than we could afford. I was, however, intrigued by the idea and we started making a large cyclone by welding sheets of steel, and soon produced a cyclone which effectively and continuously removed the particles from the air.

10.      The other experience occurred at around the same time at home. At the time, I undertook a fair amount of domestic chores, including quite often the vacuum cleaning. The vacuum cleaner we had owned up until this time was an old reconditioned Hoover Junior. This was a simple bag vacuum cleaner which used a fan and electric motor to blow dirt into a cloth bag. I decided to buy another cleaner and bought a large cylinder cleaner advertised at the time as being the most powerful on the market. It was also a Hoover machine. This machine sucked through a paper bag as opposed to blowing dust into a cloth bag as on the Hoover Junior. I was immediately struck by the fact that although the new vacuum cleaner seemed to work well for a room or two when we first bought it, it soon lost suction. One particular weekend I went to

-4-

A10

replace the paper bag and found that we had no new bags left at home. I therefore decided to cut open the existing bag, empty it and then re-use the bag by taping it back together. The machine appeared to have no more suction than before I had emptied the bag. I bought some new paper bags and tried these and the cleaner worked well again, but only for a short period of time. I realized that the problem was not the fact that the bag was full but that the dust was clogging the pores in the bag which filtered the air, thereby reducing the airflow through the cleaner. I remember feeling very cross. I felt that I had spent a large amount of money on the most powerful vacuum cleaner available but it suffered from the same problem as the old second-hand one I had always had, which because of its permanent cloth bag was permanently and irrecoverably clogged.

11.      It then occurred to me that a form of cyclone technology like that which we were using to recover the epoxy powder, as described above, might be usable in a vacuum cleaner. I wondered whether it would work in miniature. I took the old Hoover Junior, removed the bag arrangement and made out of cardboard, using kitchen scissors and tape, a miniature version of the 30 foot cone which had been used at the factory. I connected the cyclone to the cleaner's existing blowing fan. The cleaner appeared to work. At that moment, I decided that I would attempt to produce a non-clogging vacuum cleaner using cyclonic technology.

12.      Initially, I tried to interest my co-shareholders in the Ball Barrow company to join me in this project. I was excited by the prospect of producing a non-clogging or cyclonic vacuum cleaner and suggested the product to the other shareholders. There were very scornful, however, and were the first to tell me that if a better vacuum

-5-

cleaner could be designed, Hoover or Electrolux would have done it. I was therefore left on my own to develop the technology.

## Development of the Vacuum Cleaner Using Cyclonic Technology

13.    In 1978, cyclones were new to me. The problem before me was to develop a cyclonic separator that worked well with the kind of dust which one finds in a domestic environment.

14.    I took a look at the vacuum cleaners which were available in the shops near my home in Bath, England. All were vacuum cleaners with a bag or a variation on a bag in that they separated dirt from the air by sucking or blowing air through a bag or through a membrane of the kind one would find in a bag. The vast majority of vacuum cleaners had bags. They were all of simple construction and consisted essentially of an electric motor, a fan and a bag through which the air carrying the dirt was sucked or blown. In essence, this was the same technology which was invented by the British engineer Hubert Cecil Booth in 1902.

15.    For more than five years, I worked out of a carriage house in the back of my home experimenting with cyclonic technology. During this period of time I conducted thousands of experiments and designed and re-designed numerous prototypes of bagless vacuum cleaners relying on cyclonic technology. As a result of my efforts, I created a vacuum cleaner unlike any that had ever to my knowledge been made before. Using cyclonic technology, I created a vacuum cleaner that retains all of the wide variety of household dirt and debris typically found on carpets and floors without losing suction. My vacuum cleaner is capable of achieving this result because it does not use a bag to

-6-

trap the dirt in a container but rather employs the use of two cyclones and the centrifugal force created by them to separate dirt and other debris from the air and deposit them into an easily emptied collection chamber.

16.    In simple, non-technical terms, my cyclonic technology consists of an outer, relatively lower speed cyclone formed by a cylinder-shaped container and an inner, high-speed cyclone formed by a cone-shaped device. Air flows tangentially into the outer container at high speed, creating centrifugal force. This centrifugal force separates larger particles from the air, which are deposited at the bottom of this container. The air from the outer container then makes its way into the top of the cone-shaped cyclone, which increases the velocity of the particles to a much higher speed. This creates sufficient centrifugal force to capture the tiniest particles – even cigarette smoke. These particles are trapped in a separate dirt container at the bottom of the cone-shaped cyclone. Because the dirt and debris are trapped at the bottom of the containers and the air flow does not have to travel through a bag or other membrane that can clog, the vacuum cleaner does not lose suction.

## Initial Efforts to License My Technologies

17.    Initially, I thought I would myself manufacture vacuum cleaners employing my technology. But because I had accumulated significant debt, I had little option but to try to license my inventions. Beginning in the early 1980s, I approached many companies with prototypes of my cyclonic technology, hoping that they would provide me with funding to fully develop the technology. Most companies, however,

-7-

were not interested. I found that all of these companies used bags for collecting dirt and their attitude was why should they consider using any other type of technology.

18.    This lack of interest in technology other than bags was confirmed by a statement made by Mike Rutter on the "Money Programme" (a UK television show) which was broadcast in November 1995. At that time, Mr. Rutter was an executive who I understand worked for a UK company that sold Hoover branded vacuum cleaners in Europe. It is my understanding that, until June 1995, that company had been owned by Maytag. In substance, Mr. Rutter stated that Hoover regretted not buying my product technology because it would have seen to it that my technology never saw the light of day. A transcript of a portion of this interview is attached as Exhibit 1 to this affidavit.

19.    I did however have some success in licensing my vacuum cleaner technology. In the mid-1980s, for example, I licensed some of my technologies to a Japanese company called Apex for use in a vacuum cleaner called "G-Force." Around the same time, I also entered into a licensing arrangement with a Canadian company called Iona to use my cyclonic technology in certain products in Canada and the United States. I also agreed to licensing arrangements with S.C. Johnson & Son, Inc in North America and Automation Panels Limited (which according to my recollection was a division of Rotork plc) in the UK. After some litigation, the American company Amway also licensed certain of my technology. In 1991, I entered into an agreement with one of the major English manufacturers, Vax, to design an upright vacuum cleaner for it to manufacture for the UK market. By the end of 1991, we had provided Vax with a model and all the final drawings for this cleaner. There then followed a long period of delay

-8-

where I did not feel Vax was making sufficient effort to get the cleaner into production and on sale. Eventually, by September of 1992, we fell out over this delay, our agreement came to an end, and a legal action between us resulted. This action eventually was settled. A copy of the agreement with S.C Johnson & Son, Inc licensing certain of my cyclonic technologies, including technologies protected by three of the four patents in suit, is attached as Exhibit 2.

### The Decision to Manufacture and Sell my Own Vacuum Cleaners

20.    Although the money I received from these licenses did not make me wealthy, it did help me to pay off some of my debt. As a result, I felt able to change my approach. In about the early 1990s, I decided to take the major step of manufacturing vacuum cleaners myself. After trying to raise capital from merchant banks and financiers without success, I finally was able to borrow £600,000 from Lloyds Bank, putting up my house as security.

21.    Working out of the very carriage house in which I had constructed the first prototype cyclonic vacuum cleaner years earlier, I assembled a team of four design engineers that I had recruited from the Royal College of Art to assist me in developing the first "Dyson" branded vacuum cleaner. The first model, a DA001 (later known as the DC01), was available in the UK in January 1993.

22.    By late 1995, only a few years since we began selling "Dyson" branded vacuum cleaners in the UK, we had captured the largest share of the UK vacuum market by value, displacing the previous market leaders, Electrolux and Hoover. By January 1997, the value of vacuum cleaners sold by Dyson was more than the value of

vacuum cleaners sold under the Electrolux and Hoover name brands combined. By 2002 – according to one public report – Dyson had approximately 45% of the UK vacuum cleaner market, in terms of value. (*See* Market Research Monitor, *UK Market for Vacuum Cleaners & Irons (November 2003)*, http://www.euromonitor.com/mrm/default.asp.)

23.    Until 2001, I was barred from selling vacuum cleaners in the United States, by far the largest vacuum cleaner market in the world, because the license that I had given to Iona contained a U.S. non-competition clause. As of December 2001, this prohibition no longer existed. In the Autumn of 2002, Dyson began to sell its vacuum cleaners in the United States. Recently published statistics show that, in the short time Dyson vacuum cleaners have been available in the U.S. market, Dyson has become the #1 seller of upright vacuum cleaners by value with Dyson vacuum cleaners accounting for more than 20% of the total upright market, and it is #5 by volume.

**Improvements on My Cyclonic Technology**

24.    Perfecting a household appliance such as a vacuum cleaner is a continual and continuous process. Even after my invention of the cyclonic technology described above, I and others working for my companies have spent innumerable hours and resources developing improvements to this technology. Over a period of many years, we have continued to work tirelessly to develop many innovations, and have obtained a number of U.S. patents to those inventions as well.

25.    Many of these inventions have been employed on "Dyson" branded vacuum cleaners sold in the United States and elsewhere. Each of these

-10-

A16

inventions improves on my earlier technology and was the result of much experimentation, hard work and investment.

26.    When dealing with cyclonic technology, it is often very difficult, if not impossible, to know how a design change may affect airflow and the efficiency or operation of the machine. Even minor changes in engineering design can have unexpected consequences or make a significant impact on how well overall the technology works. It has been our regular practice, therefore, to modify earlier designs and to continue to challenge various aspects of our technology in order to test whether and to what extent these modifications improve on the earlier designs. I have found that through such a constant and iterative process we have been able to achieve significant improvements on earlier designs.

### The Patents at Issue

27.    The patents in issue in this action relate to improvements to my cyclonic technology described above that resulted from further experimentation. As I discovered during my experimentation, one of the difficulties with using the two cyclones alone is that sometimes larger lightweight items such as fluff and long strands can get clogged in the mechanisms. Also, in some earlier designs, debris deposited in the collection chamber below the inner cyclone sometimes would get caught in the exhaust air that flowed upward from base of the chamber and became re-entrained in the air exiting through the center of the inner cyclone. The inventions embodied by the patents in suit, among other things, help prevent these problems.

-11-

28.    For example, I invented a "Cleaning Apparatus" that included a disc mechanism designed, among other things, to prevent fibrous material from escaping the outer cyclone (or container) into the inner cyclone and to prevent long strands such as human hair from clogging the container outlet. The disc surrounds the inner cyclone and acts as a partial barrier for the debris in the outside cyclone (or container), preventing it from flowing into the air inlet to the inner cyclone. The use of a disc for this purpose was not an obvious solution and was arrived at only after numerous other designs were tried and tested. This invention was patented in the United States and elsewhere, and the United States patent issued on February 17, 1987, as Patent No. 4,643,748 (the "'748 Patent"). This is one of the patents in suit.

29.    I also invented a "Combined Disc and Shroud for Dual Cyclonic Apparatus" that improved further on the '748 Patent. In simple terms, the shroud is a covering with, in this patent, perforations that surround the inner cyclone and act like a screen. This improved design placed the disc at the lower end of the shroud for mounting on the outside of the inner cyclone. After much experimentation, I discovered that placement of the disc at this location provided better separation of dirt in the outer cyclone than was achieved by the earlier apparatus. This invention was patented in the United States and elsewhere, and the United States patent issued on August 1, 1989, as Patent No. 4,853,008 (the "'008 Patent"). This is also one of the patents in suit.

30.    I also designed a "Vacuum Cleaning Apparatus" with features to assist in preventing dirt and other debris from re-entering the inner cyclone after being deposited into the collection chamber at the bottom of the inner cyclone. Among other

-12-

things, this invention requires that the diameter of the bottom of the collection chamber be at least 3 times the diameter of the cone opening. Through experimentation with numerous collection chamber sizes, I discovered that a wider collection chamber helped to prevent re-entrainment of debris into the inner cyclone. This invention was patented in the United States on May 2, 1989, as Patent No. 4,826,515 (the "'515 Patent"). This is another patent in suit.

31.    I also designed, with two others, a "Dust Separation Apparatus" that, among other things, sets out the distances between the cone opening of the conical cyclone and the base surface of the collector that are most advantageous to dust separation efficiency. After testing the efficiency of dust separation at various distances, my co-inventors and I determined that the apparatus separated dust best when the distance between the cone opening and the base surface was either less than 8 mm or between 30 mm and 70 mm. This invention was patented in the United States and elsewhere, and the United States patent issued on January 12, 1999, as Patent No. 5,858,038 (the "'038 Patent"). This is the last patent in suit.

## Maytag's "Hoover Fusion" Vacuum Cleaner

32.    Dyson's meteoric rise in the vacuum cleaner market has no doubt caught Maytag's attention. As indicated, Dyson vacuum cleaners have quickly captured much of the U.S. vacuum cleaner market. Indeed, I understand that, at least as of early July 2005, if one visits Maytag's Hoover division website located at www.hoover.com, the first thing that appears is an advertisement specifically targeting vacuum cleaners sold by Dyson and no other vacuum cleaner manufacturer.

-13-

33.    Maytag very recently has begun to import from China and sell in the United States a vacuum cleaner known as the "Hoover Fusion," which employs my cyclonic technology and related inventions.

34.    I do not purport to be a patent expert and I have not at this moment studied in detail the patent infringement issues. In my personal opinion, however, the Hoover Fusion appears to utilize my inventions that are protected by the U.S. Patents '748, '008, '515 and '038. The Hoover Fusion contains my disc and shroud inventions. The diameter of the dirt collection chamber appears to be at least 3 times the diameter of the Hoover Fusion's cone opening. And, although I have not conducted precise measurements, the distance between the cone opening and the base surface of the Hoover Fusion's container appears to be set within the range my '038 Patent identifies as the most optimal for dust separation efficiency. In essence, Maytag is improperly free riding on my technology to better the basic cyclonic technology used in its Hoover Fusion vacuum cleaner.

35.    To my knowledge, this is the first time that a company or any other person has attempted to infringe the '008 Patent or the '038 Patent since they were issued. I am aware of only one company or person that, in my opinion, has attempted to infringe the '748 Patent and the '515 Patent since they were issued. That attempted infringement involved Amway and was, along with other claims, the subject of the litigation discussed above in paragraph 19. As indicated in paragraph 19, the Amway litigation was settled and Amway subsequently became a licensee of certain of my

-14-

A20

technologies, including certain technologies protected by the '748 Patent and the '515
Patent.

36.     Maytag's infringing activity has just begun. I first heard reports of
the Hoover Fusion being sold at Wal-Mart stores in the United States only several weeks
ago. To my knowledge, the "Fusion" has been available for purchase through Wal-
Mart's website only since about the beginning of July and it has not yet been widely
advertised by Maytag or Wal-Mart. This latter fact may of course change. If it has not
already done so, Maytag also may in the future sell the Hoover Fusion to other major
American retailers. According to Maytag's Hoover division website, in addition to Wal-
Mart, other Hoover cleaning appliances currently are sold at such major American
retailers as Sears, Lowe's, Best Buy, Target, K-Mart, Bed Bath & Beyond, Linens &
Things, JC Penny, Costco, Sam's Club, and Amazon.com. According to a 20 June, 2005,
article in the business-trade publication *TWICE (This Week in Consumer Electronics)*,
Sears, Lowe's, Best Buy and Wal-Mart are four of the top five major appliance retailers.
Unless Maytag is enjoined from importing and selling the Hoover Fusion, Dyson will
suffer irreparable injury.

37.     Dyson vacuum cleaners have made significant inroads in the
United States vacuum cleaner market since 2002, apparently reflecting the fact that many
United States consumers find Dyson vacuum cleaners, and the technology in them, better
than the technology in the traditional vacuum cleaners sold by other companies. If
Maytag is permitted to continue selling the Hoover Fusion, which utilizes technology in

-15-

four of my U.S. patents, Dyson faces a very serious threat of perhaps a significant reversal of what it has been able to accomplish in the past three years.

38.    Dyson's position in the United States is inherently vulnerable. Although I understand that Hoover vacuum cleaners have been sold in the United States since 1908 and Hoover has been a recognized brand name in the United States for decades, Dyson has been selling vacuum cleaners in the United States for only a very short period of time. Dyson has not yet had the opportunity to develop substantial and widespread goodwill and brand loyalty in the United States.

39.    It is not uncommon for a Dyson vacuum cleaner to sell in the United States for more than $400. Wal-Mart is selling the Hoover Fusion for about $128. If Maytag is permitted to import and sell the Hoover Fusion with the infringing technology, Dyson may be in a very difficult position to compete.

40.    There is also the real risk that permitting Maytag to continue using my patented inventions will encourage other major vacuum manufacturers to act similarly in an effort to stop Dyson's success in the United States before Dyson develops widespread brand loyalty. Money damages could not fully compensate Dyson for the effects that such conduct might have on the Dyson brand in the United States.

_____
James Dyson

Sworn to before me this
22nd day of July, 2005

_____
Notary Public
Malmesbury
Wiltshire, U.K.

-16-

A22



## APOSTILLE
(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

### UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

1.  Country:  United Kingdom of Great Britain and Northern Ireland
    Pays:  Royaume-Uni de Grande-Bretagne et d'Irlande du Nord

    This public document / Le présent acte public

2.  Has been signed by       A J Gill
    a été signé par

3.  Acting in the capacity of    Notary Public
    agissant en qualité de

4.  Bears the seal/stamp of    The Said Notary Public
    est revêtu du sceau/timbre de

5.  at London/à Londres

    Certified/Attesté
6.  the/le    25 July 2005

7.  by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
    par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth.

8.  Number/sous No      **G763581**

9.  Stamp:                        10. Signature:    K. Khan
    timbre:





*For the Secretary of State / Pour le Secrétaire d'Etat*

If this document is to be used in a country which is not party to the Hague Convention of 5 October
1961, it should be presented to the consular section of the mission representing that country. An
apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is
genuine. It does not mean that the contents of the document are correct or that the Foreign &
Commonwealth Office approves of the contents.

EXHIBIT 1

**Partial transcript of 19 November, 1995 broadcast of the British television show called, "The Money Programme"**

| | |
|---|---|
| Jane Corbin[1]<br>(Voiceover): | Hoover are happy – they knew what they were doing when they turned Dyson away. They get a dozen approaches a week claiming "earth moving" new cleaners. They know how to spot a good thing and he wasn't it. But they admit unashamedly, they wish now they had strangled Dyson's baby at birth. |
| Mike Rutter:[2] | There are two reasons for taking on new technology. The first is to put it into your product range and the second is to take it off the shelf to make sure that nobody else can use it. We actually believe that our products beat the Dyson's products on all of the key features. However, I do regret that Hoover as a company did not take the product technology off the shelf, take it off Dyson – and it would have lain on the shelf and not have been used. |
| Jane Corbin: | So, what about now – would you consider a cyclonic arrangement like his now? |
| Mike Rutter: | Well, in terms of cyclonic arrangement it has some benefits, he's exploited them, but he's patented them, so even if we chose to go down that route, in terms of large scale benefits we can't, so we won't. |

---

[1] Ms. Corbin worked for The Money Programme.

[2] Mr. Rutter was identified on this programme as "Vice President, Hoover Europe."

## EXHIBIT 2

DATED   4th NOVEMBER     1991

NOTETRY LIMITED

- and -

S.C. JOHNSON & SON, INC.

PATENT LICENCE

- relating to -

CERTAIN INDUSTRIAL CYCLONIC VACUUM CLEANERS

ROSLING KING
2/3 Hind Court
Fleet Street
LONDON
EC4A 3DL

GC/JAK/0879I
30.10.1991

A25

T̲H̲I̲S̲   A̲G̲R̲E̲E̲M̲E̲N̲T̲ is made on the 4th day of NOVEMBER 1991

B̲E̲T̲W̲E̲E̲N̲:-

(1)   NOTETRY LIMITED of  Sycamore House, Bathford, Bath, BA1 7RS ("Notetry"); and

(2)   S.C. JOHNSON & SON, INC of 1525 Howe Street, Racine, Wisconsin 53403-5011, U.S.A. ("Johnson")

W̲H̲E̲R̲E̲B̲Y̲ ̲I̲T̲ ̲I̲S̲ ̲A̲G̲R̲E̲E̲D̲ as follows:-

1. — D̲E̲F̲I̲N̲I̲T̲I̲O̲N̲S̲

    In  this  Licence  unless  the  context  otherwise requires:-

    "the Design Rights" means the registered designs and registered design applications (if any) particulars of which are set out in Part B in Schedule I together with any registered designs which may hereafter be obtained pursuant to any such applications; all copyright and design rights, subsisting in the Territory belonging to Notetry or which Notetry is otherwise entitled to licence to Johnson, in all designs relating to the Products whether created prior to or after the execution of this agreement (including, without limitation, any designs relating to any such Development Project Innovations as are referred to in clause 4(6) and any designs relating to any such Improvements as are referred to in clause 18 being Development Project Innovations and Improvements which are expressed by clause 18(2) to belong to Notetry) and any registered  designs  and  registered  design applications in the Territory which may hereafter be

-1-

A26

made by Notetry in respect of any such designs to the extent that any of them has not been declared unenforceable and/or invalid by a court having competent jurisdiction;

"the Patents" means the patents and patent applications (if any) particulars of which are set out in Part A of Schedule I, together with any patents which may hereafter be obtained pursuant to any such applications, any patents which may be granted in the Territory in respect of any such Improvements as are referred to in clause 18, being patents which are expressed by that clause to become Patents for the purpose of this Agreement and any patents which may be granted in the Territory in respect of any such Development Project Innovations as are referred to in clause 4(6) which are expressed by clause 18(2) to belong to Notetry including, in each case, any continuations, divisions, reissues and re-examinations thereof to the extent that any of them has not been declared unenforceable and/or invalid by a court having competent jurisdiction;

"the Inventions" means the inventions the subject of the Patents;

"the Know-How" means the information, knowledge and experience relating to the Inventions in the possession of Notetry other than any information, knowledge and experience which is generally known in the trade of the manufacture of vacuum cleaners;

"the Territory" means the whole world;

"PACFE" means those countries in the Territory in the Pacific Basin and Far East including without limitation those set out in Schedule II;

-2-

"Products" means all industrial vacuum cleaners (being machines which do not combine the vacuum cleaning function with any other cleaning function or operation) designed primarily for floor care, dusting and other general cleaning operations in commercial and industrial buildings incorporating a cyclonic dust separation mechanism made in accordance with the Inventions and any vacuum cleaner incorporating a cyclonic dust separation mechanism made in accordance with the Inventions integrated into a floor polishing device manufactured by Johnson and designed primarily for use in commercial and industrial buildings (or for use by cleaning service contractors providing service to commercial and industrial buildings) and (in each case) conforming to the distinctions between "Products" and "domestic versions of Products" specified in Schedule VI but specifically excluding any extraction or collection mechanisms designed as part of any other machine or for any specialised extraction or collection operations, and specifically excluding upright vacuum cleaners other than Licensed Uprights and Sub-Contracted Uprights;

"Uprights" means upright vacuum cleaners which would fall within the definition of "Products" but for the specific exclusion of upright vacuum cleaners (other than Licensed Uprights and Sub-Contracted Uprights) from that definition;

"Non-Uprights" means vacuum cleaners which fall within the definition of "Products" but which do not fall within the definition of "Licensed Uprights" or "Sub-Contracted Uprights" so that all Products shall either be Non-Uprights, Licensed Uprights or Sub-Contracted Uprights;

"Licensed Uprights" means all upright industrial vacuum cleaners (being machines which do not combine

-3-

the vacuum cleaning function with any other cleaning function or operation) manufactured by Iona Appliances Inc. or by another manufacturer (other than Alco) licensed to manufacture such vacuum cleaners under the Patents, in either case designed primarily for floor care, dusting and other general cleaning operations in commercial and industrial buildings incorporating a cyclonic dust separation mechanism made in accordance with the Inventions but specifically excluding any extraction or collection mechanism designed as part of any other machine or for any specialised extraction or collection operations, so that all Licensed Uprights are Products but not all Products are Licensed Uprights;

"Domestic Licencee" means a manufacturer other than Amway licensed under the Patents to manufacture upright domestic vacuum cleaners (being machines which do not combine the vacuum cleaning function with any other cleaning function or operation) designed primarily for floor care, dusting and other general cleaning operations in private dwellings otherwise than in the course of a business incorporating a cyclonic dust separation mechanism made in accordance with the Inventions but specifically excluding any extraction or collection mechanism, designed as part of any other machine or for any specialised extraction or collection operations and specifically excluding so called stickvacs;

"Sub-Contracted Uprights" means all upright industrial vacuum cleaners (being machines which do not combine the vacuum cleaning function with any other cleaning function or operation) manufactured by a Domestic Licensee for Johnson pursuant to this Agreement designed primarily for floor care, dusting and other general cleaning operations in places other than commercial and industrial buildings

-4-

incorporating a cyclonic dust separation mechanism made in accordance with the Inventions but specifically excluding any extraction or collection mechanism designed as part of any other machine or for any specialised extraction or collection operations;

"Net Selling Price" means:-

(a)    in the case of sales other than those referred to in paragraphs (b), (c) and (d) below, the gross revenue obtained for Products sold by Johnson or its Subsidiaries to a Third Party less the following: sales returns, discounts other than (i) retrospective discounts, (ii) discounts given in connection with the sale of goods other than Products (such that Johnson is compensated for the discount on the Product by a receipt in respect of other goods) and (iii) discounts given in connection with the defraying of the customer's advertising and marketing expenses but only to the extent that they relate to the defraying of such expenses; sales taxes, turnover taxes, value added taxes and excise taxes (but not income or profit taxes); import and export duties; all costs relating to transportation and freight, if separately stated; and amounts credited or refunded for defective Products;

(b)    in the case of sales other than those referred to in paragraph (d) below by Johnson or a Subsidiary to a Subsidiary by which the Products are then sold on to a Third Party at arm's length, the price at which the Products are sold by the last mentioned Subsidiary to the Third Party after deduction of the items

-5-

referred to in paragraph (a) above whether incurred by Johnson or either Subsidiary;

(c)    in the case of any sale which is not at arm's length other than those mentioned in paragraph (b) above or paragraph (d) below, or in the case of the use of Products by Johnson or a Subsidiary itself a price equivalent to the lowest published price at which Johnson or such Subsidiary has regularly sold Products to a Third Party at arm's length during the twelve month period prior to such sale;

(d)    in the case of sales of floor polishing devices with an integrated vacuum cleaner incorporating a cyclonic dust separation mechanism made in accordance with the Inventions, a proportion of the Net Selling Price calculated in accordance with paragraph (a), (b) or (c) above, as appropriate, being the same proportion as the manufacturing cost of such vacuum cleaner bears to the manufacturing cost of the complete Product;

"Subsidiary" means any entity at least fifty-one per cent of which is owned or controlled either directly or indirectly by Johnson except in a case where local law as to the control of corporations by overseas investors requires Johnson to have a lesser interest, in which case "Subsidiary" includes an entity in which the percentage owned or controlled by Johnson is the maximum permitted by local law or 25 per cent whichever is the greater;

"consumer" shall, in relation to a vacuum cleaner, mean a person who purchases that vacuum cleaner otherwise than in the course of a business;

-6-

A31

"domestic versions of Products" shall mean domestic vacuum cleaners (being machines which do not combine the vacuum cleaning function with any other cleaning function or operation) designed primarily for floor care, dusting and other general floor care operations in places other than commercial and industrial buildings incorporating a cyclonic dust separation mechanism made in accordance with the Inventions, any vacuum cleaner incorporating a cyclonic dust separation mechanism made in accordance with the Inventions integrated into a floor polishing device designed primarily for use in places other than commercial and industrial buildings and (in each case) conforming to the distinctions between "Products" and "domestic versions of Products" specified in Schedule VI, but specifically excluding any extraction or collection mechanisms designed as part of any other machine or for any specialised extraction or collection operations;

"Fiscal Year" means each of Johnson's fiscal years which begin on the Saturday closest to the end of June. The 1989/90 Fiscal Year began on 1st July 1989;

"Fiscal Quarter" means each of the four 13 week periods beginning on the first day of Johnson's Fiscal Year. For Johnson's 1990/91 Fiscal Year, the Fiscal Quarters began on June 30 1990, September 29 1990, December 29 1990 and March 30 1991;

"Contract Year" means the Fiscal Year commencing on June 29 1991 and each succeeding Fiscal Year during the term of this Agreement;

"Third Party" means a person or corporation other than Johnson, a Subsidiary or Notetry;

-7-

A32

"Development Project" means the work to be undertaken by the parties pursuant to clause 4;

"Prototypes" means Prototypes Limited of Sycamore House, Bathford, Bath  BA1 7RS

2.    <u>LICENCES</u>

Subject to the terms of this Agreement:

(1)    Notetry hereby grants to Johnson a licence under the Patents and in accordance with the Inventions to manufacture, sell and use Non-Uprights in the Territory.

(2)    Notetry hereby grants to Johnson a licence under the Design Rights to manufacture, sell and use Non-Uprights in the Territory.

(3)    Notetry hereby grants to Johnson a licence to use the Know-How in connection with the manufacture, sale and use of Non-Uprights in the Territory.

(4)    Notetry hereby grants to Johnson a licence under the Patents and in accordance with the Inventions to sell Licensed Uprights and Sub-Contracted Uprights in the Territory except for Japan, Canada and the U.S.A.

(5)    Notetry hereby grants to Johnson a licence under the Design Rights to sell Licensed Uprights and Sub-Contracted Uprights in the Territory except for Japan, Canada and the U.S.A.

(6)    Notetry hereby grants to Johnson a license under the Patents and in accordance with the Inventions to have Sub-Contracted Uprights

-8-

manufactured for it by Domestic Licensees in the Territory except for Japan, Canada and the U.S.A.

(7)    Notetry hereby grants to Johnson a licence under the Design Rights to have Sub-Contracted Uprights manufactured for it by Domestic Licensees in the Territory except for Japan, Canada and the U.S.A.

(8)    Notetry hereby grants to Johnson a licence to use the Know-How in connection with having Sub-Contracted Uprights manufactured for it by Domestic Licensees in the Territory except for Japan, Canada and the U.S.A.

(9)    Notetry shall, at Johnson's request, procure that Prototypes shall promptly offer to Prototype's existing Japanese licensee, Alco, the right to sell Licensed Uprights or Sub-Contracted Uprights, as the case may be, made by a specified manufacturer into the non-consumer market in Japan, pursuant to a right of first refusal contained in the licence agreement between Prototypes and its aforesaid Japanese licensee, and if terms shall not have been agreed between Prototypes and its aforesaid Japanese licensee within a reasonable time from the date of such offer, Notetry shall grant to Johnson licences to sell in Japan Licensed Uprights or Sub-Contracted Uprights, as the case may be, made by that specified manufacturer such licences to be equivalent to those set out in sub-clauses (4) and (5) above, and otherwise on the terms of this Agreement, save for the insertion in clause 5(4) of the words "and other than Japan (if there shall cease to be a patent in Japan) in the case of upright

-9-

vacuum cleaners" immediately after the words "other than Australia or New Zealand".

(10)  To the extent required by local law for protection of Patents or Design Rights and to the extent necessary or desirable to pursue infringers and/or protect the Patents Johnson shall, at the request of Notetry, execute formal patent licence agreements, substantially in the form set out in Schedule III (but subject to such amendments as may be required to give effect to the other provisions of this Agreement) and formal registered design licence agreements in such form as Notetry shall reasonably require, in respect of each country in the Territory and shall register or join with Notetry in registering each such licence at the patent office or designs registry (as the case may be) of each such country. The costs of such registration shall be borne equally between Notetry and Johnson.

3.    CONFIDENTIAL INFORMATION

(1)  All information of a confidential nature (including, without limitation, Know-How) which is disclosed by either Johnson or Notetry to the other party as a result of this agreement shall be maintained in strict confidence and not disclosed by the receiving party to any Third Party, or used for the receiving party's benefit, or published without the prior written consent of the disclosing party. This obligation shall exist both during and after the term of this Agreement.

-10-

(2)    Information shall not be considered confidential nor subject to this Agreement if it can be demonstrated by written records:

(a)    to have been rightfully in the possession of the receiving party prior to the date of the disclosure or development of such information;

(b)    to have been generally known within the vacuum cleaner industry prior to the disclosure or development of such information;

(c)    to have become generally known within the vacuum cleaner industry by publication or by any other means except by or as a result of an unauthorised act or omission on the part of the receiving party; or

(d)    to have been supplied to the receiving party without restriction by a third party without involving (directly or indirectly) any breach of confidence.

(3)    At any time, upon the disclosing party's written request, the receiving party shall return to the disclosing party any and all written or physical embodiments (except for one (1) copy for record purposes) of the information disclosed which is then in the possession of the receiving party. Upon termination of this Agreement (other than termination by expiration of the licences hereby granted in accordance with clause 19(1)) the receiving party shall, upon the disclosing party's written request return to the disclosing party any and all written or

-11-

physical embodiments of the information disclosed which is then in the possession of the receiving party.

(4)    Neither this Agreement nor the disclosure of confidential information shall be deemed by implication or otherwise to vest in either party any rights in patents, trade secrets, trademarks, trade names, copyrights, or other property of the other, except as herein expressly provided.

(5)    Notetry shall not do anything to adversely affect the proprietary rights of Johnson unless such trademarks, trade names, inventions, procedures, copyrights, or trade secrets become part of the public domain or otherwise non-proprietary through no fault of Notetry provided that Notetry shall not be restricted by this clause from any legitimate exercise of its rights hereunder.

(6)    Notetry agrees that its entering into this Agreement and its performance under this Agreement will not constitute a breach of any obligations Notetry may have to any third party. Notetry shall not disclose to Johnson or use for the benefit of Johnson any proprietary or confidential information which, to the best of Notetry's knowledge, belongs to, or pertains to, the business or affairs of any third party and which Notetry is not entitled to disclose or use for the benefit of Johnson.

(7)    The obligations of this clause 3 shall survive termination of this Agreement.

-12-

4.    DEVELOPMENT

(1)    Johnson shall commence its marketing of Products with models based on the Econovac, Vacmate and Rocketvac vacuum cleaners ("the Initial Products") which are already being manufactured and sold by Johnson's Australian Subsidiary, Aussie Rotobic (Australia ) Pty Ltd, with conventional filters.

(2)    The development of the Initial Products shall be carried out in accordance with the programmes set out in Schedule V.  As these Products are to be based on existing Johnson vacuum cleaners, the greater part of the development work will consist of the adaptation of Notetry's cyclonic dust separation system to these models.  It is however recognised that it will be necessary to make some changes to the external appearance of the existing models and that more such changes will probably be required in the case of the Rocketvac than the Econovac and the Vacmate.  In accordance with the timetables set out in schedule V, the development programme for the Econovac and the Vacmate will be started first and carried out in parallel for these two models, and the programme for the Rocketvac will be started later, but will overlap that for the Econovac and the Vacmate.  The development programme for each of the Initial Products shall be divided into the five stages ("Development Stages") described in Schedule V, namely specification ("Specification Stage"), design ("Design Stage"), review ("Review Stage"), drawings undimensioned ("Undimensioned Drawings Stage") and drawings

-13-

dimensioned and toleranced ("Dimensioned and Toleranced Drawings Stage").

(3)   Whilst the parties recognise that there may be a need for flexibility in the Design Project to overcome unforeseen problems, Johnson and Notetry shall each use all reasonable endeavours to procure that, so far as reasonably possible, they keep to the timetables set out in Schedule V. To this end, all communications between the parties shall be by the fastest practicable means, depending on the nature of the communication, each party shall acknowledge by fax any communication received from the other within forty-eight hours of such receipt and (without prejudice to the timetables set out in Schedule V) if a full response to such communication cannot be given within such forty-eight hour period, the acknowledgement shall state the time when a full response will be given. All communications to Johnson in respect of the Development Project shall be addressed to Ross Cameron of Aussie Rotobic (Australia) Pty. Ltd. at:

21-29 Production Avenue,        P.O. Box 395
Kogarah,                        N.S.W. 2217
Sydney,                         Fax:(02)588 2550
N.S.W. 2217
Australia.

and all communications to Notetry in respect of the Development Project shall be addressed to James Dyson at Notetry's address and fax number set out below.

(4)   Upon completion of each of the five Development Stages for each of the Initial Products each party shall confirm in writing

-14-

to the other its approval of and agreement to the specification, models and/or drawings finalised at that Development Stage, except that Johnson shall not be required to give any such confirmation upon completion of the Design Stage. If either party shall fail to give such confirmation and agreement, the other shall be entitled to refuse to proceed to the next Development Stage for that Product. Neither party shall be entitled without good cause to require any changes in any specifications, models or drawings which it has already approved and agreed to. If either party shall require any such changes for a cause which that party ought reasonably to have foreseen prior to giving its approval and agreement, the incorporation of such changes shall be at the expense of that party.

(5)   Johnson shall pay Notetry for the work to be undertaken by it pursuant to the Development Project on a time cost basis, provided that, without Johnson's prior written agreement, the total cost shall not exceed Notetry's best estimate of £60,000 for the completion of this work for the Econovac, the Vacmate and the Rocketvac, it being understood that Johnson will only be asked to pay more than £60,000 in the event of unforeseen problems.

(6)   The ownership of every invention, discovery and design made pursuant to the Development Project ("Development Project Innovations") shall be determined in accordance with clause 18(2).

(7)   Notetry shall not be required to produce drawings for tooling or to produce any other

-15-

A40

drawings or prototypes other than those expressly provided for in this Agreement.

(8)   Notetry's work in relation to the Development Project may be performed either on or away from Johnson's premises depending upon the nature of the project and the resource materials required by Notetry.

(9)   Notetry agrees to provide Johnson with monthly reports of the progress and results of the Development Project as may be reasonably requested by Johnson.

(10)  Notetry shall not, except for Notetry's or Prototypes' personnel and self-employed draftsmen engaged to work at Notetry's Prototypes' premises, engage anyone else to assist Notetry to perform services for Johnson under this Agreement without the prior written consent of Johnson.

(11)  Johnson will pay all normal and reasonable out of pocket expenses, including travel, accommodation and living expenses while travelling and visiting with Johnson which are incurred by Notetry's personnel directly in connection with work provided by Notetry under this Agreement provided that such expenses have Johnson's prior approval.

5.   <u>DOWN PAYMENT AND ROYALTIES</u>

(1)   Johnson shall pay Notetry a down payment of £100,000 which shall be payable as to £33,334 upon the signing of this Agreement, as to £33,333 on June 1st, 1990 and as to £33,333 on August 30th, 1990. This payment shall not be refundable and shall not be credited

-16-

against the expenses incurred during the Development Period, any royalty payments or any other payments which may be required to be made by Johnson to Notetry under this Agreement. Furthermore, this payment shall be made in full notwithstanding any termination of this Agreement by Johnson prior to 1st September 1990.

(2)    Johnson shall pay to Notetry on all Non-Uprights manufactured and sold or used by Johnson or by any Subsidiary, on all Sub-Contracted Uprights manufactured for and sold by Johnson or by any Subsidiary, and all Licensed Uprights sold by Johnson or by any Subsidiary a royalty at the rate of five per cent. (5%) of the Net Selling Price of such Products. Such royalties shall be paid in Sterling and shall be converted directly from the currency of sale into Sterling at the middle market rate quoted in the London Financial Times or (failing such quotation) as quoted by a London clearing bank in respect of the last day of the Fiscal Quarter to which such royalty payment relates, upon which banks are open for business.

(3)    The royalty referred to in sub-clause (2) of this clause shall be attributed, as to one half, to the Patents and the Design Rights, and as to one half, to the Know-How.

(4)    If any third party shall market in any country, other than Australia or New Zealand, within the PACFE Region where there is not a Patent or in Singapore, Malaysia or Hong Kong, a product of the same type as a Product then marketed by Johnson (for example and not by way of limitation, if the third party

-17-

shall market a backpack vacuum cleaner and Johnson is marketing a backpack vacuum cleaner, or if the third party shall market a tank type vacuum cleaner and Johnson shall be marketing a tank type vacuum cleaner) incorporating a cyclonic action which would infringe United Kingdom Patent 0042723 if the Product were sold in the United Kingdom, for as long as the sales of that Product are at least fifteen per cent. (15%) of Johnson's sales of that type of Product, the royalty rate as provided by sub clause (2) above for that country is reduced to two and one-half per cent. (2 1/2%), provided that in the case of Singapore, Malaysia, and Hong Kong, the provisions of this sub clause (4) shall only apply for so long as Notetry and/or Johnson shall not be taking legal proceedings in respect of such infringement or any infringement of the Design Rights in respect of the Products in those countries.

(5)   If any Patent is declared invalid or unenforceable, which shall not include expiration, by a court or administrative agency from which no appeal is or can be taken and there are no other Patents or Design Rights covering Products in the same country, then the royalty rate as provided by sub-clause (2) above for that country is reduced to two and one-half per cent. (2 1/2%) for so long as there shall be no such Patent or Design Right coverage.

6.   MINIMUM ROYALTIES

(1)   In each Contract Year the royalties payable under this Agreement shall amount to not less than the royalty which would have been

-18-

payable if the number of Products sold in that Contract Year had been the minimum number of units specified in or determined in accordance with sub-clause (2) below.

(2)    (a)    Subject to paragraph (b) below, the minimum number of units shall be as follows:-

First Contract Year                              18,000

Second Contract Year                             35,400

Third and each following
Contract Year                          47,200

(b)    If the number of units sold in the first Contract Year shall fall short of 18,000, and if in the Third Contract Year the number of units sold shall exceed 47,200, then the excess in the Third Contract Year shall be related back to and set against the shortfall in the First Contract Year in accordance with clause 7(2)(c)(ii).

(3)    (a)    The minimum annual royalty in each Contract year shall be calculated on the actual average Net Selling Price per Product unit sold unless the total number of units sold in that Contract Year shall be less than 1,000, in which case the Net Selling Price per unit shall be taken to be £200.  .

(b)    The actual average Net Selling Price per unit shall, for the purpose of sub-clause (a) above, be determined by reference to all sales made during that Contract Year up to the time as at which the calculation is made

-19-

divided by the total number of units sold during that period.

(4)   If Alco, Prototypes existing licensee in Japan in respect of the G-Force cyclonic vacuum cleaner, shall be granted a licence under the Patents to sell Licensed Uprights or Sub-Contracted Uprights into the commercial and industrial users market in Japan pursuant to the right of first negotiation contained in the existing licence between Prototypes and Alco, then for so long as Alco shall exercise its rights under such Licensed Uprights or Sub-Contracted Uprights licence the aforesaid minimum number of units in respect of the second Contract Year shall be reduced to 33,276 and the aforesaid minimum number of units in respect of the third and each following Contract Year shall be reduced to 44,368.

(5)   In the event of Johnson serving notice pursuant to clause 9(1) converting the licences hereby granted to non-exclusive licences, the minimum annual royalties provided for in this clause 6 shall cease to be payable in respect of the twelfth and each succeeding Contract Year.

7.   ACCOUNTING

(1)   Johnson shall keep suitable records in accordance with generally accepted practices in sufficient detail to compute the royalties payable under this Agreement. Johnson will preserve such records and any invoices, papers and documents which may be in the possession or under the control of Johnson which may be necessary to enable Notetry to

-20-

verify such records and the royalty statements referred to below for two (2) Fiscal Years following the end of the Fiscal Year to which such records pertain. Such records, accounts, invoices, papers and documents will be available for inspection during normal business hours at reasonable intervals as reasonably requested by Notetry but not more than once per reporting year for the purpose of verifying Johnson's remittance statements. Such inspection will be conducted by an independent certified accountant, chartered accountant or equivalent retained by Notetry at its expense and to whom Johnson shall have no reasonable objection. In any verification hereunder, such accountant will reveal no information, other than confirmation of the accuracy of (or correction of) the royalties due to Notetry. In the event the accountant reports that Johnson owes additional royalties to Notetry, Johnson and Notetry shall promptly meet to resolve the discrepancy in good faith. If it is determined that additional royalties of a material amount are in fact owed by Johnson to Notetry, Notetry shall have the right to an inspection of Johnson's records as aforesaid on four occasions during the following twelve months and if the additional royalties are equal to 5 per cent. or more of the royalties previously determined by Johnson, Johnson shall reimburse to Notetry the fees of such accountant.

(2)    Within thirty days after the expiration of each Fiscal Quarter Johnson shall deliver to Notetry at its address set out in this agreement a royalty statement showing written

-21-

A46

particulars of the number of Products manufactured by or for Johnson and/or and sold or used by Johnson or a Subsidiary as aforesaid during that Fiscal Quarter, the Net Selling Price of each such Product and the royalty payable in respect thereof. For the purposes of this sub-clause, Products shall be deemed to have been sold when they have been invoiced or dispatched to a purchaser or user. Johnson shall, within the thirty day period referred to above pay to Notetry by way of telegraphic transfer to such account as Notetry shall reasonably request (allowing sufficient time for the funds to be credited within the said thirty day period) a sum equal to:

either

(a)     the amount of the royalty shown in the said royalty statement plus the amount of the royalties shown in the corresponding accounts for each prior Fiscal Quarter of that Fiscal Year;

or

(b)     one quarter of the minimum annual royalties for the Contract Year corresponding to that Fiscal Year calculated in accordance with clause 6 multiplied by the number of Fiscal Quarters elapsed in that Fiscal Year down to the end of the Fiscal Quarter to which the said royalty statement relates;

whichever shall be the greater, less in either case:

(c)     (i)     all sums already paid to Notetry in respect of all prior Fiscal Quarters

-22-

A47

falling within the same Fiscal Year as the Fiscal Quarter to which the said royalty payment relates; and

(ii)    in the case of the third Contract Year, if the provisions of clause 6(2)(b) shall apply, all sums in respect of sales in that Contract Year in excess of 47,200 to the extent that such sums shall, in aggregate, not be greater than any sums paid by Johnson in respect of the shortfall of sales below 18,000 units in the first Contract Year.

(3)    Any sums payable by Johnson to Notetry under this Agreement other than those made pursuant to sub-clause (2) above shall be paid (in the manner specified in sub-clause (2) above) within thirty days of Notetry's invoice.

(4)    At Notetry's request, Johnson shall once a year deliver to Notetry a certificate signed by its auditors setting forth for the preceding Fiscal Year the combined totals for Johnson and its Subsidiaries of (a) the total number of Non-Uprights manufactured and sold or used, Licensed Uprights sold or used by or on behalf of Johnson or its Subsidiaries and of Sub-Contracted Uprights manufactured for and sold or used by or on behalf of Johnson or its subsidiaries, (b) the total Net Selling Price of such Products, and (c) the total royalty payable in respect thereof. Such certified statement shall be delivered as soon as practical following the completion of Johnson's audit in respect of that Fiscal Year, or following Notetry's request for such statement, whichever is later.

-23-

(5)    All payments to be made by Johnson to Notetry under this Agreement shall be paid free of all taxation and other deductions of whatsoever nature other than any tax which Johnson is obliged by law to deduct. In the case of any tax which Johnson is obliged by law to deduct, the deduction will be at the minimum rate (if any) prescribed by any applicable double taxation treaty, subject to the rules and regulations implementing such double taxation treaty relating to withholding and refunding of such deductions, and Johnson will provide Notetry with a certificate of deduction and will afford Notetry all reasonable assistance to enable Notetry to take full advantage of the provisions of any relevant double taxation treaty including agreeing any amendments to this Agreement which do not operate to Johnson's overall detriment.

8.    VAT

The amount of all payments referred to in this Agreement is stated exclusive of value added tax which shall, as applicable, be paid by Johnson at the appropriate rate from time to time provided that Notetry shall provide Johnson with value added tax invoices in respect of such payments and provide Johnson all reasonable assistance to enable Johnson to obtain the maximum possible deduction against such value added taxes including agreeing any amendments to this Agreement which do not operate to Notetry's overall detriment.

9.    EXCLUSIVITY

(1)    Notetry shall not grant a licence to any other person to sell or use, nor shall

-24-

Notetry sell or use in any country in the
Territory either Non-Uprights during the term
of the licences hereby granted but limited
only to the time (if any) such licences
permit the sale or use of Non-Uprights in
that country, or Licensed Uprights during the
term of the licences hereby granted but
limited only to the time (if any) such
licences permit the sale or use of Licensed
Uprights in that country, or Sub-Contracted
Uprights during the term of the licences
hereby granted but limited only to the time
(if any) such licences permit the sale or use
of Sub-Contracted Uprights in that country
(save in the case of Japan, a licence to sell
Uprights pursuant to the right of first
refusal contained in the Licence Agreement
between Prototypes and its Japanese Licensee,
Alco, and save in the case of Amway, a
licence to sell Uprights by way of settlement
of the current litigation between, among
others, Notetry and Amway), unless and until
Johnson shall, by written notice to Notetry
served at any time prior to the end of the
eleventh Contract Year, elect to convert all
but not some only of the licences hereby
granted to non-exclusive licences, in which
event such licences shall become
non-exclusive and Notetry shall cease to be
bound by the foregoing restrictions.

(2)     Subject to any obligation which Johnson may
have to continue to supply its existing
models of vacuum cleaners with conventional
filters to customers under any long term
supply agreements which Johnson may have
entered into prior to January 12, 1990,
Johnson shall convert its entire range of
vacuum cleaners to incorporate the cyclonic

-25-

A50

*OR AS APPROPRIATE MODELS*
*BECOME COMMERCIALLY AVAILA,*
*BUT BY JUNE 28, 1993*

dust separation system the subject of the
Patents in lieu of conventional filters by
June 28, 1992 except for vacuum cleaners sold
in Japan, but Johnson will endeavour to
effect such conversion in the case of vacuum
cleaners sold in Japan within 30 months of
the date of this Agreement. Johnson shall
not, following the date of this agreement
manufacture, or have manufactured for it, any
new model of vacuum cleaner (being a model
not sold by Johnson as at January 12, 1990)
which does not incorporate Notetry's cyclonic
dust separation system in lieu of a
conventional filter; this shall not prevent
Johnson from purchasing from other vacuum
cleaner manufacturers vacuum cleaners' for
resale which are not exclusive to Johnson,
for which there is no model of comparable
size in the range manufactured by Johnson and
which incorporate conventional filters.

(3)     Notwithstanding the provisions of sub clause
(2) above, Johnson shall be entitled, after
the expiration of the fifth Contract Year, to
resume the manufacture and sale of vacuum
cleaners incorporating conventional bags or
filters.

(4)     Notwithstanding the provisions of sub-clause
(2) above, Johnson shall be entitled, at any
time, to manufacture and sell vacuum cleaners
incorporating a dust separation or dust
extraction mechanism based on technology not
hitherto used in vacuum cleaners and not
being a cyclone or a conventional bag or
filter.

(5)     The provisions of sub-clause (2) above shall
not prevent Johnson from selling non cyclonic

-26-

vacuum cleaners to customers in countries into which Johnson is not, as at the time of such sale, permitted to sell Products who do not intend to resell them into the Territory.

(6)    (a)    Johnson shall not sell Products to consumers or to any person carrying on the business of retailing goods to consumers (whether or not such person also carries on the business of selling goods to persons other than consumers) or to any person who, to Johnson's knowledge, intends or is likely to sell or who has sold Products to any person carrying on such a business, or to any person who, to Johnson's knowledge, is part of a distribution chain of sellers and buyers in which Products sold to such person are likely to be sold or have been sold to any person carrying on such business. Johnson are allowed to sell to retailers for their own cleaning needs.

(b)    Notetry shall not sell domestic versions of Products except to consumers or to any person carrying on the business of retailing goods to consumers (whether or not such person also carries on the business of selling goods to persons other than consumers) or to any person who, to Notetry's knowledge, intends or is likely to sell or who has sold domestic versions of Products to any person carrying on such a business or to any person who, to Notetry's knowledge, is part of a distribution

-27-

chain of sellers and buyers in which domestic versions of Products sold to such person are likely to be sold and have been sold to any person carrying on such a business.

10.  INSPECTION

Each party shall permit the other and its authorised representatives to whom the first mentioned party has no reasonable objection at reasonable times and upon giving reasonable notice to enter any place where the development, manufacture, sale or use of Products shall be carried on by or for Notetry or Johnson for the purpose of verifying compliance with the terms of this Agreement.

11.  MARKING

Johnson shall stamp in legible figures or words on some conspicuous part of all Products manufactured by or to be sold by or on behalf of Johnson the inscription "manufactured under [Patent]/[Registered Design] Nos.       " followed by the numbers of any patents or registered designs granted in respect of the Inventions or the Products which shall for the time being be in force in those parts of the Territory where Products embodying them may be sold.

12.  DEVOLUTION

(1)  Subject to prior written notification by Johnson to Notetry, Johnson shall be entitled to perform its obligations under this Agreement through any Subsidiary and to that extent the benefit of this Agreement shall extend to any such Subsidiary and such Subsidiary shall be subject to the terms of this Agreement as though it were Johnson,

-28-

provided that Johnson shall remain liable to
Notetry for the due performance by such
Subsidiary of its obligations hereunder.
References in this Agreement to "Johnson"
shall accordingly, where appropriate, be
deemed to include a reference to such
Subsidiary or Subsidiaries. Johnson shall
procure that each such Subsidiary shall enter
into an agreement with Notetry in the form
set out in Schedule IV and Notetry shall
enter into such agreement with each such
Subsidiary. Johnson hereby guarantees the
due performance of each such Subsidiary's
obligations under each such agreement and
undertakes to indemnify and keep indemnified
Notetry in full against any loss arising as a
result of any default by such Subsidiary
including all costs, charges and expenses
incurred by Notetry in consequence of such
default and enforcing this guarantee and
indemnity on the basis that:

(a) as between Johnson and Notetry,
Johnson shall be liable as principal
obligor and shall not be released by
any time or indulgence given to, or
any arrangement or alteration of terms
being made with, such Subsidiary or by
any release, variation, dealing, act
or omission whereby as surety only
Johnson would or might have been
released; and

(b) this guarantee and indemnity shall be
a continuing guarantee and indemnity.

(2) Johnson shall be entitled to have the
Non-Uprights manufactured for it by a Third

-29-

Party and to that extent the benefit of this
Agreement shall extend to that Third Party.

(3)     Johnson shall have the Sub-Contracted
Uprights manufactured for it only by a
Domestic Licensee and to that extent the
benefit of this Agreement shall extend to
that Domestic Licensee.

(4)     Johnson shall not assign its rights under
this licence without the prior written
consent of Notetry. Such consent shall not
be unreasonably withheld in the case of an
assignment made to the purchaser of the whole
or substantially the whole of Johnson's
business of the manufacture and sale of
vacuum cleaners if such sale and assignment
or the likely subsequent conduct of the
purchaser and assignee would not result in
economic detriment to Notetry. Notetry shall
otherwise be entitled to withhold its consent
at its sole discretion and without giving any
reason. Johnson shall not in any event
effect any such sale except upon financial
terms which have first been offered to
Notetry and either rejected by Notetry or not
accepted by Notetry within thirty days of the
date of such offer. The terms of any such
offer to Notetry (other than the financial
terms) shall be terms reasonably acceptable
to Johnson and Notetry.

(5)     Except as provided in sub-clauses (1), (2),
(3) and (4) above Johnson shall not assign,
mortgage, charge, or grant sub-licenses in
respect of, or otherwise deal with its rights
under this Licence nor attempt to do so, nor
authorise any person, firm or company to

-30-

manufacture or import Products into the Territory.

13. <u>INFRINGEMENTS</u>

(1)    Johnson shall promptly notify Notetry of any infringement or suspected infringement of any of the Patents or Design Rights or of any proceedings for the revocation or involving the validity of the Patents or Design Rights or any of them as soon as they come to Johnson's attention.

(2)    If any Third Party shall infringe any of the Patents or Design Rights by manufacturing, selling or using Products in the Territory, Notetry and Johnson shall discuss the matter to determine what action to take. If Notetry and Johnson agree that legal proceedings shall be instigated against the Third Party the costs of the legal proceedings and the damages recovered from the infringer shall be shared equally between them. Neither party shall take such legal proceedings without giving the other the opportunity to participate in accordance with the foregoing provisions, but neither party shall be obliged to participate in legal proceedings to which it has not agreed. If either party shall decide to take legal proceedings in respect of an infringement and the other shall decide not to participate in those proceedings, that other shall not take any independent action in respect of that infringement. If either party shall institute legal proceedings without the other pursuant to these provisions, it shall bear the whole cost of such legal proceedings and shall be entitled to retain all damages

-31-

recovered. Notetry shall be entitled to settle any proceedings brought by it pursuant to the foregoing provisions (either alone or jointly with Johnson) on terms (including the grant of a licence to the infringer) which are equitable as between Notetry and Johnson.

14.    PARALLEL IMPORTS

(1)    Subject to the provisions of sub-clause (2) below, Johnson shall not export Products to any country outside the Territory and not sell Products to any person, firm or company who (to Johnson's knowledge) intends either to export Products or to sell them to any other party for export to any country outside the Territory or who (to Johnson's knowledge) has done so.

(2)    If, as a result of termination by country pursuant to Clause 22, Johnson shall be permitted to sell Products in some but not all of the member states of the European Economic Community ("EEC"), sub-clause (1) above shall cease to apply with respect to EEC member states and Johnson shall instead be bound by the most stringent restrictions with regard to parallel imports between member states of the EEC which are permitted by EEC laws, regulations, exemptions and notices, but not more stringent than those set out in sub-clause (1) above.

15.    BEST ENDEAVOURS

Johnson shall use reasonable endeavours consistent with sound commercial judgment to commence production of Non-Uprights and sale of each type of the Products on a commercial scale as soon as

-32-

practicable and to manufacture Non-Uprights, and
sell and promote the sale of each type of the
Products in each country in the Territory and meet
the demand for them so as to maximise market
penetration (and thereby maximise the royalties
payable to Notetry) on reasonable terms and shall
not do or omit to do anything which may be or become
an abuse of monopoly rights of the Patents or Design
Rights or any of them.

16.  TOOLING

Johnson shall place all necessary orders for the
purchase of the tooling for the manufacture of the
Products based on the Econovac and the Vacmate as
soon as practicable following the completion of the
Development Project but in any case not later than
December 1 1990.

17.  INSURANCE AND INDEMNITY

(1)    Johnson shall procure that Notetry's name is
added to all insurance policies in respect of
product liability in or in respect of any
country in the Territory maintained by
Johnson so that Notetry shall enjoy the full
benefit of such product liability insurance
with respect to Products.

(2)    Johnson shall indemnify Notetry, Prototypes
and Mr Dyson (for both of whom Notetry is for
this purpose contracting as trustee) and keep
them fully and effectively indemnified
against all claims of whatever nature and
howsoever arising in connection with the
manufacture or sale of Products by or on
behalf of Johnson and the use of such
Products by any person whatsoever provided
that this indemnity shall not extend to any

-33-

matter in respect of which Notetry or Prototypes has knowingly made a misrepresentation to Johnson or which is attributable to willful misconduct on the part of Notetry.

(3)    Johnson shall not in connection with the sale of the Products make any representation that Notetry is giving any warranty in relation thereto.

(4)    Johnson undertakes to comply with all state and federal laws in the Territory with respect to the manufacture and marketing (including the sale) of the Products.

18.    IMPROVEMENTS AND DEVELOPMENT PROJECT INNOVATIONS

(1)    Notetry and Johnson shall each promptly communicate and explain to the other every invention, discovery or design improvement or variation (together "Improvements") made or used by it or coming to its knowledge or under its control or that of any person employed by it which may be an improvement in or modification of or an addition to the Inventions or may be useful in the manufacture of the Products, whether patentable or not.

(2)    (a)    All Improvements and Development Project Innovations which are derived from or are a development of the Patents, Design Rights or the Know-How or which are developed by Notetry shall be the property of Notetry regardless of any payments made by Johnson to Notetry or Prototypes in respect of the Development Project.

-34-

A59

      (b)    All Improvements and Development Project Innovations developed by Johnson which do not fall within paragraph (a) above shall be the property of Johnson.

(3)    The party owning the rights to Improvements or Development Project Innovations pursuant to sub-clause (2) above ("the Owner") shall be entitled to obtain at its own expense patents for all such inventions (if patentable) and shall be entitled to the copyright and design rights and shall be entitled to obtain at its own expense design patents, registered designs and other appropriate forms of protection in respect of the designs therein referred to in all parts of the world and the other will at the Owner's expense execute or cause to be executed all such documents as the Owner shall require for that purpose and such patents, design patents, registered designs and other forms of protection shall be or become the property of the Owner. All Improvements and Development Project Innovations owned by Notetry shall be available for use by Johnson for the manufacture and the sale of Products in the Territory and if any of them shall be patented, registered or otherwise protected Notetry shall grant to Johnson a licence or licences thereunder in the Territory for the full terms of the Patents or of any extensions or prolongations thereof on the terms of this Licence except that only the aforesaid royalties shall be payable. All Improvements and Development Project Innovations owned by Johnson which are functional or not principally concerned with

-35-

A60

the external appearance of Products and which are unrelated to tools and accessories intended for use with Products shall be available for use by Notetry without restriction and if any of them shall be patented, registered or otherwise protected Johnson shall grant to Notetry a world-wide royalty free licence (with the right to sub-licence) thereunder for the full term of such patent or other form of protection or of any extension or prolongations thereof to use such Improvements or Development Project Innovations for any purpose.

(4)    Any patent belonging to Notetry and relating to an Improvement which is incorporated into a Product marketed by or on behalf of Johnson shall become a Patent for the purpose of this Agreement.

(5)    Notetry warrants that licences granted under the Patents to other licensees have provisions with equivalent effect to this Clause 18 so that Johnson will have the right to use improvements developed for other licensees in the same manner other licensees will have the right to use improvements developed for Johnson.

19.    TERM AND TERMINATION

(1)    Subject to prior termination in accordance with the terms hereof, this Agreement shall continue in force until the expiration of the twentieth Contract Year.

(2)    If any royalties payable under this agreement shall be in arrears and unpaid for a period of 14 days or if Johnson shall commit a

-36-

breach of any of the other terms of this agreement and shall not (if capable of remedy) remedy such breach within 30 days after Notetry shall have given Johnson written notice to do so, or if Johnson shall go or be put into liquidation or make any arrangement or compromise with its creditors generally or become subject to the insolvency or bankruptcy laws of any part of the Territory, or if Johnson shall sell or part with the whole or substantially the whole of its undertaking, business or assets without the prior written consent of Notetry then Notetry shall be entitled either:

(a)    by notice in writing to terminate this Agreement; and/or (at Notetry's option)

(b)    to grant other licences and/or itself to manufacture and sell or use Products under the Patents and the Design Rights in the Territory whereupon this Licence shall become non-exclusive to the extent that it is not already non-exclusive at that time.

(3)    Johnson shall be entitled to terminate this Agreement by not less than twelve months' written notice to Notetry, such notice to expire at the end of any Contract Year, and (for the avoidance of doubt), such termination shall be without prejudice to Johnson's obligation to pay minimum royalties during the notice period.

(4)    If Notetry shall commit a breach of any of the terms of this Agreement and shall not (if capable of remedy) remedy such breach within 30 days after Johnson shall have given

-37-

Notetry written notice to do so, or if Notetry shall go or be put into liquidation or make any arrangement or compromise with its creditors generally or become subject to the insolvency or bankruptcy laws of any part of the Territory, or if Notetry shall sell or part with the whole or substantially the whole of its undertaking, business or assets without the prior written consent of Johnson then Johnson shall be entitled by notice in writing to terminate this Agreement.

(5)    The termination of this Agreement for any reason shall not release any party from any obligation, liability or agreement which, pursuant to the provisions of this Agreement, is to survive or be performed after such termination. Such termination shall not release any party from its liability to discharge its then accrued and unfulfilled obligations. Except as otherwise stated herein, the termination of this Agreement shall not be deemed a waiver or release or otherwise prejudice or affect any of the rights, remedies or claims, whether for damages or otherwise, which either party may then possess under the terms of this Agreement or which may arise as the result of such termination, all of which rights and remedies and claims shall survive such termination.

(6)    Upon the expiration of this Agreement pursuant to the provisions of clause 19(1) Johnson shall have the right to continue sale of the Products and to use the Know-How for the manufacture of Non-Uprights and Sub-Contracted Uprights without further payments to Notetry.

-38-

(7)    In the event of early termination of this Agreement by either party due to default by the other party, Johnson shall cease to manufacture the Non-Uprights and to have the Sub-Contracted Uprights manufactured for it and the use of the Know-How. However, Johnson shall have six months from such termination to manufacture Non-Uprights and to have Sub-Contracted Uprights manufactured for it only from parts on hand at the date of termination and sell the stock of Products on hand at the date of termination and Products returned to the trade during such period provided that Johnson shall forthwith upon such termination deliver to Notetry a list of such parts and stock, permit and procure the right for Notetry to inspect such parts and stock and account to Notetry for royalties in respect of such sales in accordance with the terms of this Agreement as though it had not terminated.

<u>VALIDITY</u>

Whereas this Agreement incorporates no restrictions against trade between member states of the European Economic Community, it is the opinion of the parties hereto that it does not infringe Article 85 of the Treaty of Rome. If, notwithstanding this view, there shall be a change in the nature of the vacuum cleaner market or some other change in circumstances or some change in the construction of the relevant law, which might, but for the provisions of this clause, cause some provision of this Agreement to infringe the said Article 85, then the parties shall apply for exemption and negative clearance pursuant to Article 85(3) of the Treaty of Rome in respect of such provision and shall pursue such application diligently and pending the filing of such

A64

application the parties shall not operate the provision which might infringe Article 85 as aforesaid.

21.  FORCE MAJEURE

The time fixed for the performance by either party of its obligations under this Agreement shall be of the essence, provided that if either party shall be prevented from performing any such obligation by force majeure, that party's time for the performance of that obligation shall be extended by a period equal to the duration of the force majeure, so long as that party is exercising all due diligence to overcome the circumstances comprising the force majeure. For this purpose "force majeure" shall mean fire, flood, storm, tempest, earthquake, war, invasion or hostilities (whether war be declared or not) riot, civil commotion, strikes, lockouts (other than a lockout by the party claiming force majeure), shortages of labour, materials or power and any other event·beyond the reasonable control of the party claiming force majeure. For the avoidance of doubt, it is agreed that the payment obligations of Johnson shall not be subject to the provisions of this clause, except to the extent that payment is rendered impossible by a bank strike, war or other circumstances preventing the movement of funds.

22.  TERMINATION BY COUNTRY

(1)  If during any continous period of three Contract Years during the term of this Agreement, Johnson shall not have sold Products on a commercial scale in a particular country in the Territory, Notetry shall be entitled at any time within six months immediately following the expiration of the third such Contract Year to terminate

-40-

the Licences hereby granted with respect to that country, provided that in the case of the Peoples Republic of China no part of the first two Contract Years shall count as part of such three Contract Years.

(2)  If in any particular country in the Territory, Johnson shall exercise its right under clause 9(3) by selling upright vacuum cleaners incorporating conventional bags or filters or its right under clause 9(4) by selling upright vacuum cleaners incorporating a dust separation or extraction mechanism based on new technology, Notetry shall be entitled to terminate the licences hereby granted with respect to the sale or use of Licensed Uprights and Sub-Contracted Uprights in that country.

23.  <u>WAIVER</u>

Failure of either party at any time to require the performance by the other party as to any provision hereof shall in no way affect the full right to require such performance thereafter. Furthermore, the waiver by either party of a breach of any of the provisions hereof will not be deemed to be or held to be a waiver of any succeeding breach of that provision or a waiver of the provision itself.

24.  <u>NOTICES</u>

All notices, requests and other communciations which shall be, or may be given under this Agreement, may be made by personal delivery, first class mail or fax confirmed by first class mail and shall be addressed to the parties at the respective office as set forth below, except that either party may change such office by notice in accordance with this clause

-41-

A66

24.  Overseas communciations sent by mail shall be sent by air mail:

as to Johnson:

> S.C. Johnson & Son, Inc.
> 1525 Howe Street, #832
> Racine, Wisconsin  53403-5011
> attn:  Larry K. Switzer
> Fax No:  (414) 631 4762

with copy to :

> S.C. Johnson & Son, Inc.
> 1525 Howe Street, #077
> Racine, Wisconsin  53403-5011
> attn:  Law Department
> Fax No:  (414) 631 4253

as to Notetry:

> Notetry Limited
> Sycamore House
> Bathford
> Bath  BA1 87RS
> England
> attn:  James Dyson
> Fax No:  (0225) 852495

with a copy to:

> Rosling King
> 2/3 Hind Court
> Fleet Street
> London  EC4A 3DL
> attn:  Graham Clark
> Fax No:  (01) 583 2035

The notices, requests and communications mentioned above shall be deemed to have been received, in the case of first class inland mail two days after mailing, in the case of first class overseas mail seven days after mailing, and in the case of fax (confirmed as aforesaid) at the time of successful fax transmission.

25.  <u>ENTIRE AGREEMENT</u>

Save as expressly agreed by the parties in writing, expressly referring to the provisions of this

-42-

clause, this Agreement constitutes the entire and only Agreement between the parties hereto relating to the subject matter of this Agreement. Save as aforesaid, no modification, change or amendment of this Agreement shall be binding upon Johnson and Notetry unless, by mutual express consent in writing, of subsequent date, which is signed by an authorised officer or representative of each of the parties hereto.

6.  CAPTION DESIGNATIONS

Caption designations are for reference only and are not to be deemed to interpret, modify or in any way limit the meaning of this Agreement.

7.  LAW AND JURISDICTION

This Agreement shall be construed according to English Law and the parties hereby submit to the non-exclusive jurisdiction of the English Courts.

IN WITNESS the hands of the duly authorised representatives of the parties hereto the day and year first above written

-43-

A68

SCHEDULE I

Part A

PATENTS

| 0042723 | Granted No. | Application No. |
|---|---|---|
| EPC | 0042723 | 8020041 |
| UK | 0042723 | 8020041 |
| AUSTRIA | 0042723 | 8020041 |
| BELGIUM | 0042723 | 8020041 |
| DENMARK | 2721/81 | 8020041 |
| FRANCE | 0042723 | 8020041 |
| ITALY | 0042723 | 8020041 |
| LUXEMBOURG | 0042723 | 8020041 |
| NETHERLANDS | 0042723 | 8020041 |
| SPAIN | 534040 | 8318528 |
| SWEDEN | 0042723 | 8020041 |
| SWITZERLAND | 0042723 | 8020041 |
| WEST GERMANY | P3171910.4 | 8020041 |

| 0134654 | Granted No. | Application No. |
|---|---|---|
| EPC | | 8318529 |
| SPAIN | | 534040 |
| FRANCE | FRO134654 | |
| GERMANY (F.R.) | DEO134654 | |
| UNITED KINGDOM | GBO134654 | |

JAPAN

Granted No.

| | |
|---|---|
| | 1446407 |
| | 1440327 |
| | 1440279 |

| Country | Granted Number | Application No. |
|---|---|---|
| USA and | 4,593,429 | (CIP of 452,917 274,252) |
| | 4,643,748 | 832,370 |
| | 4,853,011 | 166,402 |
| | 4,853,008 | 224,694 |
| | 4,826,515 | (CIP 628,346) |
| | | 164,067 |
| | | 07/585,975 |
| | | 07/549,080 |
| | | 621,375 |
| | | 07/278,347 |
| | | 535,126 |

-44-

| Country | Granted Number | Application No. |
|---|---|---|
| CANADA | 1,182,613 | 180,126 |
| | 1,241,158 | 485,360 |
| | 1,238,869 | 529,635 |
| JAPAN | 1,582,142 | 5,1561/80 |
| | 1,446,407 | 44661/81 |
| | 1,440,322 | 299611/85 |
| | 1,440,279 | 94088/81 |

MALAYSIA SINGAPORE AND HONG KONG

| | EPC 80301204 | 181,97A |
|---|---|---|
| | EPC 81301255 | 37674 |
| | EPC 81302726 | 42723 |

AUSTRALIA                          US 224,694


[UTILITY MODELS]

SPAIN                                          285476

[Malaysia, Singapore and Hong Kong

| | EPC 80301204.6 | 18197A |
|---|---|---|
| | EPC 81301255.6 | 37674 |
| | EPC 81302726.5 | 42723] |


Part B

REGISTERED DESIGNS

UNITED KINGDOM           1013996

-45-

A70

SCHEDULE II

PACFE

| | | |
|---|---|---|
| Australia | Canada | Hong Kong |
| Indonesia | Japan | Korea |
| New Zealand | Philippines | Singapore |
| Thailand | Taiwan | Chile |
| Malaysia | Peoples Republic of China | |

-46-

A71

SCHEDULE III

Draft Licence


THIS LICENCE is made on                                    19 *

BETWEEN

(1)    NOTETRY LIMITED of [Sycamore House, Bathford, Bath,
       BA1 7RS ("the Licensor")]; and

(2)    S.C. JOHNSON & SON, INC. of 1525 Howe Street,
       Racine, Wisconsin, 53403-5011, U.S.A. ("the
       Licensee")


WHEREAS

(A)    The Licensor is the registered proprietor of [United
Kingdom] Patent No.    *    for an invention
entitled       *

(B)    By an Agreement dated the    *    day of    *    19
it was agreed between the parties thereto for the
consideration therein mentioned that the Licensor would
grant to the Licensee an exclusive licence under the said
Patent as herein set forth.

(C)    This Licence is granted in pursuance of the said
Agreement and not in substitution therefor whereby nothing
herein contained shall in any way derogate from the said
Agreement which shall remain in full force and effect.

NOW THIS DEED WITNESSES as follows:-

Pursuant to the said Agreement the Licensor HEREBY GRANTS
to the Licensee exclusive authority and licence [to
manufacture] / [to have manufactured], use and sell [ * ]

-47-

A72

industrial vacuum cleaners (being machines which do not combine the vacuum cleaning function with any other cleaning function or operation), designed primarily for floor care, dusting and other general cleaning operations in commercial and industrial buildings incorporating a cyclonic dust separation mechanism made in accordance with the inventions the subject of the said Patent on the terms and conditions of the said Agreement whilst the said Patent shall remain in force unless this Licence shall be terminated prior thereto under the provisions of the said Agreement or unless the said Agreement shall itself be terminated whereupon this Licence shall ipso facto terminate.

IN WITNESS whereof the respective common seals of the parties hereto have been hereunto affixed the day and year first above written.

-48-

A73

SCHEDULE IV

Agreement with Subsidiaries


This agreement made this          day of          between Notetry Limited, ("NOTETRY") and          a S.C. Johnson and Son, Inc. Subsidiary, ("Subsidiary").

The undersigned SUBSIDIARY agrees with NOTETRY to be bound by all terms conditions and obligations of Johnson under the agreement between Notetry and S.C. Johnson & Son, Inc. ("JOHNSON"), dated April     , 1990. ("the Principal Agreement")

The undersigned SUBSIDIARY will be responsible for a portion of the minimum royalty set forth in the attached agreement based on an agreement between the SUBSIDIARY and JOHNSON.

IN WITNESS WHEREOF, the parties to this Agreement have caused duplicate originals to be executed effective as of the date of the Principal Agreement.

NOTETRY LIMITED

By:


(Insert Johnson Subsidiary)


By:

-49-

A74

SCHEDULE V

Programme for Development Project

-50-

A75

SCHEDULE V

Programme for Development Project

"ECONOVAC" AND "VACMATE"



| start 4/01/90 | finish 4/30/90 |
| --- | --- |
| **SPECIFICATION** Johnson and Dyson to discuss and jointly draft both specifications. Dyson to work on feasibility of both specifications and designs. Both to communicate and agree specifications and design briefs for both products. | |

| start 5/11/90 | finish 6/15/90 |
| --- | --- |
| **DESIGN** Dyson to build models , tool and experiment to establish variety of solutions. Dyson to carry out the Visual and engineering design of both products, and do a provisional General Arrangement drawings. On completion Dyson to ship models or meet with Johnson. | |

| start 6/15/90 | finish 6/29/90 |
| --- | --- |
| **REVIEW** Johnson to review the design and address manufacturing feasibility of both products. Dyson to experiment and modify as required by Johnson (at extra cost should there be change in the specifications). | |

| start 7/2/90 | finish 7/23/90 |
| --- | --- |
| **DRAWINGS UNDIMENSIONED** Dyson to produce engineering CAD drawings and new or modified models. Johnson to review and check manufacturing feasibility in relation to the parts. | |

| start 7/23/90 | finish 8/15/90 |
| --- | --- |
| **DRAWINGS DIMENSIONED AND TOLERANCED** Dyson to carry out changes required and complete the approved undimensioned drawings. THE DEVELOPMENT PROGRAMME IS NOW COMPLETE. | |

"ROCKETDAC"



| start | finish | | start | finish | | start | finish | | start | finish | | start | finish |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/10/00 | 6/2/00 | | 6/15/00 | 7/17/00 | | 7/17/00 | 7/31/00 | | 8/15/00 | 8/17/00 | | 8/17/00 | 10/9/00 |

**SPECIFICATION**
Johnson and Dyson to discuss and jointly draft a specification. Dyson to work on feasibility of specification and design with models and drawings.

**DESIGN**
Dyson to build models, test and experiment to establish veracity of solutions. Dyson to carry out the visual and engineering design, and do a provisional General Arrangement drawing. On completion Dyson to ship models or meet with Johnson.

**REVIEW**
Johnson to review the design and address the manufacturing feasibility. Dyson to experiment and modify as required by Johnson (at extra cost should there be changes in the specification).

**DRAWINGS UNDIMENSIONED**
Dyson to produce engineering CAD drawings and a new or modified model. Johnson to review and check manufacturing feasibility in relation to the parts.

**DRAWINGS DIMENSIONED AND TOLERANCED**
Dyson to carry out changes required and complete the approved undimensioned drawings.
THE DEVELOPMENT PROGRAMME IS NOW COMPLETE.

SCHEDULE VI

This Schedule sets out certain distinctions between "Products" (as defined in clause 1) and "domestic versions of Products" (as defined in clause 9(6)(c)(ii). These distinctions are not intended to be exhaustive and are supplemental to the definitions contained in those clauses and are not either in substitution for them or by way of interpretation of the relevant provisions thereof.

Domestic versions of tank vacuum cleaner Products shall have, but Products shall not have, "on board" tool holders.

Products and domestic version of Products shall use different colours.

There shall be an agreed motor differentiation between Products and domestic versions of Products. It is recognised that the agreed differentiation may have to be varied if the market demanded a change which reduced the differentiation.

Tank vacuum Products and domestic versions of tank vacuum Products shall have different handles. Domestic versions shall have the "scooped out from the top" look whereas the handle on Products shall be cored from the side to give it a "filled in" or solid look."

-51-

A78

SIGNED by JAMES DYSON
for and on behalf of
NOTETRY LIMITED

SIGNED by RICHARD A DOW
for and on behalf of
S.C. JOHNSON & SON INC.

-52-