# HYMAN AFFIDAVIT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DYSON TECHNOLOGY LIMITED and DYSON, INC., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. NO. 05-434 (GMS) |
| v. | ) | |
| MAYTAG CORPORATION, | ) ) | |
| Defendant. | ) ) | |

### AFFIDAVIT OF JEFFREY HYMAN

STATE OF ILLINOIS   )
                    : ss.
COUNTY OF COOK      )

JEFFREY HYMAN, being duly sworn, deposes and says:

1. I am Vice President of Marketing for the United States of plaintiff Dyson, Inc., the Dyson entity responsible for sales, marketing and distribution of Dyson vacuum cleaners in the United States. In this affidavit, I refer collectively to all of the Dyson entities as "Dyson."

2. I submit this affidavit in support of plaintiffs' motion for a preliminary injunction. I understand that plaintiffs contend in this lawsuit that the Hoover "Fusion" vacuum cleaner recently released by the Hoover division of defendant Maytag Corporation ("Maytag") in the United States infringes four Dyson patents. In this affidavit, I do not offer any views as to whether the Fusion in fact infringes Dyson's patents. Instead, I explain why, unless Hoover is promptly enjoined from selling the

Hoover Fusion vacuum cleaner in the United States, Dyson faces a threat of immediate and irreparable harm.

**Personal Background**

3. I was born in New York in 1968. I attended college at the University of Pennsylvania's Wharton School of Business, where I received a Bachelor of Science degree in Marketing in 1990. After college, I worked for approximately four years in a series of marketing roles at Black & Decker Corporation, a global consumer products company based in Towson, Maryland. In 1994, I left Black & Decker and enrolled at the Kellogg School of Management at Northwestern University, where I received a Masters in Business Administration ("MBA") degree in Marketing in 1995.

4. After graduating from Northwestern University, I moved to the San Francisco Bay area and worked at a software company named Intuit Inc. from 1995 to 1996, again in a marketing position. In 1996, I started an Internet-based recruiting company called Career Central, and I was President/Chief Executive Officer of Career Central until 2000, when the company was acquired by Spencer Stuart, a major executive search firm. In 2001, I joined Heidrick & Struggles, another executive search firm, and worked in the Los Angeles area managing Heidrick & Struggles' Internet division until 2002. In 2003, I returned to the Bay Area and started another company called Canal Street Talent, which represented senior executives in their job searches. I sold Canal Street Talent to Strategic Transitions, Inc. in 2004.

5. In March 2004, I was recruited by Spencer Stuart to join Dyson, Inc., which is headquartered in Chicago, Illinois, as Vice President of Marketing for the

U.S. division. As a marketer, this opportunity was attractive to me largely because of Dyson's unique patented technology. I believed—and continue to believe—that this innovative technology differentiates Dyson's vacuum cleaners from competing products on the market and thus gives Dyson a sustainable competitive advantage. I believed that Dyson presented a rare opportunity for me as a marketer to work for a company that offers truly innovative, breakthrough technology to consumers. Because the job required me to relocate from San Carlos, California to Chicago, Illinois, I conducted thorough due diligence prior to joining Dyson. This due diligence included store visits, employee interviews, competitive intelligence and extensive reading.

6.      I formally joined Dyson in June 2004, but did not begin work at the company until early September 2004 because my wife and I had our first child that summer. As Vice President of Marketing for the United States, my job is to build the Dyson brand and to attract and retain customers for its vacuum cleaners. Accordingly, I am responsible for the company's advertising, public relations, trade marketing, graphics and other physical media such as consumer brochures, and in-store merchandising in the United States. I also work closely with the sales department to help build Dyson's relationship with retailers and other distributors, and I similarly work closely with the company's engineers on product planning and management. I currently report to Martin McCourt, the interim President of Dyson, Inc., and my marketing organization consists of twelve people.

**Dyson's Entry into the U.S. Market**

7.    I am informed and believe that Dyson entered the United States market in or about October 2002, almost two years before I joined the company. I nevertheless am familiar, based on my experience over the past year, with Dyson's history in the United States and with the U.S. vacuum cleaner market generally.

8.    The United States is the largest, and therefore most important, market for vacuum cleaners in the world. This is a function of the population size, home ownership rate and income level in the United States. When it decided to enter the United States market in 2002, Dyson was the number one producer of vacuum cleaners in the United Kingdom, measured both by volume and by value. Indeed, I understand that Dyson's brand awareness among consumers in the United Kingdom is 95%.

9.    Despite its success in the United Kingdom, Dyson faced a number of major hurdles in entering the U.S. market. To start, consumers in the United States had never heard of the Dyson brand, and its products cost approximately three times more than most other vacuum cleaners then on the market. Dyson also had no distribution network, no retailers, no organization, and no employees; it was essentially a start-up operation in the United States. Finally, the U.S. vacuum cleaner market at that time was quite mature and crowded, including some competitors, such as Hoover and Bissell, that had been around for decades and were well-known to consumers. Even worse, retail prices of vacuum cleaners were decreasing at the time, which made retailers less enthusiastic about investing in the category. All in all, Dyson was confronted with a highly challenging environment for a new entrant.

10.     Notwithstanding these challenges, Dyson has been remarkably successful in the United States over the last three years. In fact, Dyson today is the number one seller of vacuum cleaners in the United States as measured by value or dollars. According to the NPD Group, Dyson has a 28.8% share of the U.S. market for upright vacuum cleaners as measured by value or dollars. And, also according to the NPD Group, Dyson's share of the U.S. market for upright vacuum cleaners as measured by volume or unit is 9.7%. This makes Dyson the number five seller of upright vacuum cleaners in the United States as measured by volume or units.

11.     Dyson has achieved this success in the United States in less than three years primarily because of its technology. Simply stated, James Dyson and Dyson's engineers have invented a better mousetrap. In our experience, once consumers learn about our products, they discover that Dyson's technology delivers superior cleaning results while never losing suction. Consumers even are willing to pay a price premium for this performance. Consumers also are attracted to the fact that Dyson's vacuum cleaners do not require them to buy bags or new filters, which reduces their total cost of ownership.

**Dyson's Push into the Mass Market**

12.     As with any company in any industry, Dyson's previous success in the United States in no way guarantees future success. In fact, this is a particularly critical time for Dyson in the U.S. market. For many new products, including vacuum cleaners, there is a broadly-recognized, bell-shaped adoption curve. I have included below an illustration of this adoption curve obtained on the Internet at the following

website: http://www.valuebasedmanagement.net. I include this example only as an illustration.



13. Like most companies that enter a new geographic market, Dyson has achieved its success to-date in the U.S. market largely by appealing to so-called "early adopters," which make up a relatively small percentage of total consumers. As a general matter, early adopters have higher income levels and are better educated than the average consumer. They also tend to live in metropolitan areas and are "thought leaders" in their communities. Early adopters are distinguishable in that they are attracted to, and willing to take a risk on, new products, particularly those that offer new technology. Dyson thus far has been very successful among that group of consumers.

14. For Dyson to maintain—and indeed expand—its position in the United States, Dyson must penetrate the mass market, which is made up of the so-called "early majority" and "late majority." These two categories of consumers constitute the bulk of U.S. households, and thus the bulk of the U.S. vacuum cleaner market. Because

there are only a limited number of "early adopters" in any market—and because households generally purchase a new vacuum cleaner no more than once every five or six years—Dyson must penetrate the mass market in order to maintain, much less increase, its current market share. I strongly believe that if Dyson is unsuccessful in reaching the mass market, its volume in the United States will stagnate, and its vacuum cleaners will be relegated to low-volume, niche status. This is not—and has not been—Dyson's business objective in entering the United States market; Dyson instead seeks to become a leading, high-volume participant.

15. Since I began work at Dyson in September 2004, much of my focus has been on increasing Dyson's effort to penetrate the mass market in the United States. This effort cuts across all of the marketing we do at Dyson. For example, we have begun to broaden the appeal of our advertising and enhance the clarity of our packaging. We also have launched a "grassroots" marketing program to bring our new product innovations to local neighborhoods where consumers can test them. And we have entered into agreements with two large, national retailers—Target and Wal-Mart—that sell products into the mass market. In the fall of 2004, we rolled out our products in Target stores nationally, and in mid-June 2005, we began offering our products in Wal-Mart stores.

16. The Wal-Mart relationship is particularly important to Dyson's effort to penetrate the mass market. Indeed, I believe that Dyson's agreement with Wal-Mart could be our most important strategic initiative in the United States at this time. As I understand it, we had discussions with Wal-Mart for about two years, but reached an agreement approximately six months ago. After a fifty store test, we began a national

rollout in mid-June 2005 of the Dyson DC07 All Floors vacuum cleaner to 1,600 Wal-Mart stores, about half of Wal-Mart's stores in the United States.

17.     As I previously stated, our effort to penetrate the mass market is critically important to Dyson's continued success in the United States. If this effort is unsuccessful, Dyson's growth in the United States will almost surely stop, and its volume eventually will decrease as Dyson "exhausts" the early adopters to whom it can sell its products. Dyson's goal is to become a mainstream brand in the United States, just as it is in the United Kingdom. To achieve that goal, Dyson must be successful in the mass market.

**Maytag's Introduction of the Hoover "Fusion"**

18.     In early June 2005, a Dyson territorial sales manager reported that he had seen a Hoover "Fusion" vacuum cleaner in a Wal-Mart store in upstate New York. This was the first time that I or anyone else at Dyson had heard of the Hoover Fusion. At that time, the Fusion was unavailable on the websites of either Hoover or Wal-Mart or at any other Wal-Mart store visited by our sales force. The sudden appearance of the Hoover Fusion at Wal-Mart could not have come at a worse time for Dyson, occurring just two weeks before Dyson's own national rollout with Wal-Mart.

19.     The sales manager who first spotted the Hoover Fusion at the Wal-Mart store in upstate New York purchased one and immediately shipped it to us in Chicago. Upon inspecting the Fusion, I immediately saw that the product looked very similar to Dyson's DC07 Low Reach vacuum cleaner. This was particularly troubling

because the DC07 Low Reach is essentially identical to the DC07 All Floors vacuum cleaner that Dyson was about to begin selling at Wal-Mart.

20. Even worse, the physical appearance and features of the Hoover Fusion were clearly intended to mislead consumers into thinking that the Fusion provides Dyson's proprietary technology. To begin with, the two products look very much the same. For example, the size and shape of the Fusion bin are the same as those of the Dyson DC07 bin, and both products contain shrouds with perforations. The Hoover Fusion box and product literature similarly make claims designed to convince consumers that the Fusion offers Dyson technology. Those claims include "no loss of suction" (but with an asterisk setting out caveats and conditions), "cyclonic," "spins dirt and dust away" and "no filters to replace," all claims associated with Dyson vacuum cleaners.

21. After we saw the first Hoover Fusion in the Wal-Mart store in upstate New York, Hoover rolled the product out nationally with Wal-Mart over the next three or four weeks. Beginning in early July 2005, the Hoover Fusion also became available on the websites of both Hoover and Wal-Mart. This leads me to believe that the official launch date for the Hoover Fusion was probably around July 1, 2005. At present, the Hoover Fusion, to our knowledge, is available only at Wal-Mart stores and on the two companies' websites.

22. The Hoover Fusion not only attempts to mimic Dyson's technology, but also is available at a lower price. Whereas the Dyson DC07 All Floors sold at Wal-Mart typically retails for $399, Wal-Mart sells the Hoover Fusion for only $128. Dyson's other models are even more expensive: the DC14 typically retails for $429 and the DC15 Ball for $599.

### The Threat of Irreparable Harm to Dyson

23.  Dyson has a limited window of opportunity—about twelve to eighteen months, in my view—to succeed in penetrating the mass market in the United States. As with any company climbing the product adoption curve, building and sustaining momentum are critically important. As a result of our superior products, patented technology, and substantial marketing investment, momentum has been on Dyson's side. Consumers and retailers are interested in Dyson's products, which are perceived to be both technically superior and the brand-to-buy.

24.  In today's world, however, where information spreads quickly due to the Internet, momentum can be lost quickly and even reversed. If Dyson were to lose its current momentum, retailers would become less excited about selling its products, which would result in fewer "sku" listings. Similarly, Dyson's image among consumers would suffer, and Dyson ultimately would lose market share and volume. All of this could make it impossible for Dyson to penetrate the mass market. And, if its current effort to reach that market fails, Dyson may not be able to regenerate the momentum needed to take another crack at the mass market in the foreseeable future, if ever.

25.  The presence at this particular juncture of the Hoover Fusion—a product that I am told infringes upon Dyson's patents—in Wal-Mart stores seriously threatens Dyson's effort to penetrate the mass market. That threat will become even more serious if Hoover begins selling the Fusion at additional retailers. Hoover has designed and is marketing the Hoover Fusion in an attempt to confuse and convince consumers that the Fusion delivers Dyson technology—and at a lower price. In addition, Hoover's 100-year-old brand gives the product immediate recognizability and credibility

among consumers, particularly in the mass market. This fact, together with Hoover's strong distribution network, makes the threat posed by the Hoover Fusion even stronger. I am particularly concerned that consumers who purchase the Hoover Fusion will have a poor product experience that may make them less likely—due to confusion—to try Dyson's products in the future.

26.     For all of these reasons, unless Dyson receives prompt judicial relief from Hoover's infringement of Dyson's patents, Dyson will suffer—in my view—irreparable harm in the marketplace. If Dyson is required to wait a year or eighteen months until the conclusion of this litigation to obtain an injunction, it may be too late. By that time, Dyson will have lost its momentum in the U.S. market and failed in its effort to penetrate the mass market as a direct result of the presence of the Hoover Fusion in the marketplace. That failure may not be easily reversible. By issuing a preliminary injunction now—shortly after the release of the Hoover Fusion—the Court has a unique opportunity to enjoin Hoover's infringement of Dyson's patents at the precise moment when Dyson faces significant and irreparable commercial harm.

_____
Jeffrey Hyman

Sworn to before me this
22 day of July, 2005

_____
Notary Public

OFFICIAL SEAL
TIFFANY STABOU
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4-21-2009

- 11 -

A221