## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

DYSON TECHNOLOGY LIMITED )
and DYSON, INC., )
 )
                  Plaintiffs, )      C.A. No. 05-434 (GMS)
 )
         v. )
 )
MAYTAG CORPORATION, )
 )
               Defendant. )
 )

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR AN EARLY PRELIMINARY INJUNCTION HEARING DATE AND EXPEDITED DISCOVERY

C. Barr Flinn (No. 4092)
bflinn@ycst.com
John W. Shaw (No. 3362)
jshaw@ycst.com
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for Plaintiffs

OF COUNSEL:

David B. Tulchin
Richard C. Pepperman, II
James T. Williams
Keith McKenna
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

July 29, 2005

        

# TABLE OF CONTENTS

Page

Introduction ................................................................................................................ 1

Argument ..................................................................................................................... 2

Conclusion .................................................................................................................. 4

# TABLE OF AUTHORITIES

*Page*

*Woodward* v. *Sage Products Inc.*,
    818 F.2d 841 (Fed. Cir. 1987)..............................................................................3

D. Del. LR 7.1.2(a)(2)..............................................................................................3

063753.1002

## INTRODUCTION

On June 27, 2005—just weeks after Maytag's infringing Hoover "Fusion" vacuum cleaner was first introduced on the market—Dyson filed its complaint in this action and, that day, faxed a copy of the complaint to Maytag's General Counsel. The complaint states clearly that Dyson would seek a preliminary injunction.

At every turn, Maytag has rebuffed Dyson's effort to work out a sensible and workable schedule for Dyson's preliminary injunction motion that would accommodate the needs of both parties. On July 13, 2005, Dyson's counsel telephoned Maytag's counsel to inform him that Dyson would soon file a preliminary injunction motion and sought to discuss a schedule. Maytag's counsel asked for Dyson's proposal but then immediately rejected it, refusing to offer an alternative schedule. (*See* Dyson Opening Br. at 1.) That refusal on July 14 even to discuss a schedule caused Dyson to file this motion to expedite a few days later, on July 19.

Dyson's goal in filing its motion to expedite was to establish, for the convenience of the parties and the Court, an orderly schedule for Dyson's preliminary injunction motion. In its opening brief, Dyson stated that it expected to file its preliminary injunction motion on July 29 (Dyson Opening Br. at 1, 11), and it has now done exactly that.

In its brief in opposition to this motion to expedite, Maytag again refuses to propose an alternative schedule for Dyson's preliminary injunction motion and, apparently, will seek delay no matter what schedule is offered. The strategy seems to be to delay these proceedings as long as possible so as to run out the clock on two of the four patents-in-suit (which expire in the first half of next year).

**ARGUMENT**

1.      Maytag notes that "this action was brought without any forewarning to Maytag." (Maytag Opp'n Br. at 2.) This is beside the point. Dyson filed this action soon after learning about the infringing product because it faces irreparable injury in the absence of an early injunction. Maytag is at no disadvantage in this litigation:  it is far more familiar with the infringing product—its own Hoover Fusion vacuum cleaner—than is Dyson, the party that bears the burden of proof on the preliminary injunction motion. Maytag—a huge corporate enterprise with $4.7 billion in annual sales and a large legal department—is no doubt capable of proceeding on the schedule Dyson has proposed, and does not contend otherwise.

2.      Although Maytag complains that Dyson has not filed its motion for preliminary injunction (Maytag Opp'n Br. at 1, 2, 3, 6), Maytag flatly refused even to discuss a schedule when Dyson's counsel sought to open a dialogue as to timing. In any event, Dyson filed its preliminary injunction papers earlier today, and those papers identify the 18 specific claims of the patents-in-suit that the Hoover Fusion infringes.

3.      Despite acknowledging that "courts have authorized expedited discovery to gather evidence for an upcoming preliminary injunction hearing" (Maytag Opp'n Br. at 3), Maytag contends that expedited discovery is inappropriate here because Dyson has not presented its proposed discovery requests to the Court for review. (*See id.* at 1, 3, 4-6.) In view of this contention, Dyson is serving by hand today its document requests, which are attached hereto as Exhibit A. Those requests are narrowly tailored to the issues raised by Dyson's preliminary injunction motion, focusing primarily on the single Maytag product that infringes Dyson's patent—the Hoover Fusion vacuum

-2-

cleaner. There is no reason why a corporation of Maytag's size and sophistication cannot comply with those requests in a timely fashion.

   4.  Contrary to Maytag's assertion (Maytag Opp'n Br. at 7), Dyson has shown that it will suffer irreparable harm without a preliminary injunction. (Dyson Opening Br. at 2-3, 4-5, 7-9.) Moreover, Dyson filed with its motion for preliminary injunction today the Affidavit of Jeffrey Hyman, Dyson's Vice President of Marketing for the United States (a copy of which is attached hereto as Exhibit B), explaining in detail why Dyson will suffer immediate and irreparable harm absent an early preliminary injunction. Finally, in *Woodward* v. *Sage Products Inc.*, 818 F.2d 841 (Fed. Cir. 1987), the Federal Circuit did not hold, as Maytag suggests (Maytag Opp'n Br. at 7), that it is irrelevant to the question of whether prompt injunctive relief is warranted that the end of the patent term is approaching. In that case, which addressed whether a summary judgment ruling could be immediately appealed, the court held that plaintiff's conduct "belies the now asserted need for injunctive relief" because they "failed to seek a preliminary injunction." *Id.* at 854. In contrast, Dyson has moved quickly for a preliminary injunction, and it is Maytag that refused even to engage in the normal professional dialogue about a sensible and workable schedule.

   5.  Maytag claims that Dyson's proposed preliminary injunction schedule is "aggressive" and "unworkable." (Maytag Opp'n Br. at 9.) The proposed schedule was intended to be reasonable under the circumstances—namely, Dyson's need for expedition as a result of the irreparable injury it faces. Now that Dyson has served and filed its preliminary injunction motion, Maytag's answering brief is due in 10 days under the Local Rules. *See* D. Del. LR 7.1.2(a)(2). Rather than asking Maytag to comply

-3-

                  

with the schedule set out in the rules, Dyson proposed that Maytag's answering brief be due on August 24. Maytag has rejected that proposal without offering an alternative due date, making clear that it intends to draw out this process as long as possible. Given Maytag's position, Dyson believes that judicial intervention is necessary to resolve this scheduling issue.

### CONCLUSION

Maytag's stall tactics should be rejected. Dyson requests that the Court (i) set a briefing schedule on Dyson's preliminary injunction motion (Maytag's answering brief due on August 24, 2005 and Dyson's reply brief due on September 9, 2005), (ii) schedule an evidentiary hearing on this motion during the week of September 26, 2005, and (iii) permit the parties to conduct immediate and expedited discovery on issues relevant to Dyson's motion commencing forthwith and continuing until September 16, 2005.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
bflinn@ycst.com
John W. Shaw (No. 3362)
jshaw@ycst.com
Glenn C. Mandalas (No. 4432)
gmandalas@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

Attorneys for Plaintiffs

-4-

063753.1002

OF COUNSEL

David B. Tulchin
Richard C. Pepperman, II
James T. Williams
Keith McKenna
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

Dated: July 29, 2005

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

DYSON TECHNOLOGY LIMITED    )
and DYSON, INC.,    )
    )
    Plaintiffs,    )
    )    C.A. No. 05-434 (GMS)
    v.    )
    )
MAYTAG CORPORATION,    )
    )
    Defendant.    )
    )

## PLAINTIFFS' FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS (1-18)

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiffs Dyson Technology Limited and Dyson, Inc. hereby request that defendant Maytag Corporation produce for inspection and copying the following documents in its possession, custody or control, on August 15, 2005, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, or at such other place and time as may be mutually agreed between the parties.

## DEFINITIONS

A.    "Dyson" refers to plaintiffs Dyson Technology Limited and Dyson, Inc. and all of their affiliates, and includes all officers, employees, agents, representatives, contractors or consultants of those entities.

B.    "Maytag" refers to defendant Maytag Corporation and all of its subsidiaries, affiliates, divisions and joint ventures, and includes all officers, employees, agents, representatives, contractors or consultants of those entities.

C.    "Complaint" refers to plaintiffs' complaint in this action filed on June 27, 2005, in the United States District Court for the District of Delaware, Case No. 05-434 (GMS).

D.    "Document" has the broadest meaning accorded to it by Rule 34 of the Federal Rules of Civil Procedure and includes, without limitation, any recording in any tangible form of any information, whether handwritten, typed, printed, stored on computer disks, tapes or databases (including electronic files and e-mail), or otherwise reproduced. "Document" also includes all drafts and copies that are not identical to the original.

E.    The term "concerning" means directly or indirectly mentioning, constituting, discussing or describing, relating to, pertaining to or being connected with a stated subject matter or any aspect thereof.

F.    "Communication" means every manner or means of disclosure, transfer or exchange, and every disclosure, transfer or exchange of information, whether orally, by document, fact-to-face, by telephone, mail, e-mail, personal delivery or otherwise.

G.    "Patents-in-Suit" refers to U.S. Patent No. 4,643,748, U.S. Patent No. 4,826,515, U.S. Patent No. 4,853,008, and U.S. Patent No. 5,858,038, copies of which are attached to the Complaint.

H.    "Hoover 'Fusion' vacuum cleaner" refers to the product referred to in Paragraph 12 of the Complaint.

I.    The "Disc" and "Cone Opening" refer to the components of the Hoover "Fusion" vacuum cleaner shown below:

-2-



J.    The "Receiving Chamber" refers to the component of the Hoover

"Fusion" vacuum cleaner shown below:



-3-

## INSTRUCTIONS

A.     Documents should be produced as they are kept in the files of Maytag or shall be organized and labeled to correspond with the requests below.  If documents are produced as they are kept in the files of Maytag, sufficient information should be provided to permit plaintiffs to identify the source of particular documents from within the files of Maytag.

B.     All drafts of responsive documents, as well as non-identical copies, should be produced.  Identical copies of a document that is being produced need not also be produced.

C.     In construing these requests:  (i) the singular shall include the plural and the plural shall include the singular; (ii) masculine, feminine or neuter pronouns shall not exclude other genders; (iii) the conjunctions "and" and "or" shall be read either disjunctively or conjunctively so as to bring within the scope of this request all information that might otherwise be construed to be outside its scope; and (iv) the word "any" shall include, without limitation, "each and every."

D.     If you claim that any document requested is immune from disclosure (in whole or in part) under any claim of privilege or immunity, submit a written statement that for each document withheld:  (i) identifies the person(s) who prepared or authored the document and all recipients or addresses, including recipients of copies; (ii) specifies the date on which the document was prepared; (iii) describes the nature of the document (e.g., letter, memorandum, notes, e-mail, etc.); (iv) identifies the subject matter of the document; (v) if the document reflects or refers to a meeting or conversation, identifies all persons who were present at or parties to the meeting or

-4-

conversation; and (vi) sets forth the nature of the basis for the claim of privilege or immunity asserted.

    E.  This document request shall be deemed continuing as provided in the Federal Rules of Civil Procedure so as to require further and supplemental production if additional documents called for by this request are obtained by Maytag between the time of the initial request and the time of trial.

**REQUESTS**

    1.  All documents concerning the design, development or testing of the Hoover "Fusion" vacuum cleaner (specifically, the Fusion's cyclonic assembly, including the inlet thereto), including, but not limited to, design sketches, design specifications, drawings, measurements, tolerance analyses, reports, memoranda, testing results and schematics.

    2.  All documents concerning the Patents-in-Suit, including, but not limited to, any analysis of the construction, validity or scope of the Patents-in-Suit.

    3.  All documents concerning whether the Hoover "Fusion" vacuum cleaner or any version or prototype of that vacuum cleaner infringes or would infringe the Patents-in-Suit.

    4.  All documents concerning whether the Hoover "Fusion" vacuum cleaner or any characteristic, portion, aspect, piece or design of that vacuum cleaner falls or would fall within any limitation or element of any claim in the Patents-in-Suit.

    5.  All documents concerning Maytag's plans to promote, market, distribute or sell the Hoover "Fusion" vacuum cleaner in the United States.

-5-

6.    All communications between Maytag and any wholesaler, distributor or retailer in the United States concerning the Hoover "Fusion" vacuum cleaner or Dyson's patents.

7.    All documents concerning any defenses or counterclaims that Maytag has asserted or intends to assert in response to the Complaint.

8.    All documents concerning any analysis of the design of or demand for Dyson vacuum cleaners.

9.    All documents concerning any efforts by Maytag to avoid infringing Dyson's patents in designing the Hoover "Fusion" vacuum cleaner.

10.    All documents concerning any analysis of the impact that Dyson vacuum cleaners have had or may in the future have on Maytag's vacuum cleaner sales or market share.

11.    All documents concerning Maytag's projected sales of the Hoover "Fusion" vacuum cleaner in the United States.

12.    All documents concerning market shares in the United States market for vacuum cleaners of different producers of vacuum cleaners, including but not limited to Maytag and Dyson.

13.    All documents concerning test results or measurements of the diameter of the Cone Opening and/or the diameter of the Receiving Chamber of the Hoover "Fusion" vacuum cleaner.

14.    All documents concerning test results or measurements of the distance between the Cone Opening and the base surface of the bottom of the container or collector of the Hoover "Fusion" vacuum cleaner.

-6-

15.     All documents concerning test results or measurements of the extent, if at all, to which the Disc in the Hoover "Fusion" vacuum cleaner retards long strands in the dirt from clogging the air outlet and retains the strands in the container.

16.     All documents concerning test results or measurements of the extent, if at all, to which the Disc in the Hoover "Fusion" vacuum cleaner aids in dirt removal in the first container by preventing some of the dirt from flowing into the air inlet to the cyclone.

17.     For each expert upon whose opinion Maytag intends to rely in connection with plaintiffs' motion for a preliminary injunction:

      (a)     all documents relating to that opinion,

      (b)     data or information considered by that expert in forming the opinion,

      (c)     all publications of the expert relating in any way to vacuum cleaners or the subject matter of the Patents-in-Suit,

      (d)     all prior expert testimony or opinions of the expert in other litigation,

      (e)     the expert's curriculum vitae, and

      (f)     all communications between the expert and any representative of Maytag concerning this action or the Patents-in-Suit.

WP3:1132872.1                                                                                          063753.1002

18.    All documents on which Maytag intends to rely in opposing plaintiffs'
motion for a preliminary injunction or plaintiffs' claim that Maytag is willfully infringing
the Patents-in-Suit.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
bflinn@ycst.com
John W. Shaw (No. 3362)
jshaw@ycst.com
Glenn C. Mandalas (No. 4432)
gmandalas@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

Attorneys for Plaintiffs

OF COUNSEL:

David B. Tulchin
Richard C. Pepperman, II
James T. Williams
Keith McKenna
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

Dated: July 29, 2005

-8-

## CERTIFICATE OF SERVICE

I, Glenn C. Mandalas, hereby certify that on July 29, 2005, copies of the foregoing document were served on the following counsel of record in the manner indicated:

BY HAND DELIVERY

Francis DiGiovanni, Esquire
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building – 8th Floor
1007 N. Orange Street
Wilmington, Delaware 19801

BY FEDERAL EXPRESS

Ray L. Weber, Esquire
Laura J. Gentilcore, Esquire
RENNER, KENNER, GREIVE, BOBAK,
  TAYLOR & WEBER
400 First National Tower
Akron, OH 44308

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn  (No. 4092)
John W. Shaw (No. 3362)
Glenn C. Mandalas (No. 4432)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
gmandalas@ycst.com

*Attorneys for Dyson Technology Limited
and Dyson, Inc.*

063753.1001

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DYSON TECHNOLOGY LIMITED and DYSON, INC., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. NO. 05-434 (GMS) |
| v. | ) ) | |
| MAYTAG CORPORATION, | ) ) | |
| Defendant. | ) ) | |

### <u>AFFIDAVIT OF JEFFREY HYMAN</u>

STATE OF ILLINOIS   )
                          : ss.
COUNTY OF COOK   )

        JEFFREY HYMAN, being duly sworn, deposes and says:

        1.      I am Vice President of Marketing for the United States of plaintiff Dyson, Inc., the Dyson entity responsible for sales, marketing and distribution of Dyson vacuum cleaners in the United States. In this affidavit, I refer collectively to all of the Dyson entities as "Dyson."

        2.      I submit this affidavit in support of plaintiffs' motion for a preliminary injunction. I understand that plaintiffs contend in this lawsuit that the Hoover "Fusion" vacuum cleaner recently released by the Hoover division of defendant Maytag Corporation ("Maytag") in the United States infringes four Dyson patents. In this affidavit, I do not offer any views as to whether the Fusion in fact infringes Dyson's patents. Instead, I explain why, unless Hoover is promptly enjoined from selling the

Hoover Fusion vacuum cleaner in the United States, Dyson faces a threat of immediate and irreparable harm.

**Personal Background**

3.      I was born in New York in 1968.  I attended college at the University of Pennsylvania's Wharton School of Business, where I received a Bachelor of Science degree in Marketing in 1990.  After college, I worked for approximately four years in a series of marketing roles at Black & Decker Corporation, a global consumer products company based in Towson, Maryland.  In 1994, I left Black & Decker and enrolled at the Kellogg School of Management at Northwestern University, where I received a Masters in Business Administration ("MBA") degree in Marketing in 1995.

4.      After graduating from Northwestern University, I moved to the San Francisco Bay area and worked at a software company named Intuit Inc. from 1995 to 1996, again in a marketing position.  In 1996, I started an Internet-based recruiting company called Career Central, and I was President/Chief Executive Officer of Career Central until 2000, when the company was acquired by Spencer Stuart, a major executive search firm.  In 2001, I joined Heidrick & Struggles, another executive search firm, and worked in the Los Angeles area managing Heidrick & Struggles' Internet division until 2002.  In 2003, I returned to the Bay Area and started another company called Canal Street Talent, which represented senior executives in their job searches.  I sold Canal Street Talent to Strategic Transitions, Inc. in 2004.

5.      In March 2004, I was recruited by Spencer Stuart to join Dyson, Inc., which is headquartered in Chicago, Illinois, as Vice President of Marketing for the

U.S. division. As a marketer, this opportunity was attractive to me largely because of Dyson's unique patented technology. I believed—and continue to believe—that this innovative technology differentiates Dyson's vacuum cleaners from competing products on the market and thus gives Dyson a sustainable competitive advantage. I believed that Dyson presented a rare opportunity for me as a marketer to work for a company that offers truly innovative, breakthrough technology to consumers. Because the job required me to relocate from San Carlos, California to Chicago, Illinois, I conducted thorough due diligence prior to joining Dyson. This due diligence included store visits, employee interviews, competitive intelligence and extensive reading.

6.      I formally joined Dyson in June 2004, but did not begin work at the company until early September 2004 because my wife and I had our first child that summer. As Vice President of Marketing for the United States, my job is to build the Dyson brand and to attract and retain customers for its vacuum cleaners. Accordingly, I am responsible for the company's advertising, public relations, trade marketing, graphics and other physical media such as consumer brochures, and in-store merchandising in the United States. I also work closely with the sales department to help build Dyson's relationship with retailers and other distributors, and I similarly work closely with the company's engineers on product planning and management. I currently report to Martin McCourt, the interim President of Dyson, Inc., and my marketing organization consists of twelve people.

**Dyson's Entry into the U.S. Market**

       7.     I am informed and believe that Dyson entered the United States market in or about October 2002, almost two years before I joined the company. I nevertheless am familiar, based on my experience over the past year, with Dyson's history in the United States and with the U.S. vacuum cleaner market generally.

       8.     The United States is the largest, and therefore most important, market for vacuum cleaners in the world. This is a function of the population size, home ownership rate and income level in the United States. When it decided to enter the United States market in 2002, Dyson was the number one producer of vacuum cleaners in the United Kingdom, measured both by volume and by value. Indeed, I understand that Dyson's brand awareness among consumers in the United Kingdom is 95%.

       9.     Despite its success in the United Kingdom, Dyson faced a number of major hurdles in entering the U.S. market. To start, consumers in the United States had never heard of the Dyson brand, and its products cost approximately three times more than most other vacuum cleaners then on the market. Dyson also had no distribution network, no retailers, no organization, and no employees; it was essentially a start-up operation in the United States. Finally, the U.S. vacuum cleaner market at that time was quite mature and crowded, including some competitors, such as Hoover and Bissell, that had been around for decades and were well-known to consumers. Even worse, retail prices of vacuum cleaners were decreasing at the time, which made retailers less enthusiastic about investing in the category. All in all, Dyson was confronted with a highly challenging environment for a new entrant.

10.     Notwithstanding these challenges, Dyson has been remarkably successful in the United States over the last three years. In fact, Dyson today is the number one seller of vacuum cleaners in the United States as measured by value or dollars. According to the NPD Group, Dyson has a 28.8% share of the U.S. market for upright vacuum cleaners as measured by value or dollars. And, also according to the NPD Group, Dyson's share of the U.S. market for upright vacuum cleaners as measured by volume or unit is 9.7%. This makes Dyson the number five seller of upright vacuum cleaners in the United States as measured by volume or units.

11.     Dyson has achieved this success in the United States in less than three years primarily because of its technology. Simply stated, James Dyson and Dyson's engineers have invented a better mousetrap. In our experience, once consumers learn about our products, they discover that Dyson's technology delivers superior cleaning results while never losing suction. Consumers even are willing to pay a price premium for this performance. Consumers also are attracted to the fact that Dyson's vacuum cleaners do not require them to buy bags or new filters, which reduces their total cost of ownership.

**Dyson's Push into the Mass Market**

12.     As with any company in any industry, Dyson's previous success in the United States in no way guarantees future success. In fact, this is a particularly critical time for Dyson in the U.S. market. For many new products, including vacuum cleaners, there is a broadly-recognized, bell-shaped adoption curve. I have included below an illustration of this adoption curve obtained on the Internet at the following

website: http://www.valuebasedmanagement.net.  I include this example only as an

illustration.



13.     Like most companies that enter a new geographic market, Dyson

has achieved its success to-date in the U.S. market largely by appealing to so-called

"early adopters," which make up a relatively small percentage of total consumers.  As a

general matter, early adopters have higher income levels and are better educated than the

average consumer.  They also tend to live in metropolitan areas and are "thought leaders"

in their communities.  Early adopters are distinguishable in that they are attracted to, and

willing to take a risk on, new products, particularly those that offer new technology.

Dyson thus far has been very successful among that group of consumers.

14.     For Dyson to maintain—and indeed expand—its position in the

United States, Dyson must penetrate the mass market, which is made up of the so-called

"early majority" and "late majority."  These two categories of consumers constitute the

bulk of U.S. households, and thus the bulk of the U.S. vacuum cleaner market.  Because

- 6 -

there are only a limited number of "early adopters" in any market—and because households generally purchase a new vacuum cleaner no more than once every five or six years—Dyson must penetrate the mass market in order to maintain, much less increase, its current market share. I strongly believe that if Dyson is unsuccessful in reaching the mass market, its volume in the United States will stagnate, and its vacuum cleaners will be relegated to low-volume, niche status. This is not—and has not been—Dyson's business objective in entering the United States market; Dyson instead seeks to become a leading, high-volume participant.

15.    Since I began work at Dyson in September 2004, much of my focus has been on increasing Dyson's effort to penetrate the mass market in the United States. This effort cuts across all of the marketing we do at Dyson. For example, we have begun to broaden the appeal of our advertising and enhance the clarity of our packaging. We also have launched a "grassroots" marketing program to bring our new product innovations to local neighborhoods where consumers can test them. And we have entered into agreements with two large, national retailers—Target and Wal-Mart— that sell products into the mass market. In the fall of 2004, we rolled out our products in Target stores nationally, and in mid-June 2005, we began offering our products in Wal-Mart stores.

16.    The Wal-Mart relationship is particularly important to Dyson's effort to penetrate the mass market. Indeed, I believe that Dyson's agreement with Wal-Mart could be our most important strategic initiative in the United States at this time. As I understand it, we had discussions with Wal-Mart for about two years, but reached an agreement approximately six months ago. After a fifty store test, we began a national

rollout in mid-June 2005 of the Dyson DC07 All Floors vacuum cleaner to 1,600 Wal-Mart stores, about half of Wal-Mart's stores in the United States.

        17.     As I previously stated, our effort to penetrate the mass market is critically important to Dyson's continued success in the United States. If this effort is unsuccessful, Dyson's growth in the United States will almost surely stop, and its volume eventually will decrease as Dyson "exhausts" the early adopters to whom it can sell its products. Dyson's goal is to become a mainstream brand in the United States, just as it is in the United Kingdom. To achieve that goal, Dyson must be successful in the mass market.

**Maytag's Introduction of the Hoover "Fusion"**

        18.     In early June 2005, a Dyson territorial sales manager reported that he had seen a Hoover "Fusion" vacuum cleaner in a Wal-Mart store in upstate New York. This was the first time that I or anyone else at Dyson had heard of the Hoover Fusion. At that time, the Fusion was unavailable on the websites of either Hoover or Wal-Mart or at any other Wal-Mart store visited by our sales force. The sudden appearance of the Hoover Fusion at Wal-Mart could not have come at a worse time for Dyson, occurring just two weeks before Dyson's own national rollout with Wal-Mart.

        19.     The sales manager who first spotted the Hoover Fusion at the Wal-Mart store in upstate New York purchased one and immediately shipped it to us in Chicago. Upon inspecting the Fusion, I immediately saw that the product looked very similar to Dyson's DC07 Low Reach vacuum cleaner. This was particularly troubling

- 8 -

because the DC07 Low Reach is essentially identical to the DC07 All Floors vacuum

cleaner that Dyson was about to begin selling at Wal-Mart.

20.    Even worse, the physical appearance and features of the Hoover

Fusion were clearly intended to mislead consumers into thinking that the Fusion provides

Dyson's proprietary technology.  To begin with, the two products look very much the

same.  For example, the size and shape of the Fusion bin are the same as those of the

Dyson DC07 bin, and both products contain shrouds with perforations.  The Hoover

Fusion box and product literature similarly make claims designed to convince consumers

that the Fusion offers Dyson technology.  Those claims include "no loss of suction" (but

with an asterisk setting out caveats and conditions), "cyclonic," "spins dirt and dust

away" and "no filters to replace," all claims associated with Dyson vacuum cleaners.

21.    After we saw the first Hoover Fusion in the Wal-Mart store in

upstate New York, Hoover rolled the product out nationally with Wal-Mart over the next

three or four weeks.  Beginning in early July 2005, the Hoover Fusion also became

available on the websites of both Hoover and Wal-Mart.  This leads me to believe that the

official launch date for the Hoover Fusion was probably around July 1, 2005.  At present,

the Hoover Fusion, to our knowledge, is available only at Wal-Mart stores and on the two

companies' websites.

22.    The Hoover Fusion not only attempts to mimic Dyson's

technology, but also is available at a lower price.  Whereas the Dyson DC07 All Floors

sold at Wal-Mart typically retails for $399, Wal-Mart sells the Hoover Fusion for only

$128.  Dyson's other models are even more expensive:  the DC14 typically retails for

$429 and the DC15 Ball for $599.

- 9 -

**The Threat of Irreparable Harm to Dyson**

23.    Dyson has a limited window of opportunity—about twelve to eighteen months, in my view—to succeed in penetrating the mass market in the United States. As with any company climbing the product adoption curve, building and sustaining momentum are critically important. As a result of our superior products, patented technology, and substantial marketing investment, momentum has been on Dyson's side. Consumers and retailers are interested in Dyson's products, which are perceived to be both technically superior and the brand-to-buy.

24.    In today's world, however, where information spreads quickly due to the Internet, momentum can be lost quickly and even reversed. If Dyson were to lose its current momentum, retailers would become less excited about selling its products, which would result in fewer "sku" listings. Similarly, Dyson's image among consumers would suffer, and Dyson ultimately would lose market share and volume. All of this could make it impossible for Dyson to penetrate the mass market. And, if its current effort to reach that market fails, Dyson may not be able to regenerate the momentum needed to take another crack at the mass market in the foreseeable future, if ever.

25.    The presence at this particular juncture of the Hoover Fusion—a product that I am told infringes upon Dyson's patents—in Wal-Mart stores seriously threatens Dyson's effort to penetrate the mass market. That threat will become even more serious if Hoover begins selling the Fusion at additional retailers. Hoover has designed and is marketing the Hoover Fusion in an attempt to confuse and convince consumers that the Fusion delivers Dyson technology—and at a lower price. In addition, Hoover's 100-year-old brand gives the product immediate recognizability and credibility

- 10 -

among consumers, particularly in the mass market. This fact, together with Hoover's strong distribution network, makes the threat posed by the Hoover Fusion even stronger. I am particularly concerned that consumers who purchase the Hoover Fusion will have a poor product experience that may make them less likely—due to confusion—to try Dyson's products in the future.

26.    For all of these reasons, unless Dyson receives prompt judicial relief from Hoover's infringement of Dyson's patents, Dyson will suffer—in my view—irreparable harm in the marketplace. If Dyson is required to wait a year or eighteen months until the conclusion of this litigation to obtain an injunction, it may be too late. By that time, Dyson will have lost its momentum in the U.S. market and failed in its effort to penetrate the mass market as a direct result of the presence of the Hoover Fusion in the marketplace. That failure may not be easily reversible. By issuing a preliminary injunction now—shortly after the release of the Hoover Fusion—the Court has a unique opportunity to enjoin Hoover's infringement of Dyson's patents at the precise moment when Dyson faces significant and irreparable commercial harm.

Jeffrey Hyman

Sworn to before me this
22 day of July, 2005

Notary Public

OFFICIAL SEAL
TIFFANY STABOU
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 4-21-2009

- 11 -

## CERTIFICATE OF SERVICE

I, Glenn C. Mandalas, hereby certify that on July 29, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Francis DiGiovanni, Esquire
> CONNOLLY BOVE LODGE & HUTZ LLP
> The Nemours Building – 8th Floor
> 1007 N. Orange Street
> Wilmington, Delaware 19801

I further certify that on July 29, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

> BY FEDERAL EXPRESS
>
> Ray L. Weber, Esquire
> Laura J. Gentilcore, Esquire
> RENNER, KENNER, GREIVE, BOBAK,
>   TAYLOR & WEBER
> 400 First National Tower
> Akron, OH 44308

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn  (No. 4092)
John W. Shaw (No. 3362)
Glenn C. Mandalas (No. 4432)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
gmandalas@ycst.com

*Attorneys for Dyson Technology Limited and Dyson, Inc.*