IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DYSON TECHNOLOGY LIMITED )
and DYSON, INC. ) CASE NO. C.A. 05-434-GMS
)
Plaintiffs, )
v. )
)
MAYTAG CORPORATION, )
)
Defendant )

**DEFENDANT MAYTAG CORPORATION'S BRIEF IN
OPPOSITION TO DYSON'S MOTION FOR PRELIMINARY INJUNCTION**

Francis DiGiovanni (#3189)
Stephanie O'Byrne (#4446)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899
Phone (302) 658-9141
Facsimile (302) 658-5614

*Attorneys for Defendant Maytag Corporation*

OF COUNSEL:

Ray L. Weber
Laura J. Gentilcore
RENNER, KENNER, GREIVE, BOBAK,
   TAYLOR & WEBER
400 First National Tower
Akron, OH  44308
Phone  (330) 376-1242
Facsimile (330) 376-9646

Stephen P. Durchslag
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601
Phone  (312) 558-5600
Facsimile  (312) 558-5700

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES..................................................................................................ii

NATURE AND STAGE OF PROCEEDINGS..........................................................................1

STATEMENT OF THE FACTS .............................................................................................1

SUMMARY OF THE ARGUMENT .......................................................................................2

ARGUMENT .......................................................................................................................3

I.  Standard of Review for Determination of a Motion for Preliminary Injunction ...............3

II.  Dyson Cannot Demonstrate a Likelihood of Success on the Merits...................................4

    A.  The Fusion Vacuum Cleaner Does Not Infringe Any Asserted Valid Claim Of The Patents-In-Suit.................................................................................4

        1.  The '515 Patent.....................................................................................8

        2.  The '748 Patent ..................................................................................10

        3.  The '008 Patent ..................................................................................11

        4.  The '038 Patent ..................................................................................13

    B.  Dyson Cannot Overcome Maytag's Challenge As to the Validity and Enforceability of the '038 Patent.......................................................................14

III.  Dyson is Not Entitled to a Presumption of Irreparable Harm and Has Not Brought Forth Additional Facts Proving Irreparable Harm..............................................16

IV.  The Balance of Harm Weighs in Favor of Maytag and Denying Dyson's Motion for a Preliminary Injunction ...................................................................19

V.  The Public Interest will not be Served by the Grant of a Preliminary Injunction...........................................................................................................20

VI.  The Requisite Bond...........................................................................................21

CONCLUSION ...............................................................................................................22

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*ABC Indus., Inc. v. Kason Indus., Inc.*,
　30 F. Supp. 2d 331 (E.D. N.Y. 1998),
　*aff'd*, 271 F.3d 859 (Fed. Cir. 1999)........................................................................5

*Augustine Med., Inc. v. Gaymar Indus., Inc.*
　181 F.3d 1291 (Fed. Cir. 1999) .............................................................................14

*Bell & Howell Document Mgmt. Prods. v. Altek Sys.*,
　132 F.3d 701, 705 (Fed. Cir. 1997).................................................................4, 5, 15

*Celeritas Technologies, Ltd. v. Rockwell Int'l Corp.*,
　150 F.3d 1354 (Fed. Cir. 1998) ...............................................................................7

*Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*,
　291 F.3d 1317 (Fed. Cir. 2002) ...............................................................................6

*Diamond Power Specialty Corp. v. Bayer Co.*,
　95 F.2d 541 (8th Cir. 1938)....................................................................................17

*Eagle Comtronics, Inc. v. Arrow Communication Labs, Inc.*,
　305 F.3d 1303 (Fed. Cir. 2002) ...............................................................................6

*Genentech v. Novo Nordisk*,
　108 F.3d 1361 (Fed. Cir. 1997) .............................................................................15

*Genter Corp. v. Donnelly Corp.*,
　69 F.3d 527 (Fed. Cir. 1995) ...................................................................................5

*High Tech. Med. Instrumentation v. New Image Indus.*,
　49 F.3d 1551 (Fed. Cir. 1995) ...............................................................................18

*Hybritech, Inc. v. Abbott Labs.*,
　849 F.2d 1446 (Fed. Cir. 1988) .....................................................................3, 4, 20

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
　906 F.2d 679 (Fed. Cir. 1990) .....................................................................19, 20, 21

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
　995 F.2d 1566 (Fed. Cir. 1993), cert. denied, 114 S. Ct. 923 (1994) .....................4

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
　256 F.3d 1323, 1331 (Fed. Cir. 2001)......................................................................5

*Jonsson v. Stanley Works,*
   903 F.2d 812 (Fed. Cir. 1990) ........................................................................... 14

*K-2 Corp. v. Salomon S.A.,*
   191 F.3d 1356 (Fed. Cir. 1999) ........................................................................ 14

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ........................................ 5

*Novo Nordisk of North America, Inc. v. Genentech, Inc.,*
   77 F.3d 1364 (Fed. Cir. 1996) ........................................................................... 5

*Oakley, Inc. v. Sunglass Hut Int'l,*
   316 F.3d 1331 (Fed. Cir. 2003) ....................................................................... 18

*Overhead Door Corp. v. Chamberlain Group, Inc.,*
   194 F.3d 1261 (Fed. Cir. 1999) ......................................................................... 5

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
   182 F.3d 1298 (Fed. Cir. 1999) ......................................................................... 5

*Polymer Tech., Inc. v. Bridwell,*
   103 F.3d 970 (Fed. Cir. 1996) ........................................................................... 4

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
   237 F.3d 1359 (Fed. Cir. 2001) ......................................................................... 7

*Reebok Int'l Ltd. v. J. Baker, Inc.,*
   32 F.3d 1552 (Fed. Cir. 1994) ..................................................................... 4, 18

*Roper Corp. v. Litton Sys.,Inc.,*
   757 F.2d 1266 (Fed. Cir. 1985) ....................................................................... 16

*Sage v. Devon Indus., Inc.,*
   126 F.3d 1420 (Fed. Cir. 1997) ..................................................................... 6, 14

*Searfoss v. Pioneer Consolidated Corp.,*
   374 F.3d 1142 (Fed. Cir. 2004) ......................................................................... 6

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,*
   758 F.2d 613 (Fed. Cir. 1985) ........................................................................... 5

*Unique Concepts, Inc. v. Brown,*
   939 F.2d 1558 (Fed. Cir. 1991) ......................................................................... 6

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996) ........................................................................... 5

*Wahpeton Canvas Co.v. Frontier, Inc.*,
   870 F.2d 1546 (Fed. Cir. 1989) ..........................................................................................5

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997).................................................................................................... 6, 14

## STATUTES

35 U.S.C. § 102 ................................................................................................................... 6

37 C.F.R. § 1.56................................................................................................................ 7, 16

Now comes Defendant, Maytag Corporation, and opposes the Motion for Preliminary Injunction filed by Plaintiffs, Dyson Technology Limited and Dyson, Inc.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiffs, Dyson Technology Limited and Dyson, Inc. (hereinafter, collectively "Dyson"), have brought this action alleging infringement by Defendant, Maytag Corporation (hereinafter "Maytag"), of four patents, namely U.S. Patent No. 4,643,748 ("the '748 patent") for a "Cleaning Apparatus"; U.S. Patent No. 4,826,515 ("the '515 patent") for a "Vacuum Cleaning Apparatus"; U.S. Patent No. 4,853,008 ("the '008 patent") for a "Combined Disc and Shroud for Dual Cyclonic Cleaning Apparatus," and U.S. Patent No. 5,858,038 ("the '038 patent") for a "Dust Separation Apparatus," by the sale of Maytag's Hoover "Fusion" vacuum cleaner. Maytag has answered, denying all allegations, asserting affirmative defenses of noninfringement, invalidity and unenforceability, and asserting counterclaims for false and misleading advertising, deceptive trade practices and unfair competition.   Dyson has filed a motion for preliminary injunction.  Here, Maytag responds to that motion.

## STATEMENT OF THE FACTS

At all times relevant herein, The Hoover Company ("Hoover") has been a wholly owned subsidiary of Maytag or, more recently, Hoover has been merged as a business unit of Maytag. Herein, defendant may interchangeably be referred to as "Maytag," "Hoover," or "Maytag/Hoover."

Maytag/Hoover has had a long-standing business relationship with Wal-Mart, dating back to the mid 1980's.  Wal-Mart has been Maytag/Hoover's largest customer for the last four 4-5 years.  The Fusion vacuum cleaner at issue in this case was conceived and developed by Maytag/Hoover specifically for Wal-Mart and is being provided exclusively to Wal-Mart, with no present plans to otherwise market or distribute it.  Maytag/Hoover began its rollout of the

Fusion vacuum cleaner in late May or early June 2005, and the product was quickly placed throughout Wal-Mart's approximately three thousand (3000) retail stores. Sales of the Fusion product, sold under the "Hoover" brand name, are forecasted to account for 7.5% of that business unit's revenue.

It is fundamental that the Hoover name is the best known name in floorcare, and Hoover products have been consistently top rated in consumer magazines such as *Consumer Reports*, *Money Magazine,* and *Good Housekeeping*. Hoover acquired the premier position in floorcare products by engineering, manufacturing, and retailing products known for their performance and value. The Fusion vacuum cleaner is of the same top quality.

Nothing about the packaging of the Fusion vacuum cleaner would confuse consumers into believing that Maytag/Hoover designed or markets the product in an attempt to confuse and convince consumers that the Fusion product is anything but clearly differentiated from Dyson. To the extent the packaging or Maytag/Hoover materials mention Dyson in any way, it is for purposes of comparative advertising, expressly precluding confusion by consumers.

The Fusion and Dyson vacuum cleaners are not the only cyclonic vacuum cleaners in the market, there being various "cyclonic" units offered by others.

## SUMMARY OF THE ARGUMENT

1.     Dyson cannot demonstrate a reasonable likelihood of success on the merits as it cannot present a strong (clear) case for infringement for the reason that the structure of Maytag's accused Fusion vacuum cleaner does not contain all of the elements of any asserted independent claim of the '515, '748, '008, or '038 patents of Dyson;

2.     Dyson cannot demonstrate a reasonable likelihood of success on the merits as to the '038 patent for the further and separate reason that it cannot demonstrate a strong likelihood

that it can overcome Maytag's clear evidence of the invalidity and/or unenforceability of that patent;

3.    Dyson is not entitled to a presumption of irreparable harm as it cannot show a strong (clear) case for infringement or show that Maytag's evidence of invalidity and/or unenforceability of at least one of the patents in issue is without substantial merit;

4.    Dyson cannot present sufficient evidence of irreparable harm for the reasons that: (a) the *status quo* is that Dyson is established in the U.S. vacuum cleaner mass market and Maytag has already introduced its accused product into Wal-Mart, the only placement intended for the product; (b) issuance of a preliminary injunction will irreparably injure Maytag's existent business relationship with Wal-Mart, and damage it financially to the extent of tens of millions of dollars, annually; and (c) in the event that Dyson is able to prove infringement, damages could be readily calculated as Dyson admits having licensed its technology, and  Maytag is financially sound;

5.    The harm to Maytag in the event that an order issues granting a preliminary injunction outweighs the harm to Dyson in the event that an order is issued denying Dyson's motion; and

6.    The public interest lies in favor of denying Dyson's request for preliminary injunction.

## ARGUMENT

## I.    <u>Standard of Review for Determination of a Motion for Preliminary Injunction</u>

The Federal Circuit has set forth the standard of review to be followed by a district court in determining a motion for preliminary injunction in cases involving claims of patent infringement.  *Hybritech, Inc. v. Abbott Labs*., 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).  A district court must consider four factors: (1) the movant's reasonable likelihood of success on the

merits; (2) irreparable harm to the movant if the motion is not granted; (3) the balance of harm to the parties if the motion is granted; and (4) the public interest. *Id.* Demonstration of a reasonable likelihood of success on the merits requires that the movant in a patent case make a strong (clear) showing of both infringement of its patent by the accused product, and that movant is likely to withstand any challenges by the non-movant to the validity and/or enforceability of the movant's patent. *Id.; Bell & Howell Document Mgmt. Prods. v. Altek Sys.,* 132 F.3d 701, 705 (Fed. Cir. 1997). Only if a strong (clear) case for both is made by the movant, will the movant be entitled to a presumption of irreparable harm. *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994). A district court is not required to articulate findings on the third and fourth factors when the movant fails to establish either of the first two crucial factors of a likelihood of success on the merits or irreparable harm. *Id.; Polymer Tech., Inc. v. Bridwell,* 103 F.3d 970, 973 (Fed. Cir. 1996). Cardinally, the Federal Circuit "has cautioned that a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993), *cert. denied*, 114 S. Ct. 923 (1994).

## II.   Dyson Cannot Demonstrate a Likelihood of Success on the Merits

### A.   The Fusion Vacuum Cleaner Does Not Infringe Any Asserted Valid Claim Of The Patents-In-Suit

In order to prevail on its Preliminary Injunction Motion, Dyson must necessarily make a strong or clear showing of a high likelihood of success on the merits. *Hybritech, Inc.*, 849 F.2d at 1451 n.12. It must do so not only with regard to the infringement issues, but also with regard to validity when evidence showing invalidity is presented. As demonstrated below, Dyson has totally failed on the infringement issue as to each patent-in-suit and evidence will be presented herein to clearly demonstrate the invalidity of at least one of those patents.

An infringement analysis is a two step process which begins with claim construction, a matter of law for the court, and ends with a comparison of the accused device with a properly construed claim. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996); *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). Claim construction begins with the wording of the claims, themselves, giving the claim terms their ordinary and customary meaning unless the specification or file history clearly discloses any special or alternative meaning. *Id.*; *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Bell & Howell Document Mgmt. Prods. Co.,* 132 F.3d at 705. And, where terms are given their ordinary and customary meaning, corresponding structure in an accused product that falls outside that meaning, cannot be encompassed by the claim. *Genter Corp. v. Donnelly Corp.*, 69 F.3d 527, 530 (Fed. Cir. 1995); *see also ABC Indus., Inc. v. Kason Indus., Inc.*, 30 F. Supp. 2d 331, 339 (E.D. N.Y. 1998), *aff'd,* 271 F.3d 859 (Fed. Cir. 1999).

Infringement of dependent claims cannot be found absent infringement of the independent claims from which they depend. *See Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 626 (Fed. Cir. 1985); *Wahpeton Canvas Co.v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989). Accordingly, Maytag need only show Dyson's failure to present a strong case for infringement of the independent claims it asserts.

Infringement of a patent may be either literal or under the doctrine of equivalents. Literal infringement is found when every limitation recited in a claim appears in the accused device. *Overhead Door Corp. v. Chamberlain Group, Inc.*, 194 F.3d 1261, 1269 (Fed. Cir. 1999); *Novo Nordisk of North America, Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1371 (Fed. Cir. 1996). Infringement by equivalents requires that the accused product contain elements identical or

equivalent to each element of the claim. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). Under the doctrine of equivalents, "an element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Eagle Comtronics, Inc. v. Arrow Communication Labs, Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002). In determining whether the differences between the accused product and claim limitation are "insubstantial," the Federal Circuit has determined "it is axiomatic that we may determine whether the accused product performs the same function, in the same way with the same result." *Searfoss v. Pioneer Consolidated Corp.*, 374 F.3d 1142, 1150 (Fed. Cir. 2004).

Cardinally, the doctrine of equivalents may not be employed to eliminate a claim limitation or element in its entirety. *See Warner-Jenkinson Co.*, 520 U.S. at 29. S*earfoss*, 374 F.3d, at 1151; and *Cooper Cameron Corp. v. Kvaerner Oilfield Products, Inc.*, 291 F.3d 1317, 1321 (Fed. Cir. 2002). Indeed, where the patent owner's theory of equivalence would "entirely vitiate a particular claim element, partial or complete summary judgment [of non-infringement] should be rendered by the Court." *Sage v. Devon Indus., Inc.*, 126 F.3d 1420, 1429 (Fed. Cir. 1997).

Whether infringement is literal or under the doctrine of equivalents, it is fundamental that, for infringement to be found, the accused product must have each and every element of the asserted claim—the "all elements rule." *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991).

It is axiomatic that only the valid and enforceable claims of a patent may be infringed. Relevant here is the fact that a patent claim is invalid if it is anticipated by the prior art under 35 U.S.C. §102, in that a single prior art device or reference contains each claim limitation.

*Celeritas Technologies, Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998). Similarly, a patent claim is unenforceable if the duty of candor imposed by 37 C.F.R. § 1.56 is breached by failure to disclose material prior art to the Patent Office during prosecution of the patent, with the intent to deceive the patent examiner. *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1366 (Fed. Cir. 2001).

In its Brief, Dyson makes broad generalizations regarding its patent claims and the accused Fusion vacuum cleaner. Only by ignoring the express language of the claims, and by selectively reconfiguring the Fusion vacuum cleaner, can Dyson even begin to make an argument for infringement of the patents-in-suit. As will become apparent directly below, Dyson's position regarding infringement is so devoid of merit as to be deserving of nothing more than summary denial. Moreover, at least claims 1-3 and 7 of the '038 patent are invalid as being anticipated by the prior art, and that patent is unenforceable for failure of Dyson to disclose that known prior art to the Patent Office during prosecution.

Submitted herewith is the Affidavit of Charles D. DeGraff, former Vice President of Engineering of The Hoover Company, retired since 2001.[1] It is clear that Mr. DeGraff is an expert in the field of vacuum cleaners, is knowledgeable with regard to patents, and is capable of assessing the Fusion vacuum cleaner in light of the asserted patent claims. (DeGraff Aff. ¶¶ 1-5). As presented below, his assessment clearly demonstrates the absence of any infringement.[2]

---

[1] The patents-in-suit, supporting affidavits, and other documentary evidence relied upon herein are filed herewith in the Appendix to Maytag Corporation's Brief in Opposition to Dyson's Motion for Preliminary Injunction.

[2] A physical sample of the Fusion vacuum cleaner will be made available at any hearing on this Motion, or at the request of the Court. For the record, Dyson has provided photographs and illustrations of the Fusion unit to which reference can be made.

1.     **The '515 Patent**

As set forth in paragraphs 6-17 of the DeGraff Affidavit, the Fusion vacuum cleaner fails to satisfy several claim limitations of claim 14 of the '515 patent. The requirement in the claim of "a dirty air inlet in an upper portion of the outer container spaced from the bottom" is not found in the accused product. The dirty air inlet of the Fusion vacuum cleaner is 41% of the distance from the top of the outer container - - hardly at an upper portion as required by the claim. (DeGraff Aff. ¶¶ 7-8). Dyson's suggestion that the upper portion is anything above the midline as belied by its own patent, which clearly demonstrates to one skilled in the art that the "upper portion" is at the top of the container, not at its midsection. With reference to Fig. 1 of the '515 patent, the text of that patent states "A dirty air inlet passage 16 communicates through the upper part of the side surface 14. . ." ('515 patent, col. 4, ll. 59-60). Fig. 1 clearly shows what was intended by "upper part" or "upper portion."

Claim 14 of the '515 patent requires that the dirty air inlet comprise a portion of the outer container and be "oriented for supplying dirt laden air into the container tangentially to the interior surface of the outer container." ('515 patent, col. 11, ll. 39-43). While the outer container of the Fusion vacuum cleaner does have a tear drop shaped inlet, as pointed out by Mr. Jones in his affidavit and identified in Exhibit 6 thereto, that inlet has nothing to do with causing tangential flow. As DeGraff avers, "the inlet that causes tangential flow in the Fusion vacuum cleaner is an insert that is separate and apart from the outer container, being attached to the vacuum cleaner housing, not the outer container." (DeGraff Aff. ¶¶ 9-10). "The tear drop shaped outlet referenced in Exhibit 6 to Dyson's Jones Affidavit is simply an opening to receive the insert." (*Id.*).

Also absent in the Fusion vacuum cleaner is the limitation in claim 14 of a "cyclone for receiving an air flow from the air inlet and for maintaining its velocity to a cone opening." ('515

patent, col. 11, ll. 52-53).  In contradistinction to the claim, the cyclone of the Fusion vacuum cleaner does not maintain the velocity of the air, but accelerates it.  (DeGraff Aff. ¶¶ 11-12).

The futility and desperation of Dyson in attempting to show infringement is highlighted by its efforts to demonstrate that the Fusion vacuum cleaner satisfies the claim limitation of "a dirt receiving and collecting chamber extending from the bottom of the container . . . wherein the receiving chamber has a circular cross-section at the inner surface around the axis with a minimum diameter furthest from the opening of 3 times the diameter of the cone opening." ('515 patent, col. 11, ll. 61-68).  With full knowledge that the rubber seal that is interposed between the dirt collection chamber and the outer container is a separate and distinct limitation of the claim, and while separately labeling the dirt collection chamber and the rubber seal in Exhibit 15 of the Jones Affidavit and in its brief (p. 26), Dyson chooses to measure the seal, rather than the dirt collection chamber in an effort to find a measurement that will satisfy its claim limitation.  But, the claim is clear - - there is a dirt receiving and collecting chamber (element "c" of the claim) and a ring seal (element "d" of the claim).  It is the relationship between the receiving chamber and the cone opening that is recited in the claim, not the relationship between the ring seal and cone opening, measured by Dyson.  The claim is clear, the referenced diameter of the receiving chamber must be at least 3 times the diameter of the cone opening.  In the Fusion vacuum cleaner, that relationship does not exist.  (DeGraff Aff. ¶¶ 13-17).

Literal infringement will only be found where the patent holder demonstrates that each and every element and limitation of the claim alleged to be infringed is literally met in the accused device.  Clearly, the all elements rule required to prove claim infringement has not been

satisfied. Multiple limitations of claim 14 of the '515 patent are absent in the Fusion vacuum cleaner. The absence of a single claim limitation is sufficient to avoid infringement.

### 2.    The '748 Patent

Claim 15 of the '748 patent includes many of the same claim limitations as claim 14 of the '515 patent. Notably, claim 15 of the '748 patent requires "a dirty air inlet at an upper portion of the outer container" ('748 patent, col. 6, ll. 20-21), "a dirty air inlet . . . which is oriented for supplying dirt laden air into the container tangentially to the interior surface" ('748 patent, col. 6, ll. 17-23), and a "cyclone . . . for receiving an air flow from the air inlet and maintaining its velocity to a cone opening" ('748 patent, col. 6, ll. 27-33). As set forth above with regard to claim 14 of the '515 patent, none of these claim limitations are existent in the Fusion vacuum cleaner. (*See* DeGraff Aff., ¶¶ 18-25).

Further, claim 15 of the '748 patent requires "a disc means provided on the outside of the cyclone intermediate the receiving chamber and the air outlet of the container." ('748 patent, col. 6, ll. 47-49). As pointed out in the DeGraff Affidavit, the disc of the Fusion vacuum cleaner is not provided on the outside of the cyclone, but secured about an upper portion of the receiving chamber. Moreover, it is not intermediate the receiving chamber and the air outlet. In common usage, "intermediate" means "in the middle," consistent with Fig. 1 of the '748 patent and the associated specification. In the patent, the disc 20 is clearly in the middle of the receiving chamber 15 and the outlet passage 13f. In contradistinction, in the Fusion vacuum cleaner, the disc extends below the boundary of the receiving chamber itself. Accordingly, the positional statement of the disc being <u>on</u> the outside of the cyclone and being intermediate or in the middle of the outlet of the container and the receiving chamber simply is not satisfied. (*See* DeGraff Aff., ¶¶ 26-27). Notably, claim 15 requires that the disc be <u>on</u> the outside of the cyclone, in contradistinction to being merely "about" the cyclone.

Again, the all elements rule is not met, and claim 15 of the '748 patent is not infringed. Moreover, claims 16 and 17, which depend from claim 15, cannot be infringed since a dependent claim is not infringed if the claim from which it depends is not infringed.

### 3.    The '008 Patent

There can be no infringement of the '008 patent because certain of the limitations of the asserted claims do not find response in the Fusion vacuum cleaner. As a starting point, and as presented above, claim 1 of the '008 patent requires "an outer container comprising . . . a dirty air inlet which is oriented for supplying dirt laden air into the container tangentially to the interior surface" ('008 patent, col. 4, ll. 2-7), and "a Cyclone . . . for receiving an airflow from the air inlet and maintaining its velocity" ('008 patent, col. 4, ll. 11-15). As set forth earlier herein, the Fusion vacuum cleaner has neither of these structures or features and, accordingly, cannot infringe the asserted claims of this patent for the reasons set forth above with regard to the '515 and '748 patents. (*See* DeGraff Aff., ¶¶ 28-30).

Claim 1 of the '008 patent also requires that "the shroud means is mounted at one end below the air inlet to the cyclone." ('008 patent, col. 4, ll. 35-36). But, as is apparent from Exhibits 10 and 20 of the Jones Affidavit offered by Dyson, the air inlets to the cyclone ("Molded openings" of Jones Exhibit 10) are actually below the upper end of the shroud by at least 3/16 inch, as apparent from Exhibit 20 of the Jones Affidavit. (DeGraff Aff., ¶¶ 30-31). Accordingly, this claim limitation is not satisfied.

Claim 1 of the '008 patent also requires that the "shroud means has perforations adjacent to the position intermediate to the cone opening" ('008 patent, col. 4, ll. 42-43). The recited "position intermediate to the cone opening," is identified in the claim as "the other end [of the shroud means] at a position intermediate to the cone opening." ('008 patent, col. 4, ll. 35-37). In contradistinction, the Fusion vacuum cleaner perforations are not adjacent to the position at the

11

end of the shroud nearest the cone opening, but such perforations are spaced about an inch away from such location. (DeGraff Aff. ¶¶ 32-33).

The primary purpose of the '008 patent was to provide a combined disc and shroud. Indeed, the title of the patent is "Combined Disc and Shroud for Dual Cyclonic Cleaning Apparatus." The '008 patent describes the prior art at col. 1, ll. 24-30 as having a separate disc and shroud. In that same column, at lines 36-39, the object of the invention of the '008 patent is identified as devising "an improved cleaning apparatus wherein the shroud and disc are combined together for mounting on the outside of the inner cyclone." In other words, as stated in the '008 patent, and as clearly shown in the patent itself, what is intended from "disc means provided on the shroud means" in claim 1 of the '008 patent is the "combined integral shroud and disc unit 30" shown in Fig. 2 of the patent and described as such in col. 3, l. 22. It is that structure that is differentiated from the prior art acknowledged in the patent itself.

In contradistinction to the disc means provided on the shroud means as required by claim 1 of the '008 patent, the Fusion vacuum cleaner practices the prior art described in that patent at col. 1, ll. 24-30 where the disc and shroud are separate. (DeGraff Aff. ¶34).

Claim 1 of the '008 patent also requires that the disc be provided "at a lower longitudinal extent of the shroud means and the air inlet of the cyclone." ('008 patent, col. 4, ll. 46-48). However, in the Fusion vacuum cleaner, because the disc and shroud are separate elements, the disc does not provide the lower longitudinal extent of the shroud as in the '008 patent, but extends well below the lower longitudinal extent of the shroud and even further beyond the perforations that comprise the air inlet of the cyclone. In this regard, it is particularly noteworthy that the shroud and disc of the '008 patent are described as a "combined integral shroud and disc

unit" ('008 patent, col. 3, l. 22) and, in that regard, in the '008 patent the disc indeed comprises the lower longitudinal extent of the shroud as claimed. (*See* DeGraff Aff. ¶ 35).

Because the all elements rule is not satisfied with regard to the Fusion vacuum cleaner and claim 1 of the '008 patent, establishing non-infringement of that claim, there can be no infringement of claims 2, 3, 7 and 11, which depend from claim 1.

Claim 23 of the '008 patent is substantially identical to claim 1 of that patent and, accordingly, for the reasons presented above, claim 23 is not infringed. Moreover, claims 24 and 25, which depend from claim 23, cannot be infringed since the claim from which they depend is not infringed.

### 4.    The '038 Patent

The '038 patent requires that "the distance between the cone opening and the base surface is either "less than 8 mm or between 30 mm and 70 mm." ('038 patent, col. 5, ll. 26-28). In the Fusion vacuum cleaner, the recited distance is 72.2 mm, outside the recited range of the claim. Notably, during the prosecution of the '038 patent, the examiner required the use of specific dimensions and objected to the use of the word "substantially," throughout the claims.[3] Accordingly, one skilled in the art would recognize the dimensions advanced in the claims as setting the outer limits or boundaries of the claims, and would not construe the recited dimensions as being either "approximate," "substantial," or "about." (DeGraff Aff. ¶¶ 39-40).

It is also noteworthy that where the examiner has required specific measurements and limitations, absent words such as "substantially," or "about," there is no range of equivalents afforded that limitation and, accordingly, the doctrine of prosecution history estoppel applies. The Supreme Court has held that the doctrine of prosecution history estoppel applies to bar the

---

[3] Relevant portions of the prosecution history of the '038 patent are filed herewith in the Appendix to Maytag Corporation's Brief in Opposition to Dyson's Motion for Preliminary Injunction.

doctrine of equivalents in the event of an amendment to a claim related to patentability. *Warner-Jenkinson*, 520 U.S. at 40-41. The doctrine of prosecution history estoppel applies to arguments related to patentability, as well as amendments, made to gain the allowance of a parent or prior patent. *Augustine Med., Inc. v. Gaymar Indus., Inc.* 181 F.3d 1291, 100 (Fed. Cir. 1999), and *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).

Here, it is clear that the patentees distinguished between absolute measurements and "substantial" measurements from their attempted use of the word "substantially," when a broader range was intended. Having abandoned any attempt to use adjectives such as "almost" or "substantially," the absolute nature of the recited boundaries is clear. (DeGraft Aff. ¶ 40). It is simply improper for a court to now rewrite the claim. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999). The range of "between 30 mm and 70 mm" recited in the claim is quite specific. Dyson would have the Court effectively vitiate that claim limitation, but such is proscribed by law. *Sage*, 126 F.3d at 1429.

Absent infringement of claim 1 of the '038 patent, there can be no infringement of claim 2, 3, 7, 13 and 14, which depend therefrom. Moreover, independent bases for non-infringement of claims 13 and 14 are presented in the Affidavit of DeGraff. (DeGraff Aff. ¶ 43).

**B.     Dyson Cannot Overcome Maytag's Challenge As to
        the Validity and Enforceability of the '038 Patent**

Not only is it clear that the '038 patent is not infringed, it is equally clear that the patent is invalid and likely unenforceable for fraud perpetrated on the Patent Office, a subject of the counterclaims advanced by Maytag. Compellingly, what Dyson advances as the particularly patentable feature of the '038 patent was present in the prior art. Indeed, it is apparent from prior art that was well known to Dyson at the time of the prosecution of the '038 patent, supporting Maytag's contentions in its pleadings of inequitable conduct (fraud on the Patent Office) and

resultant patent unenforceability.   As presented in paragraphs 41 and 42 of the DeGraff

Affidavit, the prior art Amway vacuum cleaner Model CMS 1000A, Carpet Maintenance

System, *circa* 1987, which was the subject of prior litigation with Dyson, has a "distance

between the cone opening and the base surface" of 61.3 mm, lying well within the range of

"between 30 mm and 70 mm," as recited in the claim.[4]   Accordingly, Mr. DeGraff has found that

this Amway vacuum cleaner is a clear anticipation of claim 1 of the '038 patent, rendering that

claim invalid. (DeGraff Aff., ¶ 36).    He similarly found the limitations of at least claims 2, 3,

and 7 as being in the Amway unit, as well. (DeGraff Aff. P. 42).   Because Dyson is unable to

show that it is likely to withstand Maytag's challenge to the validity of the '038 patent. Dyson

cannot demonstrate a likelihood of success on the merits regarding that patent, and its motion for

a preliminary injunction  based on the '038 patent must be denied.   *Bell & Howell Document*

*Mgmt. Prods.,* 132 F.3d at 705.

     Not only is there clearly no infringement of the asserted claims of the '038 patent, but at

least certain of those claims are invalid, and the patent is likely unenforceable as having been

obtained by fraud, in violation of 37 C.F.R. §1.56.   Because Dyson is unable to show that it is

likely to withstand Maytag's challenge to the enforceability of the '038 patent (i.e., show that

Maytag's challenge to the enforceability of the '038 patent lacks substantial merit), Dyson

cannot demonstrate a likelihood of success on the merits, and its motion for a preliminary

injunction as to the '038 patent must be denied.   *Bell & Howell Document Mgmt. Prods.,* 132

F.3d at 705; *Genentech v. Novo Nordisk*,  108 F.3d 1361 (Fed. Cir. 1997).

---

[4] Material showing the Amway vacuum cleaner is attached to the DeGraff Affidavit, and a physical unit
will be made available at any hearing on this matter, or at the request of the Court.  It is believed that
Dyson has such a unit from its prior litigation.

**III.    Dyson is Not Entitled to a Presumption of Irreparable Harm and
Has Not Brought Forth Additional Facts Proving Irreparable Harm**

As presented above, Dyson cannot demonstrate a strong case (a clear likelihood) of
infringement, nor that it will overcome Maytag's challenge to the validity of the '038 patent.
Accordingly, Dyson is not entitled to a presumption of irreparable harm and maintains the full
burden of showing that it will suffer irreparable harm. *Roper Corp. v. Litton Sys.,Inc.*, 757 F.2d
1266, 1272 (Fed. Cir. 1985). It is apparent from Dyson's brief that it cannot meet this burden.

Dyson's contentions of damages are totally speculative and lose sight of the fact that the
purpose of a preliminary injunction is to maintain the *status quo*. Dyson's brief and supporting
Affidavit of Hyman are replete with speculation that Dyson will be damaged, and the damage
itself is cast primarily as a curtailment of Dyson's expansion[5]. In the first instance, there is no
evidence at all that Maytag will curtail the activities of Dyson in any way. Dyson already admits
that, in less than 3 years, it has gained nearly 30% of the vacuum cleaner market in the United
States in terms of value of sales, and has gained nearly 10% of the market in terms of number of
sales of units. Further, it has achieved that success without the use of what it terms the "mass
market" of stores such as Wal-Mart, K-Mart, Sears, Target, Lowes, and the like. Further, it
acknowledges its success of entry into the mass market by virtue of having obtained contracts of
placement with both Wal-Mart and Target. There is no suggestion that either of those mass
merchants can or will terminate their contracts with Dyson because of Hoover's single placement
with Wal-Mart.

Moreover, a preliminary injunction is not a proper remedy for Dyson's speculative
concerns over curtailment of its desired expansion. The purpose of a preliminary injunction is to

---

[5] The speculative nature of the Hyman Affidavit is understandable—Mr. Hyman admits to having less than a year of
experience in the floorcare market. For the eight years prior to joining Dyson as its Vice President of Marketing, he
ran employment agencies. (See Hyman Affidavit, ¶¶3-6).

maintain the *status quo*.  *Diamond Power Specialty Corp. v. Bayer Co.*, 95 F.2d 541, 542 (8th
Cir. 1938).   By definition, expansion is the antithesis of the *status quo* and a preliminary
injunction for the purpose of accommodating expansion would be improper.

Dyson has demonstrated the ability to be quite successful with its marketing campaign by
having acquired nearly 30% of the value of the vacuum cleaner market in less than 3 years.  It
proclaims to have done that without the use of mass merchants.  But, mass merchants are just
one of many avenues for addressing the vacuum cleaner market, and there is no reason to believe
that Dyson will be any less successful through the use of mass merchants than it was without
them.

Submitted herewith is the Affidavit of David Baker, a Maytag/Hoover employee for
nearly 27years, having been involved in marketing and sales since 1984.  He is presently Vice
President and General Manager of Floorcare with Maytag.  (Baker Aff. ¶¶ 1-5).  Contrary to the
tale of woe advanced by Hyman on behalf of Dyson, Mr. Baker identifies the top 10 mass
merchants in floorcare in the United States, and proclaims that Dyson is present in 9 of them.
His proclamation is supported by the February 2005 edition of H.F.N. Magazine, a trade
publication.  (Baker Aff. ¶¶ 68).  There is no question in Mr. Baker's mind but that Dyson has
well penetrated the mass market for vacuum cleaners.  (Baker Aff. ¶ 8).

Mr. Baker also opines, based upon his vast experience in sales and marketing in the
floorcare industry, that Dyson's success in the industry is not a result of its actual technology, but
more a result of its marketing endeavors and perceived technology.  This is corroborated by the
February 2005 H.F.N. Magazine, which identifies Dyson as one of the best marketing companies
that the author has ever seen.  (Baker Aff. ¶ 9).

Dyson's speculation has expanded to a concern that the Fusion vacuum cleaner at issue in this litigation will be offered by Hoover beyond Wal-Mart. Dyson's speculation is simply wrong. The Fusion vacuum cleaner has been offered exclusively to Wal-Mart, and there is no present intention by Hoover to offer it to any other merchants. (Baker Aff. ¶ 13).

Proof of irreparable harm cannot be speculative. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1343 (Fed. Cir. 2003). The speculative nature of Dyson's concerns is apparent through reading of the papers advanced by Dyson, which are characterized with repetitious statements such as "if Maytag," "if Dyson," "Dyson may not," and the like.

Further, Dyson does not contend that Maytag is unable to provide monetary relief, nor can it. In fact, Dyson tacitly acknowledges that Maytag is quite capable of satisfying an award of damages. (Dyson Brief, p. 2). "The availability of damages is particularly significant when, as here, the patentee can point to no specific interest that needs protection through interim equitable relief." *High Tech. Med. Instrumentation v. New Image Indus.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). Potential loss of sales alone is an insufficient basis on which to find irreparable harm. *Reebok Int'l Ltd.*, 32 F.3d at 1557. Dyson simply has not made a sufficient showing that monetary relief would not be adequate in this case, but it must. *High Tech Med. Instrumentation*, 49 F.3d at 1557.

Notably, Dyson acknowledges that it has licensed others under the patents-in-suit. Those licenses include Iona, Apex, and Amway. Those licenses should establish some type of base value for establishing a reasonable royalty, making money damages readily calculable. Moreover, the fact that Dyson has licensed others under its patents flies in the face of its contentions that the presence of another entity offering a competing vacuum cleaner would cause it irreparable harm. Indeed, others are offering cyclonic vacuum cleaners in the market without a

license from Dyson, undermining Dyson's contentions that, for some reason, Maytag's presence would cause irreparable injury.  (Baker Aff. ¶ 21).  Indeed, contrary to Dyson's assertions, Dyson is a late-comer to cyclonic technology for floorcare.  Patents teaching that technology date back nearly a century.  (DeGraff Aff. ¶ 44).

## IV.     The Balance of Harm Weighs in Favor of Maytag and<br>Denying Dyson's Motion for a Preliminary Injunction

In balancing the hardships, a district court must consider the movant's showing of a likelihood of success. *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).  Where the movant fails to show a strong likelihood of success on the merits and irreparable injury, a district court may properly find that the equities tip in favor of the non-movant.  *Id.*

For the reasons set forth in detail above, because Dyson cannot make an adequate showing of either likelihood of success on the merits or irreparable harm, this Court may properly find the equities tip in favor of Maytag.  Moreover, as set forth in the Affidavit of David Baker, the harm to Dyson in the absence of a preliminary injunction pales in view of the damage that would be suffered by Maytag.  As a starting point, and as presented above, in less than 3 years Dyson has garnered nearly 30% of the vacuum cleaner market, measured on value.  Its position in the market in general, and the mass market in particular, is already significant, Dyson having a presence in 9 of the top 10 mass merchants, and 10 of the top 12 retail chains.  (Baker Aff. ¶¶ 6-8).

In contradistinction, Maytag developed the Fusion vacuum cleaner specifically for Wal-Mart, has placed it in all of Wal-Mart's retail stores, and has no present plans to otherwise market or distribute it.  (Baker Aff. ¶¶ 12-14).  For the past 4-5 years, Wal-Mart has been Maytag's largest customer and an imposition of a preliminary injunction would irreparably injure

Maytag's relationship with Wal-Mart, across all of its product lines, not just the Fusion vacuum cleaner. (Baker Aff. ¶¶ 10, 11, 15). Moreover, a preliminary injunction would require a recall from the approximately 3,000 Wal-Mart stores and dozens of distribution centers, creating a logistical nightmare, and would impose upon Maytag a loss of profit on this product alone in excess of $20 million annually - - not to mention the other products placed with Wal-Mart, which might be lost as well. (Baker Aff. ¶¶ 15-17). The damage to Hoover's goodwill with a customer of 20 years duration would likely be impossible to calculate.

In balancing the equities, it is clear that the damage to Hoover, both tangible and intangible, would be near-devastating, while any damages to Dyson, which is well entrenched in the U.S. market, and present in the broad range of retail channels, would likely be minimal, and compensable in monetary damages.

## V.    The Public Interest will not be Served by the Grant of a Preliminary Injunction

In a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of a district court's public interest analysis should be whether there exists some critical public interest which would be injured by the grant of preliminary relief. *Hybritech, Inc.*, 849 F.2d at 1451. Dyson focuses its argument on the general importance of protecting valid patents. Dyson denies that the public will be harmed by the withdrawal of Maytag's Fusion vacuum cleaner.

But, the public will suffer harm in this regard. Particularly, the Maytag product provides the public with a much lower cost, yet competitive and equally effective alternative vacuum cleaner. (Baker Aff. ¶20). In view of the failure of Dyson to present a strong (clear) case of likelihood of success on the merits, under these circumstance the court may properly find that the public interest tips in favor of the denial of Dyson's motion for a preliminary injunction. *Illinois*

*Tool Works, Inc.*, 906 F.2d at 684.  Here, the public interest is best served by the continued availability of the Maytag product.

Notably, Hoover products are consistently given top rating by consumer magazines such as *Consumer Reports, Money Magazine, Good Housekeeping*, and the like.  Hoover certainly did not acquire this position in the floorcare market by providing inferior products.  (Baker Aff. ¶ 18).  Moreover, despite Dyson's protestations, Maytag's packaging does not seek to confuse consumers and, to the extent Maytag makes any reference to Dyson at all, it is for purposes of comparative advertising, which precludes confusion.  (Baker Aff. ¶ 19).  Indeed, it would be foolish for Hoover, with the best known name in floorcare, to make any suggestion that it has adopted technology or goodwill of a competitor.

At the bottom line, the denial of a preliminary injunction would allow consumers to have competing products, not only from two well known sources such as Dyson and Hoover, but also from other sources, as well.  (Baker Aff. ¶ 21).  The consuming public would be greatly harmed being denied access to Hoover's cyclonic vacuum cleaner.

## VI.    **The Requisite Bond**

Should this Court determine that a preliminary injunction is appropriate, a significant bond would be necessary to compensate Maytag, in the event of unfavorable adjudication, for losses suffered during the pendency of the litigation.  Fed. R. Civ. P. 65(c).  As is apparent from the Baker Affidavit, Maytag would lose $20 million profit annually if sales of the Fusion vacuum cleaner were enjoined, and this figure does not address the impact on sales of other Maytag products to Wal-Mart, nor the intangibles such as the impact on Maytag's goodwill.  (Baker Aff. ¶¶ 15-17).  Assessing that this litigation would proceed over a course of two years, a minimum bond of $40 million would be required.

## CONCLUSION

Based on the foregoing law and argument, supported by the evidence made of record herewith and such additional evidence that may be made of record by Maytag at hearing, Maytag respectfully requests that Dyson's motion for a preliminary injunction be denied.

Respectfully submitted,

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899
Phone (302) 658-9141
Facsimile (302) 658-5614
*Attorneys for Defendant Maytag Corporation*

OF COUNSEL:
Ray L. Weber
Laura J. Gentilcore
RENNER, KENNER, GREIVE, BOBAK,
    TAYLOR & WEBER
400 First National Tower
Akron, Ohio  44308
Phone (330) 376-1242
Facsimile (330) 376-9646

Stephen P. Durchslag
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601
Phone  (312) 558-5600
Facsimile  (312) 558-5700

414275v2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, Francis DiGiovanni, hereby certify that on August 29, 2005, I electronically filed the

foregoing **DEFENDANT MATAG CORPORATION'S BRIEF IN OPPOSITION TO**

**DYSON'S MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using

CM/ECF, which will send notification that such filing to the following, upon whom I also served

a copy of the foregoing by hand:

C. Barr Flinn
John W. Shaw
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

I further hereby certify that on August 29, 20005, I have mailed via Federal Express the

document to the following non-registered participant:

David B. Tulchin
Richard C. Pepperman, II
James T. Williams
Keith McKenna
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)
Stephanie O'Byrne (#4446)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899
Phone (302) 658-9141
Facsimile (302) 658-5614

*Attorneys for Defendant Maytag Corporation*