# UNREPORTED OPINIONS

Westlaw.

46 U.S.P.Q.2d 1218                                                                                              Page 1
1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218
(Cite as: 46 U.S.P.Q.2d 1218)

**H**

A.W. Industries Inc.

v.

Electronic Connector Service Inc.

U.S. District Court Southern District of Florida

No. 97-6452-CV-MIDDLEBROOKS

Decided November 24, 1997 and December 9, 1997
United States Patents Quarterly Headnotes

## PATENTS

**[1] Infringement -- Literal infringement (Section 120.05)**

Plaintiff has demonstrated that it is likely to succeed on merits of its claim for patent infringement, since plaintiff has established that it is owner by assignment of patent in suit, since defendants have presented no evidence to rebut statutory presumption of validity, and since independent examination of patented and accused devices, and testimony of plaintiff's expert, warrant conclusion that substantial similarity is present between elements of asserted claim and defendants' flat rock, press fit, card edge connector.

## REMEDIES

**[2] Non-monetary and injunctive -- Equitable relief -- Preliminary injunctions -- Patents (Section 505.0707.07)**

Plaintiff is entitled to preliminary injunction prohibiting defendants' manufacture of flat rock, press fit, card edge connector, since plaintiff's showing of likelihood of success on merits gives rise to presumption of irreparable harm, since plaintiff has offered evidence that alleged infringement is cutting into its business, and that its business may continue to diminish if defendants are allowed to continue drawing away customers, since fact that term of patent has less than one year to run does not favor defendant in balance of equities, since plaintiff will continue to be deprived of its patent rights and lose customers if injunction does not issue, whereas most substantial hardship defendants can claim as result of injunction is loss of business, and since public interest is clearly served by protecting rights secured by valid patents.

## COPYRIGHTS

**[3] Non-copyrightable matter -- In general (Section 211.01)**

Plaintiff has not demonstrated likelihood of success on merits of claim that defendants infringed copyright in its catalog for press fit, card edge connectors, since plaintiff's witness admitted there is standard information contained in all catalogs in connector industry, such that similar ordering of certain parts or use of certain numbers does not automatically constitute infringement, since plaintiff has not shown which similarities between parties' catalogs are due to industry demands and required specifications, and which resulted from alleged infringement, and since catalog currently copyrighted and at issue in present case is, by plaintiff's own admission, virtually identical to catalog plaintiff distributed in public domain at earlier date.

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**[4] Trade secrets -- Disclosure and misappropriation (Section 400.07)**
**Trade secrets -- State and common law (Section 400.09)**

Plaintiff has not demonstrated likelihood of success on merits of its claim for misappropriation of trade secrets, since question remains as to whether customer lists and databases at issue, private and privileged as they were, necessarily constitute trade secrets under Uniform Trade Secrets Act, since there is no evidence other than testimony of plaintiff's witnesses, who did not testify from personal knowledge, that such information was in fact misappropriated and used by individual defendant who is plaintiff's former employee, and since defendant's actions in contacting potential customers does not indicate misappropriation, in that client names and addresses are publicly available and would likely be known to anyone in defendant's position and with his experience within industry.

## TRADEMARKS AND UNFAIR TRADE PRACTICES

**Particular patents -- Electrical -- Card edge connectors**

4,269,468, Ammon, Weaver, and Rodriguez, electrical connector insulator, infringement plaintiff's

COPR. © 2005 The Bureau of National Affairs, Inc.

46 U.S.P.Q.2d 1218
1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218
**(Cite as: 46 U.S.P.Q.2d 1218)**

motion for preliminary injunction granted.

**\*1219** Action by A.W. Industries Inc. against Electronic Connector Service Inc., Dynamic Stamping Inc., and Robert Glaser for patent infringement, copyright infringement, and misappropriation of trade secrets. On plaintiff's motion for preliminary injunction. Motion granted as to claim for patent infringement.

Jack E. Dominik and Lee Anne LeBlanc, of Dominik, Knechtel, Demeur & Samlan, Miami Lakes, Fla., for plaintiff.

Lawrence R. Bujold, of Horowitz & Beam, Irvine, Calif.; Mark H. Richard, Miami, Fla., for defendants.

Middlebrooks, J.

THIS MATTER is before the Court on Plaintiff's Motion for a Preliminary Injunction, originally filed with this Court on April **\*1220** 23, 1997. Plaintiff's original Motion for a Preliminary Injunction was denied by the Honorable Judge Zloch on June 30, 1997. Plaintiff appealed this denial to the Federal Circuit Court of Appeals and the Federal Circuit Court of Appeals vacated Judge Zloch's Order as of June 30, 1997, and remanded the case back to the District Court. On July 15, 1997, this action was reassigned to the calendar of this Court. This Court held a hearing on Plaintiff's Motion for a Preliminary Injunction on October 23, 1997

By Order of this Court on October 31, 1997, the parties were directed to submit to this Court Proposed Findings of Fact and Conclusions of Law regarding the abovementioned motion. The Court has received the findings of both parties, reviewed the pertinent portions of the record, and is otherwise fully informed in the premises.

I. Background

Plaintiff A.W. Industries brings this action against Defendants Electronic Connector Service and Dynamic Stamping, alleging three claims. First, Plaintiff claims that Defendants are manufacturing and selling flat rock, press fit, card edge connectors that infringe upon Plaintiff's United States Patents nos. 4,054,868, 4,156,533, 4,188,715, 4,220,393, and 4,269,468 in violation of 35 U.S.C. Section 101 et seq. As a matter of law, the only non-expired patent referenced in Plaintiff's Complaint is Patent No. 4,269,468. The Court accordingly considers only this patent in the motion for a Preliminary Injunction.

Second, Plaintiff claims that Defendants have copied parts of A.W.I.'s copyrighted product catalog, in violation of 17 U.S.C. Section 101 et seq. Third, Plaintiff claims that when its former salesman, Robert Glaser, left his position at A.W.I. and went to work for Defendants, he took various proprietary and confidential information with him and is now using that trade secret information for Defendants' benefit, in violation of Florida's Trade Secret Misappropriation Statute, Fla. Stat. Section 688. This Court will consider each claim in turn.

II. Legal Standards for Preliminary Injunction

In deciding a motion for preliminary injunction against patent infringement, this Court applies the Federal Circuit's standard for injunctive relief, rather than the Eleventh Circuit's standard. *Hybritech, Inc. v. Abbott Laboratories,* 849 F.2d 1446, 1451 n. 12 [ 7 USPQ2d 1191 ] (Fed. Cir. 1988). The Federal Circuit sets forth four factors in evaluating the appropriateness of a preliminary injunction against patent infringement: (1) the likelihood of success at trial; (2) that irreparable injury will occur unless the injunction issues; (3) that the balance of the hardships resulting from the grant or denial of the injunction tips in favor of the moving party; and (4) that the granting of the injunction is not adverse to the interests of the public. *Hybritech,* 849 F.2d at 1451; *T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equipment, Inc.,* 821 F.2d 646, 647 [ 3 USPQ2d 1316 ] (Fed. Cir. 1987). None of these four factors is alone dispositive. *Hybritech,* 849 F.2d at 1451. The district courts are to use a "flexible approach in analyzing the four factors."*Standard Havens Products v. Gencor Industries,* 897 F.2d 511, 513 [ 13 USPQ2d 2029 ] (Fed. Cir. 1990).

The Copyright Act provides for the granting of preliminary relief to restrain acts of infringement. 17 U.S.C. Section 502(c). The necessary requisites for the granting of a preliminary injunction directed to copyright infringement are: (a) the likelihood of success at trial; (b) the presence of circumstances which indicate the Plaintiff will be irreparably harmed if a preliminary injunction is not granted; (c) the equities of the circumstances weigh in the Plaintiff's favor; (d) the preliminary injunction is necessary to protect the public interest. *Tally-Ho, Inc. v. Coast Community College Dist.,* 889 F.2d 1018, 1022 [ 13 USPQ2d 1133 ] (11th Cir. 1989); *Teledyne v. Windmere,* 433 F.Supp. 710, 195 USPQ 354 (S.D. Fla. 1977) (Judge James L. King); *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.,* 697 F.2d 1352, 1354 [ 220 USPQ 412 ] (11th Cir. 1983); *O'Neill Dev., Inc.*

COPR. © 2005 The Bureau of National Affairs, Inc.

46 U.S.P.Q.2d 1218                                                    Page 3
1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218
(Cite as: 46 U.S.P.Q.2d 1218)

*v. Galen Kilburn, Inc.*, 524 F.Supp. 710, 712 [ 216 USPQ 1123 ] (N.D. Ga. 1981). This four-part preliminary injunction test is also applicable to a claim for a temporary injunction on misappropriation of trade secrets. *See, e.g., Salsbury Laboratories, Inc., v. Merieux Laboratories, Inc., et al.*, 735 F. Supp. 1537 (M.D. Ga. 1987).

III. Findings of Fact

A. Patent Infringement

In about 1985, A.W.I. apparently began manufacturing and selling flat rock, press fit, card edge connectors. (T33 but see T43). Several varieties of "card edge" connectors exist. The designation "press fit" refers to how the contact that is contained within the insulator housing becomes mated to a printed circuit board. (T49) Connectors can either be attached to a printed circuit board through soldering or through press fitting. (T50) Press fitting is an electro-mechanical feature, which results from a compliant section *1221 that is stamped into the contact. The flat rock, press fit, card edge connectors that are the subject of this litigation are "bottom loaded." (T52) Bottom loading refers to the way that the contacts are loaded into the insulator.

The Plaintiff is the assignee of the patents in suit. (T57, Exhibit 1f) The five patents in suit are: U.S. Patent Nos. 4,045,863, 4,156,553, 4,188,715, 4,220,393, and 4,269,468 (Exhibits 1a-1e). The only non-expired patent is Patent No. 4,269,468. The standing of A.W.I. to bring this patent infringement suit against Dynamic/E.C.S. has not been challenged.

The testimony in the hearing outlined the professional history between A.W.I. and E.C.S./Dynamic as follows: when A.W.I. began manufacturing the flat rock, press fit, card edge connectors in 1985, it did not stamp the contacts for the connectors in-house. (T33) A.W.I. ordered the contacts for its flat rock, press fit, card edge connector from Dynamic Stamping. (T34) A.W.I. requisitioned and paid for the dies to produce the specific A.W.I. contacts. (T34 and Exhibit 10) Total payments were about $125,000.00. At the time A.W.I. first ordered contacts for flat rock, press fit, card edge connectors from Dynamic, Plaintiff's witness testified that Dynamic did not make the exact contact A.W.I. needed. (T35) A.W.I. thus supplied the prints to make the required contact, and the dies were built to produce contacts to the exact specifications for the patented A.W.I. connectors. In order to assist Dynamic in providing accurate

contacts to A.W.I., A.W.I. invited Dynamic's agents, Edward and Clifford Stout, to inspect A.W.I's operations and to see how A.W.I. manufactured and assembled the insulators. A.W.I. also apparently provided Dynamic with empty insulator housings so that Dynamic could conduct on-site quality control in their California stamping facility. (T48).

In about 1995, A.W.I. claims it became aware that Dynamic (through the Stout's sister company Electronic Connector Service, "E.C.S") was making and selling flat rock, press fit, card edge connectors that are the subject of the patent infringement claim in this case. In support of the hearing, Plaintiff presented a claim chart illustrating the alleged similarities between the Plaintiff's U.S. Patent 4,269,468 and Defendants' card edge connectors currently at issue in this suit.

Claim One of the '468 Patent reads:

A removable insulator for an electrical connector having an upper and a lower surface, said insulator being adapted for housing a plurality of contacts having upper mating portions, applying an insertion force to said contacts to rigidly mount them into contact receiving apertures in a mounting substrate, and subsequent removal from the press fitted contacts, said insulator comprising:

A block of dielectric material having a plurality of sleeves formed there through extending between the upper and lower surfaces, each of said sleeves having a lower portion including an enlarged bottom opening for receiving a contact shoulder, frictionally retaining said contact shoulder lightly in engagement with the sidewalls of the lower portion of said sleeve, and permitting said contact to be withdrawn from said frictional retention force, each of said sleeves including a lower portion undercutting an upper portion, the upper portion of said sleeve being adapted for receiving the upper mating portion of the contact, and said undercut lower portion of said sleeve forming a transversely extending shoulder between the upper and lower portions of said sleeve for abuttingly engaging an intermediate upper shoulder portion of said contact for imparting thereto insertion forces for rigidly press fitting said contacts into the contact receiving apertures in the mounting substrate when a downward force is applied to the insulator, said insulator being removable from around said contacts when an upward force sufficient to overcome the collective contact

46 U.S.P.Q.2d 1218

1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218

**(Cite as: 46 U.S.P.Q.2d 1218)**

shoulder/insulator frictional retention force is applied to the insulator.

The claim language onto the Dynamic/ E.C.S. connector reads: "applying an insertion force to said contacts to rigidly mount them into contact receiving apertures in a mounting substrate, and subsequently removal from said press fitted contacts. . ." (T66) This language defines the act of taking a contact strip before it is in the insulator and pushing it into the insulator body, where the insertion force is just enough that it holds the contacts within the receiving apertures of the mounting substrate (i.e. the insulator body) and hold it in such a way as to allow the contacts to remain rigid when the insulator body itself pushed them into the printed circuit board. (T67) Plaintiff's witness Mr. Weaver explained that this applies to Dynamic/E.C.S.'s flat rock, press fit, card edge connectors. (T67)

**\*1222** Claim One of the '468 Patent continues: "a block of dielectric material. . ." this refers to the insulator housing of the Defendants' product. (T67) The claim goes on: "having a plurality of sleeves formed therethrough. . ." The Defendants' connector appears to have this feature. The empty insulator housing of the accused devise, contains "sleeves" that accept the contacts in such a precise way that they fit into those insulator sleeves without falling out, and at the same time, holding them rigidly enough that they can push them into a printed circuit board. (T68)

The sleeves, the claim goes on, "extend between the upper and lower surfaces. . ." The upper and lower surface language was previously shown on the ECS accused connector and they are depicted by reference numbers 28 and 30 on Exhibit 4(b). (T68) The claim further provides that "each of said sleeves having a lower portion including an enlarged bottom opening." Mr. Weaver identified this bottom opening on the Dynamic/E.C.S. product in support of the patent infringement claim. (T68) This phrase references the actual opening within the insulator housing prior to a contact being inserted. (T68) The opening allows the contact to be inserted. (T68)

Claim One, U.S. Patent No. 4,269,468, continues: "frictionally retaining said contact shoulder lightly in engagement with the sidewalls of the lower portion of said sleeve and permitting said contact to be withdrawn from said frictional retention force. . ." Mr. Weaver testified that the foregoing language describes the accused Dynamic/E.C.S. connector with respect to the insertion of the contact, the removal of the contact and most importantly, the

terminating or insertion of the finished connector product into the printed circuit board itself. (T69, 70)

Claim One of the '468 Patent further provides: "each of said sleeves including a lower portion undercutting an upper portion, the upper portion of said sleeve being adapted for receiving the upper mating portion of the contact." Mr. Weaver testified that this element of Claim One reads directly onto the Dynamic/E.C.S. flat rock, press fit, card edge connector. (T70)

The first claim of the '468 Patent goes on: "for imparting thereto insertion forces for rigidly press fitting said contacts into the contact receiving apertures in the mounting substrate when a downward force is applied to the insulator. . ." Mr. Weaver testified that this defines the Dynamic/E.C.S. flat rock, press fit, card edge connector exactly. (T71)

Finally, Claim One of the '468 Patent provides: "said insulator being removable from around said contacts when an upward force sufficient to overcome the collective contact shoulder/insulator frictional retention force is applied to the insulator. . ." Mr. Weaver explained that this language reads onto the accused device precisely. (T71) Mr. Weaver testified that the foregoing portion of the claim language refers to the feature of removing the insulator housing off of the contacts themselves once the flat rock, press fit, card edge connector has been fully press fitted into a circuit board, to allow for contact replacement. (T71) On other press fit, card edge connectors, one can remove the contact out from the top of the housing, but not on the flat rock product. (T72) Both the patented A.W.I. product and the accused Dynamic/E.C.S. device have this property.

Based on the foregoing testimony, it appears that a substantial majority of the aspects of Claim One of the '468 patent also seem to describe Dynamic/E.C.S.'s flat rock, press fit, card edge connector.

B. Copyright Infringement

A comparison of the A.W.I. Connector Product Line Catalog, submitted as Plaintiff's Exhibit 6, and E.C.S.'s Connector Catalog, presented as Exhibit 7, reveals some substantial similarities, such as: E.C.S. breaks down their part number scheme for the E.C.S. connector in the same manner as A.W.I. (T73); E.C.S. uses some of the same numbers in much the same order as A.W.I.'s catalog (T73); the specifications claimed in the E.C.S. catalog are taken

46 U.S.P.Q.2d 1218
1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218
(Cite as: 46 U.S.P.Q.2d 1218)

virtually verbatim from the A.W.I. catalog (T73); and the specifications also follow the exact order of A.W.I.'s specifications in many instances. (T73)

Many of the product numbers and specifications are provided and standardized upon an industry-wide basis, however, and this accounts for much of the similarity between catalogs in the connector industry. Further, upon examination there are differences in the catalogs and the ordering and assignment of numbers, while similar, is not so substantially similar such that the E.C.S. catalog can be said to be an exact copy of the A.W.I. catalog at issue.

C. Trade Secret Misappropriation

Defendant Mr. Glaser was employed by A.W.I. sales until approximately 1996. Approximately three months after Mr. Glaser resigned his position with A.W.I., it became apparent that some customer lists and other proprietary information of A.W.I.'s was in the possession of Mr. Glaser. It is a disputed issue of fact whether A.W.I. requested the return of such information or Mr. Glaser *1223 discovered and returned it independently of any such request. Evidently, according to the testimony of Plaintiff witness Chris Weaver, who testified as to making this request, at some point A.W.I. did ask that Mr. Glaser return any and all A.W.I. documentary information in his possession. (T102, 103, 114)

One of the items of information that was returned was a database cross-referencing A.W.I.'s part numbers with client part numbers, which Plaintiff points to as one of the factual bases for its claim of misappropriation of trade secrets. The information is not commercially available and A.W.I. presented evidence that it took precautions to prevent this information from becoming public knowledge. (T110, 112) A.W.I. contends that the database is a valuable marketing tool of A.W.I. and would provide a competitor such as E.C.S. with an undeniable advantage. (T115). Another A.W.I. information breakdown which was allegedly misappropriately by Mr. Glaser is the listing of A.W.I.'s active customers and the key contacts within those companies. (T75, 115, 144, 145)

Mr. Glaser testified he did not maintain or disseminate any copies of these materials after their return to Plaintiff, and no evidence was presented that controverted this claim. On behalf of Dynamic/E.C.S., Glaser admitted to contacting the following A.W.I. accounts that he serviced in connection with flat rock, press fit, card edge

connectors: AT & T, Charles, Industries, Teltrend, Westell, AG Com. (T152-154). However, such contacts were apparently based upon publicly available sources and Mr. Glaser testified that they were not based upon any confidential or proprietary information.

VI. Conclusions of Law

A. Patent Infringement

As articulated above, in deciding a motion for preliminary injunction against patent infringement, this Court applies the Federal Circuit's standard for injunctive relief, rather than the Eleventh Circuit's standard. *Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 n.12 [ 7 USPQ2d 1191 ] (Fed. Cir. 1988). The Federal Circuit sets forth four factors in evaluating the appropriateness of a preliminary injunction against patent infringement: (1) a likelihood of success at trial; (2) that irreparable injury will occur unless the injunction issues; (3) that the balance of the hardships resulting from the grant or denial of the injunction tips in favor of the moving party; and (4) the granting of the injunction is not adverse to the interests of the public. *Hybritech*, 849 F.2d at 1451; *T.J. Smith & Nephew, Ltd. v. Consolidated Medical Equipment, Inc.*, 821 F.2d 646, 647 [ 3 USPQ2d 1316 ] (Fed. Cir. 1987). None of these four factors is alone dispositive. *Hybritech*, 849 F.2d at 1451.

[1] Plaintiff has established a likelihood of prevailing on its claim for patent infringement such that a preliminary injunction as to the patent infringement is appropriate. To establish a case of patent infringement, a plaintiff must prove two elements: (1) that it owns a duly issued patent and (2) that the defendant has infringed its patent. *Sensormatic v. 3M Co.*, 10 U.S.P.Q.2d 1467, 1468 (S.D. Fla. 1988) (citing *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 [ 219 USPQ 686 ] (Fed. Cir.) *cert. denied*, 464 U.S. 996 [ 220 USPQ 385 ] (1983). Plaintiff established that it is the owner, by assignment, of U.S. Patents Nos. 4,045,868; 4,156,533; 4,188,715; 4,220,939 and 4,269,468. The first prong of the test is met because there exists a statutory presumption of validity. 35 U.S.C. Section 282 (a patent issued by United States Patent Office is presumed valid); *see also, Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270 [ 225 USPQ 345 ] (Fed. Cir. 1985). Defendants presented no evidence to rebut this presumption of validity; therefore, the validity of A.W.I.'s patent is presumed under the law for the

COPR. © 2005 The Bureau of National Affairs, Inc.

46 U.S.P.Q.2d 1218                                                                                    Page 6
1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218
(Cite as: 46 U.S.P.Q.2d 1218)

purposes of this injunction.

Determining whether a patent is infringed involves a two-step inquiry: (1) interpreting the claims, followed by (2) comparing the properly interpreted claims to the accused device. *The Read Corporation v. Portec, Inc.,* 970 F.2d 816, 821 [ 23 USPQ2d 1426 ] (Fed. Cir. 1992); *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 219 U.S.P.Q. 1137 (Fed. Cir. 1983); *SSIH Equip. S.A. v. United States ITC,* 713 F.2d 746, 218 U.S.P.Q. 678 (Fed. Cir. 1983). The construction of patent claims is exclusively within the providence of the court. *Markman v. Westview Instruments, Inc.,* 116 S.Ct. 1384 [ 38 USPQ2d 1461 ] (1995). The testimony of Plaintiff's witnesses provided a comprehensive interpretation of the claim of the flat rock, press fit, card edge connector device covered by the patent at issue, U.S. Patent 4,269,468.

A claim covers an accused device if the device embodies every limitation of the claim, either literally or by a substantial equivalent. *Carroll Touch, Inc. v. Electro Mechanical Sys. , Inc.,* 3 F.3d 404, 27 USPQ2d 1836 (1993). Upon independent examination of the devices in question by this Court and based upon the testimony of Plaintiff witness Chris Weaver in describing the claims chart, Exhibit 4, it is this Court's conclusion that a substantial similarity is *1224 apparent between the elements of Claim One of the '468 Patent and the Dynamic/ECS flat rock, press fit, card edge connector such that Plaintiffs are likely to prevail upon the patent infringement count.

[2] The second consideration in a preliminary injunction action against patent infringement is irreparable injury. In the patent context, irreparable harm is presumed if the party seeking injunctive relief clearly establishes validity and continuing infringement of its patent rights. *Smith Intl., Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 [ 219 USPQ2d 686 ] (Fed. Cir.), *cert. denied,* 464 U.S. 996 [ 220 USPQ 385 ] (1983).

In addition to the presumption of irreparable harm, A.W.I. offered testimony going to its claim of irreparable harm. Testimony adduced that Dynamic/ECS's sales of allegedly infringing connectors at reduced prices to A.W.I.'s are cutting into A.W.I.'s business. Plaintiff witness Chris Weaver testified that A.W.I. has already lost several customers to Dynamic/ECS. Thus, A.W.I.'s allegations that it is being deprived of its right of exclusive manufacture and sale of the flat rock, press fit, card edge connector and it is losing customers as

a result have merit. If Defendants are able to continue to draw A.W.I.'s customers away by marketing alleged infringements of the patented connectors to A.W.I.'s actual customers, Plaintiff's business may continue to diminish in the infringing product area. These damages are not easily susceptible of measurement or quantification, and thus potential irreparable injury to Plaintiffs is present as to the patent infringement claim.

The third consideration in the issuance of preliminary injunctive relief with respect to the patent infringement count is that the threatened injury to plaintiff outweighs any damage the proposed injunction might cause the defendants.

Defendants argued that the fact that the remaining unexpired patent has less than one year to run factors in their favor. This Court disagrees. In a similar situation, the Federal Circuit granted injunctive relief, stating: "The fact that the patent has only one year to run is not a factor in favor of [Defendant] in the balance of equities. Patent rights do not peter out as the end of the patent term, usually 17 years, is approached." *Atlas Powder Co. v. Ireco Chems.,* 773 F.2d 1230, 227 USPQ 289, 293 (Fed. Cir. 1985), 35 USC Section 154.

The third factor, balancing of the hardships, also mitigates in favor of awarding a preliminary injunction to Plaintiffs. If the requested injunction is denied, A.W.I. may continue to be deprived of its patent rights as well as lose customers to Dynamic/ECS in the area of the flat rock, press fit, card edge, connector market. Defendants, through the introduction of numerous exhibits, showed the Court a wide variety of connectors which are in the market place. Presumably, Dynamic/ECS could have manufactured and sold any of those. Nonetheless they now sell a flat rock, press fit, card edge connector, which is legally manufactured and apparently sold by only two companies: EDAC and A.W.I. Accordingly, it appears that A.W.I. cannot continue to make its normal profit on the flat rock, press fit, card edge connectors. Dynamic/ECS arguably has invested less time and effort in the creation of the allegedly infringing flat rock, press fit, card edge connector. Therefore, the most substantial hardship they can claim as a result of the issuance of an injunction would be loss of business. However, " [o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected."*Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n. 12 [ 229 USPQ 562

COPR. © 2005 The Bureau of National Affairs, Inc.

46 U.S.P.Q.2d 1218
1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218
(Cite as: 46 U.S.P.Q.2d 1218)

] (Fed. Cir.), *cert. denied,* 477 U.S. 905 (1986). Moreover, the imminent expiration of the patent does indicate that the hardship to the Defendant will not be as substantial as it otherwise might be. Thus, upon balancing of the hardships involved in this case, the balance weighs in favor of Plaintiff.

The final factor involved is the public interest. The public interest is clearly served by protecting rights secured by valid patents. *Smith Int'l,* 718 F.2d at 1581. As this Court has determined that the patent infringement claim is likely to succeed at trial such that a preliminary injunction on the manufacture of the flat rock, press fit, card edge connector is warranted, the public interest is thus served by awarding Plaintiffs a preliminary injunction on the patent at issue.

B. Copyright Infringement

[3] The catalog at issue was copyrighted approximately one month before the filing of the instant lawsuit, and the Court acknowledges that such timing raises questions. Nonetheless, upon consideration of the merits of the issue, this Court finds that the Plaintiff cannot establish a likelihood of prevailing on the merits of the copyright claim such that a preliminary injunction as to the copyright claim is warranted. Plaintiff's own witness admitted that there was standard information contained in all catalogs in the connector industry. Thus, the similar ordering of certain parts or the use of certain numbers in this case does not automatically **\*1225** constitute copyright infringement, and no evidence was presented articulating what similarities were due to the industry demands and required specifications and what similarities were due to the alleged infringement. Without such evidence, it is difficult for Plaintiff to establish that it has a substantial likelihood of prevailing at trial such that a preliminary injunction is warranted.

Additionally, the defense that Defendants raise of the catalog's public domain status has enough potential merit that it precludes Plaintiff from establishing at this point its likely success at trial on the copyright infringement count. The catalog currently copyrighted and at issue in this case is, by Plaintiff's own admission, virtually identical to the catalog Plaintiff distributed in the public domain no later than 1987. Defendants claim that the AWI catalog forming the basis of the copyrighted work which Defendants are alleged to have infringed upon was in the public domain prior to March 1, 1989, and was not copyrighted within five (5) years thereafter. Defendants argue that the catalog is thus considered in the public domain and therefore as a matter of law cannot be copyrighted. *See* 17 U.S.C. Sections 405(b), 406(a) as amended by the Berne Convention Implementation Act of 1988, Section 7 (Pub. L. 100-568, 102 Stat. 2857, Section 7).

In addition to this Court's concerns about establishing copyright infringement based only on similarities in the catalogs which appear to be fairly standard in the industry, it is unlikely based on the foregoing legal analysis that Plaintiff will be able to prevail upon the merits of the copyright infringement claim and a preliminary injunction as to that claim is thus not appropriate. The court also finds that irreparable injury has not been proven by Plaintiff for the alleged copyright infringement claim. There is no evidence showing that monetary damages would be inadequate to compensate Plaintiffs for any infringement established at trial, nor that evaluating an appropriate amount of compensation would be impossible under the circumstances. Thus, a preliminary injunction as to the copyright infringement claim is not warranted.

C. Trade Secret Misappropriation

[4] The requirement that Plaintiff establish a likelihood of success on the merits is also not established in the Trade Secrets claim such that a preliminary injunction is appropriate. As a preliminary matter, there remains a question as to whether the customer lists and databases, private and privileged as they were, necessarily constitute trade secrets under the Uniform Trade Secrets Act. The Act defines "trade secrets" as "information, including a formula, pattern, compilation, device, method technique, or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Fla. Stat. Section 688.002(4) (1995). The compilation of A.W.I's customer databases likely constitute trade secrets for the purposes of the Uniform Trade Secrets Act, but their status as trade secrets cannot be established conclusively at this point.

Assuming *arguendo* that such information is indeed a trade secret, there is no proof other than the testimony of Plaintiff witnesses Christopher and

COPR. © 2005 The Bureau of National Affairs, Inc.

46 U.S.P.Q.2d 1218
1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218
**(Cite as: 46 U.S.P.Q.2d 1218)**

Leslie Weaver, who admitted they had no personal knowledge of their beliefs that such information was in fact misappropriated and used by Mr. Glaser. The testimony of Defendant Glaser was that he discovered he had proprietary and confidential materials of Plaintiffs and returned them without copying them or otherwise further using them. Plaintiffs provided no evidence that Mr. Glaser actually used these lists, other than contending he contacted various clients of Plaintiff's in his new position with Defendants. Plaintiffs contend that contacting potential customers indicates misappropriation of alleged trade secrets. Such client names and addresses are publicly available and would likely be known to anyone in Mr. Glaser's position and with his experience in the industry. These circumstantial allegations do not rise to the level of likelihood required to establish the need for a preliminary injunction. Accordingly, this Court finds that Plaintiff has failed to establish a likelihood of success at trial on the trade secrets misappropriation count.

Whether or not the alleged misappropriation of the customer lists and databases poses an irreparable injury to Plaintiff that cannot be compensated by monetary damages is also an open question, and one upon which Plaintiff presented no evidence at the hearing. *See also Salsbury Laboratories, Inc. v. Merieux Laboratories, Inc., et al.,* 735 F.Supp. 1537 (M.D. Ga. 1987). Based upon the foregoing, Plaintiff's Motion for a Preliminary Injunction as to the trade secrets misappropriation count is denied.

VII. Conclusion

Based on the foregoing and upon consideration, it is hereby ORDERED AND ADJUDGED as follows:

**\*1226** 1. Plaintiff's Motion for a Preliminary Injunction (DE #2) as to the Patent Infringement claim is hereby GRANTED. Plaintiff shall post with the clerk of this court a bond in the amount of $125,000.00, the amount Plaintiff paid Defendant Dynamic Stamping for the tooling to make the connectors at issue in this suit, as security against Defendants.

2. Plaintiff's Motion for a Preliminary Injunction (DE #2) as to the Copyright Infringement claim is hereby DENIED.

3. Plaintiff's Motion for a Preliminary Injunction (DE #2) as to the Trade Secrets Misappropriation claim is hereby DENIED.

*PRELIMINARY INJUNCTION ORDER*

December 8, 1997

Upon the Verified Complaint in this Action, the Motion for a Preliminary Injunction, the Memorandum of Fact and Law, with supporting Affidavits, and the Exhibits presented to the Court, and upon the proceedings held before this Court with due notice given to the Defendants, said proceedings having been held on October 23, 1997, commencing at 1 p.m. and carried through the entire afternoon at which time the Plaintiff presented witnesses Marianne Weaver, President of the Plaintiff; Christopher Weaver, General Manager of the Plaintiff; and Leslie Weaver, Human Resource Manager of the Plaintiff. The Defendants presented Edward Stout, President of Defendant ECS and President of Defendant Dynamic Stamping; and Robert Glaser, individual Defendant and the sales person for ECS, formerly employed by Plaintiff AWI. Both parties were permitted unlimited cross-examination of the other's witnesses. The Plaintiff has shown a likelihood of success at trial, irreparable injury, a balancing of the equities favoring the Plaintiff, and a public interest that needs to be served to avoid further infringement, and because of the lack of an adequate remedy at law, it is hereby

ORDERED:

1. That the Defendants, their officers, directors, agents, employees, and attorneys as well as molders and mold makers, makers of stamping equipment, and any other persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise shall cease making, using, or selling the flat rock press fit card edge connectors as exemplified by Exhibit 2 in Plaintiff's Exhibit Book accompanying the Complaint, or any other similar connector as set forth in any claim of U.S. Patent No. 4,269,468 (Exhibit 1).

2. The Plaintiff shall post with the clerk of this Court a bond in the amount of $125,000.00, the exact amount Plaintiff paid Defendant Dynamic Stamping for the tooling to make the contacts for AWI which are used in the making of AWI's flat rock press fit card edge connectors, as security against the Defendants in the event of any impropriety in the issuance of this order, or other damages found by this Court to have been occasioned by the Defendants based upon this Preliminary Injunction.

COPR. © 2005 The Bureau of National Affairs, Inc.

46 U.S.P.Q.2d 1218                                                                                    Page 9
1997 WL 873869 (S.D.Fla.), 46 U.S.P.Q.2d 1218
**(Cite as: 46 U.S.P.Q.2d 1218)**


  SO ORDERED.

S.D.Fla.

46 U.S.P.Q.2d 1218

END OF DOCUMENT

COPR. ©  2005 The Bureau of National Affairs, Inc.

Westlaw.

Not Reported in F.Supp.                                                                                  Page 1
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
SOLAREX CORPORATION, Plaintiff,
v.
ADVANCED PHOTOVOLTAIC SYSTEMS, INC.,
Defendant.
**Civ. A. No. 93-229-JJF.**

Jan. 6, 1995.

Steven J. Balick of Ashby & Geddes, Wilmington,
Kenneth E. Payne, Thomas W. Winland, J. Michael
Jakes, James P. Longfellow, and Raymond C. Jones
of Finnegan Henderson Farabow Garrett & Dunner,
Washington, DC, Thomas L. Tolpin, of Amoco
Corp., Naperville, IL, for plaintiff.

William J. Marsden, Jr., and Philip A. Rovner of
Potter Anderson & Corroon, Wilmington, Carl G.
Love, Lawrence Harbin, and Kendrew H. Colton of
Cushman Darby & Cushman, Washington, DC, for
defendant.

MEMORANDUM OPINION

FARNAN, District Judge.

I. INTRODUCTION
   *1 Plaintiff Solarex Corporation ("Plaintiff" or
"Solarex") commenced this patent infringement
action against Defendant Advanced Photovoltaic
Systems, Inc. ("Defendant" or "APS") on May 5,
1993. Solarex claims that APS infringed Solarex's
United States Patent No. 4,064,521 ("the '521
patent"), United States Patent No. 4,217,148 ("the
'148 patent") and United States Patent 4,317,844
("the '844 patent") (D.I. 1). In addition to its Answer,
APS filed a Counterclaim alleging that Solarex's
three patents are invalid and unenforceable (D.I. 12).

   On May 5, 1994, Solarex filed a Motion for
Temporary Restraining Order and for Preliminary
Injunction (D.I. 78). The Court granted Solarex's
Motion for Temporary Restraining Order and further
ordered that its decision would remain in effect
pending the Court's decision on Solarex's Motion for
a Preliminary Injunction (D.I. 82). For the reasons set

forth in this Memorandum Opinion, the Court will
grant Solarex's Motion for Preliminary Injunction.

II. BACKGROUND
   Solarex seeks to enjoin APS from making, using or
selling amorphous silicon solar panels or from using
any manufacturing process which allegedly infringes
upon the '521 and '844 patents. [FN1] *See* Solarex
Memorandum In Support of Temporary Restraining
Order and Preliminary Injunction at 2 ("Solarex
Memorandum").      These    patents    relate    to
semiconductor devices which have a body of
amorphous silicon fabricated by glow discharge in
silane. The semiconductor devices are photovoltaic
devices, commonly referred to as solar cells. *See*
Solarex Memorandum at 6.

   A. The *'521 Patent*

   The '521 patent was issued to Dr. David Carlson on
December 20, 1977. The patent is directed to a
semiconductor    device    having    a    semiconductor
junction and a body of amorphous silicon fabricated
by glow discharge in silane. [FN2] In the context of
the '521 patent, a semiconductor device is one that
contains a semiconductor junction. The junction may
be in the body of the semiconductor or at the surface
of the semiconductor. *Solarex Corp v. ARCO Solar
Systems, Inc.,* 805 F. Supp. 252, 268 (D. Del. 1992)
("Solarex I"). Solarex alleges literal infringement of
Claim 11 and Claim 15 of the '521 patent.

   Claim 11 of the '521 patent provides:
      A semiconductor device comprising: a body of
   amorphous silicon fabricated by a glow discharge
   in silane with a semiconductor in said body.
   *See* Appendix to Solarex Memorandum in Support
of Motion for Temporary Restraining Order and
Preliminary Injunction at A65 ("Solarex Appendix").

   This Court, in *Solarex I,* interpreted Claim 11 to
include the following four elements:
      (1) a semiconductor device, (2) comprising a body
   of amorphous silicon which is predominately
   silicon but may include other elements, (3) the
   amorphous silicon is fabricated by a glow
   discharge in silane, and (4) the device contains
   either a PN or PIN semiconductor junction within
   the body of amorphous silicon.
   805 F. Supp. at 269.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
(Cite as: 1995 WL 314742 (D.Del.))

*2 Claim 15 provides:

The semiconductor device of Claim 11 wherein said body comprises a first doped layer of one conductivity type spaced from a second doped layer of an opposite conductivity type with an "intrinsic" layer between and in contact with the first and second doped layers, such that there is a capability of a space charge region being provided in the "intrinsic" layer.

See Solarex Appendix at A65.

Claim 15 is identical to Claim 11 except that Claim 15 is limited to a PIN semiconductor junction. Claim 11 offered both PN and PIN semiconductor junctions. The PIN semiconductor device contains two doped layers, the "P" and "N" layers, and an undoped, "intrinsic" layer.

B. *The '844 Patent*

The '844 patent was issued to Dr. Carlson on March 2, 1982. Solarex alleges that APS literally infringed Claim 1 and Claim 6 of the '844 patent. Claim 1 of the '844 patent delineates a method of creating the amorphous silicon semiconductor device incorporating a rectifying junction. *Solarex I, 805 F. Supp. at 271.* This Court, in *Solarex I,* interpreted Claim 1 to include the following processing steps:

(1) placing an electrically conductive substrate in a glow discharge apparatus;
(2) reducing the pressure in the apparatus from about 10(-3) to about 10(-6) Torr;
(3) heating the substrate from a temperature of 150 degrees to about 450 degrees Celsius;
(4) initiating a glow discharge in an atmosphere including silane to form a body of amorphous silicon on the electrically conductive substrate;
(5) continuing the glow discharge while altering the relative proportion of silane and the dopants (e.g. phosphorous or boron) to form a body of amorphous silicon with layers of differing conductivity; and
(6) attaching an electrical contact to the body of amorphous silicon opposite the electrically conductive substrate.
*Id.* at 272.

Claim 6 is dependant on Claim 1. Claim 6 more specifically distinguishes the steps of the fabrication process as outlined in Claim 1. *Id.* at 273.

III. DISCUSSION
A. *Legal Standard -- Preliminary Injunction*

Injunctive relief in patent cases is authorized by 35

U.S.C. § 283. The grant or denial of a preliminary injunction is within the discretion of the trial court. The court must consider the following four factors: 1) whether the movant is reasonably likely to succeed on the merits at trial; 2) whether the movant will suffer irreparable harm if preliminary relief is not granted; 3) whether the balance of hardships favors granting preliminary relief; and 4) whether the preliminary relief sought is in the public interest. *New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882 (Fed. Cir. 1992); see also Eli Lilly and Co. v. Premo Pharmaceutical Labs., Inc., 630 F.2d 120, 136 (3d Cir.), cert. denied, 449 U.S. 1014 (1980).*

B. *Likelihood of Success on the Merits*

Solarex has the burden of showing that it has a reasonable likelihood of success on the merits at trial. *Hybritech, Inc. v. Abbott Lab., 849 F.2d 1446, 1451 (Fed. Cir. 1988).* Solarex is entitled to a preliminary injunction only if it clearly shows that its patent is valid, enforceable and infringed. *Nutrition 21 v. Thorne Research, Inc., 930 F.2d 867, 870 (Fed. Cir. 1991)* (quoting *Atlas Powder Co. v. Ireco Chemicals, 773 F.2d 1230, 1233 (Fed. Cir. 1985)).*

1. Validity

a. Burden of Proof

*3 APS claims that Solarex will not succeed on the merits at trial because the Solarex patents are invalid for obviousness pursuant to 35 U.S.C. § 103. Solarex has the burden to show that there is a reasonable likelihood that APS will fail to meet its burden at trial of proving by clear and convincing evidence that the Solarex patent claims are invalid. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 28 U.S.P.Q.2d 1362, 1367 (D. Del. 1993).* Thus, this determination is made in light of the presumptions and burdens applicable at a trial on the merits. *H.H. Robertson Co. v. United Steel Deck, Inc., 820 F.2d 384, 388 (Fed. Cir. 1987).*

In evaluating likelihood of success on the merits, the Court will also consider its prior adjudication of validity regarding the '521 patent and the '844 patent. In *Solarex I,* this Court found the '521, '844 and '148 Solarex patents to be valid and enforceable. *805 F. Supp. at 288.* The court "may give considerable weight to a prior adjudication of validity in determining the likelihood of success on the merits on the issue of validity in the preliminary injunction proceeding before it." *Hybritech, 849 F.2d at 1452.* The grant of a preliminary injunction is strongly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

supported where the patent's validity has been previously upheld following a fully litigated trial addressing the same issues of fact and law. *H.H. Robertson, Co., 820 F.2d at 388.*

### b. Obviousness

Section 103 sets forth the standard for obviousness:

[a] patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103.

When evaluating a patent for obviousness, the court must first determine the scope and content of the prior art. Next, the court must ascertain the differences between the prior art and the claims at issue. Finally, the court must determine the level of ordinary skill in the prior art. *Graham v. John Deere Co., 383 U.S. 1, 17 (1966).*

APS argues that the findings and conclusions of the court in *Solarex I* were based on an incomplete representation of prior art at the time the '521 and '844 patents were issued. APS contends that had the Court evaluated the Solarex patents with reference to this prior art, the patents would have been found invalid due to obviousness.

Specifically, APS contends that United States Patent No. 3,673,471 issued to Klein ("the Klein patent") and United States Patent No. 3,757,733 issued to Reinberg ("the Reinberg patent") are prior art which establish a basis to hold the '521 patent invalid. Additionally, APS argues that references in United States Patent No. 4,799,092 to Klaassen and United States Patent No. 3,750,268 to Wang, in combination with the Klein and Reinberg patents, provide prior art to demonstrate the invalidity of the Solarex patents. APS contends that disclosure of "such prior art references in *Solarex I* would have provided the Court with a more complete record upon which to base its findings of validity." APS Answering Brief at 5.

### (1) Scope and Content of Prior Art
The Klein Patent

**\*4** United States Patent No. 3,673,471 issued to Klein on June 27, 1972. APS contends that the Klein patent teaches a body of amorphous silicon which can be doped to form a semiconductor junction in the body of the amorphous silicon. *See* APS Ex. C, Klein

patent, Col. 5, line 75, Col. 6, line 3; APS Ex. F, Kampas Decl. at 7-8, ¶ ¶ 25-30. APS also states that the Klein patent teaches amorphous silicon fabrication by chemical vapor deposition in silane. *See* APS Ex. C, Klein patent, Col. 9, lines 34-37 and 45-47; APS Ex. F, Kampas Decl. at 7, ¶ 26. APS contends that the Klein patent discloses that the doped amorphous silicon assists in forming a P-N semiconductor junction. *See* APS Ex. C, Klein patent, Col. 8, lines 35-38; Col. 9, lines 21-58; APS Ex. F, Kampas Decl. at 8- 9, ¶ 31.

The Reinberg, Klaassen, and Wang Patents

APS contends that the Klein patent alone is sufficient to make the '521 patent invalid for obviousness. APS Answering Brief at 6. However, APS also argues that the court can combine the teachings of the Reinberg and Klein patents to reach the result of amorphous silicon fabricated in silane. Additionally, APS includes references from other patents to support its argument of invalidity based on obviousness.

APS presents comments from the Klaassen patent as evidence that the Klein patent was seen as teaching doping of amorphous silicon. APS also contends that the Reinberg patent "teaches using 'semiconductor' materials." APS Brief at 6. APS argues that the Reinberg patent teaches the concept of fabrication of amorphous silicon fabricated by glow discharge. APS Brief at 7. APS contends that these prior art teachings "provide the motivational teaching to combine Klein with Reinberg to find Claim 11 obvious under 35 U.S.C. § 103." APS Brief at 8.

The Court will not evaluate obviousness based on the combined teachings of patents discussed by APS. In *Northern Telecom, Inc. v. Datapoint Corp.,* the Federal Circuit held that prior art used to show obviousness must contain all components of the patented device. 908 F.2d 931, 934 (Fed. Cir. 1990). The court held that "[i]t is insufficient that the prior art disclosed the components of the patented device, either separately or used in other combinations; there must be some teaching, suggestion, or incentive to make the combination made by the inventor." *Id.; see also Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1143 (Fed. Cir. 1985).*

Applying the Federal Circuit's holding in this case, the Court concludes that APS may not argue that a combination of the Klein, Reinberg, Klaassen, and Wang patents establish prior art which invalidates the '521 patent for obviousness. APS must show that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
(Cite as: 1995 WL 314742 (D.Del.))

prior art was contained in one reference. *See Northern Telecom, 908 F.2d at 934.* Therefore, the Court will evaluate only the Klein patent in the analysis of obviousness.

### (2) Differences Between Prior Art and Present Claims

**\*5** Solarex stresses three ways that Claim 11 of the '521 patent is different from the Klein patent. Solarex argues that these differences demonstrate that the Klein patent is not prior art. First, Solarex argues that the '521 patent teaches a body of amorphous silicon as opposed to a body of polycrystalline silicon, as taught in the Klein patent. Solarex Appendix, Lucovsky Decl. at A102, ¶ 59. Second, Solarex contends that the '521 patent teaches glow discharge rather than the thermal decomposition method used in the Klein patent. Solarex Appendix, Lucovsky Decl. at A102, ¶ 58. Finally, Solarex argues that the '521 patent teaches a semiconductor junction which differs from the Klein patent's two juxtaposed silicon regions. Solarex Appendix, Lucovsky Decl. at A102, ¶ 57.

Solarex also contends that Claim 15 of the '521 patent is not invalid for obviousness due to the Klein patent. Solarex notes that the Klein patent does not disclose a PIN junction as found in Claim 15. Solarex Appendix, Lucovsky Decl. at A106, ¶ 72.

APS argues, however, that there are no real differences between the Klein patent and Claim 11 of the '521 patent. APS contends that the '521 patent teaches doped amorphous silicon fabricated by glow discharge. First, APS argues that amorphous silicon is indeed used in the Klein patent. APS Ex. F, Kampas Decl. at 11, ¶ 42. Dr. Kampas supports this assertion by pointing out that the Klein patent discloses a dopant concentration of 10(19/cm3). He contends that the '521 patent states that dopant concentration must be 10(18/cm3) or greater for amorphous silicon. APS Ex. F, Kampas Decl. at 11, ¶ 42.

APS also attempts to dispel any alleged differences by arguing "glow discharge," often referred to as "plasma enhanced chemical vapor deposition," is the same process as thermal decomposition. APS Ex. F, Kampas Decl. at 11, ¶ 41. Finally, APS contends that the Klein patent teaches a semiconductor junction, similar to that contained in Claim 11 of the '521 patent.

APS contends that Claim 15 of the '521 patent is invalid because it contains the same elements found in Claim 11. Claim 15 contains, in addition to the four elements in Claim 11, a PIN junction. APS claims that the PIN junction was known in the industry at the time of issuance and that this element would have been obvious to one skilled in the art. APS Answering Brief at 11-12; APS Ex. F, Kampas Decl. at 14, ¶ 52.

### (3) Obviousness to One of Ordinary Skill in the Art

APS argues that upon issuance of the Klein patent, it would have been obvious to those skilled in the art "that a body of amorphous silicon can be doped so that a semiconductor junction is formed therein." APS Answering Brief at 8; *see* APS Ex. F, Kampas Decl. at 12, ¶ ¶ 25-30. APS also contends that the PIN junction was known in the industry in July 1974, therefore, making this claim obvious to a person skilled in the art. APS Answering Brief at 11-12; APS Ex. F, Kampas Decl. at 14, ¶ 52.

**\*6** Solarex disputes these claims and argues that a person skilled in the art would have recognized differences in the '521 patent and the Klein patent. First, Solarex contends that recognition that the Klein patent taught the deposited material was polycrystalline silicon, not amorphous silicon, would be made by a person skilled in the art. Solarex Reply Brief at 5; Solarex Appendix, Lucovsky Decl. at A91-93, ¶ ¶ 25-27; Solarex Reply Brief Appendix, Third Lucovsky Decl. at C4, ¶ 12. Solarex also argues that one skilled in the art would know that the glow discharge process is different than the thermal decomposition process because the material produced "would have different chemical, structural and electronic properties." Solarex Reply Brief at 6; Solarex Appendix, Lucovsky Decl. at A104, ¶ 65; Solarex Reply Brief Appendix, Third Lucovsky Decl. at C10, ¶ 30.

### c. The Court's Findings

After considering all arguments, the Court finds that Solarex has met the burden of clearly showing a likelihood of success on the merits at trial. The Court finds that APS has not rebutted the presumption of validity due the '521 patent as a result of this Court's decision in *Solarex I.* Additionally, APS has not presented any arguments challenging the validity of the '844 patent.

Further, the Court finds that Solarex has shown a likelihood of success on the merits at trial regarding the validity of the '521 patent. The Court credits the evidence presented by Solarex's expert witness Dr. Lucovsky. Dr. Lucovsky, in several affidavits, states that amorphous silicon differs from polycrystalline

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 5
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
(Cite as: 1995 WL 314742 (D.Del.))

silicon. He also discusses how glow discharge, an element of the '521 patent, differs from thermal decomposition.

Lastly, the Court finds that Solarex has demonstrated that APS cannot prove the invalidity of the '521 patent at trial by clear and convincing evidence. As discussed previously, the Court finds it inappropriate to combine the teachings of the patents asserted by APS to invalidate the '521 patent and, on the record presented, the Court concludes that the teachings of the Klein patent alone, or when considered in the context of APS's supporting testimony, do not affect the conclusion that Solarex will prevail at trial on the invalidity claims asserted by APS.

2. Infringement

Solarex claims that APS infringed its '521 patent and '844 patent. To prove this claim at trial, Solarex must show that someone "without authority ma [de], use[d] or s[old] any patented invention within the United States during the term of the patent ...." 35 U.S.C. § 271. To successfully demonstrate literal infringement, Solarex must prove that every element of the patent claim is found in APS's product. See Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1054 (Fed. Cir.), cert. denied, 488 U.S. 825 (1988).

In Solarex I, this Court made findings interpreting the elements of Claim 11 and Claim 15 of the '521 patent. See Solarex I, 805 F. Supp at 269-70. The Court also made findings interpreting the elements of Claim 1 and Claim 6 of the '844 patent. Id. at 271-73. The Court finds that the interpretations made in Solarex I are applicable to this case.

*7 On the record before it, the Court finds that Solarex has demonstrated a likelihood of success on the merits at trial on its infringement claims. APS has manufactured eight models of solar cells or panels and is capable of producing two other models in its new California plant. See Solarex Appendix A293-96 (APS's Response to Solarex Interrogatories, 1, 4); Kampas Decl. at A284; A140.

The record provides substantial expert testimony evidence which analyzes APS's own promotional information regarding its products. Additionally, the said expert testimony is based on independently run tests on APS's photovoltaic modules. Based on this record, the Court finds that Solarex has met its burden regarding likelihood of success on the merits at trial of infringement of the '521 patent. Additionally, the Court notes that APS has failed to address or refute any of Solarex's claims of infringement.

The record establishes that APS modules are PIN solar cell semiconductor devices incorporating a rectifying semiconductor junction. See Solarex Appendix, Second Lucovsky Decl. at A120, ¶ 24. The three layers in the PIN device are fabricated by a glow discharge process in an atmosphere including silane. The layers contain other elements but primarily are comprised of amorphous silicon. See Solarex Appendix, Second Lucovsky Decl. at A120, ¶ 23. Thus, the Court finds that all elements of Claim 11 of the '521 patent are present in the APS modules. [FN3]

The Court also concludes that Solarex has shown a likelihood of success on its patent infringement claim for its '844 patent by presenting expert testimony analysis of APS's information regarding its products and independently run tests on APS's photovoltaic modules. APS's manufacturing process for making the photovoltaic modules includes each of the following elements of Claim 1 of the '844 patent:

placing an electrically conductive substrate in a glow discharge apparatus, reducing the pressure in the apparatus from about 10(-3) to about 10(-6) Torr, heating the substrate from a temperature of about 150 degrees to about 450 degrees C, initiating a glow discharge in an atmosphere including silane to form a body of amorphous silicon on the electrically conductive substrate, continuing the glow discharge while altering the relative proportion of silane and the dopants to form a body of amorphous silicon with layers of differing conductivity, and attaching an electrical contact substrate.

Solarex Appendix, Second Lucovsky Decl. at A127, ¶ 44 . The record also presents sufficient evidence of infringement of Claim 6 of the '844 patent. The particular steps for manufacturing the layers of the PIN device of Claim 6 are included in the APS manufacturing process. Solarex Appendix, Second Lucovsky Decl. at A127, ¶ 46.

C. Irreparable Harm

Solarex contends that it will suffer irreparable harm if commercial production begins at APS's new plant. Solarex argues that allowing APS to begin production at the California plant would cause "dramatic and indelible changes in the dynamics of the United States [photovoltaic solar cell] market." Solarex Memorandum at 23.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 6
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
(Cite as: 1995 WL 314742 (D.Del.))

**\*8** A presumption of irreparable harm is appropriate in this case. *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied,* 464 U.S. 996 (1983). In *Smith,* the Federal Circuit held that irreparable harm can be presumed where a strong showing of validity and infringement has been made. *Id.* In such a case, "[t]he infringer should not be allowed to continue his infringement in the face of such a holding." *Id.*

In this case, the Court has determined that Solarex has demonstrated a likelihood of success of the merits at trial on the issues of validity and infringement. The Court has also found that Solarex provides compelling arguments regarding the negative effect of continued infringement on future operations and profitability. Solarex cites loss of existing market share, price erosion and lost market penetration and expansion opportunities as examples of the irreparable injury that would result if preliminary injunctive relief is denied. The Court finds that future infringement may lead to "market effects never fully compensable in money" to Solarex. *See Atlas Powder,* 773 F.2d at 1233. Therefore, the Court finds that Solarex has established that it will suffer irreparable harm absent a grant of injunctive relief.

### D. *Balance of Hardships*

The Court must next consider the hardships each party will face as a result of the Court granting injunctive relief. The Court "must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech,* 849 F.2d at 1457.

In this case, APS has not started production of the allegedly infringing products at its new California plant. The hardship that APS faces is delay of production. This hardship is not as extreme as the hardship that may be encountered by Solarex. For instance, absent the grant of an injunction Solarex will not be able to enforce its apparently valid patent. Also, Solarex will face the loss of market share, loss of market penetration opportunities, loss of revenue and loss of goodwill. With these considerations in mind, the Court finds that the balance of hardships leans in favor of granting the preliminary injunction.

### E. *Public Interest*

The Court must also determine whether preliminary injunctive relief will serve the public interest. *See New* *England Braiding Co.,* 970 F.2d at 882. The Court finds that granting the preliminary injunction in this case will serve the public interest.

The public has an interest in upholding and preserving patent rights. *See Smith Int'l,* 718 F.2d at 1581. In *Smith,* the Federal Circuit noted that "[t]he very nature of the patent right is the right to exclude others." *Id.* This right is undermined when infringement is permitted during the pendency of the patent infringement action. *Id.*

The public interest is also benefitted when disruption of the market is prevented or minimized. *See Critikon,* 28 U.S.P.Q.2d at 1370-71. Consumers will not prematurely rely on the availability of APS's photovoltaic products if the preliminary injunction is properly granted. Pending the outcome of the trial, consumers may no longer be able to purchase APS products. The Court is persuaded that avoidance of this type of market disruption is desirable and furthers the public interest.

### IV. CONCLUSION

**\*9** Upon evaluation of the relevant four factors, the Court concludes that Solarex is entitled to preliminary injunctive relief. Solarex has clearly shown a likelihood of success on the merits at trial regarding the validity of its ' 521 and '844 patents and infringement of these patents by APS. Additionally, Solarex has shown that it will suffer irreparable harm if the request for a preliminary injunction is denied. The Court finds that the balance of hardships favors Solarex and the public interest favors granting the preliminary injunction. Therefore, the Court will grant Solarex's Motion for a Preliminary Injunction.

An appropriate Order will be entered.

> FN1. Solarex does not seek preliminary injunctive relief for the '148 patent, but intends to assert this patent at trial.

> FN2. For a more complete background of the Solarex patent technology, see *Solarex Corp. v. ARCO Solar, Inc.,* 805 F. Supp. 252, 260-67 (D. Del. 1992).

> FN3. Claim 11 contains the following four elements:
> (1) a semiconductor device, (2) comprising a body of amorphous silicon which is predominately silicon but may include other elements, (3) the amorphous silicon is fabricated by a glow discharge in silane, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 7
Not Reported in F.Supp., 1995 WL 314742 (D.Del.), 34 U.S.P.Q.2d 1234
**(Cite as: 1995 WL 314742 (D.Del.))**

      (4) the device contains either a PN or PIN
semiconductor junction within the body of
amorphous silicon.
<u>805 F. Supp. at 269</u>.

 Not Reported in F.Supp., 1995 WL 314742 (D.Del.),
34 U.S.P.Q.2d 1234

    **Motions, Pleadings and Filings <u>(Back to top)</u>**

•      <u>1:93CV00229             </u>(Docket)
(May. 14, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2 U.S.P.Q.2d 1070                                                                          Page 1
1986 WL 83435 (D.Mass.), 2 U.S.P.Q.2d 1070
**(Cite as: 2 U.S.P.Q.2d 1070)**

**H**

Spalding & Evenflo Companies Inc.
v.
Acushnet Co.

District Court, D. Massachusetts

No. 81-0088

Decided November 28, 1986
United States Patents Quarterly Headnotes

**JUDICIAL PRACTICE AND PROCEDURE**
**[1] Procedure -- Defenses; Laches (§ 410.18)**
  Patent infringement plaintiff who filed suit within one month of defendant's introduction of accused golf balls and then waited four and one-half years before filing motion for preliminary injunction did not delay unreasonably, and therefore is not precluded from seeking injunction.

**JUDICIAL PRACTICE AND PROCEDURE**
**Particular patents -- Golf Balls**
  3,819,768, Golf Ball Cover Compositions Comprising a Mixture of Ionomer Resins, Molitor, valid and infringed.

  **\*1070** Action by Spalding & Evenflo Companies Inc. against Acushnet Company, for patent infringement. On plaintiff's motion for preliminary injunction. Motion granted.

  George P. McAndrews, George B. Newitt, John J. Held, Jr., John J. McDonnell, and Allegretti, Newitt, Witcoff & McAndrews, Ltd., all of Chicago, Ill., and Jonathan F. Atwood, Boston, Mass., for plaintiff.

  Harold Hestnes, John J. Regan, Cynthia O. Hamilton, and Hale and Dorr, all of Boston, Mass., and David L. Just, and Lucas & Just, both of New York, N.Y., for defendant.

  Nelson, District Judge.

  Pursuant to an Order, approved December 17, 1985 and entered in accordance with a stipulation of the parties, Robert W. Meserve, Esq. was appointed a special master "to hear evidence and report the same together with his findings of fact and conclusions of law with respect to the Plaintiff's Motion for Preliminary Injunction"; and

  In compliance with that Order, the special master held hearings on December 16, 17, and 18, 1985 and January 6, 7, 8, and 17, 1986. He took evidence from several witnesses and admitted 138 exhibits. On January 29, 1986, the master heard oral arguments on the merits of plaintiff's motion for preliminary injunction. He completed his draft report, and in accordance with Rule 53(e)(5) of the Fed. R. Civ. P. sent each party a draft report. Counsel for the parties reviewed the reports and submitted written comments. On May 6, 1986, a hearing on the draft report was held. Thereafter, counsel **\*1071** were given an opportunity to file additional written comments.

  On May 30, 1986, the special master filed with the Clerk of the Court his 52 page report wherein he set forth his findings of fact and conclusions of law. The defendant subsequently filed objections to the special master's report, pursuant to Rule 53(e)(1) of the Fed. R. Civ. P.

  A hearing was held on October 10, 1986 before the Court on plaintiff's motion to have the Court act upon the the special master's report and upon defendant's objections. The defendant contended, among other things, that the plaintiff had failed to establish immediate and irreparable harm. The plaintiff's four and one-half (4 1/2 ) year delay in seeking an injunction by itself, the defendant argued, "destroys Spalding's eligibility for the preliminary relief it seeks." Acushnet Reply Memorandum at 13. The master himself left unanswered "whether the plaintiff's conduct [relative to the delay] . . . was such that plaintiff should be barred from interlocutory relief." Master's Report at P 31.

  [1] While a delay in seeking a preliminary injunction may support the inference that the plaintiff has not suffered *immediate* harm, delay by itself without more does not preclude consideration of injunctive relief. See *Rexnord, Inc. v. Laitram Corp. and Intralox, Inc.*, 628 F.Supp. 467 [229 USPQ 370] (E.D. Wis. 1986) (delay a factor to consider in assessing irreparable injury); *Medtronic, Inc. v. Daig Corp.*, 221 U.S.P.Q. 595, 597 (D. Minn. 1983) (preliminary injunction sought and issued three and one-half (3 1/2 ) years

COPR. © 2005 The Bureau of National Affairs, Inc.

2 U.S.P.Q.2d 1070                                                                                                                                    Page 2
1986 WL 83435 (D.Mass.), 2 U.S.P.Q.2d 1070
(Cite as: 2 U.S.P.Q.2d 1070)

after filing of complaint). [FN1] In the instant case, the plaintiff filed suit in 1981 within one (1) month of the defendant's introduction of its Pinnacle Ball. Whatever prejudice the defendant may have suffered by marketing its infringing golf balls during the subsequent four and one-half (4 1/2 ) year period has resulted from its own deliberate challenge of the validity of the plaintiff's patent. Moreover, given the injuries sustained by the plaintiff and the procedural events that followed the filing of the complaint as set forth in paragraphs 27, 35-36, and 39-41 of the master's report, it cannot be said that the plaintiff has delayed unreasonably to prevent such further harm.

The primary inquiry before the court is whether the plaintiff has suffered immediate and irreparable harm. Although the master declined to decide the "issue of irreparable injury," he all but held that such harm exists. Because of the defendant's infringing conduct, the plaintiff's golf balls have lost "significant" market penetration and expansion as well as pre-existing sales growth and "exposure" in pro shops. Master's Report at PP 35-36, 40-41. Also adversely affected are the plaintiff's golf product line as to non-patented golf items and products, consumer pull, exclusivity and commercial reputation. Master's Report at PP 39, 41. The master opined that if "the Court had power to multiply [the] amount [of damages] they might be made more adequate, *but the effect on the plaintiff's total business is not compensable as such, and will continue.*" Master's Report at 27 (emphasis supplied).

It appears that the master hedged in deciding the ultimate issue of irreparable injury because the defendant advanced the novel legal theory that "damages not compensable under the patent laws after a full trial on the merits [cannot] become somehow compensable by way of injunctive relief before a trial on the merits." Acushnet's Reply Memorandum at 22; see also Master's Report at P 44. At oral argument the defendant cited the *Velo-Bind* case to support this proposition. *Velo-Bind, Inc. v. Minn. Mining & Mfg. Co.*, 647 F.2d 965, 972 [211 USPQ 926, 932-33] (9th Cir.), *cert. denied*, 454 U.S. 1093 [213 USPQ 888] (1981). In *Velo-Bind*, however, the court held that "lost profits on sales of unpatented, consumable supplies" may not be awarded as damages *after* a trial on the merits, but failed to address the issue now before this court, i.e., whether such noncompensable damages may be considered in assessing the sufficiency of irreparable harm. *Vel-Bind, Inc., supra* at 972 [211 USPQ at 933].

It is apparent that Spalding's damages as enumerated in paragraphs 35-36 and 39-41 of the master's report (loss of market share, loss of consumer pull and of revenue from non-patented golf product line, etc.) constitute traditional irreparable injury inasmuch as such "market effects [cannot be] fully compensable in money."*Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1231, 1233 [227 USPQ 289, 292] (Fed. Cir. 1985). To hold that this court may not consider the above- ***1072** mentioned damages in evaluating irreparable injury would contradict and disable the express language of the patent statute which authorizes injunctive relief to prevent *future* infringement. See 35 U.S.C. § 283 (principles of equity govern issuance of injunctions). The preliminary relief presently sought does not compensate the plaintiff for the defendant's *past* infringing conduct, but merely prevents the defendant from infringing the patent in the future. This court is not persuaded that the defendant should be licensed to continue to commit future wrongs. See *Atlas Powder Co., supra* at 1231-33 [227 USPQ at 290-92] (Fed. Cir. 1985) (injunctive relief designed to preserve status quo, not to allow wrongdoer to continue wrong).

The plaintiff must still clearly show, however, that its patent is valid and infringed, that the injury to the defendant by issuance of an injunction does not outweigh the harm to the plaintiff if the injunction is denied, and that such issuance will not cause public injury, *Atlas Powder Co., supra* at 1233 [227 USPQ at 292]; *Roper Corp., supra* at 1269 [225 USPQ at 346], and this Court so finds by adopting the master's findings of fact and conclusions of law.

NOW, THEREFORE, after due consideration of special master Meserve's report, the record upon which special master Meserve based his findings and conclusions, defendant's objections to the special master's report, the memoranda of the parties directed to these objections, and arguments at the hearing, this Court:

HEREBY ORDERS AND DECREES THAT:

1. The findings of fact and conclusions of law in special master Meserve's report are hereby adopted by this Court; and

2. The Court further finds and concludes that plaintiff will suffer irreparable injury if the requested preliminary injunction is not granted; and

COPR. © 2005 The Bureau of National Affairs, Inc.

2 U.S.P.Q.2d 1070

1986 WL 83435 (D.Mass.), 2 U.S.P.Q.2d 1070

**(Cite as: 2 U.S.P.Q.2d 1070)**

Page 3

3. ACUSHNET COMPANY, its officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them who shall receive actual notice of this Order by personal service or otherwise, are preliminarily enjoined, under 35 U.S.C. § 283, during the pendency of this action from:

a. manufacturing, using, selling, or offering for sale or use, or causing to be manufactured, used, sold, or offered for sale or use its "Pinnacle", "Titlest IDT", and "Club Special" brand golf balls and/or any other golf ball that infringes claim 3 of U.S. Patent No. 3,819,768, to wit: any golf ball that comprises a core and a cover, wherein said cover comprises from about 90 to about 10 percent of an ionic copolymer of an olefin having from 2 to 5 carbon atoms, and a sodium salt of an unsaturated monocarboxylic acid containing from 3 to 8 carbon atoms and from about 10 to about 90 percent of an ionic copolymer of an olefin having from 2 to 5 carbon atoms and a zinc salt of an unsaturated monocarboxylic acid containing from 2 to 8 carbon atoms; and where said cover comprises from about 55 to about 45 percent of an ethylene base sodium salt copolymer and from about 45 to about 55 percent of an ethylene base zinc salt copolymer; and

b. otherwise directly infringing or contributing to the infringement of or inducing infringement of claim 3 of U.S. Patent No. 3,819,768.

SO ORDERED.

FN1 Acushnet seeks to distinguish the case at bar from *Medtronic* in which the court issued a preliminary injunction because the defendant became bankrupt and jeopardized the plaintiff's ability to recover monetary damages should the plaintiff subsequently prevail at trial. *Medtronic, Inc. v. Daig Corp., supra* at 597. The failure to show the defendant's financial instability, however, is not determinative, and other factors may be considered with respect to the issuance of a preliminary injunction. *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1269 n.2 [225 USPQ 345, 346 n.2] (Fed. Cir. 1985).

D.Mass.

2 U.S.P.Q.2d 1070

END OF DOCUMENT

COPR. © 2005 The Bureau of National Affairs, Inc.

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1997 WL 50272 (N.D.Cal.)
**(Cite as: 1997 WL 50272 (N.D.Cal.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
SUN MICROSYSTEMS, INC., Plaintiff,
v.
DATARAM CORPORATION, Defendant and
Counterclaimant.
**No. CIV. 96-20708 SW.**

Feb. 4, 1997.

ORDER GRANTING DATARAM LEAVE TO
AMEND; DENYING SUN'S MOTION FOR MORE
DEFINITE
STATEMENT; DENYING SUN'S MOTION TO
STRIKE DATARAM'S DEFENSE OF ESTOPPEL;
AND
STRIKING WITHOUT PREJUDICE DATARAM'S
DEFENSES OF IMPLIED LICENSE AND
INEQUITABLE CONDUCT

<u>SPENCER WILLIAMS</u>, District Judge.

*\*1* Plaintiff Sun Microsystems, Inc. ("Sun") initiated this action alleging that Defendant Dataram Corporation ("Dataram") is infringing five United States patents owned by Sun. In answering Sun's complaint, Dataram asserted several affirmative defenses including inequitable conduct and implied license/estoppel. Dataram also alleged four counterclaims against Sun for: (1) Violation of Section 2 of the Sherman Antitrust Act; (2) Violation of Section 43(a) of the Lanham Act; (3) Intentional Interference with Prospective Economic Advantage; and (4) Trade Libel.

Following service of the answer, Sun filed a motion to strike the defenses of inequitable conduct and implied license/estoppel on the ground that they were insufficiently pled. Sun also asserted that Dataram's counterclaims were deficient and requested that the Court compel Dataram to plead its counterclaims with more particularity. Dataram opposed Sun's motion and moved for leave to file an amended answer and add a counterclaim for fraud. In its reply to Dataram's opposition and counter-motion, Sun argues that: (1) leave to amend should be denied; (2) Dataram should not be allowed to add a counterclaim for fraud because the claim is repetitive; and (3) even

if Dataram is permitted to amend, its proposed amended answer is insufficient.

After considering the papers and arguments of counsel, the Court GRANTS Dataram leave to amend its answer and add a counterclaim. The Court also DENIES Sun's motion for a more definite statement as to Dataram's counterclaims and DENIES Sun's motion to strike Dataram's estoppel defense. Lastly, the Court STRIKES WITHOUT PREJUDICE Dataram's defenses of implied license and inequitable conduct.

I. BACKGROUND

Sun develops, manufactures, sells and licenses computer and computer-related technologies. As part of its business, Sun has developed technology concerning memory modules known as single in-line memory modules ("SIMMs") and has applied for and obtained numerous United States patents relating to this technology. It is Sun's belief that Dataram sells computer memory products which infringe five of Sun's SIMMs patents: <u>U.S. Patent Nos. 5,260,892;</u> <u>5,265,218; 5,270,964; 5,383,148; and 5,532,954</u>. Therefore, Sun contacted Dataram and offered to sell Dataram a license to its patents. After Dataram refused the offer, Sun initiated the present action.

In its original pleading, Dataram asserted affirmative defenses of inequitable conduct, implied license and estoppel in addition to counterclaims for antitrust violations, false advertising, interference with prospective economic advantage and trade libel. After reviewing Dataram's pleading, Sun concluded that Dataram inadequately set forth the counterclaims and defenses of inequitable conduct and implied license/estoppel. Accordingly, Sun filed a motion to strike the deficient defenses and for a more definite statement as to Dataram's counterclaims.

Dataram contends that its initial pleading is sufficient, but nevertheless, requests leave to file an amended answer in order to provide more detailed allegations and to add a new counterclaim. According to Dataram, if it is granted leave to amend, Sun's motion to strike and for a more definite statement becomes moot.

*\*2* In reply to Dataram's counter-motion and proposed amended pleading, Sun asserts that Dataram should not be allowed to amend its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 50272 (N.D.Cal.)
**(Cite as: 1997 WL 50272 (N.D.Cal.))**

pleadings because Dataram has not made a sufficient showing under Fed. R. Civ. Pro. 15(a). Further, Sun contends that Dataram's proposed amended pleading is inadequate and that Dataram should not be permitted to add a counterclaim for fraud because the claim is repetitive.

## II. DISCUSSION

Resolution of Sun's motion and Dataram's cross-motion requires two determinations. First, the Court must decide whether to permit Dataram to amend its answer and add a counterclaim for fraud. Second, the Court must analyze Dataram's pleading, either its initial pleading or its proposed amended pleading, and determine whether Dataram has sufficiently alleged its counterclaims and affirmative defenses of inequitable conduct and implied license/estoppel to meet the requirements of Fed. R. Civ. P. 12(e) and (f).

A. Dataram's Motion for Leave to Amend its Answer and to Add a Counterclaim

Rule 15(a) of the Federal Rules of Civil Procedure makes clear that leave to amend a complaint "shall be freely given when justice so requires." This liberality in granting leave to amend is subject to the qualifications that amendment of the complaint: (1) does not cause the opposing party undue prejudice; (2) is not sought in bad faith; (3) and does not constitute an exercise in futility. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987). Of these factors, prejudice to the opposing party is the most critical, Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th Cir. 1990), and the burden is on the party opposing amendment to make that showing. DCD Programs, 833 F.2d at 187. In the absence of such prejudice, leave to amend should be freely given. Keniston v. Roberts, 717 F.2d 1295, 1300 (9th Cir. 1983). In addition to prejudice, bad faith and futility of amendment, the court may consider the diligence of the party seeking leave to amend and whether the moving party has unduly delayed in filing its motion. Jackson, 902 F.2d at 1388.

Rule 13(f) of the Federal Rules of Civil Procedure, which governs the procedure for counterclaims, provides that a court may grant leave to amend when a pleader "fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires." The factors considered in determining what constitutes excusable neglect are similar to those used in the Rule 15(a) analysis: the good faith of the claimant, the extent of the delay, and the danger of prejudice to the opposing party.

Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership, 507 U.S. 380, 392 n.10 (1993).

Here, the factors weigh in favor of permitting Dataram to amend its answer and add a counterclaim for fraud. Despite Sun's assertions to the contrary, allowing Dataram to file an amended pleading will not prejudice Sun. Some initial discovery has taken place but the litigation is in its early stages due, at least in part, to the dispute regarding the adequacy of Dataram's pleading. Moreover, it is disingenuous for Sun to contend that amendment is prejudicial when Sun initially requested that Dataram provide a more detailed pleading. As for the other factors, there is no evidence that Dataram has acted in bad faith or has unduly delayed in requesting leave to amend. Therefore, the Court GRANTS Dataram's motion for leave to amend its answer and to add a counterclaim. [FN1]

> FN1. Sun claims that the counterclaim for fraud that Dataram seeks to add is repetitive of existing allegations. However, to support its fraud claim, Dataram added to its pleading allegations that Sun fraudulently obtained information from Dataram. Proposed Amended Answer ¶¶ 55-63, 123-30. These allegations do not form the basis for any of Dataram's other claims. Thus, the fraud claim is not repetitive and can be included in Dataram's amended pleading.

B. Sun's Motion for More Definite Statement and to Strike Certain Defenses

*3 Sun asserts that even if Dataram is permitted to file its Proposed First Amended Answer and Counterclaims, the changes to the pleading do not remedy the deficiencies in Dataram's defenses and counterclaims. Thus, regardless of the disposition of Dataram's motion to amend, Sun seeks adjudication of its motion to strike and for more definite statement pursuant to Fed. R. Civ. P. 12(e) and (f).

(1) Motion for More Definite Statement

A motion for more definite statement should not be granted unless a pleading is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e). This liberal standard is consistent with Fed. R. Civ. P. 8(a)(2) which allows pleadings that contain a "short and plain statement of the claim." "The Rules thus anticipate that the parties will familiarize themselves

Not Reported in F.Supp.                                                          Page 3
Not Reported in F.Supp., 1997 WL 50272 (N.D.Cal.)
**(Cite as: 1997 WL 50272 (N.D.Cal.))**

with the claims and ultimate facts through the discovery process." *Big Bear Fireworks, Inc. v. ANCO Management Services, Inc.,* 1992 U.S. Dist. Lexis 21918, *8 (N.D. Cal.).

Here, Dataram's counterclaims are pled with sufficient detail to meet the requirements of notice pleading under Fed. R. Civ. P. 8. Dataram's pleading adequately identifies the substance of the counterclaims asserted so that Sun can form a responsive pleading. *Beery v. Hitachi Home Electronics (America), Inc.,* 157 F.R.D. 477, 480 (C.D. Cal. 1993). Further, Sun can elicit the specific facts and legal theories for Dataram's counterclaims through the discovery process. *Famolare, Inc. v. Edison Bros. Stores, Inc.,* 525 F. Supp. 940, 949-50 (E.D. Cal. 1981). Therefore, the Court DENIES Sun's motion for a more definite statement as to Dataram's counterclaims.

(2) *Motion to Strike Defenses of Implied License/Estoppel and Inequitable Conduct*

Rule 12(f) of the Federal Rules of Civil Procedure permits parties to move the court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." As with motions to dismiss for failure to state a claim, when ruling upon a motion to strike, the court must view the pleading in the light more favorable to the pleader. *California v. U.S.,* 512 F. Supp. 36, 39 (N.D. Cal. 1981).

a. Implied License/Estoppel

Dataram has alleged in its answer that it is not infringing on Sun's patents because it is selling its products to end users of Sun computers who have a license from Sun to use Dataram's SIMMs. Proposed Amended Answer ¶ 37. The answer also asserts that Sun is estopped from asserting infringement against Dataram because Sun sells customers computer equipment with insufficient memory in reliance upon memory manufacturers such as Dataram. *Id.* at ¶ 38. Further, Dataram alleges that it relied on Sun's actions which included purchasing Sun-compatible Dataram SIMMs and telling customers that they could obtain memory modules from independent manufacturers. *Id.*

A defendant need only plead an affirmative defense with the necessary specificity to give the plaintiff "fair notice" of the defense. *Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.,* 1996 U.S. Dist. Lexis 11700, *7 (citing *Wyshak v. City National Bank,* 607 F.2d 824, 827 (9th Cir

1979). Sun contends that Dataram's allegations of implied license and estoppel fail to give Sun "fair notice" of a defense.

*4 It is unclear from reading either the original answer or the proposed amended answer whether Dataram is alleging a single defense or both implied license and estoppel. To the extent Dataram is asserting a defense based on a license, Dataram has failed to allege factual allegations to support such a claim. The legal conclusion that Sun customers have a license to use Dataram SIMMs is inadequate to provide "fair notice" of the defense. To properly plead a defense of implied or express license, Dataram must assert some factual allegations that demonstrate the existence of a license. Therefore, the Court STRIKES WITHOUT PREJUDICE Dataram's license defense (Proposed Amended Answer ¶ 37).

However, Dataram's proposed amended pleading sufficiently sets forth the elements of estoppel: (1) misleading conduct leading to inference that the patentee does not intend to enforce the patent against the alleged infringer; (2) reliance by the alleged infringer and the patentee's conduct; and (3) material prejudice if patentee is allowed to proceed with an infringement suit. *ABB Robotics., Inc. v. GMFanuc Robotics Corp.,* 52 F.3d 1062 (Fed. Cir. 1995), *cert. denied,* -- U.S. --, 116 S.Ct. 306 (1995). As such, Dataram has included in its amended answer adequate factual assertions to provide Sun with "fair notice" of its estoppel defense. Therefore, the Court DENIES Sun's motion to strike Dataram's estoppel defense.

b. Inequitable Conduct

Under the doctrine of inequitable conduct, a patent is unenforceable if the patent applicant commits improper acts while prosecuting the patent before the Patent and Trademark Office ("PTO"). *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 872 (Fed. Cir. 1988), *cert denied,* 490 U.S. 1067 (1989). Acts that constitute inequitable conduct include deception, fraud, or failure to disclose material information. *Id.*

The defense of inequitable conduct or "fraud on the patent office," falls within the general terms of Fed. R. Civ. P. 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Further, the inherent dangers of such a defense (delay, confusion, attorney disqualification, and wasted resources) necessitates that courts require particularity in order to weed out allegations that are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 50272 (N.D.Cal.)
**(Cite as: 1997 WL 50272 (N.D.Cal.))**

asserted in bad faith. *Chiron Corp. v. Abbott Laboratories,* 156 F.R.D. 219, 221-22 (N.D. Cal. 1994). Thus, in pleading inequitable conduct, a party cannot merely rely on vague allegations of fraud and deception but instead, must specify the time, place, and content of any alleged misrepresentations made to the PTO. *Sun-Flex Co., Inc. v. Softview Computer Products Corp.,* 18 U.S.P.Q.2d 1171, 1172 (N.D.Ill. 1990).

Here, Dataram's accusations of inequitable conduct are not stated with sufficient particularity. While the amended answer contains some specific allegations of misleading statements and omissions, it does not set forth with any detail or clarity when the misrepresentations or omissions took place, who made or failed to make them, and which patents were before the PTO at the time of the alleged misrepresentations or omissions. Further, Dataram alleges that Sun's inequitable conduct "taints and renders unenforceable" all of the patents asserted in this suit. Proposed Amended Answer ¶ ¶ 73, 83 & 84. However, Dataram fails to identify inequitable conduct as to each patent or, in the alternative, set forth facts demonstrating a close relationship between the patents that would justify a decree of unenforceability as to all of the patents. *See Consolidated Aluminum Corp. v. Foseco Intern. Ltd.,* 910 F.2d 804, 809-12 (Fed. Cir. 1990). Thus, Dataram has not provided allegations specific enough to apprise Sun of the particular misconduct which would constitute fraud on the patent office. Accordingly, the Court STRIKES WITHOUT PREJUDICE Dataram's defense of inequitable conduct and grants Dataram 20 days to amend its answer.

### III. CONCLUSION

**\*5** For the reasons stated above, the Court hereby ORDERS that:

(1) Dataram's motion for leave to file its First Amended Answer and Counterclaims is GRANTED.

(2) Sun's motion for a more definite statement as to Dataram's counterclaims is DENIED.

(3) Sun's motion to strike the defense of estoppel is DENIED.

(4) Sun's motion to strike Dataram's license defense is GRANTED.

(5) Sun's motion to strike the defense of inequitable conduct is GRANTED.

(6) Dataram shall have 20 days from the filing date of this Order to file a Second Amended Answer.

IT IS SO ORDERED.

Not Reported in F.Supp., 1997 WL 50272 (N.D.Cal.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Karen E. Keller, hereby certify that on September 20, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Francis DiGiovanni, Esquire
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building – 8th Floor
1007 N. Orange Street
Wilmington, Delaware 19801

I further certify that on September 20, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

BY FEDERAL EXPRESS

Ray L. Weber, Esquire
Laura J. Gentilcore, Esquire
RENNER, KENNER, GREIVE, BOBAK,
  TAYLOR & WEBER
400 First National Tower
Akron, OH 44308

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn  (No. 4092)
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Dyson Technology Limited
and Dyson, Inc.*