IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DYSON TECHNOLOGY LIMITED and DYSON, INC. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-434-GMS |
| MAYTAG CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL

Garrard R. Beeney
Richard C. Pepperman, II
James T. Williams
Keith McKenna
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

Steven F. Reich
Jeffrey S. Edelstein
Tamar Feder
MANATT, PHELPS & PHILLIPS, LLP
7 Times Square
New York, New York  10036
(212) 790-4500

C. Barr Flinn (No. 4092)
John W. Shaw (No. 3362)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

*Attorneys for Plaintiffs Dyson
Technology Limited and Dyson, Inc.*

May 26, 2006

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS .........................................................1

SUMMARY OF ARGUMENT ....................................................................................1

BACKGROUND ........................................................................................................2

A.     The Cyclonic Technology at Issue ....................................................................2

B.     The Patents-in-Suit..........................................................................................3

         The '515 Patent ............................................................................................4

         The '748 Patent ............................................................................................5

         The '008 Patent ............................................................................................5

         The '038 Patent ............................................................................................6

ARGUMENT..............................................................................................................7

I.     Applicable Legal Principles ...............................................................................7

II.     The Proper Construction of the Patents-In-Suit ....................................................8

         Term # 1      "dirty air inlet [to outer container]" .................................................8

         Term # 2      "an upper portion of the outer container" .........................................9

         Term # 3      "oriented for supplying dirt laden air into the container tangentially to the interior surface of the outer container" ............11

         Term # 4      "an air outlet from the container at an upper portion of the container"............................................................................................13

         Term # 5      "a cyclone air inlet at an upper end . . . of the cyclone in air communication with the air outlet of the container" ....................14

         Term # 6      "which has a circular cross section" ...............................................14

         Term # 7      "maintaining its velocity to a cone opening smaller in diameter than the diameter of the upper end of the cyclone" ........15

-i-

Page

Term # 8      "the air inlet being oriented for supplying air tangentially to
the surface" ...............................................................................16

Term # 9      "a dirt receiving and collecting chamber extending from the
cone opening" ...........................................................................17

Term # 10     "means for generating an airflow" ..................................................18

Term # 11     "a disc means provided on the outside of the cyclone
intermediate the receiving chamber and the air outlet of the
container and around to the longitudinal axis of the
cyclone" ....................................................................................19

Term # 12     "a shroud means mounted on and around the outer surface
of the cyclone and having opposed ends along the
longitudinal axis and providing for outlet air from the
container into the air inlet to the cyclone" .....................................22

Term # 13     "wherein the shroud means is mounted at one end below
the air inlet to the cyclone and extends along the outer
surface with the other end at a position intermediate to the
cone opening and the air inlet to the cyclone" ..............................24

Term # 14     "wherein the shroud means has perforations adjacent to the
position intermediate to the cone opening for the flow of air
from the outer container to the cyclone inlet" ...............................25

Term # 15     "disc means provided on the shroud means at a lower
longitudinal extent of the shroud means and the air inlet of
the cyclone and around the axis of the cyclone"............................26

Term # 16     "having a tangential air inlet located at or adjacent the end
of the cyclone having the larger diameter" ...................................27

CONCLUSION ..........................................................................................28

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*AFG Indus., Inc.* v. *Cardinal IG Co.*,
    239 F.3d 1239 (Fed. Cir. 2001) ..............................................................................17

*Allen Eng'g Corp.* v. *Bartell Indus. Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002) ..............................................................................20

*Anhydrides & Chems., Inc.* v. *United States*,
    130 F.3d 1481 (Fed. Cir. 1997) ..............................................................................15

*Cole* v. *Kimberly-Clark Corp.*,
    102 F.3d 524 (Fed. Cir. 1996) ............................................................20, 21, 23, 24

*Fin Control Sys. Pty, Ltd.* v. *OAM, Inc.*,
    265 F3d 1311 (Fed. Cir. 2001) ..............................................................................10

*Gart* v. *Logitech, Inc.*,
    254 F.3d 1334 (Fed. Cir. 2001) ..............................................................10, 20, 26

*Innova/Pure Water, Inc.* v. *Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ..............................................................................7

*Intervet Am., Inc.* v. *Kee-Vet Labs., Inc.*,
    887 F.2d 1050 (Fed. Cir. 1989) ............................................9, 17, 25, 26, 27

*Medrad, Inc.* v. *MRI Devices Corp.*,
    401 F.3d 1313 (Fed. Cir. 2005) ..............................................................................7

*Micro Chem., Inc.* v. *Great Plains Chem. Co.*,
    194 F.3d 1250 (Fed. Cir. 1999) ......................................................................18, 19

*Omega Eng'g, Inc.* v. *Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ......................................................................18, 19

*Phillips* v. *AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ........................................................ *passim*

*Tate Access Floors, Inc.* v. *Interface Architectural Resources, Inc.*,
    279 F.3d 1357 (Fed. Cir. 2002) ..............................................................................10

*Vitronics Corp.* v. *Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................14, 16, 18, 25

**Page**

*Wilson Sporting Goods Co.* v. *Hillerich & Bradsby Co.*,
   442 F.3d 1322 (Fed. Cir. 2006) ........................................................................8, 11, 24


**STATUTES AND RULES**

35 U.S.C. § 112 ............................................................................................. 18-21, 23-24


**OTHER AUTHORITIES**

2A Sutherland Statutory Construction § 47:33 (6th ed.) ...................................................15

Random House Webster's Unabridged Dictionary (2d ed. 2001) .....................................21

Eric W. Weisstein, "Circle Tangent Line," from *MathWorld*, a Wolfram Web Resource,
   http://mathworld.wolfram.com/CircleTangentLine.html .........................................................12

Webster's Third New International Dictionary of the
   English Language Unabridged (2002) ................................................................. *passim*

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs Dyson Technology Limited and Dyson, Inc. (collectively, "Dyson") have asserted patent infringement claims against defendant Maytag Corporation ("Maytag"), alleging that Maytag's Hoover Fusion vacuum cleaner infringes one or more claims of the following United States patents owned by Dyson Technology Limited: U.S. Patent No. 4,643,748 ("'748 patent"); U.S. Patent No. 4,826,515 ("'515 patent"); U.S. Patent No. 4,853,008 ("'008 patent"); and U.S. Patent No. 5,858,038 ("'038 patent") (collectively, the "patents-in-suit").

In compliance with the Scheduling Order entered on December 19, 2005, the parties filed a Joint Submission of Claim Construction Charts on May 12, 2006. Since then, the parties have been able to reach agreement on additional claim terms and narrow the number of terms in dispute. As a result, the parties are filing an Amended Joint Submission of Claim Construction Charts with their opening claim construction briefs. Exhibit A hereto contains the two charts that the parties are providing to the Court in their amended submission. In the first chart, the parties present their respective proposed constructions (and citations to supporting intrinsic evidence) of the terms or phrases of the claims of the patents-in-suit whose constructions are in dispute (the "Claim Construction Chart"). Many of the disputed terms or phrases are found within the same claim. In the second chart, the parties present their agreed-upon constructions of other terms or phrases. This is Dyson's opening claim construction brief addressing the disputed terms or phrases of the patents-in-suit.

## SUMMARY OF ARGUMENT

Dyson's proposed constructions are based on the claim construction principles set forth in the Federal Circuit's *en banc* opinion in *Phillips* v. *AWH Corp.*,

415 F.3d 1303 (Fed. Cir. 2005). In contrast, Maytag's proposed constructions ignore the plain meaning of words and seek to limit the claims of the patents-in-suit to Dyson's preferred embodiments. Neither the law nor the intrinsic evidence supports this attempt. As Dyson demonstrates below, application of the claim construction rules set forth in *Phillips* and other Federal Circuit decisions confirms that Dyson's proposed constructions are proper and should be adopted by the Court.

## BACKGROUND

### A.    The Cyclonic Technology at Issue

The inventions of the patents-in-suit relate to certain technologies intended for use in cyclonic cleaning apparatuses, including vacuum cleaners.

Beginning in 1978, James Dyson set about to make a better vacuum cleaner. His endeavor resulted in part from personal experience with a newly-purchased Hoover vacuum cleaner that, like others at the time, separated dirt from air by sucking the air through a paper bag. Although the vacuum cleaner seemed to work well for a short period of time, it soon lost suction. Mr. Dyson determined that the vacuum cleaner lost suction not because its bag was full, but because dust clogged the pores of the bag and thus reduced the airflow in the cleaner. After five years, thousands of experiments and numerous prototypes, he created a vacuum cleaner that, through the use of cyclonic technology, was able to capture typical household dirt and debris without losing suction.

Mr. Dyson's cyclonic technology consists of an outer, relatively low-speed cyclone formed by a cylinder-shaped container and an inner, high-speed cyclone formed by a cone-shaped device. Air flows tangentially into the outer container at high speed, creating centrifugal force that separates larger particles from the air and deposits them at the bottom of this container. The air from the outer container then makes its way

-2-

into the cone-shaped inner cyclone, increasing the velocity of the particles to a much higher speed. This increased velocity creates sufficient centrifugal force to separate the smallest particles, and these particles then are trapped in a separate dirt container at the bottom of the cone-shaped cyclone. Because the dirt and debris are trapped at the bottom of the container—and the air flow thus does not have to travel through a bag or other membrane that can clog—a vacuum cleaner using James Dyson's inventions does not lose suction. The diagram below illustrates the basics of this technology.[1]



Exhibit 2 – Diagram illustrating Dyson's cyclonic technology

Note – Schematic drawing only, not to scale

**B.    The Patents-in-Suit**

            Since Mr. Dyson created his first cyclonic vacuum cleaner, he and others working for him have spent innumerable hours and resources experimenting with and

---

[1]        This diagram is Exhibit 2 to the Affidavit of Gareth Jones, sworn July 25, 2005 ("Jones Aff.") (D72). Mr. Jones submitted two affidavits in support of Dyson's earlier-filed motion for a preliminary injunction. (*See* docket Nos. 16 & 32). In addition to his July 25, 2005 affidavit, he also submitted a reply affidavit, sworn September 15, 2005 ("Jones Reply Aff."). Both of these affidavits discuss proper construction of the patents-in-suit.

improving his invention.  Dyson has obtained a number of U.S. patents, including the

patents-in-suit, that cover these improvements.

### The '515 Patent

The inventions claimed in the '515 patent include a circular dirt collection

chamber below the inner cyclone that has a diameter at the end furthest from the opening

of the bottom of the inner cyclone that is a minimum of three times the diameter of that

opening.  Jones Aff. ¶ 13 (D7).  This innovation is illustrated in Figure 6 of the '515

patent, a copy of which is shown below, as element 112.  As the patent specification

states, although prior cyclonic technology worked well, improvements were needed

because "particles collected at the bottom of the cyclone may become re-entrained in the

air-flow in the body, or may never settle out at the bottom of the body, remaining

entrained in the air-flow through the cyclone."  '515 patent, col. 1:52-55 (JA6).  Through

experimentation with numerous collection chamber sizes, James Dyson discovered that

setting the diameter of the dirt collection chamber at the end furthest from the opening of

the bottom of the inner cyclone at a minimum of three times the diameter of that opening

helps to prevent dirt and other debris from re-entering the inner cyclone after being

deposited into the collection chamber at the bottom of the inner cyclone.



**The '748 Patent**

The inventions claimed in the '748 patent include a disc that surrounds the inner cyclone and is designed, among other things, to prevent larger particles and long strands, such as human hair, from leaving the outer container and clogging the air outlet from the outer container. Jones Aff. ¶ 14 (D7). The disc invention is illustrated in Figure 1 of the '748 patent, a copy of which is shown below, as element 20. The patent specification explains that there was no means in the prior art of preventing the clogging of the air outlet from the outer container leading to the inner cyclone other than the use of a filter in the air outlet, which would defeat the purpose of a cyclonic cleaning apparatus. '748 patent, col. 1:21-29 (JA19).



**The '008 Patent**

The '008 patent claims both a disc and a shroud that surround the inner cyclone. Jones Aff. ¶ 15 (D7-8). The disc and shroud are illustrated in Figure 2 of the '008 patent, a copy of which is shown below. The shroud is a covering with perforations that acts like a screen and is intended to prevent larger, lightweight fibrous material from

escaping the outer container, and the disc, which is located below the shroud, helps to prevent larger particles and long strands from clogging the holes of the shroud. *Id.* The '008 patent places the disc at the lower end of the shroud for mounting on the outside of the inner cyclone. After much experimentation, Mr. Dyson discovered that placement of the disc at this location provided better separation of dirt in the outer container than was achieved in the prior art.



### The '038 Patent

The '038 patent sets out the most advantageous distances between the opening of the bottom of the inner cyclone and the base surface of the outer container, as well as preferred structures for the base surface of the outer container. Jones Aff. ¶ 16 (D8); '038 patent, col. 1:54-65. As the patent specification states, the prior art assumed that as large a distance as possible between the base surface and the cone opening was desirable. '038 patent, col. 1:66-2:1 (JA34). Through experimentation, James Dyson and his co-inventors determined that varying the distance can affect the separation efficiency of the apparatus and that the "[m]axima of separation efficiency for different sizes of cyclone and collector occur when the distance between the base surface and the cone opening lies in the range 30 mm to 70 mm." '038 patent, col. 2:8-13 (JA34).

**ARGUMENT**

**I.    Applicable Legal Principles**

        In *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005), the
Federal Circuit explained that claim terms generally should be given "their ordinary and
customary meaning," which is "the meaning that the term would have to a person of
ordinary skill in the art in question at the time of the invention." *See also Innova/Pure
Water, Inc.* v. *Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).
To determine the ordinary meaning of claim terms, "the court starts the decision making
process by reviewing the same resources as would that person, *viz.*, the patent
specification and the prosecution history." *Phillips*, 415 F.3d at 1313; *see also Medrad,
Inc.* v. *MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).[2]  The patent
specification is the single best guide to the meaning of a disputed term. *Phillips*, 415
F.3d at 1315.

        Courts also may "rely on extrinsic evidence, which 'consists of all
evidence external to the patent and prosecution history, including expert and inventor
testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (citations
omitted).  As the Federal Circuit explained, dictionaries may be helpful in construing
commonly understood terms or phrases. *Id.* at 1314.  In addition, expert testimony "can
be useful to a court for a variety of purposes, such as to provide background on the
technology at issue, to explain how the invention works, to ensure that the court's
understanding of the technical aspects of the patent is consistent with that of a person of
skill in the art, or to establish that a particular term in the patent or the prior art has a

---

[2]      The parties here are not relying on prosecution histories to construe any of the disputed
terms or phrases.

particular meaning in the pertinent field." *Id.* at 1318 (citations omitted). Lastly,

"[w]hile a trial court should certainly not prejudge the ultimate infringement analysis by

construing claims with an aim to include or exclude an accused product or process,

knowledge of that product or process provides meaningful context for the first step of the

infringement analysis, claim construction." *Wilson Sporting Goods Co.* v. *Hillerich &*

*Bradsby Co.*, 442 F.3d 1322, 1326-27 (Fed. Cir. 2006).

## II.     The Proper Construction of the Patents-In-Suit

### Term # 1        "dirty air inlet [to outer container]"

Certain claims of the '748, '515 and '008 patents require that the outer

container to the cyclonic apparatus have a "dirty air inlet." This term should be construed

to require an opening in the outer container through which the dirty air sucked up by the

vacuum cleaner flows into the outer container of the cyclonic apparatus. Jones Aff. ¶ 21

(D10-11). As a leading dictionary explains, a common definition of "inlet" is "a place of

entrance: an *opening* by which entrance is made." Webster's Third New International

Dictionary of the English Language Unabridged 1165 (2002) [hereinafter "Webster's

Dictionary"] (emphasis added).

Maytag's proposed construction suggests that the "inlet" must be a

physical "passage" that directs the air flow into the container. A "passage" is "a road,

path, channel or course through or by which something passes." Webster's Dictionary

1650. Although the patent specifications refer to the physical location of the dirty air

inlet on the drawings of the preferred embodiments as the "dirty air inlet passage," the

claims themselves require only a dirty air inlet, *i.e.*, an opening. *Compare, e.g.,* '515

patent, col. 5:64-65 ("[a] dirt inlet passage 57 communicates . . ."); col. 7:55-56 ("[d]irty

air . . . into the dirty air inlet passage 16"); '748 patent, col. 3:18-19 ("[t]he head 13

-8-

includes a dirty air inlet passage"); '008 patent, col. 2:59-60 ("[t]he head 13 includes a dirty air inlet passage") *with, e.g.,* '515 patent, col. 12:24-25 ("a dirty air inlet at an upper portion of the outer cyclone"); '748 patent, col. 6:20-21 ("a dirty air inlet at an upper portion of the outer container"); '008 patent, col. 4:5-6 ("a dirty air inlet which is oriented . . ."). The word "passage" is not present in the claims, and therefore cannot properly be read into them. *See Intervet Am., Inc.* v. *Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper'") (emphasis in original).

        Maytag advances this construction of the term "inlet" in order to reinforce its proposed construction of Term 3 on the Claim Construction Chart, which states that the dirty air inlet must be "oriented for supplying dirt laden air into the container tangentially to the interior surface of the outer container." As discussed *infra* at pages 11-12, Maytag erroneously seeks to have this Court construe Term 3 to require that the dirty air inlet itself "cause" the air to flow into the container tangentially, rather than simply be oriented to allow such air flow. Maytag's proposed construction of Term 3 does not work if the "dirty air inlet" is construed, as it should be, as simply an opening through which air passes rather than a passage, *i.e.*, a path or channel, that "causes" air to flow into the container tangentially.

**Term # 2**      **"an upper portion of the outer container"**

        The words "upper portion of the outer container" mean just what they say—that the dirty air inlet must be at the upper portion, *i.e.*, above the midline, of the outer container. Jones Reply Aff. ¶ 7 (D134-35). Maytag incorrectly construes the term "upper portion" to mean "at or near the top" of the outer container. This narrower

construction is an improper attempt to restrict the clear language of the claims to cover only the features of the preferred embodiments shown in the drawings of the '515 and '748 patents. *See Gart* v. *Logitech, Inc.*, 254 F.3d 1334, 1342 (Fed. Cir. 2001) ("[T]hese drawings only [] depict the preferred embodiment [and] are not meant to represent 'the' invention or to limit the scope of coverage defined by the words used in the claims themselves."). "[O]ne of the cardinal sins of patent law [is to read] a limitation from the written description into the claims." *Phillips*, 415 F.3d at 1320 (citations omitted). Moreover, the patent specifications elsewhere refer to the "top" of the outer container (*see, e.g.,* '515 patent, col. 5:3 & col. 6:8 (JA8)) and to the "top" of other components (*see, e.g.,* '515 patent, col. 5:17-18 & col. 6:46-47 (JA8)). The patent thus distinguishes between the "upper portion" and the "top" of a component. *Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms."); *accord Fin Control Sys. Pty, Ltd.* v. *OAM, Inc.*, 265 F3d 1311, 1318 (Fed. Cir. 2001). Similarly, the very same claims also use the term "upper end"— denoting a location near the top—rather than "upper portion," which means only above the midline. *Compare, e.g.,* '515 patent, col. 11:40 (JA11) and '748 patent, col. 6:25 (JA21) (referring to an "upper portion of the outer container") *with* '515 patent, col. 11:48 (JA11) and '748 patent, col. 6:28 (JA21) (referring to an air inlet "at an upper end" of the cyclone). When two different terms are used in the same claim, they are presumed to have different meanings. *Tate Access Floors, Inc.* v. *Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1370 (Fed. Cir. 2002).

-10-

**Term # 3**     **"oriented for supplying dirt laden air into the container tangentially to the interior surface of the outer container"**

The phrase "oriented for supplying dirt laden air into the container tangentially to the interior surface of the outer container" means that the dirty air inlet to the outer container is configured to allow dirt laden air sucked up by the vacuum cleaner to flow into the container tangentially to the interior surface of the container. Jones Aff. ¶¶ 22-23 (D11); Jones Reply Aff. ¶ 9 (D135-36).   The purpose of this requirement is to allow the air entering the container to travel along the interior surface of the outer container so that it acts as a "lower efficiency" cyclone capable of separating larger particles from the air.  *See, e.g.,* '515 patent, col. 4:3-48 (JA7).

Maytag contends that "oriented" means "cause" and that "tangentially to the interior surface of the outer container" means "perpendicular to the radius of the interior surface of the outer container at its point of entry."  Once again, Maytag is improperly attempting to read into the claims words that are not there.  The dirty air inlet must be "oriented" for supplying tangential air flow; the claim does not say that the inlet must "cause" the air to flow tangentially.  Indeed, the patent specification makes clear that the air inlet itself does not "cause" the air to flow into the container.  A motor driven fan unit or equivalent is necessary to cause the air to flow through the cyclonic apparatus. *See, e.g.,* '515 patent, elements 13, 54 & 121 (JA2-4); '748 patent, element 18 (JA15); '008 patent, element 19 (JA23).

When construing this term, the Court should consider the cyclonic apparatus of Maytag's infringing vacuum cleaner. *Wilson Sporting Goods*, 442 F.3d at 1326-27. As Mr. Jones explains in his reply affidavit, the Hoover Fusion has a tear-drop shaped dirty air inlet on its outer container that is oriented for supplying air tangentially to the interior surface of the container.  Jones Reply Aff. ¶ 9 & Ex. 31 (D135-36 &

D150). Although Maytag conceded at the preliminary injunction stage that the Fusion's outer container had a tear-drop shaped air inlet and that air does flow through that inlet tangentially to the inner surface of the container, it nevertheless asserted that the claim element is not satisfied because "the inlet that *causes* tangential flow in the Fusion vacuum cleaner is an insert that is separate and apart from the outer container . . . ." *See* Maytag's Brief in Opposition to Dyson's Motion for a Preliminary Injunction, filed Aug. 29, 2005 ("Maytag's PI Opp. Br."), at 8 (D156) (emphasis added). Thus, Maytag seeks to have this Court construe "oriented" to mean "cause" simply to bolster its non-infringement argument, not because it is required by the patent claims.

Moreover, the claims require only that the air inlet be oriented for supplying air "tangentially to the surface" of the inner cyclone, not that it be oriented for supplying air "in a direction perpendicular to the radius of the surface of the outer container at its point of entry." The patent claims use the word "tangentially," which means "in a tangential manner." "Tangential," in turn, commonly means "of, relating to, *or of the nature of a tangent.*" *See* Webster's Dictionary 2337 (emphasis added).[3] Thus, the patent claims require only that the air inlet be oriented so that air flows in the nature

---

[3]    A line tangent to a circle is a line that touches the circle at only one point. In the circle illustrated below, the line between points *T* and *P* is a tangent line.



*See* Eric W. Weisstein, "Circle Tangent Line," from *MathWorld*, a Wolfram Web Resource, http://mathworld.wolfram.com/CircleTangentLine.html (citing R.C. Jurgensen, *et al.* Th. 42 in *Modern Geometry: Structure and Method* (Houghton-Mifflin 1963)).

of a tangent; they do not require that the air flow in the exact direction of a tangent. If the patent claims were intended to require the air to travel in a perpendicular direction to a specified point, they would have so stated. In fact, the word "perpendicular" is used in that fashion in several other places in the patents-in-suit. *See, e.g.,* '748 patent, col. 5:23-24 & col. 5:65-66 (JA21) (describing a collar means "perpendicular to the longitudinal axis"); col. 6:64-65 (JA21) (describing a flange "perpendicular to the longitudinal axis of the container"); '008 patent, col. 3:36-39 (JA26) (describing a disc with a downwardly inclined angle alpha between 97.5 to 110 degrees or 7.5 to 20 degrees "from a line perpendicular to the axis"); *accord* '008 patent, col. 4:63-65 (JA26); col. 5:47-49 (JA27); col. 7:3-5 (JA28). That the patent claims here use the word "tangentially," and not "perpendicular," should be deemed purposeful. *Phillips*, 415 F.3d at 1314-15.

### Term # 4    "an air outlet from the container at an upper portion of the container"

The parties dispute the meaning of the phrase "upper portion of the container." Maytag asks the Court to construe this phrase to mean "at or near the top of the outer container," whereas Dyson contends that it means "the upper half of the outer container." For the same reasons set forth above in connection with Term 2, the Court should reject Maytag's proposed construction and adopt Dyson's. In construing "upper portion" to mean "at or near the top," Maytag is improperly attempting to restrict the clear language of the claims to cover only the features of the preferred embodiments shown in the drawings of the '515 and '748 patents. This construction is inconsistent with the patent specifications and the language of the claim elements, which establish that "upper portion" means upper half or above the midline.

-13-

**Term # 5**        **"a cyclone air inlet at an upper end . . . of the cyclone in air communication with the air outlet of the container"**

This term requires an air inlet near the top of the inner cyclone into which air from the outer container's air outlet can pass. Maytag seeks to construe the words "upper end" to mean "at the top" of the inner cyclone rather than simply "near the top." This narrow construction of "upper end" should be rejected because it would exclude the preferred embodiment of the invention shown in many of the drawings. In those drawings, the cyclone air inlet is near, but not at, the top of the inner cyclone. *See, e.g.,* '515 patent, Figs. 5 and 6 & elements 94 and109 (JA4-5); '748 patent, Fig. 1 & element 13f (JA15).

A construction that would result in a preferred embodiment falling outside the scope of a patent "is rarely, if ever, correct" and "require[s] highly persuasive evidentiary support." *Vitronics Corp.* v. *Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Maytag has adduced no such evidentiary support here. Moreover, the patent specifications elsewhere refer to the "top" of the outer container (*see, e.g.,* '515 patent, col. 5:3 & col. 6:8 (JA8)) and the "top" of other components (*see, e.g.,* '515 patent, col. 5:17-18 & col. 6:46-47 (JA8)); '008 patent, col. 2:66 (JA25)). This distinction between the "top" and the "upper end" should be deemed purposeful. *Phillips*, 415 F.3d at 1314-15.

**Term # 6**        **"which has a circular cross section"**

In the relevant patents, the phrase "which has a circular cross section" refers to the outer container of the cyclonic apparatus, not to the dirty air inlet as Maytag contends. First, the words "which has a circular cross section" immediately follow, and thus clearly modify, the words "outer container" in each of the patent claims. *See, e.g.,* '515 patent, col. 11:43-44 (JA11); '748 patent, col. 6:23-24 (JA21); '008 patent, col. 4:7-

-14-

8 (JA26); *cf.* 2A Sutherland Statutory Construction § 47:33 (6th ed.) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is 'the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence.'" (citations omitted)); *Anhydrides & Chems., Inc.* v. *United States*, 130 F.3d 1481, 1483 (Fed. Cir. 1997) (same). Second, Maytag does not dispute that the clause "which is oriented for supplying dirt laden air into the container tangentially to the interior surface of the outer container" found in the same claims refers to the dirty air inlet. *See, e.g.,* Maytag's proposed construction of Term 3 of the Claim Construction Chart. If the subsequent subordinate clause beginning with the word "which" were also intended to refer to the dirty air inlet, the word "and" would have been inserted before it.[4] Third, the patent specifications show that the inner surface of the container in the preferred embodiments has a circular cross-section, as it is cylindrical or conical in form. *See, e.g.,* '748 patent, Fig. 8 & element 11 (JA18); col. 1:58-61 (JA19); '515 patent, Figs. 1, 3 and 5 & element 14, 51 and 80 (JA2-4); col. 3:39-40 (JA7); col. 4:54-57 (JA7); '008 patent, Fig. 1 & element 11b (JA23); col. 2:54-56 (JA25); col. 5:24-25 (JA27). No similar description is made of the dirty air inlet to the outer container.

**Term # 7**     **"maintaining its velocity to a cone opening smaller in diameter than the diameter of the upper end of the cyclone"**

The words "maintaining its velocity" do not mean, as Maytag asserts, that the air flow in the cone-shaped cyclone must remain at a constant speed. Jones Reply

---

[4]     Claim No. 15 of the '748 patent, for example, reads "a dirty air inlet at an upper portion of the outer container spaced from the bottom *which* is oriented for supplying dirt laden air into the container tangentially to the interior surface of the outer container *which* has a circular cross section . . ." (emphasis added).

Aff. ¶ 10 (D136-37). Rather, a person skilled in the art of cyclonic vacuum cleaner

technology would understand this term to mean simply that the conical shape of the

cyclone assists in keeping the air flow moving. In his reply affidavit, Gareth Jones

explains:

> These words do not require that the air flow remain at a constant
> speed. Indeed, such an interpretation in the context of this
> patent—or any of the Patents in Suit for that matter—makes no
> sense because it is a recognized principle of cyclonic technology
> that air entering the top of a cone-shaped cyclone tangentially will
> continue to rotate (and accelerate) to the bottom of the cyclone. It
> is the acceleration that creates the centrifugal force necessary to
> separate finer dust particles from the air.

*Id.*

If Maytag's construction were accepted, the language would not cover the

preferred embodiments of any of the patents-in-suit. In the preferred embodiments, the

air accelerates as it flows through the inner, conical cyclone, as Gareth Jones explains in

his reply affidavit. *Id.* The '515 patent specification, for example, uses the word

"maintaining" to describe the air flow in a conical cyclone (col. 2:44 (JA6); col. 3:15

(JA7)) and describes such a cyclone as "serving to increase the velocity of the dirt

particles" (col. 4:9-10 (JA7)) or as creating "greater dust particle velocity" (col. 8:3

(JA9)). As previously noted, a construction that would exclude a preferred embodiment

"is rarely, if ever, correct" and "require[s] highly persuasive evidentiary support."

*Vitronics Corp.*, 90 F.3d at 1583. Maytag offers no such support here.

### Term # 8    "the air inlet being oriented for supplying air tangentially to the surface"

The parties dispute concerning this term is similar to that concerning

Term 3. The term requires only that the air inlet to the inner cyclone be oriented such

that the air flows from the outer container into the inner cyclone tangentially to the

surface, so that air rotates around the inner surface of the cyclone.  Yet Maytag would require that the inlet itself be physically "arranged to supply air to the surface [of the inner cyclone] in a direction perpendicular to the radius of the surface."  As written, however, the cyclone air inlet need only be "oriented" for supplying air tangentially; the claims do not say that the inlet must be "arranged to" cause such air flow.  In addition, the term at issue here requires only that the air inlet be oriented for supplying air "tangentially to the surface" of the inner cyclone, not that it be oriented for supplying air "in a direction perpendicular to the radius of the surface."  *See supra* pp. 12-13.  In short, Maytag's proposed construction of this term would improperly add requirements to the patent claims that do not exist.  *Phillips,* 415 F.3d at 1320; *Intervet,* 887 F.2d at 1053.

**Term # 9**     **"a dirt receiving and collecting chamber extending from the cone opening"**

The primary distinction between the parties' proposed constructions of this term is that Maytag's construction fails to clarify that the words "extending from the cone opening" describe a dirt collection chamber that starts at the cone opening *or a portion of the outer surface of the cyclone.*  This clarification is appropriate in view of the patent specifications and drawings.  The preferred embodiments of both the '748 and '008 patents describe a dirt collection chamber that extends beyond the cone opening to a portion of the outer surface of the cyclone.  *See, e.g.,* '748 patent, Fig. 1, element 15 (JA15); col. 3:29-31 (JA20) ("A portion of the cyclone 12 and cone opening 12c projects into a receiving and collecting chamber"); '008 patent, Fig. 1, element 20 (JA23); col. 3:8-10 (JA26) ("A portion of the cyclone 12 and the cone opening 12c projects into a receiving and collecting chamber").  Absent this clarification, a jury could erroneously conclude that the words "extending from the cone opening" mean that the dirt collection chamber *must* start at the cone opening.  *Cf. AFG Indus., Inc.* v. *Cardinal IG Co.,* 239

-17-

F.3d 1239, 1247 (Fed. Cir. 2001) ("It is critical for trial courts to set forth an express

construction of the material claim terms in dispute, in part because the claim construction

becomes the basis of the jury instructions, should the case go to trial.").  There is nothing

in the applicable patents that requires the dirt collection chamber to start at the cone

opening, and such a construction would exclude the preferred embodiments of the

patents.  *Vitronics*, 90 F.3d at 1583 (construction that excludes preferred embodiment "is

rarely, if ever, correct").

     **Term # 10**    **"means for generating an airflow"**

       The term "means for generating an airflow," as used in Claim No. 14 of

the '515 patent, refers simply to a motor driven fan unit and equivalents thereof.  The

"means for generating an airflow" in the patent specification is found at elements 13, 54

and 121 on the patent drawings, and these elements are described as a "motor driven fan

unit" or "fan unit."  *See, e.g.*, '515 patent, col. 3:32-33 (JA7); col. 4:54 (JA7); col. 5:58

(JA8).

       Maytag's proposed construction would go further, requiring that the motor

driven fan unit be "positioned vertically above and immediately adjacent the cyclone

outer part."  Such a construction is erroneous.  In the context of a claim containing

means-plus-function language, paragraph 6 of 35 U.S.C. § 112 does not permit

"incorporation of structure from the written description [or diagrams] beyond that

necessary to perform the claimed function."  *Micro Chem., Inc.* v. *Great Plains Chem.*

*Co.,* 194 F.3d 1250, 1258 (Fed. Cir. 1999); *see also Omega Eng'g, Inc.* v. *Raytek Corp.*,

334 F.3d 1314, 1321 (Fed. Cir. 2003) (when construing means-plus-function limitation,

first step is to identify claimed function; second step is to ascertain corresponding

structures that are "necessary to perform the claimed function") (citation omitted).  The

only thing necessary to perform the claimed function here—*i.e.,* generating an airflow—

is a "motor driven fan unit." To generate an airflow through the cyclonic apparatus, this

unit need not be placed in any particular location of the cyclonic apparatus. Indeed,

Maytag puts its motor driven fan unit below the container on the Fusion.

The patent specification expressly states that "[n]umerous variations in

cyclonic construction will occur to those skilled in the art" and that "[i]t is intended that

they be included within the scope of [the '515 patent]." *See* '515 patent, col. 8:44-46

(JA9). Maytag's proposed construction thus improperly incorporates additional

requirements beyond those necessary to perform the claimed function. *See Omega*, 334

F.3d at 1321; *Micro Chem.*, 194 F.3d at 1258-1259. It is clear that Maytag's proposed

construction of this term has more to do with the location of the motor driven fan unit on

the Fusion (*i.e.*, below the container) than it does with any requirement in the claim or

patent specification that the motor driven fan unit be "positioned vertically above and

immediately adjacent the cyclone outer part."

Even if it were proper to include the location of the motor driven fan unit

in the preferred embodiments when construing the phrase "means for generating an

airflow," the jury should be informed that any equivalent structure satisfies the patent

claim. 35 U.S.C. § 112 ¶ 6.

> **Term # 11**      **"a disc means provided on the outside of the cyclone**
>                     **intermediate the receiving chamber and the air outlet of the**
>                     **container and around to the longitudinal axis of the cyclone"**

This term requires only that there be a disc on the outside surface of the

inner cyclone between the dirt collection chamber and the air outlet of the outer container

and around the longitudinal axis of the inner cyclone. Jones Aff. ¶ 47 (D24-25).

Maytag's proposed construction improperly tries to restrict the language of this claim to

-19-

cover only the features of the preferred embodiment discussed in the patent specifications. *See Phillips*, 415 F.3d at 1320; *Gart*, 254 F.3d at 1342-43.

In support of its proposed construction, Maytag presumably will contend this term is a means-plus-function claim limitation because the word "means" follows the word "disc." Under paragraph 6 of 35 U.S.C. § 112, a means-plus-function claim limitation must be "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." For this provision to apply, however, the claim must provide for a "means or step for performing a specified function *without the recital of the material, or acts in support thereof.*" 35 U.S.C. § 112, ¶ 6 (emphasis added). Thus, "even if the claim element specifies a function, if it also cites sufficient structure or material for performing that function, § 112 ¶ 6 does not apply." *Allen Eng'g Corp.* v. *Bartell Indus. Inc.*, 299 F.3d 1336, 1347 (Fed. Cir. 2002) (citation omitted); *accord Phillips*, 415 F.3d at 1311. That is the case here.

The relevant patent claim explains not only the function of the disc means—to "retard[] long strands in the dirt from clogging the air outlet and retain[] the strands in the container"—but also, by its very name, its structure. A "disc" is commonly understood to be "a thin circular object." Webster's Dictionary 651. There is "simply no evidence to suggest that [this term] has any other than the dictionary definition." *Cole* v. *Kimberly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996) (holding that term "perforation" was sufficiently definite to fall outside of § 112, ¶ 6, even though claim at issue included the word "means"); *see also Allen Engineering Corp.*, 299 F.3d at 1347 (finding that words "friction disk means" were sufficient recitation of structure to fall outside scope of means-plus-function limitation).

-20-

The patent claim here also specifies the location and extent of the disc:  on the outside surface of the inner cyclone between the dirt collection chamber and the air outlet of the outer container and around the longitudinal axis of the inner cyclone with a physical space between the disc and the interior wall of the outer container so that air can pass through that space.  *See* '748 patent, col. 6:47-54 (JA21); Jones Aff. ¶¶ 47-48 (D24-25).  A finding of a means-plus-function limitation is improper where "[t]he claim describes not only the structure that supports the [] function, but also its location . . . and extent."  *See Cole*, 102 F.3d at 531.  Such specificity of structure, location and extent is entirely incompatible with the means-plus-function limitation.  *Id.*[5]

Maytag's attempt to construe "intermediate" to mean only "midway" is also improper.  The word "intermediate" commonly refers to any position between two extremes.  *See, e.g.,* Random House Webster's Unabridged Dictionary 995 (2d ed. 2001) (defining "intermediate" in preferred definition to mean "being, situated, or acting between to points, stages, things, persons, etc."); Webster's Dictionary 1180 (defining "intermediate" in preferred definition to mean, among other things, "between extremes or limits" or "coming or done in between").  "Intermediate" here—as Maytag's own expert apparently agreed with respect to Claim No. 1 of the '008 patent—means "between," not "in the middle."  Jones Reply Aff. ¶ 15 (D139-40).  In its opposition to Dyson's motion for a preliminary injunction, Maytag nevertheless argued that Figure 1 of the '748 patent and unspecified language of "the associated specification" support its "in the middle" construction.  *See* Maytag's PI Opp. Br. at 10 (D157).  Contrary to Maytag's assertion,

---

[5]    Even if the Court were to find that the claim at issue is encompassed by 35 U.S.C. § 112, ¶ 6, it should be construed to cover not only the corresponding structure, material, or acts described in the specification, but also "equivalents thereof."  35 U.S.C. § 112, ¶ 6.

the '748 patent specification does not describe or require the disc to be "in the middle" of

or at the midpoint between the receiving chamber and the cyclone air outlet. Maytag is

simply attempting to have this Court construe the claim language in a manner that it

believes will be more favorable to it when the claim requirement is compared to the

Fusion. Moreover, even if such language were found in the patent specification, it would

not be proper to import a limitation from the preferred embodiment into the claim

language. *Phillips*, 415 F.3d at 1320.

> **Term # 12**    **"a shroud means mounted on and around the outer surface of
> the cyclone and having opposed ends along the longitudinal
> axis and providing for outlet air from the container into the air
> inlet to the cyclone"**

This term requires a shroud designed to act as an air outlet from the outer

container to the air inlet of the inner cyclone that is mounted on and around the outer

surface of the cone-shaped inner cyclone and has opposing ends along the longitudinal

axis of the inner cyclone. Nothing in the '008 patent requires "a combined integral

shroud and disc unit," as Maytag contends. The references in the patent description to

the "combined" disc and shroud of the '008 patent, as opposed to the "separate" disc and

shroud of the '748 patent (*see* '008 patent, col. 1:24-30 (JA25)), do not relate to whether

the disc and shroud are "separate" components but to whether the disc and shroud are

"separate" in terms of distance from one another. Jones Reply Aff. ¶ 21 (D143-44).

Figure 1 of the '748 patent, reprinted at ¶ 21 of the Jones Reply Affidavit, shows that the

disc is not touching the bottom of the shroud, but rather is located some distance below it.

In contrast, Figure 2 of the '008 patent shows that the disc and shroud are "combined" in

the sense that they now touch.

Once again, Maytag's proposed construction presumably is based

on the contention that the term is subject to the means-plus-function limitations of

35 U.S.C. § 112, ¶ 6 because it contains the word "means." For reasons similar to those discussed above in connection with Term 11, this contention is erroneous. The relevant patent claims sufficiently explain the structure, location and extent of the shroud means to fall outside 35 U.S.C. § 112, ¶ 6. The word "shroud" in and of itself identifies the nature of the structure of the shroud means. Those skilled in the art of cyclonic vacuum cleaner technology understand that a "shroud" in a cyclonic vacuum cleaner is a covering with perforations that act like a screen to prevent larger, lightweight fibrous material from escaping the outer container. *See* Jones Aff. ¶ 15 (D7-8). This understanding is consistent with the common dictionary definition of "shroud," which is "something that covers, screens or guards." *See* Webster's Dictionary 2107. Any doubt on this point is dispelled by the patent claims' express references to the shroud as having "perforations" on it. *See* '008 patent, col. 4:42 (JA26); col. 6:50 (JA27); *see also Cole*, 102 F.3d at 531 (recognizing that perforations are commonly understood to be "hole[s] or [] a number of hole[s], bored or punched through something").

As was the case with the "disc means" in the '748 patent, the patent claims at issue here describe not only the structure of the shroud means, but also its location and relevant position: it is to be mounted on and around the outer surface of the cone-shaped inner cyclone, to have opposing ends along the longitudinal axis of the inner cyclone, to be positioned below the air inlet to the cone-shaped cyclone, to extend along the outer surface of the inner cyclone to a position somewhere before the cone opening at the bottom of the inner cyclone, to touch the outer surface of the inner cyclone at the point where the shroud ends, and to have perforations on it near the end of the shroud closest to the cone opening, so that air can pass through the perforations to the air inlet of the inner

cyclone. *See* Jones Aff. ¶¶ 61-64 (D29-31); '008 patent, col. 4:31-45 (JA26); col. 6:38-
53 (JA27); *see also infra* discussion of Terms 13 and 14, pp. 24-26. It thus would be
entirely inappropriate to impose a means-plus-function limitation to Term 12.[6] *Phillips*,
415 F.3d at 1311; *Cole*, 105 F.3d at 531.

        The Court also should consider the Hoover Fusion's structure when
determining whether the claim element requires "a combined integral shroud and disc
unit." *Wilson Sporting Goods*, 442 F.3d at 1326-27. As Mr. Jones explains in his reply
affidavit, the Fusion has a disc and shroud that, although separate components, are
combined in the sense that they touch one another and are attached together by screws.
*See* Jones Reply Aff. ¶ 21 & Ex. 35 (D143-44 & D154). Maytag's proposed
construction, which would require the shroud and disc to be one "integral" component, is
simply an effort to have this Court construe the claim elements in a manner that it hopes
will make the Fusion fall outside the claim.

Term # 13        **"wherein the shroud means is mounted at one end below the
                 air inlet to the cyclone and extends along the outer surface with
                 the other end at a position intermediate to the cone opening
                 and the air inlet to the cyclone"**

        This term requires that the shroud be positioned below the air inlet to the
cone-shaped cyclone and extend along the outer surface of the inner cyclone to a position
somewhere before the cone opening at the bottom of the inner cyclone. Jones Aff. ¶ 62
(D30). Maytag contends that no construction is required for this term. But given
Maytag's prior contention that "intermediate," as used in the patents-in-suit, means "in

---

6        As with Term 12, even if the Court were to find that the claims are encompassed by 35
         U.S.C. § 112, ¶ 6, they should be construed to cover not only the corresponding structure,
         material, or acts described in the specification, but also "equivalents thereof." 35 U.S.C.
         § 112, ¶ 6.

the middle" (*see* discussion of Term 11, *supra*), some clarification is appropriate. The word "intermediate" simply means between—and is not limited to "in the middle"—and the end of the shroud closest to the cone opening need only be positioned somewhere before the cone opening of the cyclone—*i.e.*, between the cone opening and the air inlet. As previously discussed, the word "intermediate" commonly refers to any position between two extremes. *See supra* pp. 21-22. Figure 1 of the '008 patent confirms this construction. JA23. In that drawing, the end of the shroud (element 30) closest to the cone opening (element 12c) is between the cone opening and the air inlet (element 13k), not "in the middle" of those two points. Any construction of "intermediate" to mean "in the middle" thus would exclude the preferred embodiment of the technology described in the '008 patent. Such a construction is rarely, if ever, correct. *Vitronics Corp.*, 90 F.3d at 1583.

**Term # 14**   **"wherein the shroud means has perforations adjacent to the position intermediate to the cone opening for the flow of air from the outer container to the cyclone inlet"**

Maytag states that no construction is required for this term. In its papers opposing Dyson's motion for a preliminary injunction, however, Maytag implied that the word "adjacent" requires that the perforations on the shroud be immediately next to the cone opening. That construction is incorrect. Although the '008 patent specification states that "[i]t has been found that having the perforations 30f *immediately adjacent* the disc 30b provides an advantage in separation" (col. 3:57-59 (JA26) (emphasis added)), the claim element is broader, requiring only that the perforations be "adjacent to," *i.e.*, near, the position intermediate the cone opening. Jones Reply Aff. ¶ 20 (D142-43). The word "immediately" is not present in the claim, and cannot properly be read into it. *See Phillips*, 415 F.3d at 1320; *Intervet,* 887 F.2d at 1053. Dyson's proposed construction

-25-

properly clarifies that the word "adjacent" requires only that the shroud have perforations near the end of the shroud.

      **Term # 15**      **"disc means provided on the shroud means at a lower longitudinal extent of the shroud means and the air inlet of the cyclone and around the axis of the cyclone"**

      Maytag states that no construction is required for this term either, but Maytag's prior statements again suggest otherwise. In opposing Dyson's preliminary injunction motion, Maytag argued that the words "provided on" require that the disc and shroud be one integral component. This construction improperly attempts to read into the claim words that are not there. *Gart*, 254 F.3d at 1342-43; *Intervet Am.*, 887 F.2d at 1053; *see also supra* pp. 22-24. Nothing in the '008 patent requires that the disc and shroud be one component, and the patent specification makes clear that the words "provided on" simply require that the disc be attached to the bottom of the shroud. Jones Reply Aff. ¶ 21 (D143-44). The references in the patent description to the "combined" disc and shroud of the '008 patent, as opposed to the "separate" disc and shroud of the '748 patent (*see* '008 patent, col. 1:24-30 (JA25)), do not relate to whether the disc and shroud are "separate" components, but to whether the disc and shroud are "separate" in terms of distance from one another. Jones Reply Aff. ¶ 21 (D143-44).

      The claim element therefore is met if there is a disc that surrounds the axis of the inner cyclone and touches the bottom portion of the shroud, so that the air inlet is above the shroud ('008 patent, col. 4:35-36 (JA26)) and the disc is at a lower longitudinal extent of the shroud ('008 patent, col. 4:46-48 (JA26)). Jones Reply Aff. ¶ 22 (D144).

**Term # 16**    **"having a tangential air inlet located at or adjacent the end of
the cyclone having the larger diameter"**

This term requires a tangential air inlet at or adjacent the end of the inner

cyclone having the larger diameter, which is the end of the inner cyclone nearest the top

of the container. Jones Aff. ¶ 80 (D35). Maytag's proposed construction incorrectly

suggests that the air inlet itself must cause the air to flow into the cyclone tangentially by

being positioned "in a direction perpendicular to the radius of the cyclone." The patent

specification makes clear that the words "tangential air inlet" in the '038 patent are a

short-hand reference to an air inlet like that on the cyclones in the other patents-in-suit,

*i.e.*, one that is oriented for supplying air tangentially to the interior surface of the

cyclone. *See, e.g.*, "References Cited" section of '038 patent, listing among others, the

'515 and '008 patents (JA29); '038 patent, col. 1:20-22 (JA34) (explaining that in typical

frusto-conical cyclone, "an airflow carrying dirt and dust with it enters the cyclone via

the air inlet and, *by virtue of the tangential orientation of the air inlet*, is set into a

swirling motion over the interior surface of the cyclone.") (emphasis added). Thus, for

the reasons discussed above in connection with the cyclone air inlets described in the

other patents-in-suit (*see supra* p. 17), the cyclone air inlet described in the '038 patent

should not be construed in a manner that would require the air inlet itself to cause the air

to flow into the cyclone tangentially. It simply needs to be oriented for supplying

tangential air flow. In addition, for reasons discussed above (*see supra* pp. 12-13 & 16-

17), a "tangential" air flow is not the same as an air flow that is "perpendicular to the

radius of the cyclone," and Maytag's attempt to read words into the claim that are not

there should be rejected. *Philips,* 415 F.3d at 1320; *Intervet*, 887 F.2d at 1053.

-27-

## CONCLUSION

For the foregoing reasons, the Court should adopt Dyson's proposed claim construction for the disputed terms of the patents-in-suit.

Dated: May 26, 2006

YOUNG CONAWAY STARGATT & TAYLOR, LLP

C. Barr Flinn (No. 4092)
John W. Shaw (No. 3362)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

*Attorneys for Plaintiffs*

OF COUNSEL

Garrard R. Beeney
Richard C. Pepperman, II
James T. Williams
Keith McKenna
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

Steven F. Reich
Jeffrey S. Edelstein
Tamar Feder
MANATT, PHELPS & PHILLIPS, LLP
7 Times Square
New York, New York  10036
(212) 790-4500

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on May 26, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Francis DiGiovanni, Esquire
> CONNOLLY BOVE LODGE & HUTZ LLP
> The Nemours Building – 8th Floor
> 1007 N. Orange Street
> Wilmington, Delaware 19801

I further certify that on May 26, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following in the manner indicated:

> **BY FEDEX**
>
> Ray L. Weber, Esquire
> Laura J. Gentilcore, Esquire
> RENNER, KENNER, GREIVE, BOBAK,
>   TAYLOR & WEBER
> 400 First National Tower
> Akron, OH 44308

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> C. Barr Flinn (No. 4092)
> John W. Shaw (No. 3362)
> Adam W. Poff (No. 3990)
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801
> (302) 571-6600
> apoff@ycst.com
>
> *Attorneys for Dyson Technology Limited*
>   *and Dyson, Inc.*