IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DYSON TECHNOLOGY LIMITED )
and DYSON, INC. )                    Case No. C.A. 05-434-GMS
)
Plaintiffs, )
v. )
)
MAYTAG CORPORATION, )
)
Defendant )

## DEFENDANT MAYTAG CORPORATION'S
## OPENING CLAIM CONSTRUCTION BRIEF

Francis DiGiovanni (#3189)
Stephanie O'Byrne (#4446)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899
Phone (302) 658-9141
Facsimile (302) 658-5614

*Attorneys for Defendant Maytag Corporation*

OF COUNSEL:
Ray L. Weber
Laura J. Gentilcore
RENNER, KENNER, GREIVE, BOBAK,
   TAYLOR & WEBER
400 First National Tower
Akron, OH 44308
Phone (330) 376-1242
Facsimile (330) 376-9646

Stephen P. Durchslag
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Phone: (312) 558-5600
Facsimile: (312) 558-5700

Dated: May 26, 2006

# TABLE OF CONTENTS

**PAGE**

I.     Claim Construction in General ........................................................................................1

II.     Rules of Claim Construction .......................................................................................2

III.     Maytag's Proposed Claim Constructions ....................................................................5

      Term No. 1 ....................................................................................................................5

      Term No. 2 ....................................................................................................................7

      Term No. 3 ....................................................................................................................8

      Term No. 4 ....................................................................................................................9

      Term No. 5 ..................................................................................................................10

      Term No. 6 ..................................................................................................................12

      Term No. 7 ..................................................................................................................13

      Term No. 8 ..................................................................................................................15

      Term No. 9 ..................................................................................................................16

      Term No. 10 ................................................................................................................17

      Term No. 11 ................................................................................................................18

      Term No. 12 ................................................................................................................20

      Term No. 13 ................................................................................................................21

      Term No. 14 ................................................................................................................22

      Term No. 15 ................................................................................................................23

      Term No. 16 ................................................................................................................24

IV.     Conclusion ..................................................................................................................25

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Acco Brands, Inc. v. Micro Sec. Devices, Inc.*,
    346 F.3d 1075 (Fed. Cir. 2003) ................................................................................4

*ACT TV, Inc. v. The Walt Disney Company*,
    346 F.3d 1082 (2003) ...............................................................................................4

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ................................................................................3

*Astrazeneca AB v. Mutual Pharmaceutical Co, Inc.*,
    384 F.3d 1333 (Fed. Cir. 2004) ................................................................................2

*Autogiro Co. of Am. v. United States*,
    384 F.2d 391 (Ct. Cl. 1967) ......................................................................................3

*Brookhill-Wilk 1 LLC v. Intuitive Surgical, Inc.*,
    334 F. 3d 1294 (Fed. Cir. 2003) ...............................................................................2

*Cole v. Kimerbly-Clark Corp.*,
    102 F.3d 524 (Fed. Cir. 1996) ..................................................................................4

*Johnson & Johnston Associates, Inc. v. R. E. Service Co., Inc.*,
    285 F.3d 1046 (Fed. Cir. 2002) ................................................................................3

*K2 Corp. v. Salomon S. A.*,
    191 F.3d 1356 (Fed. Cir. 1999) ................................................................................4

*Laitram Corp. v. Rexnord, Inc.*,
    939 F.2d 1533 (Fed. Cir. 1991) ................................................................................4

*Markman v. Westview Instruments, Inc.*,
    52 F. 3d 967 (Fed. Cir. 1995) (e*n banc*), *aff'd*, 116 S. Ct. 1384 (1996) ....................1

*Micro Chemical, Inc. v. Great Plains Chemical Co.*,
    194 F.3d 1250, (Fed. Cir. 1999) ...............................................................................4

*Oak Technology, Inc. v. ITC*,
    248 F.3d 1316 (Fed. Cir. 2001) ................................................................................3

*Perkin-Elmer v. Westinghouse Elec. Corp.*,
    822 F. 2d 1528 (Fed. Cir. 1987) ...............................................................................5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................................1, 2

*PSC Computer Products, Inc. v. Foxconn Int'l, Inc.*,
    355 F.3d 1353 (Fed. Cir. 2004) ......................................................................3

*RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*,
    326 F.3d 1255 (Fed. Cir. 2003) ......................................................................3

*SRI Int'l v. Matsushita Elec. Corp. of America*,
    775 F.2d 1107 (Fed. Cir. 1985) ......................................................................3

*Superguide Corp. v. DirecTV Enterprises, Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ........................................................................3

*Teleflex, Inc. v. Ficosa North America Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ......................................................................2

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) ......................................................................2

*United States v. Adams*,
    383 U.S. 39 (1966) ..........................................................................................1

*Vanderlande Industries Nederland BV v. ITC*,
    366 F. 3d 1311 (2004) .....................................................................................1

*Vitronics Corp. v. Conceptron IC, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .....................................................................1, 5

*York Products, Inc. v. Central Tractor Farm & Family*,
    99 F.3d 1568 (Fed. Cir. 1996) ........................................................................4

## Statutes

35 U.S.C. § 112................................................................................................passim

Now comes Defendant, Maytag Corporation ("Maytag"), and presents its opening brief on the construction to be given to claim terms at issue in this matter. The parties submit herewith their Joint Appendix For Opening Claim Construction Briefs, containing copies of the patents-in-suit, to wit: Patent 4,826,515 ("the '515 patent"); Patent 4,643,748 ("the '748 patent"); Patent 4,853,008 ("the '008 patent"); and Patent 5,858,038 ("the '038 patent"). Reference herein to the Joint Appendix is made by the designation "JA ___," and/or by reference to particular portions of the patents by column ("col.") and by line ("l.").

## I.    Claim Construction in General

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F. 3d 967,979 (Fed. Cir. 1995) (*en banc*), a*ff'd*, 116 S. Ct. 1384, 1393 (1996). The claims of a patent are to be construed in light of the patent specification, and both are to be read with a view of ascertaining the invention. *United States v. Adams*, 383 U.S. 39, 49 (1966). The goal is to determine what a person of ordinary skill in the art would understand the claims to mean. *Phillips v. AWH* Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005); *Vanderlande Industries Nederland BV v. ITC*, 366 F. 3d 1311, 1318 (2004).

In construing claims, a court should first address the intrinsic evidence of the patent itself, including the claims, the patent specification, and prosecution history. *Markman*, 52 F.3d at 979. The court should first look to the claims themselves, both those asserted and those not asserted in the litigation, to determine the scope of the patented invention. *Phillips*, 415 F.3d at 1314. It is then always necessary to review the patent specification to determine if the inventor used any of the words, terms or phrases of the patent claims inconsistently with their ordinary meaning. See *Vitronics Corp. v. Conceptron IC, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The court may then look to the prosecution history of the patent, if the same is in evidence, with regard to representations made to the Patent Office regarding the claims. *Id.*

Resort may also be made to extrinsic evidence, such as the testimony of experts, if needed to assist in determining the meaning or scope of technical terms in the claims. *Vitronics*,

90 F. 3d at 1583. In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent to lay people. Claim construction in such cases involves nothing more than the application of widely accepted meanings of commonly understood words. *Phillips*, 415 F.3d at 1314. In such circumstances, resort can be made to general purpose dictionaries. *Id.*

While there is typically a presumption that the ordinary and customary meaning of words and phrases of a claim are to apply, the presumption is overcome if the patentee, acting as his or her own lexicographer, has clearly set forth an explicit definition of the term different from its ordinary meaning, or if the inventor has disavowed or disclaimed scope of coverage by using words or expressions of manifest exclusion or restriction representing a clear disavowal of claim scope. *Astrazeneca AB v. Mutual Pharmaceutical Co, Inc.*, 384 F.3d 1333, 1337 (Fed. Cir. 2004). Moreover, a dictionary definition inconsistent with the specification is to be rejected. *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002). Indeed, the general meanings gleaned from reference sources such as dictionaries or the like must be compared against the use of the words, terms or phrases in context, and the intrinsic record of the patent must be consulted to determine what definition, if any, offered by the dictionary or resource is most consistent with the use of words by the inventor. *Brookhill-Wilk 1 LLC v. Intuitive Surgical, Inc.*, 334 F. 3d 1294, 1300 (Fed. Cir. 2003). The patent specification should be used to assist in resolving ambiguity when the ordinary and customary meaning of words in the claims would lack sufficient clarity to permit the scope of the claim to be determined, or where there is an inherent intent to deviate from the ordinary and customary meaning of a claim word or term. *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

## II.    Rules of Claim Construction

While claim construction is undertaken with resort first to the intrinsic record and then to extrinsic evidence in order to ascertain the true meaning of the claims as would be understood by

one skilled in the art, the exercise is fraught with rules and caveats that must be considered along the way. The following treats those relevant here.

While recourse must always be made to the patent specification in order to gain an appreciation of the claims, a cardinal rule of claim construction is "Specifications teach. Claims claim." *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985). "Consistent with its scope definition and notice functions, the claim requirement presupposes that a patent applicant defines his invention in the claims, not in the specification. After all, the claims, not the specification, provide the measure of the patentee's right to exclude." *See PSC Computer Products, Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1359 (Fed. Cir. 2004), citing *Johnson & Johnston Associates, Inc. v. R. E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002). In other words, while reference may be made to the specification in order to determine the meaning of claim language, and while "understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim." *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). Cardinally, "[c]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth." *Oak Technology, Inc. v. ITC*, 248 F.3d 1316, 1329 (Fed. Cir. 2001), citing *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967).

Just as it is improper to import limitations from the patent specification into the claims, it is equally improper to read a limitation from one claim into another, whether for purposes of determining validity or infringement. *SRI Int'l*, 775 F.2d at 1122. There is a presumption that different claims are of different scopes. *See Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003); *RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003).

Some claims are written in the format of a means-plus-function limitation, provided for under 35 U.S.C. § 112, ¶ 6. Where the word "means" appears in the claim in association with a function, there is a presumption that § 112, ¶ 6 applies, but the presumption collapses where the

claim itself recites the structure or device to perform the claimed function. *Micro Chemical, Inc. v. Great Plains Chemical Co.*, 194 F.3d 1250, 1257 (Fed. Cir. 1999).

A means-plus-function claim limitation is construed by first identifying the function that the means-plus-function element performs and then looking to the written specification to identify the structure corresponding to that function. "A means-plus-function claim encompasses (i.e., is construed to include) all structure in the specification corresponding to that element and equivalent structures." *Micro Chemical*, 194 F.3d at 1258. *See also ACT TV, Inc. v. The Walt Disney Company*, 346 F.3d 1082, 1087 (2003).

However, not every use of the word "means" involves a means-plus-function limitation. As stated above, when the word "means" is accompanied by the identification of an element or structure that performs the function, the provisions of 35 U.S.C. § 112, ¶ 6, do not apply. *See York Products, Inc. v. Central Tractor Farm & Family*, 99 F.3d 1568, 1574 (Fed. Cir. 1996). Indeed, the "perfunctory addition of the word means" to an otherwise known device or structure does "not somehow magically transform this element into a §112, ¶ 6, means-plus-function limitation. *Cole v. Kimerbly-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1996). Moreover, "the judicially developed guide to claim interpretation known as 'claim differentiation' cannot override the statute (§112, ¶ 6)." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). In other words, the mere fact that a dependent claim may set forth with particularity the structure of a means-plus-function limitation in an independent claim is something that "simply will have to be tolerated." *Id.*

A patent claim directed to a structure may also include functional language that serves as an additional limitation in the claim. In other words, where structure is defined in a particular relationship to achieve a particular function or operation, the functional relationship or operation of the structural components are considered an additional claim limitation requiring construction. *See K2 Corp. v. Salomon S. A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) and *Acco Brands, Inc. v. Micro Sec. Devices, Inc.*, 346 F.3d 1075, 1078 (Fed. Cir. 2003).

Throughout, it must be remembered that claim construction begins with the language of the claims, themselves. *Vitronics*, 90 F.3d at 1582. Specific claim limitations may not be ignored as insignificant or immaterial. *Perkin-Elmer v. Westinghouse Elec. Corp.*, 822 F. 2d 1528, 1533 n. 8 (Fed. Cir. 1987).

## III.    Maytag's Proposed Claim Constructions

Maytag has presented its proposed claim constructions on all the terms at issue in this case in the Amended Joint Submission Of Claim Construction Charts filed herein. Those charts include claim terms for which the construction is contested, as well as claim terms upon which the parties have reached agreement. This Brief treats the former, and particularly the claims chart entitled Claim Terms From The Asserted Patents That Dyson And/Or Maytag Contend Require Construction By The Court. It will be noted from that chart that it is Maytag's contention that the vast majority of the contested terms should simply be accorded their ordinary meaning. Accordingly, Maytag routinely advances the ordinary meaning of the contested terms, and demonstrates support for such meanings from the patents themselves. In contradistinction to Maytag's approach, Dyson repeatedly seeks to read extraneous limitations from the specifications into the claims, effectively rewriting the claims by either adding or deleting limitations, or ignoring the plain and ordinary meaning of the terms employed.

**Term No. 1**

The contentions of the parties regarding Term No. 1 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 1 | '515 [14]<br><br>'748 [15]<br><br>'008 [1, 23] | "dirty air inlet" [to outer container] | an opening via which the dirty air sucked up by the vacuum cleaner flows into the outer container of the cyclonic apparatus<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, elements 16, 58, 86; Col. 4:38-43; Col. 5:59-62; Col. 5:64-67; Col. 6:66-7:1; Col. 7:55-56; Col. 12:24-25<br>'748 patent, elements 13b and 13c; Col. 1:64-2:5; | a passage by which dirty air flows into the outer container of the cleaning apparatus<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, elements 16, 57, 86; col. 4, ll. 59-65; col. 5, l. 64 – col. 6, l. 2; col. 6, l. 66 - col. 7, l.1<br>'748 patent, element 13b; col. 3, ll. 18- |

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| | | | Col. 2:42-46; Col. 3:18-21; Col. 6:20-21 '008 patent, element 13b; Col. 2:1-4; Col. 2:59-62; Col. 3:40-41; Col. 3:63-65; Col. 4:5-6 | 19 '008 patent, element 13b; col. 2, ll. 59-62 |

The parties agree from their definitions that "dirty air" does not need to be construed. Accordingly, the only term for construction is the word "inlet" as used in association with the term "dirty air." Resort to the patents themselves, as designated by Maytag, makes it clear that the referenced element is consistently referred to as a "dirty air inlet passage." Nowhere is it referred to as an "opening" as suggested by Dyson. Indeed, Dyson's references to the patents themselves demonstrate an absence of the term "opening."

Moreover, there is absolutely no basis in the claim term itself for the phrase "sucked up by the vacuum cleaner" or "of the cyclonic apparatus" as suggested by Dyson. Dyson seeks to read extraneous limitations into the claim. As a starting point, none of the claims in issue are directed to a "vacuum cleaner." Instead, they are directed to a "cleaning apparatus."

In sum the claim term "dirty air inlet" is consistently referred to within the patent by the designation "dirty air inlet passage" and the claim term in issue makes no reference to "sucked up by the vacuum cleaner" or "cyclonic apparatus." The construction offered by Maytag adopts the ordinary meaning of the words and is fully consistent with the patent claims and their specifications.

**Term No. 2**

The contentions of the parties regarding Term No. 2 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 2 | '515 [14]<br><br>'748 [15] | "an upper portion of the outer container" | a portion of the outer container that is above the midline of the outer container<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Col. 5:3; Col. 5:17-18; Col. 6:8; Col 6:46-47; Col. 8:44-46; Col. 11:36-12:12<br>'748 patent, Col. 4:35-37; Col. 6:17-54 | at or near the top of the outer container<br><br>*See, e.g*:<br>ordinary meaning of the claim language<br>'515 patent, elements 16, 57, 86 as shown in drawings<br>'748 patent, elements 13b, 13c as shown in drawings |

As is apparent from the claims themselves, the term in issue deals with the location of the dirty air inlet - - being "at an upper portion of the outer container." The common meaning of that term would locate the dirty air inlet at or near the top of the outer container, as proposed by Maytag. That is clearly consistent with the location of the inlets 16, 57 and 86 in the drawings of the '515 patent. (JA 2-5). There, the dirty air inlet passage 16 is clearly at or near the top of the outer container 10; the dirty air inlet passage 57 is at or near the top of the outer container 51; and the dirty air inlet passage 86 is in the head 84, which is positioned above the outer container 80 and is thereby at or near the top thereof. As to the '748 patent, it is clear that the dirty air inlet passage 13b, with an inlet port 13c, is in the head 13 that is positioned above the outer container 11, again positioning it "at or near the top of the outer container." (JA 15,20). Clearly, the patent specifications and drawings demonstrate that the dirty air outlet is at or near the top of the outer container.

Again, Dyson seeks to read limitations into the claim that have no basis there. The patent specifications make absolutely no mention of a "midline of the outer container," but Dyson suggests that such is the demarcation to define an "upper portion." Not only does Dyson's suggestion have no support in the patents themselves, but it belies the fact that the outer containers have a mid portion, as well as an upper portion and lower portion. It is rather arbitrary of Dyson to simply cut the outer container in half, designating anything above the midline as being an upper portion. Indeed, there is no basis in the patents for that arbitrary construction.

Clearly, all of the embodiments of the '515 and '748 patents position the dirty air inlet passages at or near the top of the outer container, consistent with the ordinary meaning of the term "at an upper portion of the outer container." There is otherwise no definition in the patents themselves of that term.

**Term No. 3**

The contentions of the parties regarding Term No. 3 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 3 | '515 [14]<br><br>'748 [15]<br>'008 [1, 23] | "oriented for supplying dirty laden air into the container tangentially to the interior surface of the outer container" | configured to allow dirt laden air sucked up by the vacuum cleaner to flow into the container tangentially to the interior surface of the container<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Col. 4:3-48<br>'748 patent, Col. 2:39-45; Col. 5:23-24; Col. 5:65-66; Col. 6:64-65<br>'008 patent, Col. 2:1-3; Col. 3:36-39; Col. 4:63-65; Col. 5:47-49; Col. 7:3-5 | arranged to cause dirt laden air to enter the container in a direction perpendicular to the radius of the interior surface of the outer container at its point of entry<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, drawings and col. 5, ll. 64-67; col. 4, ll. 59-62<br>'748 patent, Fig. 1 and col. 2, ll. 14-15<br>'008 patent, Fig. 1 and col. 2, ll. 59-62 |

Here, the parties have a slight disagreement as to the definition of "oriented." Maytag presents that "oriented" means "arranged" (aligned or positioned) - - its ordinary meaning. (*See* Exhibit A hereto). In contradistinction, Dyson suggests that "oriented" means "configured," but the word "configured" is actually directed to the construction or make-up of the dirty air inlet

8

passage, rather than its orientation (arrangement or positioning). Further, Dyson again attempts to read extraneous limitations into the claim by adding the term "sucked up by the vacuum cleaner," when the claims make no reference to a vacuum cleaner nor air being sucked up thereby.

Dyson suggests that the phrase "tangentially to the interior surface of the outer container," requires no construction. This assumes that the word "tangentially" will be understood by a jury applying the claims to the accused products and the prior art. The offering by Maytag provides the ordinary definition of "tangentially" as being "in a direction perpendicular to the radius." In the context of the claim where the "outer container. . . has a circular cross-section," the proffered definition is consistent with the dictionary definition. (*See* Exhibit A). The specifications of the patents suggest nothing different. Accordingly, Maytag offers a construction totally consistent with the claim term itself, and with a definition of the word "tangentially," which it believes should be defined. Clearly, the claim term indicates that the dirt laden air enters the container (through the dirty air inlet) in a direction perpendicular to the radius of the interior surface of the container at its point of entry.

The Maytag definition is totally consistent with the claim language, the specification and drawings of the patents, and the ordinary and customary meaning of the words "oriented" and "tangentially," the only words of the term suggested by the parties as requiring construction.

### Term No. 4

The contentions of the parties regarding Term No. 4 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 4 | '515 [14] '748 [15] | "an air outlet from the container at an upper portion of the container" | an air outlet in the upper half of the outer container through which the air circulating in the outer container can move from that container into the inner, cone-shaped cyclone mounted within the container<br><br>*See, e.g.*:<br>ordinary meaning of the claim language | an air outlet from the container at or near the top of the container<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Fig. 5; col. 6, l. 62 - col. 7, l. 7<br>'748 patent, Fig. 1; col. 3, ll. 11 -26 |

| | | | '515 patent, Fig. 5; element 25; Col. 5:3 -11; element 66; Col. 5:17 -18; Col. 6:8; Col. 6:13-17; elements 90 and 91; Col. 6:46-47; Col. 6:62 – 7:4; Col. 11:36-12:12<br>'748 patent, abstract; element 13d; Fig. 1; Col. 1:7 -9; Col. 1:23-26; Col. 2:26-38; Col. 3:11-26; Col. 3:50 -54; Col. 6:17 -54 | |

This claim term should be construed consistently with Term No. 2. Here again, the issue is what is intended by "an upper portion of the [outer] container." The '515 patent shows and describes an outlet passage 90 in outlet port 91 that is maintained in the head 84 positioned above ("at or near") the top of the outer container 80. *See* Fig. 5 of the '515 patent, and col. 6, l. 62, - col. 7, l. 7. (JA 4, 8, 9). In the '748 patent, the outlet passage 13f is provided in the head 13 maintained above the outer container 11 and, accordingly, the outlet passage 13f is at or near the top of the container 11. (JA 15, 20).

Dyson again arbitrarily divides the outer container in half, absent any support in the specification and drawings. It disregards that the containers may have a middle portion separating upper and lower portions, or any number of portions for that matter. Further, Dyson reads extraneous limitations into the claim such as "through which the air circulating in the outer container can move from that container into the inner, cone-shaped cyclone mounted within the container." This language has absolutely no basis in the claim term under consideration and is nothing more than a reading of an extraneous limitation into the claim apart from any need for construing the claim.

## Term No. 5

The contentions of the parties regarding Term No. 5 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 5 | '515 [14]<br>'748 [15]<br>'008 [1, 23] | "a cyclone air inlet at an upper end . . . of the cyclone in air communication | an air inlet near the top of the inner cyclone into which air from the outer container's air outlet can pass<br><br>*See, e.g.*: | an air inlet at the top of the cyclone, having a first diameter, in air passing communication with the air outlet of the container |

| | | with the air outlet of the container" | ordinary meaning of the claim language<br>'515 patent, Figs. 1, 3, 5 and 6; elements 22, 63, 94 and 109; Col. 2:38-41; Col. 5:3; Col. 5:17-18; Col. 6:8; Col. 6:46-47<br>'748 patent, Fig. 1; element 13f; Col. 3:18-21<br>'008 patent, Fig. 1; Col. 2:59-63; Col. 2:66 | *See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Fig. 5; col. 6, l. 57 – col. 7, l. 20<br>'748 patent, Fig. 1; col. 3, ll. 10-26<br>'008 patent, Fig. 1; col. 2, ll. 50 – col. 3, l. 68; col. 3, ll. 40-56 |

The claim limitation speaks of an "air inlet <u>at</u> an upper end . . . of the cyclone." (emphasis added). The parties agree in their definitions that "upper end" means "top." The word "at," however, does not mean "near" as suggested by Dyson. That portion of the term simply means what it says - - the air inlet is <u>at</u> the top of the cyclone.

The limitation further requires that the air inlet be "in air communication with the air outlet of the container." Simply stated, the air inlet is in air passing communication with the air outlet. This definition is clearly apparent from the term itself, and consistent with the patents' teachings. The '515 patent, at col. 6, l. 57 – col. 7, l. 20 teaches and shows "a flexible tube 92 connects the outlet port 91 to an inlet port 93." (JA 8-9). This structure, shown in Fig. 5, is clearly at the top of the cyclone. (JA 4). The '748 patent shows the same type of structure in Fig. 1, and describes it at col. 3, ll. 10-26, where it is noted that "tube 14 connects the outlet port 13g to an inlet port 13f." (JA 15, 20). Again, this arrangement is clearly at the top of the cyclone. In the '008 patent, as shown in Fig. 1 and described at col. 3, ll. 40-56, the air from the container 11 moves "up through passage 13h defined by shroud unit 30 and wall 12b. The air then moves into the inlet passage 13k of head 13 and into the inner cyclone 12." (JA 23, 26). Again, all of this structure is at the top of the cyclone, as is clearly apparent from the drawings of each of the three patents.

It is also noted at this point, that Maytag has advanced a construction of the phrase "having a first diameter," which is part and parcel of the term to be construed.

11

Here again, Dyson has chosen to gratuitously add the term "inner" in association with the cyclone referenced in the claim. This term has absolutely no basis in the claim, and is nothing more than the adding of an extraneous limitation to the claim from the specification or otherwise.

In essence, the patent specifications and drawings all show communication from an outlet of the container to an inlet of the cyclone at an upper end (at the top) of the cyclone. To the extent that this claim term requires construction, it should be construed accordingly.

### Term No. 6

The contentions of the parties regarding Term No. 6 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 6 | '515 [14] '748 [15] '008 [1, 23] | "which has a circular cross section" | the outer container has a circular cross section<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Figs. 1, 3 and 5; elements 14, 51 and 80; Col. 3:39-40; Col. 4:54-57; Col. 4:68; Col. 5:59-63; Col. 6:5; Col. 6:35-37; Col. 6:62-63; Col. 11:43-44<br>'748 patent, Fig. 8; element 11; Col. 1:58-61; Col. 1:67 – 2:3; Col. 2:43-47; Col. 6:23-24<br>'008 patent, Fig. 1; element 11b; Col. 1:66 – 2:4; Col. 2:54-56; Col. 4:7-8; Col. 5:24-25; Col. 6:16-17 | the dirty air inlet has a circular cross section<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Figs. 1, 3, 5; col. 4, ll. 59-65; col. 5, l. 64 – col. 6, l. 2; col. 6, l. 57 – col. 7, l. 4<br>'748 patent, Fig. 1; element 13b; col. 3, ll. 11-26<br>'008 patent, drawings; elements 13c and 14; col. 2, l. 50 – col. 3, l. 5 |

Here, the parties simply disagree as to the antecedent basis for the word "which." Dyson contends that it is the "outer container," while Maytag asserts that it is the "dirty air inlet" that has the circular cross section. The term in issue deals solely with the dirty air inlet and reads:

> a dirty air inlet at an upper portion of the outer container spaced from the bottom and is oriented for supplying dirt laden air into the container tangentially to the interior surface of the outer container which has a circular cross-section."

Were the phrase "which has a circular cross-section" intended to modify the "outer container," it is clear that the phrase would have been set off between a pair of commas. It is not. Notably, the specification and drawings of the patents cited by both Maytag and Dyson reflect that both the

outer container and the dirty air inlet have circular cross sections.  However, the claim limitation

is directed to only one of them.  Which one can be determined only by reference to the claim

itself.  When the claims were drafted, had the inventors intended that the total  term dealing with

"a dirty air inlet" include terminology modifying other elements, steps should have been taken to

effect that intent.  They were not.  The drafting of claims is to be undertaken with due care, since

their purpose is to put the public on notice of what is claimed as exclusive to the patentee.  Here,

Dyson seeks to rewrite the claim by effectively segregating the phrase "which has a circular

cross-section" with commas, when no such commas appear in the claim.  The effect is a total

rewriting of the claim, which is proscribed by law.  Clearly, the ordinary meaning of the claim

term sets forth that the dirty air inlet has a circular cross-section, and that is consistent with the

specification and drawings of the patents.

### Term No. 7

The contentions of the parties regarding Term No. 7 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 7 | '515 [14]<br><br>'748 [15]<br>'008 [1, 23] | "maintaining its velocity to a cone opening smaller in diameter than the diameter of the upper end of the cyclone" | the conical shape of the cyclone assists in keeping the air flow moving as it makes its way from the air inlet at the top of the cyclone to the smaller cone opening at the bottom of the cyclone.<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Figs. 1, 3, 5 and 6; Col. 2:42 -46; Col. 3:14-18; Col. 4:9 -13; Col. 8:1 -4<br>'748 patent, Fig. 1; Col. 2:9 -13; Col. 3:27 -42<br>'008 patent, Fig. 1; Col. 2:10-13 | the frusto-conical shape of the cyclone serves to keep the air flow at a constant velocity or speed as it makes its way from the air inlet at the top of the cyclone to the smaller cone opening at the bottom of the cyclone<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Figs. 1, 3, 5, 6; col. 2, ll. 38-63; col. 3, ll. 3 -42; col. 4, ll-3-15<br>'748 patent, Fig. 1; col. 1, l. 64 – col. 2, l. 37; col. 3, ll.10-42<br>'008 patent, Fig. 1; col. 1, l. 64 – col. 2, l. 47 |

Here, the definitions offered by the parties track rather closely, but for one major and one

minor difference.  As to the minor difference, Maytag references a "frusto-conical shape,"

because that is the specific term used by the claims, and it is a term upon which the parties have already agreed. *See* chart of Claim Terms From The Asserted Patents On Which Dyson And Maytag Have Reached Agreement On Construction. Accordingly, the term "frusto-conical shape," which is used and intended by the claims, should be retained in the constructions.

As to the phrase "maintaining its velocity," the ordinary and customary meaning of such phrase would be "to keep the air flow at a constant velocity or speed." Such is totally consistent with the use of that terminology throughout the patents. There is absolutely no basis in any of the patents for anything other than the ordinary and customary meaning of the phrase. There is certainly no suggestion in the patents that the phrase "maintaining its velocity," simply means "keeping the air moving" as it makes its way from the top to the bottom of the cone. If that is what were intended, that is what should have been said - - but not only was that language not used in the patent claims, it was not used in the patent specifications either.

A simple analogy to the claimed feature is that of cruise control on an automobile. When a driver seeks to maintain his car at a certain speed, cruise control operates to assure that the velocity is maintained. It does not serve to simply keep the automobile moving as it makes its way along the highway - - it serves to keep the automobile moving at a constant velocity or speed.

Dyson attempts to rewrite the claims by diluting "maintaining its velocity" to simply "keeping the air moving." Such is a prohibited rewriting of the claims to modify the limitations originally contained therein.

## Term No. 8

The contentions of the parties regarding Term No. 8 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 8 | '515 [14] '748 [15] '008 [1, 23] | "the air inlet being oriented for supplying air tangentially to the surface" | the air inlet to the inner cyclone being oriented such that the air flows from the outer container into the inner cyclone tangentially so that it rotates around the inner surface of the inner cyclone<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent, Figs. 1, 3, 5 and 6; elements 22, 63, 94 and 109; Col. 2:38-41; Col. 5:19-26; Col. 7:1-4<br>'748 patent, Col. 3:11-26; Col. 5:23-24; Col. 5:65-66; Col. 6:64-65<br>'008 patent, Fig. 4; Col. 1:62-63; Col. 3:36-48; Col. 4:63-65; Col. 5:47-49; Col. 7:3-5 | the air inlet is arranged to supply air to the surface in a direction perpendicular to the radius of the surface<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'515 patent; Figs. 3, 4, 5; col. 6, l. 66 – col. 7, l. 20; col. 6, ll. 9-30; col. 5, ll. 4-25<br>'748 patent, Fig. 1; element 13h; col. 3, ll. 11-26<br>'008 patent, Fig. 4; col. 3, ll. 40-56 |

Maytag believes that the word "tangentially," is the only word requiring construction. In contradistinction, Dyson has not construed any of the words of the claim, but added extraneous terminology that has no basis in the claim itself. Throughout its definition, Dyson refers to an "inner cyclone," but there is absolutely no reference in any of the claims to an "inner cyclone." Moreover, the claim term in issue makes no reference whatsoever to rotation around the inner surface of any cyclone. The claim limitation speaks only of "the air inlet being oriented for supplying air tangentially to the surface."

Rather than rewrite the claim limitation, which is proscribed by law, Maytag offers to construe the only word that could possibly require construction - - "tangentially." Consistent with the ordinary and customary meaning of that term, and as presented with regard to Term No. 3, tangentially means "in a direction perpendicular to the radius of the surface." No further definition is required, nor proper.

15

**Term No. 9**

The contentions of the parties regarding Term No. 9 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 9 | '748 [15] '008 [1, 23] | "a dirt receiving and collecting chamber extending from the cone opening" | a chamber for receiving and collecting dirt that starts at the cone opening or a portion of the outer surface of the cyclone *See, e.g.*: ordinary meaning of the claim language '748 patent, Fig. 1; element 15; Col. 2:18-26; Col. 3:29-41 '008 patent, Fig. 1; element 20; Col. 3:6-21 | a chamber for receiving and collecting dirt extending from the cone opening *See, e.g.*: ordinary meaning of the claim language '748 patent, Fig. 1;col. 3, ll. 27-42 '008 patent, Fig. 1; col. 3, ll. 6-21 |

The term in issue hardly requires construction. It is clear that the patent specifications do not show any special definition intended for the term "a dirt receiving and collecting chamber extending from the cone opening." Indeed, both the '008 and the '748 patents give but fleeting attention to the receiving and collecting chamber, designated as numeral 20 in the '008 patent and numeral 15 in the '748 patent. While the parties agree that a dirt receiving and collecting chamber is "a chamber for receiving and collecting dirt," there is no basis in the claim term to suggest that "extending from a cone opening is equivalent to "starts at the cone opening or a portion of the outer surface of the cyclone." Such is not an interpretation of a claim limitation, but a wholesale rewriting of it. Moreover, there is no basis in the specification for the proffered rewriting.

It is clear from the patents themselves that "a dirt receiving and collecting chamber extending from the cone opening," is simply "a chamber for receiving and collecting dirt extending from the cone opening" as advanced by Maytag.

**Term No. 10**

The contentions of the parties regarding Term No. 10 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 10 | '515[14] | "means for generating an airflow" | a motor driven fan unit and equivalents<br><br>*See, e.g.,*<br>'515 patent, elements 13, 54 and 121; Col. 2:57-63; Col. 3:32-38; Col. 4:50-54; Col. 5:57-58; Col. 6:50-55; Col. 7:19-20; Col. 8:13-16; Col. 8:44-46 | a motor driven fan unit positioned vertically above and immediately adjacent the cyclone outlet port<br><br>*See, e.g.*:<br>'515 patent, elements 13, 54, and 121 in the specification and drawings; Figs. 1, 3, 5, 6 |

The term "means for generating an airflow," is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. The presumption is clear, since the word "means" is followed by the function performed by the means. Accordingly, this claim term is to be construed to include all of the structure required for performing the recited function of "generating an airflow." While the parties agree that the structure is at least "a motor driven fan unit [and equivalent]," there is more to the structure than that. The motor is specifically positioned as set forth in the patent. The parties agree that the motor driven fan units of the various embodiments of the '515 patent are the elements 13, 54 and 121. As shown in each of Figs. 1, 3 and 5 of the '515 patent, the motor driven fan unit is necessarily positioned vertically above and immediately adjacent the cyclone outlet port. See, for example, the motor driven fan unit 13 and the outlet port or tube 35 in Fig. 1, the motor 54 and outlet tube 77 of Fig. 3, and the motor driven fan 121 and outlet port 105 of Fig. 5. (JA 2-4). All of the embodiments of a "means for generating an airflow" presented in the '515 patent include a motor driven fan unit positioned vertically above and immediately adjacent the cyclone outlet port. Clearly, this is the necessary structure for achieving the desired airflow referenced in claim 14 as passing "sequentially through the dirty air inlet, the container, the cyclone air inlet, the cyclone, the receiving chamber and the cyclone air outlet." Accordingly,

this is the necessary structure "for generating an airflow" in the context of the claim and this means-plus-function limitation should be so construed.

**Term No. 11**

The contention of the parties regarding Term No. 11 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 11 | '748 [15] | "a disc means provided on the outside of the cyclone intermediate the receiving chamber and the air outlet of the container and around to the longitudinal axis of the cyclone" | a disc which is on the outside of the inner cyclone between the dirt collection chamber and the air outlet of the outer container and around the longitudinal axis of the inner cyclone<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'748 patent, Col 3:1-4; Col. 4:35-37; Col. 6:47-54; Col. 6:57-66 | a disc positioned on the outside surface of the cyclone, the disc having a detent in a smaller opening that engages an attachment ring on the cyclone, the disc having a downwardly tapered wall and an annular flange extending toward the inside wall of the container, the disc being midway between the receiving and collecting chamber and the air outlet of the container and around the longitudinal axis of the cyclone.<br><br>*See, e.g.*:<br>'748 patent, Figs. 1 and 2; col. 3, ll. 43-54; col. 4, ll. 26-28 |

This is a means-plus-function limitation under 35 U.S.C. §112, ¶ 6. The word "means" is followed by the stated function "retards long strands in the dirt from clogging the air outlet and retains the strands in the container." *See* '748 patent, claim 15, final 3 lines. (JA 21). Accordingly, the limitation must be construed to include all the structure necessary for achieving the recited function, plus its equivalent. The '748 patent clearly defines this very specific disc at col. 3, ll. 43-54 and col. 4, ll. 26-28. (JA 20). It is also shown in Figs. 1 and 2 of the patent. (JA 15-16). Indeed, these portions of the specification recite that the "disc 20 retards long strands, such as hair, from moving upwards into the air outlet," and further the "disc 20 retards the flow of strands of dirt into the shroud 21." (JA 20). Certainly, not just any disc will perform this function. Indeed, that is not the purpose of a disc. The structure of a disc capable of performing

this function is set forth with particularity in the patent specification at col. 3, ll. 43-54 as follows:

> a disc 20 is positioned on the outside surface 12b of the cyclone 12. The disc 20 includes a detent 20a (Fig. 2) in smaller opening 20b which engages an attachment ring 12c on the cyclone 12. The disc 20 includes a downwardly tapered wall 20c and an annular flange 20d extending towards the inside wall 11a of the container 11. The disc 20 retards long strands, such as hair, from moving upwards into air outlet 13d through a shroud 21 attached to outlet 13d. The disc 20 can have any shape which is circular around the axis a-a and leaves an air passage 19.

The claim itself further states that the disc is intermediate (midway between) the receiving chamber and the air outlet of the container and around the longitudinal axis of the cyclone. Accordingly, it is clear that Maytag's proffered construction tracks the recitation in the specification of the structure required to perform the recited function, and then tracks the claim itself as to its positioning.

Dyson distances itself from the fact that the referenced "disc means" is in a means-plus-function format. Dyson ignores the fact that the disc means has an associated function and is therefore presumed to be controlled by 35 U.S.C. § 112, ¶6. Indeed, it is not at all apparent that a disc would inherently perform the function recited in the claim. The specification makes it clear that a disc having a downwardly tapered wall and an annular flange extending toward the inside wall of the container is required to achieve that function.

Dyson's attempt to remove the word "means" and ignore the recited function is simply an effort to rewrite the claim and to broaden it by removing the limitations of the structure set forth in the specification required for performing the claimed function.

**Term No. 12**

The contentions of the parties regarding Term No. 12 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 12 | '008 [1, 23] | "a shroud means mounted on and around the outer surface of the cyclone and having opposed ends along the longitudinal axis and providing for outlet air from the container into the air inlet to the cyclone" | a shroud designed to act as an air outlet from the outer container to the air inlet of the inner cyclone which is mounted on and around the outer surface of the cone-shaped inner cyclone and has opposing ends along the longitudinal axis of the inner cyclone<br><br>*See, e.g.*:<br>ordinary meaning of the claim language '008 patent, Figs. 1 and 2; Col. 1:19-49; Col. 2:26-47; Col. 3:66-68; Col. 4:31-45; Col. 6:38-53 | a combined integral shroud and disc unit provides for outlet air from the container into the air inlet to the cyclone, and includes a cone-shaped disc with a larger downwardly tapered portion facing the bottom of the container, the unit being tapered with walls parallel to the outside of the cyclone, the walls ending in a flange that surrounds and encloses the passage to the inner cyclone, and the disc having a downwardly inclined angle between about 97.5° to 110° from a central axis of the unit.<br><br>*See, e.g.*:<br>'008 patent, Figs. 1-4; title; col. 1, ll. 14-33; col. 3, ll. 22-39 |

The "shroud means" recited in this claim term is clearly a means-plus-function limitation and requires construction under 35 U.S.C. § 112, ¶6. The shroud means has the associated function of "providing for outlet air from the container into the air inlet to the cyclone." A shroud is certainly not a known structure for providing such a function. Indeed, the '008 patent proclaims a very special shroud to achieve the recited function. The title of the patent itself, all of its figures, and substantial portions of its specification (Col. 1, ll. 14-33; Col. 3, ll. 22-39) (JA 25-26) attest to the need for a very specific shroud to achieve the objects of the invention. Indeed, the patent specification, claims and drawings are replete with reference to the need for something other than a separate disc and shroud to provide for improved separation of dirt over prior devices. *See* Col. 1, ll. 14-30. (JA 25). The structure necessary for performing the recited function in the context of the invention is set forth in detail in the paragraph beginning at Col. 3, l. 22. (JA 26). That is the structure recited in Maytag's proposed claim construction. The

benefits of the invention are derived, as the title of the patent indicates, by combining an integral shroud and disc unit.

Dyson seeks to distance itself from the means-plus-function nature of this claim limitation.  The inventors did not claim simply a shroud, but a "shroud means" with the particularly associated function of providing outlet air from the container into the air inlet to the cyclone.  This function is achieved by the recited structure, not by just a shroud.  Indeed, a shroud does not have the inherent capability of "providing for outlet air from the container into the air inlet to the cyclone," a fact that is apparent from the details given the specific design of the combined shroud and disc unit of the invention of the '008 patent.

Dyson's attempt to rewrite the claim by ignoring the means-plus-function implications of 35 U.S.C. §112, ¶ 6 should be rejected, and the term should be construed as the stature requires.

## Term No. 13

The contentions of the parties regarding Term No. 13 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 13 | '008 [1, 23] | "wherein the shroud means is mounted at one end below the air inlet to the cyclone and extends along the outer surface with the other end at a position intermediate to the cone opening and the air inlet to the cyclone" | the shroud is positioned below the air inlet to the cone-shaped cyclone and extends along the outer surface of the inner cyclone to a position somewhere before the cone opening at the bottom of the inner cyclone<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'008 patent, abstract; Figs. 1 and 2; elements 12c, 13k, and 30; Col. 1:13-34; Col. 1:35-49; Col. 1:65-2:47; Col. 3:22-36 | No construction required – ordinary meaning of the claim language |

Maytag advances that no construction of the term is necessary - - that it can be attributed its ordinary and customary meaning. To the contrary, Dyson seeks to rewrite the term, complete with extraneous limitations. In that regard, it can hardly be said that the word "mounted," as used in the claim, is the equivalent of "position." Nor can it be said that "at a position intermediate to" is the equivalent of "somewhere before." Clearly, "intermediate" does not mean "somewhere," "mounted" does not mean "positioned," and there is simply no basis in the claim for the word "inner" to further define the cyclone. Rather than contort the claim by seeking to rewrite it, which is proscribed by law, the claim term should simply be accorded its ordinary meaning, with no further construction required.

### Term No. 14

The contentions of the parties regarding Term No. 14 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 14 | '008 [1, 23] | "wherein the shroud means has perforations adjacent to the position intermediate to the cone opening for the flow of air from the outer container to the cyclone inlet" | the shroud has perforations near the end of the shroud closest to the cone opening, so that air can pass through the perforations to the air inlet of the inner cyclone<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'008 patent, Figs. 1 and 2; Col. 1:35-49; Col. 1:65-2:47; Col. 3:22-36; Col. 3:57-65 | No construction required – ordinary meaning of the claim language |

Maytag contends that the claim limitation in issue may be accorded its plain and ordinary meaning. Again, Dyson seeks to rewrite the claim by making reference to an "inner cyclone" which is not even mentioned or suggested by the claim. Dyson further confounds the claim limitation by stating that the perforations are near the end of the shroud closest to the cone opening, while the claim itself states that the perforations are adjacent to the position

intermediate to the cone opening, not necessarily near the end of the shroud. While the claim does state that the shroud provides "for the flow of air from the outer container to the cyclone inlet," that is not the same as "passed through the perforations to the air inlet of the inner cyclone," as offered by Dyson. Notably, the construction offered by Dyson does not even mention the portion of the claim limitation that the flow of air is "from the outer container to the cyclone inlet." Instead, Dyson disregards the source of the flow expressly stated in the claim, and then refers to an "inner cyclone," which is never mentioned in the claim at all.

The ordinary and customary meaning of this claim term fully addresses what was intended by the inventor without reading limitations into and out of the claim as proposed by Dyson.

### Term No. 15

The contentions of the parties regarding Term No. 15 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 15 | '008 [1, 23] | "disc means provided on the shroud means at a lower longitudinal extent of the shroud means and the air inlet of the cyclone and around the axis of the cyclone" | a disc that surrounds the axis of the inner cyclone and touches the bottom portion of the shroud, so that the air inlet is above the shroud and the disc is at a lower longitudinal extent of the shroud<br><br>Intrinsic Evidence:<br>ordinary meaning of the claim language<br>*See, e.g.,* '748: Fig. 1; '008: Fig. 2, Col. 1:24-30; Col. 2:41-47; col. 4:35-36; Col. 4:46-48; Col. 4:46-48 | No construction required – ordinary meaning of the claim language |

Neither Dyson nor Maytag contend that the disc means of this limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶6. However, Dyson again seeks to rewrite the claim. In Dyson's construction, there is no basis in the claim for the term "inner cyclone." Moreover, providing a disc on the shroud at the lower longitudinal extent of the shroud is not the

equivalent of "touches the bottom portion of the shroud." "Providing" and "touching" are not the same action. Moreover, the disc is defined in the claim as being on the shroud at the lower longitudinal extent of the shroud and the air inlet of the cyclone. Dyson seeks to construe the claim limitation "so that the air inlet is above the shroud." But that is not what the claim says. The claim says that the disc is on the shroud at the lower extent of the shroud and the air inlet of the cyclone. Dyson's proffer does not even identify the fact that the air inlet is that of the cyclone, and it positions the air inlet above the shroud, rather than the disc being positioned at the lower longitudinal extent of the shroud and air inlet of the cyclone. In effect, Dyson has so misconstrued and rewritten this portion of the claim as to be almost unintelligible. Its ordinary and customary meaning should be employed.

### Term No. 16

The contentions of the parties regarding Term No. 16 are reproduced directly below.

| Term No. | Asserted U.S. Patent(s) and Claim(s) | Term | Dyson's Proposed Construction and Intrinsic Evidence | Maytag's Proposed Construction and Intrinsic Evidence |
|---|---|---|---|---|
| 16 | '038 [1] | "having a tangential air inlet located at or adjacent the end of the cyclone having the larger diameter" | a tangential air inlet at or adjacent the end of the inner cyclone having the larger diameter, which is the end of the inner cyclone nearest the top of the container<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'038 patent, Figs. 1a and 3a; element 16; Col. 1:20-22; Col. 2:50-55 | having an air inlet in a direction perpendicular to the radius of the cyclone located at or adjacent the end of the cyclone having the larger diameter<br><br>*See, e.g.*:<br>ordinary meaning of the claim language<br>'038 patent, Figs. 1a and 3a; element 16; col. 2, l. 50 – col. 3, l. 7 |

Maytag offers that the term itself requires little construction, except for the word "tangential," as discussed above with regard to Term Nos. 3 and 8. As is well known from geometry, and pertinent to the frustoconical structure here, a tangent is a line perpendicular to the radius of a curve or circle. Accordingly, a tangential air inlet located or adjacent the end of the cyclone is an air inlet in a direction perpendicular to the radius of the cyclone and, as the claim

states, it is located at or adjacent the end of the cyclone having the larger diameter. Maytag simply offers a construction of the word "tangential" in the context of the claim. This definition is ordinary and customary, and is consistent with the term as used in the '038 patent at col. 2, l.50 – col. 3, l. 7 where the air inlet 16 is discussed. (JA 34-35). There, it is made apparent that the air enters the cyclone 12 via the inlet 16 through a "tangential entry arrangement." There is no special meaning offered or intended for the term "tangential." Dyson's proffered definition again speaks of a "inner cyclone," which is nowhere mentioned or suggested in the claims. It also suggests that the end of the cyclone having the larger diameter is that end of the "cyclone nearest the top of the container." Again, this is a gratuitous addition to the claim, having no basis in the claim itself, and in fact being dependent upon the orientation of the cleaning apparatus of the claim. Indeed, instead of construing the term "tangential," which is the only term that could possibly require construction, Dyson has sought to rewrite the claim term by adding phrases such as "inner cyclone," and "the end of the inner cyclone nearest the top of the container," which are not otherwise apparent from the claim itself, nor required for its understanding.

The claim term should be given its ordinary and customary meaning, but for the possible construction of the word "tangential," which is used in its ordinary and customary manner in both the patent specification and claim.

## IV.    Conclusion

Courts are to construe patent claims, not rewrite them. Moreover, claim terms are to be given their ordinary and customary meanings, unless there is a clear showing of an intent by the patentee to disavow such meanings. Here, there is no showing that the patentee intended any of

the claim terms to be accorded anything other than their ordinary and customary meanings. There certainly has been no clear disavowal.

Maytag has offered construction of the terms placed in issue that are consistent with the ordinary and customary meanings of such terms, and has shown the support therefore in the patents themselves. Dyson has been unable to point to any portion of any of the patents-in-suit that would demonstrate that the patentee intended anything other than the ordinary and customary meanings. Undaunted, Dyson has embarked on a path of rewriting the claim terms while ignoring the express language of the claims themselves and the descriptions provided in the specifications and drawings. It has further exacerbated the matter by ignoring the statutory rules of patent construction required by 35 U.S.C. § 112, ¶6 with regard to means-plus-function limitations.

This Court should adopt the constructions of Maytag, consistent with the ordinary and customary meanings of the claim terms, and reject the wholesale rewriting of the patent claims advanced by Dyson.

Respectfully submitted,


/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)
Stephanie O'Byrne (#4446)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899
Phone (302) 658-9141
Facsimile (302) 658-5614

*Attorneys for Defendant Maytag Corporation*

OF COUNSEL:
Ray L. Weber
Laura J. Gentilcore
RENNER, KENNER, GREIVE, BOBAK,
    TAYLOR & WEBER
400 First National Tower
Akron, OH  44308
Phone  (330) 376-1242
Facsimile (330) 376-9646

Stephen P. Durchslag
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL  60601
Phone: (312) 558-5600
Facsimile:  (312) 558-5700

Dated:  May 26, 2006

467267_1

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on May 26, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> C. Barr Flinn
> John W. Shaw
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801
>
> Garrard R. Beeney
> Richard C. Pepperman, II
> James T. Williams
> Keith McKenna
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, New York  10004

I further certify that on  May 26, 2006, I caused a copy of the foregoing document to be served by hand delivery on the above-listed Delaware counsel of record, and by Federal Express on the above-listed out of town counsel.

/s/ Francis DiGiovanni<br>
Francis DiGiovanni (#3189)

467267_1

2