# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DYSON TECHNOLOGY LIMITED )
and DYSON, INC., )
    Plaintiffs, )
   )   Civil Action No. 05-434 GMS
v. )
   )
MAYTAG CORPORATION, )   REDACTED FOR PUBLIC FILING
    Defendant. )         CORRECTED VERSION FILED
   )         DECEMBER 8, 2006

---

### DEFENDANT MAYTAG CORPORATION'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION REGARDING IMPROPER ASSET TRANSFERS

Francis DiGiovanni
Connolly Bove Lodge & Hutz
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899
Phone (302) 658-9141
Fax (302) 658-5614

Kimball R. Anderson
Stephen P. Durchslag
Winston & Strawn
Chicago, IL 60601
Phone (312) 558-5600
Fax (312) 558-5700

Ray L. Weber
Laura J. Gentilcore
Renner, Kenner, Greive, Bobak,
  Taylor & Weber
400 First National Tower
Akron, OH 44308
Phone (330) 376-1242
Fax (330) 376-9646

*Attorneys for Defendant*
*Maytag Corporation*

Dated: December 1, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................................i

I.    NATURE AND STAGE OF THE PROCEEDING........................................2

II.   SUMMARY OF THE ARGUMENT...........................................................3

III.  STATEMENT OF FACTS........................................................................4

IV.   ARGUMENT.......................................................................................10

    A.    Maytag Can Establish a Likelihood of Success on the Merits......................12

        1.    Dyson's Advertising Claims about
            Superior Cleaning are False...........................................13

        2.    Dyson's Claims about No Loss
            of Suction are False.......................................................17

        3.    Dyson's Claims of Having No Filters
            that Clog is Absurdly False..............................................18

    B.    Maytag Will Suffer Irreparable Harm if the
        Requested Relief is not Granted.........................................20

    C.    The Balance of Harms Weighs in Favor of Maytag.........................22

    D.    The Requested Relief is in the Public Interest..............................23

    E.    The Amount Subject To The Requested Injunctive Relief Is
        Appropriate In Relation To The Expected Remedy..........................24

    F.    Maytag Will Post an Appropriate Bond........................................25

V.    CONCLUSION....................................................................................26

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*AT&T Co. v. Winback & Conserve Program, Inc.,*
42 F.3d 1421 (3d Cir. 1994)...............................................................................23

*Banjo Buddies, Inc. v. Renosky,*
399 F.3d 168 (3d Cir. 2005)...............................................................................20

*Callaway Golf Co. v. Slazenger,*
384 F. Supp. 2d 735 (D. Del. 2005).....................................................................21

*Construction Drilling, Inc. v. Chusid,*
63 F. Supp. 2d 509 (D.N.J. 1999) .......................................................................12

*Deckert v. Independence Shares Corp.,*
311 U.S. 282 (1940)..........................................................................................10

*Dole Fresh Fruit Co. v. United Banana Co., Inc.,*
821 F.2d 106 (2d Cir. 1987)...............................................................................25

*Elliott v. Kiesewetter,*
98 F.3d 47 (3d Cir. 1996)..................................................................................11

*F.D.I.C. v. Faulkner,*
991 F.2d 262 (5th Cir. 1993) .............................................................................25

*F.T. Int'l, Ltd. v. Mason,*
2000 WL 1514881 (E.D. Pa. Oct. 11, 2000)...............................................12, 20, 21,

*Gerardi v. Pelullo,*
16 F.3d 1363 (3d Cir. 1994)..........................................................................11, 20

*Hoxworth v. Blinder, Robinson & Co.,*
903 F.2d 186 (3d Cir. 1990)..........................................................................20, 24

*Marsellis-Warner Corp. v. Rabens,*
51 F. Supp. 2d 508 (D.N.J. 1999) ................................................11, 12, 22, 23, 25

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,*
290 F.3d 578 (3d Cir. 2002)...............................................................................12

*Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.,*
735 F. Supp. 597, 600 (D. Del. 1989),
*aff'd,* 902 F.2d 222 (3d Cir. 1990) .....................................................................12

*United States v. First Nat'l City Bank,*
379 U.S. 378 (1965)................................................................................................11

*United States ex rel. Rahman v. Oncology Assoc.,*
198 F.3d 489 (4th Cir. 1999) ............................................................................11, 21

*Wood v. Prudential Ins. Co. Of America,*
207 F.3d 674 (3d Cir. 2000)...................................................................................21

## **Statutes**

Fed. R. Civ. P. 65 ...................................................................................3, 11, 24, 25

15 U.S.C. § 1117(a) ................................................................................................20

15 U.S.C. § 1125(a) ............................................................................................4, 12

6 Del. C. § 2532(a) (2005) ........................................................................................4

## I.    NATURE AND STAGE OF THE PROCEEDING

Defendant/Counter-plaintiff Maytag Corporation ("Maytag") now comes to the Court respectfully seeking injunctive relief to prevent Plaintiff/Counter-defendant Dyson, Inc. ("Dyson USA"), its parents, subsidiaries, affiliates, agents and assigns (collectively, "Dyson")[1],

This motion is being filed because Maytag has recently learned in discovery that:

Maytag has counterclaimed in this patent infringement action, alleging that Dyson USA has engaged in a broad, concerted false advertising campaign in the United States. This ad campaign gave U.S. consumers the false impression that Dyson vacuum cleaners are more powerful, never lose suction and clean more effectively than those of their competitors, including Maytag – while simultaneously unjustly enriching Dyson and harming Maytag in the competitive marketplace.

---

[1] The Dyson entities in the UK will be referred to hereafter as "Dyson UK." we hereafter will employ the phrase "Dyson" to refer to the entire Dyson corporate organization.

[2] Dyson Technology Limited is also a Counter-Defendant in this case,

Accordingly, Maytag now

seeks a temporary restraining order and preliminary injunction pursuant to Fed. R. Civ. P. 65,

## II.    SUMMARY OF THE ARGUMENT

1.    Maytag's request for a temporary retraining order and preliminary injunction,

should be granted

because Maytag likely will succeed on its false advertising claims; Maytag will be irreparably

harmed if such relief is not granted; the balance of harms favors Maytag; and the requested relief

is in the public interest.

2.    Maytag likely will succeed on the merits of its false advertising claims, pursuant

to the Lanham Act, because Dyson's claims that its vacuums clean better than all others, that its

vacuums never lose suction, and that its vacuums do not rely on filters are literally false.

3.    Maytag will be irreparably harmed

4.      Granting injunctive relief here is in the public interest because Maytag has established the elements of a likelihood of success on the merits and irreparable harm, and because the public has a strong interest in seeing that blatantly false advertising such as Dyson's is dealt with through the imposition of an appropriate remedy.

5.      Finally, injunctive relief also is appropriate here because Maytag has a legitimate equitable claim and a sufficient nexus exists between those claims and the assets subject to the order. The remedy Maytag seeks is indisputably equitable in nature because Maytag is entitled to any unjust enrichment Dyson received as a result of its false advertising. There is a sufficient nexus because the assets Maytag is seeking to encumber pursuant to this order and Maytag's equitable claims because those assets *are* Dyson's unjust enrichment. But for Dyson's false advertisements, Dyson would not have obtained those revenues.

6.      The requested relief Maytag seeks is a temporary restraining order and preliminary injunction

## III.    STATEMENT OF FACTS

Maytag's countersuit alleged that Dyson violated Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), Delaware's Deceptive Trade Practices Act (6 Del. C. § 2532(a) (2005)) and the Delaware common law for unfair competition by making a number of false and misleading advertising claims regarding several of Dyson's upright vacuum cleaners and those of its competitors, including Maytag.  (Counterclaim ¶¶ 55, 60, 65)  Maytag's allegations of false

4

advertising center on an intensive advertising blitz in the United States by Dyson over the last several years – formulated

featuring the image, voice and signature of Dyson founder, inventor, controlling shareholder and spokesman James Dyson -- claiming that Dyson vacuums, among other things, are the most powerful on the market, never lose suction and outperform all other vacuum cleaners. (Counterclaim ¶¶ 10, 21, 27) Dyson even goes as far in its ad claims as alleging that *all other vacuums* in the market have a design defect and do not work properly. (Counterclaim ¶ 27) Maytag's false advertising claims are based on Dyson's advertising for its DC07, DC14 and DC15 vacuums. In particular, Maytag alleges that Dyson's vacuum performance claims are both literally and implicitly false and mislead consumers to believe that Dyson vacuums are superior over all other vacuums at cleaning carpet.

The Dyson financial statements Maytag was able to obtain outside of discovery via the internet paint additional troubling pictures of the removal of assets by James Dyson. For example, Dyson James Limited's 2005 annual statement discloses a 2004 loan to James Dyson of 25.2 million GBP. (Goldberg Aff. Ex. F at 33, para. b) The loan was outstanding at the end of the year, but Dyson UK nonetheless reported it "settled in full on 20 March 2006 from amounts owed to James Dyson for services provided during this year to 31 December 2005." (*Id.*) The 2005 statement also disclosed loans and payments in the tens of millions of GBP to a company called Profred Limited and Profred Partners LLP, entities in which James Dyson has a

"beneficial interest" (*Id.* at 33, para. c-e)[6], as well as a sale-leaseback of property to James Dyson that year for a loss of nearly 1 million GBP (*Id.* at 33, para. f)[7]

---

[6] Dyson's 2004 financial statement reported a similar loan to Profred Limited in the amount of nearly 20 million GBP. (Goldberg Aff. Ex. E at 24, para. b)

IV.   **ARGUMENT**

Federal courts have general equitable power to enter temporary restraining orders and preliminary injunctions that prevent asset dissipation to ensure the adequacy of a judgment rendered at trial.  *See Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288-89 (1940) (preliminary injunction preventing transfer of assets proper when plaintiff sued to rescind

contract induced by fraud); *United States v. First Nat'l City Bank*, 379 U.S. 378, 385 (1965) (preliminary injunction preventing transfer of assets warranted when plaintiff asserted equitable interest in property); *Elliott v. Kiesewetter*, 98 F.3d 47, 52 (3d Cir. 1996); *United States ex rel. Rahman v. Oncology Assoc.*, 198 F.3d 489, 496-97 (4th Cir. 1999).

This relief is necessary to maintain the status quo and to secure any meaning in an expected judgment against Dyson for its false advertising – namely, restitution of Dyson's profits from that false advertising, plus any damages Maytag has suffered and costs of Maytag's countersuit.

In deciding whether to issue a preliminary injunction preventing dissipation of assets, a District Court must weigh four factors:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994); *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 520 (D.N.J. 1999).

The Third Circuit has confirmed that preliminary injunctive relief is wholly appropriate to prevent dissipation of assets. For example, in *Gerardi*, the Third Circuit affirmed the entry of a preliminary injunction preventing the dissipation of moneys that could be used to satisfy a judgment resulting from the defendant's improper transfer of funds to his own company, leading to claims of unjust enrichment. 16 F.3d at 1365. Likewise, in *Kiesewetter*, the Third Circuit affirmed a freeze of a husband and wife's assets in light of the husband's breach of fiduciary duty, fraud, unjust enrichment, and fraudulent conveyance of funds subject to judgment to his

wife.[8]  98 F.3d at 50.

### A.    Maytag Can Establish a Likelihood of Success on the Merits.

Maytag need not establish likelihood of prevailing on the merits of all counts in its

countersuit in order to secure injunctive relief; one is sufficient. *Marsellis-Warner Corp.*, 51 F.

Supp. 2d at 520-21. Section 43(a)(1)(B) of the Lanham Act makes it unlawful to render false or

misleading statements in connection with the advertising or promotion of a product.  *See* 15

U.S.C. § 1125(a)(1)(B).   To establish a false advertising claim under Section 43(a)(1)(B), the

plaintiff (in this case, Counter-Plaintiff) must prove that the advertisement is (1) literally false or

(2) literally true or ambiguous, but has the tendency to deceive consumers.  *Novartis Consumer*

*Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir.

2002); *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 735 F. Supp. 597, 600 (D. Del. 1989),

*aff'd* 902 F.2d 222 (3d Cir. 1990).

Dyson has demonstrated a consistent and calculated pattern of deception regarding the

performance of its DC07, DC14 and DC15 upright vacuum cleaners through its packaging, print

advertising, and national television commercials, each of which reinforces the false and

misleading communication that Dyson upright vacuum cleaners are the most powerful upright

---

[8] Numerous District Court decisions in this circuit are in accord.  *See Construction Drilling, Inc.*
*v. Chusid*, 63 F. Supp. 2d 509 (D.N.J. 1999) (preliminarily enjoining defendants from
transferring interests in their real and personal property in light of likely unjust enrichment,
fraud, breach of fiduciary duty, RICO violations, and conversion related to deceitful acquisition
of plaintiff's funds); *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508 (D.N.J. 1999)
(preliminarily enjoining defendants from dissipating assets when employer alleged that
employees in a satellite office had falsified documents, solicited business from existing
customers, and misappropriated company funds resulting in claims for fraud, RICO, breach of
fiduciary duty, and conversion); *F.T. Int'l, Ltd. v. Mason*, 2000 WL 1514881 (E.D. Pa. Oct. 11,
2000) (granting TRO freezing assets on unjust enrichment claim based on allegations that
defendant CEO fraudulently transferred plaintiff's funds and then moved funds offshore) (Ex. A
hereto); *In re National Cred. Mgt. Group, L.L.C.*, 21 F. Supp. 2d 424, 462 (D.N.J. 1998)
("When, as in this case, business operations are permeated by misrepresentations and fraud, the
likelihood that assets may be dissipated during the pendency of the legal proceedings is strong.").

vacuum cleaners, that they don't have filters, don't clog, don't lose suction and clean carpet better than all other upright vacuum cleaners.

In addition to Dyson's admissions, independently supervised tests also prove that Hoover WindTunnel and Fusion upright vacuum cleaners clean carpet better than Dyson vacuum cleaners, a fact that has already been recognized by the National Advertising Division of the Better Business Bureaus ("NAD") in Dyson's 2005 challenge of certain Maytag advertising. (*See* The Hoover Company, NAD Case Report #4467 (4/05/05), attached as Goldberg Aff. Exhibit I)

### 1.   Dyson's Advertising Claims about Superior Cleaning are False.

Dyson's advertising claims falsely communicate to consumers that Dyson vacuum cleaners clean carpet better than other upright vacuum cleaners. This cleaning superiority message is communicated both expressly ("picks up more dirt from your home") and implicitly (Dyson vacuum cleaners "never lose suction"). Consumers understand Dyson's claim that its vacuums never lose suction to mean cleaning superiority, which is confirmed in the extensive market research performed by Dyson on this claim. (*See. e.g.*, January 2006 Hall & Partners report, attached as Goldberg Aff. Exhibit J)[9]

---

[9] The NAD has consistently found that consumers understand claims relating to vacuum cleaner suction power as cleaning claims, and has consistently required that vacuum cleaner suction power claims be substantiated by cleaning efficacy. (*See* NAD Case Report #4217 (08/06/04), attached as Goldberg Aff. Exhibit K) ("However, NAD determined that consumers could reasonably interpret the claim that the Fantom Twister has '1 ½ times more suction power' to mean that it has 1½ times more suction power than competing vacuums, *and that it cleans better*

Moreover, Dyson is clearly linking its suction message to cleaning performance, as illustrated by Dyson's claim that a Dyson "has the highest suction power and picks up more dirt from your home." (*See e.g.,* various Dyson advertising claims, attached as Goldberg Aff. Exhibit L).

it is generally understood that consumers purchase vacuum cleaners primarily to clean carpet, and not for use over a "wide variety of surfaces." (Equifax, Scout Survey chart entitled, "Which types of cleaning is the vacuum cleaner used for?" attached as Goldberg Aff. Exhibit M)

In truth, the ability of a vacuum cleaner to pick up dust and dirt is a function of several different factors, including suction power, air flow, nozzle interface with the carpet and agitator design. Thus, a vacuum cleaner with constant suction will not necessarily pick up more dust and

---

*than other vacuums in real use* – a message NAD determined was not supported by the evidence in the record.")(emphasis added)

dirt. Even assuming the Dyson units have higher suction power than other vacuum cleaners, which they do not, this does not translate into better cleaning efficacy.

Independently supervised testing conducted by Maytag using the ASTM Test Method F608, *Standard Test Method for Evaluation of Carpet Embedded Dirt Removal Effectiveness of Household/Commercial Vacuum Cleaners* proves that Maytag's Hoover WindTunnel, Savvy and Fusion vacuum cleaners clean carpet better than Dyson vacuum cleaners.[10] (*See* February 2005 Hoover test results utilizing ASTM F608, attached as Goldberg Aff. Exhibit N). As this independently supervised testing shows, all seven of the Hoover upright vacuum cleaners tested cleaned better (and thus provided more "powerful" cleaning) than both the Dyson DC07 and the DC14, by at least 49.5%, and by as much to 70.5%. *Id.*

To further emphasize the cleaning effectiveness of Hoover vacuums, Maytag conducted testing using ASTM F608 to compare the performance of Dyson's DC07, DC14 and DC15

---

[10] The ASTM Test Method F608, attached as Exhibit I, is the *only* United States industry recognized standard for evaluating the cleaning effectiveness of a vacuum cleaner on carpet.

vacuum cleaners *with empty dirt cups* versus Hoover WindTunnel vacuum cleaners operating *with a full bag or dirt cup*. (*See* Goldberg Aff. Ex. N)  This testing clearly demonstrates that Hoover WindTunnel vacuum cleaners with a full bag or dirt cup clean carpet better than Dyson vacuum cleaners with an empty dirt cup by a significant margin.  This data proves that although Hoover WindTunnel vacuum cleaners may experience a temporary reduction in suction power as the bag or dirt cup is filled,[11] even in this filled condition these vacuum cleaners still clean better than Dyson vacuum cleaners.

Maytag's likelihood of success here is further supported by the recent NAD ruling in favor of Maytag's ASTM claim-substantiation testing and against Dyson's ad hoc conglomeration of hand-picked tests from ASTM and the International Electrotechnical Committee ("IEC"). (*See* Goldberg Aff. Ex. I)  In reaching this conclusion, the NAD was persuaded by the reliability of Hoover's use of the industry recognized ASTM testing standards, and "troubled" by Dyson's selective reliance on only parts of the ASTM standard and by Dyson's reliance of selective portions of IEC testing standards, which are not recognized as reliable in the U.S. vacuum industry.  (*Id.* at 30, 33.)  Specifically, the NAD rejected Dyson's preferred IEC testing standards because Hoover's "ASTM standard -- unlike [Dyson's IEC standard] -- is based upon and represents real-life conditions found in American homes ... [Dyson's] attempt to piece together portions of results from different test methodologies was not a meaningful exercise." (*Id.* at 33.)

In other words, the NAD ruled that Maytag's testing methodology represented real-life conditions in American homes.  The testing standards Maytag relied upon demonstrate that Dyson vacuum cleaners do not clean more effectively than Maytag vacuums do, particularly

---

[11] The reduction in suction power is only temporary because once the bag is filled the consumer is instructed to replace the bag.  Upon replacing the bag, the suction power will return to the original level.

when used on carpets, as intended by consumers upon purchase.    Accordingly, Dyson's advertising claims about cleaning superiority are literally false.

### 2.    Dyson's Claims about No Loss of Suction are False.

In addition to falsely communicating superior cleaning performance, Dyson's superior suction power claims are also literally false.

The hose on a vacuum cleaner is the round flexible tube that detaches from the vacuum to clean surfaces such as drapes and furniture.    The nozzle is the wide compartment at the front of the vacuum that contains the brushes and wheels and makes contact with the carpet as the vacuum is pushed along the carpet.    The nozzle is the most relevant place to measure suction power of an upright vacuum cleaner because consumers primarily use upright vacuum cleaners to clean carpet.

Maytag's test results done at the nozzle in accordance with ASTM Test Method F558[12] show that the Hoover® WindTunnel™ Self-Propelled bagless vacuum cleaner has more suction power at the nozzle than both the Dyson DC07 and DC14.  (*See* April 8, 2005 Maytag nozzle air performance test results, attached as Goldberg Aff. Exhibit R)   Thus, the Dyson units do not have either "the highest suction power" or "double the suction power of other vacuums."

Notably, Dyson does not disclose anywhere in its advertising that its suction power claims are based on suction power as measured at the end of the hose.   In fact, most of Dyson's advertising shows its vacuums being used on carpets. (*See e.g.*, October 6, 2003 storyboard for

---

[12]   ASTM Test Method F558 is the only industry-recognizes test method for evaluating suction of vacuum cleaners in the United States.

Dyson television ad entitled "James Dyson Amazed By Lousy Suction," attached as Goldberg Aff. Exhibit S)  Accordingly, Dyson's suction claims likewise are literally false.

### 3.    Dyson's Claims of Having No Filters that Clog is Absurdly False.

Dyson's advertising communicates that its vacuum cleaners do not clog or lose suction because its vacuum cleaners do not have filters that can clog.  Any notion that Dyson vacuum cleaners do not have filters, or do not rely on filters, is patently untrue.  In truth, Dyson vacuum cleaners have two filters, a pre-motor filter and a post-motor, or HEPA, filter.

In fact, Dyson states on page 12 of the owner's manual for the DC07 that the lifetime pre-motor filter must be rinsed at least once every six months in accordance with the instructions, and that if the machine is used to vacuum fine dust that the consumer may need to rinse the filter more often. (Dyson DC07 owner's manual, attached as Goldberg Aff. Exhibit T)  Similar instructions exist on page 10 of the owner's manual for the DC14 (DC14 owner's manual, attached as Goldberg Aff. Exhibit U) and on the Dyson website, under the troubleshooting issue of "Machine not sucking / picking up as well as usual." (Dyson US customer support web page, attached as Goldberg Aff. Exhibit V)  There could be no reason to require consumers to wash the pre-motor filter other than because clogging of the filter will affect the performance of the vacuum cleaners by causing the vacuum cleaners to lose air flow, and thus lose suction.  In any event, any advertisement stating that Dyson vacuums do not have or rely on filters is absurdly false on its face.

Dyson also has recognized the fact that *any* vacuum cleaner with a filter, including Dyson's, will lose suction.  During a 1998 interview, Dyson's commercial director at the time, Martin McCourt, stated that "the suction will drop if you don't replace your filter if it's time to replace it.  In all vacuum cleaners, including the Dyson, the filter is a separate part of the process." (April 30, 1998 interview of Martin McCourt, attached as Goldberg Aff. Exhibit W)

Mr. McCourt went on to say that "There comes a time when you must change the filter, then you have another three months of uninterrupted performance." These admissions confirm what Hoover has found through its testing and what Dyson states in its commercials – all filters clog with dust, including those found in the Dyson vacuum cleaners.[13]

Dyson's claim that its vacuums do not "rely" on filters is so patently untrue that it removes any doubt that Maytag will succeed on its Lanham Act claims in this regard. As demonstrated above, Dyson's numerous other advertising claims regarding power, cleaning

efficacy and suction also are literally false, so Maytag is likely to succeed on those claims as well. Accordingly, Maytag has established the first element for a temporary restraining order and preliminary injunction.

### B.    Maytag Will Suffer Irreparable Harm if the Requested Relief is not Granted.

The inevitability of irreparable harm to Maytag in the absence of injunctive relief is clear. Under relevant precedent, the fact that a defendant is dissipating or threatening to dissipate assets in which the plaintiff possesses a likely equitable interest constitutes irreparable harm. *Kiesewetter*, 98 F.3d at 58 (defendant's history of dissipating assets acquired through unjust enrichment, fraud, and breach of fiduciary duty justified conclusion that plaintiffs would suffer irreparable harm in the absence of a freeze order); *F.T. Int'l*, 2000 WL 1514881, at *2 ("The diversion and transfer abroad of millions of dollars" likely acquired through unjust enrichment "suggests that plaintiff will be unable to recoup its funds without prompt injunctive action" and "is sufficient to show irreparable harm"). The same situation is present here.[15]

As an initial matter, Maytag has an equitable interest in the assets subject to this order. Here, Maytag has asserted, and presented compelling evidence to establish, repeated violations of the Lanham Act, Delaware's Deceptive Trade Practices Act and the Delaware common law for unfair competition. As remedies, Maytag is entitled to the profits Dyson received as a result of its false advertising, damages suffered by Maytag as a result of Dyson's false advertising, and the costs of this litigation. 15 U.S.C. § 1117(a); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168,

---

[15] In addition, the likelihood that the defendants, as here, are squandering assets subject to a future money judgment has been held to constitute irreparable harm. *See Gerardi*, 16 F.3d at 1373 (there "is ample authority for the proposition 'that the unsatisfiability of a money judgment can constitute irreparable injury'"); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 208 (3d Cir. 1990) ("an unsatisfied money judgment constitutes an irreparable injury"); *Chusid*, 63 F. Supp. 2d at 513 (the "Third Circuit [has] held that a plaintiff can meet this burden by showing a likelihood that a money judgment will otherwise go unsatisfied" and that "a preliminary injunction is warranted . . . particularly where the party subject to the injunction had a history of fraud relating to the plaintiffs' assets"); *Marsellis-Warner Corp.*, 51 F. Supp. 2d at 531 (same); *Leone Indus. v. Associated Packaging, Inc.*, 795 F. Supp. 117, 119 (D.N.J. 1992) (same).

176 (3d Cir. 2005). These remedies for unjust enrichment to Dyson are indisputably equitable in nature. *Callaway Golf Co. v. Slazenger*, 384 F.Supp.2d 735, 744 (D.C. Del. 2005); *see also Wood v. Prudential Ins. Co. Of America*, 207 F.3d 674, 686 (3d Cir. 2000) (recognizing disgorgement of improper profits as an equitable remedy) (citations omitted).

Federal courts have enjoined a defendant's dissipation of assets where the plaintiff asserts an equitable interest in the assets and a sufficient nexus exists between the assets and the plaintiff's claim. *United States ex rel. Rahman v. Oncology Assoc.*, 198 F.3d 489, 496-97 (4th Cir. 1999); *F.T. Int'l*, 2000 WL 1514881, at *1.

A compelling nexus exists between Maytag's false advertising claims and the targeted assets — Dyson's unlawful profits. *See Mason*, 2000 WL 1514881, at *2 ("Plaintiff seeks a constructive trust on the funds to be targeted by the injunctive relief and thus a sufficient nexus exists . . . . Moreover, plaintiff avers that defendant acquired the funds fraudulently and thus plaintiff has an equitable interest in the funds which provides a sufficient nexus."); *Rahman*, 198 F.3d at 497-98 (sufficient nexus existed between claims of fraud/unjust enrichment and funds or property obtained by fraud or "assets purchased with the proceeds of fraud"). First, Maytag asserts a false advertising claim for a disgorgement of the profits that Dyson received as a result of its false advertising.

But for Dyson's false advertisements, U.S. consumers would not have been duped into thinking that Dyson vacuums clean better than the competition, including Maytag. Moreover, Dyson would not have profited to such a degree, and Maytag would not have suffered as much, absent Dyson's misleading U.S. consumers.

21

Thus, preliminary relief is essential to maintain the status quo pending a likely judgment on Maytag's equitable claims and receipt of equitable remedies returning what is rightfully Maytag's.

The profits Dyson obtained from its false advertising are the very profits Maytag seeks to have returned to it in this action because Dyson acquired them through inequitable conduct.

Accordingly, Maytag has established the second element for a temporary restraining order and preliminary injunction.

### C.    The Balance of Harms Weighs in Favor of Maytag.

Dyson cannot plausibly claim that the requested relief will cause it more harm than denial of the relief will cause Maytag. *See Marsellis-Warner Corp.*, 51 F. Supp. 2d at 532 (concluding that issuance of an injunction freezing assets "will not harm the Defendants more than a denial would harm Marsellis-Warner"). As demonstrated above, Maytag will suffer irreparable harm without the requested relief. By contrast, courts routinely conclude that defendants will not suffer irreparable harm from an order preventing asset depletion especially when, as here, the consequences from such an order "were brought on by [the defendant's] own conduct." *Warner Corp.*, 51 F. Supp. 2d at 532; *see also Kiesewetter*, 98 F.3d at 59 (rejecting claim that freeze order that preventing defendant from covering certain "living expenses" outweighed harm to plaintiffs who had lost their interest in assets as a result of defendant's misconduct).

Accordingly, Maytag has established the third element for a temporary restraining order and preliminary injunction.

### D.    The Requested Relief is in the Public Interest.

Because Maytag has shown likelihood of success and irreparable harm, the relief requested is in the public interest. Courts routinely hold that when both of these elements have been established, "it almost always will be the case that the public interest will favor" the issuance of an injunction. *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994); *Marsellis-Warner Corp.*, 51 F. Supp. 2d at 532-33. The facts and claims in this action only serve to confirm that an injunction is in the public interest. At issue in this case is a concerted, highly coordinated advertising campaign by Dyson to mislead the American public through proven falsehoods The public certainly has an interest in ensuring that such conduct is properly dealt with through the imposition of an appropriate remedy.

E.   **The Amount Subject To The Requested Injunctive Relief Is Appropriate In Relation To The Expected Remedy.**

Under Third Circuit precedent, the Court "must make some attempt reasonably to relate the value of the assets encumbered to the likely value of the expected judgment." *Hoxworth*, 903 F.2d at 198. This Court need not, however, "make an extended effort to match the value of the assets encumbered to the expected value of the judgment dollar for dollar" and may tailor the scope of the injunction through an exercise of its discretion. *Id.* at 199. Thus, the Court is not required to quantify the precise expected judgment or perfectly match it to the value of the enjoined assets. *Chusid*, 63 F. Supp. 2d at 514 ("In order to meet this standard, the court is not required to perform a precise calculation of the defendants' ultimate liability.")

Maytag has estimated its damages as a result of Dyson's false advertising at more than $300 million.

(*See* November 28, 2006 Yahoo Finance web page, attached as Goldberg Aff. Exhibit Y)

As Maytag will establish at trial, a sizable award is appropriate in this case due Dyson's blatant false advertising campaign in the U.S.. The Lanham Act and supporting case law makes clear that *all* of the Dyson's profits from its false ads are recoverable.

Moreover, under Federal Rule of Civil Procedure 65(d), an injunctive order is binding "upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Thus, this Court's injunctive order relating to Dyson should be binding (after appropriate notice) on all of its corporate entities, including but not

limited to the parent company, Dyson James Limited; the former parent company, Dyson Limited; all of Dyson's subsidiaries and affiliates; as well as Dyson's principal shareholders, James Dyson and his three children, Emily, Jacob and Sam.    All transferees are bound by injunctive relief entered by this Court

F.D.I.C. v. Faulkner, 991 F.2d 262, 267 (5th Cir. 1993) (affirming freeze order of non-party's assets; persons "in active concert or participation with" defendant as set in Rule 65(d) includes nonparties who had participated in transferring assets that defendant had fraudulently obtained from plaintiff); Dole Fresh Fruit Co. v. United Banana Co., Inc., 821 F.2d 106, 110 (2d Cir. 1987) (individual officers and employees were within scope of injunction prohibiting corporation from dissipating assets).

### F.    Maytag Will Post an Appropriate Bond.

The party seeking an injunction is ordinarily required to post a bond "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to be wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While the Third Circuit has strictly interpreted the bond requirement, *Marsellis-Warner*, 51 F. Supp. at 534, the Court has the discretion in setting the amount, and may even waive it altogether. *Kiesewetter*, 98 F.3d at 59-60 (holding that security must be given unless balance of equities weighs overwhelmingly in favor of party seeking injunction, and then the district court has discretion to waive Rule 65(c) bond requirement after proper finding).

The bond should be set at a relatively low amount here

Under Maytag's proposed remedy, Dyson still would be able to use and control those assets, which later could be used to pay for any future judgment. In any event, Maytag is prepared to post any appropriate bond the Court may set within its discretion.

## V.    CONCLUSION

Maytag respectfully requests that the Court enter a temporary restraining order and preliminary injunction

Dated: December 1, 2006

Respectfully submitted,

MAYTAG CORPORATION

/s/ Francis DiGiovanni
Francis DiGiovanni (#3189)
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899
Phone (302) 658-9141
Fax (302) 658-5614

Kimball R. Anderson
Stephen P. Durchslag
Winston & Strawn
Chicago, IL  60601
Phone (312) 558-5600
Fax (312) 558-5700

Ray L. Weber
Laura J. Gentilcore
Renner, Kenner, Greive, Bobak,
Taylor & Weber
400 First National Tower
Akron, OH  44308
Phone (330) 376-1242
Fax (330) 376-9646

**CERTIFICATE OF SERVICE**

I, the undersigned attorney for Maytag Corporation, hereby certify that on December 1, 2006, I caused to be served a true and correct copy of the foregoing document upon the following counsel of record:

**BY HAND AND E-MAIL**
C. Barr Flinn
John W. Shaw
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

**BY FIRST CLASS MAIL AND E-MAIL**
Garrard R. Beeney
Richard C. Pepperman, II
James T. Williams
Keith McKenna
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Steven F. Reich
Jeffrey S. Edelstein
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10004

/s/ Francis DiGiovanni