**4**

MYLAN PHARMACEUTICALS, INC., et al., Plaintiffs, v. KREMERS URBAN
DEVELOPMENT, et al., Defendants.

C.A. No. 02-1628 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2003 U.S. Dist. LEXIS 20665*

**November 14, 2003, Decided**

**SUBSEQUENT HISTORY:** Patent interpreted by, Motion denied by *Mylan Pharms., Inc. v. Kremers Urban Dev. Co., 2004 U.S. Dist. LEXIS 391 (D. Del., Jan. 13, 2004)*

**PRIOR HISTORY:** *Mylan Pharms., Inc. v. Kremers Urban Dev. Co., 2003 U.S. Dist. LEXIS 5728 (D. Del., Apr. 7, 2003)*

**DISPOSITION:** [*1] Plaintiff's Motion for Leave to Amend GRANTED.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
[HN1] Fed. R. Civ. P. 15(a) permits a party to amend a complaint by leave of court or by written consent of the adverse party. Leave to amend a complaint should be freely given when justice so requires. A court has discretion to deny leave to amend when there exists undue delay, bad faith, dilatory motive, or undue prejudice to the opposing party, or when the amendment would be futile. Specifically, an amendment would be futile for purposes of Rule 15(a) if, accepting all the well pleaded facts as true, the amended complaint fails to state a claim upon which relief may be granted. In other words, the court should apply the same standards as are applied to Fed. R. Civ. P. 12(b)(6) motions to dismiss.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
*Trade Secrets Law > Civil Actions > General Overview*
*Trade Secrets Law > Misappropriation Actions > General Overview*
[HN2] Where it has original jurisdiction over a federal claim, a district court may exercise supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under U.S.

Const. art. III. 28 U.S.C.S. § 1367(a). Specifically, supplemental jurisdiction is proper under § 1367 if the state law claims derive from a common nucleus of operative fact to the federal claims.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court*
*Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation*
[HN3] There is no requirement that a plaintiff allege the facts that support a finding of personal jurisdiction in a complaint.

*Civil Procedure > Dismissals > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
[HN4] Generally, the appropriate procedural mechanism to enforce an arbitration agreement is a motion to compel, not a motion to dismiss.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Governments > Legislation > Statutes of Limitations > Pleading & Proof*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN5] Unless a complaint, on its face, fails to comply with the applicable limitations period, a motion to dismiss based on the failure to comply with the statute of limitations should be denied.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN6] In the absence of undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party,

or futility of the amendment, a court should exercise its discretion in favor of granting leave to amend. To ensure that cases are decided on the merits rather than on technicalities, the court should use strong liberality in considering whether to grant to leave to amend.

**COUNSEL:** For Mylan Pharmaceuticals Inc, Esteve Quimica, SA, PLAINTIFFS: John W Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE USA.

For Kremers Urban Development Company, Schwarz Pharma Inc, Schwarz Pharma Manufacturing, Inc, Schwarz Pharma-Group USA, DEFENDANTS: Philip A Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE USA.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

### I. INTRODUCTION

On November 2, 2002, plaintiff, Mylan Pharmaceuticals Inc. ("Mylan"), filed the above-captioned action alleging infringement of the '875 patent and tortious interference by the defendants, Kremers Urban Development Company, Schwartz Pharma, Inc., Schwartz Pharma Manufacturing, Inc., Schwartz Pharma USA Holdings, Inc. and Kremers Urban, Inc. (collectively "Kremers"). On January 2, 2003, Mylan filed an amended complaint joining the plaintiff, Esteve Quimica, S.A. ("Esteve" or collectively with Mylan, "Mylan"), a corporation organized under the laws of Spain with its principal place of business in Spain and the assignee of the '875 patent. On April 4, 2003, Mylan [*2] filed a second amended complaint correcting the name of one of the defendants.

Presently before the court is Mylan's motion for leave to file a third amended complaint adding two new defendants, Dr. Pawn Seth and Dr. Andre Stamm, and alleging four new counts for transfer of ownership of the '499, '198, and '355 patents, infringement of the '499, '198, and '355 patents, misappropriation of trade secrets technology and know-how, and conversion, respectively. For the following reasons, the court will grant this motion.

### II. BACKGROUND

The existing complaint alleges that Kremers' manufacturing and marketing of omeprazole generic drug in-

fringes Mylan's '875 patent and tortiously interferes with Mylan's prospective business opportunity to the sole use of its patented invention and the right to compete fairly for customers. After Mylan joined Esteve in this action, it undertook further investigation of these issues during discovery. In doing so, Mylan uncovered proof that two Esteve consultants, Dr. Seth and Dr. Stamm, misappropriated certain trade secrets, know-how, and other proprietary information regarding the development and manufacture of omeprazole. This proprietary information, [*3] Mylan claims, is the exclusive property of Esteve pursuant to the terms of an agreement between Saltrade Ltd. and Laboratorios Esteve, S.A. (hereinafter the "Saltrade Agreement"), n1 an affiliate of plaintiff Esteve. According to Mylan, Dr. Seth and Dr. Stamm used the know-how they misappropriated from Esteve to develop the omeprazole formula that is the subject of the '499, '198, and '355 patents assigned to Schwartz Pharma A.G. upon issuing. Mylan contends that those three patents, therefore, rightfully belong to itself and not to Schwartz Pharma A.G. or any of the other defendants.

---

n1 The pertinent section of the Saltrade Agreement states, "SALTRADE hereby transfers to ESTEVE on exclusive basis on the KNOW-HOW to manufacture the PRODUCT." "Know-how" is defined to mean "a body of technical information, documentation and data which refer to the process technology, machinery required and analytical technology used in manufacture, testing and analysis of the PRODUCT." "Product" is defined to mean OMEPRAZOLE PELLETS, bioequivalent to *ANTRA pellets."

[*4]

Mylan's allegations are reflected in the proposed amended complaint by four new counts, modification of the existing tortious interference count, and the addition of two defendants, Dr. Seth and Dr. Stamm. Count Two of Mylan's proposed amended complaint alleges that Dr. Seth and Dr. Stamm improperly obtained and assigned to Schwartz Pharma A.G. the '499, '198, and '355 patents for a formulation of omeprazole. Count Three then claims that Kremers marketing of omeprazole infringes the '499, '198, and '355 patents. In Count Five, Mylan asserts that Dr. Seth and Dr. Stamm, in addition to the other defendants, misappropriated confidential technology and know-how that Dr. Seth gained during his association with Esteve and that was the exclusive property of Esteve. Mylan also seeks to amend its tortious interference claim in Count Four to include allegations that Dr. Seth and Dr. Stamm conspired to misappropriate

confidential technology and know-how that was the exclusive property of Esteve. In Count Six of the proposed amended complaint, Mylan alleges that the defendants' receipt of profits from the sale of omeprazole constitutes conversion of funds properly belonging to Mylan.

Mylan claims [*5] it should be permitted to amend the complaint because the facts supporting the additional counts and joinder of parties were ascertained and developed during discovery. Kremers contends that the amendments are prejudicial because Mylan seeks to add four entirely new claims concerning three new patents and two new defendants at a late date in the case which would require reworking of the case management plan and rescheduling of the trial date. Kremers also makes a series of arguments claiming that Mylan's motion for leave to amend is also futile. It argues that Mylan lacks standing to claim patent infringement over the '499, '198, and '355 patents. Kremers also contends that the court lacks subject matter jurisdiction over the claims and personal jurisdiction over Dr. Seth and Dr. Stamm. It further argues that the new claims must be settled through arbitration because they arise out of the Saltrade Agreement which contains an arbitration provision. The tort claims, Kremers asserts, are barred by the three-year statute of limitations because Esteve was aware of the underlying facts as early as 1996. Kremers makes additional arguments that Mylan improperly relies on Delaware law, the [*6] Saltrade Agreement does not transfer a future interest in all omeprazole technology, and the conversion and tortious interference counts fail to state claims upon which relief may be granted. The court disagrees with these contentions.

## III. STANDARD OF REVIEW

*Rule 15 of the Federal Rules of Civil Procedure* permits [HN1] a party to amend the complaint by leave of court or by written consent of the adverse party. Leave to amend a complaint should be "freely given when justice so requires." *Fed. R. Civ. P. 15(a)*. The court has discretion to deny leave to amend when there exists undue delay, bad faith, dilatory motive or undue prejudice to the opposing party, or when the amendment would be futile. *See Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*; *Cureton v. NCAA, 252 F.3d 267, 273 (3d Cir. 2001)*. Specifically, an amendment would be futile for purposes of *Rule 15(a)* if, accepting all the well pleaded facts as true, the amended complaint fails to state a claim upon which relief may be granted. *See Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington, 646 F. Supp. 118, 120 (D. Del 1986)*. [*7] In other words, "the court should apply the same standards as are applied to *Rule 12(b)(6)* motions to dismiss." *Id.*

## IV. DISCUSSION

The court does not find the relevant factors to weigh against granting leave to amend the complaint to add Dr. Seth and Dr. Stamm as defendants and to include the proposed new and modified claims for transfer of ownership, infringement, tortious interference, misappropriation of trade secrets and conversion.

### A. Mylan Has Neither Unduly Delayed Nor Exhibited Bath Faith in Seeking to Amend the Complaint, and Kremers Will Not Be Significantly Prejudiced by the Amendments.

Having discovered the factual basis for the claims only after conducting discovery, Mylan timely seeks to amend its complaint to include the proposed counts. Mylan has not unduly delayed in seeking to amend the complaint to add the new counts, nor does its motion for leave appear to arise out of any bad faith or dilatory motive. This is particularly true because the proposed claims are based on facts having to do with the newer plaintiff, Esteve. Being a foreign corporation, Esteve had not been represented by counsel in the United States until being joined in [*8] this action after the filing of the initial complaint. After being joined in this action, Esteve had just over three months, pursuant to the March 19, 2003 scheduling order, to obtain any discovery necessary to evaluate potential additional claims and amend the complaint accordingly. Given the foregoing circumstances, it seems that the plaintiffs acted quickly and diligently to investigate Esteve's involvement in the events that gave rise to this action.

Furthermore, permitting Mylan to amend the complaint to include the above-described counts would not significantly prejudice Kremers. The court is not unsympathetic to Kremers' concerns that the addition of the new defendants and claims would require discovery from new third parties and additional discovery from the plaintiff Esteve. However, Mylan sought leave to amend nearly two months before the close of discovery, and the new defendants, Dr. Seth and Dr. Stamm, have already produced documents and been deposed as third parties. In view of Mylan's timely request and considering the discovery that has already been obtained, the court finds that little prejudice would result from re-opening discovery for the limited purpose of obtaining [*9] additional information on these claims.

### B. Mylan's Proposed Amendments Are Not Futile.

Kremers' remaining arguments against Mylan's proposed amendments, though possibly proper bases for a fully briefed motion to dismiss, are premature reasons for denying Mylan's motion to amend. The court will not determine at this juncture that Mylan lacks standing to

bring infringement claims for the '499, '198, and '355 patents. The issue of Mylan's standing to bring an infringement claim for these patents is riveted with factual disputes over the meaning of the Saltrade Agreement. Precedent suggests that Mylan would have standing to bring these claims if the Saltrade Agreement indeed transferred to Esteve legal title in the omeprazole formulation that is the subject of the '499, '198, and '355 patents. *See Speedplay Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed. Cir. 2000)* ("A party that has been granted all substantial rights under the patent is considered the owner regardless of how the parties characterize the transaction that conveyed those rights."); *Filmtec Corp. v. Allied-Signal Inc., 939 F.2d 1568, 1573 (Fed. Cir. 1991)* (where a contract expressly [\*10] granted rights in any future invention, finding the transfer of title would occur by operation of law). However, to make such a determination the court would have to probe the fact-intensive issue of the scope of the know-how and technology transferred under the Saltrade Agreement. The court will not undertake this kind of inquiry on a motion to amend the complaint.

Because the court at this juncture will not opine ultimately on the issue of Mylan's standing to claim infringement of the '499, '198, and '355 patents, it likewise would be premature for the court to conclude that it lacks subject matter jurisdiction over Mylan's proposed additional state law claims. [HN2] Where it has original jurisdiction over a federal claim, a district court may exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under *Article III of the United States Constitution*." *28 U.S.C. § 1367(a)*. Specifically, supplemental jurisdiction is proper under *28 U.S.C. § 1367* if the state law claims "derive from a common nucleus of operative [\*11] fact" to the federal claims. *United Mine Workers v. Gibbs, 383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)*. Based on the allegations in the proposed amended complaint, Mylan's state law claims for transfer of ownership, tortious interference, misappropriation of trade secrets and conversion purport to arise from the same or similar set of facts and circumstances that give rise to Mylan's claim of ownership and infringement of the '499, '198, and '355 patents. It therefore appears that the court would have sufficient grounds to exercise supplemental jurisdiction over the additional state law claims if Mylan has properly brought the additional infringement claims. Nevertheless, without expressing a view on Mylan's standing to bring the additional infringement claims, the court cannot determine whether or not to exercise supplemental jurisdiction over the accompanying proposed state law claims.

Kremers' challenge to this court's exercise of personal jurisdiction over Dr. Seth and Dr. Stamm is also not a proper basis for denying Mylan leave to amend the complaint under these circumstances. [HN3] There is no requirement that a plaintiff allege the facts that support [\*12] a finding of personal jurisdiction in a complaint. *See, e.g., Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474 (D. Del. 1995)* ("Noticeably absent from ... Rule [8] is a requirement of a statement setting forth the grounds upon which the court has personal jurisdiction over the defendant."). In view of this consideration, along with the fact that the parties have not yet developed a record on the possible contacts Dr. Seth and Dr. Stamm may or may not have in the state of Delaware, denying Mylan leave to amend its complaint for lack of personal jurisdiction over these two defendants would be inappropriate.

The court furthermore finds it inappropriate to determine the arbitrability of Mylan's claims on a motion to amend. [HN4] Generally, the "appropriate procedural mechanism to enforce an arbitration agreement is a motion to compel, not a motion to dismiss." *West v. Merillat Indus., Inc., 92 F. Supp. 2d 558, 561 (W.D. Va. 2000)*; *see also Strick Corp. v. Cravens Homalloy (Sheffield) Ltd., 352 F. Supp. 844, 848 (E.D. Pa. 1972)*. Moreover, although the Saltrade Agreement does contain an arbitration clause, the actual parties to that contract, [\*13] Saltrade Ltd. and Laboratorios Esteve, S.A., have not been joined in this action. Given these considerations, it would be premature at this juncture to compel arbitration, particularly where the dispute is among non-parties to the contract.

Likewise, Kremers' argument that Mylan's tort claims are barred by the statute of limitations is also premature. [HN5] "Unless the complaint, on its face, fails to comply with the applicable limitations period, a motion to dismiss based on the failure to comply with the statute of limitations should be denied." *Tracinda Corp. v. Daimlerchrysler AG 197 F. Supp. 2d 42, 57 (D. Del. 2002)* (citing *In re Equimed, Inc., 2000 U.S. Dist. LEXIS 6209, 2000 WL 562909, at \*9 (E.D. Pa. May 9, 2000)*). The parties clearly dispute when the proposed claims accrued. Kremers contends that Mylan knew of the claims over six years ago whereas Mylan asserts that it had the opportunity to learn of the defendants' unlawful activities on January 14, 2003, at the earliest. Applying the same standard as for a *12(b)(6)* motion, the court will not deny Mylan leave to amend on the grounds that its proposed counts are barred by the statute of limitations.

Finally, construing the [\*14] allegations of the proposed amendments in the light most favorable to Mylan, the facts underlying Kremers' remaining contentions that the conversion and tortious interference counts fail to state claims upon which relief may be granted, that the

Saltrade Agreement does not transfer a future interest in all omeprazole technology, and that Mylan improperly relies on Delaware law are not sufficiently developed at this time to warrant a finding that the amendments are futile

## IV. CONCLUSION

[HN6] In the absence of undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of the amendment, the court should exercise its discretion in favor of granting leave to amend. *See Foman, 371 U.S. at 182; Cureton, 252 F.3d at 273.* To ensure that cases are decided on the merits rather than on technicalities, the court should use strong liberality in considering whether to grant to leave to amend. *See Dole v. Arco Chem. Co., 921 F.2d 484, 487 (3d Cir. 1990); Bechtel v. Robinson, 886 F.2d 644, 652 (3d Cir. 1989); Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing Virgin Islands, 663 F.2d 419, 425 (3d Cir. 1981).* [*15] Having found no dilatory motive or undue prejudice and that the claims would not be futile, the court will exercise its discretion in favor of granting Mylan leave to amend the complaint in the proposed manner

Therefore, IT IS HEREBY ORDERED that:

1. Plaintiff's Motion for Leave to Amend (D.I. 81) is GRANTED.

2. Mylan shall be permitted leave to file the Third Amended Complaint in the form attached as Exhibit A to the Plaintiff's Motion for Leave to Amend.

Dated: November 14, 2003

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**5**

LEXSEE

MICHAEL S. PINKERT and ELEANOR A. PINKERT, Plaintiffs, v. JOHN J. OLIVIERI, P.A., BROSNAHAN BUILDERS, INC., KEVIN BROSNAHAN and LINDA BROSNAHAN, Defendants and Third-Party Plaintiffs, v. REEF INDUSTRIES, INC., FACILITIES RESTORATION SUPPLY, INC. and PRESERVATION & PROTECTION SYSTEMS, INC., Third-Party Defendants, v. OCEAN DESIGNS, OCEAN DESIGNS LLC and PAUL ROUCHARD D/B/A OCEAN DESIGNS, INC.; C. JOSEPH COUCHMAN TILE INC.; DOUG GRIFFITH DRYWALL; W.M. PLUMBING & HEATING, INC. A/K/A and/or D/B/A WM PLUMBING & HEATING, INC.; and ADVANCE FIBERGLASS TECHNOLOGIES, LLC., Additional Third-Party Defendants.

Civil Action No. 99-380-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2001 U.S. Dist. LEXIS 8133*

May 24, 2001, Decided

**DISPOSITION:** [*1] Brosnahan defendants' motion for summary judgment on the claims (D.I. 124) granted in part and denied in part. Brosnahan defendants' motion for partial summary judgment that plaintiffs not entitled to attorney's fees pursuant to paragraph 16(b) of the Construction Contract (D.I. 221) granted. Brosnahan defendants' motion for a protective order respecting pre-judgment discovery in aid of execution (D.I. 218) granted. Reef Industries' motion for summary judgment (D.I. 225) granted in part and denied in part. Preservation Systems's motion for summary judgment (D.I. 228) and Facilities Restoration's motion for summary judgment (D.I. 230) granted. Ocean Designs' motion for summary judgment (D.I. 233) denied.

**COUNSEL:** Daniel B. Rath, Esquire, Klett, Rooney, Lieber & Schorling, P.C., Wilmington, Delaware, for Plaintiffs.

Michael A. Gatje, Esquire, Of Counsel, Wickwire Gavin, P.C., Vienna, Virginia.

Adam Balick, Esquire, Balick & Balick, Wilmington, Delaware, for John J. Olivieri, P.A., Defendant and Third-Party Plaintiff.

Neal C. Belgam, Esquire, Blank, Rome, Comisky &

McCauley, Benjamin C. Wetzel, III, Esquire and Natalie M. Ippolito, Esquire, Bailey & Wetzel, P.A., Wilmington, [*2] Delaware, for Brosnahan Builders, Inc., Kevin Brosnahan and Linda Brosnahan, Defendants and Third-Party Plaintiffs.

Loreto P. Rufo, Esquire, The Bayard Firm, Wilmington, Delaware, for Reef Industries, Inc., Facilities Restoration Supply, Inc. and Preservation & Protection Systems, Inc., Third-Party Defendants.

Richard W. Pell, Esquire and Jennifer L. Gioia, Esquire, Tybout, Redfearn & Pell, Wilmington, Delaware, for Ocean Designs, Ocean Designs LLC and Paul Rouchard, Additional Third-Party Defendants.

**JUDGES:** Sue L. Robinson, Chief Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated: May 24, 2001
Wilmington, Delaware

**Sue L. Robinson**

2001 U.S. Dist. LEXIS 8133, *2

**Chief Judge**

## I. INTRODUCTION

Plaintiffs Michael and Eleanor Pinkert filed this action on June 16, 1999 claiming damages arising out of the construction of their home in Bethany Beach, Delaware. Plaintiffs' complaint alleges breach of contract and various counts of fraud against defendants Brosnahan Builders, Inc., Kevin Brosnahan and Linda Brosnahan ("the Brosnahan defendants"), as well as breach of contract, professional negligence and negligent misrepresentation against defendant John J. Olivieri, P.A. ("Olivieri"). [*3] (D.I. 1) On July 23, 1999, Olivieri filed a third-party complaint for indemnification and contribution against Reef Industries, Inc. ("Reef Industries") and Facilities Restoration Supply, Inc. ("Facilities Restoration"), which the court dismissed on September 29, 2000. (D.I. 115) On August 21, 2000, the court granted the Brosnahan defendants leave to file a third-party complaint against Ocean Designs, Ocean Designs LLC and Paul Rouchard ("Ocean Designs"), W.M. Plumbing & Heating, Inc., and Advance Fiberglass Technologies, LLC, alleging breach of contract and negligence, and seeking indemnity and contribution. (D.I. 101) On October 10, 2000, Ocean Designs filed a third-party complaint against Taco Metal, Inc. ("Taco Metal") for indemnification and contribution. (D.I. 123) On November 20, 2000, the Brosnahan defendants filed a third-party complaint against Reef Industries, Facilities Restoration, and Preservation & Protection Systems, Inc. ("Preservation Systems"), alleging claims of negligence, breach of the implied warranty of fitness, and indemnification and contribution. (D.I. 157) The court has jurisdiction pursuant to *28 U.S.C. § 1332.*

Currently before [*4] the court are the Brosnahan defendants' motion for summary judgment on all claims against them (D.I. 124), the Brosnahan defendants' motion for partial summary judgment that plaintiffs are not entitled to recover attorney's fees (D.I. 221), the Brosnahan defendants' motion for protective order respecting pre-judgment discovery in aid of execution (D.I. 218), Reef Industries' motion for summary judgment on all claims against it (D.I. 225), Preservation Systems' motion for summary judgment on all claims against it (D.I. 228), Facilities Restoration's motion for summary judgment on all claims against it (D.I. 230), and Ocean Designs' motion for summary judgment on all claims against it. (D.I. 233) For the following reasons, the court shall grant in part and deny in part the Brosnahan defendants' motion for summary judgment on claims against them; grant the Brosnahan defendants' motions for summary judgment that plaintiffs are not entitled to attorney's fees under paragraph 16(b) of the Construction Contract and for a protective order limiting discovery; grant in part and deny in part Reef Industries' motion for summary judgment on claims against it; grant Facilities Restoration's and [*5] Preservation Systems' motions for summary judgment on claims against them; and deny Ocean Designs' motion for summary judgment on claims against it.

## II. BACKGROUND

### A. Relevant Parties

Plaintiffs are husband and wife who reside in McLean, Virginia. Defendant Brosnahan Builders, Inc. ("Brosnahan Builders") is a corporation organized under the laws of Delaware, with its principal place of business in Frankford, Delaware. Brosnahan Builders is primarily engaged in the business of constructing single family homes. Defendant Kevin Brosnahan is the president of Brosnahan Builders, and his wife, defendant Linda Brosnahan, is an employee of Brosnahan Builders. Kevin and Linda Brosnahan are Delaware residents and are sued in their individual capacities. Olivieri is a professional association organized under the laws of New Jersey, with its principal place of business in New Jersey. Olivieri is primarily engaged in the business of providing architectural services. (D.I. 1) Reef Industries is a Texas corporation that manufactures vapor barriers used as siding in buildings. Facilities Restoration and Preservation Systems, Pennsylvania corporations, are distributors of Reef Industries' [*6] products. (D.I. 157) Ocean Designs, a Maryland limited liability company, is a supplier and installer of aluminum railings. (D.I. 240, Ex. A) Taco Metal is a Florida corporation that manufactures aluminum used in railings. (D.I. 123)

### B. Facts

In 1995, plaintiffs purchased a beachfront property (the "Property") in Bethany Beach, Delaware to construct a three-story home (the "Residence"). On October 30, 1995, plaintiffs entered into an "Architecture Contract" with Olivieri that required Olivieri to create designs and plans, review shop drawings, provide specifications to the contractor and subcontractors, and meet with contractors on-site. (D.I. 126, Ex. A)

2001 U.S. Dist. LEXIS 8133, *6

On September 30, 1997, plaintiffs and Brosnahan Builders entered into a "Construction Contract" for the construction of the Residence for a price of approximately $ 1.5 million. (D.I. 126, Ex. B) The Construction Contract provides, in pertinent part:

> 3. Plans and Specifications. (a) The Home shall be constructed and completed substantially in accordance with those certain plans and specifications more particularly identified by Exhibit "A" attached hereto and incorporated herein by reference . . . n1
>
> 10. [*7] Changes in Plans and Specifications. . . .
>
> (b) Owner may, at any time and from time to time prior to the Completion Date without invalidating this Agreement, require changes to the Work. Such changes may consist of additions, deletions, or modifications the Plans and Specifications, with the Contract Sum and completion Date being adjusted accordingly. Such changes in the Work shall be authorized by written Change Order signed by Owner, Contractor and Architect, or by written Construction Change Directive signed by Owner and Architect. The Contract Sum and the Completion Date shall be changed only by Change Order. . . .
>
> (c) Contractor shall be under no obligation to implement any change nor shall Owner [be] under any obligation to pay for the same unless and until the same is documented by such a change order. Likewise, no change in the Work shall be authorized absent a change order for same signed by Owner and no change order shall be [in] effect unless the same is signed by Owner.
>
> . . .
>
> 12. Payment. (a)(i) Payments to the Contractor shall be paid in accordance with Exhibit B. n2

> (ii) Progress invoices shall be accompanied by such documentation as Owner and/or [*8] Architect may reasonably require to verify the propriety of such request for payment. Following review of each such invoice (and its supporting documentation) by Owner, Architect and Owner's lender, and acceptance of the same, Owner shall, in exchange for appropriate mechanics' lien releases, satisfy such invoice.
>
> . . .
>
> 16. Indemnification. (a) Owner agrees to defend, indemnify and hold Contractor harmless from and against any and all loss, cost, expense, liability, actions, and claims for injury suffered by Owner or others, including reasonable attorneys fees, or for harm caused to the Lot or the Home, due solely to inspections of the Home by Owner or Owner's invitees prior to Settlement.
>
> (b) Contractor agrees to defend, indemnify and hold Owner harmless from and against any and all loss, cost, expense, liability, actions, and claims whatsoever (including, without limitation, reasonable attorneys fees and court costs) incurred by Owner incident to any malfeasance or nonfeasance by Contractor with respect to Contractor's responsibilities under the terms of this Agreement.
>
> . . .    .
>
> 19. Governing Law. This Agreement shall be governed, construed and enforced [*9] in accordance with Delaware law.

(D.I. 126, Ex. B)

> n1 The parties have not submitted "Exhibit 'A'" to the court, but the Brosnahan defendants allege that Olivieri's "Project Manual" is incorporated into the referenced "Plans and Specifications."

(D.I. 154, Ex. 2) The Project Manual in turn incorporates the "General Conditions of the Contract for Construction" published by the American Institute of Architects ("AIA"), which describes the AIA standard forms for progress payments (the G703 Continuation Sheet and G702 Application for Certification and Payment). (D.I. 154, Ex. 3)

n2 "Exhibit B" is the AIA standard G703 Continuation Sheet ("Continuation Sheet"), a list of the work that Brosnahan Builders was contracted to perform with a scheduled price for each item. Each Continuation Sheet references the AIA standard G702 Application and Certification for Payment ("Application and Certification for Payment"). (D.I. 154, Ex. 4)

Brosnahan Builders began construction of the Residence in September 1997 and [*10] completed the project in April 1999. (D.I. 1) Brosnahan Builders subcontracted with Ocean Designs to deliver and install the exterior aluminum railings on the Residence, and with Reef Industries to deliver the vapor barrier used in the exterior siding. n3 On fifteen occasions during construction, Brosnahan Builders submitted to Olivieri an AIA standard Application and Certification for Payment. n4 Each was signed by Linda Brosnahan and provided:

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

(D.I. 144, Ex. 4) Olivieri made several visits to the construction site and approved each Application and Certification for Payment, which also provided:

In accordance with the Contract

Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner [*11] that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

(D.I. 144, Ex. 4) (emphasis in original)

n3 Olivieri's Plans and Specifications required the "VAPORguard wrap," which Brosnahan Builders ordered from Reef Industries. Reef Industries instead delivered the "T-65G wrap," which Brosnahan Builders installed onto the Residence. Reef Industries fully admits the delivery error, but claims that because of their similarity, there was no damage caused to the Residence by the T-65G wrap that would not have been caused by the VAPORguard wrap. (D.I. 226)

n4 A Continuation Sheet with a list of services performed was appended to each Application and Certification for Payment. (D.I. 144, Ex. 4)

In November 1998, with construction substantially completed, plaintiffs and their family moved into the Residence. After a rainstorm [*12] in January, plaintiffs noticed water leaks around windows, doors and ceiling fixtures. Plaintiffs retained an independent moisture consultant, who concluded that the wrong building wrap had been installed, there was no aluminum flashing around doors and windows, and there were no roof vents as provided by the Plans and Specifications. (D.I. 1) Plaintiffs have since discovered other deficiencies, including corrosion of exterior railings, cracks in the marble tile floor, flaws in the drywall installation and finishing, leaking showers, defectively installed shower panes, and improperly installed fiberglass roofing. (D.I. 126, Ex. 1; D.I. 240, Ex. A) As of October 2000, plaintiffs have spent over $ 650,000 in remedial architectural and construction costs. (D.I. 144, Ex. 3) Plaintiffs allege that when they confronted Kevin

Brosnahan with the construction defects, he responded by asserting that he did not have the "manpower" or the "money" to remedy the problems, and that if pursued, he would "go bankrupt." (D.I. 1)

### C. Plaintiffs' Complaint

Count I of plaintiffs' complaint alleges breach of contract by Brosnahan Builders for failing to perform work in accordance with general industry [*13] standards and the Plans and Specifications provided by Olivieri. Count V alleges that Brosnahan Builders committed fraud by requesting payment for work that plaintiffs claim was not properly performed.

Count VI asserts that Kevin Brosnahan committed fraud in his individual capacity by requesting payments on behalf of Brosnahan Builders for work that plaintiffs claim was not performed in accordance with the Plans and Specifications and general industry standards. Counts VII and VIII allege that Linda Brosnahan committed fraud and equitable fraud in her individual capacity by signing payment requests on behalf of Brosnahan Builders for the work performed.

Counts IX, X, and XI assert that the Brosnahan defendants violated Delaware's Consumer Fraud Act, *6 Del. C. § 2513*, by submitting payment requests on behalf of the Brosnahan Builders for work plaintiffs claim was not performed in accordance with the Plans and Specifications and general industry standards. n5

n5 The Consumer Fraud Act provides, in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or

> damaged thereby, is an unlawful practice.
> *6 Del. C. § 2513(a).*

[*14]

Counts II, III and IV allege breach of contract, professional negligence and negligent misrepresentation by Olivieri for failure to adequately inspect and monitor the construction work, and for approving payment requests by the Brosnahan defendants for defective work.

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations [*15] omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

## IV. DISCUSSION

### A. [*16]  Plaintiffs' Fraud Claims Against the Brosnahan Defendants

As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort. See *Garber v. Whittaker, 36 Del. 272, 174 A. 34, 36 (Del. Super. 1934).* "[A breach of contract claim] cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform." *Iotex Communications, Inc. v. Defries, 1998 Del. Ch. LEXIS 236, 1998 WL 914265,* at *5 (Del. Ch. Dec. 21, 1998). See also *Dann v. Chrysler Corp., 40 Del. Ch. 103, 174 A.2d 696, 700 (Del. Ch. 1961)* ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

Plaintiffs allege that the Brosnahan defendants: (1) contracted to perform construction services; (2) failed to perform the services in the manner called for by the Construction Contract; and (3) submitted payment applications indicating [*17] the services had been performed according to the Construction Contract. The gravamen of plaintiffs' common law fraud, equitable fraud, and Consumer Fraud Act claims is that the Brosnahan defendants knowingly misrepresented the nature of their work each time they submitted an Application and Certification for Payment. These alleged misrepresentations were not collateral to the Construction Contract, but rather memorialized as some of the Brosnahan defendants' principal obligations under their agreement with plaintiffs. The duty to submit periodic payment applications existed solely by reason of the Construction Contract. Neither Brosnahan Builders, Kevin Brosnahan nor Linda Brosnahan violated any common law duty independent of the Construction Contract between Brosnahan Builders and plaintiffs. See, e.g., *Feinberg v. Saunders Karp & Megrue, L.P., 1998 U.S. Dist. LEXIS 19144,* No. 97-297- SLR, *1998 WL 863284,* at *17 (D. Del. Nov. 13, 1998) (dismissing fraud action under New York law where breached promise was incorporated into written agreement); *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 256 Va. 553, 507 S.E.2d 344, 348 (Va. 1998)* (dismissing fraud claims based on contractor's [*18] alleged misrepresentations in submissions of applications for payment because no independent duty existed apart from construction contract).

Plaintiffs have also failed to present evidence that they were fraudulently induced into the Construction Contract. Such evidence may, in certain cases, give rise to an action in fraud. See, e.g., *Tam v. Spitzer, 1995 Del. Ch. LEXIS 116,* No. 12538, *1995 WL 510043,* at *6 (Del. Ch. Aug. 17, 1995). Here, plaintiffs' allegations arise solely from the Brosnahan defendants' performance of their contractual duties and are, therefore, insufficient to support a fraud claim. Thus, the court dismisses all of the fraud claims against the Brosnahan defendants (Counts V through XI) in plaintiffs' complaint. n6

> n6 The Brosnahan defendants also argue that plaintiffs' fraud claims are barred by the economic loss doctrine. See *Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1195 (Del. 1992)* ("The economic loss doctrine is a judicially created doctrine that prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to **other** property) and, the only losses suffered are economic in nature.") (emphasis in original). The 1996 Delaware Home Owner's Protection Act, however, has banned the application of the economic loss doctrine to certain residential construction cases:
>
>> No action based in tort to recover damages resulting from negligence in the construction or manner of construction of an improvement to residential real property and/or in the designing, planning, supervision and/or observation of any such construction or manner of construction shall be barred solely on the ground that the only losses suffered are economic in nature.

*6 Del. C. § 3652*. Based on the record presented, the court finds that if plaintiffs had alleged fraud claims based on duties apart from the Construction Contract, those claims would not be barred by the economic loss doctrine.

[*19]

### B. Plaintiffs' Breach of Contract Claim Against the Brosnahan Defendants

The Brosnahan defendants also argue that they are not liable for breach of the Construction Contract because they were acting under the direction of Olivieri. See *Ridley Inv. Co. v. Croll, 56 Del. 208, 192 A.2d 925, 927 (Del. 1963)* ("[A] contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if he performs his work without neglect and in a workmanlike manner."). The Brosnahan defendants claim that any deviations from the Plans and Specifications were approved by Olivieri and, therefore, they are not liable for damage that resulted from those changes.

Based on the record presented, the court finds genuine issues of material fact as to whether the deviations from the Plans and Specifications that resulted in damage to plaintiffs' Residence were approved by Olivieri, as well as whether the Brosnahan defendants' work was performed "without neglect and in a workmanlike manner." Thus, summary judgment that the Brosnahan defendants are not liable to plaintiffs because they were acting as agents of Olivieri is denied.

### C. Attorney's [*20] Fees Pursuant to Paragraph 16(b) of the Construction Contract

Plaintiffs allege that they are entitled to recover their attorney's fees from the Brosnahan defendants pursuant to paragraph 16(b) of the Construction Contract. The Construction Contract is governed by Delaware law, which states that "apart from statute or contract a litigant must pay his [own] counsel fees." *Maurer v. Int'l Re-Insurance Corp., 33 Del. Ch. 456, 95 A.2d 827, 830 (Del. 1953)*. The Delaware Code, which allows recovery of attorney's fees when a lawsuit is based on a written instrument, states that "counsel fees shall not be entered as part of such judgment unless the note, bond, mortgage, invoice or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and

allowance thereof . . ." *10 Del. C. § 3912*.

The court must determine, therefore, whether paragraph 16(b) of the Construction Contract expressly provides for the recovery of plaintiffs' attorney's fees. Paragraph 16(b) provides:

> Contractor agrees to **defend, indemnify and hold Owner harmless** from and against any and all loss, cost, expense, liability, actions, and claims whatsoever [*21] (including, without limitation, reasonable attorneys fees and court costs) incurred by Owner incident to any malfeasance or nonfeasance by Contractor with respect to Contractor's responsibilities under the terms of this Agreement.

(Emphasis added) The language "defend, indemnify and hold Owner harmless" clearly renders Paragraph 16(b) an indemnification provision which acts to protect plaintiffs from liability if they are sued by a third party for damage caused by "malfeasance or nonfeasance" by the Brosnahan defendants. Plaintiffs' belief that they are entitled to attorney's fees based on this indemnification provision is irreconcilable with the terms of the provision. The Brosnahan defendants cannot agree to "defend, indemnify and hold [plaintiffs] harmless" from a lawsuit filed against the Brosnahan defendants by plaintiffs themselves. Other Delaware courts have held that similar indemnification provisions are not applicable to claims between contracting parties; they are intended to protect one contracting party against liability from third party claims when the other contracting party is at fault. See, e.g., *DRR, L.L.C. v. Sears, Roebuck and Co., 949 F. Supp. 1132, 1142 (D. Del. 1996);* [*22] *Cannon and Son v. Dorr-Oliver, 394 A.2d 1160, 1165 (Del. 1978)*. Therefore, the Brosnahan defendants' motion that plaintiffs are not entitled to attorney's fees pursuant to Paragraph 16(b) of the Construction Contract is granted.

### D. Pre-Judgment Discovery of the Brosnahan Defendants' Assets

The Brosnahan defendants have requested a protective order preventing pre-judgment discovery of their assets. The Federal Rules of Civil Procedure do not permit pre-trial discovery of a defendant's finances. See *Gangemi v. Moor, 268 F. Supp. 19, 21-22 (D. Del. 1967);*

*McCurdy v. Wedgewood Capital Mgmt. Co., 1998 U.S. Dist. LEXIS 18875, No. 97-4304, 1998 WL 964185,* at *10 (E.D. Pa. Nov. 16, 1998) ("Rule 26 will not permit the discovery of facts concerning a defendant's financial status, or ability to satisfy a judgment, since such matters are not relevant, and cannot lead to the discovery of admissible evidence."). Two exceptions to this general rule have been recognized by Delaware courts, namely, if there is a "factual basis rising to the level of a triable issue for punitive damages," or if a plaintiff "can prove by a preponderance of the evidence that a defendant made [*23] a negligent misrepresentation of a material fact with the intent that a consumer rely upon it" under the Delaware Consumer Fraud Act. *State ex rel. Brady, State of Delaware v. Wellington Homes, 2001 Del. Super. LEXIS 73, No. 99 C-09-168-JTV, 2001 WL 238125,* at *1 (Del. Super. Jan. 23, 2001).

The court is dismissing plaintiffs' fraud claims against the Brosnahan defendants, thereby rendering punitive damages unrecoverable from them. See *E.I. DuPont de Nemours and Co. v. Pressman, 679 A.2d 436, 445 (Del. 1996)* ("Punitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort."). Thus, the court finds no basis to deviate from the general rule prohibiting pre-trial discovery of the Brosnahan defendants' assets. The Brosnahan defendants' request for a protective order is granted.

### E. The Brosnahan Defendants' Claims Against Reef Industries

The Brosnahan defendants filed a third-party complaint against Reef Industries, alleging negligence, breach of the implied warranty of fitness for a particular purpose, and indemnification and contribution. The Brosnahan defendants do not oppose Reef Industries' motion for summary judgment [*24] as to the implied warranty claim, which is therefore dismissed.

Regarding the remaining negligence claim and indemnification and contribution claim, the court concludes that there exist genuine issues of material fact as to Reef Industries' liability. Reef Industries admits that it delivered the T-65G wrap instead of the VAPORguard wrap requested by Brosnahan Builders, and the parties appear to agree that all cited experts acknowledge that either wrap would have caused damage to the Residence. However, the record is unclear as to the difference in extent of damage caused by one type over the other type.

Therefore, the court finds there are triable issues of fact on this issue, and declines to grant summary judgment on the remaining claims against Reef Industries.

### F. The Brosnahan Defendants' Claims Against Facilities Restoration and Preservation Systems

The Brosnahan defendants do not oppose motions for summary judgment by Facilities Restoration and Preservation Systems on all claims against them. Therefore, the court grants their motions for summary judgment and dismisses them from the case.

### G. The Brosnahan Defendants' Claims Against Ocean Designs

Ocean Designs argues [*25] for summary judgment that it is not liable for the corrosion of plaintiffs' aluminum railings because if the corrosion was in fact due to a defect in the railings and not poor maintenance by plaintiffs, that defect was caused by Taco Metal, Ocean Designs' aluminum supplier. The court finds that there exists a genuine issue of material fact as to whether Ocean Designs is responsible for the defective aluminum railings. Although Ocean Designs may ultimately be found not to be at fault, Ocean Designs contracted with Brosnahan Builders to supply and install quality aluminum railings. To the extent that Taco Metal is responsible for the corroded aluminum, Ocean Designs is seeking indemnification and contribution from it. Based on the record presented, therefore, Ocean Designs' motion for summary judgment is denied.

### V. CONCLUSION

For the reasons stated, the court shall grant in part and deny in part the Brosnahan defendants' motion for summary judgment on claims against them; grant the Brosnahan defendants' motions for summary judgment that plaintiffs are not entitled to attorney's fees under paragraph 16(b) of the Construction Contract and for a protective order limiting [*26] discovery; grant in part and deny in part Reef Industries' motion for summary judgment on claims against it; grant Facilities Restoration's and Preservation Systems' motions for summary judgment on claims against them; and deny Ocean Designs' motion for summary judgment on claims against it. An appropriate order shall issue.

### ORDER

2001 U.S. Dist. LEXIS 8133, *26

At Wilmington, this 24th day of May, 2001;

IT IS ORDERED that:

1. The Brosnahan defendants' motion for summary judgment on the claims (D.I. 124) is granted in part and denied in part.

2. The Brosnahan defendants' motion for partial summary judgment that plaintiffs are not entitled to attorney's fees pursuant to paragraph 16(b) of the Construction Contract (D.I. 221) is granted.

3. The Brosnahan defendants' motion for a protective order respecting pre-judgment discovery in aid of execution (D.I. 218) is granted.

4. Reef Industries' motion for summary judgment (D.I. 225) is granted in part and denied in part.

5. Preservation Systems's motion for summary judgment (D.I. 228) and Facilities Restoration's motion for summary judgment (D.I. 230) are granted.

6. Ocean Designs' motion for summary judgment (D.I. 233) is denied.

United States District [*27] Judge

**6**

LEXSEE 1981 DEL CH LEXIS 641

**ROTHCHILD INTERNATIONAL CORP. v. LIGGETT GROUP, INC.**

No. 6239

Court of Chancery of the State of Delaware, Sussex

*1981 Del. Ch. LEXIS 641*

July 14, 1981

OPINION BY: [*1]

BROWN

OPINION:

BROWN, Vice-Chancellor

This suit is brought as a class action by a former shareholder of the 7 per cent Preferred stock of the defendant-Liggett Group, Inc. ("Liggett"). As a result of a tender offer and merger, the defendant GM Sub Corporation ("GM Sub") became the owner of Liggett. GM Sub, indirectly, is the wholly-owned subsidiary of the named defendant Grand Metropolitan Limited ("Grand Met").

Liggett is a Delaware corporation. GM Sub is also a Delaware corporation which was formed during 1980 as a subsidiary of Grand Met for the purpose of purchasing and holding shares in Liggett. GM Sub is engaged in no other activity. It has no office in Delaware, but it does have a registered agent for service of process. Grand Met is a British corporation. According to the present status of the record, there is no indication that it conducts any commercial business in Delaware under its own name and it has no Delaware registered agent for the purpose of accepting service of process.

Plaintiff's suit, brought on behalf of itself and the other former holders of Liggett's 7 per cent Preferred stock, contends in effect, that the acquisition of Liggett by Grand Met through [*2] the merger process amounted to a liquidation of Liggett insofar as the rights of the 7 per cent Preferred shareholders were concerned. Under Liggett's certificate of incorporation existing at the time of the tender offer and merger, the 7 per cent Preferred shareholders were entitled to $ 100 per share upon the liquidation of Liggett. Under the tender offer, accepted by less than 50 per cent of the 7 per cent Preferred shareholders, and pursuant to the terms of the subsequent merger, the 7 per cent Preferred shareholders received $ 70 per share as their consideration for being eliminated from the Liggett enterprise.

Plaintiff's suit charges that Liggett, by accepting Grand Met's proposal through the action of its board of directors, contravened the certificate of incorporation insofar as the rights of the 7 per cent Preferred shareholders were concerned. It charges Grand Met and GM Sub, as the majority shareholders of Liggett at the time of the merger, with a breach of fiduciary duty by paying $ 70 rather than $ 100 per share in acquiring the interests of the 7 per cent Preferred shareholders.

The complaint seeks a declaration that Liggett was liquidated within the meaning [*3] of the certificate of incorporation as it applied to the rights of the 7 per cent Preferred stock, and it seeks to recover $ 30 per share for each 7 per cent Preferred shareholder who either tendered or was cashed out at $ 70 per share under the terms of the merger.

Against this background, three motions are now pending. First, Liggett and GM Sub have moved to dismiss the complaint for lack of jurisdiction, the basis being that the complaint seeks only specified money damages for breach of contract, thus indicating the existence of an adequate remedy at law. Secondly, Grand

Met has moved to quash service of process as to it, and to dismiss the complaint against it for lack of in personam jurisdiction. Thirdly, plaintiff has moved to compel discovery against Grand Met, it being conceded that in view of its pending motion to quash service Grand Met has made no effort to respond to plaintiff's discovery demands.

I.

Based upon the argument and authorities submitted, I conclude that the motion of Liggett and GM Sub to dismiss for lack of subject matter jurisdiction must be denied. The complaint does not contend that Liggett itself was liquidated. Rather, as I read it, the [*4] complaint charges that the actions taken by Grand Met through GM Sub, and approved and accepted by Liggett's board of directors, amounted to a liquidation as to plaintiff and its class in that it terminated the certificate of incorporation right of a 7 per cent Preferred shareholder to ever realize $ 100 per share upon a total liquidation of Liggett, and did so for only $ 70 per share.

Thus, the basis of the complaint is not so much that Liggett breached its contractual obligation to plaintiff as established by the certificate of incorporation by entering into a liquidation without paying the 7 per cent Preferred the full amount to which they were entitled. Rather, as I view the complaint, the plaintiff is charging that the defendants, through the tender offer and merger, caused the 7 per cent Preferred shareholders to be eliminated from the corporate enterprise in a manner which destroyed their contractual liquidation rights for less than full value.

So viewed, and without passing on the merits of plaintiff's theory, I feel that the action is one which attacks a corporate act on the basis that a fiduciary duty owed to minority shareholders has been breached, thus requiring [*5] the scrutiny of the Court under *Singer v. Magnavox Company, Del. Supr., 380 A.2d 969 (1977)* and *Roland Int'l Corp. v. Najjar, Del. Supr., 407 A.2d 1032 (1979).* The grey area here derives from the fact that the would-be class of shareholders is comprised of preferred shareholders who, in legal theory, have contract rights with the corporation.But in the cash-out merger context, the issue would appear to be the same whether common or preferred stock is involved, namely, forced removal by a majority shareholder for less than fair value. Thus, as in Roland, the fact that the complaint seeks only the recovery of money on behalf of the members of the

class does not deprive this Court of jurisdiction -- at least not until the Supreme Court speaks on the subject and takes a contrary view. Citron v. Fairchild Camera and Instrument Corp., Del. Ch., (C.A. No. 6085-NC, Unreported Opinion: Oct. 15, 1980).

II.

The service of process issue presented by Grand Met's motion is more troublesome. Plaintiff has purported to serve Grand Met in three separate ways -- all three of which it contends are sufficient.Primarily, it contends that GM Sub, as an indirect, wholly-owned subsidiary of Grand [*6] Met, existing for no purpose other than to hold all outstanding stock of Liggett on behalf of Grand Met, is in reality the agent or alter ego of Grand Met and that as a consequence, by serving two copies of the complaint on the registered agent for GM Sub in Delaware, in personam jurisdiction was obtained over Grand Met as well as over GM Sub.

Secondly, plaintiff has served Grand Met pursuant to *8 Del. C. § 382* on the basis that by forming a Delaware corporation for the sole purpose of acquiring and holding stock in another Delaware corporation -- such stock ownership ultimately deriving from a merger accomplished under Delaware law -- Grand Met falls within the category of an unqualified foreign corporation transacting business in Delaware and thereby, under the aforesaid statute, it has constituted the Secretary of State as its agent to accept service of process.

Thirdly, plaintiff has purported to effect service of process on Grand Met pursuant to *10 Del. C. § 3104.* By Subsection (c)(3) of that statute it is provided that a Delaware court may exercise personal jurisdiction over any nonresident who, in person or through an agent, causes tortious injury in this State by an [*7] act or omission in this State. Plaintiff contends that a breach of a fiduciary duty can be said technically to constitute a tort and that as a consequence, when Grand Met formed GM Sub and caused it, as Grand Met's subsidiary and agent, to acquire Liggett in the manner complained of, it constituted torious (sic ) conduct such as gives rise to personal jurisdiction over Grand Met through service of process on the Secretary of State pursuant to § 3104(c)(3).

Plaintiff also contends that under § 3104(c)(1) Grand Met, through GM Sub as it agent, has transacted business in this State, and that under § 3104(c)(2) it has contracted

to supply services or things in Delaware. If I understand the argument, plaintiff is saying that by forming GM Sub as its agent to make a tender offer, Grand Met contracted to supply something in Delaware, namely, payment for tendered shares, and that for the same reason, by causing a subsidiary corporation to be formed under Delaware law for the purpose of holding and acquiring shares in another Delaware corporation, it was, through an agent, transacting business in Delaware.

I must confess that I am not persuaded by any of these three arguments, and [*8] in taking this position, and without reciting or analyzing them, I am -- with one exception -- content to rely on the authorities and arguments offered by Grand Met.

Taking them in reverse order, I find no jurisdiction under § 3104. Aside from the questions of whether or not a use of the Delaware corporation law can constitute the type of tortious conduct contemplated by the statute, or whether the formation of a corporation constitutes the transaction of business, § 3104 has been interpreted recently by both this Court and the Superior Court as one intended to afford Delaware residents with a means of redress against persons not subject to personal service within the State. Meeker v. Bryant, Del. Ch.,    A.2d (May 12, 1981); *Harmon v. Eudaily, Del. Super., 407 A.2d 232 (1979).* The allegations of the complaint in this case indicate that the plaintiff is a corporation of the State of Washington with its principal place of business located in the State of Washington. Thus, in view of the aforesaid decisions, I see no need to give further consideration to the purported service of process by this means. While this point was not argued by counsel, it appears nonetheless [*9] to be dispositive of the issue.

As to service attempted pursuant to *8 Del. C. § 382,* the transaction of business by a foreign corporation that will give rise to personal jurisdiction is defined by the statute itself to mean "the course or practice of carrying on any business activities in this State...." This has been interpreted to mean that the corporation must be doing business generally in Delaware and that the suit must arise out of a particular business transaction which occurred in the State. *Perry v. American Motors Corp., Del. Super., 353 A.2d 589 (1976); Cropper v. Rego Distribution Center, Inc., D. Del., 344 F. Supp. 7 (1972).* There is no indication of record that Grand Met conducts any business activities at all in Delaware. The only activity or transaction relied upon is its formation of GM

Sub as its indirect subsidiary under Delaware law for the purpose of acquiring and holding shares of Liggett. I do not find this to be the course or practice of carrying on business activities generally within the meaning of § 382. Compare, *Mazzotti v. W.J. Rainey, Inc., Del. Ch., 77 A.2d 67 (1950)* wherein it was held that the mere ownership by a foreign corporation of the [*10] majority stock of a Delaware corporation did not amount to doing business in this State.

On a related point, the act of forming GM Sub for the aforesaid purpose and using the merger process under Delaware statutes to acquire ownership of Liggett may well constitute such a minimum contact as to subject Grand Met to service of process under the foreign attachment or sequestration statutes. Compare, *Papendick v. Bosch, Del. Supr., 410 A.2d 148 (1979),* cert. den. sub. nom., *Bosch v. Papendick,    U.S.   , 100 S. Ct. 1837 (1980).* However, minimum contact is not the measuring standard under § 382, and there has been no attempt at service by the attachment process here.

Finally, I cannot find, as plaintiff argues, that service on the registered agent for GM Sub, a Delaware corporation, constitutes service on Grand Met. While Corporation Trust Company is the registered agent for GM Sub, it is not the registered agent for Grand Met. In fact, Grand Met has no registered agent in Delaware.

Plaintiff argues that it can obtain jurisdiction over Grand Met by serving GM Sub as its agent or alter ego. But so far the indication is that GM Sub is an indirect, wholly-owned subsidiary [*11] of Grand Met. The only factual promise on which plaintiff relies, as I understand it, is the statement in the tender offer circular that GM Sub was incorporated "for the purpose of purchasing and holding shares of [Liggett] and to date has engaged in no other activity and owns no assets," coupled with the statement that GM Sub is "an indirect wholly-owned subsidiary of Grand Met." As a general principle one corporation does not become the agent of another merely because a majority of its voting shares is held by the other. *Restatement (Second) of Agency, § 14M.* Some further showing is normally required.

Here there is nothing to show that GM Sub is a mere alter ego of Grand Met, or that fraud or some other element is involved such as would justify ignoring the distinction between the two separate corporate entities.

Moreover, as a practical matter, the praecipe

accompanying the filing of the complaint does not show that the Sheriff was directed to serve Corporation Trust Company in two different ways -- one as registered agent for GM Sub and the other as registered agent for the agent of Grand Met. Nor does the Sheriff's return indicate that he affected, or attempted to [*12] affect, service on Grant Met in this manner.

Accordingly, I conclude that Grand Met's motion to quash service of process and to dismiss the complaint against it for lack of in personam jurisdiction should be granted.

III.

Finally, because of this result, plaintiff's motion to compel discovery by Grand Met must be denied. Having been dismissed as a party defendant, Grand Met is not subject to the type of discovery that the motion seeks to compel. Alternatively, plaintiff seeks to obtain discovery against Grand Met by pursuing its motion to compel against GM Sub -- the theory again being that GM Sub is really the alter ego of Grand Met. However, on the present status of the record I find no basis to deviate from the general rule on the subject, namely, that since a subsidiary corporation by definition does not control the parent corporation, it cannot be compelled through the discovery process to produce documents and information possessed solely by the parent. Compare, *Pennwalt Corp. v. Plough, Inc., D. Del., 85 F.R.D. 257 (1979); Westinghouse Credit Corp. v. Mountain States Mining and Milling Co., D. Colo., 37 F.R.D. 348 (1965).*

An appropriate form of order may be submitted [*13] embodying the rulings made herein.

7

LEXSEE

**SEQUA CORPORATION and SEQUA CAPITAL CORPORATION, Plaintiffs, -against- JEFFREY J. GELMIN; GBJ CORPORATION and TOPAZ CAPITAL CORPORATION, Defendants.**

**91 Civ. 8675 (DAB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 9338*

**July 6, 1995, Decided**
**July 7, 1995, FILED**

**COUNSEL:** [*1] For GBJ CORPORATION, plaintiff: James C. Jones, New York, NY. Charles B. Manuel, Jr., Law Offices of Charles B. Manuel, Jr., New York, NY.

For SEQUA CORPORATION, SEQUA CAPITAL CORPORATION, defendants: David M. Brodsky, Schulte Roth & Zabel, New York, NY. For BT SECURITIES CORPORATION NEW YORK, defendant: Jack H. Weiner, Law Off: Jack H. Weiner, New York, NY.

For SEQUA CORPORATION, SEQUA CAPITAL CORPORATION, counter-claimants: David M. Brodsky, Schulte Roth & Zabel, New York, NY.

For SEQUA CORPORATION, SEQUA CAPITAL CORPORATION, third-party plaintiffs: David M. Brodsky, Schulte Roth & Zabel, New York, NY.

For GBJ CORPORATION, counter-defendant: James C. Jones, New York, NY. For SEQUA CORPORATION, SEQUA CAPITAL CORPORATION, counter-defendants: David M. Brodsky, Schulte Roth & Zabel, New York, NY.

For TOPAZ CAPITAL CORPORATION, third-party defendant: James C. Jones, New York, NY. Charles B. Manuel, Jr., Law Offices of Charles B. Manuel, Jr., New York, NY.

**JUDGES:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE

**OPINION BY:** MICHAEL H. DOLINGER

**OPINION:**

MEMORANDUM & ORDER

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

The parties to this venerable lawsuit have been on trial, on an episodic basis, since October 1994. On June 12, 1995, plaintiffs applied to this court for emergency relief that would (1) grant them an opportunity for expedited discovery concerning the defendants' financial assets, in anticipation of a forthcoming motion for a preliminary injunction freezing some portion of those assets, and (2) temporarily restrain defendants from transferring or disbursing "cash or assets in an amount of at least $ 280,000." (Proposed Order to Show Cause with Temporary Restraining Order at 1.) The court denied the request for a temporary restraining order and invited further briefing of the request for asset discovery. Having reviewed the additional submissions of both sides, I now deny that request.

**A. Background**

This suit was commenced in late December 1990 by Jeffrey Gelmin, GBJ Corporation, and Topaz Capital Corporation to restrain Sequa Corporation and Sequa Capital Corporation ("SCC") from seeking to sell certain leveraged [*2] leases without notice to potential purchasers that Gelmin had or asserted an interest in

Case 1:05-cv-00434-GMS    Document 199-8    Filed 12/20/2006    Page 24 of 40

Page 2
1995 U.S. Dist. LEXIS 9338, *2

those leases based on his consultancy agreement with Sequa. Sequa and SCC subsequently asserted counterclaims against Gelmin et al., and upon the dismissal of the original complaint by the Hon. Charles S. Haight, Sequa and SCC reasserted those counterclaims in a new complaint.

In brief, the new complaint asserted four claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. §§ 1961*-68 (1988), one claim of breach of fiduciary duty, a fraud claim, a claim for breach of Gelmin's consultancy agreement, and a claim of unjust enrichment. In response to this new, and expansive, set of claims, Gelmin and his two companies asserted counterclaims for breach of the consultancy agreement.

The claims and counterclaims still in the case became the subject of extensive, if not exhaustive, discovery and related motion practice. That process began in early 1991 and continued into 1994. Finally, in the Spring of 1994 the parties prepared and filed summary judgment motions papers. Those motion were not acted upon because the case was transferred to the Hon. Deborah A. Batts in [*3] late June 1994, and she directed the parties to prepare instead for trial. As noted, that trial began at the end of October 1994, and it has continued through more than forty trial days, with no end in sight.

## B. The Nature of Plaintiffs' Current Application

Plaintiffs' claims against Gelmin and his companies rest upon the core contention that, over a period of years, he used his position as a consultant to SCC concerning leveraged leases to arrange a vast array of transactions with SCC or on its behalf that dishonestly diverted millions of dollars from SCC into his own pockets, or into the treasuries of his companies. (See Complaint of Sequa Corporation and Sequa Capital Corporation ("Complaint") PP 1(a), 25-48, 49-62, 69.) The total losses claimed by plaintiffs, including consequential damages, are said to approximate, if not exceed, one hundred million dollars. (Id. P 1(a).) For relief plaintiffs seek damages, restitution, and a declaration that Gelmin has forfeited any right to compensation under the consultancy agreement. (See id. PP 50-52.)

By contrast with the breadth and extent of these allegations, plaintiffs' contentions on their current application [*4] rest on a far narrower base. Plaintiffs

contend that in the course of pre-trial discovery and in testimony during the first month of the trial, Gelmin conceded that, whatever the merits of Sequa's claims against him and of his asserted counterclaims against Sequa under the consultancy agreement, he and his companies owe some monies to Sequa, and that at some point in the past they were holding these funds on account, apparently as a setoff to the far larger claims that they were asserting in the lawsuit against Sequa. (See Affidavit of David M. Brodsky, dated June 12, 1995 ("Brodsky Aff."), PP 2-9.) The amount in question was a matter of some dispute -- Sequa suggesting that the proper figure approached two million dollars whereas Gelmin suggested that it was closer to $ 200,000.00 -- but in any event plaintiffs claim that at some point defendants held these funds in a separate account for plaintiffs. Although that is no longer the case, plaintiffs assert that they are now entitled, or will eventually be entitled, to a declaration of a constructive trust over these monies. (See Brodsky Aff. P 2.)

From this premise plaintiffs press two theories. First, they argue that, by virtue [*5] of the foregoing facts, they are now entitled to an order directing defendants not to disburse, during the pendency of the case, a sum of money equal to the amount that they contend will be awarded to them by way of a constructive trust. (See Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order and Expedited Discovery ("Pls.' Mem.") at 6-11.) Second, they suggest that defendants have in fact been disbursing or wasting their remaining assets -- a process allegedly confirmed by defendants' own former attorney in informal discussions with plaintiffs' counsel in early June -- and that this process will effectively deny plaintiffs their ability to recover on their constructive trust theory at the end of the case. (See Brodsky Aff. P 12; Pls.' Mem. at 6-9, 11-12.) According to plaintiffs, this conduct also justifies an order freezing sufficient assets to cover the anticipated judgment against defendants on plaintiffs' constructive-trust theory. (See Pls.' Mem at 1; Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Expedited Discovery ("Pls.' Reply Mem.") at 17-18.)

Finally, under both of these theories, plaintiffs argue that they need expedited [*6] asset discovery. Plaintiffs contend that such discovery is needed under the second theory in order to determine whether there has been asset depletion, and that under both theories plaintiffs require asset information in order to permit the court to frame a

1995 U.S. Dist. LEXIS 9338, *6

precise asset-freeze order. (See Pls.' Mem. at 12-14; Pls.' Reply Mem. at 18-19.)

## C. General Legal Standards

As a general rule, discovery concerning an adversary party's assets is not permitted during the course of the litigation unless it is relevant to the merits of a claim. See *Resolution Trust Corp. v. Thornton, 309 U.S. App. D.C. 384, 41 F.3d 1539, 1547 (D.C. Cir. 1994); accord, FTC v. Turner, 609 F.2d 743, 745 (5th Cir. 1980); Sanderson v. Winner, 507 F.2d 477, 479-80 (10th Cir. 1974),* cert. denied, *421 U.S. 914, 95 S. Ct. 1573, 43 L. Ed. 2d. 780 (1975); Evans v. Calise, 1994 U.S. Dist. LEXIS 6187, 1994 WL 185696,* *2, *4 n.2 (S.D.N.Y. May 12, 1994); cf. *Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1361, 1367 (2d Cir. 1991)* (affirming sanctions for violation of discovery order requiring production, inter alia, of records concerning "corporate assets" where documents related directly to issue of alter ego liability on which plaintiff [*7] had burden of proof); *Abu-Nassar v. Elders Futures Inc., 1991 U.S. Dist. LEXIS 3794, 1991 WL 45062,* at *15-16, *19 n.20 (S.D.N.Y. Mar. 28, 1991) (permitting discovery pertaining to changes in "corporate form, transfers of assets and information regarding related entities" where information sought was "entirely relevant" to "claims of alter ego liability and fraudulent conveyance").

Rather, such discovery is properly reserved for post-judgment proceedings, when a judgment creditor seeks the information necessary to permit it to enforce the judgment. See *Fed. R. Civ. P. 69(a)* n1; *SEC v. Tome, 1987 WL 9415,* at *1-2 (S.D.N.Y. Apr. 3, 1987); *Magnaleasing, Inc. v. Staten Island Mall, 76 F.R.D. 559, 560-61 (S.D.N.Y. 1977);* cf. *Evans, 1994 WL 185696,* at *2, *4 n.2 (denying prejudgment discovery of defendant's wealth because plaintiff was "not a judgment creditor and accordingly, without a stronger showing by plaintiff, discovery of defendant's wealth [was] not appropriate at [such a] juncture"). To determine whether such an inquiry is appropriate in this case, in the middle of a trial on the merits, we must consider the legal and factual premises for plaintiffs' promised motion for a preliminary [*8] injunction.

n1 Rule 69(a) provides, in pertinent part, that

in aid of the judgment or execution, the judgment creditor or a successor in interest . . . may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held.

*Fed. R. Civ. P. 69(a);* see also *Minpeco, S.A. v. Hunt, 1989 WL 57704,* at *1 (S.D.N.Y. May 24, 1989) (stating that Rule 69 is "'intended to provide the post-judgment creditor with an efficient means of uncovering the existence of assets upon which he may levy to satisfy the judgment,'" including discovery of "'the identity and location of any of the judgment debtor's assets, wherever located'") (citations omitted).

When a litigant in federal court fears that his adversary may be squandering, diverting, or concealing assets to defeat a judgment that has yet to be entered, he is ordinarily required to look to the terms of *Fed. R. Civ. P. 64,* which [*9] deals with provisional remedies. It provides, in pertinent part, that

At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought . . . . The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent

1995 U.S. Dist. LEXIS 9338, *9

action.

*Fed. R. Civ. P. 64.*

As suggested by the wording of this rule, the plaintiffs in this case may proceed by way of a writ of attachment under New York law, if they can satisfy the standards of Article 62 of the New York Civil Practice Law and Rules. See, e.g., *Standard Chartered Bank v. DAA Sales Inc., 1991 U.S. Dist. LEXIS 10730, 1991 WL 156252,* at *1 (S.D.N.Y. Aug. 5, 1991); Morin v. Trupin, 738 F. Supp. 98, 101 (S.D.N.Y. 1990); Graubard Mollen Dannett [*10] & Horowitz v. Kostantinides, 709 F. Supp. 428, 432 (S.D.N.Y. 1989).* To do so, the plaintiffs must demonstrate that

> the defendant[s], with intent to defraud [their] creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff[s'] favor, have assigned, disposed of, encumbered or secreted property, or removed it from the state or [are] about to do any of these acts . . . .

*N.Y. Civ. Prac. L. & R. 6201(3)* (McKinney 1980). n2 If they can meet this test, they must also

> show, by affidavit and such other written evidence as may be submitted, that there is a cause of action, that it is probable that the plaintiff will succeed on the merits . . . and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff[s].

*N.Y. Civ. Prac. L. & R. 6212(a).* Moreover, even if plaintiffs satisfy all of the statutory criteria, the issuance of such relief is discretionary with the court, and since attachment is a harsh remedy, the "court must exercise care in its application." *Merrill Lynch Futures Inc. v. Kelly, 585 F. Supp. 1245, 1259 (S.D.N.Y. 1984).*

> n2 Section 6201 includes four additional alternative grounds for relief, but none is remotely relevant to the factual basis on which plaintiffs premise their

current application.

[*11]

Plaintiffs do not seek this remedy, however, choosing instead to couch their request in terms of a preliminary injunction under *Fed. R. Civ. P. 65.* The reason for this choice is apparently that the standards for preliminary injunctive relief, if plaintiffs' analysis is correct, are less stringent than the criteria governing an attachment. I therefore turn briefly to an assessment of the law applicable to such a request.

As a general matter, an applicant for a preliminary injunction may obtain such relief if he shows "'irreparable harm, and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [his] favor.'" *Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 478-79 (2d Cir.)(quoting Polymer Technology Corp. v. Mimran, 975 F.2d 58, 61 (2d Cir. 1992)),* cert. denied, *115 S. Ct. 2277 (1995).* Despite this consistently recognized standard, plaintiffs have argued in this proceeding that all they need to show to obtain a freeze order is a likelihood that they will succeed at the conclusion of the trial in obtaining a declaration of [*12] a constructive trust in the amount for which they seek a freeze. (See Pls.' Mem. at 8-11; Pls.' Reply Mem. at 17-18.) Alternatively, they argue that they can satisfy the general test for preliminary injunctive relief. (See Pls.' Reply Mem. at 17-18.)

There is no substantial support for plaintiffs' contention that proof of likely success on a constructive-trust claim is sufficient -- without a showing of irreparable harm -- to earn them an injunction. Moreover, it appears that the circumstances in which an injunction of this sort to freeze assets may be available are quite limited.

The case on which plaintiffs principally rely is the Second Circuit's decision in *Republic of Philippines v. Marcos, 806 F.2d 344 (2d Cir. 1986),* aff'g *New York Land Co. v. Republic of Philippines, 634 F. Supp. 279 (S.D.N.Y. 1986),* cert. denied, *481 U.S. 1048, 95 L. Ed. 2d 835, 107 S. Ct. 2178 (1987).* In that action an agency of the Philippine Government filed suit principally to prevent the defendants from disposing of five large New York properties in which they apparently held an ownership interest, and to assert the plaintiff's interest in those properties. *Id.* at 346-49. The [*13] plaintiff

alleged that while President of the Philippines, defendant Ferdinand Marcos and his wife, Imelda Marcos, had stolen huge sums of monies and other assets belonging to the Philippine Government and people, and that through a series of nominees, they had invested these assets in the five properties in question. *Id. at 348.* Plaintiff further alleged in the complaint that there were clear signs that the Marcoses were seeking to liquidate their interest in these properties and thus transfer their ill-gotten gains elsewhere. *Id. at 348-49.* By its lawsuit, the plaintiff agency, which had been created by Philippine law to recover such stolen assets, sought an injunction against any · transfer of the properties through sale or encumbrance until title was determined. Id.

Consistent with this theory of the case, the plaintiff moved at the outset of the lawsuit for an order prohibiting defendants from selling, transferring, or encumbering the properties. Treating the motion as one for a preliminary injunction, the District Court granted the application. *Id. at 349.* On appeal the Second Circuit affirmed, noting that this relief was justified in light of the evidence demonstrating [*14] the basis for a claim of a constructive trust and possibly an equitable lien. *Id. at 355.* n3 In so concluding, the Court reiterated the well-settled rule that a party may not obtain a preliminary injunction to restrain transfer "of property that will be irrelevant to a final judgment." *Id. at 356* (citing *De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 220, 89 L. Ed. 1566, 65 S. Ct. 1130 (1945)).* In the Marcos case, however, the properties in question were of course centrally relevant to the underlying claims since the suit was designed to prevent disposition of those very properties so that the plaintiff could seek a declaration of title to them, and the injunction was intended to prevent defendants from frustrating the ability of the plaintiff to obtain the ultimate relief that it was seeking. Id. Thus the case fit squarely within the rule that "'[a] preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally.'" Id. (quoting *De Beers, 325 U.S. at 220).*

n3 Plaintiffs in this case do not suggest that they satisfy the criteria for imposition of an equitable lien. Such relief requires, among other things, proof of "a particular agreement by defendant to confer a security interest in the property at issue." *Security Pac. Mortgage & Real Estate Servs., Inc. v. Republic of the Philippines, 962 F.2d 204, 209 (2d Cir. 1992)* (citing cases) Moreover, "a mere promise, whether parol or written, to satisfy a debt from a 'designated fund' does not support creation of an equitable lien on that fund." Id. (citing cases). As will be seen, there is no indication that any such identifiable res currently exists.

[*15]

The principal implication of the Marcos decision is that a party seeking to impress a constructive trust on an identifiable asset may use the device of a preliminary injunction if he can show a likelihood of success on the merits of that claim. To obtain such relief, however, it appears that he must demonstrate that the asset is identifiably linked to the wrongdoing that forms the predicate for the constructive trust. See id. at 355; *Restatement of Restitution § 160* (1937). Accord, e.g., *Security Pac. Mortgage, 962 F.2d at 210; Small Business Admin. v. Echevarria, 864 F. Supp. 1254, 1265-66 (S.D. Fla. 1994); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1271-72 (S.D.N.Y. 1991). Cf. USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94, 98 (6th Cir. 1982)* (holding district court had power to issue ` preliminary injunction preserving defendant's property where "property subject to the injunction may well be dealt with by a final decree in equity requiring an accounting by the defendants as constructive trustees for the plaintiffs"). Thus, a constructive trust will not be impressed on a defendant's assets merely because the plaintiff may [*16] seek to satisfy a final judgment against them. As the Second Circuit has noted, "before a constructive trust may arise, there must be a res -- a segregated fund or property -- to which the trust can attach." *Matter of Weis Sec., Inc., 605 F.2d 590, 597 (2d Cir. 1978)* (citing *Restatement of Restitution § 160* cmt. i (1937)), cert. denied, *439 U.S. 1128 (1979); see also United States v. Coluccio, 51 F.3d 337, 340-41 (2d Cir. 1995)* (noting requirement of transfer of "subject res", court holds that mother of criminal defendant could seek constructive trust over cost bond for which she paid).

A further complication in plaintiffs' Rule 65 theory is that they must satisfy the full panoply of substantive tests applicable to the award of injunctive relief under Rule 65 since such an application invokes the equity powers of the courts. Thus the court must be satisfied as to the

1995 U.S. Dist. LEXIS 9338, *16

existence of irreparable harm if relief is denied, and in addition it should take into consideration the balance of hardships between the parties unless the movant establishes at least a probability of success on the merits. See, e.g., *New York Land Co., 634 F. Supp. at 288* (applying preliminary [*17] injunction test from *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)* (per curiam)); see also *Chemical Bank v. Haseotes, 13 F.3d 569, 573 (2d Cir. 1994).*

The outer limits of this Rule 65 approach -- as distinguished from the relief available under Rule 64 -- have not been defined with precision by the Second Circuit. In dictum the Court suggested in Marcos that a plaintiff may use Rule 65 "to prevent a defendant from making a judgment uncollectible." *806 F.2d at 356; see also Chemical Bank, 13 F.3d at 573* (noting in dictum that "an injunction may issue to stop a defendant from dissipating assets in an effort to frustrate a judgment") (citing *Marcos, 806 F.2d at 356); Gelfand v. Stone, 727 F. Supp. 98, 100 (S.D.N.Y. 1989).* Notwithstanding this general observation, however, the very case principally cited in Marcos for this proposition suggests the contrary:

> If the mandatory injunction here is a "remedy providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action," the district court's application of the New York [attachment statute] was [*18] entirely proper and perhaps even required.

*Feit & Drexler, Inc. v. Drexler, 760 F.2d 406, 415 n.2 (2d Cir. 1985)* (citing cases) (emphasis added). n4 That observation appears to be an accurate statement of the law.

n4 The Court in Marcos also cited *International Controls Corp. v. Vesco, 490 F.2d 1334, 1347 (2d Cir.), cert. denied, 417 U.S. 932, 41 L. Ed. 2d 236, 94 S. Ct. 2644 (1974),* for the same proposition, but that decision relied upon well-settled precedent that "an asset freeze may be appropriate to assure compensation to those who are victims of a securities fraud." Id. (citing *SEC v. Manor Nursing*

*Centers, Inc., 458 F.2d 1082, 1105-06 (2d Cir. 1972)).* Moreover, the order at issue in International Controls was directed at a specific jet aircraft that the plaintiff contended it had been fraudulently deprived of by the defendants' machinations, see id. at 1341-42, and thus the factual pattern fit squarely within the "identifiable property" ground for imposition of a constructive trust, as in Marcos.

[*19]

Indeed, the generally prevailing view in the federal courts appears to be that a court may not use its equitable powers under Rule 65 to freeze a defendant's assets that are not directly related to the claims in the case in order to ensure that a final monetary judgment may be satisfied. In such a circumstance, relief may be granted only under Rule 64, pursuant to state law, and only if the applicable state law authorizes such relief. See, e.g., *Rosen v. Cascade Int'l, Inc., 21 F.3d 1520, 1527-31 (11th Cir. 1994)* (securities fraud case); *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc., 14 F.3d 1507, 1521-22 (11th Cir. 1994),* cert. denied, *130 L. Ed. 2d 1061, 115 S. Ct. 1092 (1995); Home-Stake Prod. Co. v. Talon Petroleum, C.A., 907 F.2d 1012, 1021 (10th Cir. 1990); In re Fredeman Litig., 843 F.2d 821, 824 (5th Cir. 1988); Nationwide Mut. Ins. Co. v. Whiteford Sys. Inc., 787 F. Supp. 766, 768-69 (S.D. Ohio 1992);* cf. *Chemical Bank, 13 F.3d at 572-73* (noting availability of injunction in aid of attachment order; movant must satisfy criteria for writ of attachment); *Securities Pac. Mortgage, 962 F.2d 204 at 210-11* (no constructive trust may be [*20] imposed on funds or property over which plaintiff did not have a preexisting interest) (citing cases).

This approach finds its principal genesis in the Supreme Court's decision in *De Beers Consolidated Mines Ltd. v. United States, 325 U.S. at 218-23,* in which the Court held that the District Court could not use its equity power to freeze an antitrust defendant's assets to ensure the enforceability of a possible fine for contempt if the defendant disobeyed an injunction that the court might issue at the end of the case. In so holding the Supreme Court observed that the assets had nothing to do with the claims being asserted in the case and that the freeze was not interim relief of a kind that might be awarded at the end of the case. *Id. at 220.* In the course of

its discussion the Court noted that lower courts, both federal and state, had consistently refused equitable relief when asked to freeze assets in order to ensure satisfaction of an eventual monetary judgment, see *id. at 221,* and it then observed:

> To sustain the challenged order would create a precedent of sweeping effect. This suit, as we have said, is not to be distinguished from any other suit in equity. [*21] What applies to it applies to all such. Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence.

*Id. at 222-23.*

The implication of this analysis is plain, particularly in view of the Court's distinguishing of those cases in which the injunction sought relates "to a fund or property which would have been the subject of the provisions of any final decree in the cause." *Id. at 220 & n.11* (distinguishing *Deckert v. Independence Shares Corp., 311 U.S. 282, 85 L. Ed. 189, 61 S. Ct. 229* [*22] *(1940)).* First, in support of an equitable claim, the plaintiff may seek preliminary injunctive relief freezing assets if such relief is of a kind that may be awarded as final relief on the claim and if the plaintiff can satisfy the generally applicable standards for preliminary injunctive orders. Second, if the underlying claim is legal in nature and thus seeks a monetary award, the plaintiff may not ordinarily bypass Rule 64 and seek a preliminary

injunction on the premise that the defendant might otherwise become judgment-proof. n5

> n5 Two circuits have not followed this reading of De Beers. See *Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 194-97 (3d Cir. 1990)* (concluding that "De Beers simply held that a defendant's money may not be encumbered by a preliminary injunction when the final merits judgment sought by plaintiffs cannot involve a transfer of money from defendant to plaintiffs. In short, De Beers is simply inapplicable to cases in which a litigant seeks money damages, as the plaintiffs do here."); *Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 52 (1st Cir. 1986)* (court upholds use of injunctive freeze to protect against unenforceable money judgment; court does not mention De Beers). However, I agree with the Eleventh Circuit, which recently noted, in rejecting the Third Circuit's interpretation of De Beers in Hoxworth, that such a reading "tortures the express language of De Beers and runs counter to established equitable principles." *Rosen, 21 F.3d at 1529.*

[*23]

## D. Evaluation of Plaintiffs' Application for Asset Discovery

Application of these criteria demonstrates serious problems in plaintiffs' current campaign for an asset freeze. Moreover, we have no reason to believe that these difficulties would fade with the granting of the requested discovery, whereas the opening of such discovery promises unfairness to the defendants in connection with the ongoing trial.

As noted, the linchpin of plaintiffs' factual argument is the assertion that defendants, at some time in the past, held some monies on account for Sequa. It is this assertedly segregated res that plaintiffs seek to transform into the basis of a constructive trust claim. There are several problems with this approach.

1995 U.S. Dist. LEXIS 9338, *23

First, although it appears that defendants may at one point have held these funds in a segregated account for plaintiffs (see Brodsky Aff., Ex. E at 2137), there appears to be no dispute that it was long ago closed, and that that fact was known long before the trial commenced. For example, in his December 1992 Answer to plaintiffs' Complaint, Gelmin averred that funds "which Topaz was holding for the account of SCC . . . have been used to pay [*24] obligations of SCC." (Answer P 16.) This allegation was elaborated on in defendants' interrogatory answers dated May 10, 1993. (See Brodsky Aff., Ex. F. at Interrog. Resps. 4, 15.) Moreover, at his deposition in October 1993, Gelmin testified that such moneys were no longer being held. (See Brodsky Aff., Ex. N at 664.) Indeed, the very trial testimony of Gelmin that plaintiffs cite in support of their application -- testimony that was given nearly eight months before plaintiffs made this application -- confirms that moneys originally held for plaintiffs by defendant Topaz were long ago set off by Gelmin against debts that he asserted were owed by SCC. (See Affidavit of Brooks R. Burdette, Esq. ("Burdette Aff."), Ex. H at 5177-79 & Ex. I at 5157-59.)

Since the existence of an identifiable res is a crucial element for imposing a constructive trust on the funds, see, e.g., Coluccio, 51 F.3d at 340; Matter of Weis, 605 F.2d at 597, plaintiffs' case faces an immediate obstacle. Moreover, this is scarcely a matter concerning which plaintiffs have been denied discovery. As noted, from 1991 until 1994 plaintiffs were given a virtually unlimited opportunity to conduct [*25] relevant discovery, and thus they were free to inquire as to the status of those funds. n6 Furthermore, plaintiffs can scarcely plead ignorance as to the existence of such funds since Sequa's president, John Quicke, has stated under oath that Gelmin told him in early 1991 that "he was holding certain moneys on behalf of Sequa Capital and asked me what I wanted him to do with those funds." (Burdette Aff., Ex. G (Affidavit of John J. Quicke, sworn to on January 17, 1995) P 6.)

n6 At one point in plaintiffs' current papers, their counsel suggests that plaintiffs were denied discovery of defendants' financial records concerning transactions post-dating June 1991. (See Brodsky Aff. P 13 and Ex. P (Transcript of June 30, 1993 Teleconference with the Court).) This representation is plainly false, as illustrated by the very transcript that counsel cites in support of his assertion. As reflected in the colloquy with the court in the course of this transcribed telephone conference, plaintiffs sought defendants' financial records post-dating June 30, 1991 because they might reflect payments demonstrating ties between Gelmin and parties with whom he had caused SCC to contract (see Brodsky Aff., Ex. P at 18-19), and the court proceeded to authorize such discovery as to any payments between defendants and any other relevant entities or persons ("payors or payees whose transactions with Gelmin or GBJ you would be interested in post June 30, 1991"). (See id. at 21-24.) It also bears noting that plaintiffs never suggested that they wanted these documents to support a constructive-trust theory.

[*26]

If it turns out that plaintiffs did not avail themselves of pre-trial discovery opportunities in this matter, that failing may well be attributable to the fact that they were focusing on other issues in this case. In this regard it bears mentioning that plaintiffs' complaint does not separately assert a claim for a constructive trust with respect to any properties or specific liquid assets, an omission that may reflect plaintiffs' understanding that there was no basis for such a claim, particularly in the absence of an identifiable res.

In sum, it appears from the record now before me that the very legal premise on which plaintiffs are said to be poised to seek injunctive relief -- their unpleaded entitlement to a constructive trust at the end of the case -- is unlikely to be sustained. Moreover, since asset discovery has not been shown to be a useful instrumentality for shoring up this claim and since plaintiffs have in any event not justified their failure to seek such discovery when it was available to them, there is little reason to grant it now on this basis.

Second, even if we assumed, for the sake of argument, that plaintiffs might ultimately be able to demonstrate a [*27] probability of success on the merits of this claim or substantial issues going to the merits, they have equally difficult problems with the other aspect

of their proposed Rule 65 application -- the need to demonstrate irreparable harm and a balance of hardships tipping decidedly in their favor. Moreover, asset discovery has not been shown to be justified on this point.

As noted, plaintiffs have long been on notice that whatever funds the defendants may originally have held for their account were dispersed well before trial. When asked at oral argument why plaintiffs failed to seek relief if, as they now claim, they were entitled to it at a much earlier stage of these proceedings, plaintiffs' counsel responded that he had simply never thought of doing so. (Tr. 9). The candor of this response, however refreshing, does not cure the impact of plaintiffs' delay on their case for irreparable harm.

The very fact of substantial delay has long been recognized as a factor favoring denial of preliminary injunctive relief, on the premise that such delay is incompatible with a claim of irreparable injury. See, e.g., *Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985)* (citing cases); [*28] *Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985).* n7 In this case that inference is particularly strong. As noted, there is no real dispute at this stage that whatever funds may have been held by defendants for plaintiffs were long ago dispersed. Necessarily, then, the implicitly posited irreparable harm -- that absent emergency relief there will be no res to which to attach a constructive trust -- appears nonexistent since there is no suggestion of an existing res that might disappear in the near future absent injunctive relief. n8

n7 Plaintiffs suggest that this line of cases is confined to trademark or related claims. (See Pls.' Reply Mem. at 9.) Although Citibank addresses in one respect a consideration unique to trademark cases -- the ordinary presumption that likelihood of confusion demonstrates irreparable harm -- its discussion of delay as a factor affecting the likelihood of harm reaches more broadly. See *756 F.2d at 273.* Indeed, plaintiffs' proposed distinction is not supported by the cases or by common sense. See, e.g., *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel, 872 F.2d 75, 79-80 (4th Cir. 1989)* (citing *Citibank, 756 F.2d at 276)* (noting that "equity demands

that those who would challenge the legal sufficiency of administrative decisions concerning time sensitive public construction projects do so with haste and dispatch," and concluding that where construction delays and disruption "could easily be avoided by promptly challenging administrative decisions, the denial of preliminary relief lies well within the sound discretion of the trial judge"); *Nassau Boulevard Shell Serv. Station v. Shell Oil, 869 F.2d 23, 23-24 (2d Cir. 1989)* (stating preliminary injunctive relief "should ordinarily not be granted in franchise disputes where the franchisee, having knowledge for weeks or months of the franchisor's intention to terminate, waits until the very eve of termination to seek such relief"); *Costello v. McEnery, 767 F. Supp. 72, 78 (S.D.N.Y.)*(civil rights action) (concluding that one-year delay in seeking preliminary relief in retaliatory discharge action "bolsters the Court's conclusion that there has been an insufficient showing of irreparable harm to justify issuance of a permanent injunction"), aff'd, *948 F.2d 1278 (2d Cir. 1991),* cert. denied, *504 U.S. 980, 119 L. Ed. 2d 579, 112 S. Ct. 2957 (1992);* *Silverman v. Local 3, Int'l Bhd. Elec. Workers. AFL-CIO, 634 F. Supp. 671, 673 (S.D.N.Y. 1986)* (labor dispute) (denying preliminary injunction where NLRB's "lengthy and unexplained delay in seeking such relief demonstrates that it is unnecessary"); *Brookhaven Housing Coalition v. Kunzig, 341 F. Supp. 1026, 1030 (S.D.N.Y. 1972)* (refusing to preliminarily enjoin construction of federal office facility where, inter alia, plaintiffs delayed filing suit for over a year). Unjustified delay in seeking relief is plainly a relevant concern in assessing the weight of a party's showing of irreparable harm since such delay constitutes conduct that is inconsistent with the movant's underlying factual premise for relief. E.g., *Plessey Co. v. General Elec. Co., 628 F. Supp. 477, 500 (D. Conn. 1986)* (citing *Skehan v. Board of Trustees of*

*Bloomsburg State College, 353 F. Supp. 542 (M.D. Pa. 1973)).* Also, delay may reflect tactical maneuvering by the movant with the goal of maximizing the burden on his adversary. If so, then this delay would be relevant to an assessment of the relative harms to be endured by the parties if a proposed preliminary injunction were either granted or denied. *See Nassau, 869 F.2d at 24* (noting that failure to seek injunction promptly "is a delaying tactic that is inequitable to the franchisor and to the courts as well"). As will be seen, this is a concern in the present case.

[*29]

n8 Indeed, plaintiffs' requested temporary restraining order would not have frozen any specified property or segregated funds, but rather, by its terms, would have applied to any assets of defendants up to a total of $ 280,000.00.

It is not altogether surprising that the heart of plaintiffs' showing of asserted current irreparable harm in fact does not pertain to their constructive-trust theory. Plaintiffs argue that their emergency application was triggered by an apparently passing comment by defendants' former trial attorney, Thomas Butler, Esq., to plaintiffs' lead trial counsel, David Brodsky, Esq., on June 1, 1995. (See Pls.' Mem. at 3, 6, 11; Brodsky Aff. P 12.). According to plaintiffs, the attorneys were talking about the failed settlement negotiations that had begun in early March 1995 and terminated in early April. Mr. Brodsky recounts that he and Mr. Butler apparently agreed that the unresolved bone of contention had concerned which side was to pay money up-front to the other as part of the settlement, and he asserts that Butler, in commenting on why Gelmin had refused to accede [*30] to Sequa's demands, explained that defendants could not comply because they lacked the funds to do so. (See Tr. 2; Brodsky Aff. P 12.)

From this comment, plaintiffs draw the inference that Gelmin has been spending down his assets during the course of the litigation, thus impelling plaintiffs to make their current application. Again, plaintiffs' argument misses the mark, for several reasons. n9

n9 I reject defendants' contention that if the discussion between Brodsky and Butler was a settlement negotiation, *Fed. R. Evid. 408* bars the use of any statement made by Butler. That rule precludes the use of factual representations, if made in the course of settlement discussions, for two purposes -- to demonstrate liability and to establish the amount of damages. Plaintiffs' proffer of their version of Butler's comment does not come within the scope of either of these two categories, at least in the current context, which is to demonstrate a need for discovery. It is at least arguable that Rule 408 might bar use of these statements to support a preliminary injunction motion, since the term "liability" may be read broadly enough to encompass liability in such a context. In view of the other problems with plaintiffs' application, I need not address that question here.

[*31]

At the outset, plaintiffs' implicit suggestion that this disclosure was news to them is at least a substantial overstatement. In the course of settlement discussions with the court in early March 1995, plaintiffs' counsel indicated, at least in general terms, that he was aware of financial difficulties facing the defendants, which purportedly had led to defendants' failure to pay fees to their attorneys for an extended period of time. (See Tr. 4-6.) n10

n10 For reasons noted in note 7, this comment may be considered by the court notwithstanding the strictures of *Fed. R. Evid. 408.*

There is also a potential, although not fully documented, problem with plaintiffs' reliance on Butler's asserted statement, since at the time he was no longer counsel to the defendants. This at least raises the specter that he was not authorized to disclose to plaintiffs the information in question, which was apparently covered by the attorney-client privilege. Plaintiffs are correct that defendant Gelmin has not adequately [*32] documented either the status of the information or the status of Butler

when he disclosed it, but Gelmin has submitted an affidavit that at least attempts to question the privilege, thus raising the question of whether plaintiffs will ultimately be able to use this information in support of an asset-freeze application. (See Affidavit of Jeffrey J. Gelmin, sworn to June 16, 1995, PP 5-6.)

Finally, and most importantly, the plaintiffs' showing based on Butler's comment, even if eventually deemed admissible, does not support plaintiffs' position that they will be entitled to a preliminary injunction. As noted, Rule 65 is not ordinarily available to obtain a freeze of a defendants' assets merely to ensure that plaintiffs will be able to satisfy a money judgment at the end of the case, and it is similarly unavailable in the context of an equitable claim unless the funds in question are related to the claim and the freeze is in effect a preliminary form of the very relief that will be available at the end of the case.

Plaintiffs' showing based on Butler's comment does not meet these standards. Plaintiffs, as we have observed, have not, at this stage, offered evidence that suggests a [*33] likelihood of success on a constructive trust claim. n11 Necessarily, then, the assertion that defendants' assets are eroding, even if proved, would not form the predicate for a preliminary injunction freezing any assets. The general funds of defendants, to which Butler apparently alluded, have not been linked to any assets over which a constructive trust might be imposed. Rather, the thrust of plaintiffs' argument is that defendants are spending or otherwise draining away their assets, and that this process should be stopped in order to ensure satisfaction of some or all of the judgment that plaintiffs may ultimately receive in this case. This is precisely the type of preliminary injunction that the Supreme Court has recognized as impermissible.

> n11 I make no judgment at all concerning the merits of plaintiffs' apparent contention that Gelmin was obliged to turn over to them a substantial sum of money, approaching $ 2,000,000.00, and that he failed to do so. That is an issue before Judge Batts, and I have no occasion to consider it despite plaintiffs' efforts to litigate that matter here and now.

[*34]

Our analysis of potential harm suggests still a further reason to question plaintiffs' current application, insofar as it is linked to Rule 65. We have already noted the weakness of plaintiffs' case on the merits for such preliminary relief. Under the circumstances, plaintiffs have not shown a likelihood of success on the merits, and therefore we are compelled to consider the harm that might be visited on defendants if plaintiffs' application were granted. Such harm may be of two kinds -- harm imposed by a preliminary injunction freezing defendants' assets and harm imposed by the requested asset discovery.

Defendants claim that an order freezing as much as $ 1.5 million, a figure suggested in plaintiffs' papers, would deprive defendants of the use of all of their assets. (See Gelmin Aff. at P 7.) If this is true, then the requested injunctive relief would impose a considerable burden on defendants, who are in the midst of litigating a very substantial, and presumably very costly, lawsuit with plaintiffs. Indeed, this concern is underscored by the recent order of the court requiring defendants either to pay their former lawyers more that $ 150,000.00 or to post a bond in excess [*35] of $ 3.2 million as the price for obtaining the release of the attorneys' retaining lien on the files of the case. (Amended Order dated June 21, 1995). n12

> n12 The court went on to hold that defendants were obligated to the firm of Butler, Fitzgerald & Potter for more than $ 3.2 million for past services and disbursements in this case.

We of course lack detailed information on Mr. Gelmin's assertion. Nonetheless, the potential harm asserted by defendants with regard to their ability to press forward with this lawsuit is certainly plausible. It rests on a premise that is evidently shared by plaintiffs -- that defendants are short of funds -- and it is self-evident that continued litigation is and will continue to be quite costly. This harm, which may be anticipated from any preliminary injunction of the nature sought by plaintiffs, appears not to be in serious dispute, n13 and puts plaintiffs' anticipated motion into further doubt, without justifying discovery of the sort that they now seek.

n13 Indeed, we may at least speculate

that this interference with defendants' ability to continue in the lawsuit may be a substantial motivating factor in plaintiffs' decision to initiate this motion practice.

[*36]

The other form of harm to defendants flows from the proposed discovery sought by plaintiffs. If granted, it would permit plaintiffs one-sided discovery, in the middle of the trial, that may ultimately yield evidence useful to the plaintiffs in the trial itself. Indeed, to the extent that plaintiffs are formulating theories of constructive trust or similar legal approaches, an ability to trace the flow of defendants' funds may possibly yield information that could be placed in the service of such evolving theories. Allowing plaintiffs to conduct such sub rosa merits discovery more that a year after the pre-trial discovery period closed and nearly eight months after the trial started would plainly be unfair to defendants, particularly in the absence of any justification for plaintiffs' failure to press a constructive trust theory as a defining basis for pre-trial discovery.

The final consideration that substantially undercuts the plaintiffs' current request is a concern for court administration. We note that, in assessing any request for equitable relief, including a preliminary injunction, the court may take account of the public interest. See, e.g., LaRouche v. Kezer, 20 [*37] F.3d 68, 73 (2d Cir. 1994); RTC v. Elman, 949 F.2d 624, 629-30 (2d Cir. 1991) (citing cases). In this case, as noted, the parties have been on trial for nearly eight months, litigating all of their claims, counterclaims and defenses. When that trial has been completed, Judge Batts will presumably rule on all of these matters.

Given the very belated nature of plaintiffs' application, a resolution of plaintiffs' injunction motion would necessarily require not only visiting the lengthy but still substantially incomplete trial record, but also the creation of a parallel trial record on some of the same issues, with this court required to make parallel or anticipatory rulings on claims and defenses that will also be addressed by the District Court at the completion of the trial. This stereophonic approach to litigation sets this case apart from any of the cases cited by plaintiffs, since in all of them the application for preliminary relief was filed at the outset of the case or at least well before trial.

Obviously the fact that a preliminary injunction

motion will require some anticipatory assessment of the movant's claims is unavoidable in any case, given the standards for such [*38] preliminary relief. Accordingly, that alone will not preclude granting the motion. In this case, however, the creation of a simultaneous double-tracking of the trial is obviously undesirable, and underscores the difficulties imported into this matter by plaintiffs' peculiar choice of timing.

Finally, I note in this regard that plaintiffs' contention that we need not undertake some assessment of the merits of defendants' counterclaims is unpersuasive. The one case cited by plaintiffs for this proposition is ITT Community Development Corp. v. Barton, 457 F. Supp. 224, 230-31 (M.D. Fla. 1978). The court there declined to consider the defendant's counterclaims after determining that the plaintiff was likely to prevail on its claim for a constructive trust on specified accounts and real property held by the defendant, which the court found were linked to the defendant's alleged wrongdoing. That holding is not supported by any other case law that either the parties or the court has been able to find. Moreover, it appears to be inconsistent with general principles of equity, which require us to consider the harm to the defendant of any order granting preliminary injunctive relief. Finally, [*39] I note that New York law is to the contrary, at least insofar as it authorizes a pre-judgment writ of attachment in specified circumstances. See N.Y. Civ. Prac. L. & R. 6201, 6212(a).

In sum, for the reasons noted, I conclude that plaintiffs have offered an insufficient basis for authorizing asset discovery by them in aid of a proposed motion for a preliminary injunction. Although plaintiffs might conceivably seek an order of attachment, they have not attempted to justify discovery on that basis, and there is accordingly no need to address the matter, other than to note that the burden of proof on such an application is still more stringent in some respects -- including the required showing of intent to defraud and the absence of counterbalancing counterclaims -- and that the current record offers no evident support for such an application.

CONCLUSION

Plaintiffs' application for asset discovery directed to defendants' disposition of assets since the commencement of this lawsuit is denied for the reasons stated. This decision is without prejudice to any application that plaintiffs may make for either a preliminary injunction or

1995 U.S. Dist. LEXIS 9338, *39

a writ of attachment.

DATED: New York, [*40] New York
July 6, 1995

SO ORDERED.

MICHAEL H. DOLINGER

UNITED STATES MAGISTRATE JUDGE

**8**

LEXSEE 2003 U.S. DIST. LEXIS 7593

**VENOCO, INC., a Delaware corporation, Plaintiff v. TIMOTHY M. MARQUEZ,
Defendant.**

**C.A. No. 02-1685 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 7593*

**May 5, 2003, Decided**

**DISPOSITION:** [*1] Motion to dismiss granted.

**COUNSEL:** For VENOCO, INC., plaintiff: Donald J. Wolfe, Jr., Potter Anderson & Corroon, LLP, Wilmington, DE.

For TIMOTHY MARQUEZ, defendant: Martin S. Lessner, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

### MEMORANDUM AND ORDER

**I. INTRODUCTION**

On November 19, 2002, Venoco, Inc. ("Venoco"), a Delaware corporation, filed a complaint for declaratory relief against Timothy M. Marquez ("Marquez"), a director and shareholder of Venoco, in the Court of Chancery of the State of Delaware, New Castle County. On November 20, 2002, Marquez filed a shareholder derivative action in the United States District Court for the Central District of California seeking, [*2] on behalf of Venoco, to recover damages caused by the payment of a cash dividend. On December 18, 2002, Marquez timely removed the declaratory relief action to this court.

Presently before the court is Marquez's motion to dismiss, or alternatively, to transfer this case to the

Central District of California, or to stay this case pending the outcome of the derivative shareholder litigation (D.I. 4). For the reasons that follow, the court grant Marquez's motion to dismiss.

**II. BACKGROUND**

Founded in 1992, Venoco is an oil and gas company, incorporated in Delaware, with its principal place of business in California. Pl.'s Compl. P 2. Marquez, a Colorado resident, is a stockholder and Director of Venoco and was the Chief Executive Officer (CEO) of the company from 1992 until he was terminated in June of 2002. *Id.* P 3. Venoco has two preferred stockholders, Joint Energy Development Investments II Limited Partnership ("JEDI II"), and ECTMI Trutta Holdings LP ("Trutta"), both of which are affiliates of Enron Corporation ("Enron"). Collectively, JEDI II and Trutta own 8192.90 shares, or all of Venoco's outstanding Series A preferred stock. *Id.* PP 5,6. Venoco had certain [*3] dividend obligations on the preferred stock, which it failed to meet in full. *Id.* PP 10-15. On June 30, 2002, Venoco's Board of Directors ("Board") met to consider its preferred dividend obligations, and decided by vote to pay a cash dividend of $ 2,048,000 to the Enron affiliates. *Id.* P 15. Marquez voted against payment of the dividend and subsequently, after the dividend was paid, made a demand regarding the dividend. Pl.'s Compl. P16-17. Marquez asserted that "'no Director of Venoco in the proper exercise of his/her reasonable business judgment could have believed that the cash dividend was in the best interest of the corporation.'" *Id.* P 17. Additionally, Marquez demanded that Venoco "'take all steps necessary, including an action against the holders of the Series A, to obtain the return of the cash dividend, including but not limited to an action against those

Directors who, in breach of their fiduciary duties to Venoco, approved the cash dividend.'" *Id.* P17.

On November 14, 2002, the Board met and formed a committee to consider Marquez's demand and make a recommendation to the entire Board. *Id.* P 18. On November 18, 2002, after investigating and meeting, [*4] the committee unanimously determined and recommended that the full Board reject Marquez's demand. The full Venoco Board met and subsequently rejected Marquez's demand. *Id.* P18-20. On November 19, 2002, Venoco filed its complaint in the Court of Chancery of the State of Delaware, New Castle County, seeking declaratory judgments that the Board's decision rejecting the demand is valid and protected by the business judgment rule and that any Venoco shareholder be precluded from pursuing a derivative claim relating to the dividend. *Id.* P 1. On November 20, 2002, Marquez filed a shareholder derivative action on behalf of Venoco in the Central District of California. On December 18, 2002, Marquez removed the above captioned case from the Chancery Court to this court. On January 7, 2003, Marquez filed the present motion to dismiss, or alternatively, to stay or transfer the action to the Central District of California.

### III. STANDARD OF REVIEW

Marquez moves to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)* for lack of jurisdiction over the defendant. In determining the presence or absence of personal jurisdiction, courts engage in a two step analysis. First, the [*5] court must decide whether the long-arm statute of the state in which the court sits authorizes jurisdiction. *Transportes Aeros de Angola v. Ronair, Inc., 544 F. Supp. 864-65 (D. Del. 1982).* If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the *Fourteenth Amendment. Id.* (noting, however, "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elecs., 948 F. Supp. 338, 342 (D. Del. 1996)* (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct.*

*154 (1945)* (citation omitted). Specifically, the plaintiff must show that the defendant "purposefully availed itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)* [*6] (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)); see also Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 108-09, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).* Unless the contacts are continuous and systematic, they must be related to the plaintiff's cause of action. *Helicopteros Nacionales de Colombia, S. A. v. Hall, 466 U.S. 408, 414-15, 80 L. Ed. 2d 404, 104 S. Ct. 1868 (1984).* In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Industries, Inc. v. Al Tech Specialty Steel Corp., 542 F. Supp. 53, 55 (D. Del. 1982).*

### IV. DISCUSSION

Because Marquez has challenged the propriety of personal jurisdiction, it is Venoco's initial burden to demonstrate that Marquez's activities fall within the ambit of the long-arm statute. *Jeffreys v. Exten, 784 F. Supp. 146, 151 (D. Del. 1992).* According to the statute, a non-resident person or corporation is deemed to submit to the jurisdiction of the Delaware courts by committing any one of several acts. *DEL. CODE ANN. tit. 10, § 3104(b).* These acts [*7] are: (1) transacting any business or performing any character of work within the state; (2) contracting to supply services or things in Delaware; (3) causing tortious injury in Delaware through an act committed in Delaware; (4) causing tortious injury in Delaware through an act committed outside Delaware if the person solicits business in Delaware, engages in regular conduct in Delaware or derives substantial revenue from Delaware contacts; (5) having an interest in, using, or possessing real property in Delaware; or (6) contracting to act as a surety for a contract or other such obligation located, executed, or to be performed within Delaware at the time the contract is made. *Id.* z§ *3104(c)(1)-(6).*

The plaintiff urges that *§ 3104 (c)(1)* applies to the defendant. Venoco contends that Marquez has transacted business in this state by his position as a director and stockholder of Venoco, a Delaware corporation, and through his previous litigation in a Delaware state court. n1 Even when construed in the light most favorable to Venoco, however, the court cannot conclude that these

acts constitute "transacting business" within the state.

n1 *See* Pl.'s Ans. Br. at 10 (citing *Venoco, Inc. v. Eson,* 2002 Del. Ch. LEXIS 65, 2002 WL 12288703 (Del. Ch. 2002)).

[*8]

First, the mere ownership of stock in a Delaware corporation does not constitute "transacting business" in the state as contemplated by the long arm statute. The plaintiff has presented no support for this contention, and the court has found none. In any case, it is well-established that ownership of stock is not sufficient to establish personal jurisdiction consistent with due process. *See In re DaimlerChrysler AG Securities Litigation, 197 F. Supp. 2d 86, 98 (D. Del. 2002)* ("Stock ownership has not been found to be sufficient to support the exercise of personal jurisdiction.") (citing *Shaffer v. Heitner, 433 U.S. 186, 53 L. Ed. 2d 683, 97 S. Ct. 2569 (1977)); see also Hana Ranch, Inc. v. Lent, 424 A.2d 28, 31 (Del. Ch. 1980)* ("a valid cause of action against a non-resident defendant for acts within the scope of a directorship was a *sine qua non* to a successful assertion of a claim against such a non-resident in his capacity as stockholder").

Neither is the mere holding of a directorship sufficient to establish jurisdiction over Marquez via the long-arm statute. *See, e.g., Pestolite, Inc. v. Cordura Corp., 449 A.2d 263, 267 (Del. Super. 1982)* [*9] ("the mere status as director of a Delaware corporation, standing alone, is not a significant basis for the individual Defendants to reasonably anticipate being haled into this Court"). Again, the plaintiff has cited no caselaw, and the court has found none, to suggest that the mere holding of a directorship constitutes "transacting business" or "performing work" for purposes of the statute. Furthermore, as in *Hana Ranch,* Venoco has not filed an action against Marquez for acts within the scope of his directorship, but has filed an action against Marquez as a common shareholder.

Finally, Marquez's involvement in prior litigation in Delaware is not sufficient to bring him within the ambit of the long-arm statute. *See, e.g., Hartford Cas. Ins. Co. v. Petrolon Mgmt., Inc., 1995 U.S. Dist. LEXIS 22086 (D. Del. 1995)* (defendant's participation as third-party defendant in a previous suit in Delaware not sufficient to confer personal jurisdiction over it via long-arm statute). The previous litigation in Delaware was initiated by Venoco. Marquez, though stating he had a personal interest in remaining CEO of the company, testified as a witness only in his capacity as a [*10] director and CEO of Venoco. The court declines to hold that testifying as a witness in an official capacity constitutes transacting business or performing work in the state sufficient to confer personal jurisdiction pursuant to the long-arm statute.

Venoco has offered no other grounds for finding that Marquez falls within the ambit of the long-arm statute, and it appears that no other such basis exists. It appears the defendant has no other contact with Delaware beyond those alleged connections already discussed. He has no office or property in Delaware, conducts no business in the state, and is not registered to do business in Delaware. There is no suggestion that the defendant has committed any tortious act in Delaware, or otherwise caused any injury in the state. In short, there is no asserted connection to Delaware as required by *§ 3104*. As such, the long-arm statute does not authorize the exercise of jurisdiction over Marquez.

Because the court has found that personal jurisdiction over Marquez is not authorized by the Delaware long-arm statute, it need not address the constitutional dimension of the jurisdictional question. *See, e.g., Intel Corp. v. Silicon Storage Tech., 20 F. Supp. 2d 690, 699 (D. Del. 1998)* [*11] ("The Delaware long-arm statute [does not] authorize this court to exercise jurisdiction over [the defendant]. Therefore, the court need not analyze whether exercising such jurisdiction would comport with the *Due Process Clause*."). In addition, the court need not address Marquez's motion to dismiss on other grounds, or his motion to transfer or stay the case. Finally, the plaintiff's motions to remand to the Chancery Court (D.I. 7) and to expedite the proceedings (D.I. 15) are deemed moot.

**V. CONCLUSION**

For the aforementioned reasons,

IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss Action for Lack of Personal Jurisdiction; Dismiss or Stay Action in Favor of Parallel Action; or Transfer Venue of

2003 U.S. Dist. LEXIS 7593, *11

Action to California (D.I. 4) is GRANTED;

2. This action is DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction over the defendant;

3. The plaintiff's Motion to Remand to the Court of Chancery of the State of Delaware (D.I. 7) is DENIED as moot;

4. The plaintiff's Motion to Expedite Proceedings (D.I. 15) is DENIED as moot;

5. The Clerk of the Court is directed to close the case.

Dated: May 5, 2003

Gregory M. [*12] Sleet

UNITED STATES DISTRICT JUDGE