1

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1

Not Reported in F.Supp.2d, 2000 WL 1514881 (E.D.Pa.)

(Cite as: 2000 WL 1514881 (E.D.Pa.))

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
F.T. INTERNATIONAL, LTD.,
v.
Thomas E. MASON, Marshland, Ltd., and Main
Street Bank also Trading as Berks
County Bank and Heritage Bank and Sovereign
Bank.
No. CIV.A. 00-5004.

Oct. 11, 2000.

*MEMORANDUM ORDER*

WALDMAN.

\*1 In a verified amended complaint filed yesterday, plaintiff asserted a variety of claims arising from an alleged conversion of its funds by defendants Marshland and Mason. The complaint was accompanied by a motion for a temporary restraining order and preliminary injunction pursuant to Fed.R.Civ.P. 65 by which plaintiff seeks to freeze funds held by the defendant banks in accounts of the individual and corporate defendants.

Plaintiff avers that it was fraudulently induced to maintain $15,000,000 in its account at First Union Bank in Reading by defendant Marshland, through its CEO and shareholder, defendant Mason, who represented that these funds would remain on deposit at First Union while generating a substantial return in connection with a $500,000,000 investment program. Plaintiff avers that Marshland, through defendant Mason, effected the transfer of the $15,000,000 from plaintiff's account at First Union to accounts in their names at different financial institutions by use of a falsified corporate resolution purportedly adopted by plaintiff. Plaintiff avers that it has made a demand of defendant Mason for return of these funds and he has refused. Plaintiff avers that defendant Mason has now transferred $5,000,000 of these funds to an offshore bank and $2,500,000 to accounts at Berks County Bank in the names of Marshland and Mason. Plaintiff avers that those defendants have been transferring these funds between their accounts at Berks County Bank and accounts in their names at Sovereign Bank. Plaintiff avers that Mr. Mason has engaged in similar conduct with regard to the bank account of a South Carolina investor.

Plaintiff seeks an order freezing all accounts and deposits at the defendant banks in the name of defendant Marshland or defendant Mason and restraining these defendants from withdrawing any funds on deposit with the defendant banks. [FN1] Plaintiff also seeks an order requiring these defendants to render an accounting of all of the funds transferred from First Union.

> FN1. Plaintiff has presented its request for a TRO *ex parte.* Plaintiff has not specifically articulated a reason why an order should be entered *ex parte.* The court infers from the averments in the complaint that plaintiff reasonably fears that with advance notification, Mr. Mason would alienate or secrete the funds before a hearing could be held.

There is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

A federal court has no authority generally to freeze a defendant's funds to help ensure satisfaction of a judgment should the plaintiff prevail on an underlying legal claim. *See Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.,* 527 U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1514881 (E.D.Pa.)

(Cite as: 2000 WL 1514881 (E.D.Pa.))

Page 2

308, 119 S.Ct. 1961, 1975, 144 L.Ed.2d 319 (1999). A court also has no authority in any event to freeze assets in an amount which exceeds that recoverable in the underlying action. *See Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 198-99 (3d Cir.1990). [FN2]

> FN2. That plaintiff has included a civil RICO claim does not authorize an injunctive order freezing assets. *See Rosen v. Cascade Int'l, Inc.,* 21 F.3d 1520, 1529-30 (11th Cir.1994); *Dixie Carriers, Inc. v. Channel Fueling Service, Inc.,* 843 F.2d 821, 830 (8th Cir.1988); *Religious Tech. v. Ctr. v. Wollersheim,* 796 F.2d 1076, 1088-89 (9th Cir.1986).

Aside from the traditional showing necessary to obtain preliminary injunctive relief, a plaintiff may obtain a prejudgment freeze on a defendant's assets only if he has asserted a cognizable equitable claim, has demonstrated a sufficient nexus between that claim and specific assets of the defendant which are the target of the injunctive relief, and has shown that the requested interim relief is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed. *See U.S. ex rel. Rahmam v. Oncology Associates, P.C.,* 198 F.3d 489, 496-97 (4th Cir.1999). *See also Travelers Casualty & Surety Co. v. Beck Development Corp.,* 95 F.Supp.2d 549, 552-53 (E.D. Va.2000); *III Finance Ltd. v. The Aegis Consumer Funding Group, Inc.,* 1999 WL 4619808, *4 n. 1 (S.D.N.Y. July 2, 1999).

Plaintiff has asserted a cognizable equitable claim for unjust enrichment. The elements of unjust enrichment are: a benefit conferred on the defendant by plaintiff; appreciation of such benefit by defendant; and, acceptance and retention of such benefit under circumstances making it inequitable for defendant to retain the benefit without payment of value. *See Mitchell v. Moore,* 729 A.2d 1200, 1203 (Pa.Super.Ct.1999). Unjust enrichment has been applied in circumstances where the defendant acts wrongly or fraudulently in appropriating plaintiff's property. *See Robbins v. Kristofic,* 434 Pa.Super. 392, 643 A.2d 1079, 1083

(Pa.Super.Ct.1994) (defendant misappropriated funds of plaintiffs); *Denny v. Cavalieri,* 297 Pa.Super. 129, 443 A.2d 333, 335 (Pa.Super.Ct.1982)(financial advisors defrauded plaintiff of funds he gave defendants); *Scott v. Purcell,* 264 Pa.Super. 354, 399 A.2d 1088, 1092 (Pa.Super.Ct.1979).

**\*2** Plaintiff seeks a constructive trust on the funds to be targeted by the injunctive relief and thus a sufficient nexus exists. *See Rahman,* 198 F.3d at 498. Moreover, plaintiff avers that defendant acquired the funds fraudulently and thus plaintiff has an equitable interest in the funds which provides a sufficient nexus. *See Travelers Casualty & Surety Co.,* 95 F.Supp.2d at 554. A TRO freezing the claimed funds is a reasonable means to preserve the status quo. *See Fairview Machine & Tool Co.,* 77 F.Supp.2d at 204. A TRO is also reasonable as it would aid the court in granting the equitable relief sought. *See Rahman,* 198 F.3d at 498.

On the facts as averred, plaintiff would likely prevail on a claim for unjust enrichment. The diversion and transfer abroad of millions of dollars by defendants suggests that plaintiff will be unable to recoup any of its funds without prompt injunctive action. This is sufficient to show irreparable harm. This harm substantially outweighs the negligible harm to the defendant banks and the harm to defendants Mason and Marshland from the entry of a restraining order which essentially would consist of loss of the use of the frozen funds for a short period until the parties could be heard on whether a preliminary injunction should issue. [FN3] On the facts as averred, the public interest would not be affected adversely in any way. Also, the prevention of unjust enrichment by means of fraud or misappropriation, even that affecting only private entities, is in the general public interest.

> FN3. Any interest on the funds would continue to accrue.

The TRO requested by plaintiff will be granted. The freeze of assets will be limited to the identified $2,500,000 and will automatically dissolve upon defendant's escrow of $2,500,000.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1514881 (E.D.Pa.)

(Cite as: 2000 WL 1514881 (E.D.Pa.))

Page 3

ACCORDINGLY, this .... day of October, 2000, upon consideration of plaintiff's Motion for Temporary Restraining Order (Doc. # 7), consistent with the foregoing, IT IS HEREBY ORDERED that said Motion is GRANTED and an appropriate restraining order will be entered.

### TEMPORARY RESTRAINING ORDER

*3 AND NOW, this .... day of October, 2000, consistent with the court's accompanying memorandum order granting plaintiff's Motion for a Temporary Restraining Order, IT IS HEREBY ORDERED that:

1. defendants Thomas E. Mason and Marshland, Ltd. are immediately enjoined from removing, withdrawing, drawing upon, pledging or in any way alienating any funds or deposits of any kind on account in the name of or subject to the control of Mason or Marshland in Main Street Bank t/a Berks County Bank and Heritage Bank or from Sovereign Bank through October 21, 2000, see Fed.R.Civ.P. 65(b), or such other time as may be prescribed by further Order of this Court;

2. defendants Main Street Bank t/a Berks County Bank and Heritage Bank and Sovereign Bank shall immediately freeze any accounts, funds and deposits in the names of, or subject to control by, Thomas E. Mason and/or Marshland, Ltd. through October 21, 2000 or such other time as may be prescribed by further order of this Court;

3. the foregoing notwithstanding, the total amount of funds to be frozen pursuant to paragraphs 1 and 2 shall aggregate no more than $2,500,000, and this restraining order shall automatically dissolve upon the escrow of $2,500,000 by defendants Mason and Marshland into the registry of this Court; and,

4. a hearing will be held at 2:00 p.m. on October 19, 2000, in Courtroom 9B, Ninth Floor, United States Courthouse, 601 Market Street, Philadelphia, Pa. at which time the parties shall appear and be heard on whether plaintiff's request for a preliminary injunction should be granted continuing the relief provided herein.

This order is conditioned upon plaintiff promptly posting security in the amount of $20,000.00. See Fed.R.Civ.P. 65(c).

Plaintiff shall be responsible for obtaining any necessary certified copies of this order from the clerk and for immediately thereafter effecting service upon defendants.

This order is entered on the above date at 4:15 p.m. without advance notice to defendants because it appears from plaintiff's averments regarding defendant's conduct to date that upon such advance notice defendant would likely secrete or alienate the funds to be frozen. See Fed.R.Civ.P. 65(b).

Not Reported in F.Supp.2d, 2000 WL 1514881 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:00CV05004 (Docket) (Oct. 04, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

(Cite as: 2001 WL 884718 (E.D.Pa.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Nand TODI, Plaintiff,
v.
Henry J. STURSBERG, and Stursberg & Fine,
Defendants.
No. CIV. A. 01-2539.

Aug. 1, 2001.

*MEMORANDUM*

DUBOIS, Judge.

I. INTRODUCTION

*1 Plaintiff Nand Todi ("Todi" or plaintiff) seeks preliminary injunctive relief in a dispute arising out of plaintiff's investment in reXnow.com, a company controlled by defendant Henry J. Stursberg ("Stursberg"). Plaintiff alleges that Stursberg controlled and operated three entities, reXnow.com ("reXnow" or "Rex"), an internet start-up company; J & C Publishing, Inc. ("J & C Publishing"), a company that publishes Commercial Realty Review ("CRR"), a magazine related to the real estate industry; and Stursberg & Fine ("S & F"), an investment banking company. It is plaintiff's position that these three entities were used interchangeably by Stursberg and that Stursberg improperly diverted plaintiff's investment in reXnow to the other entities he controlled and to himself for his own personal benefit. In support of these allegations, plaintiff avers that the companies shared employees, income and disbursements, and that in the course of managing the companies, Stursberg commingled funds of the three entities.

On the basis of these claims, plaintiff argues that the Court should pierce S & F's corporate veil; Stursberg should be found individually and personally liable to plaintiff; and S & F should be treated as the alter ego of Stursberg and held liable for his obligations to plaintiff.

Against both defendants, plaintiff requests injunctive relief (Count One) and an equitable trust (Count Two); he also alleges fraud (Count Four); civil conspiracy (Count Five); and fraudulent transfers (Count Six). Against Stursberg individually, plaintiff alleges violations of various securities laws (Count Three). In Count Seven, which names only S & F as defendant, plaintiff claims that S & F should be treated as Stursberg's alter ego and held responsible for all of Stursberg's debts and obligations.

Jurisdiction in this case is based on 28 U.S.C. § 1331; plaintiff claims that defendant Stursberg violated § 10(b) of the Securities Exchange Act, Rule 10b-5, and the applicable Pennsylvania securities laws by employing devices, schemes and artifices to defraud; making untrue statements of material fact and/or omitting to state material facts necessary to make statements not misleading; and engaging in acts, practices and a course of business which operated as a fraud and deceit upon investors in an effort to raise funds. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Presently before the Court is plaintiff's Petition for Preliminary Injunction under Rule 65 of the Federal Rules of Civil Procedure. In it, plaintiff seeks an injunction preventing defendants from, *inter alia,* entering into any extraordinary transactions, making any expenditures in excess of $1,000 without plaintiff's prior approval, engaging in any transactions with each other or any other related entities, and altering any books and records of either defendant. Plaintiff also seeks an accounting and the creation of a constructive trust covering all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 2

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

(Cite as: 2001 WL 884718 (E.D.Pa.))

of defendants' assets to be held for the benefit of Nand Todi. For the following reasons, plaintiff's Petition for Preliminary Injunction will be denied.

## II. STANDARD OF REVIEW

*2 Preliminary injunctive relief is appropriate where "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *Maldonado v. Houston,* 157 F.3d 179, 184 (3d Cir.1998) (citing *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., Inc.,* 963 F.2d 628, 632-33 (3d Cir.1992)). *See also Wright v. Columbia Univ.,* 520 F.Supp. 789, 792-93 (E.D.Pa.1981) ("To prevail on its motion for a temporary restraining order and a preliminary injunction, plaintiff must demonstrate that irreparable injury will occur if the relief is not granted until a final adjudication on the merits can be made, that there is a reasonable probability of success on the merits, and that the possibility of harm to the non-moving party will be minimal and that harm to the public, when relevant, will not be likely.").

## III. ANALYSIS

### A. Background

On June 9, 2000, plaintiff invested $300,000 in reXnow pursuant to a convertible note, payable within one year. *See* Ex. P-1 (Convertible Note dated June 9, 2000). Subsequently, plaintiff agreed to invest an additional $200,000 in reXnow for an equity stake in the company, upon the completion of private placement funding. [FN1] The additional $200,000 investment was made in installments of $100,000 each, one in October 2000 and the other in December 2000. On February 9, 2001, Stursberg sent an e-mail message to Todi in which he stated that reXnow no longer had any employees. *See* Ex. P-4 (E-mail message from Henry J. Stursberg to Nand Todi, dated February 9, 2001) ("Effective today, there are no more reXnow employees. Sadly, we were forced to make this announcement at the close of business today."). Plaintiff argues that the e-

mail amounted to a notice of a cessation of business--a default under the terms of Todi's initial note--and that the note became immediately payable to plaintiff.

> FN1. As set forth in a letter from defendant Stursberg to plaintiff dated October 10, 2000, plaintiff agreed to invest an additional $200,000 in reXnow under the following terms:
> Pursuant to your investment, you have agreed to convert your loan to reXnow.com of $300,000 (three hundred thousand dollars) to stock in reXnow.com. The additional $200,000 (two hundred thousand dollars) investment as outlined above will be equity of stock in reXnow.com. Therefore, your total investment of $500,000 (five hundred thousand dollars) will be equity in reXnow.com....
> Ex. P-3 (Letter from Henry J. Stursberg to Nand Todi, October 10, 2000).

After receipt of the e-mail, plaintiff demanded an accounting from reXnow. When such an accounting was not forthcoming, plaintiff filed a related action in this Court on March 30, 2001 against reXnow and CRR, alleging that the money invested in reXnow had been improperly diverted to CRR. *See Todi v. reXnow.com, et al.,* Civil Action No. 01-1545. Both defendants in that case subsequently filed petitions in bankruptcy and the case was placed in civil suspense by Order of this Court dated May 1, 2001, pursuant to the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362.

Plaintiff then initiated this case by filing a Complaint and Petition for a Temporary Restraining Order on May 23, 2001. The Court held the first part of a hearing on the Petition for Temporary Restraining Order on May 23, 2001 and then entered an agreed-upon temporary restraining order ("TRO") on May 24, 2001. The Court concluded the hearing on plaintiff's Petition for Temporary Restraining Order on May 25, 2001 and issued a TRO on that date in which it granted in part and denied in part the relief sought by plaintiff. By

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

(Cite as: 2001 WL 884718 (E.D.Pa.))

Page 3

request of the parties, the Court extended the TRO on two occasions until the hearing on plaintiff's Petition for Preliminary Injunction that was held June 14, 19 and 20, 2001. [FN2] It is to that Petition for Preliminary Injunction to which the Court now turns, first evaluating plaintiff's likelihood of success on the merits.

> FN2. As explained in the Court's Order of June 20, 2001, the Court intended to rule on the Motion for Preliminary Injunction shortly after the conclusion of the hearing held on June 14, 19 and 20, 2001. However, because of inconsistent records and reports produced by defendants, and the myriad of explanations given for the inconsistent records and reports, the Court was unable to do so. It is for this reason that the Court extended the provisions of the Temporary Restraining Order dated May 25, 2001 until the Court's ruling on the Motion for Preliminary Injunction.

B. Likelihood of Success on the Merits

*1. Commingling of Assets--reXnow and CRR*

*3 At the preliminary injunction hearing, plaintiff presented evidence that tended to show there was significant commingling of assets between two of the companies that Stursberg controls--reXnow and CRR. As evidence of the commingling, plaintiff presented defendants' accounting records, which demonstrated that monies invested in reXnow were often quickly dispersed to CRR. *See, e.g.,* Ex. P-51 (reXnow.com Balance Sheet dated Dec. 31, 2000) (itemizing substantial transfers of funds from reXnow to CRR; showing $104,558.95 owed to reXnow from CRR as a current asset); Ex. P-55 (reXnow.com Balance Sheet dated Feb. 28, 2001) (detailing $82,250.57 owed from CRR to reXnow as a current asset); Ex. P-61 (Commercial Realty Review Audit Trail dated Apr. 23, 2001) (detailing monies due from reXnow); Ex. P-46 (invoices from CRR to reXnow for advertising costs totaling $209,500).

In addition, plaintiff presented evidence which

supported his argument that Stursberg's bookkeeping methods were suspect--evidence of apportioning common expenses, such as rent, telephone, and postage machine and copier costs to the entities as he deemed appropriate long after the expenses were incurred. In response, Stursberg testified that the system of allocating these common expenses was suggested by Smart & Associates, an accounting firm, and that the allocation method was based on the percentage of payroll for which each entity was responsible. Hr'g Tr. at 102-03 (testimony of Henry J. Stursberg, June 14, 2001).

Stursberg's basis for allocating payroll expenses is, however, suspect as well. According to the evidence presented, there was one payroll for reXnow and CRR and Stursberg would allocate a percentage of each employee's salary to each company based upon the projects on which that employee was working. Hr'g Tr. at 104 (testimony of Henry J. Stursberg, June 14, 2001). Stursberg testified as to the reason for this practice as follows:

> The reason why we didn't have two payrolls is because there's two--its double taxation to the employee, in addition to which there's a matching piece of the company, so we'd have to match two different--and the employee would suffer as well as the employer. So there was one payroll and we couldn't have two sets of records. So all the payroll for all the employees, whether they worked exclusively on Rex or partially on Rex or completely for CRR, were all run through J & C Publishing.

Hr'g Tr. at 105 (testimony of Henry J. Stursberg, June 14, 2001). Examples of the employee salary apportionment were provided by the defense as Defense Exhibit D-T. Like the other common expenses, the allocation method used for the employee salaries supports plaintiff's argument that there was commingling of assets between reXnow and CRR.

*2. Commingling of Assets--S & F and Stursberg*

Plaintiff presented substantially less evidence of commingling of assets involving S & F and Stursberg. With respect to S & F, plaintiff presented no evidence of direct payments from reXnow or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

(Cite as: 2001 WL 884718 (E.D.Pa.))

Page 4

CRR to S & F. *See* Ex. D-Z, page entitled "Answer to Questions 2 & 4"; page entitled "Answer to Question 3." There were, however, indirect transfers of funds documented in Defense Exhibit Z, which detailed $164,779.84 in funds paid by CRR to third parties on behalf of S & F. *See* Ex. D-Z, page entitled "Answers to Questions 2 & 4." In addition, the accounting records produced by defendants documented $30,715.11 in funds paid from reXnow on behalf of S & F. Ex. D-Z, page entitled "Answer to Question 3." At the hearing, Stursberg explained that although these sums were noted in records as having been paid on behalf of S & F, the payments actually represented each entity's share of the rent, supplies, services, etc., for which that entity, not S & F, received the benefit. [FN3] Stursberg's testimony on that subject was as follows:

> FN3. At the hearing, Stursberg initially admitted that these columns reflected payments made by reXnow to third parties on behalf of S & F. Further development of this testimony established, however, that the payments were actually charges for which reXnow received the benefit.

The expenses that the magazine paid for Stursberg & Fine would have been expenses of items such as the lease on the premises of our offices is in the name of Stursberg & Fine.
*4 ... [N]one of the charges on this statement were expenses related to Stursberg & Fine's business operations, nothing, because it wasn't in business from the standpoint of being operational, it was just dormant and idle. We didn't shut it down, it was just idle.
And the leases on the premises and for the mail and for the copier and telephone lines, et cetera, were paid by Commercial Realty Review and at times, not a great deal but at times by Rex.
Hr'g Tr. at 58 (testimony of Henry J. Stursberg, June 14, 2001).

Notwithstanding Stursberg's explanation, the propriety and accuracy of a number of expenditures and the exact allocation of many of the joint expenses charged to reXnow and CRR are not free from doubt. For example, with respect to certain

common expenses such as rent and telephone service, Stursberg did not apportion any share of the rent or telephone charges to S & F on the theory that S & F was not operational, although S & F maintained a sign outside the office. The total rent for the office shared by all three entities was approximately $4,000 per month; the telephone bills were several hundred dollars a month. Assuming rent of $4,000 per month and telephone bills of $500 per month over the course of 12 months, even if the proper allocation of the rent and telephone bills to S & F was one-third of the total of these joint expenses, plaintiff's recovery as a result of these improper allocations would not exceed $18,000 (one-third of $54,000).

Plaintiff also questions the allocations of payroll expenses made by Stursberg. Specifically, plaintiff argues that some of the employees of the three entities worked for reXnow, CRR and S & F interchangeably; that there were periods when no payroll allocation was made to S & F despite that certain employees were working for S & F; [FN4] and that although CRR normally paid the payroll, S & F paid some of reXnow's payroll expenses. *See, e.g.,* Hr'g Tr. at 82-83 (testimony of Henry J. Stursberg, June 19, 2001) (stating that S & F paid salary to Tim Sawyer and Gary Durfee in January 2001). Stursberg's testimony on the issue of payroll allocations to S & F was somewhat inconsistent and the evidence presented at the hearing suggests that some employees did perform work for the benefit of S & F in months when no payroll allocation was made to that entity. On the present state of the record, however, it is impossible to determine the amount of the benefit received by S & F as a result of these indirect payments. No evidence was presented at the hearing regarding the number of employees who worked for S & F or CRR prior to reXnow's founding; the Court thus cannot evaluate plaintiff's likelihood of success on this issue as it is impossible to assess the propriety of any payroll allocations that were made between the entities.

> FN4. As an example, plaintiff points to Amy Doolittle, who Stursberg first identified as an employee of S & F and then as an employee for reXnow. *Compare*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 5

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

(Cite as: 2001 WL 884718 (E.D.Pa.))

Hr'g Tr. at 66 (testimony of Henry J. Stursberg, June 19, 2001) and P-68 (Employer's Federal Tax Return for S & F dated Mar. 31, 2000) (identifying Amy Doolittle as an employee of S & F); *with* Hr'g Tr. at 44 (testimony of Henry J. Stursberg, June 20, 2001) (stating that Amy Doolittle was a reXnow employee).

Based on all of the evidence presented, the Court concludes that S & F might owe reXnow and/or CRR money because there was no allocation of a number of expenses to S & F. However, the amount of money that may have been improperly diverted to S & F in this fashion is probably not substantial. Ultimately, the propriety of the expenses charged to reXnow and CRR and the question whether funds were improperly diverted to S & F will be for the trier of fact.

*5 With respect to defendant Stursberg personally, the evidence presented establishes that substantial funds were paid by reXnow and CRR to him, or on his behalf. For example, CRR paid $142,543.50 to, or on behalf of, Stursberg from approximately February 2000 through February 2001. *See* Ex. D-Z, page entitled "Answers to Questions 2 & 4"; Hr'g Tr. at 63 (testimony of Henry J. Stursberg, June 14, 2001) (admitting that $142,543.50 was paid by CRR to, or on behalf of, Stursberg); Ex. D-Z, page entitled "Answer to Question 3" (documenting $35,548.22 paid by reXnow to, or on behalf of, Stursberg personally). Stursberg offered explanations of many of the payments made to him directly, or made on his behalf. For example, he testified that the payments made to him or on his behalf actually covered a number of business expenditures, such as checks made out to him personally that he cashed in order to supply the office with petty cash, entertainment expenses, business expenses charged to his personal credit cards for which he was reimbursed, etc. *See* Hr'g Tr. at 66-71 (testimony of Henry J. Stursberg, June 14, 2001). On the present state of the record, it is impossible to determine the amount of the benefit to Stursberg as a result of these payments. As with the payments made on behalf of S & F, the ultimate determination as to whether these expenses were

proper will be for the trier of fact.

*3. Piercing the S & F Corporate Veil*

Finally, with respect to S & F, plaintiff argues that the corporate veil of S & F should be pierced and S & F should be held liable as an alter ego of Stursberg. As explained by the Third Circuit, the "court may only pierce the [corporate] veil in 'specific, unusual circumstances', lest it render the theory of limited liability useless." *American Bell, Inc. v. Federation of Tel. Workers,* 736 F.2d 879, 886 (3d Cir.1984) (quoting *Zubik v. Zubik,* 384 F.2d 267, 272 (3d Cir.1967)). A court must look at the following factors to determine whether the alter ego theory of corporate veil piercing should apply:

gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder.

*Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484-85 (3d Cir.2001) (citing *American Bell,* 736 F.2d at 886). The test is essentially an inquiry into whether or not the debtor corporation is a legal fiction; the burden of proof is thus "notoriously difficult for plaintiffs to meet." *Id.* at 485. "[I]n order to succeed on an alter.ego theory of liability, plaintiffs must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." *Id.*

Some of the evidence presented at the preliminary injunction hearing weighs in favor of piercing the corporate veil in this case. It is undisputed, for example, that the debtor corporation (reXnow) is in bankruptcy, and the corporate records of all of Stursberg's entities are a shambles. However, there is insufficient evidence to establish that there was a complete failure to observe corporate formalities with respect to S & F; nor can the Court conclude, based on the evidence presented at the preliminary injunction hearing, that the corporations Stursberg controlled were merely operating as a single entity.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 6

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

(Cite as: 2001 WL 884718 (E.D.Pa.))

Accordingly, the Court concludes that disregarding the corporate form of S & F and granting relief on an alter ego theory is not warranted at this stage in the proceedings.

*4. Conclusion*

*6 Having determined that there were questionable inter-company transfers, and improperly allocated joint expenses, the Court concludes that plaintiff has shown some likelihood of success on the merits. The sums traceable to S & F and Stursberg on the present state of the record, however, do not appear to constitute the hundreds of thousands of dollars that plaintiff claims were improperly diverted and the evidence presented thus far does not warrant piercing the corporate veil. Moreover, as discussed below, plaintiff has failed to demonstrate that defendants are likely to further dissipate their assets to prevent plaintiff from any monetary recovery to which he may be entitled pending a trial on the merits in this case.

C. Irreparable Harm to Plaintiff

Having concluded that plaintiff has shown some likelihood of success on the merits, the Court will next address the question whether plaintiff has established irreparable harm. As explained by the Third Circuit in *Hoxworth v. Blinder*, 903 F.2d 186 (3d Cir.1990), "the unsatisfiability of a money judgment can constitute irreparable injury" under certain circumstances. *Id.* at 206. Based on the facts presented at the hearing, the Court concludes that, although plaintiff has established some commingling of assets, and substantial evidence of poor record-keeping, extraordinary injunctive relief is not warranted in a case such as this where plaintiff has an adequate remedy at law in the form of a money judgment. Thus far, plaintiff has not presented any evidence to demonstrate that the money judgment he seeks would be unsatisfiable.

In addition, the injunctive relief plaintiff seeks is extremely overbroad. As discussed above, plaintiff seeks comprehensive injunctive relief, whereby defendants would be restrained in their activities and prevented from making any expenditures in

excess of $1,000 without plaintiff's prior approval, and all assets of S & F and Stursberg would be held in a constructive trust for the benefit of plaintiff. The Third Circuit explained in *Hoxworth* that "[i]f a court imposes a preliminary injunction encumbering a defendant's assets in order to protect a potential future money judgment, the court must make some attempt reasonably to relate the value of the assets encumbered to the likely value of the expected judgment." *Id.* at 198. Under *Hoxworth*, an injunction that orders a constructive trust of all of defendants' assets for the benefit of Todi would be fatally overbroad on the present state of the record and plaintiff's request for such relief will be denied.

Plaintiff's only argument in support of his position that the Court should order a constructive trust is that Stursberg has a history of commingling assets. Plaintiff did not present any evidence, however, that Stursberg has attempted to transfer assets out of plaintiff's reach--all of the transfers of assets occurred between the defendants in the two lawsuits [FN5]--nor did plaintiff demonstrate that defendants have attempted to disguise assets in an effort to conceal them from plaintiff and thus prevent a monetary recovery in this case. *See generally Hoxworth*, 903 F.2d 186; *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir.1985) ("[E]ven where the ultimate relief sought is money damages, federal courts have found preliminary injunctions appropriate where it has been shown that the defendant 'intended to frustrate any judgment on the merits' by 'transfer[ring its assets]' out of the jurisdiction.' ") (quoting *Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir.1980)) (modification in original); *Star Creations Inv. Co., Ltd. v. Amron Dev., Inc.*, 1995 WL 495126 (E.D.Pa. Aug.18, 1995) (finding irreparable harm where plaintiff demonstrated that defendant was likely to engage in fraudulent transfers, with actual intent to defraud or hinder creditors). [FN6]

> FN5. As discussed *supra*, plaintiff filed a related case against reXnow and CRR on March 30, 2001, *see Todi v. reXnow.com, et al.*, Civil Action No. 01-1545.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

(Cite as: 2001 WL 884718 (E.D.Pa.))

Page 7

FN6. The Court notes that the primary cases on which plaintiff relies in support of his argument that a constructive trust should be ordered are distinguishable from the facts of this case. In *American Express Travel Related Servs. Co., Inc. v. Laughlin*, 424 Pa.Super. 622, 623 Pa.A.2d 854 (Pa.Super.Ct.1993) ("*AMEX* "), American Express sought a constructive trust over funds received by defendant as proceeds from the sale of American Express money orders; defendant was authorized to sell such money orders pursuant to a trust agreement executed with plaintiff. Because plaintiff and defendant were in a trust relationship, the court concluded that defendant had no interest in the funds he had received from the sale of the money orders and that a constructive trust was therefore an appropriate remedy. As explained by the *AMEX* court, "[s]ince [defendant's] relationship with AMEX is that of trustee, rather than debtor, the existence of a remedy at law is irrelevant." *Id.* at 627, 623 Pa.A.2d at 856. Because the unique relationship of the parties in *AMEX* was created by virtue of a trust agreement, plaintiff's reliance on *AMEX* is inapposite. Likewise, reliance on *F.T. Int'l, Ltd. v. Mason*, 2000 WL 1514881 (E.D.Pa. Oct.11, 2000), is misplaced. In *F.T. Int'l*, plaintiff had asserted "a cognizable equitable claim, ha[d] demonstrated a sufficient nexus between that claim and specific assets of the defendant which are the target of the injunctive relief, and ha[d] shown that the requested interim relief [was] a reasonable measure to preserve the status quo...." *Id.* at \*1. In this case, as discussed above, plaintiff's request for preliminary injunctive relief is overly broad and there is no evidence to suggest that the funds plaintiff seeks to freeze and/or place in a constructive trust are sufficiently linked to his claims.

\*7 Rather than attempting to hide and/or dissipate assets, S & F's bank records showed recent deposits

in excess of $170,000 as payments for S & F services. *See* Ex. D-A1 (Commerce Bank statements for S & F dated April 12, 2001 and May 14, 2001). With respect to defendant Stursberg, there was no evidence presented at the hearing that he is in a financially precarious position or that a money judgment ordered against him would not be satisfied. In fact, no evidence about Stursberg's personal wealth and/or finances was presented at all. As such, the evidence presented at the preliminary injunction hearing simply failed to show that plaintiff would suffer irreparable harm in the absence of an injunction. In light of this conclusion, the Court declines to reach the remaining requirements for the issuance of a preliminary injunction. [FN7]

FN7. Another aspect of the relief plaintiff seeks is an accounting. As discussed *supra*, evidence presented at the preliminary injunction hearing demonstrated that the books and records of the defendants in this case and the other entities that Stursberg controls--reXnow and CRR--are in a state of disarray and that the records document innumerable inter-company transfers of assets and payments made by one entity to, or on behalf of, another entity. A full accounting was ordered in discovery for the preliminary injunction hearing and, to the extent that the accounting provided by defendants was incomplete and/or inaccurate, defendants must complete and/or correct the accounting during discovery.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Petition for Preliminary Injunction (Document No. 2) will be denied. An appropriate order follows.

### ORDER

AND NOW, this 1st day of August, 2001, upon consideration of Plaintiff's Petition for Preliminary Injunction (Document No. 2, filed May 23, 2001), Plaintiff's Brief in Support of Petition for Preliminary Injunction (Document No. 8, filed May

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

**(Cite as: 2001 WL 884718 (E.D.Pa.))**

30, 2001), Defendants' Response in Opposition to Plaintiff's Petition for Preliminary Injunction (Document No. 16, filed May 31, 2001), Reply Memorandum of Defendants in Further Support of Why the TRO Should be Dissolved and Why Plaintiff's Motion for an Injunction Should be Denied (Document No. 50, filed July 10, 2001), Plaintiff Nand Todi's Post-Hearing Memorandum (Document No. 46, filed June 29, 2001), Post-Injunction Hearing Submission of Defendants Stursberg & Fine, Inc. and Henry Stursberg to Support Why the Temporary Restraining Order Should be Resolved and Why Plaintiff's Motion for an Injunction Should be Denied (Document No. 44, filed June 29, 2001), and Response of Plaintiff Nand Todi to Defendants' Post-Injunction Hearing Submission (Document No. 49, filed July 9, 2001), the Court having conducted a hearing on Plaintiff's Petition for Preliminary Injunction on June 14, 19 and 20, 2001, for the reasons stated in the attached Memorandum, IT IS ORDERED that Plaintiff's Petition for Preliminary Injunction is DENIED.

IT IS FURTHER ORDERED that a preliminary pretrial conference will be scheduled in due course.

Not Reported in F.Supp.2d, 2001 WL 884718 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 2:01cv02539 (Docket) (May. 23, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Page 1

**H**

Motions, Pleadings and Filings

United States District Court,
D. Massachusetts.
VERMONT PURE HOLDINGS, LTD., Plaintiff,
v.
NESTLÉ WATERS NORTH AMERICA, INC.,
Defendant.
No. Civ.A.03-11465 DPW.

March 28, 2006.

Barry A. Ragsdale, Birmingham, AL, Garve W. Ivey, Jr., Ivey & Ragsdale, Jasper, AL, George M. Gowen, III, Kevin F. Berry, Cozen & O'Connor, Philadelphia, PA, Thomas M. Sobol, Hagens Berman Sobol Shapiro LLP, Cambridge, MA, for Plaintiff.

Benjamin L. Hincks, Kevin M. McGinty, Martha J. Koster, Helen M. Gerostathos, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, Jeffrey M. Garrod, Orloff, Lowenbach, Stifleman & Siegel, P.C., Roseland, NJ, for Defendant.

*MEMORANDUM AND ORDER*

WOODLOCK, J.

*1 Vermont Pure Holdings, Ltd. ("Vermont Pure") alleged in its original complaint that Nestle Waters North America, Inc. ("Nestle") violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and multiple state law unfair competition statutes by making false or misleading statements in its advertising regarding the source, nature, and purity of Nestle's Poland Spring brand bottled water. In a Memorandum and Order dated September 9, 2004 ("September 9, 2004 Order"), 2004 WL 2030254 (D.Mass.), I dismissed Vermont Pure's claims that Poland Spring water was not "spring water" on the

grounds such claims were preempted by the Federal Food Drug & Cosmetic Act ("FDCA"), 21 U.S.C. § 301, et seq. *Id.* at *7. The September 9, 2004 Order also denied Nestle's motion to dismiss with respect to the claims based on the origin and purity of the water ("quality claims"). *Id.* at *8.

Upon reference from me, Magistrate Judge Sorokin, who has been overseeing discovery in this case, issued Reports and Recommendations ("R & R") with respect to the three motions now before me: (1) a motion by Vermont Pure for reconsideration of the September 9, 2004 Order in light of the Supreme Court's decision in *Bates v. Dow Agrosciences, LLC,* 544 U.S. 431, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005); (2) a motion by Nestle for the dismissal of the quality claims as presented in the Amended Complaint; and (3) a motion by Nestle to strike Vermont Pure's claim for disgorgement of profits, or in the alternative, enter judgment as a matter of law denying this form of relief.

Magistrate Judge Sorokin recommended that all three motions be denied. For the reasons discussed below, I accept this recommendation with respect to the latter two, but I find that my September 9, 2004 Order merits reconsideration and reversal of my earlier interlocutory order.

I. BACKGROUND
Drawing from Vermont Pure's original Complaint, the factual allegations of this case may be summarized as follows:

In 1854, Hiram Ricker began bottling spring water from a bedrock spring on Ricker Hill in Poland Maine. In the 1860's, the Ricker family opened a resort on the property, and in the 1880's, built a water bottling plant at the spring. The resort and bottled water sales thrived until the 1960s. By 1967, groundwater had ceased to flow out of the spring, and the bottling plant was closed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

In 1973, the Ricker family sold a 400-acre parcel of land surrounding the spring to a company called Waters of Maine. Waters of Maine installed wells on its property and began to draw ground water from the Lower Range Pond Aquifer, which it marketed and sold as "spring water." Waters of Maine then built a new bottling plant on the property.

Perrier Co. ("Perrier") purchased the assets of Waters of Maine in 1979, and expanded the bottling plant. In a 1993 hostile takeover, Nestle S.A. purchased Perrier, and in 1994, further expanded the plant. Nestle also purchased Garden Spring Water Company, which was located several miles from the former Perrier plant. Nestle began bottling and marketing what it called Poland Spring water in approximately 1994.

*2 Vermont Pure alleges that Poland Spring water has never been extracted from the Poland Spring, and does not even come from the same acquifer as the original source. Vermont Pure claims that Poland Spring water is pumped from the ground from a series of gravel-packed wells, some of which are located several miles from the original Poland Spring. Vermont Pure further alleges that Poland Spring derives this ground or well water not from "some of the most pristine and protected sources deep in the woods of Maine," as advertised, but from four publicly disclosed sources, and on occasion, from water trucked in from undisclosed out-of-state sources.

With respect to the purity of Poland Spring water, Vermont Pure alleges that Nestle's production well techniques and methods for withdrawing groundwater cause actual or potential contamination of ground and well water.

## II. DISCUSSION

28 U.S.C. § 636(b)(1)(B) authorizes the parties to make timely objections to a magistrate's report and recommendation. This court then must make a de novo determination of those portions of the report to which objections are made. § 636(b)(1)(B).

### A. "Spring water" claims

Vermont Pure initially brought suit under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and multiple state unfair competition and false advertising statutes, alleging that Nestle's advertising for Poland Spring water was false or misleading because Poland Spring water was not " 'spring water' in any regulatory, hydrological or plain meaning sense." Original Complaint at ¶ 15.

In the September 9, 2004 Order, I held that these claims were preempted by the FDCA. Vermont Pure, 2004 WL 3030254 at *7. In that decision, I noted that FDA regulations explicitly define the term "spring water." 21 C.F.R. § 165.110(a)(2)(vi). While the FDCA clearly does not confer a private right of action to enforce its regulations directly, see Mendes v. Medtronic, Inc., 18 F.3d 13, 19 n. 4 (1st Cir.1994), mere regulation of a term does not necessarily bar all false advertising claims relating to that term, see Summit Tech., Inc. v. High-Line Med. Instruments Co., 933 F.Supp. 918, 933 (C.D.Cal.1996). 2004 WL 3030254 at *3-*4.

I interpreted 21 U.S.C. § 343-1's requirement of identity between state and federal standards to mean that FDA regulations and requirements are exclusive and cannot be overriden by the states. 2004 WL 3030254 at *7. [FN1] I held that where, as here, the FDA has undertaken to define a term, the FDA has sole authority in misbranding cases relying upon that term. Drawing from Sandoz Pharmaceuticals v. Richardson-Vicks, 902 F.2d 222 (3rd Cir.1990) and Braintree Labs., Inc. v. Nephro-Tech, Inc., 1997 WL 94237 (D.Kan. Feb.26, 1997), I reasoned that whether a claim is preempted turns on whether it requires direct interpretation and application of the FDCA or FDA regulations. 2004 WL 3030254 at *4. Because Vermont Pure's claims required interpreting and applying the FDA's definition of "spring water", they were preempted. Id. at *7.

> FN1. 21 U.S.C. § 343-1 provides, in pertinent part:
> [N]o State or political subdivision of a state may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce—

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

(1) any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity or that is not identical to the requirement of section 343(g) of this title ...
21 U.S.C. § 343-1(a)(1).

*3 Vermont Pure seeks reconsideration only of the dismissal of its state law claims in light of the Supreme Court's April 2005 decision in *Bates*. A federal court may reconsider interlocutory orders and revise or amend them any time prior to final judgment. Fed. R. Civ. P. 54(b); *Perez-Ruiz v. Crespo- Guillen*, 25 F.3d 40, 42 (1st Cir.1994). In order to balance the competing interests of finality and justice, a motion for reconsideration should only be granted if the movant demonstrates "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *Davis v. Lehane*, 89 F.Supp.2d 142, 147 (D.Mass.2000). Vermont Pure contends that *Bates* presents a development in the relevant law and shows that the September 9, 2004 Order was clear error.

In *Bates*, Texas peanut farmers alleged that their crops were severely damaged by the application of Dow's "Strongarm" pesticide, which was registered by the Environmental Protection Agency (EPA) pursuant to its authority under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 et seq. *Bates*, 125 S.Ct. at 1790. The farmers threatened to sue Dow, alleging that Strongarm's label recommended its use in all peanut-growing areas when Dow knew or should have known that Strongarm would damage crops in soils with pH levels higher than 7.0. *Id.* In response, Dow sought a declaratory judgment that FIFRA preempted the farmers' claims. *Id.* The farmers then counterclaimed, bringing state law claims based on strict liability, negligence, fraud, and breach of warranty. *Id.* at 1790-91.

The Supreme Court granted certiorari to address the proper test for preemption in FIFRA cases. The Court began with a lengthy review of the legislative history of FIFRA, from which it concluded that

"States have ample authority to review pesticide labels to ensure that they comply with both federal and state labeling requirements." *Id.* at 1797. The Court then considered the text of 7 U.S.C. § 136v, the provision at issue, which reads in relevant part:
    (a) In general
    A State may regulate the sale or use of any federally regulated pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
    (b) Uniformity
    Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.
7 U.S.C. § 136v. After carefully parsing subsection (b), the Court adopted a "parallel requirements" reading, which allows states to make and enforce labeling requirements so long as they are "equivalent to, and fully consistent with FIFRA's misbranding provisions." *Id.* at 1800. Thus, the Court held that "a state cause of action that seeks to enforce a federal requirement 'does not impose a requirement that is 'different from, or in addition to,' requirements under federal law.' " *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 513, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996)).

*4 The Court found unpersuasive Dow's arguments that the parallel requirements reading would lead to a "crazy-quilt" of anti-misbranding requirements put forth by juries in 50 states. *Id*. at 1801. The Court held that FIFRA authorizes a relatively decentralized scheme, and private remedies enforcing FIFRA would further, rather than hinder, the functioning of the statute. *Id.* at 1802.

Magistrate Judge Sorokin rejected Vermont Pure's request that this court follow *Bates* and adopt a parallel requirements reading of 21 U.S.C. § 343-1. His decision focused on the differences between the nature of the regulatory schemes established by FIFRA and the FDCA. He noted that even before *Bates*, the Supreme Court had found that FIFRA did not occupy the field to the exclusion of the states. September 23, 2005 R & R at 3 (citing *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 607,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 4

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

111 S.Ct. 2476, 115 L.Ed.2d 532 (1991)). In his view, *Bates* merely confirmed the narrow preemptive effect of FIFRA by holding that § 136v allows the imposition of state sanctions for violating state rules that duplicate federal standards. September 23, 2005 R & R at 4; *Bates,* 125 S.Ct. at 1797.

In contrast, Magistrate Judge Sorokin found that the FDA mandates that state requirements be barred unless they are "identical" to the federal requirements, 21 U.S.C. § 343-1, and that all enforcement be centralized in the FDA, 21 U.S.C. § 337(a). September 23, 2005 R & R at 4. Section 337, which has no equivalent in FIFRA, requires that all enforcement actions be brought by the federal government and has only one narrow exception allowing states to bring actions in their own names. 21 U.S.C. § 337(a), (b). From these provisions, Magistrate Judge Sorokin concluded that "Congress established the FDA as the interpreter and enforcer of the FDCA." September 23, 2005 R & R at 5.

Magistrate Judge Sorokin acknowledged that § 343-1 permits states, in at least some circumstances, to impose requirements "identical" to federal requirements and to enforce or create remedies for those regulations. *Id.* However, based on what he viewed as a marked difference between the role of the EPA in enforcing FIFRA and the FDA in enforcing the FDCA, he rejected the notion that *Bates* amounted to "an intervening change in controlling law" or "evidence of clear error of law" sufficient to prompt a reconsideration of the September 9, 2004 Order. *Id.*

Vermont Pure objects to Magistrate Judge Sorokin's decision on two grounds. First, it claims that he misunderstood the text of § 343-1. Vermont Pure argues that FIFRA's § 137v is substantively identical to § 343-1 in that they each allow states to impose requirements in federally regulated areas, so long as those requirements are identical to the federal ones. Docket No. 122 at 8. Invoking the long-settled principle that courts may only find preemption when congressional intent is "clear and manifest", *Bates,* 125 S.Ct. at 1801, Vermont Pure

argues that the text of § 343-1, like that of FIFRA in *Bates,* expressed no such preemptive intent, either explicitly or implicitly.

*5 Second, Vermont Pure contends that Magistrate Judge Sorokin misconstrued the scope of the FDCA's regulatory scheme. It claims that the FDCA has never been held to occupy the field of food regulation, and as evidenced by the FDA's web site, the FDA relies on state regulation in the area of bottled water. Docket No. 122 at 11-12 (citing http://www.cfsan.fda.gov/dms/botwatr.html). Vermont Pure points to the legislative history of § 343-1, which it claims suggests a limited preemptive effect.

After carefully considering the Court's ruling in *Bates,* I find that I must reconsider my holding in the September 9, 2004 Order and the test that I employed for preemption under the FDCA. I begin with the relevant text of § 343-1:

(a) [N]o State or political subdivision of a state may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce--
(1) any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity or that is not identical to the requirement of section 343(g) of this title ...

21 U.S.C. § 343-1(a)(1). The introductory words "[N]o State or political subdivision of a state" clearly establish the intent of Congress to entirely occupy at least a portion of the field of food regulation. The more difficult task is to describe what portion and delineate the scope of the preemptive effect expressed in Paragraph (a)(1).

The term "requirement" "sweeps broadly." *Cipollone v. Ligget Group, Inc.,* 505 U.S. 504, 521, 112 S.Ct. 2608, 120 L.Ed.2d 407. Yet, it is not so expansive as to include "[a]n occurrence that merely motivates an optional decision," such as a jury verdict that might induce a pesticide maker to change its label; rather it incorporates "positive enactments, such as statutes and regulations, as well as common-law duties." *Bates,* 125 S.Ct. at 1798.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Section 343-1(a)(1) relates only to those state requirements for foods that are the "subject of a standard of identity established under section 341 of this title." 21 U.S.C. § 343-1(a)(1). A "standard of identity" is a regulation in which the FDA fixes the ingredients of, and consequently the definition of, a food. *62 Cases, More or Less, Each Containing Six Jars of Jam v. U.S.,* 340 U.S. 593, 598, 71 S.Ct. 515, 95 L.Ed. 566 (1951). There is no doubt that the FDA has promulgated such a regulation with respect to bottled water in general, and spring water in particular. *See* 60 Fed.Reg. 57076, 57076 (Nov. 13, 1995); 21 C.F.R. § 165.110.

Section 341(a)(1) states that "no State" may establish requirements that are "not identical to such standard of identity" or that are "not identical to the requirement of section 343(g)." [FN2] 21 U.S.C. § 343-1(a)(1). The negative pregnant evident from a plain reading of this language is that states *may* establish requirements that *are* identical to FDA standards. The term "identical," does not refer to the specific words used in the state requirement, but to the direct and indirect effects of the requirement. *See* 21 C.F.R. 100.1(c)4. In this connection, I find and adopt as my own a definition of "identical" which has been incorporated in pending legislation to modify the FDCA: "the term 'identical' means that the language is substantially the same language as the comparable provision of the [FDCA], and that any difference does not result in the imposition of materially different requirements." H. Rep. No. 109-379 (Feb. 28, 2006).

> FN2. Section 343(g) provides that:
> A food shall be deemed to be misbranded ... [i]f it purports to be or is represented as a food for which a definition and standard of identity has been prescribed by regulations as provided by section 341 of this title, unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard, and, insofar as may be required by such regulations, the common names of optional ingredients (other than spices, flavoring, and coloring)

present in such food.
21 U.S.C. § 343(g).

*6 Applied in the context of this case, the plain meaning of § 343- 1(a)(1) is that states may regulate bottled water so long as their standards mirror those set by the FDA. Thus, the analysis for express preemption turns not on whether a claim requires direct interpretation and application of FDA regulations, as I stated in the September 9, 2004 Order, but on the identity of the state and federal regulations. [FN3] *See Bates,* 125 S.Ct. at 1800.

> FN3. Section 337 does not change this analysis. Section 337(a) clearly states that only the federal government can bring an action to enforce the FDCA. 21 U.S.C. § 337(a). Section 337(b) creates an exception for states to enforce certain provisions, including § 343(g)'s standard of identity requirements. 21 U.S.C. § 337(b). These provisions, however, relate only to enforcement of the FDCA. Vermont Pure's "spring water" claims arise purely from state law. To be sure, the state laws are based on federal regulations, as the FDCA requires them to be, but Section 337 is silent as to these state law suits. This reading makes sense not only in terms of the plain language of § 337, but in light of the legislative history and the agency's interpretive history of § 343- 1, *see infra.*

FDA regulations define "spring water" as "water derived from an underground formation from which water flows naturally to the surface of the earth." [FN4] 21 C.F.R. § 165.1110(a)(2)(vi). To the extent the state laws under which Vermont Pure brings suit have adopted, by recitation or reference, the FDA's definition of "spring water," they are not expressly preempted by § 343-1. [FN5]

> FN4. FDA requirements also specify in detail the method of extraction to be used for acquiring spring water. 21 C.F.R. § 165.110(a)(2)(vi).

> FN5. In Count II of its original complaint,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 6

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Vermont Pure alleged violation of the unfair competition statutes of least twenty-five states. In its objections to Magistrate Judge Sorokin's R & R, it lists only six states. Docket No. 122 at 10, n. 5. Each of these states appears to have incorporated the FDA definition of "spring water." *See* Conn. Gen.Stat. Ann. § 21a-150 ("natural water obtained from an underground formation from which water flows naturally to the surface of the earth"); 105 Mass. Regs.Code § 570.012(C)(2)(a) (explicitly adopting definition in 21 C.F.R. § 165.1110(a)(2)(vi)); Code Me. R. 10-144 Ch. 235, § 2 ("Water derived from an underground formation from which water flows naturally to the surface of the earth"); N.H.Code Admin. R. Env-Ws 389.03, HE-P 2101.01 (explicitly adopting definition in 21 C.F.R. § 165.1110(a)(2)(vi)); N.Y. Comp.Codes R. & Regs. tit. 10, § 5-6.3 ("water derived from an underground formation from which water flows naturally to the surface of the earth"); R.I.Code R. 14 180 007 ("water derived from an underground formation from which water flows naturally to the surface of the earth"). Vermont Pure has not provided an amended complaint describing under which state laws it intends to proceed. Nestle argues that Vermont Pure should not be granted leave to amend given the status of discovery and the extensive defense preparation that has taken place thus far. Docket No. 131 at 19, n. 11. Fed.R.Civ.P. 15(a) is a "liberal amendment policy" and because I find no "undue delay" or "undue prejudice," *Invest Almaz v. Temple-Inland Forest Products Corp.,* 243 F.3d 57, 71(1st Cir.2001), I will permit Vermont Pure to file a Second Amended Complaint identifying in Count II precisely the state law upon which it will seek to establish a "spring water" claim.

Although the text of § 343-1(a)(1) is strong

evidence that Congress did not expressly preempt Vermont Pure's state law claims, Nestle nevertheless contends that they are impliedly preempted. An examination of the legislative history and the agency's interpretive history lead to the opposite conclusion.

When Congress passed § 343-1 as part of the Nutrition Labeling and Education Act of 1990 (NLEA), it expressly considered the question of preemption. The purpose of the NLEA was not to preclude all state regulation of nutrition labeling, but to "prevent State and local governments from adopting *inconsistent* requirements with respect to the labeling of nutrients." H. Rep. No. 101-538, 1990 U.S.C.C.A.N. 3336, 3337(emphasis added). In service of this purpose, Congress expressly declared "[t]he Nutrition Labeling and Education Act of 1990 shall not be construed to preempt any provision of State law, unless such provision is expressly preempted under section 403A of the [FDCA]." [FN6] Pub.L. 101-535, 104 Stat 2353, 2364 (Nov. 8, 1990).

> FN6. Section 403A of the Nutrition Labeling and Education Act of 1990 is codified as 21 U.S.C. § 343-1.

The FDA echoed this view when it promulgated its final rule interpreting § 343-1. In response to requests for clarification as to preemptive scope, the FDA stated "if the State requirement is identical to the Federal law, there is no issue of preemption ... [T]he only State requirements that are subject to preemption are those that are affirmatively different from the Federal requirements ." 60 C.F.R. 57076-01, 57120 (Nov. 13, 1995). The FDA also clarified that where no federal requirement exists, preemption does not occur. *Id.*

Nestle argues that the FDCA creates a "thorough, comprehensive and precise regulatory scheme" and the goal of uniform national standards mandates preemption of Vermont Pure's claims. It points to the technical extraction criteria for "spring water" listed in 21 C.F.R. 165.110(a)(2)(vi) and Congress' stated goal of relieving industry from "some types of State requirements that interfere with [industry's]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Page 7

ability to market products in all 50 States in an efficient and cost-effective manner." 60 C.F.R. 57076-01, 57120 (Nov. 13, 1995). The specificity and uniformity of the definition of "spring water," however, are not directly threatened by a claim under state deceptive practices law where, as here, it appears that at least some of the state laws forming the basis for the lawsuit have adopted the federal definition of "spring water."

*7 This case is also distinct from a situation in which a state enacts a statute that substantively adds to federal labeling requirements. As evidence of the importance of uniformity, Nestle points to the FDA's opinion that a Maine statute that required labels on bottled water to identify the name and geographic location of the source of the water was preempted. Here, Vermont Pure does not seek either to challenge or add to the FDA's definition of "spring water."

Nestle contends that Vermont Pure's claims have the indirect effect of adding to the FDA regulations by imposing the "requirement" that Nestle prove in private litigation that its bottled water meets the "spring water" standard set by the FDA. Nestle also argues that the claims add the requirement of various state statutory remedies, such as enjoining labeling and advertising, damages, and attorney's fees. Justice Thomas touched on a similar concern in his opinion concurring in part and dissenting in part in *Bates*: "[a] state-law cause of action, even if not specific to labeling, nevertheless imposes a labeling requirement 'in addition to or different from' FIFRA's when it attaches liability to statements on the label that do not produce liability under FIFRA." *Bates*, 125 S.Ct. at 1805. However, the language of § 343-1 is clear that state remedies for failing to meet FDA standards of identity are not "requirements" and are not foreclosed.

I recognize that allowing Vermont Pure's state law claims arguably threatens the goal of uniform interpretation. There is the prospect that judges and juries in 50 different states interpreting a precise FDA definition and then imposing injunctions and damages on a bottled water producer will generate inconsistencies in interpretation of the identical

provision. But Congress and the FDA appear to have made a conscious choice to allow the several states to regulate bottled water so long as the state standards employed are identical to those adopted by the FDA. The requirement of identity promotes uniformity in that courts in every state look to the same standard. Permitting states to interpret FDA definitions also allows for additional resources to be brought to bear in the enforcement of national standards upon regional and local markets.

Having been instructed by the Supreme Court's approach in *Bates*, [FN7] I cannot ignore the text, legislative history, and the agency's interpretive guidance regarding § 343-1. I find that Vermont Pure's "spring water" claims are not preempted to the extent that they are based solely on state laws that provide private rights of action and have adopted the FDA definition of "spring water."

> FN7. Of course, I rely on *Bates* only by analogy for my adoption of a parallel requirements reading of § 343-1. I take from *Bates* the general model for statutory interpretation in the context of legislation implicating a theory of parallel federal requirements, but my conclusions as to the issue at hand derive from consideration of the FDCA itself.

B. Quality claims

Vermont Pure's Amended Complaint alleges a single count of false advertising under § 43(a) of the Lanham Act. Amended Complaint at ¶¶ 38-46. Vermont Pure contends that Nestle falsely or misleadingly markets Poland Spring water as "pure, even though Poland Spring is aware of contamination, and the potential for contamination of its water sources." *Id.* at ¶ 13f. In this connection, Vermont Pure claims that test samples of Poland Spring water have revealed excessive levels of Heterotrophic Plane Count ("HPC") bacteria, excessive chlorination, and contamination by fecal coliform. *Id.* at ¶¶ 21, 24. Plaintiff also claims that Nestle's extraction practices "have the actual or potential ability to extract contaminated or potentially contaminated water." *Id.* at ¶ 26.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

*8 The Amended Complaint further alleges that in order to compete with Vermont Pure, Nestle devised a strategy to market its water as "pure water from a natural protected source in Maine," even though it was neither pure nor from a natural source in Maine. *Id.* at ¶ 35. Vermont Pure asserts that, consistent with this strategy, Nestle made the following false or misleading statements in its commercial advertising: that Poland Spring bottled water is "filtered and purified deep underground;" that it comes from "some of the most pristine and protected sources deep in the woods of Maine;" it "remains unspoiled because thousands of guards protect it;" it "only comes from one source--in the wilderness of Maine;" and it "comes straight from nature, straight from Maine ." *Id.* at ¶ 41. Vermont Pure claims that the name "Poland Spring" is misleading because it suggests that the water actually comes from the Poland Spring, and in 2002, Nestle changed its label to read "Poland Spring Brand" in recognition of the "material misrepresentation in its advertising." *Id.* at ¶ 41(e), (g).

Pursuant to Fed.R.Civ.P. 12(c), Nestle has moved to dismiss the claims in Plaintiff's Amended Complaint relating to the quality, purity, treatment, testing, and contamination of Poland Spring's water sources. Docket No. 98. Magistrate Judge Sorokin recommended that I deny the motion. December 12, 2005 R & R. I will adopt his recommendation.

In reviewing a motion for judgment on the pleadings under Rule 12(c), "the district court must accept all of the nonmoving party's well-pleaded factual averments as true and draw all reasonable inferences in her favor." *Feliciano v. Rhode Island,* 160 F.3d 780, 788 (1st Cir.1988). The motion may not be granted "unless it appears beyond a doubt that the nonmoving party can prove no set of facts in support of her claim which would entitle her to relief." *Id.*

Magistrate Judge Sorokin rejected Nestle's argument that the quality claims were preempted by the FDCA. First, he found that unlike Plaintiff's claims regarding "spring water", the quality claims do not arise out of a term that is specifically defined

by the FDA. December 12, 2005 R & R at 5. "Indeed," he explained, "the FDA expressly declined to 'use its resources to define the term 'pure,' a term central to Plaintiff's amended claims." *Id.* (quoting 60 Fed.Reg. 57076, 57099 (1995)).

Magistrate Judge Sorokin's holding turned on the finding that Vermont Pure's claims question the truth of Nestle's advertising, not whether Poland Spring water meets FDA standards. *Id.* He rejected the argument that the FDCA so comprehensively regulates the field that a plaintiff may never bring a Lanham Act claim regarding the misleading advertising of bottled water quality, purity, testing, treatment, and sources. *Id.* at 6.

Magistrate Judge Sorokin distinguished the cases upon which Nestle relied for its preemption argument. He focused on *Sandoz Pharmaceuticals v. Richardson-Vicks,* 902 F.2d 222 (3rd Cir.1990), which Nestle cited in support of a broad view of the FDCA's preemptive effect. *Sandoz* involved a claim of false advertising based upon the use of the term "inactive" with respect to demulcents. *Id.* at 230. The *Sandoz* court refused to usurp what it viewed as the FDA's responsibility to define the term "inactive" and decide whether the demulcent at issue fit that definition. *Id.* at 231. Magistrate Judge Sorokin found that Vermont Pure's claims, in contrast to those in *Sandoz,* require no interpretation, application, or enforcement of FDA regulations.

*9 Similarly, he found inapplicable *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1139 (4th Cir.1993) (dismissing as preempted by the FDCA a claim that merely placing a drug on the market is a statement of false FDA approval actionable under the Lanham Act), and *Animal Legal Defense Fund v. Promivi Veal Corp.,* 626 F.Supp. 278, 283-84 (D.Mass.1986) (finding that the FDCA and the Federal Meat Inspection Act preempted state law actions forcing veal producers to label their products as "adulterated" and to add to the label bacteria content, use of antibiotics, and genetic alteration information). [FN8]

FN8. Because Nestle advanced different

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 9

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

arguments in the instant motion to dismiss than those pressed in the prior motion to dismiss (Docket No. 32), Magistrate Judge Sorokin recommended against simply applying the Law of the Case doctrine to bar the present motion. December 12, 2005 R & R at 5 n. 4. I agree that the prior motion raised arguments that are distinct from those under consideration here, and I decline to deny the motion on the basis of the Law of the Case doctrine.

Nestle objects to Magistrate Judge Sorokin's R & R arguing that he erred in his interpretation of the scope of federal preemption. First, Nestle contends that Magistrate Judge Sorokin mistakenly relied on Vermont Pure's statement in its brief that Nestle made false claims in order to differentiate Poland Spring from other bottled water. Docket No. 155 at 8. Nestle argues that the heart of Vermont Pure's claims is not statements in Nestle's advertising comparing its product to its competitors' products, but the quality of Poland Spring water as measured by a variety of standards. *Id.* at 8, 10. Because the FDA sets forth what Nestle labels "exclusive quality standards," evaluation of water purity by any other standard, according to Nestle, encroaches upon the FDA's authority. *Id.* Similarly, Nestle claims that Vermont Pure's intention to consult FDA and non-FDA standards for allowable contaminate levels also flouts the federal regulatory scheme. [FN9] *Id.* at 11-12.

> FN9. Nestle has submitted to the court Vermont Pure's answers to interrogatories stating the standards that Vermont Pure intends to use to prove its case. Magistrate Judge Sorokin did not consider the interrogatory answers in his decision because, although they were available at the time the R & R was issued, they were not provided when the parties briefed the motion. December 12, 2005 R & R at 9, n. 9. Nestle argues that not only should Magistrate Judge Sorokin have considered the interrogatories, but because they constitute "matters outside the pleadings," the motion to dismiss should have been

converted to a motion for summary judgment. Docket No. 155 at 11; Fed.R.Civ.P. 12(c).

Rule 12(c) gives a court the option of considering the evidence and converting to summary judgment, or excluding it and deciding the motion for judgment on the pleadings. Fed.R.Civ.P. 12(c). *See Garita Hotel Ltd. Partnership, Etc. v. Ponce Federal Bank, F.S.B.,* 958 F.2d 15, 18 (1st Cir.1992) ("If the district court chooses to ignore the supplementary materials and determines the motion under the Rule 12(b)(6) standard, no conversion occurs."). Magistrate Judge Sorokin did not consider the interrogatories and properly treated the motion as a judgment on the pleadings. I do the same here. At this stage in the litigation, with discovery still ongoing, I will not convert a Rule 12(c) motion in a complex case based on the belated submission of a single set of interrogatory answers.

Nestle further argues that Magistrate Judge Sorokin's recognition that the FDA has authority over the term "pure" leads to the conclusion that the FDA, and not the courts, should define that term. Nestle points to two courts that deferred to the FDA on what it contends are analogous questions: *Sandoz,* 902 F.2d at 231 (leaving to the FDA the question of whether a demulcent should be labeled "active" or "inactive"), and *Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.,* 687 F.Supp. 20, 21 (D.Mass.1988) (holding that "this court lacks the authority to create a standard of what constitutes "freshness" in the pre-packaged pasta industry"). [FN10]

> FN10. Nestle also argues that Magistrate Judge Sorokin raised sua sponte a possible distinction in the FDCA's misbranding regulations between advertising and labeling, and the parties never had the opportunity to brief the issue. Docket No. 155 at 15. Vermont Pure responds that Nestle failed to raise this point with the Magistrate and is barred from raising it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

now. Docket No. 161 at 14. Because the parties did not raise or brief this issue before Magistrate Judge Sorokin and because I decide on other grounds whether Vermont Pure's claims are preempted, there is no need to delve into the question of whether the FDCA's misbranding regulations extend to advertising as well as labeling.

If I were to consider that issue, I would observe that 21 U.S.C. §§ 334(a) and 321 clearly include advertising as within the scope of the FDCA's definition of "misbranded." However, these provisions do not apply to the issue in this case. The question here is not whether Poland Spring water is misbranded for purposes of the FDCA, but whether Nestle has falsely or misleadingly represented the purity and source of Poland Spring water.

In short, Nestle argues that the quality claims cannot be proven without interpretation and application of FDCA standards, and therefore, they are preempted. I disagree. No federal standards of identity for bottled water purity exist. It is clearly within the FDA's power to promulgate such standards, but as Magistrate Judge Sorokin noted, it has chosen not to do so. 60 Fed.Reg. 57076 at 57099.

Nestle asserts that the failure of the FDA to regulate a term precludes Lanham Act actions based upon that term. To the contrary, as the FDA observed, "[i]f there is no Federal requirement to be given preemptive effect, preemption does not occur." *Id.* at 57120. The fact that the FDA sets standards for contaminates in bottled water, including the chlorine and bacteria that Vermont Pure alleges have been found in Poland Spring water, does not change this conclusion. In the absence of a federal standard of identity, private litigants may look to other standards, including FDA standards, to interpret the term at issue.

*10 The First Circuit's opinion in *Abruzzi,* a case discussed by both Vermont Pure and Nestle, is instructive. 986 F.2d 605 (1st Cir.1993). In *Abruzzi,*

a pasta producer and wholesaler sued a competitor for calling its pasta "fresh" allegedly in violation of Massachusetts' unfair competition laws. *Id.* at 605. The term "fresh" as applied to refrigerated pasta had not been defined in any federal or state law, statute, or regulation. The District Court granted summary judgment on the grounds that only the FDA or a legislative body has the authority to define the term. 687 F.Supp. at 21, n. 2.

The First Circuit affirmed the District Court, but on entirely different grounds. Without reaching or even mentioning the question of a court's competence to define food-related terms, then-Chief Judge Breyer reached the merits of the case. He asked whether Abruzzi had set forth facts sufficient to show that its use of the term "fresh" was deceptive. 986 F.2d at 605. In answering that question, he looked to various sources for a definition of "fresh": FDA rules for milk, FDA rules on the use of the term "fresh", magazine articles, even "common sense." *Id.* at 606. With respect to the fact that the FDA specifically declined to define "fresh," Chief Judge Breyer held that Abruzzi must look elsewhere for support. *Id.* He did not find Abruzzi's claim preempted merely because the FDA had the (unexercised) authority to define the term at issue.

Magistrate Judge Sorokin appropriately distinguished *Sandoz, Promivi,* and *Mylan Labs,* the three cases upon which Nestle principally relies. I add only that the FDA has in this setting specifically refused to define the term "pure." 60 Fed.Reg. at 57099. This is in contrast to *Sandoz,* 902 F.2d at 230-31, in which the plaintiff asked the court to decide if a defined FDA term ("active") applied to a particular product (a demulcent); *Promivi,* 626 F.Supp. at 283, in which the FDCA, in conjunction with the Federal Meat Inspection Act, was found to have created a comprehensive federal scheme controlling medicated animal feeds, drugs used to treat animals raised for human consumption, and meat labeling, packaging, and marketing; and *Mylan Labs.,* 7 F.3d at 1139, in which the plaintiff alleged that the defendants falsely represented FDA approval of a product.

Although Magistrate Judge Sorokin did not address

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

it in detail, *Lynnbrook Farms v. Smithkline Beecham Corporation,* 79 F.3d 620 (7th Cir.1996), is also inapposite. In *Lynnbrook Farms,* a farm partnership sued a cattle vaccine manufacturer when the vaccines proved ineffective and harmful to cattle. The case raised the question whether the United States Department of Agriculture's (USDA) declaration of preemption, made through Animal and Plant Health Service (APHIS) pursuant to the federal Virus-Serum-Toxin Act (VSTA), 21 U.S.C. §§ 151-159, preempted the plaintiff's numerous state law claims. The preemption clause promulgated by APHIS provided:

> *11 states are not free to impose requirements which are different from or in addition to, those imposed by USDA regarding the safety, efficacy, potency or purity of a product

57 Fed.Reg. 38759 (Aug. 27, 1992). The Seventh Circuit interpreted this provision as "just another way of saying a[s]tate shall not impose ... any requirements." 79 F.3d at 628 (quoting *Cipollone,* 505 U.S. at 371). That interpretation was consistent with readings given by several other courts of nearly identical language in FIFRA and the Medical Device Amendments to the FDCA (MDA). *Lynnbrook Farms,* 79 F.3d at 628-69. It was also consistent with the intent of APHIS, which expressly stated that the regulation was designed to preempt state tort actions when the defendant complied with federal regulations, but to allow them when the defendant ignored or violated federal rules. *Id.* at 629.

*Lynnbrook Farms* differs significantly from the instant case in that APHIS clearly explained that it intended to preempt the state actions in question. Here, the FDA did the opposite: it expressly declined to regulate the term "pure." More fundamentally, the approach to interpretation of the preemption clause in *Lynnbrook Farms* is suspect after *Bates,* 125 S.Ct. at 1800, which adopted a parallel requirements reading of the "in addition to or different from" language in FIFRA.

Nothing in the text, legislative history, agency interpretation or caselaw of the FDCA suggests that it preempts Vermont Pure's claims regarding Nestle's allegedly misleading representations

regarding the quality, purity, treatment, contamination and source of Poland Spring water. Accordingly, I accept Magistrate Judge Sorokin's recommendation to deny Nestle's motion to dismiss.

C. Disgorgement of profits

In its Amended Complaint, Plaintiff includes the following prayer for relief: "all of Nestle's profits and/or pecuniary gains derived directly or indirectly from Nestle's unlawful conduct, as permitted by 15 U.S.C. § 1117." Amended Complaint at 16. Nestle argues that the remedy of disgorgement of profits is not available to Plaintiff in this case as a matter of law. Accordingly, it has moved to strike pursuant to Fed.R.Civ.P. 12(f), or in the alternative for judgment as a matter of law as allowed by Rule 12(c). Docket No. 74. Magistrate Judge Sorokin recommended that I deny Defendant's motion. [FN11] Again, I accept this recommendation.

> FN11. As a threshold matter, I note that Nestle has adequately established that its Objection to the September 20, 2005 R & R was timely raised. This issue not previously addressed by Nestle despite its inclusion at the outset of Vermont Pure's opposition to the Objection was raised by me at the hearing in this matter where Nestle was given the opportunity to respond with a post hearing submission. That submission establishes--and Vermont Pure does not now dispute--that despite the date of the September 20, 2005 R & R, the objection was served within ten days from service of the R & R on Nestle. *See generally* Fed.R.Civ.P. 72.

Magistrate Judge Sorokin found that contrary to Nestle's contention, the Lanham Act does not, as a matter of law, preclude the remedy of disgorgement of profits in a non-comparative false advertising case. September 20, 2005 R & R at 7. Looking first to the statutory text, he observed that 15 U.S.C. § 1117(a), the provision governing damages for Lanham Act cases, specifically allows for plaintiffs to recover defendants' profits, subject to principles of equity and the discretion of the court. *Id.* at 4-5.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Page 12

He then noted that in *Aktiebolaget Electrolux v. Armatron Int'l Inc.*, 999 F.2d 1, 5 (1st Cir.1999), the First Circuit required a plaintiff seeking disgorgement to prove both actual harm and direct competition. [FN12] In the absence of those elements, damages may be awarded upon one of three conditions: the defendant acted fraudulently; to avoid unjust enrichment of the defendant; or to deter further willful misconduct. *Id.* In *Tamko Roofing Products v. Ideal Roofing Co.*, 282 F.3d 23, 36 (1st Cir.2002), the First Circuit described three justifications for awarding an accounting:

> FN12. Magistrate Judge Sorokin relied on the following passage in which the Court stated four rules for awarding monetary damages under § 1117:
> 1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant; 2) a plaintiff seeking an accounting of defendant's profits must show that the defendant's profits would have gone to plaintiff if there was no violation; 3) the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods, such that actual harm is presumed; and 4) where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory.
> *Aktiebolaget Electrolux v. Armatron Int'l Inc.*, 999 F.2d 1, 5 (1st Cir.1999).

*12 (1) as a rough measure of the harm to plaintiff; (2) to avoid unjust enrichment of the defendant; of (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement.

In its Amended Complaint, Vermont Pure alleged that Nestle's alleged violations proximately caused a direct diversion of sales from Vermont Pure to Nestle. Amended Complaint at ¶ 46. Noting that to satisfy Rule 12(c), Vermont Pure need only allege one set of facts for which disgorgement is available, Magistrate Judge Sorokin concluded that although

far from making the factual showing necessary for a damage award, Vermont Pure's allegations of actual harm and direct competition were sufficient to overcome a judgment on the pleadings. September 20, 2005 R & R at 7.

Nestle objects to this decision on the grounds that Magistrate Judge Sorokin misconstrued the legal standard. Specifically, it takes issue with the following statement:

> Vermont Pure might obtain Nestle's profits as one form of relief in this case if, after prevailing on the merits of the claim that Nestle engaged in false advertising under the Lanham Act, it establishes actual harm and direct competition *such that* Nestle's profits would have been Vermont Pure's.
> R & R at 5 (emphasis in original).

Nestle argues that in a non-comparative advertising case, such as this one, the plaintiff must include a showing of "culpable conduct," such as intentional deception and targeted wrongdoing, on the part of the defendant in order to merit disgorgement of profits. [FN13] Nestle's Objection at 2 (Oct. 5, 2005). Magistrate Judge Sorokin, it claims, based his recommendations on principles derived from cases involving trademark infringement, palming off, or other actions that directly compare defendant's and plaintiff's products. Since the First Circuit has never directly ruled on the availability of disgorgement of profits in a non-comparative advertising case, Nestle urges this court to follow *Eckel Indus., Inc. v. Primary Bank*, 26 F.Supp.2d 313 (D.N.H.1998) and *ALPO Petfods, Inc. v. Ralston Purina Co.*, 913 F.2d 958 (D.C.Cir.1990), among others, in holding that the remedy of disgorgement of profits in false advertising cases is limited to cases involving comparative advertising or deceptive acts that would lead consumers to mistake the defendant's product for the plaintiff's. *See Eckel*, 26 F.Supp. at 318.

> FN13. As Magistrate Judge Sorokin noted, there is no dispute that this is a non-comparative advertising case, as the challenged advertising makes no direct comparison between Poland Spring and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Page 13

any of its competitors. September 20, 2005 R & R at 4. Although Vermont Pure's allegations that Nestle conducted an "ongoing, pervasive fraud on American consumers", Amended Complaint at ¶ 12, suggests bad faith, Vermont Pure made no specific allegations that Nestle made false statements knowingly, willfully, or in bad faith. *Id.*

I decline the invitation to embrace a per se rule forbidding the remedy of disgorgement of profits in non-comparative advertising cases. I begin, as did Magistrate Judge Sorokin, with the text of the governing statute. Section 1117(a) provides that when a violation of § 1125(a) has been established,

the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*13 15 U.S.C. § 1117(a). This provision does not limit or suggest limiting damages on the basis of the comparative or non-comparative nature of the false advertising claim. The three types of allowable damages are restricted only by § 1111, which requires notice to the defendant; § 1114, which specifically limits remedies for copyright infringement; "principles of equity"; and the discretion of the court "according to the circumstances of the case." § 1117(a).

Case law supports a case-by-case determination of available remedies. As Magistrate Judge Sorokin pointed out, the standard articulated by First Circuit in *AB Electrolux* and *Tamko* focuses on actual harm, direct competition, and equitable considerations; bad faith is not necessarily required. September 20, 2005 R & R at 7; *AB Electrolux*, 999 F.2d at 5; *Tamko*, 282 F.3d at 36. The *Tamko* court specifically distinguished the rule of the First Circuit from the Restatement on the question of bad faith: "it has been this circuit's rule that an accounting of defendant's profits where the products directly compete does not require fraud, bad faith, or palming off." [FN14] *Tamko*, 282 F.3d at 36. Put simply, *AB Electrolux* and *Tamko* teach that actual harm and direct competition are sufficient to

support a damages award in a Lanham Act case. [FN15] *Id.* And because it is an equitable remedy, determination of such an award should be made on a case-by-case basis.

> FN14. The *Tamko* court explicitly left unresolved the question of whether "willfulness" is a precondition for an accounting. *Tamko Roofing Products, Inc. v. Ideal Roofing Co.*, Ltd., 282 F.3d 23, 36 (1st Cir.2002).

> FN15. To be sure, actual harm and direct competition may be more difficult to prove in a non-comparative false advertising case than for example, in an infringement case.

Nestle distinguishes *AB Electrolux* and *Tamko* on the grounds that they were trademark infringement cases, and consequently, their holdings do not apply to non-comparative false advertising claims. Nestle's Objection at 6-8. I disagree. In both cases, the First Circuit used generic language to articulate broad Lanham Act principles. Throughout the opinions, the Court makes general statements about the nature of the Lanham Act that apply beyond the infringement context. *See e.g., Tamko*, 282 F.3d at 38 ("Mechanical rules are of little aid in this analysis [of damages]"; "Equity must take account of the purposes served by the Lanham Act"). I decline to ignore this guidance, especially when the First Circuit has yet to address the specific question at hand.

Nestle relies heavily on *Eckel Indus., Inc. v. Primary Bank*, 26 F.Supp.2d 313 (D.N.H.1998), for the proposition that disgorgement of profits is not available for non-comparative false advertising claims. In *Eckel*, a manufacturer of impact traffic doors brought suit under the Lanham Act against a competitor for allegedly using photos of the plaintiff's doors in defendant's advertising materials and identifying them as defendant's. *Id.* at 315. Eckel alleged that the defendant made false and misleading statements about Eckel's products and "palmed off" its doors as Eckel's doors. *Id.* at 316.

In applying the law as stated in *AB Electrolux*, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 14

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

*Eckel* court questioned whether direct competition alone was sufficient grounds for awarding an accounting. *Id.* at 317. The *Eckel* court was concerned that as opposed to infringement cases, the "assumption that defendant's profits correspond to the plaintiff's lost sales may be unfounded in a false advertising or unfair competition case." *Id.* "Without more," it continued, "the court cannot assume that the defendant's sales would have gone to the plaintiff but for the false advertisement or deceptive act." *Id.* To prevent a windfall to the plaintiff, the *Eckel* court proposed limiting the remedy of an accounting only to those cases "in which there was a false comparative advertisement or deceptive act that would lead consumer's [sic] to mistake the defendant's product for the plaintiff's." *Id.* at 318.

*14 Nestle seizes on this language to support a per se rule prohibiting an accounting in all non-comparative advertising cases. I do not read *Eckel* so expansively. The *Eckel* court rightly highlighted a problem of causation that can arise in false advertising claims. A plaintiff and defendant may be in direct competition, but the defendant's alleged false advertising may not have caused harm directly to the plaintiff. *Id.* at 318. *Eckel's* suggestion of limiting damage awards to comparative false advertising and palming off cases prevents providing the plaintiff with a windfall in cases in which the plaintiff has proven direct competition, but no actual harm or causation. [FN16] *Id.* Where a plaintiff has alleged actual damages and causation, as is the case here, the concern for a windfall is significantly lessened. Thus, *Eckel's* bright-line rule is inapplicable.

> FN16. I note that the *Eckel* court denied monetary damages because the plaintiff failed to show actual harm and causation. *Eckel Indus., Inc. v. Primary Bank,* 26 F.Supp.2d 313, 318 (D.N.H.1998).

Nestle's reliance on *ALPO,* 913 F.2d 958, is also misplaced. In *ALPO,* two dog food producers sued each other for false advertising under the Lanham Act. After a 61-day bench trial, the district court enjoined both parties from making the advertising claims found to be false and, pursuant to § 1117(a), awarded ALPO over $10 million, Ralston's estimated profits from its wrongdoing. *Id.* at 961. Then-Circuit Judge Clarence Thomas writing for the Court of Appeals, vacated the monetary damages on the basis that, in the absence of willful targeted wrongdoing, damages based upon profits was improper. *Id.* Judge Thomas relied on the D.C. Circuit's holding in *Foxtrap, Inc. v. Foxtrap, Inc.,* 671 F.2d 636, 641 (D.C.Cir.1982), which required a showing of bad faith as a prerequisite to an award based upon defendant's profits.

*ALPO* does not support Nestle's position for two reasons. First, *Foxtrap* acknowledged that where no bad faith was shown, courts nevertheless may award profits where plaintiff has made a showing of actual competition, such as diversion of sales. *Id.* at 642 n9. Second, and more important, the First Circuit in *Tamko,* 282 F.3d at 36, explicitly rejected *Foxtrap'* s requirement of bad faith in cases of direct competition. It bears repeating that "it has been [the First C]ircuit's rule that an accounting of defendant's profits where the products directly compete does not require fraud, bad faith, or palming off." *Tamko,* 282 F.3d at 36.

I also find inapplicable the other cases upon which Nestle relies. *Riggs Investment Management Corp. v. Columbia Partners, L.L.C.,* 966 F.Supp. 1250, 1270 (D.C.Cir.1997), relies on *Foxtrap,* 671 F.2d at 641, which as explained above, neither precludes an award of profits nor controls in this circuit. *McNeilab, Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988) holds that because the injury in non-comparative advertising cases accrues equally to all competitors, "some indication of actual injury and causation" is required before awarding damages under the Lanham Act--a position consistent with the law of the First Circuit. *Healthpoint, Ltd. v. Stratus Pharmaceuticals, Inc.,* 273 F.Supp.2d 871 (W.D.Tex.2001) involved a question that is not at issue in this case: the applicability of a presumption of causation and injury in non-comparative advertising. *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 209 (9th Cir.1989), was concerned with a similar presumption and is similarly inapposite.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Page 15

**\*15** *Burndy Corp. v. Teledyne Indus., Inc.,* 748 F.2d 767, 772 (2d Cir.1984), appears to support Nestle's argument in that it states that the remedy of an accounting

appears to have been limited to situations in which the defendant's profits represent unjust enrichment derived from diversion of business that clearly would otherwise have gone to the plaintiff, such as in instances where the defendant palmed off its goods as made by the plaintiff or otherwise infringed the plaintiff's rights rather than engaged simply in false advertising of the defendant's own product.

However, properly read, this statement merely echos the views expressed in *Eckel,* 26 F.Supp.2d at 317, and *McNeilab,* 848 F.2d at 38, that a false advertising plaintiff must show some actual harm and causation, such as "diversion of business that clearly would otherwise have gone to the plaintiff." *Burndy,* 748 F.2d at 772.

As Magistrate Judge Sorokin correctly stated, in order to survive a motion for judgment on the pleadings, Vermont Pure must allege facts which, if true, would entitle it to disgorgement of profits. *McCord v. Horace Mann Ins. Co.,* 390 F.3d 138, 141 (1st Cir.2004). Vermont Pure has alleged that "as a direct and proximate result of Nestle's false and misleading advertising concerning its Poland Spring bottled water," it suffered damages by the direct diversion of sales. Amended Complaint at ¶ 46. In support of this allegation, it further alleges that Nestle captured a significant market share through false advertising, and as a direct competitor, Vermont Pure suffered damages. *Id.* at ¶ 1. I agree with Magistrate Judge Sorokin that this is sufficient to survive a motion for judgment on the pleadings. Consequently, I find Nestle's motion to strike, or in the alternative for judgment as a matter of law, as to Vermont Pure's claim for disgorgement of profits to be unfounded.

### III. CONCLUSION

For the reasons set forth more fully above, I DENY Nestle's motion [98] to dismiss the quality claims and its motion [74] to strike Vermont Pure's claim for disgorgement of profits; and I ALLOW Vermont Pure's motion [67] for reconsideration of

the "spring water" claims as to state causes of action. In connection with allowance to proceed on state "spring water" claims, I direct Vermont Pure to file a Second Amended complaint on or before April 14, 2006 setting forth with particularity the precise state law "spring water" claims it intends to press.

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

### Motions, Pleadings and Filings (Back to top)

• 2006 WL 1354095 (Trial Pleading) Answer to Second Amended Complaint (Apr. 28, 2006)Original Image of this Document (PDF)

• 2006 WL 1354094 (Trial Pleading) Second Amended Complaint and Jury Demand (Apr. 14, 2006)Original Image of this Document (PDF)

• 2006 WL 1033529 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Memorandum in Support of Its Renewed Third Motion to Compel (Mar. 10, 2006)Original Image of this Document (PDF)

• 2006 WL 1084601 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant's Second Motion to Compel (Feb. 1, 2006)Original Image of this Document (PDF)

• 2006 WL 548367 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Opposition to Plaintiff's Third Motion to Compel Production of Documents and Responses to Interrogatories (Jan. 31, 2006)Original Image of this Document (PDF)

• 2006 WL 548366 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum in Further Support of Objections to Magistrate Judge's Report and Recommendation on Defendant's Motion to Dismiss Purity Claims. (Jan. 25, 2006)Original Image of this Document (PDF)

• 2006 WL 548365 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Plaintiff's Third Motion to Compel Production of Documents and Responses to Interrogatories (Jan. 17, 2006)Original Image of this Document (PDF)

• 2006 WL 548364 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant's Objections to the December 12, 2005 Report and Recommendation of United States Magistrate Judge Leo T. Sorokin (Jan. 11, 2006)Original Image of this Document (PDF)

• 2005 WL 3617106 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Motion to Compel Production of Documents from Ensr International (Oct. 28, 2005)Original Image of this Document (PDF)

• 2005 WL 3617107 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Motion to Compel Production of Documents from Woodard & Curran, Inc. (Oct. 28, 2005)Original Image of this Document (PDF)

• 2005 WL 3617105 (Trial Motion, Memorandum and Affidavit) Defendant's Response to Plaintiff's Objections to the September 23, 2005 Report and Recommendation of United States Magistrate Judge Leo T. Sorokin (Oct. 21, 2005)Original Image of this Document (PDF)

• 2005 WL 3617104 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant's Objections to the September 20, 2005 Report and Recommendation of United States Magistrate Judge Leo T. Sorokin (Oct. 19, 2005)Original Image of this Document (PDF)

• 2005 WL 3617103 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Third Motion to Compel Production of Documents and Responses to Interrogatories (Oct. 17, 2005)Original Image of this Document (PDF)

• 2005 WL 3617102 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition to Defendant's Motion for Sanctions (Oct. 14, 2005)Original Image of this Document (PDF)

• 2005 WL 3617101 (Trial Motion, Memorandum and Affidavit) Plaintiff's Objections to the September 23, 2005 Report and Recommendation of United States Magistrate Judge Leo T. Sorokin (Oct. 7, 2005)Original Image of this Document (PDF)

• 2005 WL 3617100 (Trial Motion, Memorandum and Affidavit) Defendant's Objections to Magistrate Judge's Report on the Motion to Strike, or for Judgment as A Matter of Law, as to Plaintiff's Claim for Disgorgement of Profits (Oct. 5, 2005)Original Image of this Document (PDF)

• 2005 WL 3617099 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Support of the Imposition of Sanctions Against Plaintiff Pusuant to Rule 37(b)(2) (Sep. 30, 2005)Original Image of this Document (PDF)

• 2005 WL 3617098 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum in Further Support of Motion to Dismiss Claims Relating to Quality, for Entry of A Protective Order and to Quash Subpoenas Directed to Discovery Related to Quality (Aug. 31, 2005)Original Image of this Document (PDF)

• 2005 WL 3617097 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant's ""Motion to Dismiss Claims Relating to Quality, Etc., for Entry of A Protective Order, and to Quash Subpoenas Directed to Discovery Related to Quality, Etc." (Aug. 16, 2005)Original Image of this Document (PDF)

• 2005 WL 3617095 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Opposition to Plaintiff's Motion to Restrain Defendant's Assertion of Objections With Respect to Plaintiff's Third-Party Discovery and for Other Relief (Aug. 4, 2005)Original Image of this Document (PDF)

• 2005 WL 3617096 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Support of Motion to Dismiss Claims Relating to Quality, Etc., for Entry of A Protective Order, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 17

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

to Quash Subpoenas Directed to Discovery Related to Quality, Etc. (Aug. 4, 2005)Original Image of this Document (PDF)

• 2005 WL 3617094 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum in Further Support of Motion in the Alternative to Strike, or for Judgment As A Matter of Law, as to Plaintiff's Claim for Disgorgement of Profits (Jul. 25, 2005)Original Image of this Document (PDF)

• 2005 WL 3617093 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Support of Motion in the Alternative to Strike, or for Judgment As A Matter of Law, As to Plaintiff's Claim for Disgorgement of Profits (Jun. 13, 2005)Original Image of this Document (PDF)

• 2005 WL 3617092 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Opposition to Plaintiff's Second Motion to Compel Production of Documents and Responses to Interrogatories (May 17, 2005)Original Image of this Document (PDF)

• 2005 WL 3617090 (Trial Motion, Memorandum and Affidavit) Defendant's Sur-Reply Memorandum in Response to Plaintiff's Motion to Compel Production of Documents and Responses to Interrogatories (May 13, 2005)Original Image of this Document (PDF)

• 2005 WL 3617089 (Trial Motion, Memorandum and Affidavit) Motion (May 6, 2005)Original Image of this Document (PDF)

• 2005 WL 3617091 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Plaintiff's Motion to Compel Production of Documents and Responses to Interrogatories (May 3, 2005)Original Image of this Document (PDF)

• 2005 WL 3617088 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Oppposition to Plaintiff's Motion to Compel Discovery (Apr. 25, 2005)Original Image of this Document (PDF)

• 2005 WL 3617087 (Trial Motion, Memorandum and Affidavit) Motion (Apr. 8, 2005)Original Image of this Document (PDF)

• 2004 WL 3090082 (Trial Pleading) Answer to Amended Complaint (Dec. 13, 2004)

• 2004 WL 3642908 (Trial Pleading) Answer to Amended Complaint (Dec. 13, 2004)Original Image of this Document (PDF)

• 2004 WL 3643432 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Nov. 22, 2004)Original Image of this Document (PDF)

• 2004 WL 2789374 (Trial Motion, Memorandum and Affidavit) Plaintiff Vermont Pure's Memorandum in Opposition to Defendant Nestle Waters North America's Second Motion to Dismiss (Nov. 05, 2004)

• 2004 WL 2515370 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Support of Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Oct. 15, 2004)

• 2004 WL 3643430 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Support of Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Oct. 15, 2004)Original Image of this Document (PDF)

• 2004 WL 2270784 (Trial Pleading) Amended Complaint and Jury Demand (Sep. 29, 2004)

• 2004 WL 3642907 (Trial Pleading) Amended Complaint and Jury Demand (Sep. 29, 2004)Original Image of this Document (PDF)

• 2004 WL 2270785 (Trial Motion, Memorandum and Affidavit) Defendant Nestle Waters North America Inc.'s Response to Plaintiff's Notice of Supplemental Authority (Mar. 24, 2004)

• 2004 WL 2270787 (Trial Motion, Memorandum and Affidavit) Plaintiff's Notice of Supplemental

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 839486 (D.Mass.), 2006-1 Trade Cases P 75,213

(Cite as: 2006 WL 839486 (D.Mass.))

Authority (Mar. 12, 2004)

• 2004 WL 2270786 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of Defendant Nestle S.A. to Dismiss the Complaint (Jan. 22, 2004)

• 2004 WL 3960111 (Expert Report and Affidavit) Independent Auditors' Report (Jan. 21, 2004)Original Image of this Document (PDF)

• 2003 WL 23823686 (Trial Motion, Memorandum and Affidavit) Plaintiff's Sur-Reply in Opposition to Defendant Nestle Waters North America, Inc.'s Motion to Dismiss the Complaint (Dec. 30, 2003)

• 2003 WL 23823684 (Trial Motion, Memorandum and Affidavit) Defendant Nestle Waters Reply Memorandum (Dec. 10, 2003)

• 2003 WL 23823685 (Trial Motion, Memorandum and Affidavit) Plaintiff Vermont Pure's Opposition to Defendant Nestle Waters North America's Motion to Dismiss (Oct. 29, 2003)

• 2003 WL 23823683 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Support of Defendant's Motion to Dismiss (Oct. 15, 2003)

• 2003 WL 24219457 (Trial Motion, Memorandum and Affidavit) Defendant's Motion to Dismiss (Oct. 15, 2003)Original Image of this Document (PDF)

• 2003 WL 24219458 (Trial Motion, Memorandum and Affidavit) Defendant's Memorandum in Support of Defendant's Motion to Dismiss (Oct. 15, 2003)Original Image of this Document (PDF)

• 2003 WL 24218780 (Trial Pleading) Complaint and Jury Demand (Aug. 7, 2003)Original Image of this Document (PDF)

• 1:03cv11465 (Docket) (Aug. 7, 2003)

• 2003 WL 24841272 (Expert Report and Affidavit) (Report or Affidavit) (Mar. 12, 2003)Original Image of this Document (PDF)

• 2002 WL 33770626 (Expert Report and Affidavit) Independent Auditors' Report (Dec. 13, 2002)Original Image of this Document (PDF)

• 2001 WL 35675015 (Expert Report and Affidavit) Independent Auditors' Report (Dec. 14, 2001)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1192692 (D.Del.)

(Cite as: 2004 WL 1192692 (D.Del.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Douglas P. WILBERGER, Plaintiff,
v.
Lloyd R. JOSEPH, Defendant.
No. Civ.A. 03-631-SLR.

May 20, 2004.
Douglas P. Wilberger, Cleveland, OH, pro se.

MEMORANDUM ORDER

ROBINSON, J.

*1 Presently before the court is plaintiff Douglas P. Wilberger's "Motion to Seize All Assets of Lloyd R. Joseph Pending the Outcome of Said Action." (D.I.29) For the reasons stated below, the court will deny plaintiff's motion.

I. BACKGROUND

On July 9, 2003, plaintiff filed a complaint under 42 U.S.C. § 1983, along with an application to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. Plaintiff is currently incarcerated at the Cuyahoga County Jail in Cleveland, Ohio. At the time he filed this complaint, plaintiff was incarcerated at the Howard R. Young Correctional Institution in Wilmington, Delaware. Plaintiff alleges that defendant Lloyd R. Joseph ("Joseph"), a New Castle County Police Officer, detained him on May 8, 2003. Plaintiff further alleges that Joseph illegally charged him on May 9, 2003, with possession of a firearm by a person prohibited. Plaintiff alleges that the gun was in the trunk of another individual's car, and was not in plaintiff's possession. (D.I. 2 at 2) Plaintiff further alleges that he was acquitted of the charges. (D.I.22) Plaintiff requests one million dollars in compensatory damages. (*Id.* at 4) On March 23, 2004, plaintiff filed the instant motion stating that he wishes to ensure that Joseph does not transfer any of his assets out of Joseph's name prior to this case being resolved. (D.I.29) Plaintiff does not raise any facts to support his request for extraordinary relief.

II. DISCUSSION

Plaintiff is, in essence, requesting that the court grant him a preliminary injunction under Fed.R.Civ.P. 65(a). Plaintiff states that he is seeking to enjoin Joseph from transferring any assets from his name to a third party, prior to a decision in this case. (D .I. 29 at 2) Plaintiff has not alleged that he has obtained a judgment against Joseph in any State Court. Rather, plaintiff clearly states that he is seeking to seize assets in which he has no cognizable interest. (*Id.*) Consequently, this court has "no authority to issue a preliminary injunction preventing [Joseph] from disposing of [his] assets, pending adjudication of [plaintiff's] ... claim for money damages." *Grupo Mexicano de Desarrollo, S.A., v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 333, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999).

Even if the court did have the authority to issue a preliminary injunction in this case, plaintiff's motion would fail. "[T]he grant of injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances." ' *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989) (quoting *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988)). In ruling on plaintiff's motion, this court must consider: 1) the likelihood of success on the merits; 2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; 3) the extent to which the defendant will suffer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1192692 (D.Del.)

**(Cite as: 2004 WL 1192692 (D.Del.))**

irreparable harm if the requested relief is granted; and 4) the public interest. *See Clear Ocean Action v. York,* 57 F.3d 328, 331 (3d Cir.1995).

\*2 Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of making a "clear showing of immediate irreparable injury." *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 359 (3d Cir.1980) (quoting *Ammond v. McGahn,* 532 F.2d 325, 329 (3d Cir.1976)). The "requisite feared injury or harm must be irreparable--not merely serious or substantial." *Glasco v. Hills,* 558 F.2d 179, 181 (3d Cir.1977). An injunction should only issue if all four factors favor preliminary relief. *See S & R Corp. v. Jiffy Lube Int'l. Inc.,* 968 F.2d 371, 374 (3d Cir.1992).

In the Third Circuit, a plaintiff must allege, at a minimum, the following factors in order to establish a claim for malicious prosecution under § 1983: 1) the deprivation of liberty, *Albright v. Oliver,* 510 U.S. 266, 271 n. 4, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); 2) an absence of probable cause, *Montgomery v. De Simone,* 159 F.3d 120, 124 (3d Cir.1998); and 3) termination or reversal of the criminal proceeding by reason of the plaintiff's innocence, *Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Here, plaintiff has demonstrated a likelihood of success on the merits regarding his malicious prosecution claim. However, plaintiff has failed to establish that he has or will suffer an immediate "irreparable harm" that would justify issuing a preliminary injunction striping Joseph of control of his assets. In fact, plaintiff doesn't allege that he will be harmed if the court fails to grant the preliminary injunction; he merely asserts that he is seeking to prevent Joseph from transferring assets out of Joseph's name prior to a decision in this matter. (D.I. 29 at 2)

There being no evidence presented regarding either the extent to which the defendant will suffer irreparable harm if a preliminary injunction is issued, or the public interest, the court can not address those issues. However, it is not necessary to do so, as failure to meet any one of the factors is sufficient to deny relief.

III. CONCLUSION

Having reviewed the record presented, the court finds that it does not have the authority to issue a preliminary injunction preventing Joseph from disposing of his assets pending adjudication of plaintiff's claim for money damages. In the alternative, the court finds that the plaintiff has not carried his burden of proof as required under the standards enunciated above. Therefore, the court shall deny plaintiff's Motion to Seize All Assets of Lloyd R. Joseph Pending the Outcome of Said Action. (D.I.29)

NOW THEREFORE, at Wilmington this 20th day of May, 2004, IT IS HEREBY ORDERED that:

1. Plaintiff's Motion to Seize All Assets of Lloyd R. Joseph Pending the Outcome of Said Action (D.I.29) is DENIED.

2. The Clerk of the Court shall cause a copy of this Memorandum Order to be mailed to plaintiff.

Not Reported in F.Supp.2d, 2004 WL 1192692 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03CV00631 (Docket) (Jul. 9, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.