# EXHIBIT P

LEXSEE 1975 US DIST LEXIS 16148


Analysis
As of: Dec 20, 2006

**TEXACO, INC., Plaintiff, v. ALLIED CHEMICAL CORPORATION, Defendant.**

75 Civ. 327

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1975 U.S. Dist. LEXIS 16148; 193 U.S.P.Q. (BNA) 716*

**September 17, 1975, Decided**

**COUNSEL:** [*1] ROGERS HOGE & HILLS, 90 Park Avenue, New York, New York 10016, Attorneys for Plaintiff.

FISH & NEAVE, 277 Park Avenue, New York, New York 10017, Attorneys for Defendant.

**JUDGES:** PIERCE

**OPINION BY:** LAWRENCE W. PIERCE

**OPINION:** LAWRENCE W. PIERCE, D.J.

OPINION AND ORDER

Texaco, Inc. brought this action for infringement of federally registered trademarks, alleging that defendant Allied Chemical Corporation has marketed motor gasoline and liquified petroleum gas ("LPG") under the trademark TEXGAS, and that the use of that mark infringes plaintiff's prior mark TEXACO and a series of other trademarks of plaintiff's which embody the prefix TEX. Plaintiff alleges that its mark is uniquely associated with its products, and that over the years TEXACO and the TEX prefix have achieved significant consumer recognition. Specifically, plaintiff charges that in 1971, defendant began nationwide advertising of the TEXGAS mark, through a full-page ad in a national periodical. Texaco claims that TEXGAS has produced actual confusion among purchasers as to the source of TEXGAS products, and that defendant Allied has thus appropriated plaintiff's goodwill. Further, plaintiff alleges that Allied's federal registration [*2] of the mark TEXGAS was procured through fraud on the United States Patent and Trademark Office, in that Allied knew of plaintiff's prior rights and knew of the likelihood of confusion, yet stated to the contrary in its application.

Thus, plaintiff charges defendant with trademark infringement in violation of *15 U.S.C. § 1051* et seq., violations of *15 U.S.C. § 1125*(a) which prohibits false designation of origin of goods shipped in interstate commerce; dilution of plaintiff's distinctive corporate and trade name in violation of N.Y. Bus. Corp. L. § 368(d); and unfair competition at common law. For relief, plaintiff demands that defendant and all those in concert with the defendant be enjoined from the use of the TEXGAS mark; that defendant account to plaintiff for profits and pay damages for violation of *15 U.S.C. § 1125*(a), including treble damages for trademark infringement; and that defendant's federal registration of TEXGAS be declared invalid and be cancelled.

Defendant has not answered plaintiff's complaint; instead, Allied now moves before this Court in three separate motions attacking plaintiff's action here. First, Allied moves to dismiss for plaintiff's failure to join [*3] a party needed for just adjudication under *Rule 19 Fed.R.Civ.P.* Second, Allied moves for an order of this

Case 1:05-cv-00434-GMS    Document 204-6    Filed 12/20/2006    Page 3 of 15

Page 2

1975 U.S. Dist. LEXIS 16148, *3; 193 U.S.P.Q. (BNA) 716

Court transferring this action to the United States District Court for the Southern District of Texas pursuant to *28 U.S.C. § 1404*(a). Third, Allied moves to strike the allegations of fraud upon the Patent and Trademark Office for failure to plead the fraud with particularity, as required by *Rule 9(b) Fed.R.Civ.P.*

I. Motion to Dismiss for Failure to Join

Defendant's first motion is based on the claim that its wholly-owned subsidiaries, Texgas Corporation and Texgas Service Stations, Inc. ("TSSI") each claim an interest in the controversy, and that those interests will be impaired in the event of disposition in their absence. According to defendant, TSSI is not doing business in New York and thus is not amenable to process in this action. TSSI and Texgas Corp. market Allied's TEXGAS motor gasoline in a number of states under the challenged mark; Allied also sells TEXGAS gasoline to independent third parties, some of whom employ the TEXGAS mark. Allied asks this Court to declare both TSSI and Texgas Corp. necessary parties, and moves for dismissal in that while Texgas Corp. [*4] is subject to process here, TSSI is not. It is to be noted that defendant does not assert that Texgas Corp. or TSSI have any ownership rights in the TEXGAS mark; rather, defendant claims that its two subsidiaries have acquired, through use of the mark, certain rights "akin to ownership." Plaintiff's papers in opposition assert that Texgas Corp. and TSSI are not necessary or indispensable; that TSSI could be joined in any event; and that this Court "in equity and good conscience" could decide that the action may proceed between the current parties, Texaco and Allied.

*Rule 19(a) Fed.R.Civ.P.* provides that a person subject to service of process shall be joined in an action if (1) complete relief cannot be afforded without such joinder, or (2) if the person not joined claims an interest in the controversy and is so situated that disposition without joinder may (i) as a practical matter impair his ability to protect that interest, or (ii) raise the possibility of multiple liability or inconsistent obligations on the part of those already parties. Rule 19(a) thus describes what has been referred to as "necessary" parties, who must be joined if joinder is possible. Only if a non-joined [*5] person is "necessary" and beyond the reach of the court, must the analysis proceed to determine whether the absent person is "indispensible" under the separate criteria of Rule 19(b). The remedy sought by Allied on this motion, dismissal, will result only if Texgas Corp. or TSSI are found to be necessary under Rule 19(a), not subject to service of process, indispensible under Rule 19(b), and unable to be protected from prejudice by special shaping of relief. However, if full relief can be afforded in the absence of the non-joined persons, or if plaintiff will be denied an adequate remedy in the event the action is dismissed for non-joinder, or if the Court determines that "in equity and good conscience" the action may proceed between the parties before it, then the motion to dismiss must be denied.

As is clear from the language of the Rule, "the philosophy of present Rule 19 is to avoid dismissal whenever possible . . . ." *Yonofsky v. Wernick, 362 F. Supp. 1005, 1023 (S.D.N.Y. 1973)* (citation omitted). In fact, if the absent persons are not necessary under Rule 19(a), then the question of dismissal does not even arise. *Id. at 1024.*

There exists persuasive authority [*6] that subsidiary corporations who make use of a trade name owned by their parent corporation are not necessary parties to an infringement action against the parent. *American Plan Corporation v. State Loan and Finance Corporation, 278 F. Supp. 846 (D. Del. 1968).* In American Plan, plaintiff sought an injunction against the defendant prohibiting the use of the name "American Plan" in its business and in the business of its subsidiaries, who had not been made parties. After concluding that complete relief could be afforded between the present parties, the court observed that

> "The absence of the subsidiaries does not impair or impede their ability to protect their interests since as a practical matter their interests are being actively and adequately protected by the defendant." ( *Id. at 848-49).*

This Court must examine the elements of Rule 19(a) in light of the relief sought here. As noted above, plaintiff seeks an injunction against use of the mark, an accounting of profits, treble damages, and cancellation of the TEXGAS mark. It appears from the moving papers that the TEXGAS mark is owned solely by Allied; thus, the remedies of accounting, damages and cancellation [*7] clearly can be achieved through jurisdiction over the parties now before the Court. Only the request for an injunction involves Texgas Corp. and TSSI. Yet it is clear that an injunction issued pursuant to *Rule 65(d)*

*Fed.R.Civ.P.* binds not only the parties before the court but also their agents and those "in active concert or participation with them." The depositions and affidavits before the Court reveal that personnel of Allied are directly involved in the activities of the two subsidiaries, and that Allied supplies the subsidiaries with TEXGAS advertising and promotional materials. Thus, it appears that an injunction entered in this case would operate to bind Allied's wholly-owned subsidiaries Texgas Corp. and TSSI. Even if TSSI and Texgas Corp. are to be considered tortfeasors joint and severally liable for infringement, that does not make them indispensible or necessary parties for purposes of Rule 19. *Wells v. Universal Pictures Co., 166 F.2d 690, 692 (2d Cir. 1948); Decorative Cabinets Corp. v. Stor-Aid of Ohio, Inc., 10 F.R.D. 266, 268 (S.D.N.Y. 1950).* Rather, joinder of joint tortfeasors is merely permissive under *Rule 20 Fed.R.Civ.P.* See Advisory Committee's [*8] Note to Amended Rule 19, *39 F.R.D. 69, 91* (1966).

Certainly, if Texgas Corp. or TSSI were separate co-owners of the TEXGAS mark along with Allied, then joinder would be required. See *Switzer Brothers, Inc. v. Byrne, 242 F.2d 909 (6th Cir. 1957).* That is not the case here; Allied claims only that its subsidiaries have an interest "akin" to ownership. In this Court's view, a declaration of indispensibility based solely upon use of the trademark would require joinder of every independent gas station which sells under the name TEXGAS, a result impossible in any one forum.

Allied's arguments that its subsidiaries are separate and distinct corporate entities invite this Court to ignore the realities of business relationships which exist between a company and its wholly-owned subsidiaries. Allied asserts that control over both Texgas Corp. and TSSI "is exercised in the normal manner, whereby the shareholders elect a Board of Directors who then determine the management policies . . . ." (Def. Memo at 4). Yet Allied admits that the sole stockholder of both Texgas Corp. and TSSI is Allied itself.

The Court concludes that complete relief can be afforded in this action solely [*9] through jurisdiction over Texaco and Allied; the interests of Texgas Corp. and TSSI, such as they are, are fully and adequately protected by their parent, defendant Allied. There is no possibility that non-joinder will result in multiple liability or inconsistent obligations. Thus, neither Texgas Corp. nor TSSI being necessary parties under Rule 19(a), the provisions of Rule 19(b) are not considered, and defendant's motion to dismiss for failure to join is denied.

II. Motion to Transfer Pursuant to § *28 U.S.C. § 1404*(a)

In its second motion, defendant Allied moves before this Court for an order pursuant to *28 U.S.C. § 1404*(a), transferring this action to the United States District Court for the Southern District of Texas, Houston Division. In support of its motion, Allied alleges that the present action could have been brought in Texas; that the convenience of the parties would be served by transfer, in that both parties are present there and TEXGAS products are sold principally there; that transfer would allow the joinder of Texgas and TSSI; and that evidence and witnesses relevant to the long use of the TEXGAS mark and the common nature of TEX-prefixed marks are located [*10] in or are more convenient to Houston. The gravamen of Allied's transfer motion appears to be the position that a suit in Texas will better allow it to prove a yet unpleaded defense of laches. Allied alleges that not only have the marks TEXGAS and TEXACO co-existed in Texas for many years, but further that employees of Texaco who are located in Texas long have acquiesced in the use of the TEXGAS mark. Finally, defendant states that the docket in the Southern District of Texas will permit a speedier resolution of this case than would the docket in this court.

Plaintiff Texaco opposes the transfer motion, asserting that both parties are doing business in New York, that plaintiff's claim arose in part in New York, and that the great majority of witnesses which plaintiff considers material, i.e., the corporate officers of both parties, are within the jurisdictional reach of this Court. Plaintiff asserts that its choice of forum must be accorded great weight, and urges this Court to conclude that defendant has not overcome its heavy burden of showing that transfer is desirable.

Both parties have supplied the Court with affidavits of attorneys and corporate officers, detailing the manner [*11] of operations of each side, identifying the location of crucial documentary evidence, and describing the nature of testimony to be offered and the location of the witnesses who will supply that testimony. Defendant states that Texas employees of its Union Texas Division, as well as of Texgas Corp., TSSI and of plaintiff Texaco will be crucial to establishing the history of the TEXGAS marks. Further, defendant supplies the Court with two

Case 1:05-cv-00434-GMS    Document 204-6    Filed 12/20/2006    Page 5 of 15

Page 4
1975 U.S. Dist. LEXIS 16148, *11; 193 U.S.P.Q. (BNA) 716

maps, the first showing TEXGAS motor gasoline retail outlets centered primarily in the Texas and Tennessee area, and the second showing TEXGAS LPG outlets spread throughout the eastern half of the United States, with concentrations in the Mississippi Valley, the Texas gulf region, Florida, and in four northeastern states, including New York.

Not surprisingly, Texaco reveals a different strategy in its assessment of material evidence. Texaco plans to offer historical evidence of its own marks' histories, through documents said to exist at Texaco's New York headquarters. Plaintiff asserts that it is a highly centralized corporation, with all its policymakers present in New York City. Further, Texaco plans to offer "confusion" evidence from its own employees [*12] scattered throughout the northeast. Texaco admits that it has significant Houston operations, but asserts that both Texaco and Allied are national corporations, and that TEXACO is a nationally recognized trademark. Plaintiff disputes whether Allied even sells any LPG in Texas which is marketed under the challenged trademark TEXGAS, citing depositions for the proposition that all LPG sold by Allied in Texas is sold to independent jobbers who do not employ the TEXGAS mark. Finally, Texaco notes that its complaint is based in part upon advertising which occurred in the northeast, and that its action states a pendent cause of action under New York law.

Despite the disagreements between the parties as to the interests of justice on this motion, in this Court's view the material factors are not in dispute. Plaintiff Texaco is a Delaware corporation with its principal place of business in New York City. Allied Chemical is a New York corporation with its principal place of business in Morristown, New Jersey, well within the jurisdictional reach of this Court under *Rule 45(e) Fed.R.Civ.P.* The parties each are full owners of their respective trademarks, and, as the Court has already concluded, [*13] Allied's Texas subsidiaries are not necessary parties to this action.

Plaintiff's complaint states a cause of action that appears national in scope, yet defendant's laches defense will doubtless rely on facts and circumstances occurring or existing primarily in Texas. Thus, it appears that there will be inconvenience to some party regardless of where this case is tried. However, given the weight to be afforded plaintiff's choice of forum, the rule is that a court will order "transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient." *VanDusen v. Barrack, 376 U.S. 612, 645-46, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964).*

It is not questioned in this Circuit that plaintiff's choice of forum is a factor to be afforded weight. *Allied International Products Ltd. v. Textron Industries, Inc., 382 F. Supp. 210, 213 (S.D.N.Y. 1974); Houghton-Mifflin Co. v. National Computer Systems, Inc., 378 F. Supp. 592, 596 (S.D.N.Y. 1974)* (plaintiff's choice "entitled to great deference"); *Lehn & Fink Products Corp. v. Milner Products Corp., 117 F. Supp. 320 (S.D.N.Y. 1953)* (trademark infringement action). Accordingly, the burden [*14] is on the moving party to show that transfer is proper; the burden is a heavy one, and evidence of inconvenience in the chosen forum is not sufficient; defendant must show more convenience in the transferee district. *Sinclair Oil Corporation v. Union Oil Co., 305 F. Supp. 903, 904 (S.D.N.Y. 1969).*

> "The forum properly selected by a party should not be disturbed unless the movant clearly demonstrates that the balance of convenience and justice weighs heavily in favor of transfer." *Blue Bell, Inc. v. Jaymar-Ruby, Inc., 311 F. Supp. 942, 942-43 (S.D.N.Y. 1969)* (action for trademark infringement).

With the nature of the movant's burden in mind, the Court must examine the factors to be considered in a § 1404(a) motion. These factors have been stated as including:

> "(1) the convenience of the parties; (2) the convenience of witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of billing witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems indicating where the case can be tried more expeditiously and inexpensively; and (7) the interests of justice, a term broad [*15] enough to cover the particular circumstances of each case." *Schneider v. Sears, 265 F. Supp. 257, 263 (S.D.N.Y. 1967);* accord, *Saminsky v. Occidental Petroleum Corp.,*

Case 1:05-cv-00434-GMS    Document 204-6    Filed 12/20/2006    Page 6 of 15

Page 5
1975 U.S. Dist. LEXIS 16148, *15; 193 U.S.P.Q. (BNA) 716

*373 F. Supp. 257, 258 (S.D.N.Y. 1974); Goldstein v. Rusco Industries, Inc., 351 F. Supp. 1314, 1317 (E.D.N.Y. 1972).*

As regards the convenience of parties, the Court notes that both plaintiff and defendant have their principal places of business within the jurisdictional reach of this Court. Defendant is a New York corporation, and the metropolitan area appears to be the center of both company's marketing and purchasing activities. See Formflex Foundations, *Inc. v. Cupid Foundations, Inc., 383 F. Supp. 497, 499 (S.D.N.Y. 1974).* Even where the defendant is an out-of-state corporation, motions to transfer have been denied when the defendant has been shown to have significant contacts with this state. *Houghton-Mifflin, supra, at 595-96.* The causes of action stated by plaintiff occurred in part within this state; see *Vanity-Fair Mills v. T. Eaton Co., 234 F.2d 633 (2d Cir.), cert. denied, 352 U.S. 871 (1956); RFD Group, Ltd. v. Rubber Fabricators, Inc., 323* [*16] *F. Supp. 521, 526-27 (S.D.N.Y. 1971);* compare *Ryer v. Harrisburg Kohl Bros., 307 F. Supp. 276, 279 (S.D.N.Y. 1969).* In sum, the first factor indicates that as far as the parties before this Court, New York is a more convenient forum than Texas.

The convenience of witnesses' factor truly divides the parties. Plaintiff's case will rest primarily upon New York and northeast witnesses; defendant's laches defense will rest primarily upon Texas witnesses. However, in regard to both the convenience of witnesses and the location of documents, a court must not disturb plaintiff's choice where a transfer would merely shift the inconvenience from one party to the other. *Blue Bell, Inc., supra, at 943.* As regards compulsory process to produce unwilling witnesses, the Court has noted that both party's headquarters are within the reach of *Rule 45(e) Fed.R.Civ.P.* Further, it is unlikely that there will be significant problems of unwilling witnesses in this action; it appears that the pertinent witnesses are in any event under the control of the parties before the Court. This fact also goes to the expense of transporting witnesses. This Court is "not convinced that defendant would suffer [*17] any oppressive or unusual expense or inconvenience in transporting its own employees to New York, where it does business." *Schmidt v. American Flyers Airline Corp., 260 F. Supp. 813, 814 (S.D.N.Y. 1966).* Again, a mere shifting of inconvenience is insufficient to overcome the presumption against transfer. *Blue Bell, supra.*

The practical problems of trying this case relate to, inter alia, the relative size of dockets in the respective courts. While some courts have considered the congestion of dockets on motions to transfer, e.g., *Allied International, supra, at 213,* court calendars cannot be considered decisive. *Brody v. American Medical Association, 337 F. Supp. 611, 613 (S.D.N.Y. 1971), Blue Bell, supra, at 944.* This Court is not inclined to give much weight to such a factor, especially here where the parties disagree as to the likelihood of a speedier trial in Texas.

The final factor to be considered is the broad concept of the interests of justice. Under this heading the Court notes that plaintiff states a pendent cause of action under New York law; such a claim is best adjudicated by a federal court familiar with local law. *Brody, supra, at 613-14.* [*18] The Court does not ignore the fact that defendant's laches defense might be more conveniently presented in Texas; however, plaintiff's complaint states a claim national in scope, and the advertising activities of defendant which occurred in this region are said to be one basis of the action.

Defendant has failed to show affirmatively that the Southern District of Texas would be a more convenient forum than that chosen by the plaintiff. Accordingly, the motion to transfer must be denied.

III. Motion to Strike Pursuant to Rule 9(b).

In paragraph 23 of its complaint, plaintiff names three registrations of the mark TEXGAS which it alleges to be invalid. Plaintiff demands cancellation of these marks because of the infringement of plaintiff's prior rights and

> "because each said registration was obtained fraudulently in that, contrary to the statement of the applicant for such registration, the applicant was then well aware of plaintiff's trademark TEXACO, of plaintiff's rights thereto and of the likelihood of confusion, mistake and deception arising from the resemblance of the purported mark TEXGAS to plaintiff's said mark TEXACO and because all proceedings conducted by [*19] and papers filed by the applicant and subsequent owners of such registration were conducted and filed with full

Case 1:05-cv-00434-GMS   Document 204-6   Filed 12/20/2006   Page 7 of 15

Page 6
1975 U.S. Dist. LEXIS 16148, *19; 193 U.S.P.Q. (BNA) 716

knowledge of plaintiff's mark TEXACO and of plaintiff's rights with respect thereto and registrations thereof."

Defendant moves to strike this clause of paragraph 23 on the ground that it fails to comply with the requirement of *Rule 9(b) Fed.R.Civ.P.* that "the circumstances constituting fraud . . . shall be stated with particularity." Allied states that the above-quoted clause of the complaint is "studiously vague" and that it says "absolutely nothing."

The requirements of Rule 9(b) are not to be regarded as an exception to the general policy of *Rule 8(e)(1) Fed.R.Civ.P.* that "each averment of a pleading shall be simple, concise and direct. No technical forms of pleadings or motions are required." Instead, the proper approach is to harmonize the respective requirements of the two Rules. 2A Moore's Federal Practice, P 9.03 (2d Ed. 1974). Indeed, courts have harmonized the two Rules rather than viewing Rule 9 as an abrogation of Rule 8. See *Essex International, Inc. v. Industra Products, Inc., 64 F.R.D. 361, 363 (N.D. Ind. 1974); CIT Finance Corp. v.* [*20] *Sachs, 10 F.R.D. 397, 398 (S.D.N.Y. 1950).*

When the charge is fraudulent procurement of a trademark registration, allegations of false statements made by the applicant with knowledge of falsity are sufficient under Rule 9(b). *Scervini v. Miles Laboratories, 11 F.R.D. 542, 543 (S.D.N.Y. 1951).* The challenged clause presents a statement made to the Patent and Trademark Office, an allegation that the statement was false, and an allegation that the applicant knew of the falsity. The essential elements of fraud have been alleged. Plaintiff's paragraph 23 gives defendant fair notice of the transaction charged and is thus sufficient under the liberal pleading Policy of the Federal Rules.

Conclusion

1. The motion of defendant Allied Chemical to dismiss the complaint for failure to join a party required for just adjudication is denied.

2. The motion of defendant Allied Chemical for an order transferring this action to the Southern District of Texas is denied.

3. The motion of defendant Allied Chemical to strike the allegations of fraud contained in paragraph 23 of the complaint is denied.

SO ORDERED.

Dated: New York, New York
September 17, 1975

LAWRENCE [*21] W. PIERCE

U. S. D. J.

THIS PAGE INTENTIONALLY LEFT BLANK

Westlaw.

Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2002 WL 649086 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.D.Minn.,2002.Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.
SLIDELL, INC., Plaintiff and Counter-defendant,
v.
MILLENNIUM INORGANIC CHEMICALS, INC., Defendant and Counter-claimant.
No. CIV A. 02-213 (JRT/F.

April 17, 2002.

Jeffrey W. Post and Thomas S. Fraser, Fredrikson & Byron, P.A., Minneapolis, for plaintiff and counter-defendant.
Scott A. Smith, Michael T. Nilan and Matthew E. Johnson, Halleland Lewis Nilan Sipkins & Johnson, Minneapolis, for defendant and counterclaimant.

MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT/COUNTERCLAIMANT'S
MOTION FOR A PRELIMINARY INJUNCTION
TUNHEIM, District J.
*1 This matter is before the Court on the motion of defendant and counterclaimant Millennium Inorganic Chemicals, Inc. ("Millennium") for a preliminary injunction. Millennium seeks an order from the Court that would temporarily enjoin plaintiff Slidell, Inc. ("Slidell") from disassembling partially-constructed packaging equipment designed for Millennium under an $11 million contract until a full determination of the claims asserted in this action can be made. For the reasons that follow, the Court grants the motion.

BACKGROUND

Millennium is a large manufacturer of a variety of inorganic products, including titanium dioxide (" TiO2") pigments.[FN1] Slidell is a manufacturing company located in Owatonna, Minnesota. It manufactures automated industrial packaging equipment systems used by a variety of TiO2 manufacturers like Millennium and other manufacturers who supply products to customers in powdered form.

> FN1. TiO2 is a white, non-toxic pigment used to impart opacity and whiteness in paint, plastics, paper and other products. It is manufactured in powdered form and is shipped to customers in either a wet slurry or in its dry powder state.

In the late 1990s, Millennium embarked on a $38 million improvement project encompassing its TiO2 manufacturing plants in Ashtabula, Ohio, Le Havre, France and Stallingborough, United Kingdom. The project called for, among other things, improving and/or expanding TiO2 packaging performance in all three facilities. In December 1999, Millennium and Slidell executed a Letter of Intent ("LOI") by which Slidell stated its intent to design and manufacture, and Millennium its intent to purchase, a number of fully automated packaging machines for Millennium's use in its three plants. After the execution of the LOI, Slidell and Millennium continued negotiations to firm up the specifications for the machines and the details of the contract.

In April 2000, Millennium and Slidell executed a written contract dated March 17, 2000. Under the contract, Slidell agreed to design, manufacture, deliver and install seven packaging machines for Millennium-three each for its plant in the United Kingdom and Ohio and one for its plant in France. The contract price for all seven packaging machines was $10,350,465, to be paid by Millennium according to a milestone-based payment schedule outlined in the contract. Contract ¶ 20. The contract also incorporated a 12% discount provision premised upon the manufacture of "identical" units

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 2
Not Reported in F.Supp.2d, 2002 WL 649086 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

of packing equipment. Contract ¶ 20(b). According to other terms of the contract relevant to the dispute, the parties agreed that "title to the Goods shall remain with Slidell until the full purchase price (including installation and service costs) is paid." Contract ¶ 3. The parties also agreed that modifications to the contract could be effectuated through the execution of change orders. Section 19 provides that "Change Orders may be requested at any time by [Millennium] or [Slidell] to alter, add to, delete aspects of, or otherwise change the final scope of the project." Contract ¶ 19. The parties further agreed that should "the parties elect to proceed with such Change Order, a Change Order shall be executed by both parties and [Slidell] shall proceed with adjustments to the Project Schedule, the final scope of the project, the Contract Price or other aspects of the final scope of the project as defined in such Change Order." *Id.* Finally, the parties confirmed that "[t]his Contract, including all of its exhibits, appendixes and attachments, comprises the entire agreement between [Millennium] and [Slidell]." Contract ¶ 22.

*2 Work on the project progressed slowly, in part because of difficulties that arose concerning two critical areas of production-wire color-coding and the supervisory control systems. In the summer of 2000, it was brought to Millennium's attention that the wire colors specified in the contract did not fully comply with all applicable US, UK and European standards. To resolve this issue, the parties agreed to Change Order No. 3, which set forth revised wiring colors with no change to the contract price. However, a few months later, the parties returned to the original specifications concerning wire color and added $7,600 to the contract price to compensate Slidell for the extra expense incurred as a result of the changes. Change Order No. 4.

Difficulties also arose with respect to the equipment's supervisory control system, which is a computer software interface between the packaging units and other TiO2 production components. Millennium claims this issue was also resolved through the execution of a change order in which the parties agreed to remove the supervisory system from the scope of Slidell's work but without any change in the contract price in recognition of the work performed by Slidell on this issue. Slidell says it has not signed Change Order No. 5 effectuating these changes. Slidell also claims, among other things, that any blame for delays under the contract lies with Millennium as a result of its interference with Slidell's production of the equipment and the ineffective management team Millennium employed on the project.[FN2]

FN2. Slidell also claims that Millennium breached an oral agreement for Slidell's establishment of Slidell B.V., a European servicing facility in Belgium. According to Slidell, it expended time and expense opening, staffing and maintaining a European office based on Millennium's representations that it would need Slidell's long-term support services for its Europeans plants. However, these allegations fall outside the terms of the March 17, 2000 contract and therefore run afoul of the integration clauses expressly included in the contract. Contract ¶ 1 (providing that "all other provisions of any previous order or communication that are additional or different from the terms hereof are expressly rejected") *id.* ¶ 22 (reiterating that "this contract, including all of its exhibits, appendixes and attachments, comprises the entire agreement between Owner and Contractor"). Slidell is entitled to prove that a separate European servicing agreement existed between the parties and was breached, but that issue is irrelevant to the issue of whether Slidell breached this contract.

In September 2001, Slidell demanded that the 12% discount built into the contract for the manufacture of identical equipment be eliminated from the contract price. Millennium rejected this request, contending that, despite the execution of several change orders, none of the agreed-upon modifications differentiated the machines from one another to render the discount provision inapplicable. Thereafter, Slidell discontinued work on the units and no progress has been made since

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d   Page 3
Not Reported in F.Supp.2d, 2002 WL 649086 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d)

November 2001. Currently, the partially-constructed equipment sits on Slidell's production floor in various stages of assembly.

To date, Millennium has paid Slidell a total of $8,580,734.20 in progress payments under the contract; the total contract price currently stands at $11,058,475.76, inclusive of the change orders. In other words, Millennium has paid 77.6% of the total contract price. By contrast, according to the current state of construction of the units and the payment schedule in paragraph 20 of the contract, Millennium estimates that Slidell has earned no more than 65% of the total contract price, meaning that Millennium has paid Slidell at least $1.4 million more than what Slidell is currently entitled under the contract. Nonetheless, Slidell has stated that it cannot complete the machines without a substantial infusion of more capital.

Slidell commenced this action in January 2002, contending that Millenium was in breach of contract for, among other things, interfering with and unjustifiably hindering Slidell's performance of its contractual obligations; failing to fulfill its contractual obligations in a diligent manner; interfering with Slidell's production resources; making numerous requests for Slidell's performance of work outside the scope of the contract; making numerous misrepresentations in breach of the confidentiality agreement executed as part of the contract; making unwarranted and extensive requests for changes to the scope of the contract; failing to make payments in a timely manner and refusing to follow through with its commitment to utilize Slidell B.V.

*3 Shortly thereafter, counsel for Slidell informed Millennium by letter dated February 19, 2002, that it was contemplating disassembling the seven packaging units for purposes of selling off the parts for value:
If this matter is not resolved shortly, Slidell may soon be forced to disassemble the packaging equipment it was building for Millennium to use components or to place it in storage to mitigate damages.

Scott A. Smith Aff. Exh A. Millennium strenuously objected to any disassembly of the packaging equipment, however, on March 4, 2002, Slidell reiterated and expanded upon its intention to dispose of the equipment designed for Millennium under the contract:Slidell intends to mitigate its damages by using components of the packaging equipment for other orders or otherwise dispose of the equipment after Millennium's inspection. Slidell has a significant amount of overhead taken up not only by the floor space the equipment occupies, but also by the value of the equipment's parts. Slidell can only mitigate its overhead losses, which it estimates at in excess of $500,000/month if it uses the components of the equipment. If Slidell does not, it puts its very existence at risk.

Smith Aff. Exh. C. Based on this correspondence, Millennium counterclaimed and moved for injunctive relief to preserve the status quo and maintain the machines and parts designated for the project until a full determination on the merits can be made.

ANALYSIS

I. Jurisdiction

Before addressing the merits of Millennium's motion for a preliminary injunction, the Court must address the threshold question raised by Slidell concerning the Court's jurisdiction to grant the injunctive relief Millennium seeks in this motion. Slidell contends that under *Grupo Mexicano de Desarrollo v. Alliance Bond Fund Inc.,* 527 U.S. 308 (1999), the Court is without jurisdiction to enter a preliminary injunction. In *Grupo Mexicano,* the Supreme Court held that "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." *Id.* at 333.

*Grupo Mexicano* is distinguishable from the case at bar because in *Grupo,* the plaintiffs sought only money damages on its contract claim.[FN3] In this case, by contrast, Millennium's counterclaim also seeks equitable relief in the form of a constructive

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 2002 WL 649086 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

trust, equitable lien, specific performance and/or replevin. Accordingly, the holding in *Grupo* does not deprive the Court of jurisdiction to entertain Millennium's claim for equitable relief. *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) (injunction freezing assets permissible where complaint stated cause of action for equitable relief); *United States ex rel. Rahman v. Oncology Assocs. P.C.*, 198 F.3d 489, 494-98 (4th Cir.1999) (interpreting *Grupo* holding to be limited to claims for money damages only and concluding that complaint which asserts claims for money damages and equitable relief "does not defeat the district court's equitable powers").

> FN3. The very first sentence of the opinion makes this clear: "The case presents the question whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." *Id.* at 310.

### II. Dataphase Factors

*4 In the Eighth Circuit, a preliminary injunction may be granted only if the moving party can demonstrate: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; 3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981). "No single factor in itself is dispositive; in each case all the factors must be considered to determine whether on balance they weigh towards granting an injunction." *Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.*, 815 F.2d 500, 503 (8th Cir.1987); *Dataphase*, 640 F.2d at 113 ("In balancing the equities no single factor is determinative."). However, a court may not issue a preliminary injunction without finding that some possibility of irreparable harm to the movant exists. *Id.* at 114 n. 9.

#### 1. Irreparable Harm

Millennium has made a convincing showing of irreparable harm. To date, Millennium has paid over $8.5 million on an $11 million contract for machines that are only partially completed and for which Millennium has not yet received anything in return. In letters from counsel for Slidell to Millennium shortly after Slidell filed this action, Slidell has stated that it intends to disassemble the units in their currently partially-assembled state and sell the parts to third parties. Should Slidell carry out this threat, Millennium's request for equitable remedies of specific performance, replevin, constructive trust and equitable lien will be rendered meaningless. All these claims depend upon the continued existence of the equipment.

Although Millennium has also asserted a claim for money damages for Slidell's alleged breach of contract, Millennium has made a sufficient showing that Slidell's current financial situation renders it questionable whether it could satisfy a money judgment against it. Slidell's tenuous financial circumstance is evident given its claim that it needs to disassemble the currently constructed units and sell the parts in order to remain in business. The Eighth Circuit has held that the threat of unrecoverable economic loss due to a company's bankruptcy or insolvency can constitute irreparable harm. *Iowa Utilities Board v. Federal Communications Comm'n*, 109 F.3d 418, 425-26 (8th Cir.1996); *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir.1987) (upholding district court's issuance of a preliminary injunction where movant "demonstrated a clear probability that defendants will not be able to satisfy an award of adequate damages").

Moreover, as Millennium emphasizes, monetary relief is of secondary importance to Millennium in this case. Millennium is keenly interested in obtaining the machines currently sitting on Slidell's production floor. It has expended substantial capital reconfiguring its plants for this particular equipment and by Slidell's own admission, "[t]he Packaging Equipment is engineered to meet Millennium's specific technical needs." Complaint ¶ 11. On these facts, the Court finds that Millennium has made a strong showing that, absent an injunction, the possibility of irreparable harm to Millennium

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 5
Not Reported in F.Supp.2d, 2002 WL 649086 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

clearly exists.

### 2. Balance of Harms

*5 The balance of harms also weighs in favor of Millennium. Absent an injunction, the harm to Millennium is obvious: were Slidell to dismantle the equipment and sell the parts to third parties, not only would Slidell be unjustly enriched, but Millennium would be at serious risk of losing all of the $8.5 million it has paid Slidell, as well as the extensive investment it has made reconfiguring its plants in preparation for this specialized equipment.

For its part, Slidell claims the imposition of an injunction would jeopardize its future by crippling its cash flow, would consume half of its production floor and cost it over $500,000 a month in overhead costs. While the Court sympathizes with the financial difficulties Slidell is experiencing at the moment, the Court is not persuaded by several of Slidell's arguments. For instance, Slidell claims that it can alleviate its financial problems by doing other projects because the other projects have milestone-based progress payments. However, this project is structured precisely the same way. Contract ¶ 20(a). Slidell could earn its final $ 2.5 million on the contract and free up its production floor were it to complete the equipment.[FN4]

> FN4. Slidell has claimed damages of $30 million, however, a review of the contract plainly reveals that damages are limited to the contract price. Contract ¶ 4 ("[Slidell] further agrees in no event shall [Millennium] have liability for direct damages in excess of the contract price of the portion of the goods or services in respect to which a claim is made, whether such claim arises out of contract, negligence or other tort or otherwise."). Accordingly, the most Slidell could recover from Millennium for breach of the March 17, 2000 contract is the difference between the current contract price and the amount Millennium has already paid.

Furthermore, to the extent Slidell is prevented from taking on new projects because Millennium's units are occupying its production floor, Slidell can minimize such harm by placing the partially-constructed packaging units in storage during the pendency of this litigation. Indeed, Millennium has stated that it is not opposed to such an arrangement upon mutually-agreeable terms and conditions. Accordingly, when the harms asserted by each side are balanced against one another, the Court finds that the risk of harm to Millennium absent an injunction is decidedly greater than the harm to Slidell should an injunction be issued.

### 3. Probability of Success on the Merits

The Eighth Circuit has emphasized that "[t]he very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability test." *Dataphase,* 640 F.2d at 113. Indeed, the circuit has expressly rejected the argument that in every case, "the party seeking preliminary relief prove a greater than fifty percent likelihood that he will prevail on the merits." *Id.* Rather, "the equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case." *Id.* Where a movant makes a strong showing on other factors, as Millennium has done here, the showing of success need not be as strong. *Id.* at 113 (explaining that the showing of success on the merits can be less when the equities are otherwise strongly in his favor).

In this case, both parties have asserted breach of contract claims against the other and the facts concerning the parties' conduct during performance of the contract are very much in dispute. Nonetheless, at this stage, albeit a preliminary one, Millennium appears to have the stronger claim. The undisputed facts establish that Millennium has paid nearly 80% of the contract price for seven packaging units which are not yet complete and are now in jeopardy of being dismantled. Although Slidell claims that delays were caused because of issues that arose regarding critical path items, the parties specifically agreed under the contract that modifications of the contract could be requested

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 6
Not Reported in F.Supp.2d, 2002 WL 649086 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

and sought by either party and resolved through the execution of change orders. That is precisely the process that occurred here. Additionally, Slidell's demand to eliminate the 12% discount seems questionable given that the change orders applied equally to all the units. Accordingly, this factor weighs in favor of Millennium.

### 4. Public Interest

*6 Finally, the public interest in the performance of contracts weighs in favor of issuance of an injunction, particularly where, as here, Millennium has made substantial advance payments of money in return for a seller's promise of future delivery.

Having found that all four *Dataphase* factors weigh in favor of granting the requested preliminary injunction, the Court therefore grants the motion. In the Court's view, the balance of equities favor Millennium and requires the Court to intervene to preserve the status quo until the merits are determined.

### ORDER

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendant and counterclaimant Millennium's motion for a preliminary injunction [Docket No. 5] is GRANTED as follows:
a. Until further Order of this Court, Slidell is hereby restrained and enjoined from the following:
1) Disassembling all or any portion of each of seven partially-constructed titanium dioxide packaging machines being built by Slidell for Millennium pursuant to the parties' contract dated March 17, 2000;
2) Selling, transferring or conveying in any manner, whether for or without value, to any entity other than Millennium, any legal or equitable right or interest, without limitation, in or to:
(a) Each of the aforesaid titanium dioxide packaging machines, and any components thereof;
(b) Any and all parts, subassemblies or other components which have been identified in the parties' contract for the aforesaid titanium dioxide packaging machines, regardless of whether such parts, subassemblies or other components have, or have not, been physically attached to or incorporated into the units themselves;
3) Committing, taking or causing or allowing to occur any other act, action or omission, without limitation, which would in any manner diminish the value of or otherwise interfere with Millennium's potential legal and equitable rights to
(a) Each of the aforesaid titanium dioxide packaging machines, and any components thereof;
(b) Any and all parts, subassemblies or other components which have been identified to the parties' contract for the aforesaid titanium dioxide packaging machines, regardless of whether such parts, subassemblies or other components have, or have not, been physically attached to or incorporated into the units themselves.

2. In accordance with Fed.R.Civ.P. 65(c), the preliminary injunction shall become effective upon defendant and counterclaimant posting a bond with the Clerk in the amount of Two Million Dollars ($2,000,000.00) for the payment of such costs and damages as may be incurred or suffered by plaintiff in the event plaintiff is found to have been wrongfully enjoined.

3. The parties are ordered to meet and confer and reach agreement concerning storage of the subject equipment until a full determination of the merits can be made.

D.Minn.,2002.
Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.
Not Reported in F.Supp.2d, 2002 WL 649086 (D.Minn.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 712015 (Verdict, Agreement and Settlement) Special Verdict Form (Feb. 24, 2005)
• 2003 WL 24029995 (Trial Pleading) First Amended Answer and Counterclaim of Millennium Inorganic Chemicals Inc. (Apr. 23, 2003)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 7
Not Reported in F.Supp.2d, 2002 WL 649086 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

• 2002 WL 32818037 (Trial Pleading) Complaint (Jan. 16, 2002)
• 0:02CV00213 (Docket) (Jan. 16, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.