# EXHIBIT A

TITAN STONE, TILE & MASONRY, INC., Plaintiff, v. HUNT CONSTRUCTION GROUP, INC., UNITED STATES FIDELITY AND GUARANTY COMPANY, FIDELITY & DEPOSIT OF MARYLAND, AND FEDERAL INSURANCE COMPANY, Defendants.

Civ. No. 05-3362 (GEB)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

2006 U.S. Dist. LEXIS 70569

September 26, 2006, Decided

**NOTICE:** [*1] NOT FOR PUBLICATION

**COUNSEL:** For TITAN STONE, TILE & MASONRY, INC., Plaintiff: JOHN MICHAEL AGNELLO, CARELLA BYRNE BAIN GILFILLAN CECCHI STEWART & OLSTEIN, PC, ROSELAND, NJ. KERRIE R. HESLIN, CARELLA, BYRNE, BAIN, GILFILLAN, ROSELAND, NJ.

For HUNT CONSTRUCTION GROUP, INC., FEDERAL INSURANCE COMPANY, Fidelity and Deposit of Maryland, UNITED STATES FIDELITY AND GUARANTY COMPANY, Defendant: ANNE MURRAY PATTERSON, RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, ESQS., HEADQUARTERS PLAZA, ONE SPEEDWELL AVENUE, MORRISTOWN, NJ.

For HUNT CONSTRUCTION GROUP, INC., Third-Party Plaintiff: ANNE MURRAY PATTERSON, RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, ESQS., HEADQUARTERS PLAZA, ONE SPEEDWELL AVENUE, MORRISTOWN, NJ.

For INTERNATIONAL FIDELITY INSURANCE COMPANY, ThirdParty Defendant: KERRIE R. HESLIN, CARELLA, BYRNE, BAIN, GILFILLAN, ROSELAND, NJ.

**JUDGES:** GARRETT E. BROWN, JR., U.S.D.J.

**OPINION BY:** GARRETT E. BROWN

**OPINION:**

### MEMORANDUM OPINION

BROWN, Chief Judge

This matter comes before the Court upon Defendant Hunt Construction Group Inc.'s ("Hunt") Motion to Dismiss Counts I through X of Titan Stone, Tile & Masonry, Inc.'s ("Titan") Complaint, and the Motion of Defendants United States [*2] Fidelity and Guaranty Company, Fidelity and Deposit Company of Maryland and Federal Insurance Company (collectively, "the Sureties") to Dismiss Counts XII and XIII of Titan's Amended Complaint. n1 Both motions seek dismissal of said Counts under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons set forth herein, Hunt's Motion to Dismiss will be granted in part and denied in part, and the Sureties' Motion to Dismiss will be denied.

n1 Hunt filed its Motion to Dismiss Counts I through X of Titan's July 1, 2005 Complaint (the "Initial Complaint") on September 19, 2005. On March 20, 2006, Titan filed its First Amended Complaint (the "Amended Complaint"), adding Counts XII and XIII against the Sureties. The allegations against Hunt set out in Counts I through X of the Amended Complaint are in all material respects identical to the corresponding Counts in the Initial Complaint. This Court will therefore read Hunt's Motion to Dismiss as addressing Counts I through X of the Amended Complaint.

[*3]

### I. BACKGROUND

Hunt is a construction firm that provides general contracting services in the construction industry. (Am. Compl. P 3.) Hunt was hired to provide the contracting work for the construction of a library (the "Project") on behalf of the College of New Jersey in Ewing, New Jersey (the "Owner"). (*Id.*) Following a bidding contest among potential subcontractors, Hunt entered into a valid and binding Subcontract Agreement (the "Agreement") with plaintiff Titan on October 13, 2003, whereby Titan would perform services as a subcontractor on the Project. (*See* Declaration of Larry A. Weisman ("Weisman

Case 1:05-cv-00434-GMS    Document 220-2    Filed 01/05/2007    Page 3 of 15

Page 2
2006 U.S. Dist. LEXIS 70569, *

Decl.") Ex. A.) In particular, Titan was hired for work relating to the installation of the exterior panelized wall system for the project (the "Wall System"). (Am. Compl. P 5.) Titan now alleges that Hunt failed, from the very beginning of the Project, to fulfill its obligations under the Agreement. (*Id.* at P 6.)

First, Titan claims to have been concerned that the structural drawings upon which Hunt was relying for the Project were inconsistent with the use of Titan's Wall System. (*Id.* at PP 6-8.) According to Titan's Amended Complaint, Titan was assured [*4] by Hunt that the Owner's engineer for the project, STV Incorporated ("STV"), would work with Titan and its engineer, Curtin Wall Design & Consulting, Inc. ("Curtin"), to integrate Titan's Wall System into the structure of the building. (*Id.* at P 8.) Titan now alleges that these representations were false. (*Id.*)

Second, Titan's Amended Complaint states that Hunt and STV promised to provide Titan with essential drawings relating to the Project, without which Titan could not begin work on the Wall System. (*Id.*) Titan claims that it was not provided the promised drawings at the time they were needed, and in fact did not receive them until July 1, 2004. (*Id.*) As a result of this and Hunt's allegedly negligent management of the Project in general, Titan's part of the Project incurred significant delays. (*Id.* at PP 8-11.)

Finally, Titan alleges that Hunt was paid up to $ 2,000,000 for work performed by Titan, and yet refused to forward those funds to Plaintiff on the grounds that it held Titan responsible for the delays and other problems incurred during the Project. (*Id.* at PP 16-17.) Titan claims that the Sureties issued Payment Bonds and Performance Bonds in varying [*5] amounts on July 31, 2003 to assure the payment by Hunt of its obligations to, *inter alia,* the subcontractors, and to assure performance by Hunt of its obligations to the Owner under the Agreement. (*Id.* at PP 26-31.) Titan also claims that while Hunt promised that it would pay Titan under the Agreement for all the work it performed on the Project - including all extra work resulting from the delays allegedly caused by Hunt, (*id.* at P 14), Hunt in fact terminated Titan once the Wall System was installed. (*Id.* at P 15.)

On July 1, 2005, Titan filed a Complaint against Hunt in this Court alleging Breach of Contract (Count I), Fraud (Count II), Anticipatory Breach/Repudiation (Count III), Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV), Quantum Meruit (Count V), Conversion (Count VI), Negligent Misrepresentation (Count VII), Negligent Contract Administration (Count VIII), Unjust Enrichment (Count IX), Constructive Trust (Count X) and Violations of the New Jersey Trust Fund Act (Count XI). On March 20, 2006, Titan filed its First Amended Complaint, adding claims against the Sureties under the Payment and Performance Bonds (Counts XII and XIII, respectively). [*6]

## II. DISCUSSION

### A. APPLICABLE LEGAL STANDARDS

A rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957); *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S. Ct. 502, 62 L. Ed. 2d 441 (1980). "The question before the court is not whether plaintiffs will ultimately prevail; rather, it is whether they can prove any set of facts in support of their claims that would entitle them to relief." *Mobile Dredging & Pumping Co. v. City of Gloucester,* No. 04-0624, 2005 U.S. Dist. LEXIS 16601 at *7 (D.N.J. Aug. 4, 2005), citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). "Therefore, in deciding a motion to dismiss, a court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to the non-movant, plaintiff's allegations state a legal claim." *Mobile Dredging,* 2005 U.S. Dist. LEXIS 16601 at *7, citing *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir. 1990). [*7] n2

> n2 Titan claims that Hunt's Motion to Dismiss Counts I and IV should be governed by Fed. R. Civ. P. 56 rather than FED. R. CIV. P. 12(b)(6). Titan Opp. Br. 9-11. Indeed, Titan argues that since Hunt submitted the Declaration of Larry A. Weisman (the "Weisman Decl.") along with its motion, and since Titan offered, in opposition, the Declaration of Richard E. Wenger (the "Wenger Cert.'), the resolution of the motion will "require[] reference by the Court to declarations and exhibits that have been submitted by the parties, [and] the motion must [therefore] be decided under Fed. R. Civ. P. 56." Titan Opp. Br. 9-10.
>
> Rule 12(b) does indeed provide that "[i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." FED. R. CIV. P. 12(b). Never-

Case 1:05-cv-00434-GMS   Document 220-2   Filed 01/05/2007   Page 4 of 15

Page 3
2006 U.S. Dist. LEXIS 70569, *

theless, this Court believes that the Rule 12(b)(6) standard should be applied in the case at bar.

First, the only substantive Exhibit to the Weisman Declaration is a copy of the Agreement between Hunt and Titan. This Circuit has held that a court deciding a Rule 12(b)(6) motion to dismiss "may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document . . . . When a complaint relies on a document . . . the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished." *Pension Benefit Guaranty Corp. v. White Consol. Indus. Inc.,* 998 F.2d 1192, 1196-97 (3d Cir. 1993); *see also GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir. 1997) ("if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."). Here, the Agreement is central to Counts I, IV XII and XIII of Titan's Amended Complaint. Since Hunt attached a copy of the Agreement - the authenticity of which has not been contested by any party to this action - to its Motion to Dismiss, this Court may consider the contents of the Agreement without converting the Motion to Dismiss to a Motion for Summary Judgment. *See Pension Benefit,* at 1196-97.

Second, the Wagner Certification only contains information relating to the issue of whether or not Titan *actually* complied with all conditions precedent to bringing forth litigation or arbitration under the Agreement. As further discussed below, that information is not relevant to the resolution of these motions. *See infra,* note 5. Its inclusion in the pleadings does not compel the conversion of the motions to dismiss to motions for summary judgment.

This Court will therefore review these motions under the Rule 12(b)(6) standard of review.

[*8]

B. HUNT'S MOTION TO DISMISS COUNTS I THROUGH X

1. **Failure to plead with sufficient particularity (Count II - Fraud, and Count VII - Negligent Misrepresentation)**

*a. Fraud*

Neither party contests that the pleading requirements of Fed. R. Civ. P. 9(b) apply to Titan's claim of Fraud. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). "[A] plaintiff can meet this heightened pleading standard by alleging the identify of the person who made the alleged misrepresentation, the general content of the misrepresentation, along with the date, place and time the representation was made." *Folkman v. Roster Fin., LLC,* 2005 U.S. Dist. LEXIS 18117, No. 05-2099, 2005 WL 2000169, at *5 (D.N.J. Aug. 16, 2005), citing *Lum v. Bank of America,* 361 F.3d 217, 224 (3d Cir. 2004).

This Circuit has, however, been relatively flexible in its application of Fed. R. Civ. P. 9(c). "Plaintiffs are[, for example,] free to use alternative means of injecting precision and some [*9] measure of substantiation into their allegations of fraud." *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir. 1984) (holding that plaintiffs, by identifying with specificity the pieces of machinery that were the subject of the alleged fraud, and the nature and subject of the alleged misrepresentation, could withstand a motion to dismiss under 9(b) despite their failure to "describe the precise words used."); *see also United States v. Kensington Hosp.,* 760 F. Supp. 1120, 1125 (E.D. Pa. 1991) (holding that plaintiff had met 9(b) standards by identifying the time period during which the alleged fraud occurred and identifying some of the locations of the alleged fraud). Courts may also relax the requirements of Rule 9(b) upon a showing that the necessary "factual information is peculiarly within the defendant's knowledge or control." *In re Craftmatic Sec. Litig.,* 890 F.2d 628, 645 (3d Cir. 1989).

This Court finds, however, that Titan has failed to meet even the flexible Rule 9(b) standard adopted by this Circuit. *See Kensington,* 760 F. Supp. at 1125 ("The standard for 9(b) is a generous [*10] one in this Circuit"). Indeed, Titan's allegation of fraud is limited to the following statements:

> . "Hunt assured Titan that the Owner's engineer for the Project . . . would work with Titan and its engineer . . . to integrate the panelized wall system into the design of the steel superstructure of the building.

These representations were false." Am. Compl. P 8.

. "Titan repeatedly advised Hunt of the need to have approved final drawings in order to commence fabrication but Titan's concerns were either ignored or met with promises to cooperate which went unfulfilled." Am. Compl. P 8.

. "Hunt [ceased payments to Titan] knowing . . . that Titan had significantly completed fabrication and commenced installation based upon Hunt's promises that it would pay Titan for all its work . . . . Hunt's representations with respect to its intention to pay Titan were false and fraudulent." Am. Compl. PP 14-15.

Titan has not alleged the identify of the person(s) who made misrepresentations, describes only very briefly the nature of the misrepresentations, and presents the court with only minimal information regarding the time and place the representations were made. Moreover, [*11] Titan fails to provide the Court with "alternative means of injecting precision and some measure of substantiation into their allegations of fraud," *see Seville*, at 791, and does not argue that the necessary "factual information is peculiarly within the defendant's knowledge or control." *Craftmatic*, 890 F.2d at 645. Titan has therefore failed to plead its allegation of fraud with sufficient particularity, and Count II is therefore dismissed with leave to amend within 10 days of filing of this opinion.

*b. Negligent Misrepresentation*

Titan does however appear to have adequately plead its claim of negligent misrepresentation. That claim is not subject to the heightened pleading requirement of Fed. R. Civ. P. 9(b), and will instead be reviewed under the default pleading standard of Fed. R. Civ. P. 8(a). *See Resolution Trust Corp. v. Re Castellett*, 1993 U.S. Dist. LEXIS 21267, No. 92-4635, 1993 WL 719764, at *3 (D.N.J. Sep. 7, 1993) ("At the outset, the Court notes that Rule 9(b) does not reach claims grounded in negligence.").

Under Federal Rule of Civil Procedure 8(a) [*12], "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). "Thus, the complaint need only provide a statement sufficient to put the opposing party on notice of the claim." *Sunset Fin. Res., Inc. v. Redev. Group V, LLC*, 417 F. Supp. 2d 632, 648 (D.N.J. 2006), *quoting Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001). "In the context of a negligence claim, a bare allegation of negligence is sufficient." *Sunset*, at 648, *citing Sierocinski v. E.I. Du Pont de Nemours & Co.*, 103 F.2d 843, 843-44 (3d Cir. 1939) (a general allegation of negligence such as "defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway" is sufficient.); *see also United States v. Pinnacle Elecs.*, No. 03-2416, 2005 U.S. Dist. LEXIS 37668, at *16 (M.D. Pa. June 15, 2005) ("Pinnacle alleges that Bell made misrepresentations regarding the conditions of the ducts on a specific construction project. Thus, we find that Pinnacle's negligent [*13] misrepresentation allegations are sufficient to place Bell on notice of the conduct for which Pinnacle seeks recovery.").

Plaintiff here has briefly described the nature of the misrepresentations at issue (the promise to provide Titan with the essential drawings necessary for the design of the Wall System, Am. Compl. P 8; the promise to pay Titan for extra costs incurred as a result of delays in construction, *id.* at PP 14, 75). The Court deems these allegations sufficient to put Hunt on notice of the conduct for which Titan seeks recovery. Titan's negligent misrepresentation claim therefore satisfies the pleading requirements of Fed. R. Civ. P. 8(a). However, defendant Hunt's motion to dismiss Count VII will be granted on other grounds, as set forth below.

**2. The Economic Loss Doctrine (Count VII - Negligent Misrepresentation, and Count VIII - Negligent Contract Administration)**

Hunt argues that Titan's claims for Negligent Misrepresentation and Negligent Contract Administration are barred under the Economic Loss Doctrine. Hunt Br. 5-6. "Th[at] doctrine bars a plaintiff from recovering purely economic losses suffered as a result [*14] of a defendant's negligent or otherwise tortious behavior, absent proof that the defendant's conduct caused actual physical harm to a plaintiff or his property." *Public Service Enter. Group, Inc. v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 193 (D.N.J. 1989); *see also Kirtley v. Wadekar*, No. 05-5383, 2006 U.S. Dist. LEXIS 60309, at *11 (D.N.J. Aug. 24, 2006) ("The economic loss doctrine, put simply, holds that purchasers of personal property, whether commercial entities or consumers, should be limited to recovery under contract principles.") (quotations omitted); *Shan Indus. LLC v. Tyco Int'l (US), Inc.*, No. 04-1018, 2005 U.S. Dist. LEXIS 37983, at *14 (D.N.J. Sept. 12, 2005) ("the doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract.") (quotations omitted).

While the doctrine has predominantly been applied in connection with transactions for goods, *see, e.g., Kirtley*, 2006 U.S. Dist. LEXIS 60309 at *11; *Alloway v. General Marine Indus., L.P.*, 149 N.J. 620, 695 A.2d 264 (N.J. 1997), it has also been found, in New Jersey, to

apply to contracts for services. *See Bracco Diagnostics Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557 (D.N.J. 2002) [*15] (applying doctrine to service contract); *Dynalectric Co. v. Westinghouse Electric Corp.*, 803 F.Supp. 985 (D.N.J. 1992) (applying doctrine to subcontract for construction of electrical power plant).

In the case at bar, it is beyond dispute that the loss allegedly experienced by plaintiffs is purely economic. Titan does not claim to have suffered any physical injury or any injury to its property. It is also apparent that the validity of the Agreement has not, at this point, been disputed by the parties. This Court therefore holds that Titan's Negligent Misrepresentation and Negligent Administration of a Contract claims are precluded under the Economic Loss Doctrine. *See Dynalectric,* at 991 (in case involving dispute relating to subcontract for construction services, Court holding that "under New Jersey law, when a party has suffered economic loss because of the negligent actions of another, and the party has another means of redress against the alleged tortfeasor, that party may not assert the identical claims for identical damages under tort theories."). n3 Counts VII and VIII are therefore dismissed.

> n3 This Court has held that fraudulent or negligent misrepresentations that *induce* a plaintiff to enter into the contractual agreement may still be the basis for a tort claim, as such a claim would not be barred by the economic loss doctrine. *Parrino v. Swift,* No. 06-0537, 2006 U.S. Dist. LEXIS 40361, at *8-10 (D.N.J. June 19, 2006). Titan's negligent misrepresentation claim however, relates merely to a "subsequent failure of the promisor to do what he has promised," and thus, "is not recoverable in tort." *Parrino,* 2006 U.S. Dist. LEXIS 40361 at *8, *quoting Bracco,* 226 F. Supp. 2d at 563 (D.N.J. 2002).

[*16]

**3. Counts barred by existence of a valid contract (Count III - Anticipatory Breach/Repudiation, Count V - Quantum Meruit, Count VI - Conversion, Count IX - Unjust Enrichment, and Count X - Constructive Trust)**

Hunt argues that Titan's equitable counts should be dismissed because "quasi-contractual liability will not be imposed when a valid, unrescinded contract governs the rights of parties." Hunt Br. 6-7, *citing Nat'l Amusements, Inc. v. N.J. Turnpike Auth.,* 261 N.J. Super. 468, 619 A.2d 262 (N.J. Super. Ct. Law Div. 1992). Hunt misconstrues the import of Fed. R. Civ. P. 8(e).

Under the Federal Rules of Civil Procedure:

> [a] party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on [*17] legal, equitable, or maritime grounds.

FED. R. CIV. P. 8(e)(2).

A plaintiff may therefore put forth contractual, quasi-contractual and other equitable claims for relief in its complaint, even if the plaintiff has not sought rescission of the contract. *Verizon New Jersey, Inc. v. Ntegrity Telecontent Services, Inc.,* 219 F. Supp. 2d 616, 635 (D.N.J. 2002); *see also Dykstra v. Ryder/P.I.E. Nationwide, Inc.,* No. 85-3212, 1985 WL 25639, at *5 (D.N.J. Dec. 9, 1985) ("It is a determination of the trial court whether plaintiff has an adequate remedy at law. Should the court decide that the plaintiff is not entitled to recovery pursuant to a contractual theory, then it may in turn deal with one equitable theory."). The cases cited by Hunt are inapposite, either because they do not address Fed. R. Civ. P. 8(e), *see, e.g., Nat'l Amusements,* 261 N.J. Super. 468, 619 A.2d 262; *Fiedler, Inc. v. Coast Fin. Co.,* 129 N.J. Eq. 161, 18 A.2d 268 (N.J. 1941), or because they merely reaffirm the uncontested truth that *recovery* under quasi-contractual or other equitable claims [*18] is precluded in the presence of a valid contract. *See Van Orman v. The American Ins. Co.,* 680 F.2d 301, 310 (3d Cir. 1982) (court reviewing partial grant of summary judgment and holding that "recovery under unjust enrichment may not be had when a valid, unrescinded contract governs the rights of the parties.").

While it is true that some of plaintiff's quasi-contractual or other equitable claims may be dismissed as inconsistent at a later time in these proceedings, it is far to early to do so now. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 975 F. Supp. 584, 621-22 (D.N.J. 1996) (refusing to dismiss plaintiff's unjust enrichment claim, on the grounds that it was too early in the proceedings to determine whether the relationship between the parties was governed by a valid and enforceable contract.); *Dykstra,* 1985 WL 25639, at * 5-6

(D.N.J. Dec. 9, 1985) (refusing to dismiss unjust enrichment and *quantum meruit* claims put forth by plaintiff alongside contractual claims, on the grounds that the court would eventually determine whether any of these claims were precluded.). n4 The Court will therefore not dismiss Plaintiff's quasi-contractual and equitable claims [*19] at this time.

n4 Hunt appears to argue that claims are not plead "in the alternative" unless that particular phrase or its equivalent appears on the face of the Amended Complaint. Hunt Rep. Br. 7-8. This Court refuses to enforce such a meaningless requirement.

This Court will therefore dismiss Counts II, VIII and VIII against Hunt, and deny Hunt's Motion to Dismiss as to all other Counts.

**4. Conditions precedent under the Agreement (Count I - Breach of Contract, and Count IV - Breach of the Implied Duty of Good Faith and Fair Dealing) n5**

n5 On January 6, 2006, Titan filed a Motion to Strike parts of Hunt's Reply Brief in Further Support of the Motion to Dismiss Counts I-X of Plaintiff's Complaint, alleging that Hunt had erred in discussing the earlier proceedings in this case before the New Jersey Superior Court, and in particular, that court's alleged conclusion that Titan had not satisfied the Conditions Precedent under paragraph 34.2 of the Agreement. *See* Titan Mot. Strike, at 4-6; *see also* Hunt Rep. Br. 11. This Court finds that Hunt's argument was proper, since Titan had addressed these prior proceedings in its Opposition Brief. *See* Titan Opp. Br. 22-23; *see also Bayer AG v. Schein Pharma., Inc.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001) ("It is axiomatic that reply briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent has refuted."), quoting *Elizabethtown Water Co. v. Hartford Casualty Ins. Co.*, 998 F. Supp. 447, 458 (D.N.J. 1998). Titan's Motion to Strike is therefore hereby denied.

This Court finds, however, that neither Titan's nor Hunt's discussion of these prior proceedings are relevant to the issue of whether or not Titan met the pleading requirements for a condition precedent. Accordingly, those parts of the pleadings will not be taken into account in ruling on the present Motions to Dismiss.

[*20]
Hunt argues that plaintiff's claims under the Agreement are to be dismissed on the grounds that Titan failed to properly allege compliance with all conditions precedent set out in said Agreement. *See* Hunt Br. 8, *citing* Weisman Decl. Ex. A, P 34.2 ("As a condition precedent to initiating any court or arbitration proceeding . . . the Subcontractor must first comply with the provisions set forth herein."). Hunt errs in its interpretation of the applicable pleading requirement.

Federal Rule of Civil Procedure 9(c) provides that: "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred." FED. R. CIV. P. 9(c). Plaintiffs here have plead full compliance with the provisions of the Contract, including the provisions relating to the conditions precedent to arbitration or litigation, at paragraphs 89 and 110 of their Amended Complaint. *See* Am. Compl. P 89 ("Titan has fully performed all of its obligations under the Subcontract."); *see also id.* at P 110 ("Titan has performed its obligations [*21] under the Subcontract and has not breached the covenants of good faith and fair dealing as they relate to the Subcontract.").

Plaintiff here has thus adequately plead that it has met all conditions precedent under the Agreement. *See Video Pipeline v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 562 (D.N.J. 2002) (motion to dismiss denied when plaintiff had "generally averred" that it had fulfilled the condition precedent in its answer); *Internet Law Library, Inc. v. Southridge Capital Mgmt. LLC*, 223 F. Supp. 2d 474, 490 (S.D.N.Y. 2002) (plaintiff's averment that it had "performed its obligations under th[e] agreement" sufficient to satisfy the requirements of Rule 9(c)). Hunt's motion to dismiss Counts I and IV must therefore be denied.

**C. COUNTS XII AND XIII AGAINST THE SURETIES**

Just as Hunt sought to dismiss Counts I and IV under the Agreement, the Sureties now petition this Court to dismiss Count XII and XIII - Titan's claims against them under the Agreement. The Sureties claim that proceedings before the New Jersey Superior Court establish that Titan has not complied with the conditions precedent set out in the Agreement, [*22] and that Titan's claims under the Agreement must be dismissed because Titan has failed to plead that it complied with all said conditions precedent. *See* Sureties Br. 4-8.

The Sureties' Motion to Dismiss must be denied for the same reasons that Hunt's Motion to Dismiss Titan's claims under the Agreement was denied above. Titan has

Case 1:05-cv-00434-GMS   Document 220-2   Filed 01/05/2007   Page 8 of 15

Page 7
2006 U.S. Dist. LEXIS 70569, *

plead its compliance with the conditions precedent in the Agreement in a manner sufficient to meet the standard of Fed. R. Civ. P. 9(c). *See supra,* at 13. In addition, while the Sureties are entitled to discuss the procedural history of this case before the Superior Court of New Jersey in their pleadings, *see supra,* note 5, this Court finds that those events have little bearing on the crucial issue here - whether or not Titan's compliance with all conditions precedent set out in the Agreement was alleged with sufficient particularity. Counts XII and XIII against the Sureties will not be dismissed.

## III. CONCLUSION

For the foregoing reasons, this Court will grant in part and deny in part Hunt's Motion to Dismiss Counts I through X of Titan's Amended Complaint, and will deny the Sureties' Motion [*23] to Dismiss Counts XII and XIII of Titan's Amended Complaint. Specifically, the Court will dismiss Count II, Count VII and Count VIII. An appropriate form of Order accompanies this Memorandum Opinion.

Dated September 26, 2006

s/ Garrett E. Brown, Jr.

GARRETT E. BROWN, JR., U.S.D.J.

METEX MFG. CORPORATION, Plaintiff,-v-IAN MANSON AND MANSON ENVIRONMENTAL CORPORATION, Defendants.

Civ. No. 05-cv-2948 (HAA)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

2006 U.S. Dist. LEXIS 54891

August 4, 2006, Decided

NOTICE: [*1] NOT FOR PUBLICATION

COUNSEL: For METEX MFG. CORPORATION, Plaintiff: JAMIE P. CLARE, COLE SCHOTZ, HACKENSACK, NJ.

For IAN MANSON, MANSON ENVIRONMENTAL CORPORATION, Defendants: JOHN F. OLSEN, WILLIAM W. ROBERTSON, ROBERTSON, FREILICH, BRUNO & COHEN, LLC, NEWARK, NJ.

JUDGES: Harold A. Ackerman, U.S.D.J.

OPINION BY: Harold A. Ackerman

OPINION:

### OPINION & ORDER

ACKERMAN, Senior District Judge:

This matter comes before the Court on a motion by Defendants Ian Manson ("Manson") and Manson Environmental Corporation ("MEC") to dismiss for lack of personal jurisdiction the Complaint filed by Plaintiff Metex Manufacturing Corporation ("Metex" or "Plaintiff") (Docket No. 7). Additionally, Plaintiff has filed a motion for leave to file a sur-reply (Docket No. 17). For the reasons discussed below, both motions are DENIED.

### BACKGROUND

Metex, a New York corporation based in New Jersey, is suing MEC, a Canadian company, and Manson, MEC's president, sole shareholder and principal operating officer, for fraudulent inducement, breach of contract, breach of the covenant of good faith and fair dealing, and replevin.

Metex manufactures, among other things, knitted mesh "substrates" that [*2] are used to create small engine catalysts. If the substrates undergo a manufacturing process whereby they are coated with precious metals, they can be used as mufflers in small engines. By 1998, Metex was interested in expanding its business from automotive parts into the manufacture and supply of small engine parts. Redem, Inc. ("Redem") n1, a research and development company that coated parts for the automotive industry, introduced Manson to Richard Wojtovitz ("Wojtovitz"), Metex's Senior Sales and Marketing Manager, as an expert in coating metallic and nonmetallic substrates. At that time, Manson was a principal in the IM Manufacturing Co. ("IM"), an automotive equipment company, in Oakville, Ontario, and assisted Metex on behalf of Redem to provide samples for engine testing for a Wisconsin company called Tecumseh Engine. n2 However, Tecumsah Engine declined to use Metex as a supplier of catalysts, largely because, at that time, there were no laws requiring small engines to have catalysts.

---

n1 Note that Plaintiff refers to Redem, Inc., an American company doing business in Chicago, while Defendants insist Manson was never employed by Redem, Inc., but rather by Redem Canada, Inc. Further, Manson says that he was introduced to Metex by Redem Canada, Inc., not by Redem, Inc.

[*3]

n2 Defendants assert that neither MEC nor Manson was advised as to the identity of the customer for whom the coating was performed. They claim that while these coated samples requested by Metex may have ultimately been provided to Tecumsah Engine, neither Defendant ever worked directly with that company.

---

Then in June 2001, Wojtovitz learned, while on a sales call at Electrolux Home Products ("EHP") that a new Federal law would by 2005 require all hand-held engines in the United States to be equipped with catalysts. Metex, eager to take advantage of the opportunities arising from this new law, contacted Manson again. Manson, also seeking to benefit from this opportunity

Case 1:05-cv-00434-GMS   Document 220-2   Filed 01/05/2007   Page 10 of 15

Page 2
2006 U.S. Dist. LEXIS 54891, *

and acting on behalf of MEC, began to provide technical assistance to Metex, who actively solicited potential customers and gave presentations. Metex asserts that Manson's support helped to convince customers to work with Metex and to confirm that Metex had the skill and ability to produce and test parts in compliance with customer specifications for coated catalysts. Manson eventually agreed to visit customers with Metex and to [*4] make technical presentations as a representative of his newly-formed company, MEC.

In October of 2002, Manson traveled to Metex's offices in New Jersey. Manson claims he simply went to tour the facilities as a representative of MEC. On the contrary, Metex maintains that Manson came to solicit Metex's business, solidify his and MEC's relationship with Metex, and plan the necessary course of action for them to jointly obtain large coating contracts and mass-produce coated small engine parts on a long-term basis. In March 2003, Manson signed a non-compete agreement with Metex, providing in part that it would be "construed and interpreted in accordance with the laws of the State of New Jersey." n3 It prevented MEC from designing, soliciting, quoting or selling catalysts of the type that incorporated the knitted wire mesh substrate.

<div style="margin-left:2em">

n3 The Confidentiality, Intellectual Properties and Non Compete Agreement states: "The Agreement shall be construed and interpreted in accordance with the laws of the State of New Jersey." (Plaintiff's Exhibit B, Exhibits pg. 4 to the Declaration of Paul Messina.)

</div>

[*5]

During May and June of 2004 alone, Manson accompanied Metex's representatives on eight sales calls at different customer's offices in the United States. Throughout those trips, Metex paid in United States dollars for Manson's airfare, lodging and per diem compensation for his services. In May, they traveled to Wisconsin and went to Briggs & Stratton, Tecumsah Engine, Kohler Engine, Harley Davidson and Nelson Industries. In June, they went to Onan Engine, Arctic Cat, and Polaris in Minnesota. Also in June, according to Metex, it ultimately obtained a contract with Engineered Exhaust Systems/B-T, Inc. ("EES"), as a result of Manson's active solicitation of EES's business. n4 The contract called for Metex to deliver 1 million coated catalysts from New Jersey. Although Manson alleges that he "came to understand" that EES was a Metex customer, Metex maintains that Manson portrayed himself as an expert parts coater, provided documents to Metex to include in its written presentation to EES, visited EES with Metex's representatives, and invited EES's principals to his facility in Canada in order to observe his production facilities firsthand.

<div style="margin-left:2em">

n4 Defendants argue that while Manson had a general understanding that EES was a potential customer for the coated catalysts and visited EES with Metex, he was unaware of the details of the relationship between Metex and EES. However, Defendants admit that Metex did arrange for EES to visit the MEC facility in Canada. Additionally, Defendants claim that Manson believed the products MEC produced were going to EHP, and was unaware that EES was the customer.

</div>

[*6]

Moreover, Metex claims that Manson purchased more than $125,000 worth of coating equipment for MEC to perform under its contract with Metex. Further, Metex asserts that Metex's representatives traveled to Canada to help Manson assemble and install it. During July and August of 2004, Metex and Manson corresponded frequently by phone and email to arrange various individual purchase orders, each for more than 1 million parts, hundreds of thousands of which were to be manufactured by MEC and delivered to Metex in New Jersey. Beginning in December of 2004, MEC began shipping coated catalysts to Metex pursuant to the aforementioned purchase orders. Over the next 3 months, MEC shipped more than 575,000 coated catalysts to Metex pursuant to the purchase orders. As per their contract, Manson personally verified that the parts MEC produced and shipped to Metex met Metex's and EES's specifications.

In February of 2005, Metex discovered through independent laboratory testing that MEC's coating of its wire mesh substrates was not to specification. Metex notified MEC and Manson immediately, and demanded corrective action. Representatives of Metex traveled to MEC's facility in Canada and met with [*7] Manson on various occasions in attempts to help Manson uncover the problem and create a solution. During this time, EES demanded that corrective action be taken so to avoid the shut-down of its manufacturing facility in China and its customer EHP's facility in Arkansas. EES informed Metex that its catalysts failed EHP's engine performance tests. Additionally, four independent laboratories employed by Metex reported test results showing that the majority of MEC's parts failed to meet EES or Metex specifications.

Manson was unable to explain the discrepancy between his own tests for specification and the independent laboratory tests. However, Manson admitted that the parts shipped were not coated to specification, as a result

of improper testing, and that MEC was unable to coat them to specification. On March 21, 2005, MEC issued the 7-step Corrective Action Plan ("Corrective Action Plan"), which was signed by Manson and sent to Metex. Specifically, the Corrective Action Plan admits that "[a]nalyses of parts from the first three production lots were found to contain insufficient quantities of Platinum Group Metals (PGM) Platinum, Palladium and Rhodium," and that "MEC deviated from [*8] the analytical process for the sake of expediency. Rather than use the Atomic Absorption equipment which was not correctly operational, a combination of absolute weight gain and x-ray analysis using scanning electron microscope was implemented." n5 Despite issuing the Corrective Action Plan, MEC halted further production of catalysts and demanded payment for all of the catalysts that it coated and recoated upon return, notwithstanding whether the catalysts met Metex's specifications.

n5 Corrective Action Plan - Exhibit C to Brief of Plaintiff, Metex Mfg. Corporation, in Opposition to Defendants' Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction.

Metex filed suit against Manson and MEC, alleging that Manson lied about his abilities as a coater and fraudulently induced Metex to enter into a contract with MEC, and that MEC breached their contract. Metex claims that Manson personally assured Metex that he and MEC were capable of producing parts to specification, when in fact, they did not have the [*9] ability or the resources to do so. Metex also claims that Manson misrepresented that he and MEC would perform certain tests on the coated catalysts before shipping them to Metex in New Jersey, when in fact, neither he nor MEC intended to perform or actually performed those tests.

As a result of MEC's and Manson's misrepresentation and breach of contract, Metex claims that it has incurred losses for nonconforming goods, parts that needed to be thrown away, consulting fees, travel, laboratory testing, and legal expenses currently exceeding $ 445,000. Moreover, MEC lost the business of EES, who decided to contract with an alternate vendor of coated catalysts. Further, EES has demanded payment from Metex of more than $ 461,262 for shipping and loss of the mufflers it manufactured using the faulty catalysts.

Defendants Manson and MEC moved to dismiss the complaint in lieu of an answer. They assert a lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). They insist that all of the relevant discussions, negotiations, processing, manufacturing, and testing occurred in Canada, and that the defendants and the crucial evidence [*10] for the case are located in Canada. Moreover, the alleged breach of contract and fraudulent inducement took place in Canada, and the materials related to the replevin claim are in Canada. Manson is the founder and sole shareholder of MEC. MEC employs just four individuals, has its principal place of business and a manufacturing facility in Ontario, Canada, does not have any offices, facilities or property outside of Canada, and only pays taxes to the Canadian government. MEC is not licensed to do business in New Jersey, does not have offices, bank accounts or financial assets, a postal mailing address, or telephone and fax numbers there or anywhere else in the United States. MEC does not have an internet website, and it does not advertise in or purchase supplies from New Jersey. MEC also claims that Metex is its only United States customer. Therefore, Manson and MEC claim that the exercise of jurisdiction over them by this Court would not only offend the Due Process Clause of the United States Constitution, but also any common sense notions of fair play and substantial justice.

*ANALYSIS*

**I. Defendants' Motion to Dismiss Fails As Metex Has Stated Sufficient Facts to [*11] Support An Exercise of Specific Jurisdiction Over Defendants**

Federal Rule of Civil Procedure 12(b)(2) permits a court to dismiss a complaint, or a count therein, for lack of personal jurisdiction. When a defendant raises a possible lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction exists and of "present[ing] a prima facie case for the exercise of personal jurisdiction by establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Malay. Int'l Shipping Corp. v. Sinochem Int'l Co.*, 436 F.3d 349, 364 (3d Cir. 2006) (quoting *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)) (internal quotation marks omitted). The plaintiff should demonstrate that there is a "nexus between the defendant, the forum and the litigation" to establish *in personam* jurisdiction. *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 149 (3d Cir. 2001). The plaintiff may show either general or specific personal jurisdiction. *Id.* Here, while New Jersey does not have general jurisdiction over Defendants, [*12] the State may exercise specific jurisdiction over them.

**A. General Jurisdiction Not Applicable To Defendants**

Defendants are not subject to general jurisdiction in New Jersey. General jurisdiction exists when the defendant's contacts with the forum are "continuous and systematic," even where the connection between the defendant's contacts and the litigation are insufficient to amount to specific jurisdiction. *Int'l Shoe Co. v. Wash-*

Case 1:05-cv-00434-GMS    Document 220-2    Filed 01/05/2007    Page 12 of 15

Page 4
2006 U.S. Dist. LEXIS 54891, *

*ington,* 326 U.S. 310, 317, 66 S. Ct. 154, 90 L. Ed. 95 (1945); *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 416, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). The contacts between the defendant and the forum do not have to be "specifically related to the underlying cause of action" for the exercise of personal jurisdiction to be legitimate. *Pinker v. Roche Holdings, Ltd.,* 292 F.3d 361, 368 (3d Cir. 2002).

In *BP Chemicals,* the Third Circuit found that although the defendant exported its products to the United States, it had no personnel or facilities in the forum state, nor did it advertise or solicit business there. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 262 (3d Cir. 2000) (quoting *Burger King,* 471 U.S. at 475). [*13] Thus, the Court was unable to conclude that the company had a continuous presence in the United States. *Id.* Likewise, MEC exports products to New Jersey, but it is undisputed that it has no personnel or facilities here and has not advertised here. Although MEC has not directly solicited its own business here in the United States, Manson, on behalf of MEC, has helped Metex to obtain additional customers by providing technical support to Metex during sales presentations. Nevertheless, this court does not find that Manson's visits to the United States, which occurred over the space of a few months, are sufficient to establish general jurisdiction over either Manson or MEC in New Jersey. In their briefs in support of the motion to dismiss, Defendants have successfully argued in opposition to general jurisdiction; however, as discussed below, Defendants are unable to muster a successful opposition to this Court's exercise of specific jurisdiction over Metex and MEC.

### B. Specific Jurisdiction Standard

Specific jurisdiction exists over a defendant when that defendant has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries [*14] that arise out of or relate to those activities." *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 96 (3d Cir. 2004) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)) (internal quotations and citation omitted). The Due Process Clause of the Fifth Amendment mandates that for specific jurisdiction the defendant must first have "constitutionally sufficient 'minimum contacts' with the forum." *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 451 (3d Cir. 2003) (quoting *Burger King,* 471 U.S. at 474).

"Minimum contacts" signifies "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Toys "R" Us,* 318 F.3d at 451 (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 109, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)). The requirement of purposeful availment guarantees that the defendant will not be subject to jurisdiction only because of "'random,' 'fortuitous.'or 'attenuated' contacts. . . ." *BP Chemicals,* 229 F.3d at 259 (quoting *Burger King,* 471 U.S. at 475). [*15] The Supreme Court has held that a nonresident defendant who "purposefully directs" his activities at forum residents may legitimately be subject to jurisdiction in that forum. *BP Chemicals,* 229 F.3d at 259 (quoting *Burger King,* 471 U.S. at 475).

According to Federal Rules of Civil Procedure, a federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law. *Miller Yacht Sales,* 384 F.3d at 96 (3d Cir. 2004). *See* Fed.R.Civ.P. 4(e); *See also Carteret Sav. Bank, FA v. Shushan,* 954 F.2d 141, 150 (3d Cir. 1992). New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution. *Miller Yacht Sales,* 384 F.3d at 96; *See* N.J. Court Rule 4:4-4(c); *See also Charles Gendler & Co., v. Telecom Equipment Corp.,* 102 N.J. 460, 508 A.2d 1127 (1986). Thus, parties who have constitutionally sufficient "minimum contacts" within New Jersey are subject to suit here. *Miller Yacht Sales,* 384 F.3d at 96; *See Carteret Sav. Bank,* 954 F.2d at 149. [*16]

Additionally, subjecting the defendant to a particular court's jurisdiction must comport with "traditional notions of fair play and substantial justice." *Toys "R" Us,* 318 F.3d at 451 (quoting *Int'l Shoe,* 326 U.S. at 316). It will generally not be unfair to subject a defendant to the burdens of litigating in another state for disputes relating to his interstate activities, since "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *BP Chemicals,* 229 F.3d at 260 (quoting *Burger King,* 471 U.S. at 474). Moreover, "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *BP Chemicals,* 229 F.3d at 260 (quoting *Burger King,* 471 U.S. at 473). New Jersey has an interest in protecting its residents and corporations from the injuries inflicted by out-of-state and foreign actors, and in preventing breaches of contract from affecting its economy and commercial operations. Additionally, it [*17] would be unjust to allow actors to "purposefully derive benefit" from their interstate activities, but to not hold them accountable for consequences arising out of those activities in other states. *BP Chemicals,* 229 F.3d at 260 (quoting *Burger King,* 471 U.S. at 473-4).

### C. By Their Actions, Defendants Have Established the Requisite Minimum Contacts To Subject Them to Specific Jurisdiction in this Forum

Case 1:05-cv-00434-GMS   Document 220-2   Filed 01/05/2007   Page 13 of 15

Page 5
2006 U.S. Dist. LEXIS 54891, *

In this case, Metex has asserted that Manson and MEC engaged in specific conduct and correspondence with Metex in regard to Metex's New Jersey business, such that Defendants are subject to the jurisdiction of this court. Manson and MEC have purposefully conducted business with Metex, a company operating in New Jersey. They have thereby engaged in the requisite minimum contacts to constitute purposeful availment of the privilege of conducting activities within the forum State, which justifies this Court's exercise of personal jurisdiction over them.

According to *Burger King*, in which the Supreme Court held that the district court's exercise of personal jurisdiction pursuant to Florida's long-arm statute did not violate the Due Process Clause [*18] of the Fourteenth Amendment, a single contact that creates a substantial connection with the forum may be sufficient to support the exercise of personal jurisdiction over a defendant. *Burger King*, 471 U.S. at 475. Since the defendants were Michigan residents who operated a franchise within Michigan and the franchiser-plaintiff was a Florida corporation with its principal offices in Miami, the defendants argued that the Southern District of Florida lacked jurisdiction over them. *Id.* at 464, 466. In finding that the franchisee-defendants were subject to suit in Florida, the Supreme Court held it was not solely the existence of the contract between the parties that established minimum contacts and therefore personal jurisdiction over the defendant, but rather jurisdiction rested on the existence of the contract combined with the "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479. The appellee, an "experienced and sophisticated" businessman, formed a long-term relationship and "substantial connection" with Burger King's Miami headquarters, was familiar with its policies, [*19] and had notice from the governing contracts that the franchise relationship was established in Miami and governed by Florida law. *Id.* at 479, 484. The Supreme Court found there to be personal jurisdiction and emphasized that jurisdiction would not be found lacking merely because the defendant was not physically present in the forum, especially considering the modern nature of commercial transactions. *Id.* at 476.

In contrast, in *BP Chemicals*, the Third Circuit held that the non-resident's communications with a forum resident for the purpose of establishing a contract and furthering the contractual relationship were insufficient to establish the minimum contacts required for specific jurisdiction. *BP Chemicals*, 229 F.3d at 261. The contracts in question were for a solitary purchase of equipment on only one occasion, and that equipment was to be shipped to Taiwan. *Id.* Moreover, the contracts were solicited and negotiated through Taiwanese agents. *Id.* Additionally, the arbitration clause provision in the contract did not specify the law of any particular American jurisdiction that would govern potential disputes, but merely stipulated venue selection. [*20] *Id.* at 262. Thus, the Court found that the forum lacked specific jurisdiction over the defendant.

The Third Circuit has instructed in General Electric that when reviewing contract cases for jurisdiction, a court should consider "whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *GE v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001). In *General Electric*, the plaintiff, a New York corporation with manufacturing facilities in Pennsylvania, entered into a contract with a German corporation, whose parent company and guarantor was the defendant in this case. *Id.* at 149. When the defendant failed to provide the additional funding requested by the plaintiff, as per the contract, the plaintiff brought suit in federal court in Pennsylvania. *Id.* The Third Circuit affirmed the District Court's ruling that the defendant's contacts with Pennsylvania, "in the course of pre-contract negotiations and post-contract visits ... in an effort to resolve the parties' dispute," sufficed to constitute specific jurisdiction. *Id.* The defendant had maintained extensive correspondence [*21] and physical contacts with the forum of Pennsylvania, including visiting the plaintiff's Pennsylvania facilities. Notably, at the Pennsylvania site, the parties engaged in discussions regarding the development of their joint business ventures, of which the defendant's role as guarantor was an essential element. *Id.* at 152. Thus, the Court found that the defendant's behavior amounted to "'purposeful direction' of business activity" toward the plaintiff, and that the suit "arose out of [defendant's] contractual endeavors." *Id.*

Moreover, the Third Circuit has said that it is not significant in determining specific jurisdiction to focus on which party initiated the relationship. *Carteret Sav. Bank*, 954 F.2d at 150. In *Carteret Savings Bank*, the Court disregarded whether the plaintiff invited the out-of-state defendant to its New Jersey meeting or whether the defendant himself initiated the meeting. *Id.* Instead, the Court determined that telephone calls and letters to New Jersey, in addition to the defendant's attendance at one meeting with the Plaintiff in New Jersey pertaining to an important transaction, constituted minimum contacts sufficient [*22] to establish personal jurisdiction. *Id.*

Here, neither the existence of a non-compete agreement between the Defendants and Plaintiff nor the contract's choice-of-law clause, which states that the agreement will be "construed and interpreted in accordance with the laws of the State of New Jersey," is sufficient on its own to create a substantial connection that establishes

Case 1:05-cv-00434-GMS    Document 220-2    Filed 01/05/2007    Page 14 of 15

Page 6
2006 U.S. Dist. LEXIS 54891, *

specific jurisdiction. *Burger King Corp*, 471 U.S. at 478, 481. However, *Burger King* does suggest that those two factors, combined with the existence of an ongoing interdependent relationship between the parties, here evidenced by the continuous correspondence, Manson's visit to Metex's New Jersey facilities, and Manson's willingness to accompany Metex at sales presentations throughout the United States on behalf of MEC, would constitute purposeful availment.

Defendants' contacts with Metex in New Jersey were integral both in the formation of their contract and the breach of contract. Plaintiff and Defendants have been in contact since 1998. Defendants have provided technical assistance to Plaintiff since 2001. Defendants have shipped parts to Plaintiff in New Jersey. Further, they essentially [*23] operated as a sales and manufacturing team throughout the United States during the last several years. Manson's October 2002 visit to New Jersey solidified his and his company MEC's relationship with Metex, and it set the stage for their joint long-term contracts with other companies requiring coated substrates. Defendants convinced Plaintiff that MEC could properly coat its mesh substrates to meet Metex's and its customers' specifications. Once the parties agreed upon specifications, amounts and prices, Defendants improperly coated the substrates and shipped those defective products to New Jersey. Although Manson insists that he was a passive participant and that Metex actively sought out his and MEC's business, identifying which party initiated the relationship has no bearing on the question of personal jurisdiction. *Carteret Sav. Bank*, 954 F.2d at 150. In sum, Defendants established the requisite minimum contacts to be subject to specific jurisdiction.

**D. The Exercise Of Jurisdiction Comports With Traditional Notions of Fair Play and Substantial Justice**

Once it is clear that a defendant has established the requisite minimum contacts, it is necessary to determine [*24] whether the exercise of jurisdiction "comports with traditional notions of fair play and substantial justice." *Toys "R" Us*, 318 F.3d at 451(quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)). If the exercise of jurisdiction does comport with those "traditional notions," then the defendant "should reasonably anticipate being haled into court" in that forum. *Toys "R" Us*, 318 F.3d at 451 (quoting *World-Wide Volkswagen*, 444 U.S. at 297). In order to successfully challenge jurisdiction pursuant to a fairness analysis, a defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Miller Yacht Sales*, 384 F.3d at 97 (quoting *Burger King*, 471 U.S. at 477). A court may consider various factors when determining fairness in this context, including: the forum State's interest in adjudicating the dispute; the shared interest of the several States in furthering fundamental substantive social policies; the burden on the defendant; and the plaintiff's interest in obtaining the most efficient resolution of controversies. [*25] *Miller Yacht Sales*, 384 F.3d at 97 (quoting *Burger King*, 471 U.S. at 477).

The Third Circuit determined in *Mesalic v. Fiberfloat Corp.* that Fiberfloat, a Florida resident, would not be unduly burdened by the expenses of litigating in New Jersey. *Carteret Sav. Bank*, 954 F.2d at 151; *Mesalic v. Fiberfloat Corp.*, 897 F. 2d 696 (3d Cir. 1990). It held that New Jersey had a "valid interest in protecting its residents from damages arising out of the sale by a nonresident of a defectively manufactured product." *Carteret Sav. Bank*, 954 F.2d at 151; *Mesalic*, 897 F. 2d at 701. Likewise, here, New Jersey has a valid interest in protecting Metex from losses suffered as a result of MEC's defectively manufactured product and Manson's fraudulent inducement.

New Jersey has a very strong interest in ensuring that contracts entered into under its laws are not breached or fraudulently induced. Manson and MEC profited from MEC's commercial activity in the United States, as a result of its relationship with this New Jersey corporation, and they should not be allowed to break the laws of the several [*26] states, particularly New Jersey's, with impunity. Further, the several States, including those other States with companies affected by the Defendants' defectively-coated products, have a common interest in preventing foreign companies doing business in the United States from failing to perform on their contracts.

Based on the length and persistence of their contact and on the closeness of their business relationship with Metex, as well as on the selection of New Jersey law for the resolution of issues related to their non-compete agreement, Manson and MEC should have been cognizant that they may be haled into court in New Jersey. Moreover, any claimed burden on the Defendants is not so heavy as to outweigh the other factors. Although MEC is a Canadian corporation and Manson is a Canadian citizen, they had no difficulty engaging in economic activity in the United States and visiting New Jersey. They have already shown that travel to New Jersey and other States in the United States is not only convenient for them, but is simply part of their ongoing business enterprise. Further, their lawyers would be able to take advantage of modern conveniences to diminish any potential inconvenience. [*27]

Finally, conducting the litigation in federal court in New Jersey is obviously the most convenient and efficient method for Plaintiff, whose business operates in the State. It will not have to transport witnesses and docu-

ments to another location. Therefore, Defendants' contacts with New Jersey are sufficient to subject both Manson and MEC to personal jurisdiction in the State, without offending traditional notions of fair play and substantial justice.

## II. Plaintiff's Motion for Leave to File a Sur-Reply Is Denied

On October 24, 2005, Plaintiff requested leave to file the Declaration of Gregory Vongas as part of a sur-reply to Defendants' motion to dismiss for lack of personal jurisdiction. Defendants oppose the motion on grounds that Plaintiff merely seeks to re-assert its version of the facts in opposition to their motion to dismiss, and that New Jersey Local Rules of Federal Procedure do not permit such a filing when Plaintiff already had its opportunity to provide full disclosure and to preserve the record in its opposition.

"It is axiomatic that Reply Briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent [*28] has refuted. The rationale for this rule is self-evident - because the local rules do not permit sur-Reply Briefs, see L.Civ.R. 7.1(d), a party opposing [a motion] has no opportunity to respond to newly-minted arguments contained in Reply Briefs." *CIBC World Markets, Inc. v. Deutsche Bank Securities,* 309 F. Supp.2d 637, 645 (D.N.J. 2004) (quoting *Bayer AG v. Schein Pharmaceutical, Inc.,* 129 F. Supp.2d 705, 716 (D.N.J. 2001)) (internal quotations omitted). In *Venuto v. Carella,* the Third Circuit recognized the plaintiff's adversarial tactic of filing a sur-reply to be "sandbagging." *Venuto v. Carella,* 11 F.3d 385, 388 (3d Cir. 1993). After the defendants filed their reply brief, the plaintiff filed a sur-reply, a five-page memorandum reasserting the same arguments that the plaintiff presented on appeal. *Id.* The Court said that the district court acted within its discretion when it did not consider the sur-reply, that it was proper not to consider it, and that issues not raised in the district court are waived upon a appeal. *Id.*

Because Plaintiff has demonstrated no extraordinary circumstances justifying the proposed [*29] sur-reply, and because Plaintiff already had an opportunity in its opposition brief to provide full disclosure and to preserve the record, Plaintiff's request for leave to file a sur-reply is DENIED.

### Conclusion

For the foregoing reasons, it is hereby ORDERED on this 4th day of August 2006 that Defendants' motion to dismiss the Complaint is DENIED. Additionally, Plaintiff's motion for leave to file a sur-reply is DENIED.

Newark, New Jersey
Dated: August 4, 2006

s/ Harold A. Ackerman, U.S.D.J.