# SCHEDULE 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **DYSON TECHNOLOGY LIMITED** | ) |
| **and DYSON, INC.,** | ) |
| **Plaintiffs,** | ) |
| | ) **Civil Action No. 05-434 GMS** |
| **v.** | ) |
| | ) |
| **MAYTAG CORPORATION,** | ) **REDACTED – PUBLIC VERSION** |
| **Defendant.** | ) |
| | ) |

## STIPULATED STATEMENT OF UNCONTESTED FACTS

C. Barr Flinn
John W. Shaw
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

Garrard R. Beeney
Richard C. Pepperman, II
James T. Williams
Adam R. Brebner
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Steven F. Reich
Jeffrey S. Edelstein
John F. Libby
Tamar Feder
Christopher A. Cole
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10004

*Attorneys for*
*Plaintiffs/Counterclaim Defendants Dyson*
*Technology Limited and Dyson, Inc.*

Francis DiGiovanni
Connolly Bove Lodge & Hutz
The Nemours Building
1007 N. Orange Street
Wilmington, DE 19899
Phone (302) 658-9141
Fax (302) 658-5614

Kimball R. Anderson
Stephen P. Durchslag
Winston & Strawn
Chicago, IL 60601
Phone (312) 558-5600
Fax (312) 558-5700

Ray L. Weber
Laura J. Gentilcore
Renner, Kenner, Greive, Bobak,
Taylor & Weber
400 First National Tower
Akron, OH 44308
Phone (330) 376-1242
Fax (330) 376-9646

*Attorneys for Defendant/Counterclaim*
*Plaintiff Maytag Corporation*

## STATEMENT OF UNCONTESTED FACTS

IT IS HEREBY STIPULATED AND AGREED that the following facts are uncontested and shall become a part of the evidentiary record:

1.     Plaintiff Dyson Technology Limited is a corporation organized and existing under the laws of England and Wales and has its principal place of business in Malmesbury, England.

2.     Plaintiff Dyson Inc. is a corporation organized and existing under the laws of the State of Illinois and has its principal place of business in Chicago, Illinois.

3.     Dyson Inc. distributes Dyson vacuum cleaners in the United States.

4.     The Hoover Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in North Canton, Ohio.

5.     Dyson Inc. conducts business, including distributing the vacuum cleaners at issue in this suit, throughout the United States, including the State of Delaware.  This Court has personal jurisdiction over Dyson for the purposes of adjudicating Hoover's counterclaims.

6.     Hoover conducts business throughout the United States, including the State of Delaware.  Hoover is subject to personal jurisdiction in the District of Delaware.

7.     The current action pertains to upright vacuum cleaners.

8.     On February 17,1987, United States Patent No. 4,643,748 was issued to Notetry Limited, as assignee of inventor James Dyson, for a device entitled "Cleaning Apparatus" (the "'748 Patent"). Plaintiff Dyson Technology Limited owns and holds the rights to the '748 Patent. The '748 Patent expired on February 24, 2006.

9.     The '748 Patent was enforceable as to infringement prior to itsexpiration.

10.     On May 2, 1989, United States Patent No. 4,826,515 was issued to Prototypes, Ltd., as assignee of inventor James Dyson, for a device entitled "Vacuüm Cleaning Apparatus"

(the "'515 Patent"). Plaintiff Dyson Technology Limited owns and holds the rights to the '515 Patent. The '515 Patent expired on May 2, 2006.

11.    The '515 Patent was enforceable as to infringement prior to its expiration.

12.    On August 1, 1989, United States Patent No. 4,853,008 was issued to Notetry Limited, as assignee of inventor James Dyson, for a device entitled "Combined Disc and Shroud for Dual Cyclonic Cleaning Apparatus" (the "'008 Patent," together with the '748 Patent and '515 Patent, "the patents in suit"). Plaintiff Dyson Technology Limited owns and holds the rights to the '008 Patent. The '008 Patent expires in July 2008.

13.    The '008 patent is enforceable as to infringement.

14.    Maytag developed and manufactured a vacuum cleaner called the Hoover "Fusion" employing a cyclonic separation system. Maytag began selling the Hoover Fusion vacuum cleaner in the United States in May 2005.

15.    In March 2006, Maytag began selling a modified version of the Hoover Fusion (hereinafter, "the Modified Fusion").  Dyson does not contend that the Modified Fusion infringes any of the patents in suit.

16.    ██████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████

17.    Maytag/Hoover does not contest the validity or enforceability of the three patents-in-suit in this action.

18.    Dyson Inc. distributes and markets certain Dyson upright vacuum cleaner models in the United States, including the DC07, DC14, and DC 15.

19.     At the time this suit was filed, Dyson Inc. and Hoover were competitors in the United States market for premium priced upright vacuum cleaners.

20.     Dyson vacuum cleaners are manufactured in part from components made of acrylonitrile butadiene styrene and polycarbonate.

21.     The Hoover Company was not a party to a lawsuit in the United Kingdom by Dyson Appliances Limited and The Hoover Company has not yet been found liable for infringement of Dyson patents. ████████████████████████████████████

████████████████████████

41102596.1

# SCHEDULE 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DYSON TECHNOLOGY LIMITED and          )
DYSON, INC.,                          )
                                      )
              Plaintiffs,             )
                                      )
        v.                            )    C.A. No. 05-434-GMS
                                      )
MAYTAG CORPORATION,                   )
                                      )
              Defendant.              )
                                      )

**SCHEDULE 2**

**AGREED STATEMENT OF CONTESTED ISSUES OF FACT AND LAW (PATENT)**

        The following is a list of contested issues of fact and law with respect to Dyson's

patent infringement claims to which the parties have agreed.

**Issues for the Jury**

    1.    **Infringement.**  Dyson contends that the Hoover Fusion vacuum cleaner

sold by Maytag/Hoover beginning in May 2005 infringes claim no. 14 of United States Patent

No. 4,826,515 (the "'515 patent"), claim nos. 15, 16 and 17 of United States Patent No.

4,463,748 (the "'748 patent") and claim nos. 1, 2, 3, 7, 11, 23, 24 and 25 of United States Patent

No. 4,853,008 (the "'008 patent").  The jury will need to determine the following contested

issues with respect to the infringement of these claims by the accused device:[1]

---

[1]    Maytag/Hoover does not contest that the Hoover Fusion meets the remaining elements of
the above-listed claims of the patents in suit.  Maytag/Hoover does not concede to the
presentation of expert testimony regarding the doctrine of equivalents, apart from that presented
in the expert reports herein, nor that the doctrine of equivalents is available for the recited claim
elements.

(a)    whether the Hoover Fusion includes "a dirty air inlet [to outer container]," as
       construed by the Court to mean "a passage by which dirty air flows into the outer
       container of the cleaning apparatus" (for all claims);

(b)    if so, whether said inlet is at "an upper portion of the outer container" of the
       Hoover Fusion (for claims of '515 and '748 patents only);

(c)    if so, whether said inlet is "oriented for supplying dirt laden air into the container
       tangentially to the interior surface of the outer container" as construed by the
       Court to mean "oriented for supplying dirt laden air into the container generally in
       a direction perpendicular to the radius of the interior surface of the outer
       container" (for all claims);

(d)    whether the Hoover Fusion includes "an air outlet from the container" (for all
       claims);

(e)    whether the Hoover Fusion includes a "cyclone air inlet . . . in air communication
       with the air outlet of the container" (for all claims);

(f)    whether the dirt receiving and collecting chamber of the Hoover Fusion has a
       "minimum diameter furthest from the [cone] opening of 3 times the diameter of
       the cone opening" as a matter of literal infringement (for claim of '515 patent
       only);

(g)    whether the Hoover Fusion includes a ring seal between "the [dirt receiving and
       collecting] chamber and [the] outer container" (for claim of '515 patent only);

(h)    whether the Hoover Fusion includes "a motor driven fan unit positioned vertically
       above and immediately adjacent to the cyclone outlet port" or any equivalent
       thereof for purposes of the "means for generating airflow" means-plus-function

- 2 -

element of [all claims] [claim no. 14 of the '515 patent] [Note: Whether this is an issue for all claims or only claim no. 14 of the '515 patent will be the subject of a Dyson motion in limine.];

(i)     whether the Hoover Fusion includes a disc "provided on the outside of the cyclone intermediate the receiving chamber and air outlet of the container" (for claims of '748 patent only);

(j)     if so, whether said disc "retards long strands in the dirt from clogging the air outlet and retains the strands in the container" (for claims of '748 patent only);

(k)     whether the Hoover Fusion shroud is "mounted at one end below the air inlet to the cyclone" (for claims of '008 patent only);

(l)     whether the Hoover Fusion shroud has "perforations adjacent to the position intermediate to the cone opening" (for claims of '008 patent only);

(m)    whether the Hoover Fusion includes a disc "provided on the shroud means at a lower longitudinal extent of the shroud means and the air inlet of the cyclone and around the axis of the cyclone" (for claims of '008 patent only); and

(n)     if so, whether said disc "aids in dirt removal in the first container by preventing some of the dirt from flowing into the air inlet to the cyclone" (for claims of '008 patent only).

2.     **Reasonable Royalty Damages.** If the jury determines that the Hoover Fusion infringes one or more of the patents in suit, the jury will need to determine a reasonable royalty rate to which Dyson is entitled for Maytag/Hoover's infringement of Dyson's patent(s).

3.    **Willfulness of Infringement.**  If the jury determines that the Hoover Fusion infringes one or more of the patents in suit, the jury will need to determine whether Maytag/Hoover's infringement was willful.

## Issues for the Court

4.    **Enhanced Damages for Willful Infringement.**  If the jury determines that Maytag/Hoover's infringement of one or more of the patents in suit was willful, the Court will need to determine the amount of enhanced damages to which Dyson is entitled pursuant to 35 U.S.C. § 284.

5.    **Reasonable Attorney's Fees and Expenses.**  The Court will need to determine whether this is an exceptional case entitling Dyson or Maytag/Hoover to its reasonable attorney's fees and expenses pursuant to 35 U.S.C. § 285 and the amount thereof.[1]

6.    **Interest.**  If the jury determines that Dyson is entitled to damages, the Court will need to determine whether Dyson is entitled to pre-judgment interest pursuant to *General Motors Corp.* v. *Devex Corp.*, 461 U.S. 648 (1963) and 35 U.S.C. § 284 and post-judgment interest pursuant to 28 U.S.C. § 1961.

---

[1]    Should the Court determine that Dyson or Maytag/Hoover is entitled to its reasonable attorney's fees and expenses, Dyson or Maytag/Hoover will submit evidence of such amounts post-trial.

# SCHEDULE 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DYSON TECHNOLOGY LIMITED )
and DYSON, INC., )
    Plaintiffs, )
  )
v. )  **Civil Action No. 05-434 GMS**
  )
  )
MAYTAG CORPORATION, )  **REDACTED – PUBLIC VERSION**
    Defendant. )
  )

### DEFENDANT/COUNTERPLAINTIFF HOOVER, INC.'S
### STATEMENT OF CONTESTED ISSUES OF FACT AND LAW

Kimball R. Anderson
Stephen P. Durchslag
Winston & Strawn
Chicago, IL  60601
Phone (312) 558-5600
Fax (312) 558-5700

Ray L. Weber
Laura J. Gentilcore
Renner, Kenner, Greive, Bobak,
Taylor & Weber
400 First National Tower
Akron, OH  44308
Phone (330) 376-1242
Fax (330) 376-9646

Francis DiGiovanni
Connolly Bove Lodge & Hutz LLP
The Nemours Building
1007 N. Orange Street
Wilmington, DE  19899
Phone (302) 658-9141
Fax (302) 658-5614

The following is Defendant/Counterclaim Plaintiff Hoover, Inc.'s ("Hoover") Statement of Contested Fact and Law:

## I.    CONTESTED ISSUES OF FACT ON INFRINGEMENT

1.    Hoover will comment after receiving from Dyson its draft of these contested issues of fact related to Dyson's patent claims.

## II.    CONTESTED ISSUES OF LAW ON INFRINGEMENT

1.    Hoover will comment after receiving from Dyson its draft of these contested issues of law related to Dyson's patent claims.

## III.    CONTESTED ISSUES OF FACT ON FALSE ADVERTISING

### The Parties

**Creation of Dyson Advertising**

4.    The advertising and marketing of Dyson vacuums in the United States is

8.    The claims made in Dyson's advertising, including the Dyson advertising that
runs on television and appears in print in the United States,

**Profits from the Sale of Dyson Vacuums in the U.S.**

14.    The main Dyson subsidiary in the U.S. is Dyson Technology, Inc.,

Dyson, Inc. is a direct subsidiary of Dyson Technology, Inc.

4

## <u>Advertising Claims in the U.S.</u>

20.

The advertising claims for Dyson's DC07, DC14, DC15 and DC17 vacuum cleaners that are relevant to this suit can be broken down into several categories:

21.

    a. Other vacuum cleaners use bags and filters, which clog with dust so they lose suction. Dyson is different because it doesn't rely on bags or filters so it never clogs and never loses suction.

    b. Bags, filters, they all clog with dust and lose suction. But a Dyson works differently. Its creates 100,000 times the force of gravity to spin dirt out of the air, so nothing gets clogged, ever.

    c. Dyson is the only vacuum in the world that never loses suction while releasing fresh, clean air into your home.

    d. [A Dyson] doesn't lose suction.

    e. The first vacuum cleaner that doesn't lose suction.

    f. Only a Dyson is designed not to lose suction.

    g. Only a Dyson is designed to not lose suction. Which make you wonder, what are the others designed to do?

    h. Unlike other vacuum cleaners, Dyson doesn't lose suction.

    i. [A] Dyson never loses suction no matter how much you vacuum.

    j. Because a Dyson doesn't clog like other vacuums, its suction power remains constant, room after room, after room.

    k. While all other vacuums begin to lose suction immediately--either through bags or filters--the suction power of a Dyson remains constant room after room.

    l. A Dyson doesn't lose suction no matter how far you vacuum.

    m. Room after room after room a Dyson doesn't lose suction.

    n. I [James Dyson] was so frustrated with my old vacuum cleaner – it clogged quickly with dust, destroying the suction. So I set about developing an entirely new one to solve the problem. More than 5,000 prototypes later I had it – the first vacuum cleaner that doesn't lose suction.

o.  So I [James Dyson] thought I'd try and design something better.  A few thousand prototypes later, I had it.  No bags, no clogged up filters and the first vacuum that doesn't lose suction.

p.  After 14 years and 5,127 prototypes, we had it.  A vacuum that works as it should.  It doesn't lose suction.

q.  Fact: Vacuums don't always work effectively.  Dyson does.

r.  Five years and 5,127 prototypes later, the world's first cyclonic bagless vacuum cleaner arrived.

s.  [James Dyson] found that the filter used in a typical bagless system clogs as the container fills.  Indeed, he discovered that vacuum cleaners can lose up to 50 percent of their suction after picking up just 10 ounces of dust.  Five years and 5,127 prototypes later, Dyson came up with a solution – the world's first vacuum cleaner that doesn't lose suction.

t.  Picks up larger dirt and debris that others leave behind.

u.  Other vacuums can lose up to half their suction power after a small amount of dust.  Dyson doesn't - it keeps its suction power room after room.

v.  The most powerful upright.

w.  The most powerful upright vacuum cleaner available.

x.  The most powerful upright for pet hair.

y.  The Root[8]Cyclone has the highest suction power and picks up more dirt from your home.

z.  Dyson scientists developed the Root[8]Cyclone technology to give higher suction power and pick up more dust.

aa. More cyclones give higher suction power.

bb. Double the suction of other vacuums.  After 10 oz of dust.

cc. Although manufacturers are reluctant to admit it, vacuums on the market today quickly lose suction.  Not Dyson.  In fact, after picking up just ten ounces of dust, a Dyson has double the suction power of other vacuums.

dd. When it comes to vacuuming, nothing is more important than suction.

7

ee. Higher volumes of air are spread simultaneously through many cyclones to give higher constant suction power - which means you pick up even more dust.

ff. Wide channel picks up large debris that others can leave behind.

gg. DC07 upright delivers constant suction power to pick up more dirt from your home.

hh. The Dyson cyclones create 100,000 times the force of gravity to spin dirt out of the air, so nothing gets clogged, ever.

ii. The Dyson Root[8]Cyclone™ DC07 upright delivers constant suction power to pick up more dirt from your home.

jj. The DC07 vacuum is therefore able to remove even the finest dust particles.

kk. The new Dyson-engineered Contact-head™ articulates responsively at the neck to maintain close contact with all floor surfaces even as you pull backwards. This means it picks up more dust from your home than conventional floor tools.

ll. Video depicting Dyson vacuum picking up more dirt and steel balls than Dyson's competitors' vacuums.

mm. [A] Dyson works differently, It uses 100,000 times the force of gravity to spin the dirt out of the air. So nothing clogs. And it doesn't lose suction. Ever.

nn. Unlike other vacuums, the suction of a Dyson doesn't fade.

oo. Dirt and dust are thrown out of the airflow and collected in the bin, not on filters or in bags.

pp. Ever since the vacuum cleaner was invented its had a basic design flaw... bags, filters, they all clog with dust then lose suction. The technology simply doesn't work.

qq. When vacuum cleaners lose suction, your first instinct is to shake or hit it to unblock the clog. The problem, however, is more serious. Bags, filters, they all clog with dust and lose suction. I just think things should work properly.

rr. Other vacuums – the more you use them, the less they work.

ss. Dyson vacuum cleaners create 100,000 times the force of gravity to spin the dirt out of the air.

tt. Dyson Root[8]Cyclone technology uses 100,000 G of centrifugal force in the cyclones to filter dust from the airflow efficiently.

8

uu. Approved for allergy sufferers.

vv. Dyson vacuum cleaners are hygienic and quick to empty.

ww. Dyson vacuum cleaners are made of Liquid Steel.

xx. Even the integral hose, seen on most upright vacuum, cleaners, is a Dyson invention.

yy. Dyson . . . invented cyclone technology.

zz. One of the largest UK vacuum manufacturers tried to imitate a Dyson, and James Dyson was forced back into court to protect his invention again … The High Court last week agreed with James Dyson that Hoover had stolen the secrets of his dual-cyclone vacuum cleaner.

aaa. The packaging for Dyson upright vacuum cleaner models sold in the United States also includes the following suction power chart and similar charts:



22.    Dyson's false advertising claims

9

23.    Dyson places the vacuum cleaners

into interstate commerce.

A.    Dyson's false and misleading claims.

**Literal Falsity**

25.    Dyson's claims that its vacuums

c.

d.  Despite knowing that its vacuums

27.    Dyson's claims that its vacuums

a.

b.  Dyson's recommendation in its owners' manuals that consumers

suction during that six-month period.

11

a.

IEC 60312, clause 2.9 was never intended to measure or substantiate claims that a vacuum cleaner has constant suction or does not lose suction. IEC 60312, clause 2.9 simply represents testing of a vacuum based on a single loading of dust. It does not purport to represent real-world conditions or the ability of a vacuum to maintain suction over time. IEC 60312, clause 2.9 has never been correlated to real-world conditions.

12

    b.  In real-world conditions,

29.    Dyson's claims of superior

13

30.    Dyson's claims that it picks up

**Implied Falsity**

31.    Dyson's advertising conveys to consumers that its vacuums

15

16

33.    Finally, all of Dyson's claims are implicitly false because

34.    Dyson's claims that other vacuums ›

C.    <u>Dyson's false claims that its vacuums are :</u>

D.    <u>Dyson's false claims that its vacuums create</u>

18

a.

E.    <u>Dyson's false claims that</u>.

F.    <u>Dyson's false claims that its upright vacuums are</u>

G.    <u>Dyson's false claims that Dyson</u>

H.    <u>Dyson's false claims that Hoover</u>

42.    Dyson's claims that Hoover was found liable for infringing

<u>**Consumers in the U.S.**</u>

20

## Hoover was Injured by Dyson's False Advertising

47.    Hoover has been damaged and, as a result, lost sales due to false and misleading advertising by Dyson in the U.S. market for vacuum cleaners.

**IV.    CONTESTED ISSUES OF LAW ON FALSE ADVERTISING**

54.    Hoover's claims against Dyson under the Lanham Act are established by proving

the following elements by a preponderance of the evidence: (1) that Dyson has made false or

misleading statements as to its own product, or another's, *e.g.*, Hoover's; (2) that there is actual

deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that

the deception is material in that it is likely to influence purchasing decisions; (4) that the

advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to

22

the plaintiff in terms of declining sales, loss of good will, etc. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 586 (3d Cir. 2002); *Warner-Lambert Co. v. Breathasure, Inc. ,* 204 F.3d 87, 96-97 (3d Cir. 2000).

55.     Liability under the Lanham Act arises in the false advertising context if the commercial message or statement is either: (1) literally false; or (2) literally true or ambiguous, but has the tendency to deceive customers. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 586 (3d Cir. 2002) (citing *Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 943 (3d Cir. 1993)); *see also Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.,* 735 F. Supp. 597, 600 (D. Del. 1989), *aff'd* 902 F.2d 222 (3d Cir. 1990).

56.     There need not be a direct comparison to a competitor for a statement to be actionable under the Lanham Act. *See Warner-Lambert Co. v. Breathasure, Inc. ,* 204 F.3d 87, 94 (3d Cir. 2000) (citing quotation in *Castrol Inc. v. Pennzoil Co.,* 987 F.2d at 946). Even where the advertisement did not specifically mention the competitor, the advertiser can be deemed to implicitly target a competitor. *See id.*

57.     Claims that rely on specific product attributes,  explicitly or implicitly rely on testing, or makes specific or measurable claims are not considered mere puffery. *See Castrol, Inc. v. Pennzoil Quaker State Co.,* 169 F. Supp. 2d 332, 335-36 (D.N.J. 2001).

**Literally False**

58.     A literally false claim may be (1) explicit; or (2) conveyed by necessary implication. *Novartis,* 290 F.3d at 586-87 (quoting *Clorox Co. v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 34 (1st Cir. 2000)). In the Third Circuit, "the test for literal falsity is simple[]; if a defendant's claim is untrue, it must be deemed literally false." *Castrol Inc. v. Pennzoil Co.,* 987 F.2d at 944.

23

59.    Dyson's advertisements are considered false by necessary implication when, considering the advertisements in their entirety, the audience would recognize the claims as readily as if they had been explicitly stated, and would unavoidably receive a false message from the product's name or advertising. *See Novartis*, 290 F.3d at 587; *see also Warner-Lambert Co. v. Breathasure, Inc.* , 204 F.3d 87, 96-97 (3d Cir. 2000); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d at 946.

60.    Although the plaintiff normally has the burden to demonstrate that the defendant's advertising claim is false, it may be found that a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence by plaintiff to that effect. *Novartis*, 290 F.3d at 590.

61.    If it is proven that the challenged claims are literally false, relief may be granted without considering whether the buying public was actually misled. *See Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994) (cited with approval in *Novartis*); *Sandoz Pharms.*, 735 F. Supp. at 600.

62.    Where a consumer can be expected to reasonably perceive that a defendant's advertising claim of superiority applies to the real world, the defendant must demonstrate a correlation between its laboratory tests and its real world superiority claim. *See Church & Dwight Co. Inc., v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 905 (D.N.J. 1994) (citing *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 127 (3d Cir. 1994)). Even where the defendant asserts that its claimed superiority is true in a laboratory setting, this does not rescue it from literal falsity if the laboratory test has no practical equivalent in the real world. *See id.* at 904.

**Impliedly False**

24

63.    If a plaintiff does not prove that a claim is literally false, it must prove that it is deceptive or misleading, which depends on the message that is conveyed to consumers. *Johnson & Johnson-Merck,* 19 F.3d at 129.

64.    The burden of proof is shifted to the defendant in Lanham Act cases, and a presumption arises that consumers are, in fact, being deceived, when a plaintiff has presented evidence of the defendant's intent to deceive the public. *Johnson & Johnson-Merck,* 19 F.3d at 130 (citing *Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,* 960 F.2d 294 (2d Cir. 1992)).

65.    Consumer reaction is the measure of an advertisement's impact. *Johnson & Johnson-Merck,* 19 F.3d at 129. A plaintiff can meet the burden of establishing how consumers actually react by relying on consumer surveys. *See Johnson & Johnson-Merck,* 19 F.3d at 129; *Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939, 943 (3d Cir. 1993). *See Church & Dwight Co.,* 873 F. Supp. at 906 (D.N.J. 1994). *See also American Home Products Corp. v. Proctor & Gamble Co.,* 871 F. Supp. 739, 760 (D.N.J. 1994) (requiring consumer surveys to demonstrate an implied false claim).

66.    They type of consumer survey questions companies employ when making consumer marketing decisions are the most accurate and reliable measure of actual consumer perception. *See Church & Dwight Co. Inc., v. S.C. Johnson & Son, Inc.,* 873 F. Supp. 893, 910 (D.N.J. 1994).

67.    A proponent of a survey must establish that it was conducted in accordance with accepted principles of survey research. *Church & Dwight Co. Inc., v. S.C. Johnson & Son, Inc.,* 873 F. Supp. 893, 903 (D.N.J. 1994) (citing *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir. 1978)). Among the factors that are included in accepted principles of survey

research are the following: (1) a proper universe must be examined and a representative sample chosen; (2) the survey must be conducted by experts; (3) the data must be properly gathered and reported; and (4) the survey should be objective. *See id.*

68.    The value of a survey may be determined by a number of factors including whether the survey is properly filtered to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading and suggestive. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 591 (3d Cir. 2002); *Church & Dwight Co. Inc., v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 903 (D.N.J. 1994); *American Home Products Corp. v. Proctor & Gamble Co.*, 871 F. Supp. 739, 750 (D.N.J. 1994).

69.    In Lanham Act cases, courts have found that surveys that indicate 15% confusion is sufficient to establish that a claim is misleading. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 594 (3d Cir. 2002) (citing cases); *Goya Foods, Inc. v. Condal Distribs., Inc.*, 732 F. Supp. 453, 457 n.7 (S.D.N.Y. 1990) (cited in *Novartis* and finding that 9-10% confusion was sufficient to demonstrate "meaningful evidence of actual confusion").

**Establishment Claims**

70.    If any of Dyson's advertisements explicitly or implicitly represent that tests or studies prove the advertised attribute, then they are "establishment claims." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992).

71.    An establishment claim can be implied from the context of the advertisement. *See BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994).

72.    In order to prove that an advertising claim based on product testing is literally false, the plaintiff must demonstrate that such tests are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made. *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 336 (D.N.J. 2001). A plaintiff may meet this burden either by attacking the validity of the defendant's tests directly or by showing that the defendant's tests are contradicted or unsupported by other scientific tests. Moreover, if the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has met its burden of demonstrating literal falsity. *Id.*; *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62-63 (2d Cir. 1992). *See also Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993); *AstraZeneca LP v. Tap Pharmaceutical Products, Inc.*, 444 F. Supp. 2d 278, 294 (D. Del. 2006).

73.    Tests that are neither industry-recognized nor correlated to the field cannot be relied upon to establish product superiority. *Church & Dwight Co. Inc., v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 903 (D.N.J. 1994). Tests that do not test the specific conditions contained in the claims, or are conducted on different models or versions of the product advertised do not support advertising claims. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 594-95 (3d Cir. 2002); *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 336-37 (D.N.J. 2001); *Upjohn Co. v. Riahom Corp.*, 641 F. Supp. 1209, 1224 (D. Del. 1986).

74.    Hoover may rely on data generated by Dyson as scientific proof that the challenged advertisement was false. *Callaway*, 384 F. Supp. 2d at 743 (citing *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991)).

**Delaware Deceptive Trade Practices Act And Common Law**

27

75.    The Delaware Deceptive Trade Practices Act is "intended to address unfair and deceptive trade practices that interfere with the promotion and conduct of another's business." *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 65 (Del. 1993); *Don's Hydraulics, Inc. v. Colony Ins. Co.*, 417 F. Supp. 2d 601, 612 (D. Del. 2006).

76.    Dyson has violated the Delaware Deceptive Trade Practices Act if Hoover proves by a preponderance that Dyson has done any of the following:

6 Del. C. § 2532(a) (2007).

77.    In order to establish a claim under the Delaware Deceptive Trade Practices Act, Hoover does not have to demonstrate any of the following: (1) competition between the parties; (2) actual confusion or misunderstanding; (3) existence of monetary damages or; (4) an intent to deceive. *See* 6 Del. C. § 2532(b) (2007); *see also Grand Ventures*, 632 A.2d at 67.

78.    Hoover, is allowed to seek redress under the Delaware common law of unfair competition in addition to pursuing a claim under the Delaware Deceptive Trade Practices Act. *See Moore North America, Inc. v. Poser Business Forms, Inc.*, No. 97-712-SLR, 2000 WL 14800992, at *7 (D. Del. Sept. 29, 2000); *Grand Ventures*, 632 A.2d at 67.

**Permanent Injunction**

79.    The Court must consider the following in order to grant a permanent injunction to enjoin Dyson's false advertising claims: (1) Hoover's success on the merits; (2) the probability

28

of irreparable injury to Hoover in the absence of relief; (3) the potential harm to Dyson; and, if applicable, (4) the public interest. *Fechter v. HMW Indus., Inc.,* 879 F.2d 1111, 1116 (3d Cir. 1989); *Church & Dwight Co. Inc., v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 903 (D.N.J. 1994).

80.    To prove irreparable injury, Hoover needs only to provide a reasonable basis for the belief that Hoover will likely be damaged as a result of the false advertising. *See Warner-Lambert Co. v. Breathasure, Inc. ,* 204 F.3d 87, 95-97 (3d Cir. 2000); *W.L. Gore & Assoc., Inc., v. Totes Inc.,* 788 F. Supp. 800, 810 (D. Del. 1992). Hoover's irreparable injury may include damage to its reputation, the loss of control of its reputation, loss of trade, and loss of goodwill, and does not have to include diversion of actual sales. *W.L. Gore & Assoc,* 788 F. Supp. at 810. Evidence of a loss of market share following the false advertising is sufficient evidence of irreparable injury. *Novartis,* 290 F.3d at 595-96.

81.    The public has an interest in not being deceived or confused. *W.L. Gore & Assoc,* 788 F. Supp. at 813-14; *see also Church & Dwight Co.*, 873 F. Supp. at 912.

82.    Under the principles of equity and on terms that the court considers reasonable, an injunction may be entered against Dyson if Dyson's false advertising will likely damage Hoover. Proof of monetary damage, loss of profits, or intent to deceive, is not required. 6 Del. C. § 2533(a) (2007).

**Damages**

83.    Hoover may recover: (1) the profits arising from Dyson's false advertising; (2) any damages Hoover sustained; and (3) the costs of the action. 15 U.S.C. § 1117(a); *Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 176 (3d Cir. 2005).

29

84.     Among Hoover's damages are: (1) Hoover's lost profits attributable to the false advertising; and (2) the amount necessary to undertake a corrective advertising campaign. *See* 44 Am. Jur. Proof of Facts 3d 1; *Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 741 (D. Del. 2005); *see also e.g., Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 640 (7th Cir. 2003); *Adray v. Adry-Mart, Inc.*, 76 F.3d 984 (9th Cir. 1995).

85.     There must be a rationale for awards for prospective corrective advertising. *See Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 741 (D. Del. 2005) (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374-76 (10th Cir.)). Courts may use Dyson's advertising budget in order to determine the appropriate amount for Hoover to undertake a corrective advertising campaign. *See e.g., Novell v. Network Trade Center, Inc.*, 25 F. Supp. 2d 1233, 1241 (D. Utah 1998) (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374-76 (10th Cir.)).

86.     The Court "may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a).

87.     Under the Delaware Act, "if damages are awarded to the aggrieved party under the common law or other statutes of this State, such damages awarded shall be treble the amount of the actual damages proved." 6 Del. C. § 2533(c) (2007).

**Profits Related to the False Advertising**

88.     An award based on the profits arising from Dyson's false advertising is allowed when: (1) Dyson has been unjustly enriched by its false advertising; (2) Hoover sustained damages due to Dyson's false advertising; or (3) such an award is necessary to deter Dyson from committing false advertising in the future. *See Banjo Buddies*, 339 F.3d at 178; *Wynn Oil Co. v.*

*Am. Way Serv. Corp.*, 943 F.2d 595, 606-07 (3d Cir. 1991). There is no requirement that Hoover prove that Dyson acted willfully in order to obtain the profits arising from Dyson's false advertising. *See Banjo Buddies*, 339 F.3d at 178.

89.    In assessing the profits arising from Dyson's false advertising, Hoover needs only to prove Dyson's sales. *See Banjo Buddies*, 339 F.3d at 176. Once Hoover proves Dyson's sales, the burden shifts to Dyson, and Dyson must prove all elements of cost or deduction claimed. 15 U.S.C. 1117(a). Dyson may not attempt to deduct distributions of profits or payments of compensation, dividends, or inter-company charges made to owners. *Banjo Buddies*, 339 F.3d at 176-77; *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.,* 914 F Supp. 210, 211 (N.D. Ill. 1995).

*See Banjo Buddies*, 339 F.3d at 176-78.

90.    There is no requirement that the profits arising from Dyson's false advertising approximate Hoover's damages. *Banjo Buddies*, 339 F.3d at 177; *see also Callaway Golf*, 384 F. Supp. 2d at 741. The limitation on actual damages, (*i.e.*, that they may be increased, but not to exceed three times the actual damage amount), has no application to an award based on profits arising from Dyson's false advertising. *Banjo Buddies*, 339 F.3d at 177

91.    If Dyson's actions are found to be willful by a preponderance of the evidence, Hoover is entitled to recover both its damages *and* the profits arising from Dyson's false advertising. *See Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 740 (D. Del. 2005); *Wynn Oil Co. v. American Way Service Corp.,* 943 F.2d 595, 606-07 (3d Cir. 1991).

92.    Evidence of Dyson's voluntary, knowing or intentional misconduct are considered indicators of willfulness. *See Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 742 (D. Del.

2005) (citing *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 341 (D.N.J. 2001)). Whether Dyson's false advertising affected other competitors in addition to Hoover does not serve to counter evidence that the false advertising was conducted at Hoover's expense. *Id.*

**Attorneys' Fees and Interest**

93.    Attorney fees are authorized to the prevailing party if the case was "exceptional." *See Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 747 (D. Del. 2005); 6 Del. C. § 2533(b) (2007).

94.    Whether the circumstances of this case are "exceptional," requires clear and convincing evidence of

*See Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 747 (D. Del. 2005) (citing *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir. 1991)).

95.    Whether to allow prejudgment interest is within the Court's discretion and normally reserved for "exceptional" cases, as defined above. *See Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 747 (D. Del. 2005) (citing *American Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 2000)).

**Standing and Choice of Law**

96.

When one corporation becomes the successor to another by merger or other acquisition, the acquirer-or obtains all litigation rights and interests of the acquired company. *See Luxliner P/L Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72 (3d Cir. 1993); *General Battery Corp. v. Globe Union, Inc.*, 100 F.R.D. 258, (D. Del. 1989) (allowing joinder of assignee of interests, which included right to counterclaim raised by original defendant). In light

of the fact that Hoover has

97.                                                                                    ,

See *Dainippon Screen Manufacturing Co., Ltd. v. CFMT, Inc. and CFM Technologies, Inc.*, 142 F.3d 1266, 1272-73 (Fed. Cir. 1998) (reversing dismissal of declaratory action regarding patent rights and finding that parent corporation could maintain the action thought wholly-owned subsidiary owned patents at issue; the subsidiary was not an indispensable party); *Centex Corp. v. United States*, 52 Fed. Cl. 599, 606-07 (2002) (denying government's motion to dismiss parent corporation for lack of standing despite the fact that subsidiary, and not the parent corporation, was signatory on contract).

98.

See *United HealthCare Corp. v. American Trade Ins. Co.*, 88 F.3d 563, 569 (8th Cir. 1996) (defendant waived right to have subsidiary substituted for plaintiff parent corporation where defendant waited until the pre-trial conference, nearly two years after action, to make argument); *Allegheny Intel, Inc., v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1431 (3d Cir. 1994) (defendant waived right to require successor to seller to be substituted as plaintiff where defendant waited until filing of motion for summary judgment); *Gogolin & Stelter v. Karn's Auto Imports, Inc.*, 886 F.2d 100, 102-03 (5th Cir. 1989) (holding that defendant waived real-party-in-interest defense by untimely assertion, where defendant raised it for the first time in a motion for directed verdict), *cert. denied*, 494 U.S. 1031 (1990); *Hefly v. Jones*, 687 F.2d 1383, 1388 (10th Cir. 1982) (finding real party in-interest-argument waived because it was not discussed until sixteen days prior to trial). Dyson sued Maytag, not The Hoover Company, and

33

defended against these counterclaims without ever seeking to add The Hoover Company or to dismiss Maytag as a party.

99.

Federal Rule of Civil Procedure 17 provides that no action shall be dismissed on the ground that it is not prosecuted by the real party in interest until a reasonable time has been allowed for the joinder or substitution of the real party in interest.    F.R.C.P. 17(a). Counterclaimants have timely moved to add Hoover as a party in this case.

100.                                                                      *See Neely v. Club Med Management Services Inc. et al.*, 63 F.3d 166, 180 (3d Cir. 1995); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1004 n.1 (3d Cir. 1980) (holding that parties waived any choice-of-law objection by not raising one);  *Laidlaw Inc. v. Student Transportation of America, Inc.*, 20 F. Supp 2d 727, 750 (D.N.J. 1998) (finding that parties who had proceeded as if New Jersey law applied to agreements that stated that they were governed by the laws of Ontario waived the ability to argue Ontario law applied).

34