# TAB A



**NATIONAL ADVERTISING DIVISION®**

70 West 36th Street, New York, NY 10018



NARC PARTNERS

AAAA

AAF

ANA

BBB

<u>BY MESSENGER</u>                                             Direct Line: (212) 705-0119

April 6, 2006

Jeffrey S. Edelstein, Esq.
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10036

**Re: Advertising for WindTunnel and Fusion Upright Vacuum Cleaners**

Dear Mr. Edelstein:

I am writing to advise you that NAD has concluded the investigation based on your challenge. The final case decision is enclosed. NAD's announcement to the press will follow by regular mail or by fax. Please note that NAD's findings may not be used for promotional purposes or to indicate impropriety by any party.

As stated in *NAD/NARB Procedures* at § 3.1(B), if Dyson, Inc. takes issue with NAD's decision, you have a ten-day period (ending April 20, 2006) within which you may request that a panel of the National Advertising Review Board review the decision. The granting of a panel review is at the discretion of the Chairman of the NARB. Your request for a panel review should be addressed to the Chairman, NARB, 70 West 36th Street, 13th Floor, New York, New York, 10018, and copies must be sent to all the parties. The entire appeal process is described in the *Procedures* at §§ 3.1 through 3.8. Please review it carefully.

We greatly appreciate your contribution to the self-regulation program and, in particular, to the resolution of this inquiry. If you have any questions, please do not hesitate to call.

Sincerely,

Jennifer Fried
NAD Attorney

cc:    Stephen P. Durchslag, Esq.

Enclosure

The National Advertising Division of the Council of Better Business Bureaus (CBBB). Policy is established by the National Advertising Review Council (NARC).

*Case #4467 (04/05/06)*

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**

| | |
|---|---|
| *Advertising Agency:* | *Undisclosed* |
| *Challenger:* | *Dyson, Inc.* |
| *Product Type:* | *Household Products* |
| *Issues:* | *Comparative Performance Claims* |
| *Disposition:* | *Modified* |

Advertising claims by The Hoover Company for its WindTunnel and Fusion Upright vacuum cleaners were challenged by Dyson, Inc., the manufacturer of Dyson vacuums. The claims at issue appeared in a wide variety of media, including television commercials, print ads, radio spots, websites, brochures, and product packaging.

The challenged television commercial featured the following dialogue.

> Person holding a Dyson vacuum cleaner: *"My vacuum is purple. They say it doesn't loose suction."*

> Second person with a Dyson vacuum cleaner: "*My vacuum makes me look good."*

> Third person with a Dyson vacuum cleaner: *"My vacuum was in a fashion magazine."*

> Person standing next to a Hoover vacuum: *"My vacuum's a WindTunnel and it cleans better than Dyson."*

> Voice-over: *"The self-propelled WindTunnel by Hoover cleans carpet 56% better than Dyson. It's proven by the only recognized test representing real-life conditions in American homes. After all, do you want people to look at your vacuum or your clean home?"; "Clean to the highest power."*

The following are representative of the other claims that served as the basis of the instant challenge:

> *"Dyson thinks things should work properly. We couldn't agree more. That's why our self-propelled WindTunnel picks up 56% more dirt than Dyson."*

> *"[WindTunnel] Picks up more dirt than any other brand."*

> *"The Hoover Self-Propelled WindTunnel Vacuum has been proven to extract more embedded dirt from horizontal floor surfaces than any other upright."*

> *"The Hoover® Self-Propelled WindTunnel picks up 56% more dirt than Dyson."*

> *"The self-propelled WindTunnel by Hoover cleans carpet 56% better than Dyson."*

> *"WindTunnel Technology ... They [dual air ducts] not only lift the dirt but trap it so it won't fall back into your carpet." [Accompanied by close up of cyclone logo]*

> *"[WINDTUNNEL] PICKS UP MORE DIRT THAN ANY OTHER UPRIGHT"*

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
**Page: 2**

*"[WINDTUNNEL]HEPA FILTER WITH ALLERGEN FILTRATION. Long-lasting 3-year HEPA Filter with allergen filtration traps 100% of dust mites, ragweed and common pollen."]*

*"[WindTunnel] TWIN CHAMBER BAGLESS SYSTEM HELPS MAINTAIN MAXIMUM PERFORMANCE"*

*"Patented WindTunnel Technology picks up more dirt than any other brand, including Dyson. Some vacuums pick up dirt, only to scatter it back down into your carpet."*

*"These results are based on ASTM International Test F608, the only recognized industry standard test representing real-life conditions found in American homes."*

*"[WindTunnel] 'No-Touch' Filter Cleaning System"*

*"[Fusion] Incredible cleaning power – every time you use it"*

*[WindTunnel] "PICKS UP MORE DIRT THAN ANY OTHER UPRIGHT ... Period!"*

*[WindTunnel] "PICKS UP OVER 70% MORE DIRT!" caption over chart comparing "All Hoover Self Propelled Uprights", "Oreck Model XL21-600 Upright", and "Dyson Model DC-07 Upright".*

*[WindTunnel and Fusion] "HEPA FILTER WITH ALLERGEN FILTRATION. Long lasting 3-year HEPA filter with allergen filtration traps 100% of dust mites, ragweed and common pollen."*

*[WindTunnel] "TWIN CHAMBER BAGLESS SYSTEM HELPS MAINTAIN MAXIMUM PERFORMANCE"*

*[Fusion] "Cyclonic technology offers powerful cleaning with no loss of suction."*

*[Fusion] "NO LOSS OF SUCTION"*

*"The Hoover® Fusion Cyclonic Bagless Upright Vacuum Outcleans Dyson by 13%"*

*[Fusion] "E-Z Empty Dirt Cup. No bags. No mess! Simply remove the cup, hold it over the trash and push the button to dump contents from the bottom."*

**Challenger's Position**

*I. Background*

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 3

The challenger explained that for many years, vacuums collected dirt and dust either by using a bag, or a bin combined with a large central filter. The challenger described both of these designs as "barrier filtration," and explained that the chief disadvantage of this method is that, while large dust particles settle to the bottom of the bag or bin, smaller dust particles clog the small holes in the bag or the filter, thereby creating a barrier to the airflow and losing suction power.

In contrast, the challenger explained, its DC07, DC14, and DC17 Dyson vacuums utilize a "root cyclone" layout, which uses centrifugal force to separate dirt particles of varying sizes. The significance of Dyson's mechanism of action, argued the challenger, is that unlike vacuums utilizing bags or bins, the challenger's machines never lose suction power, and therefore maintain a constant and continuous level of performance.

## *II. Implied Claims that the Challenger's Vacuum is Ineffective and Does Not Clean Properly*

The challenger contended that the challenged advertising implies that the challenger's Dyson vacuums are ineffective and do not clean properly. Specifically, the challenger objected to a television commercial for the WindTunnel (and a rotating website banner) which purportedly implies that consumers choose Dyson vacuums solely for their looks and style. The challenger argued that these advertisements convey the false and misleading message that the challenger's vacuum cleaners are ineffective.[1]

The challenger argued that its vacuums are highly effective. In addition to the above-described "root cyclone" system, the challenger noted its vacuums' advanced features including an "automatic brush control system" which protects rug fringes and the drive belt, a foot-operated on-off switch for the brush roll, automatic carpet-height adjustment, a reversible wand, a clear bin, on-board tools, and HEPA filtration.

### *a) Consumer Perception Survey*

The challenger submitted a consumer perception survey purporting to show that the commercial conveys the message that the advertiser's vacuums clean better than the challenger's vacuums. The survey was conducted online and was completed by 265 adults throughout the United States, all of whom were actual or potential purchasers of vacuum cleaners. After watching the commercial and being asked open-ended questions about the commercial's overall message, 250 respondents (94%) knew the advertised brand was Hoover, and were asked questions about any messages communicated about the Hoover. In addition, 206 respondents (78%) were aware that the other brand in the commercial was Dyson, and were asked questions about any messages communicated about the Dyson vacuum. The challenger further argued that 77% took away superiority messages relating to Hoover's superiority to Dyson, and 46% took away a variety of disparaging messages about the Dyson vacuum.

---

[1] According to the challenger, the claim that Dyson vacuum cleaners are ineffective is conveyed in the challenged television commercial as well as in WindTunnel print advertisements which claim that Dyson vacuums do not clean properly, as well as the hangtag stating that "some vacuums…pick up dirt, only to scatter it back down into your carpet."

THE HOOVER COMPANY
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 4

Contrary to the disparaging messages conveyed by this commercial, the challenger argued, the challenger's vacuums are proven to be more effective than the advertiser's. Specifically, the challenger argued that its vacuum has constant suction power, that it outperforms the WindTunnel on a variety of floor surfaces, and that it has low dust emissions.

### b) The Challenger's Dyson Vacuum is Proven To Be Effective

In support of the argument that its vacuum cleaner outperforms the WindTunnel on a variety of floor surfaces, the challenger noted that it has performed numerous efficacy tests on its vacuum cleaners using industry standards established by both ASTM International ("ASTM") and the International Electrotechnical Committee ("IEC").[2] The challenger argued that these tests demonstrate that Dyson vacuum cleaners outperform Hoover vacuums with respect to (i) suction power; (ii) performance on a variety of floor surfaces; and (iii) dirt emissions.

### (i) Suction Power Testing

The challenger maintained that its Dyson vacuum cleaners have constant suction power. The challenger defines suction power as "a combination of suction pressure generated by the vacuum cleaner and airflow" as defined in ASTM F558 and IEC 60312. The challenger noted that a decline in suction power may occur when dust collects inside a machine, and that such a dust-loaded condition is highly consumer relevant, as many vacuum cleaners are used when partially loaded with dust.

The challenger noted that unlike "bag" or "bin" vacuums, Dyson's Root Cyclone system utilizes a series of eight cyclones to filter dirt and dust. Thus, because dust does not settle on any part of the vacuum required to maintain airflow, it argued that Dyson's vacuums experience no clogging or resulting loss of suction.

As substantiation, the challenger submitted testing conducted by Intertek Testing Services ("ITS"), an independent industrial testing and certification company. ITS measured the maximum suction power of the DC07, DC14, and the DC 15 Dyson vacuums—as well as that of the Hoover WindTunnel, the Eureka Boss Smartvac, the Kenmore Progressive, and the Dirt Devil Platinum Force Vision Upright. In each case, maximum suction power was measured pursuant to either IEC 60312 or ASTM F558. The challenger explained that both standards measure maximum suction power in a laboratory setting, but that IEC also measures suction as the vacuum cleaner becomes loaded with dust. The challenger noted that this test showed that the challenger's DC07 (the model featured in Hoover's advertisements) maintained a constant suction power of 268 airwatts throughout the test, which was by far the highest maximum suction power of any upright vacuum tested. The challenger further noted that the suction power of all the tested competitors rapidly declined from their "base" suction power, and that Dyson was the only vacuum not to lose suction as the vacuum filled with dust.

---

[2] The challenger noted that ASTM measures cleaning efficacy (F608) and suction power (F558) using two separate standards, but that the IEC standard addresses both cleaning efficacy and suction power in a single standard (60312).

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
**Page: 5**

### (ii) Cleaning on a Variety of Floor Surfaces Testing

Using both ASTM and IEC standards for vacuum pick-up efficiency, the challenger tested several of its own Dyson vacuums against several WindTunnels, along with a number of other upright vacuum cleaner models. Specifically, the challenger performed two types of tests: (i) ASTM-based tests conducted on plush and "level loop" carpeting, and (ii) IEC-based tests conducted on hard-wood floors with crevices and on Wilton carpet.[3] With respect to the results of the ASTM-based tests, the challenger argued that while its DC07model (which is featured in various Hoover advertisements) does not perform as well as the premiere WindTunnel model on plush carpet, it performs "much better on the level loop carpet" (72.7% for Dyson versus 88.2% for WindTunnel on pick-up). These test results further showed that the challenger's DC14 model performed better on level-loop carpet (77.9% for Dyson versus 88.2% for WindTunnel on pick-up) than it did on plush carpet (56.3% for Dyson versus 74.4% for WindTunnel on pick-up).

With respect to the IEC-based tests, the challenger noted that its DC07 was shown to outperform all competitors (including the WindTunnel) on hard wood floors, and that it offers performance comparable to the WindTunnel on Wilton carpeting. The challenger noted that when all of the IEC-based test results are combined, the DC07's pick-up results are vastly superior to the WindTunnel's—82% vs 51%.

The challenger further argued that when results from its ASTM-based tests and its IEC-based tests are "averaged across all four floor surfaces," (to represent actual consumer use), the Dyson outperforms the WindTunnel. The DC14 has an average 77.9% pick-up efficacy, the DC07 has an average 70.9% pick-up; the WindTunnel has an average pick-up efficacy of only 66.3%.

### (iii) Dirt Emissions Testing

The challenger also argued that its Dyson vacuum has low dust emissions. In support of this argument, the challenger submitted dust emission testing[4] purporting to show that the DC07 and the DC14 only emit 0.0001% dust back into the air, which means that the filtration methods in these models are 99.9999% effective. In contrast, the challenger noted that the WindTunnel emits 0.0170% of the collected dust back into the air, thus releasing 170 times more dust into the air than the challenger's machines.

### c) Disparaging Nature of the Advertising

The challenger contended that the advertisements at issue are disparaging, and therefore violate NAD precedent as well as industry guidelines.[5] The challenger argued that even if the

---

[3] In its first submission to NAD, the challenger included IEC testing that was performed on hard wood floors with crevices and Wilton carpeting only. In its second submission to NAD, the challenger included "new" testing in which vacuum cleaners were tested on all five surfaces as specified by IEC.

[4] The dust emissions testing was based on IEC 60312.

[5] *The Clorox Company/Clorox Toilet Wand System*, NAD Case # 4307 (April, 2005); *McNeil Consumer Healthcare/St. Joseph Adult Low-Strength Aspirin* NAD Case # 3871 (February, 2002). The challenger also cited the Better Business Bureau's *Advertising Review Handbook and Guidelines.*

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 6

advertiser's superiority claims were true, the advertiser would not have license to falsely claim that the challenger's vacuums do not clean properly, or that the only reason consumers purchase these vacuums is for their looks and style. The challenger further added, again citing NAD precedent[6] that the presence of humor in an advertisement does not relieve an advertiser from the obligation to support all reasonable interpretations of its claims.

### III. Hoover's Implied Claim that The Dyson Vacuum Looses Suction

The challenger also took issue with what it characterized as the implied claim that the challenger's Dyson vacuum loses suction. The challenger noted the commercial at issue in this proceeding in which an actor sarcastically says, "My vacuum is purple. They say it doesn't lose suction." The challenger argued that the sarcasm in her voice indicates that she means the opposite of what she is saying—that the challenger's vacuum does in fact lose suction. Indeed, the challenger noted, the above-described consumer perception survey indicated that 23% of respondents took away such a disparaging message from this line alone.

Here again, the challenger pointed to the above-described testing (conducted by ITS) to show that its own vacuum cleaners maintain constant suction power throughout the test—while the suction power of all tested competitors rapidly declined. The challenger also noted that according to the only recognized industry standard designed to measure suction power under dust-loaded conditions, its Dyson machines are the only vacuum cleaners that do not lose suction as the vacuum fills with dust. Accordingly, the challenger argued that the claim that Dyson vacuums lose suction is false and misleading.

### IV. The Advertiser's Cleaning Claims

#### (a) The Advertiser's Claim that the WindTunnel Cleans Better than Other Vacuums

The challenger objected to the advertiser's claim that the WindTunnel cleans better than other vacuum cleaners. Specifically, the challenger took issue with the advertiser's claim in Sears brochures that the WindTunnel "[o]utcleans all competitive bagless cleaners," in addition to the advertiser's tagline (in print advertisements, on television commercials, and on WindTunnel hangtags) that WindTunnel vacuums "[c]lean to the highest power." The challenger characterizes this claim as a broad cleaning superiority claim.

The challenger explained that cleaning involves a combination of pick-up and suction power with respect to all surfaces where consumers may reasonably use a vacuum cleaner. Among these surfaces, the challenger noted, were carpeted and hard floors, crevices, curtains, upholstery, stairs, and automobile interiors. The challenger noted, however, that the advertiser relies primarily on the results of testing conducted pursuant to ASTM F608 (*Standard Test Method for Evaluation of Carpet Embedded Dirt Removal Effectiveness of Household/Commercial Vacuum Cleaners*), which only measures pick-up on four types of carpeting. In addition, the challenger noted, the ASTM test does not measure suction power. For these reasons, the challenger argued

---

[6] *Sanderson Farms/Sanderson Farms Chicken*, NAD Case # 4289 (March, 2005)

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 7

that the advertiser's ASTM testing is insufficient to support the advertiser's broad superior cleaning claims.

*(i) ASTM vs IEC Tests*

The challenger took issue with the advertiser's claim that ASTM F608 is the *only* standard for measuring the cleaning efficacy of upright vacuum cleaners. In reality, the challenger contended, there are *two* equally accepted standards by which cleaning efficiency of upright vacuum cleaners is measured. In addition to the ASTM F608, the challenger noted, the industry also relies upon IEC 60312 ("Vacuum cleaners for household use—Methods of measuring the performance"). The challenger argued that NAD has accepted both of these testing standards in prior cases.

The challenger suspected that the advertiser relied *only* upon ASTM F608 (rather than the IEC 60312) because the advertiser's vacuum cleaners are designed primarily for cleaning *carpets*— not other surfaces. To this end, the challenger argued, the advertiser's vacuums are equipped with stiffer bristle bars that beat carpeted surfaces harder than the challenger's more gentle vacuum cleaners. The challenger further argued that this difference in design, while giving the advertiser an advantage with respect to ASTM testing, results in greater wear to consumers' carpeting. As evidence, the challenger submitted testing purportedly showing that the WindTunnel tears three times as many carpet fibers out of carpets as compared to the challenger's DC07 vacuum cleaner.

Moreover, the challenger argued, the ASTM standard in no way reflects a vacuum cleaner's performance on the wide variety of surfaces found in today's homes. Specifically, the challenger noted that according to the NPD Households Floor Covering Reports, only 37.8% of flooring sold in 2005 in the U.S. is carpet; the remaining 62.2% is hard floor. In addition, the challenger contended that vacuums are frequently used to clean a variety of non-floor surfaces.

In contrast to the ASTM standard, the challenger noted, IEC tests vacuums on a range of surfaces and debris types, and also tests for suction power. The challenger noted that the IEC standard was developed by the industry over the course of many years to evaluate the performance of vacuum cleaners under consumer relevant circumstances. The "Scope" section of the IEC standard states: "This International Standard is applicable to vacuum cleaners for household use in or under conditions similar to those in households." The challenger further argued that the advertiser's decision to ignore the IEC test standard is troubling, given the advertiser's participation in IEC committees and its acknowledgment (on product packaging) of the importance of a vacuum's ability to clean surfaces other than carpet. One packaging panel clearly states that other "performance factors" relevant to a vacuum's "cleaning performance" include "hose power,…surface litter cleaning, hard floor cleaning, edge cleaning, cleaning width and air filtration." The challenger noted that these are precisely the factors taken into account by the IEC test and ignored by the ASTM standard.

Finally, the challenger took issue with a consumer survey submitted by the advertiser. This survey, conducted by The Good Housekeeping Institute, was submitted to show that "cleaning

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 8

ability on carpets" is the most important attribute to consumers who are considering purchasing vacuum cleaners.    The challenger raised several questions about the reliability of the polls, noting that the advertiser failed to supply even the most basic information about the test methodology.

### (ii) The WindTunnel's Performance on the IEC Tests

The challenger disputed the advertiser's claim that its vacuum cleaners out-clean all other vacuums arguing that its own Dyson machines perform better than the WindTunnel on wood floors with crevices and on Wilton carpet. (In its second submission, the challenger also included test showing the vacuum cleaners' respective performance with respect to the other three floor surfaces specified by IEC.) Specifically, the challenger noted that the DC07 has an 85.5% pick-up efficiency on wood floors with crevices and 78.1% on Wilton carpet; the DC14 has a 94.6% pick-up on wood floors with crevices and 82.3% pick-up on Wilton carpet; whereas the WindTunnel has only a 21.9% pick-up on wood floors, and an 80.7% pick-up on Wilton carpet. The challenger noted that its Dyson machines outperform WindTunnels when all floor types are averaged together.

### (iii) The WindTunnel's Performance Declines With Use

The challenger further objected to the advertiser's reliance on ASTM F608 to support its WindTunnel superiority claim on the grounds that ASTM testing is performed on brand new vacuums with new drive belts and new bristles. The challenger noted that consumers continue to use their vacuum cleaners for years after their first cleaning, and argued that the WindTunnel's performance rapidly declines with use. The challenger pointed to testing purporting to show that the pick-up efficiency of the WindTunnel to decline as dust enters the vacuum. In particular, the pick-up efficiency of a dust-loaded WindTunnel decreased 71% on wood floors with crevices, 38% on level loop carpet, 10% on plush carpet, and 8% on Wilton carpet. When averaged across all four surfaces, the pick-up efficiency of the dust-loaded WindTunnel decreased 25%.

Likewise, the challenger argued that the WindTunnel's performance declines as its drive belt ages. The challenger submitted testing that compared a brand new replacement belt with an original belt that had not been significantly used for six months, and that of an original belt that had been used for 300 hours. The testing found that the new belt transmitted the most power (about 200 watts), while the 6-month old belt showed a slight reduction in power, transmitting about 190 watts. The belt that had been used for 300 hours was shown to transmit only about 170 watts—15% less than the new replacement belt. The challenger contended that this reduced power due to belt wear results in decreased performance.

Similarly, the challenger maintained that the WindTunnel's performance decreases as its bristles wear. On this point, the challenger submitted testing showing the bristle wear of its own DC07 vacuum cleaner and the WindTunnel after 200 hours of use on plush carpet. After 200 hours of use, the challenger noted, the WindTunnel's bristles decreased by 86%, reducing pick-up performance by 18%.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 9

(b) *The Advertiser's Claim that the WindTunnel Cleans 56% Better Than the Dyson Vacuum*

Dyson challenged the accuracy of a claim made in print advertising and on the advertiser's website and online brochure that the WindTunnel "cleans carpet 56% better" than the challenger's vacuum. Likewise, the challenger took issue with the television commercial claims that the WindTunnel "cleans carpet 56% better" than the challenger's vacuum and more generally that it "cleans better" than the challenger's machine. The challenger also noted the hangtag claims that "Patented WindTunnel Technology™ picks up over 56% more dirt than Dyson DC-14" and "Picks up over 56% more dirt."

The challenger maintained that the WindTunnel does not in fact perform better, let alone 56% better, than the Dyson DC07 or DC14 vacuums. Here again, the challenger noted that its Dyson vacuum performed better than the WindTunnel when tested according to the IEC standard, and when the results of the ASTM and IEC testing are averaged across all surfaces.

The challenger further objected to the advertiser's statement that "These results are based on ASTM International F608, the only recognized industry standard representing real-life conditions in American homes."[7] As argued above, the challenger contended that in fact the ASTM test is *not* the only industry-accepted standard, and that the IEC test is in fact broader and more comprehensive. Moreover, the challenger contended that the advertiser's reference to ASTM fails to inform consumers about the limitations of the test—namely, that it is limited to removing fine test dirt from certain types of carpet only. The challenger added that consumers are generally not familiar with ASTM testing standards, and that 77% of respondents in the above-discussed consumer perception survey took away an overall superiority message, rather than a narrow claim that the WindTunnel tested better in removing one type of dirt from certain types of carpet. Nor does the advertisement inform consumers that the test was performed on a brand new, empty vacuum cleaner with a new drive belt and new bristles. Here again, the challenger noted that the WindTunnel loses both suction power and pick-up efficiency in a dust-loaded vacuum.

(c) *Claim that the Fusion Out-cleans the Dyson Vacuum by 13%*

Dyson also challenged advertiser's claim that its Fusion vacuum "outcleans Dyson by 13%." This claim is accompanied by the disclaimer: "Outcleans Dyson models DC07, DC14, and DC15 (The Ball™); proven in tests per ASTM International F608, the only recognized industry standard representing real-life conditions in American homes."

The challenger reiterated its argument that ASTM is not the only recognized industry standard, and that this test does not account for a wide variety of floor surfaces. Moreover, as discussed in reference to the WindTunnel vacuum, the challenger argued that the Fusion's performance rapidly declines as dust enters the vacuum cleaner and the drive belt and bristle bar wear down as

---

[7] This disclaimer on the television commercial is "It's proven by the only recognized test representing real-life conditions in American homes."

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
**Page: 10**

a result of normal use. The challenger submitted test results showing that the Fusion's suction power dropped 24.8 airwatts—or 13.2%—when repeat-loaded to a cumulative total of 1200 grams of dust.

Finally, the challenger argued that the Fusion has "astonishingly high" dust emissions. Specifically, the Fusion emits 0.1596% of the collected dust back into the air, which means its filtration method is only 99.8404% effective. As such, the challenger noted, the Fusion releases 1596 times more dust into the air than the Dyson DC07 and DC14 vacuums.

*V. The Advertiser's "Pick-Up Efficacy" Claims*

The challenger took issue with numerous "pick-up efficacy" claims, including: (i) product packaging claims that "WindTunnel Picks Up More Dirt Than Any Upright...Period" and "WindTunnel Picks Up Over 70% More Dirt"; (ii) print advertising claims that the WindTunnel "Picks up more dirt than any other brand!"; (iii) radio advertising claim that "The Hoover Self-Propelled WindTunnel Vacuum has been proven to extract more embedded dirt than any other upright"; (iv) a Sears brochure claiming that the WindTunnel "Picks up more dirt than any other bagless upright!"; "Picks up more dirt than any other clean-air upright!" and "Picks up more dirt than any other upright!"; and (v) a hangtag claiming that "Patented WindTunnel Technology™ picks up more dirt than any other brand, including Dyson."

The challenger argued that its own testing shows that when averaged together, the pick-up for various vacuum cleaners on the market today ranges from 52.3% to 77.8%, whereas the WindTunnel only had a 66.3% pick-up efficacy. The challenger also noted that for the many reasons outlined above, the advertiser's reliance on the ASTM test—to the exclusion of the IEC standard—was misguided.

*VI. The Advertiser's Claims that WindTunnel Technology Provides Superior Cleaning Performance and Use of the Cyclone Logo*

The challenger also took issue with the advertiser's claim that the WindTunnel technology provides superior cleaning performance, and with its depiction of a cyclone on the WindTunnel packaging and on the product itself. The challenger argued that contrary to the name "WindTunnel," the cyclone graphic, and the advertiser's superiority claims, WindTunnel technology is *not* cyclone technology. The challenger explained that unlike its own cyclone filtration technology, the advertiser's WindTunnel technology has absolutely nothing to do with the vacuum's method of filtration. Rather, the challenger noted, WindTunnel technology is limited to the vacuum cleaner's head.[8] To demonstrate the ineffectiveness of the WindTunnel technology, the challenger devised a test in which the pick-up of the WindTunnel vacuum with WindTunnel technology was compared to the pick-up of the WindTunnel vacuum without WindTunnel technology. This test purportedly showed that with the WindTunnel technology, the vacuum has an average pick-up of 75.0%, whereas without the technology, the vacuum has an

---

[8] The challenger further explained the WindTunnel technology diverts some of the air under the cleaner head into a tunnel running over the top of the bristle bar into a channel running across the front of the vacuum to create a suction in front of and behind the bristle bar.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 11

average pick-up of 72.5%. Thus, the challenger argued, the use of WindTunnel technology increases pick-up by a mere 3.5%—an amount that would go unnoticed by consumers. For these reasons, the challenger contended that the advertiser's superiority cleaning claims as well as its use of the cyclone logo are false and misleading.

## VII. Implied Claim that the WindTunnel does not Lose Suction

The challenger argued that the claim "Twin Chamber Bagless System helps maintain maximum cleaning power," which appears in the Sears brochure for the WindTunnel, implies that the WindTunnel does not lose suction. The challenger previously noted that WindTunnel was shown to lose significant suction power when tested in accordance with the IEC dust-loaded test. The challenger further noted that the bagless WindTunnel—which is the model being promoted in the materials at issue—loses suction much faster than the bagged model. The challenger also argued that the very design of the advertiser's bagless WindTunnel vacuum—barrier filtration that utilizes a paper filter—results in a loss of suction power. Specifically, the challenger explained, dust and dirt clog the paper filter and prevent air from flowing, thereby reducing suction.

## VIII. Claim that the Fusion Does Not Lose Suction

The challenger also objected to the claim, appearing on product packaging, the advertiser's website, the Fusion Owner's Manual, and the online Fusion brochure, that the Fusion offers "NO LOSS OF SUCTION," that "Cyclonic technology offers powerful cleaning with no loss of suction," and that the Fusion has "incredible cleaning power—every time you use it."

Here again, the challenger noted that due to the very design of the advertiser's vacuums, in which dirt and dust can clog the pores of the filter, suction is reduced with repeated use. While the challenger acknowledges that the Fusion maintains relatively constant suction power when the machine is *not* loaded with dust, the challenger contended that its testing shows that the Fusion does so by emitting 1596 times as much dust and dirt as the advertiser's vacuum.

The challenger also took issue with the disclaimer that appears with certain "no suction loss" claims: "Suction stays constant after picking up 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition comprised of 70% mineral dust, 20% cellulose dust and 10% fibrous material." As discussed above, the challenger argued that the results of a narrow ASTM test do not support the advertiser's broad claims. The challenger also contended that this test does not measure a vacuum's performance over time, and that contrary to the advertiser's disclaimer, the test does not use any dust at all. Nor, the challenger added, does the test measure dust emissions from vacuums.

## IX. Dirt Disposal Claims

The challenger also took issue with the advertiser's dirt disposal claims. Specifically, the challenger argued that the advertiser's touted "no-touch" filter cleaning for its WindTunnel vacuum is false, because in order to clean the paper filter, consumers must remove the filter by hand and spin it against an attached piece of plastic to remove the dust and dirt. Likewise, argued

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 12

the challenger, consumers must replace the vacuum's filter by hand. The challenger further objected to the advertiser's claim that the WindTunnel and the Fusion dirt cups are clean and hygienic to empty. The challenger noted specifically the advertiser's claim that the Fusion involves "No Mess!" and that the WindTunnel offers "hygienic dirt disposal." In reality, the challenger argued, in order to empty the advertiser's vacuums' dirt cups, consumers must open the dirt cups and empty the loose dirt and dust into a garbage can. The challenger maintained that this process results in dirt flying into the hands and face of the consumer, and offered as evidence two demonstrations showing how this happens.

## X. Total Allergen Filtration Claims

The challenger argued with the advertiser's claims that a number of its vacuums offer total allergen filtration. Specifically, the challenger drew NAD's attention to the claim on the WindTunnel brochure that "Allergen Filtration traps 100% of dust mites, ragweed and common grass pollens," as well as the claim on WindTunnel product packaging that "Allergen Filtration traps 100% dust mites, 99.98% ragweed and common grass pollens."

The challenger argued that these health claims overstate the capabilities of the advertiser's vacuums. As discussed above, the challenger maintained that the advertiser's vacuums emit more dust into the air than the average vacuum cleaner, and that this results from their below-average filtration systems. The challenger added that it is dust mite *feces* that people are allergic to—not dust mites themselves. Therefore, the challenger argued that trapping the insects themselves would have little to no effect on allergies. Finally, the challenger noted, there are many allergies in American homes aside from dust mites, ragweed, and grass pollens.

## Advertiser's Position

### I. Background

The advertiser informed NAD of pending patent litigation which was filed prior to the NAD challenge and involves similar issues. According to the advertiser, NAD should not assert its jurisdiction over the comparative cleaning performance claims at issue, as doing so would invite the possibility that NAD and the court would issue conflicting decisions regarding cleaning superiority claims made by parties to this challenge.

Additionally, the advertiser disputed the challenger's contention that the advertiser confined its initial response to the Self Propelled WindTunnel vacuum cleaner. In fact, the advertiser argued, the ASTM F608 test results it submitted clearly establish that both the Self Propelled WindTunnel and the Bagless Self Propelled WindTunnel vacuum cleaner pick up 56% more dirt than Dyson, and that all bagless WindTunnel models also out-clean Dyson. The advertiser further argued that the challenger failed to refute the advertiser's testing for any Hoover models other than the Self Propelled WindTunnel vacuum cleaner (bagged and bagless models) and the Hoover Fusion upright vacuum.

### II. The Advertiser's Performance Claims

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
**Page: 13**

The advertiser argued that its independently supervised tests, conducted pursuant to ASTM F608, prove that its Hoover Self Propelled WindTunnel cleans carpet better than Dyson vacuum cleaners by at least 56%.

> a.  *The advertiser's testing demonstrates that Hoover WindTunnel vacuums out-clean Dyson vacuum cleaners*

The advertiser contended that the primary reason consumers purchase upright vacuum cleaners is to clean their carpeting and rugs, and that carpeting and rugs account for roughly two-thirds of the total floor covering market in the United States. Accordingly, the advertiser argued, the ability of a vacuum to clean carpets is the most meaningful measure of how well the machine works.

The advertiser's independently supervised testing, which used the ASTM F608, tested each of the upright Hoover WindTunnel vacuum cleaners against the Dyson DC07 model and the Dyson DC14. The advertiser's test results show each of its vacuums outperforming the Dyson models by at least 49.5%, and as much as 70.5%. The advertiser also tested Dyson's newest model, the DC15. According to The advertiser, the DC15 performed a near parity with the DC07, and therefore is also outperformed by the upright Hoover WindTunnel vacuums.

> b.  *Consumers Union Agrees That Hoover WindTunnel Vacuum Cleaners Outclean Dyson Vacuum Cleaners*

The advertiser noted that Consumers Union reported generally similar results to those demonstrated by the advertiser's independently supervised ASTM F608 tests. Consumers Union rated two Hoover WindTunnel models as "excellent" for carpet cleaning, while it rated the Dyson DC07 and DC14 as merely "good"—the lowest rating given to any of the 33 vacuum cleaners tested. The advertiser contended that these results confirm the superior cleaning ability of the Self Propelled WindTunnel.

> c.  *ASTM F608 is the appropriate standard*

ASTM F608 is a testing standard that evaluates the effectiveness of household and commercial vacuums for the removal of carpet-embedded dirt. According to the advertiser, it is the only method recognized in the United States for testing the cleaning efficacy of an upright vacuum cleaner. The advertiser also maintained that ASTM F608 is the American National Standard, as recognized by ANSI, which means that this standard takes precedence over the IEC 60312 procedure for evaluating carpet cleaning in the United States. The advertiser reasoned that since upright vacuum cleaners (such as the Hoover and Dyson models involved in this challenge) are primarily purchased by consumers to clean carpets and rugs, and since carpeting accounts for

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 14

roughly two-thirds of the total floor-covering market in the United States,[9] the ASTM F608 is the most consumer relevant measure for testing upright vacuums.

The advertiser then compared the ASTM F608 to the IEC 60312—the standard used by the challenger. According to the advertiser, there are several differences between the two testing procedures which support the advertiser's argument that the ASTM F608 is the more accurate and more relevant test method.

First, explained the advertiser, ASTMF608 procedure correlates to actual field results in American homes,[10] whereas IEC 60312 was not based upon field studies. ASTM F608 requires that the carpets and padding used in the testing conform to ASTM F655, which requires the use of multiple carpets representing the major styles found in American homes. Conversely, the IEC 60312 only uses Wilton wool carpet, which according to the advertiser, has been criticized by members of the IEC and the European Carpet Association ("ECA") because it is not representative of current carpets. According to the advertiser, ASTM F608 has an established statistical precision statement which details expected repeatability and reproducibility errors unlike the IEC test which has a "lack of reproducibility between laboratories and materials."[11] The advertiser explained that ASTM vacuum cleaner test methods require a minimum of three units per each tested model, each of which must meet the repeatability requirements. Furthermore, unless a 90% confidence interval for the units is less than 5% of the sample mean, additional units must be tested. The advertiser points out that the IEC method only requires testing of a single unit of any given model to determine a representative value for the entire population. Finally, argued the advertiser, ASTM F608 has specific rules for determining when a test carpet must be replaced. The advertiser argued that because the IEC test leaves carpet replacement up to the individual laboratory it creates the possibility for massive reproducibility errors between laboratories.

The advertiser also rejected the challenger's assertion that Dyson's testing, which combines the averages of both ASTM and IEC based tests, is more consumer relevant than the "well established standard" used by the advertiser.

Finally, the advertiser submitted consumer research conducted by *Good Housekeeping* magazine, which was conducted between June and October of 2005 at the request of the ASTM F11.93.05 Task Group to "determine what attributes of a vacuum cleaner were the most important influences in making a purchase decision." The research consisted of three separate surveys which the advertiser argued "confirmed that cleaning ability on carpets was the most important attribute to consumers and that the cleaning ability on bare (hard) floors was either 6 or 7 out of the 8 attributes."

---

[9] Carpet and Area Rugs account for 66.8% of the floor covering sales by volume. *Floor Covering Weekly*, July 18/25, 2005.

[10] The advertiser explained that ASTM F608 was based upon 27 field studies in which numerous vacuum cleaners were tested side-by-side in 25 houses per study, for a total of 675 homes. Additional field studies have been conducted since then to insure that the field conditions have not changed the correlation that was established between the laboratory and the field.

[11] Advertiser's Final Response, Page 7, ¶2.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 15

> d. *Dyson's testing is unreliable and does not represent actual consumer use in the*
> *U.S.*

The advertiser raised several issues with the challenger's test procedures as well as the accuracy and consumer relevance of the test data. According to the advertiser, the challenger's testing included ASTM F608 tests on two of the four carpets specified by ASTM F655, along with the IEC hard surface crevice test and the IEC embedded soil removal test.

The advertiser contended that the challenger's tests were neither conducted nor supervised by an independent third party. The advertiser also asserted that the challenger did not follow proper testing procedures, or "good laboratory practice." The advertiser further objected to the challenger's use of only two of the four carpets required by the F608 test;[12] the challenger's failure to perform head-to-head performance evaluations;[13] the challenger's failure to meet strict statistical accuracy requirements of the F608, and the fact that the challenger's testing occurred over a five-year period. By conducting the tests over a period of five years, the advertiser argued, the challenger's testing utilized different carpets, dust supplies, and materials. The advertiser further argued that the challenger utilized different technicians, and changed the environments in which it evaluated the products' performance. According to the advertiser, these factors would impact the test results to a great degree and therefore render the test inaccurate.

Although the advertiser did not believe that the IEC 60312 test is relevant to consumers in the United States, it ran its own IEC 60312 testing. The advertiser averred that it conducted the IEC 60312 properly (head-to-head testing with the challenger's products, using the same technician, carpet and dust supply for all tests) and demonstrated that the WindTunnel outperformed each of the Dyson units. (The Self Propelled WindTunnel (U6439-900) achieved percent clean score of 88.5%, whereas the Dyson DC07, DC14, and DC15 received scores of only 79.1%, 78.3%, and 70.0% respectively.

According to the advertiser, three additional tests (a dust removal test from hard surfaces, a litter removal test, and an edge cleaning test) exist under the IEC 60312 standard, yet were not submitted to NAD by the challenger until the challenger's second submission. With respect to the timing of this testing, the advertiser noted that Section 2.4(C) of the NAD/NARB/CARU Procedures specify that a challenger is required to include in its initial challenge any data on which it intends to rely. As to the testing submitted to NAD in the challenger's original challenge, the advertiser argued that the crevice test chosen by the challenger uses a slot which is 1cm deep and 3mm wide and is most representative of a crack that would occur between two hardwood floor boards. The advertiser further asserted that the challenger failed to explain how

---

[12] According to the advertiser, the ASTM F608 requires that the testing include four carpets which are specified in the ASTM F655 standard. The ASTM F655 is the Standard Specification for Test Carpets and Pads for Vacuum Cleaner Testing. The ASTM F608 test method specifies that carpets and padding conforming to Specification F655 be used.

[13] The advertiser asserts that all ASTM and IEC vacuum cleaner performance test methods are intended to be head-to-head performance evaluations. The advertiser also asserts that the Dyson test results cannot be compared because they were not conducted head-to-head. See Sonex Corporation, NAD Case Reports, Case No.3656 (May 2002).

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 16

this surface is relevant to typical consumer use or what type of surface it is intended to represent, and that the July 18-25 issue of *Floor Covering Weekly* shows hardwood floors as representing 3.6% of total floor covering sales by volume. The advertiser stated that the majority of hard floor surfaces in the United States are smooth and therefore would be better represented by the IEC Dust Removal Test. The advertiser argued that of all of the IEC standards, the omitted tests were the most relevant to consumer use.

The advertiser concluded that the challenger's combination of the Wilton Carpet Test (based on a carpet that is not used in the United States), the IEC Crevice Test, and two of the four required ASTM Tests was created to achieve a favorable outcome for its products' performance.

> *e. Dyson's Claim That Hoover Vacuums Will Tear Out Carpet Fibers is False and Irrelevant To This Challenge*

The challenger created a test to show the "destructive" nature of the Hoover WindTunnel and other American vacuum cleaners compared to its DC07. The advertiser noted that this test utilized an English carpet consisting of 80% wool and 20% nylon, and argued that only two out of 3,275 different styles listed in the Carpet Directory Database for the fall of 2004 come close to matching this style in the United States. The advertiser further noted that because the carpets in England "do not hold up as well" as American carpets, the brushes used in its European models generally have less aggressive bristles.

The advertiser also argued that the DC14 and the DC15 are absent from this analysis, as is any indication of how or when the test was conducted. Assuming that the test was conducted on a continuous basis for 1,000 double strokes at 0.5 m/s over a stroke length of 1.2 m, the advertiser reasoned that the units were operated for 80 continuous minutes. The advertiser maintained that an 80-minute operation of continuous vacuuming over the exact same area in a home is highly unlikely. Finally, the advertiser noted that the preparation of the carpets is unknown.

> *f. The Hoover WindTunnel Continues to Outclean the Dyson Vacuum Even After Years of Use Under Typical Household Conditions*

The advertiser defended its reliance on the industry-approved ASTM F608 test despite the challenger's contention that the WindTunnel's performance declines with use. The advertiser maintained that *both* parties' testing demonstrates that the WindTunnel outperforms the Dyson even after being loaded with dust. Moreover, the advertiser emphasized that ASTM F608 is the agreed-upon industry standard for measuring the comparative cleaning efficacy of vacuum cleaners. While acknowledging that the performance of every vacuum cleaner declines to some degree with use, the advertiser maintained that this fact does not invalidate the ASTM F608 standard or the claim that Hoover vacuums outclean Dyson vacuums.

> *(i) Dyson's test results are flawed and its testing is not consistent with IEC 60312*

The advertiser noted that the challenger used testing from different years, conducted by different technicians, and did not test units head-to-head. In addition, the advertiser charged that the

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 17

challenger deviates from the stopping points that have been agreed to by the IEC task group and that will be included in the next draft of the IEC 60312 standard. The three stopping points specified by this standard are: (i) when the dust reached a maximum fill line or a bag check indicator activated; (ii) when 50g of dust per usable liter has been fed into the system; and (iii) when the suction reached 40% of its initial value. The advertiser maintained that throughout all of the challenger's testing for the loaded dust receptacle, the second stopping point of 50g per usable liter has been repeatedly ignored. The advertiser speculated that the deviation from this stopping point was clearly intended to overfill competitive products so as to create an unrealistic condition to prove a cleaning superiority that does not exist. In summary, the advertiser argued that the challenger's test results should be given no weight except to the extent that they demonstrate that the WindTunnel units tested continue to outperform the Dyson units even when the suction power of the former machines is reduced to 40%.

> *(ii) The Advertiser's Testing Confirms that WindTunnel Units Outclean Dyson Units Even When Suction Power is Reduced to 40% Of Its Original Suction*

The advertiser conducted additional independently supervised testing pursuant to ASTM F608 to evaluate the embedded soil removal capability of the Hoover SelfPropelled WindTunnel (bagged and bagless) vacuum cleaners, as well as the Hoover Fusion upright vacuum, against the Dyson units under dust-loaded conditions (the "Loaded Dust Receptacle Test"). The Hoover Self-Propelled vacuum cleaners were restricted to the worst-case scenario of 40% of the initial suction. The data clearly showed that even when "clogged" to 40% of its initial suction value, the WindTunnel cleans better than any of the Dyson upright vacuums.

> *(iii) The Challenger's Power Transference Test Actually Demonstrates That The Self Propelled WindTunnel Maintains Most Of Its Power After Years Of Ordinary Use*

The advertiser disputed the challenger's argument that the belts of WindTunnel upright vacuum cleaners wear out and result in reduced performance. Dyson created a test to measure the power transference of the belt as it ages. This test consisted of operating a single Self Propelled WindTunnel Bagless vacuum in a reciprocator and then periodically disassembling this unit to gain access to the belt. The advertiser noted that the belt when first measured transferred 200W of power—and that after 300 hours it continued to transfer 170W of power. The advertiser argued that the technician/engineer who wrote the report seemed impressed to find that "There is considerable physical degradation in the belt that has run for 300 hours <u>however it is still capable of transmitting 170 Watts.</u>" (emphasis added by the advertiser.) The advertiser added that 300 hours of use represents approximately 10 years of use. The advertiser further noted that the technician stated that the loading of the belt would be quite different if done at home from that in the test. Finally, it noted that no effort was made to determine the effect on cleaning of this purported 15% reduction in power transfer. Thus, the advertiser argued that the Dyson test is unreliable, irrelevant to consumer use, and meaningless.

> *(iv) The Challenger's Bristle Wear Test is also flawed, but demonstrates the superior cleaning efficacy of the WindTunnel*

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 18

The advertiser also took issue with the challenger's bristle wear test. The challenger's technicians operated a WindTunnel of unknown model in a continuous pattern in an automated reciprocator for 200 hours, measuring the embedded dirt removal capability per ASTM F608 every 50 hours and compared it to a Dyson DC07 undergoing the same test. The advertiser noted that at 50 hours, when a reduction in penetration of 2.5 mm for the WindTunnel was measured, the pick-up was reduced by 7.5 g, but after 100 hours, when the bristle penetration was reduced an additional 1.2 mm, the pick-up increased by 8.1 (the highest value during this test.)

Moreover, the advertiser argued that this data actually demonstrates that the air watts for the WindTunnel increased by 50% and the Dyson decreased by 14%. Thus, to the extent these results can be trusted, the advertiser claimed, the data actually shows an improvement in the performance of a WindTunnel over time, and a loss of suction for the Dyson DC07 over time. A 14% change in air power is outside the range of test error for the ASTM F558 procedure.

Finally, the advertiser noted that because the average usage of a vacuum cleaner in an American home is 30 hours per year, a 200 hour test represents approximately six years and eight months of use. Accordingly, the advertiser argued that the challenger's test demonstrates that even after approximately 6 years and 8 months, the WindTunnel still cleans better than the Dyson DC07 by a normalized value of 40.4%. The advertiser also noted that the carpet used for this test was a UK carpet, and that according to the test technician, U.S. carpets tend to have a longer pile and therefore less bristle wear should occur.

### III. The Advertiser's Commercial

In response to the challenger's contention that the television commercial is misleading, the advertiser stated that the commercial's only express claim (that the self propelled WindTunnel out cleans Dyson) is true. The advertiser also argued that the to the extent that the claims could be interpreted as communicating that Dyson vacuums loose suction, this is also true.

According to the advertiser, there is nothing about the commercial which implies that the product is ineffective or which is disparaging to the product. Rather, it insisted that the message implied is that when choosing a vacuum, consumers should be concerned with its cleaning performance rather than its color. It argued that the consumer data submitted by the challenger does not support its argument. Furthermore, the advertiser insisted that the NAD cases cited by the challenger are distinguishable from the instant proceeding because the advertisements here at issue are not focused on any particular flaw of the challenger's product–but instead concentrate on the superiority of the advertiser's product. According to the advertiser, the responses provided by the challenger from its consumer perception survey show that those who saw an implied performance message took away a comparative superiority message. The advertiser insists that the statement: "Dyson thinks things should work properly. We couldn't agree more," (which is immediately followed by: "That's why our Hoover Self-Propelled WindTunnel picks up 56% more dirt than Dyson") is not interpreted by the reasonable consumer to mean that the one product is ineffective. Rather, the advertiser maintains that such a statement is taken to mean that one product is more effective than the other. This statement, according to the advertiser, implies

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 19

that the Hoover WindTunnel cleans *better* then the Dyson vacuum cleaners, and is substantiated by the data provided.

*IV. Other Challenged Claims*

   *a.  The Advertiser Does Not Claim that the WindTunnel Does Not Lose Suction*

The advertiser took issue with the challenger's argument that the statement "Twin Chamber Bagless System helps maintain maximum cleaning power" implies that the WindTunnel does not lose suction. The advertiser noted that the challenger offered no support for this claim, and contended that the challenger confuses cleaning power with suction power. The advertiser maintained that suction power is *only one* element of cleaning power, and that a vacuum can offer maximum cleaning power even without maintaining its full suction power.

In fact, the advertiser noted, the WindTunnel vacuum cleaners with *full* bags and dirt cups clean better than the challenger's machines with *empty* dirt cups. In support of this statement, the advertiser pointed to an independently supervised internal test demonstrating that the Self Propelled WindTunnel uprights (bagged and bagless) clean better than the challenger's DC07, DC14, and DC15 vacuum cleaners. Although the cleaning effectiveness of the WindTunnel units drops as suction power declines, the advertiser emphasized that the cleaning effectiveness of the WindTunnel never drops below that of the challenger's machines. Accordingly, the advertiser argued that the Twin Chamber Bagless System does indeed help maintain maximum cleaning power.

   *b.  The Claim that the Hoover Fusion Does Not Lose Suction is True and Properly Qualified*

The advertiser noted that its "Does not Lose Suction" claim is qualified by language appearing directly beneath the claim, stating: "Suction stays constant after picking up 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition composed of 70% mineral dust and 10% fibrous material." The advertiser submitted testing to this effect. This disclosure, argued the advertiser, renders this claim qualified and substantiated.

   *c.  The WindTunnel Has a "No-Touch" Filter and Dirt Cups*

The Self Propelled WindTunnel Bagless Upright employs a two-chamber dirt cup with a lid. The lid has a small knob to allow the consumer to rotate the filter prior to opening the lid. The advertiser emphasized that in the course of typical cleaning, a consumer turns the knob prior to opening the lid, causing the filter still inside the dirt cup to rotate against a piece of plastic that causes the dust and dirt to fall off the filter and into the container. The consumer would then open the lid with her thumb while holding the cup's handle and pour out the dust and debris. The advertiser maintained that if individuals are removing the filter prior to spinning it, this is contrary to the instructions provided in the owner's manual. The advertiser did acknowledge, however, that there are times (such as when picking up large quantities of fine dust) that the filter

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 20

may require a more thorough cleaning in which the filter is removed from the frame and tapped against the side of a dust bin to dislodge any remaining dust.

> d. *The WindTunnel Utilizes a HEPA Filter That Traps 100% of Dust Mites, Ragweed and Common Grass Pollens*

The advertiser stated that its Self Propelled WindTunnel bagless utilizes a cartridge filter that is certified to meet the HEPA criteria of 99.97% efficient at 0.3 microns. The advertiser explained that this is the accepted criteria for HEPA in the United States and is also being pursued at ITC. Common pollen is generally between 15 and 25 microns. Dust mites are generally between 250 and 300 microns and even the dust mite allergens referred to by Dyson are generally between 10 and 20 microns. All of these allergens, the challenger noted, are significantly larger than 0.3 microns. Thus, the advertiser maintained, the HEPA filter on the Hoover will trap 100% of these allergens.

**DECISION**

Dyson challenged numerous performance claims and superiority claims made by the advertiser for its Hoover WindTunnel and Fusion upright vacuum cleaners. At the outset, NAD noted that both companies make effective upright cleaning products but rely on different kinds of testing to support their arguments and the performance capabilities of their respective products. A central dispute in this case involves the suitability of ASTM F608, the "Standard Test Method for Evaluation of Carpet Embedded Dirt Removal Effectiveness of Household/Commercial Vacuum Cleaners," as a basis for the advertiser's cleaning and "pick up" superiority claims. The advertiser argued that its testing, conducted pursuant to ASTM F608, supports its numerous cleaning superiority claims. The challenger, on the other hand, argued that ASTM F608 testing does not provide a reasonable basis for the challenged claims, and offered its own evidence to show that in fact its own Dyson vacuum cleaners outperform the Hoover units.

NAD is often called upon to review evidence of product testing based upon industry standards and then to assess the "fit" between the performance claims made by an advertiser and its supporting evidence.[14] Even when product testing is based on sound testing methodologies and industry-recognized protocols, NAD will typically examine the correlation between the testing and the real world experience of consumers in determining if the advertising claims are supported by the evidence. It is against this backdrop that NAD considered the claims in the challenged advertising.

I.    *NAD'S Jurisdiction*

NAD first considered the advertiser's argument that NAD should decline to exercise jurisdiction in this matter because a related dispute between the parties is simultaneously being litigated in

---

[14] The Valvoline Company (Zerex G-05 Extended Life Antifreeze) , Report #4375, *NAD Case Reports* (September 2005); Dow Chemical Company (Styrofoam Brand Insulation), Case # 4383, *NAD Case Reports* (August 2005); EuroPro-Corporation (Shark Bagless Stick Vacuum Cleaner, Case # 4216, *NAD Case Reports* (August 2004); Bausch & Lomb Incorporated (Renu), Case #4385, *NAD Case Reports* (August 2005).

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
**Page: 21**

Federal District Court. *NAD Procedures* provide that if the advertising claims complained of are "the subject of pending litigation or an order by the court....NAD shall advise the challenger that complaint is not, or is no longer, appropriate for formal investigation in this forum."[15]

After carefully reviewing the complaint in the federal court proceeding, NAD determined that the claims challenged by Dyson, for WindTunnel and Fusion vacuum cleaners were not themselves the subject of the pending litigation.     Accordingly, NAD determined that *NAD Procedures* do not require NAD to close the case.  NAD recognized that the District Court may be adjudicating matters related to the proceeding (i.e., making findings on the testing methods) but this circumstance is not one that should divest the self-regulatory forum of its jurisdiction or charge to ensure that advertising is truthful, non-misleading and adequately substantiated. Accordingly, NAD proceeded with its review of the challenged advertising.

II.     *The Issue of False Disparagement*

    *A. Implied Claim in Television Commercial*

NAD first examined the challenged television commercial featuring the following dialogue:

- "My vacuum is purple. They say it doesn't loose suction."
- "My vacuum makes me look good."
- "My vacuum was in a fashion magazine."
- "Dyson thinks things should work properly. We couldn't agree more. That's why our Hoover Self-Propelled WindTunnel picks up 56% more dirt than Dyson."

The challenger argued that this commercial implies that Dyson vacuums are ineffective. In support of this argument, the challenger offered a consumer perception study which was completed by 265 adults throughout the United States over the age of 18, all of whom were actual or potential purchasers of vacuum cleaners. The respondents were asked open-ended questions about the overall message communicated by the commercial. 250 respondents (94%) knew the advertised brand was Hoover, and were asked questions about any messages communicated about the Hoover vacuum. 206 respondents (78%) were aware that the other brand in the commercial was Dyson, and were asked questions about any messages communicated about the Dyson vacuum. According to the challenger, 77% of the respondents surveyed took away superiority messages about Hoover vacuums, such as Hoover vacuums clean better than Dyson; Hoover is better than Dyson; Hoover is the best; and Hoover is better than the competition. Also according to the challenger, 46% of these respondents took away a variety of disparaging messages about the Dyson vacuum. After the survey was completed, the results were validated by an independent third-party validation company.

The advertiser argued that its commercial does not in fact imply that the Dyson vacuum is ineffective. It further contended that the consumer test data does not support the challenger's

---

[15] Section 2.2 (B)(i).

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 22

position. The advertiser argued that the commercial simply implies that consumers should be concerned with cleaning performance when deciding which vacuum to purchase—not with the color of the vacuum cleaner. This message, the advertiser maintained, is one of comparative superiority—not disparagement. Moreover, the advertiser distinguished the NAD cases sited by Dyson, arguing that the advertising here at issue does not focus on any particular flaw with Dyson cleaners. Finally, the advertiser noted that not one respondent in the challenger's consumer test indicated that the commercial implied that the Dyson vacuum cleaner is "ineffective" or "does not work properly." Rather, the verbatim responses reveal that the vast majority of those respondents who took away a performance message took away a comparative superiority message that is supported by the advertiser's evidence.

NAD agreed with the advertiser that the commercial conveyed a message of comparative superiority—and did not falsely disparage Dyson vacuum cleaners by suggesting they were ineffective or did not work properly. In reaching this conclusion, NAD first carefully reviewed the consumer perception survey. As to the purported 77% of respondents who took away superiority messages from the commercial, NAD noted that this percentage is not indicative of "false disparagement." Advertisers are of course free to make superiority comparisons, provided that they are supported, against competing products.

The issue here is whether the advertiser falsely disparaged the challenger by conveying the message that Dyson vacuum cleaners are somehow ineffective. On this point, NAD concluded that the consumer perception survey did not support the challenger's position. Although the challenger argued that 46% of respondents surveyed took away disparaging impressions of Dyson vacuum cleaners, NAD's own review of the survey responses revealed that relatively few respondents who saw the commercial took away the message that Dyson vacuum cleaners are ineffective or that they lose suction. The questionnaire employed a technique of "funneling" in which open-ended questions were followed by more specific questions including questions that specifically asked respondents to focus on the individual statement: "My vacuum is purple, they *say* it doesn't lose suction." Although *some* respondents, in response to such questioning, took away disparaging messages about Dyson vacuum cleaners, NAD concluded that the overwhelming majority of respondents took away no such messages.

NAD's analysis of the survey respondents yielded results that were consistent with its own takeaway of the commercial. Even if consumer perception evidence is not reliable or dispositive of the issues, NAD is authorized to stand in the shoes of consumers and determine what reasonable messages are conveyed by an advertisement. NAD, based upon its review of the commercial, determined that the commercial conveys a clear message of cleaning superiority, but does not reasonably communicate a message that Dyson cleaners are ineffective when it comes to cleaning.

Moreover, NAD disagreed with the challenger's suggestion that the Hoover commercial is analogous to the advertising at issue in *The Clorox Company (Clorox Toilet Wand System)*.[16] In *The Clorox Company*, the advertiser depicted its competitor's product as a ragged and useless

---

[16] NAD Case # 4306 (April, 2005)

THE HOOVER COMPANY
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 23

object that blows away in the wind. Based on this depiction, NAD concluded that the advertisement conveyed that the competing toilet brush was "ineffective." Unlike the *Clorox* commercial, the Hoover commercial does not show the competing product falling apart or otherwise breaking or failing to work. [17] Rather, NAD determined that the Hoover commercial gently mocks its competition—but does not expressly or impliedly suggest that Dyson vacuum cleaners are ineffective.[18]

NAD concluded that the commercial conveys that the advertised vacuum cleaners outclean Dyson machines, and that, specifically, "the self-propelled WindTunnel by Hoover cleans carpet 56% better than Dyson." NAD addresses the whether the evidence supports this cleaning superiority claim in Section IV of this decision.

    *B. Other Advertising*

The challenger also took issue with two other Hoover advertisements it described as falsely disparaging.[19] First, the challenger pointed to what it described as the "false and misleading claim in the Hoover print advertising for the WindTunnel that Dyson vacuums do not clean properly." NAD presumes that the challenger is referencing the print advertisement that appears in Exhibit 3 of the challenge which reads "Dyson thinks things should work properly. We couldn't agree more. That's why our Hoover self-propelled WindTunnel picks up 56% more dirt than Dyson." NAD concluded that this claim, similar to the above-discussed commercial, communicates that the self-propelled WindTunnel picks up more dirt than Dyson—but does *not* convey to the reasonable consumer that Dyson machines are ineffective or do not work.

Finally, the challenger took issue with a WindTunnel hangtag which reads, in relevant part: "Patented WindTunnel™ Technology picks up more dirt than any other brand, including Dyson. Some vacuums pick up dirt, only to scatter it back down into your carpet." On this point, NAD agreed with the challenger that the challenged hangtag does indeed imply that Dyson vacuums—as the only competing vacuum mentioned by name on the hangtag—is among the vacuums that "scatter [dirt] back down into your carpet." NAD noted that the record lacks any reliable evidence that demonstrates that Dyson vacuums scatter dirt onto carpet. Accordingly, NAD recommended that the advertiser discontinue the claim that "Patented WindTunnel™ Technology picks up more dirt than any other brand, including Dyson. Some vacuums pick up dirt, only to scatter it back down into your carpet."

---

[17] In Clorox, NAD also found that the advertiser provided no evidence that its own product cleaned toilets more effectively than the challenger's. *Id.*

[18] Likewise, NAD determined that the present advertising is not analogous to the advertising reviewed in *McNeil Consumer Healthcare (St. Joseph Adult Low-Strength Aspirin)* NAD Case # 3871 (February, 2002). Although the advertiser correctly cited *McNeil* for the proposition that "[e]ven an otherwise literally accurate statement may be misleading if it falsely disparages a competing product," NAD concluded—for the reasons discussed above—that the instant commercial does not falsely disparage another product. Similarly, NAD determined that the Better Business Bureau's *Advertising Review Handbook and Guidelines,* which prohibit false disparagement, were not violated by the advertiser's commercial.

[19] The challenger did not submit consumer perception research relating to these two advertisements.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 24

*III.  "These results are based on ASTM International Test F608, the only recognized industry standard test representing real-life conditions found in American homes."*

The challenged performance claims include qualified language stating that ASTM F608 is "the only recognized industry standard test representing real-life conditions found in American homes." In support of this claim, the advertiser noted that ASTM F608 was developed with the cooperation of leading vacuum cleaner manufacturers, consumer organizations, academia, and general interest members, at the strong urging of the Federal Trade Commission ("FTC"). Moreover, the advertiser stated that F608 test methodology was based upon 27 field studies, in which numerous vacuum cleaners were tested side-by-side in 675 homes. It also noted that additional field studies have been conducted since the standard was originally established in the early 1970s, to insure that the standard remains current.

Given that the standard is indeed based upon ongoing field tests in which vacuum cleaners are tested in American homes, NAD was satisfied that ASTM F608 is indeed based upon "real-life conditions found in American homes." NAD then considered whether ASTM F608 is the "only" industry recognized standard that fits this description—or whether IEC 60312 is also a "recognized industry standard test representing real-life conditions found in American homes."

The challenger argued that the IEC 60312 is "equally accepted" as ASTM F608. In support of its argument, the challenger sited two NAD cases: *Euro-Pro Corporation (Shark Bagless Stick Vacuum Cleaner)[20]* and *Euro-Pro Corporation (Fantom Twister Vacuum Cleaners)[21]*, in which NAD determined that the advertiser's evidence, consisting of testing pursuant to ASTM F-55803, was not sufficient to support its suction claims. NAD was not persuaded by this argument. Contrary to the challenger's position, NAD did not opine in these cases as to the relative importance or reputability of ASTM F608 versus IEC 60312, nor did NAD find that "the two methods coexist side-by-side," or that they are "equally accepted." At most, NAD implicitly acknowledged that the IEC testing submitted by the challenger was not irrelevant to the issues it reviewed in that proceeding.

The challenger also argued for IEC's relevance by citing certain statements made by ANSI, ASTM, and the U.S. National Institute of Standards and Technology ("NIST") in which these bodies endorse the internationalization of standards. For example, the challenger noted ANSI's mission statement, which emphasizes the importance of global standards. The advertiser also pointed to recent minutes of the ASTM subcommittee on vacuum cleaners, in which the committee chairman discusses the goal of "bring[ing] together ASTM with relevant international standards." Finally, the challenger highlighted a statement made by the director of NIST, which stresses that "[b]oth government and the private sector in the United States have worked actively in the [IEC]."

While these statements perhaps make the case that American standards organizations seek to harmonize their own standards with those of the IEC, NAD noted that the question at issue here

---

[20] Case # 4216 (August, 2004)
[21] Case # 4217 (August, 2004)

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 25

is not whether the respective standards can be harmonized, but whether IEC 60312 currently qualifies as a "recognized industry standard test *representing real-life conditions found in American homes*."[22] NAD determined that the above-described statements by ANSI, ASTM, and NIST fall short of establishing that IEC 60312 is a recognized industry standard test "representing real-life conditions found in American homes."

The challenger's principle basis for the proposition that IEC testing standards represent "real-life conditions found in American homes" is a statement made by Mr. Capron-Tee, who is the chairman and member of various ASTM and IEC Committees and Sub-Committees relating to vacuum cleaner testing. The challenger relies upon Mr. Capron-Tee's statements that with respect to IEC testing, "the results obtained are representative of performance in the home," and that "the results show a proportionate performance in the home and can differentiate between the performance of different vacuum cleaners when used in the home." Mr. Capron-Tee also stated that "[t]his was tested against much field data collected from the USA and Europe." These representations directly contradict the statements made by the advertiser's expert, Mr. Miller, who stated that IEC 60312 does not correlate to any consumer studies.

NAD concluded that Mr. Capron-Tee's assertions that IEC 60312 represented (American) in-home vacuum cleaner performance were not sufficient to rebut the advertiser's claim regarding ASTM F608. First, NAD noted that Mr. Capron-Tee acknowledged that IEC test carpeting (Wilton carpet) is only found in a "tiny minority of homes," and that the dust used in the IEC testing is "also not found in many homes." NAD also noted the absence of any explanation (by the challenger or by Mr. Capron-Tee himself) as to how a test using both carpet and dirt that is found only in the minority of actual homes could accurately represent actual conditions in American homes. Mr. Capron-Tee's only basis for this argument was the bald assertion that "this was tested against much field data collected from the USA and Europe." Given the lack of supporting evidence as to the nature of this field data, or as to the proportion of this data that was collected, respectively, from the USA versus Europe (two regions in which carpet styles differ significantly), NAD concluded that Mr. Capron-Tee's statement was insufficient to establish that IEC standards correlate strongly with real-life conditions in American homes.

In contrast, the advertiser submitted detailed information as to the nature of the in-home field tests on which ASTM F608 was based. As discussed above, ASTM F608 was based on 27 field studies in which numerous vacuum cleaners were tested side-by-side in 675 homes.[23] Moreover, the advertiser provided NAD with a chart demonstrating the correlation between in-home field tests and ASTM laboratory tests. Indeed, the very language of ASTM F 608-9 reflects the fact that the standard is designed to be representative of American homes; Section 4.1 of F 608-9 reads, in relevant part: "This test method is based upon results of home cleaning tests so that, in most cases, a reasonable correlation exists between home and laboratory results." The language of IEC 60312 as quoted by the challenger, however, refers to no field testing whatsoever—no

---

[22] Emphasis added
[23] Additional field studies have been conducted since F608 was originally established in the early 1970s to insure that the standard remains current.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
**Page: 26**

less field testing conducted primarily in American homes.[24] Accordingly, NAD concluded that the challenger did not overcome the advertiser's reasonable basis for its claim that ASTM F608 is "the only recognized industry standard test representing real-life conditions found in American homes."

Finally, the challenger maintained that "[a]ll of Hoover's advertising that states that the ASTM test is the only industry test to measure vacuum cleaner performance are… false on their face." Importantly, however, the claim presently at issue is not that ASTM F608 is "the only recognized industry standard test" for measuring vacuum cleaner performance—but that it is the only recognized industry standard "representing real-life conditions found in American homes." For the reasons outlined above, NAD found this claim to be properly qualified and supported.

*IV.    Cleaning Superiority Claims*

In support of its numerous cleaning superiority claims as to both the WindTunnel and the Fusion, the advertiser submitted testing conducted pursuant to ASTM F608.[25] As a preliminary matter, NAD noted the parties' dispute as to whether the challenged superiority claims were limited to the Self Propelled WindTunnel, or whether they extended to other Hoover models as well. While it is true that some claims are limited to the Self Propelled WindTunnel, NAD observed that other claims clearly apply to other models. For example, as noted by the challenger, the claim "picks up more dirt than any other bagless brand" appears on product packaging for the Hoover WindTunnel Bagless. Likewise, the claim "picks up more dirt than any other upright… period," appears on packaging for the Hoover Self Propelled WindTunnel Bagless. Similar claims appear in catalogue advertising for the Self Propelled WindTunnel Bagless, the Self Propelled WindTunnel Ultra, the WindTunnel Bagless, and the WindTunnel Bagless Plus. Accordingly, NAD determined that the advertiser must not only substantiate its claims with respect to the Self Propelled WindTunnel, but must also provide evidence supporting those claims relating to other Hoover models.

*A) The Advertiser's ASTM Testing*

In support of its cleaning superiority claims as to both the WindTunnel and the Fusion, the advertiser submitted two independently supervised tests conducted pursuant to ASTM Test Method F608, the "Standard Test Method for Evaluation of Carpet Embedded Dirt Removal Effectiveness of Household/Commercial Vacuum Cleaners." The first test compared the challenger's DC07 and DC14 models against seven different models of Hoover vacuum cleaners.

---

[24] As quoted by Mr. Capron-Tee, the stated purpose of IEC 60312 is "to specify essential performance characteristics of vacuum cleaners being of interest to the users and to describe methods for measuring these characteristics."

[25] The evidence discussed in this section was offered as substantiation for numerous cleaning superiority claims—both general and specific—identified by the challenger, including: "Picks up more dirt than any other brand;" "outcleans all competitive bagless cleaners;" "clean to the highest power;" "picks up more dirt than any other brand;" "The Hoover Self-Propelled WindTunnel Vacuum has been proven to extract more embedded dirt from horizontal floor surfaces than any other upright." "The Hoover® Self-Propelled WindTunnel™ picks up 56% more dirt than Dyson." "The self-propelled WindTunnel™ by Hoover cleans carpet 56% better than Dyson." The Hoover® Fusion™ Cyclonic Bagless Upright Vacuum Outcleans Dyson by 13%"

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 27

As prescribed by ASTM, all vacuum cleaners were tested on four different types of carpeting: plush, multi-level, shag, and level loop. The test also used dirt as specified in ASTM F608. This testing demonstrated that the advertiser's WindTunnel machines outcleaned the DC07 and the DC14 by at least 49.5% and by as much as 70.5%.

The second test, conducted several months later, compared the DC07, the DC14, and Dyson's recently introduced DC15 model—all with empty dirt cups—with Hoover WindTunnel vacuum cleaners operating with a full bag or dirt cup. This test, the advertiser noted, shows that the DC15 is no more effective at cleaning carpet than the DC07, and is significantly less effective at cleaning carpet than the WindTunnel vacuum cleaners tested in both tests.

As further support for its cleaning superiority claims, the advertiser noted that Consumers Union reported similar results to those found by its own ASTM F608 testing. The advertiser further noted that Consumers Union rated two models of Hoover vacuum cleaners "excellent" for carpet cleaning—while it rated the DC07 and DC14 models as merely "good."

The challenger disputed the appropriateness of ASTM F608 as substantiation for the challenged claims. First, the challenger noted that this standard only measures pick-up of test dirt on four types of carpeting, and does not measure pick-up on hard floor surfaces or other commonly vacuumed surfaces. The challenger also noted that ASTM F608 does not measure suction power, and that the standard only calls for testing to be performed on brand new vacuums with new drive belts and new bristles. For these reasons, the challenger contended that the advertiser must not only test its machines using ASTM F608, but must also test them against another industry standard: IEC 60312 "Vacuum cleaners for household use—Methods of measuring the performance."

In an NAD proceeding, the advertiser has the initial burden of presenting a reasonable basis for its claims.[26] Accordingly, NAD first considered the advertiser's evidence.
As a preliminary matter, NAD appreciated that ASTM F608 is a widely accepted industry standard that was developed with the cooperation of leading vacuum cleaner manufacturers, consumer organizations, and academia. NAD further noted that ASTM F608 is the American National Standard as recognized by the American National Standards Institute ("ANSI"). NAD too has recognized the legitimacy of ASTM F608 as a basis for cleaning superiority claims; In a previous proceeding, NAD determined that testing conducted pursuant to this standard constituted a reasonable basis for an advertiser's claim that its vacuum cleaner "gets more dirt out of a carpet than any other cleaner."[27]

Indeed, ASTM F608 enjoys legitimacy for good reason. Based on in-home field tests, the standard incorporates a variety of methodological safeguards, such as requiring the testing of a minimum of three units for each model, the utilization of a statistical precision statement,[28] and the use of multiple carpets representing the major styles found in American homes.

---

[26] *Johns Manville (Formaldehyde-Free Insulation)*, Case # 4395 (October, 2005)

[27] *The Hoover Company (Vacuum Cleaners)*, Case # 3044 (August, 1993)

[28] The advertiser explained that ASTM F608's statistical precision statement details potential repeatability and reproducibility errors.

THE HOOVER COMPANY
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 28

The challenger, however, highlighted several purported limitations of ASTM F608, and argued that these shortcomings render the advertiser's testing insufficient to support its claims. As a preliminary matter, NAD noted that its task here was to determine whether the advertiser's ASTM testing provided a reasonable basis for its cleaning superiority claims—not whether the testing constituted "perfect" evidence.[29] With this standard in mind, NAD considered the challenger's criticisms in turn.

(i) *The Argument that ASTM F608 Only Calls For Testing on Carpeting*

First, the challenger argued that ASTM F608, which calls for testing only on carpeted surfaces (not on hard flooring or other non-carpeted surfaces), does not support the challenged superiority claims—which are not limited to carpet cleaning. The advertiser countered that consumers' primary reason for purchasing upright vacuum cleaners is to clean carpeting and rugs. Accordingly, the advertiser argued that the ability of an upright vacuum cleaner to clean carpets is the true and most meaningful measure of how well it works.

Both parties cited statistics to bolster their respective arguments about the importance of carpeting versus hard flooring. The challenger pointed to a report showing that only 37.8% of flooring sold in the US last year[30] consisted of carpet. The advertiser cited research suggesting that carpets and area rugs account for 66.8% of floor covering sales by volume. NAD determined that the statistical evidence submitted was not dispositive to the issue at hand, which concerns the purposes for which consumers use vacuum cleaners and the way in which they will interpret the challenged cleaning superiority claims. Statistics simply speaking to the relative percentages of carpeting and rugs versus hard flooring does not shed light on which of these floor surfaces vacuum cleaners are commonly used.

NAD also considered but was not ultimately persuaded by the three *Good Housekeeping* surveys that were submitted by the advertiser in an effort to show that carpet cleaning is most important to consumers of vacuum cleaners. As noted by the challenger, these surveys fell short in several methodological respects. The first poll received responses from only 14 out of 100 respondents and contained no information regarding test methodology—and no explanation of why the sample size was so small. The second poll was deemed "unusable" because "Respondents appeared to rate each attribute on a 1-8 scale individually rather than as part of one question." Finally, in the third poll, the survey sample was not representative of the U.S. population with respect to variables such as gender, age, marital status, and education. Thus, to the extent that this consumer research was offered to show that consumers understand the challenged advertising claims to apply only to *carpet* cleaning, NAD was not persuaded.[31]

---

[29] As noted by the advertiser, NAD has held that "[i]n advertising claim substantiation, perfection is not required but, rather, advertising claim substantiation is based on a determination of whether an advertiser has provided a reasonable basis for its claims." *The Valvoline Company*, NAD Case # 4375 (August 2005)

[30] The year ending in March, 2005

[31] Moreover, NAD found that even if these polls had convincingly established that a vacuum cleaner's carpet cleaning ability ranks first in importance to consumers, such a showing would still not prevent consumers from taking away the unsupported message that the challenged superiority claims apply to all floor surfaces. Thus, even if

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 29

It is well-established that there must be a good fit between an advertiser's claims and the evidence offered to support those claims.[32] Thus, absent reliable consumer research demonstrating otherwise, NAD determined that the advertiser's unqualified cleaning superiority claims[33] did not sufficiently "fit" with its evidence, which was based on carpet cleaning alone. Accordingly, NAD recommended that the advertiser modify its cleaning superiority claims— both as to its WindTunnel and its Fusion—by disclosing that this claim applies only to carpeted surfaces.[34]

### (ii) The Argument that ASTM F608 Does Not Measure Suction

The challenger also argued that the ASTM F608 standard does not measure performance as well as the IEC 60312, because it does not measure suction. NAD was not persuaded by this argument. Although suction power is an important attribute in the design of vacuum cleaners (some more than others), NAD noted that the claims at issue here involve vacuum cleaners' ability to "pick up dirt," and "clean." Whether this cleaning ability is achieved via a vacuum cleaner's suction power, its bristle action, or by other means is not directly material to the claims at hand. Accordingly, NAD found that the advertiser's reliance on ASTM F608 was not fatally flawed on the grounds that the standard does not measure suction.

### (iii) The Argument that ASTM F608 Only Calls For Testing on Brand New Vacuum Cleaners

The challenger also objected to the advertiser's reliance on ASTM F608 because this standard only tests vacuum cleaners in a brand new state. The challenger noted that consumers continue to use their vacuum cleaners for years after their first cleaning, and argued that the WindTunnel's performance rapidly declines with use. As support, the challenger pointed to (i) testing purportedly showing the pick-up efficiency of the WindTunnel declines, on average by 25%, as dust enters the vacuum; (ii) testing purportedly showing that the WindTunnel's performance

---

it were true that consumers are primarily concerned with a vacuum cleaner's carpet cleaning ability, consumers are still entitled to know the extent to which the advertiser's superiority claim is supported. Short of reliable and methodologically sound evidence showing that reasonable consumers would not interpret the advertiser's cleaning superiority claims to apply *only* to carpeted surfaces, the advertiser remains obliged to disclose that its claims are limited to carpet cleaning only.

[32] *Avon Products, Inc. (ANEW Clinical Line and Wrinkle Corrector)* Case # 4250 (November, 2004)

[33] NAD acknowledged that some of the advertiser's claims are expressly limited to carpet-cleaning (such as the claim that "*"The self-propelled WindTunnel™ by Hoover cleans carpet 56% better than Dyson."*) The instant recommendation, of course, does not apply to these claims in which the advertiser already limits its claims to carpeted surfaces only.

[34] NAD was not persuaded, however, by the challenger's argument that the advertiser improperly fails to disclose the *types* of carpeting on which the vacuum cleaners were tested. NAD noted that ASTM F608 is based upon ongoing field tests in American homes, and that the types of carpeting called for by the standard were chosen because they are representative of real-world homes. Moreover, NAD was confident that consumers understand that no testing standard could conceivably test vacuum cleaners on *all* types of carpeting that may be found in homes. Therefore, NAD concluded that the advertiser is under no obligation to inform consumers as to which types of carpeting were used in the tests.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 30

decreases as its belt wears; and (iii) testing purportedly showing that the WindTunnel's performance decreases as its bristles wear.

NAD addressed these concerns in turn. NAD first considered the challenger's testing purporting to show that pick-up efficiency of the WindTunnel declines as dust enters the vacuum. The challenger argued that as the WindTunnel's paper filter becomes coated with dust, less air is able to pass through the filter, causing a reduction in suction power. A reduction in suction power, the advertiser added, causes a decline in performance. As support for this argument, the advertiser points to testing results purportedly showing that Hoover vacuum cleaners experience a decline in pick-up efficiency as dust enters the vacuum.

NAD did not find this testing persuasive. First, NAD was troubled by the fact that this testing utilized only two of the four carpeting types (ASTM plush and ASTM "level loop") that are specified by ASTM. The challenger then averaged together the results of these to ASTM carpeting types with the results of testing conducted upon two flooring surfaces specified by the IEC standard, presuming that this average reflected an overall measure of pick-up decline over time.

While NAD values testing performed in accordance with ASTM standards, NAD noted that these testing standards are of limited value when only certain aspects of the standards are adhered to. Thus, NAD concluded that choosing only certain flooring types on which to test pick-up is a significant deviation from ASTM and IEC protocol, and produces results of limited value. Accordingly, NAD concluded that this testing did not overcome the advertiser's reasonable basis for its cleaning superiority claims.

Second, NAD considered the challenger's belt-wear test. NAD was not persuaded that this belt-wear test demonstrated that the WindTunnel declined in performance over time in any meaningful manner. First, NAD was not convinced that a vacuum cleaner's performance after having been used for 300 hours—which the advertiser estimated to approximate10 years of use—is a consumer-relevant measure of its overall performance. Moreover, NAD noted that no effort was made to determine the effect on cleaning of this purported 15% reduction in power transfer. Perhaps most importantly, NAD took note of the significant limitations of the study that are acknowledged in the study's own conclusion section: "In applying this data to machines in the marketplace one must consider that the loading this belt has been subjected to is quite different to that which would be expected in a home environment. This belt has been run on a push-pull rig for the majority of its life whereas in a home the belt would be subject to many more stops and starts and generally a more varied load. This is sure to affect the rate at which the performance decays. It is also worth noting that this is a very limited sample with only one belt in each condition tested, for these reasons the performance figures may not necessarily be representative of all similar belts." Given the self-acknowledged significant limitations of the test, together with the above-mentioned concerns, NAD concluded that the bristle-wear test failed to demonstrate that the advertiser's WindTunnel vacuums decrease in performance by any meaningful measure.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 31

NAD next turned to the challenger's bristle wear test. In this test, the challenger's technicians operated a WindTunnel in a continuous pattern in an automated reciprocator for 200 hours, measuring the embedded dirt removal capability per ASTM F608 every 50 hours and compared it to a Dyson DC07 undergoing the same test. Here again, NAD was not persuaded that the bristle-wear testing demonstrated that the WindTunnel declines in performance by any meaningful measure. First, as noted by the advertiser, this test reveals that reduction in bristle penetration is not correlated to reduction in pick-up. Specifically, at 50 hours, when a reduction in penetration of 2.5 mm for the WindTunnel was measured, the pick-up was reduced by 7.5 g, but after 100 hours, when the bristle penetration was reduced an additional 1.2 mm, the pick-up increased by 8.1 (the highest value during this test.) Moreover, NAD noted the acknowledgement in the test report that: "The carpet used in the life test part of this project was a short pile nylon, which is known to be relatively tough. This type of carpet is popular with UK consumers… In the event that the machine does not spend its entire life on such carpet, the bristle wear and pick up reduction values quoted in this report represent a worst case. USA carpets are likely to be a longer pile resulting in less bristle wear." Given the use of carpeting that is not representative of typical carpeting found in the US, NAD concluded that the test is of limited value.

*(iv) The Argument that the Advertiser's Own ASTM F608 Testing Undermines its "56%" Claim*

The challenger argued that the advertiser's own test results undermine its claim that the Hoover Self-Propelled WindTunnel outcleans Dyson DC07 vacuum by 56%. The challenger noted that the advertiser submitted two sets of testing: one conducted on unclogged Self-Propelled WindTunnel machines, the other comparing clogged Self-Propelled WindTunnels with unclogged Dyson machines. The challenger argued that while the first set of testing indeed demonstrated that the Hoover Self-Propelled WindTunnel outcleans Dyson DC07 vacuum by 56%, the second set of testing showed that a "clogged" Hoover SelfPropelled WindTunnel only outcleans the Dyson DC07 by 39%.

NAD was not persuaded by the challenger's argument.  NAD noted that the second test compared Dyson vacuum cleaners *with empty dirt cups* to Hoover WindTunnels *with full bags or dirt cups.* Thus, this testing was compared the Hoover machines at their least effective against Dyson machines at their top performance. (Even testing the respective vacuum cleaners under such disparate circumstances, the Hoover still outperformed the Dyson machines by a significant margin.) NAD determined that a test which subjected the competing units to such disparate circumstances was not sufficient to negate the 56% advantage established by the advertiser's first set of ASTM testing.

*B) The Challenger's Argument that Hoover vacuums are designed "at the expense of consumers' carpets"*

In addition to criticizing the advertiser's ASTM F608 testing, the advertiser argued that Hoover vacuum cleaners are designed "at the expense of consumers' carpets." The advertiser maintained that Hoover vacuums have stiffer bristle bars which beat carpeting harder than Dyson vacuum

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 32

cleaners—thereby tearing three times as many fibers out of carpet as compared with the Dyson DC07 vacuum cleaner.

At issue in this proceeding is the truth and accuracy of advertising claims made by Hoover. Outside of its findings relating to the claims here at issue, it is not in NAD's purview to make determinations as to extraneous advantages or disadvantages of Hoover machines. NAD concluded that this testing did not overcome the advertiser's reasonable basis for its cleaning superiority claims.

### C) The Challenger's IEC Testing

Once a claim is determined to have a reasonable basis, the burden shifts to the challenger to show either that the advertiser's evidence is fatally flawed or that it possesses more reliable evidence reaching a different result.[35] Having determined that the advertiser has provided a reasonable basis for its cleaning superiority claims (as modified by the above recommendation), NAD next considered whether this evidence is "fatally flawed," or whether the challenger's evidence qualifies as "more reliable."

The challenger submitted testing that was based upon both ASTM F608 and IEC 60312 ("Vacuum cleaners for household use—Methods of measuring the performance") to show that Dyson, in fact, performs *better* than Hoover.[36] The challenger tested several of its own Dyson vacuums against several WindTunnels along with a number of other upright vacuum cleaner models. Specifically, the challenger performed two types of tests: (i) ASTM tests conducted only on plush and "level loop" carpeting, and (ii) IEC tests conducted on hard-wood floors w/ crevices and on Wilton carpet.[37]

With respect to the results of the ASTM tests, the challenger argued that while its DC07model (which is featured in various Hoover advertisements) does not perform as well as the premiere WindTunnel model on plush carpet, it performs "much better" on the level loop carpet. These test results further showed that the challenger's DC14 model also performed better on level-loop carpet than on plush carpet.

With respect to the IEC tests, the challenger noted that its DC07 was shown to outperform all competitors (including the WindTunnel) on hard wood floors, and that it offers performance comparable to the WindTunnel on Wilton carpeting. The challenger noted that when the IEC results are combined, the DC07's pick-up results are vastly superior to the WindTunnel's—82% vs 51%. The challenger further argued that when results from ASTM and IEC are combined (to represent actual consumer use), the Dyson outperforms the WindTunnel. The DC14 has an average 77.9% pick-up efficacy, the DC07 has an average 70.9% pick-up; the WindTunnel has an average pick-up efficacy of only 66.3%.

---

[35] *Johns Manville (Formaldehyde-Free Insulation)* Case # 4395 (October, 2005)
[36] The challenger noted that ASTM measures cleaning efficacy (F608) and suction power (F558) using two separate ASTM standards, but that the IEC standard addresses both cleaning efficacy and suction power in a single standard (60312).
[37] The challenger submitted more exhaustive IEC testing in its second submission to NAD.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 33

Once again, the question for NAD is whether the challenger's evidence is "more reliable" than the advertiser's ASTM F608 testing. As a preliminary matter, NAD was troubled by the challenger's deviation from the standards set forth by both ASTM and IEC. First, as noted by the advertiser, the challenger only conducted ASTM F608-based tests on two of the four carpets specified by ASTM F655. NAD noted that ASTM specified four carpet types for a reason: because they were deemed representative of the array of carpeting seen in actual American homes. Failure to test its vacuum cleaner on half the required carpet types rendered the test of highly limited value.

Nor was NAD persuaded that the challenger's IEC testing is "more reliable" than the advertiser's ASTM testing. As discussed above, NAD noted that the ASTM standard—unlike IEC 60312—is based upon and represents real-life conditions found in American homes. NAD also determined that the advertiser's attempt to piece together portions of results from different test methodologies was not a meaningful exercise.

NAD was further troubled by the excessive variability in the challenger's testing. As noted by the advertiser, the challenger's testing took place over a five-year period and utilized different carpets for different vacuum cleaners, as well as different technicians. Accordingly, NAD found that the challenger's testing was of limited value in terms of head-to-head comparisons.

Accordingly, NAD was not persuaded that the challenger's evidence was "more reliable" than the advertiser's ASTM F608 testing. NAD therefore determined that the advertiser's ASTM testing provided a reasonable basis for its WindTunnel and Fusion cleaning superiority claims— provided that the advertiser modifies its superiority claims, as discussed above, to clearly and conspicuously disclose that its cleaning superiority claims are limited to cleaning carpeting.

V.    *The Claim that Fusion Offers "NO LOSS OF SUCTION"*

The challenger contended that the advertiser's claim that its Fusion cleaner offers "NO LOSS OF SUCTION" is false because the design of the Hoover vacuum which permits dirt and dust to clog the pores of the filter. Dyson maintained that suction is reduced with repeated use. In support of its argument, Dyson submitted data indicating that there is a decline in suction as the bin fills with dust.[38] The advertiser, on the other hand, maintained that the claim is truthful because it is properly qualified through the use of the following disclosure: "Suction stays constant after picking up 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition composed of 70% mineral dust and 10% fibrous material." The challenger objected to the appropriateness of the disclosure arguing that the results of a narrow ASTM test do not support the advertiser's broad claims and, moreover, does not measure a vacuum's performance over time.

The claim "No loss of suction" is a broad claim that reasonably communicates to consumers a performance attribute that occurs over time and with repeated use of their vacuum cleaners.

---

[38] Suction  was examined by measuring air flow and Air Watts.

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 34

Accordingly, NAD was concerned as to whether the disclosure was adequate to qualify the claim.[39] It is not unusual for a performance claim to be qualified with language indicating that the claim is based on laboratory testing or that the touted measure of performance occurs only under some limited set of conditions. While such qualifying language may, in some circumstances, be perfectly appropriate, NAD must assess the correlation between the test conditions and the real world experience of consumers to ensure that the performance claim is meaningful and not misleading to consumers.[40]

The support for the claim "No Loss of suction" consisted of a laboratory test, based on ASTM F558, which purportedly demonstrated that the suction power of the Fusion model remained constant in certain laboratory conditions. NAD was not persuaded that there was sufficient correlation between the laboratory testing and consumer experience in the real world to support a "No Loss of Suction Claim." NAD noted that limitations of the test to support claims for consumer use are addressed in the test itself. Section 4.1 of the Test, under the heading "Significance and Use," provides as follows:

> The test results allow the comparison of the maximum potential air power available for cleaning tasks when tested under the conditions of this method. The test results do not indicate the actual air power present during the cleaning process due to the effects of the various tools in use and surfaces being cleaned.[41]

NAD also noted that although the test was based on an industry test standard, ASTM F558, the test method conducted by the advertiser, the standard does not provide for measuring the suction of a cleaner in a dust-loaded condition. NAD appreciates that the advertiser sought to measure suction in a cleaner that was not in a new condition but was not persuaded that the protocol utilized by the advertiser, which involved dust loading the machine with 10 ounces of dirt composed of 70% mineral dust and 10% fibrous material, was representative of real world experience of consumers or a representative measure of how vacuum cleaners perform over time. NAD therefore determined that the claim "No Loss of Suction" was not adequately substantiated and recommended that the claim be discontinued.

*VI.    The Remaining Claims*

---

[39] The qualifying language appeared as follows: "Suction stays constant after picking up 10 ounces of dirt, as tested by an independent laboratory using ASTM F558 test method and a dirt composition composed of 70% mineral dust and 10% fibrous material." On the product packaging, the qualifying language appeared in a disclosure on a separate panel.

[40] The Valvoline Company (Zerex G-05 Extended Life Antifreeze) , Report #4375, *NAD Case Reports* (September 2005); Dow Chemical Company (Styrofoam Brand Insulation), Case # 4383, *NAD Case Reports* (August 2005); EuroPro-Corporation (Shark Bagless Stick Vacuum Cleaner, Case # 4216, *NAD Case Reports* (August 2004); Bausch & Lomb Incorporated (Renu), Case #4385, *NAD Case Reports* (August 2005).

[41] ASTM F558-03. In contrast, NAD observed that the test methodology for ASTM 608, which evaluates the dirt removal effectiveness of vacuum cleaners, specifically provides for a correlation with real world use by consumers:

> This test method provides an indication of the capability of the vacuum cleaner to remove embedded dirt from carpeting. This test method is based upon results of home cleaning tests so that, in most cases, a reasonable correlation exists between home and laboratory results. (Section 4.1).

THE HOOVER COMPANY
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 35

### A. Dirt Disposal Claims

The challenger also challenged the advertiser's description of its filter cleaning procedure for the WindTunnel vacuum as "no-touch" filter cleaning false, because in order to clean the paper filter, consumers must remove the filter by hand and spin it against an attached piece of plastic to remove the dust and dirt. The challenger also objected to the claim "No Mess" and "hygienic dirt disposal" because, argued the challenger, in order to empty the advertiser's vacuums' dirt cups, consumers must open the dirt cups and empty the loose dirt and dust into a garbage can, a process that may result in dirt flying into the hands and face of the consumer.

As set forth by the advertiser, the Self Propelled WindTunnel Bagless Upright employs a two-chamber dirt cup with a lid. The lid has a small knob to allow the consumer to rotate the filter prior to opening the lid. In the course of typical cleaning, a consumer turns the knob prior to opening the lid, causing the filter still inside the dirt cup to rotate against a piece of plastic that causes the dust and dirt to fall off the filter and into the container. The consumer may then open the lid with her thumb while holding the cup's handle and pour out the dust and debris.

NAD acknowledged that to ensure a thorough cleaning, a consumer may periodically need to remove the filter and tap it against a dustbin. Nevertheless, because the ordinary cleaning procedure does not require the consumer to come in contact with the filter, NAD determined that the advertiser established a reasonable basis for its use of the claim "no touch" filter cleaning. Similarly, NAD determined that the advertiser provided a reasonable basis for its claims "No Mess" and "hygienic dirt disposal." NAD appreciates that there remains a potential for messiness in cleaning a filter and emptying a dust bin and that the claim might not be supported in comparative context. NAD determined however, that the advertiser's dirt disposal claims, in a monadic context, were adequately supported.

### B. HEPA filter/allergen claims

Dyson challenged the advertiser's claims of total allergen filtration, including the advertising claim "Allergen Filtration traps 100% of dust mites, ragweed and common grass pollens," and the claim packaging claim "Allergen Filtration traps 100% dust mites, 99.98% ragweed and common grass pollens." Although the advertiser stated that its Self Propelled WindTunnel bagless utilizes a cartridge filter that is certified to meet the HEPA criteria of 99.97% efficient at 0.3 microns[42], the claims are misleading, according to the challenger, because there is a significant difference between making a claim for a filter and for a vacuum cleaner as whole.

Although the advertiser established that the advertiser utilizes a cartridge filter that is certified to meet the HEPA criteria of 99.7% efficient at .3 microns, NAD determined that the advertiser's

---

[42] According to the advertiser, common pollen is generally between 15 and 25 microns. Dust mites are generally between 250 and 300 microns and even the dust mite allergens referred to by Dyson are generally between 10 and 20 microns. All of these allergens, the challenger noted, are significantly larger than 0.3 microns. Thus, the advertiser maintained, the HEPA filter on the Hoover will trap 100% of these allergens

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 36

claims of total allergen filtration were broader than could be supported by the evidence. NAD agreed with the challenger's contention that the filter capability is not the sole measure of a vacuum cleaner's ability to trap allergens and that the vacuum's sealing system and efficiency of its filter system may strongly influence a vacuum's capacity for trapping allergens and consequently, potential health benefits. Evidence submitted by the challenger indicated that the Hoover cleaners emit a significant quantity of dust, a result which may limit the ability of a HEPA filter to trap or remove allergens. Accordingly NAD recommended that the advertiser discontinue its allergen claims or alternatively, modify the claims to clearly indicate that they are claims limited to the component filter and not for the vacuum cleaner unit as a whole.

### C. Twin Chamber Bagless System Helps Maintain Maximum Performance

The challenger argued that the claim "Twin Chamber Bagless System helps maintain maximum cleaning power," which appears in the Sears brochure for the WindTunnel, implies that the WindTunnel does not lose suction. The challenger previously noted that WindTunnel was shown to lose significant suction power when tested in accordance with the IEC dust-loaded test. The advertiser maintained however, that the statement "Twin Chamber Bagless System helps maintain maximum cleaning power" does not imply that the WindTunnel does not ever lose suction. Suction power, argued the advertiser, is only one element of the cleaning performance of a vacuum cleaner. NAD agreed and determined that the claim "helps maintain maximum performance" does not communicate to the reasonable consumer that the vacuum never loses suction. Accordingly, NAD determined that the advertiser provided a reasonable basis for the claim.

### D. Cyclone Logo

The challenger also contended that the advertiser's use of cyclone logo, appearing in conjunction with cleaning performance claims for WindTunnel technology, gives rise to the impression that the cleaner uses "cyclone technology." Dyson argued that unlike its own cyclone filtration technology, the advertiser's WindTunnel technology has absolutely nothing to do with the vacuum's method of filtration and contributes little to the cleaning performance of the unit. NAD considered the advertiser's cleaning performance claim in Section IV of this decision and notes here that there was no evidence that the use of the cyclone logo conveys or contributes to any misimpression about the performance of the WindTunnel. Consequently, NAD found the advertiser had a reasonable basis for the use of the logo in its advertising.

**CONCLUSION:**

NAD concluded that the advertiser provided a reasonable basis for its cleaning superiority claims, provided that the advertiser clearly and conspicuously limit these claims to the vacuum cleaner's performance on carpeting. NAD also concluded that the challenged television commercial did not falsely disparage the Dyson vacuum, but that a certain hangtag advertisement conveyed the impression that Dyson was an ineffective vacuum cleaner. NAD therefore recommended that that advertisement be discontinued. NAD further determined that the claim

**THE HOOVER COMPANY**
**WindTunnel and Fusion Upright Vacuum Cleaners**
Page: 37

that the Fusion cleaner offers "No Loss of Suction" was not adequately supported by the evidence and NAD recommended that it be discontinued.

**ADVERTISER'S STATEMENT:**

Maytag Corporation ("Maytag") is pleased that NAD acknowledged that ASTM F608 is the only recognized industry standard test representing real life conditions found in American homes and agreed that the ASTM F608 testing submitted by Maytag provided a reasonable basis for it's Hoover WindTunnel™ and Hoover Fusion™ cleaning superiority claims. Maytag believes that consumers understand that cleaning superiority claims for upright vacuum cleaners apply to cleaning of carpeted surfaces in the context of the Maytag advertising. Notwithstanding, Maytag agrees to clarify its cleaning superiority claims (where necessary) to communicate that the claims apply only to cleaning of carpeted surfaces.

Maytag is also pleased that NAD agreed that the challenged television commercial conveyed a message of comparative superiority (which was substantiated by Maytag's F608 testing) and did not falsely disparage Dyson vacuum cleaners.

Maytag is also pleased that NAD determined that the "no touch filter" and other dirt disposal claims were adequately supported; that Maytag provided a reasonable basis for the claim that the WindTunnel's "Twin Chamber Bagless System helps maintain maximum cleaning power"; and that Maytag's use of the WindTunnel logo is not misleading.

Maytag agrees to address NAD's concerns regarding other claims at issue in the challenge in future advertising.

Maytag supports NAD and the self regulatory approach of the industry and appreciates the opportunity to participate in the process. (#4467 JF, closed 04/05/2006)

# TAB B

 NATIONAL ADVERTISING DIVISION



MEMBERSHIP     NEWSROOM     CONTACT

| HOME | ABOUT NAD | NAD EXCHANGE | CASE REPORTS & PROCEDURES | NATIONAL ADVERTISING DIVISION |



**About NAD ...**      How NAD Works ▼

**How NAD Works**

- [NAD: A Low-cost Alternative to Litigation](#)
- [NAD: A Quick and Private Process](#)
- [NAD: Settles Disputes Fairly and Effectively](#)
- [NAD: Experts in Advertising Review](#)
- [NAD: Ensures a Level Playing Field](#)
- [NAD's Purview](#)
- [Filing a Complaint or Inquiry with NAD](#)

---

**NAD provides a low-cost alternative to litigation** 

National advertisers who use the NAD process find it to be **significantly less expensive than litigation**. By utilizing NAD, cost-conscious companies save hundreds of thousands of dollars typically spent seeking reparation through the courts.

---

**NAD provides a quick and private process** 

NAD adheres to a strict timetable; providing **a written decision within 60 business days**. Companies can expect advertising challenges to be resolved while the ad campaign is still running. And, unlike judicial files, NAD keeps confidential all data it receives in reviewing a case. The challenger's and advertiser's positions, NAD's decision and a statement by the advertiser are made public.

---

**NAD settles disputes fairly and effectively** 

NAD uses **a unique, hybrid form of alternative dispute resolution**, working closely with in-house counsel, marketing executives, research and development departments and outside consultants to decide whether claims have been substantiated. Each party to the dispute has ample opportunity to explain its position and provide supporting data.

---

**NAD attorneys are experts in advertising review** 

The advertising review specialists at NAD are experienced attorneys with expertise in claims substantiation, advertising and trade regulation, litigation and arbitration.

### NAD helps to ensure a level playing field ▲

**Government regulation is usually costly and burdensome**. NAD has earned the respect of consumers and regulators alike for providing an effective, successful self-regulatory mechanism. Advertisers' willingness to support NAD and voluntarily adhere to its decisions helps to ensure an honest and open playing field in advertising.

### NAD Purview ▲



As we enter the Information Age, it becomes more and more difficult to monitor the message content of advertisements. Businesses are encouraged to use the NAD to voice their concerns about potentially misleading national advertising claims.

**NAD reviews only national advertisements -- those ads disseminated on a nationwide or broadly regional basis.** The advertising may be placed on broadcast or cable television, in radio, magazines and newspapers, on the Internet or commercial on-line services, or provided direct to the home or office. Product performance claims, superiority claims against competitive products and all kinds of scientific and technical claims in national advertising are the types of cases accepted by the NAD. **NAD is _not_ the appropriate forum to address concerns about the "good taste" of ads, moral questions about products that are offered for sale or political or issue advertising.**

Local advertising, which NAD does not review, appears only within the cities and towns served by local businesses (or local branches of national chains). If a complaint involves local advertising or local business practices, such as payment and refund problems, delays in delivery, or "bait and switch" tactics, the bes qualified self-regulatory organization to contact is the Better Business Bureau (BBB) located nearest to the advertiser's address. A consumer can speed action on a local advertising complaint by calling the BBB directly.

For a complete listing of procedures for NAD and other Council of Better Business Bureau advertising self-regulation programs go to Procedures.

### Filing a Complaint or Inquiry with NAD ▲

No special form is needed to bring advertising to NAD's attention, but it is helpful to remember the following:

**1. Put the query or complaint in writing;**

**2. Enclose originals or photocopies of newspaper or magazine ads. If the advertising was on radio or television, be specific about the name of the product and company, the claims at issue, and where and when the advertsement appeared;**

**2. Mail your letter and supporting materials to:**

**The Director National Advertising Division**
**Council of Better Business Bureaus**
**70 W 36th St., 13th Fl. New York, NY 10018**

Your letter will be promptly acknowledged and you will be informed of NAD's action. If a formal investigation is conducted, you will be provided with a copy of the NAD's decision.

# TAB C

Effective August 23, 2005

# THE ADVERTISING INDUSTRY'S PROCESS OF VOLUNTARY SELF-REGULATION

Policies and Procedures by
**The National Advertising Review Council
(NARC)**

Administered by
**The Council of Better Business Bureaus
(CBBB)**

Procedures for:
**The National Advertising Division
(NAD)**

**The Children's Advertising Review Unit
(CARU)**

**The National Advertising Review Board
(NARB)**



**NARC PARTNERS**



## 1.1 Definitions

**A.** The term "national advertising" shall include any paid commercial message, in any medium (including labeling), if it has the purpose of inducing a sale or other commercial transaction or persuading the audience of the value or usefulness of a company, product or service; if it is disseminated nationally or to a substantial portion of the United States, or is test market advertising prepared for national campaigns; and if the content is controlled by the advertiser.

**B.** The term "advertiser" shall mean any person or other legal entity that engages in "national advertising."

**C.** The term "advertising agency" shall mean any organization engaged in the creation and/or placement of "national advertising."

**D.** The term "public or non-industry member" shall mean any person who has a reputation for achievements in the public interest.

## 2.1 NAD/CARU

### A. Function and Policies

The National Advertising Division of the Council of Better Business Bureaus (hereinafter NAD), and the Children's Advertising Review Unit (CARU), shall be responsible for receiving or initiating, evaluating, investigating, analyzing (in conjunction with outside experts, if warranted, and upon notice to the parties), and holding negotiations with an advertiser, and resolving complaints or questions from any source involving the truth or accuracy of national advertising, or consistency with CARU's *Self-Regulatory Guidelines for Children's Advertising.*

### B. Advertising Monitoring

NAD and CARU are charged with independent responsibility for monitoring and reviewing national advertising for truthfulness, accuracy and, in the case of CARU, consistency with CARU's *Self-Regulatory Guidelines for Children's Advertising.*

### C. Case Reports

The Council of Better Business Bureaus shall publish at least ten times each year the Case Reports, which will include the final case decisions of NAD, CARU and NARB, and summaries of any other matters concluded since the previous issue. Each final NAD, CARU and NARB case decision shall identify the advertiser, challenger, advertising agency, product or service, and subject matter reviewed. It shall also include a summary of each party's position, NAD, CARU or the NARB's decision and its rationale, and a concise Advertiser's Statement, if any. (See Section 2.9).CARU shall publish in the Case Reports a summary of CARU's actions, other than formal cases, during the preceding month. Included in this Activity Report, shall be the following:

   **(i)** Inquiries—summaries of informal inquiries under CARU's Expedited Procedures (see Section 2.13 below);
   **(ii)**Pre-Screening/Submissions—summaries of story-boards or videotapes of proposed advertising submitted to CARU for prescreening; and

### D. Guidance to the Public

   **(i)** From time to time, after consultation with the General Counsel, NAD/CARU may inform the public, through the *Case Reports* and other media, of trends, principles and interpretations derived from previously published case decisions.
   **(ii)** After consulting with the General Counsel, CARU may also inform the public of new interpretations of its guidelines that it believes would provide appropriate advance notice of the application of CARU guidelines to existing industry practices maintained by multiple advertisers. Prior to publication of any such interpretation, CARU will prepare appropriate explanatory materials for the National Advertising Review Council (NARC), and may publish the interpretation in the *Case Reports* and other media if, after 30 days, NARC has not scheduled a meeting to consider the matter. If such a meeting is scheduled, CARU may publish the interpretation after NARC's consideration unless NARC revises CARU's *Self-Regulatory Guidelines for*

1

*Children's Advertising* in a manner that moots the interpretation

*E. Confidentiality of NAD/CARU Proceedings*

It is the policy of the National Advertising Division of the Council of Better Business Bureaus and the Children's Advertising Review Unit not to endorse any company, product, or service, and a decision of "Advertising Substantiated" (see Section 2.8) should not be construed as such. Correspondingly, an advertiser's voluntary modification of advertising, in cooperation with NAD/ CARU's self-regulatory efforts, is not to be construed as an admission of any impropriety. To ensure the integrity and cooperative nature of the review process, parties to NAD/CARU proceedings must agree: 1) to keep the proceedings confidential throughout the review process (See Section 2.2 (B) (vii)); and 2) not to subpoena any witnesses or documents from NAD/CARU/NARB regarding the review proceeding in any future court or other proceeding (except for the purpose of authentication of a final, published case decision by a staff member) and to pay attorneys fees and costs if such a subpoena is attempted and successfully resisted; and, 3) after a decision has been published, not to issue a press release regarding the decision or mischaracterize any NAD/CARU/NARB case decision or use and/or disseminate any NAD/CARU/NARB case decision for any advertising and/or promotional purposes. NAD/CARU may issue a public statement, for clarification purposes, if any party violates any of the provisions of this Section.

*F. Referrals to Law Enforcement Agencies*

When NAD/CARU commences a review pursuant Section 2.2 of these Procedures, and the advertiser elects not to participate in the self-regulatory process, NAD/CARU shall prepare a review of the facts with relevant exhibits and forward them to the appropriate federal or state law enforcement agency. Reports of such referrals shall be included in the Case Reports.

*G. Academic and Other Expert Advisors*

CARU may establish a panel of academic and other experts as needed from which CARU may obtain advice pertinent to advertising, cognitive ability, nutrition and other matters, and on the application of CARU's *Self-Regulatory Guidelines for Children's Advertising.*

**2.2 Filing a Complaint**

**A.** Any person or legal entity, including NAD/CARU as part of their monitoring responsibility pursuant to Section 2.1 (B) of these Procedures, may submit to NAD/CARU any complaint regarding national advertising, regardless of whether it is addressed to consumers, to professionals or to business entities. All complaints (except those submitted by consumers), including any supporting documentation, must be submitted in duplicate hard copy and in an electronic format (including evidentiary exhibits when possible.) To help ensure a timely review, challengers should strive to limit the length of their submissions to 8 double-spaced typewritten pages (excluding evidentiary exhibits) and limit the number of issues raised in a challenge to those that are the most significant. A challenger may further expedite the review of the contested advertising by waiving its right to reply (see Section 2.6 B) or by requesting an "Expedited Review" pursuant to Section 2.11 of these Proceedings.

> **(i) Filing Fee-** All competitive challenges shall be filed together with a check, made payable to the Council of Better Business Bureaus, Inc., in the amount of $2,500 (for CBBB members and CARU Supporters) or $6,000(for non-members), as a filing fee to help defray some of the administrative costs associated with the advertising review process. The President of the National Advertising Review Council (NARC) shall have the discretion to waive the fee for any challenger who can demonstrate economic hardship. If a case is administratively closed, the filing fee will be $1500 for CBBB members or CARU Supporters and $2500 for non-members. The difference between these administrative closing fees and the initial filing fee will be refunded to the challenger.

**B.** Upon receipt of any complaint, NAD/CARU shall promptly acknowledge receipt of the complaint and, in addition, shall take the following actions:

> **(i)** If, at the commencement or during the course of an advertising review proceeding, NAD/CARU concludes that the advertising claims complained of are : (a) not national in character; (b) the subject of pending litigation or an order by a court; (c) the

2

subject of a federal government agency consent decree or order; (d) permanently withdrawn from use prior to the date of the complaint and NAD/CARU receives the advertiser's assurance, in writing, that the representation(s) at issue will not be used by the advertiser in any future advertising for the product or service; (e) of such technical character that NAD/CARU could not conduct a meaningful analysis of the issues; or (f) without sufficient merit to warrant the expenditure of NAD/CARU's resources, NAD/CARU shall advise the challenger that the complaint is not, or is no longer, appropriate for formal investigation in this forum. Upon making such a determination, NAD/CARU shall advise the challenger that a case will not be opened, or in the event that an advertising review proceeding has already been commenced, shall administratively close the case file and report this action in the next issue of the Case Reports. When it can, NAD/CARU shall provide the challenger with the name and address of any agency or group with jurisdiction over the complaint.

**(ii)** If the complaint relates to matters other than the truth or accuracy of the advertising, or consistency with CARU's *Self-Regulatory Guidelines for Children's Advertising,* NAD/CARU shall so advise the challenger, as provided above, and where a significant national advertising issue is raised, shall forward a copy of the complaint to the NARC President who, in consultation with the NARB Chair, shall consider whether the complaint is appropriate for a consultive panel.

**(iii)** If, in its discretion, NAD/CARU determines that a complaint is too broad or includes too many issues or claims to make resolution within the time constraints proscribed by these Procedures feasible, NAD/CARU may request that the challenger limit the issues or claims to be considered in the review proceeding, or, in the alternative, advise the challenger that the matter will require an extended schedule for review.

**(iv)** If a complaint challenges advertising for more than one product (or product line) NAD/CARU may return the complaint to

the challenger and request that separate complaints be submitted for each of the advertised products.

**(v)** If the complaint relates to the truth or accuracy of a national advertisement, or consistency with CARU's *Self-Regulatory Guidelines for Children's Advertising,* NAD/CARU shall promptly forward the complaint by facsimile, overnight, or electronic mail to the advertiser for its response.

**(vi)** Complaints regarding, specific language in an advertisement, or on product packaging or labels, when that language is mandated or expressly approved by federal law or regulation; political and issue advertising, and questions of taste and morality (unless raising questions under CARU's *Self-Regulatory Guidelines for Children's Advertising*), are not within NAD/CARU's mandate. If the complaint, in part, relates to matters other than the truth and accuracy of the advertising, or consistency with CARU's *Self-Regulatory Guidelines for Children's Advertising,* NAD/ CARU shall so advise the challenger.

**(vii)** NAD/CARU reserves the right to refuse to open or to continue to handle a case where a party to an NAD/ CARU proceeding publicizes, or otherwise announces, to third parties not directly related to the case the fact that specific advertising will be, is being, or has been, referred to NAD/CARU for resolution. The purpose of this right of refusal is to maintain a professional, unbiased atmosphere in which NAD/CARU can affect a timely and lasting resolution to a case in the spirit of furthering voluntary self-regulation of advertising and the voluntary cooperation of the parties involved.

**C.** Complaints originating with NAD shall be considered only after the General Counsel of the NARB has reviewed the proposed complaint and has determined that there is a sufficient basis to proceed. Complaints originating with CARU that would apply a new interpretation or application of CARU's *Self-Regulatory Guidelines for Children's Advertising* shall be considered only after the

General Counsel of NARB has reviewed the proposed interpretation or application and has determined that there is a sufficient basis to proceed.

**D.** In all cases, the identity of the challenger must be disclosed to NAD/CARU who shall advise the advertiser of the identity of the challenger.

## 2.3 Parties to NAD/CARU/NARB Proceedings

The parties to the proceeding are (i) NAD/CARU acting in the public interest, (ii) the advertiser acting in its own interest, and (iii) the challenger(s), whose respective rights and obligations in an NAD/CARU/NARB proceeding are defined in sections 2.2, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, 2.10, 2.11, 2.12, 3.1, 3.2, 3.3, 3.5, and 4.1 of these Procedures.

## 2.4 Information in NAD/CARU Proceedings

**A.** All information submitted to NAD/CARU by the challenger and the advertiser, pursuant to Sections 2.4 through 2.11 of these Procedures, shall be submitted in duplicate hard copy and in an electronic format (including evidentiary exhibits when possible). Upon receipt of a filing by any party, NAD/CARU shall forward a copy to the other party by messenger, facsimile, electronic or overnight mail. All transmittals by NAD/CARU during the course of an advertising review proceeding shall be paid for by the challenger, unless the challenger is a consumer or otherwise demonstrates economic hardship, in which case all transmittals shall be paid for by NAD/CARU.

**B.** Time periods for all submissions to NAD, CARU and NARB shall commence on and include the first day of business following the date of delivery of the triggering document and shall not include Saturdays, Sundays or Federal holidays.

**C.** NAD/CARU shall not consider any data submitted by a challenger that has not been made available to the advertiser, and any materials submitted by a challenger on condition that they not be shown to the advertiser shall promptly be returned. In the case of studies, tests, polls and other forms of research, the data provided should be sufficiently complete to permit expert evaluation of such study, poll, test or other research. NAD/CARU shall be the sole judge of whether the data are sufficiently complete to permit expert evaluation. If a party initially submits incomplete records of data

that is then in its possession, and later seeks to supplement the record, NAD/CARU may decline to accept the additional data if it determines that the party's failure to submit complete information in the first instance was without reasonable justification.

**D.** An advertiser may submit trade secrets and/or proprietary information or data (excluding any consumer perception communications data regarding the advertising in question) to NAD/CARU with the request that such data not be made available to the challenger, provided it shall: (i) clearly identify those portions of the submission that it is requesting be kept confidential in the copy submitted for NAD/CARU's review; and (ii) redact any confidential portions from the duplicate copy submitted to NAD/CARU for NAD/CARU to forward to the challenger; (iii) provide a written statement setting forth the basis for the request for confidentiality; (iv) affirm that the information for which confidentiality is claimed is not publicly available and consists of trade secrets and/or proprietary information or data; and (v) attach as an exhibit to NAD/CARU's and the complainant's copy of the submission a comprehensive summary of the proprietary information and data (including as much non-confidential information as possible about the methodology employed and the results obtained) and the principal arguments submitted by the advertiser in its rebuttal of the challenge. Failure of the advertiser to provide this information will be considered significant grounds for appeal of a decision by a challenger. (See Section 3.1)

**E.** Prior to the transfer of data to the advertiser or challenger, NAD/CARU shall obtain assurances that the recipients agree that the materials are provided exclusively for the purpose of furthering NAD/CARU's inquiry; circulation should be restricted to persons directly involved in the inquiry, and recipients are required to honor a request at the completion of the inquiry that all copies be returned.

**F.** Whenever CARU has consulted an expert from the panel established under 2.1 G, or otherwise, in connection with the filing of a complaint, consideration of a complaint, or pre-screening, the expert's opinion shall be in writing, or summarized in writing by CARU. The expert's opinion and a brief description of the expert's qualifications shall be made available to the parties promptly. The advertiser or challenger may respond to the expert's opinion in any submission under 2.5, 2.6, 2.7. or

2.8. When furnished to the advertiser or challenger, CARU shall inform the parties that there has been no final determination by CARU on any matter contained in the expert's opinion.

## 2.5 The Advertiser's Substantive Written Response

The advertiser may, within 15 business days after receipt of the complaint, submit to NAD/CARU, in duplicate hard copy and an electronic format (including exhibits when possible), a written response that provides substantiation for any advertising claims or representations challenged, any objections it may have to the proceedings on jurisdictional grounds, as defined in Sections 2.2(B)(i)-(v), together with copies of all advertising, in any medium, that is related to the campaign that includes the challenged advertising. The advertiser may not include a counter challenge (i.e., a request that NAD/CARU review advertising claims made by the challenger) in its response. Such a request must be filed as a separate complaint as described in Section 2.2 of these Procedures. To help ensure a timely review, advertisers should strive to limit the length of their submissions to 8 double-spaced typewritten pages (excluding evidentiary exhibits). Advertiser responses addressed to the issue of NAD/CARU jurisdiction, should be submitted as soon as possible after receipt of the complaint, but in any event, must be submitted no later than 15 business days after the advertiser receives the initial complaint. (See also Section 2.10 Failure to Respond.)

## 2.6 The Challenger's Reply

**A.** If the advertiser submits a written response, NAD/CARU shall promptly forward the copy of that response prepared by the advertiser for the challenger, that shall have any material designated as confidential redacted, and shall include, as an exhibit, a comprehensive summary of the redacted information in the manner set forth in Section 2.4 above. Within ten business days of receipt of the advertiser's response, the challenger shall submit in duplicate hard copy and an electronic format (including exhibits when possible) its reply, if any, to NAD/CARU. To help ensure a timely review, challengers should strive to limit the length of their reply to 8 double-spaced typewritten pages (excluding evidentiary exhibits). This reply should include a short Executive Summary summarizing the key points in the challenger's position on the

case and cite to the supporting evidence in the record. If the challenger does not submit a reply, NAD/CARU shall proceed to decide the challenge upon the expiration of the complainant's time to reply, subject to a request by NAD/CARU for additional comments or data under Section 2.8 (A)

**B.** *Expediting Review by Waiving the Reply –*

After the challenger has reviewed the Advertiser's first substantive written response; the challenger may notify NAD/CARU in writing that it elects to waive its right to add to the record thereby expediting the proceeding. In the event that a challenger waives its right to reply, additional information from either party may be submitted only upon request from NAD/CARU and shall be treated in the same manner as requests for additional comments or data under Section 2.8(A) of these procedures and any meetings with the parties will be held at the discretion of the NAD/CARU.

## 2.7 Advertiser's Final Response

If the challenger submits a reply, NAD/CARU shall promptly forward a copy of that reply to the advertiser. Within ten business days after receipt of the complainant's reply, the advertiser shall submit a response, if any, in duplicate hard copy and an electronic format (including exhibits when possible). To help ensure a timely review, advertisers should strive to limit the length of their response to 8 double-spaced typewritten pages (excluding evidentiary exhibits). This response should include a short Executive Summary summarizing the key points in the advertiser's position on the case and cite to the supporting evidence in the record.

## 2.8 Additional Information and Meetings with the Parties

**A.** In the event that NAD/CARU deems it necessary and request further comments or data from an advertiser or challenger, the written response must be submitted within six business days of the request. NAD/CARU will immediately forward the additional response to the advertiser or challenger, who will be afforded six business days to submit its own response to the submission. Unless NAD/CARU requests further comments or data under this paragraph, no additional submissions will be accepted as part of the case record, and any

unsolicited submissions received by NAD/CARU will be returned.

**B.** NAD/CARU, in its discretion, may, in addition to accepting written responses, participate in a meeting, either in person or via teleconference, with either or both parties. In the event that NAD/CARU participates in a meeting in which only one party participates, NAD/CARU shall notify the other party that a teleconference or meeting has been scheduled to take place and after the meeting shall summarize the substance of the information exchanged for the other party (or have such a summary provided by the attending party). Where feasible, upon request, an advertiser shall be afforded the opportunity to schedule its meeting with NAD/CARU after the date of challenger's meeting. All meetings with the parties shall be held within 15 business days of NAD's receipt of the Advertiser's Final Response (Section 2.7).

**C.** Except upon request by NAD, as provided in Section 2.8(A) of these procedures, no new evidence may be submitted for inclusion in the record at these meetings. Any non-requested information provided during a meeting that is not already in the submissions of the party (including visual demonstrations, summaries and other documentary evidence) will not be included in the record and will not be considered by NAD/CARU in making its decision or by an NARB Panel in reviewing NAD's decision on appeal.

**D.** The period of time available for all communications, including meetings and written submissions, shall not exceed the time limits set forth in Sections 2.4 through 2.8 above except upon agreement of NAD/CARU and the parties.

## 2.9 Decision

### A. The Final Case Decision

Within 15 business days of its receipt of the last document authorized by Rules 2.5 to 2.8, above, NAD/CARU will formulate its decision on the truth and accuracy of the claims at issue, or consistency with CARU's *Self-Regulatory Guidelines for Children's Advertising*; prepare the "final case decision;" provide a copy to the advertiser and invite the advertiser to add an Advertiser's Statement within five business days of receipt.

### B. Advertiser's Statement

In the event that NAD/CARU decides some or all of the advertising claims at issue are not substantiated, the advertiser shall, within five business days of receipt of the decision, submit an Advertiser's Statement stating whether the advertiser agrees to modify or discontinue the advertising or chooses to take the issues to appeal, as specified in Section 3.1. The Advertiser's Statement should be concise and may not exceed one double spaced page in length. Whether an advertiser intends to comply or appeal, an advertiser may include in this statement an explanation of why it disagrees with NAD/CARU. However, this is not the venue to reargue the merits of the case, bring in new facts, or restate or summarize NAD/CARU's conclusions. NAD/CARU reserves the right, following consultation with the advertiser, to edit for length or inappropriate material. In the event that the advertiser fails to submit an Advertiser's Statement as required by this Section, NAD/CARU may refer the matter to an appropriate government agency for review and possible law enforcement action.

### C. Publication of the Decision

Upon receipt of the final version of the Advertiser's Statement, NAD/CARU shall provide copies of the "final case decision" to the advertiser and the challenger, by facsimile, electronic or overnight mail or messenger, and make the decision available to the public through press announcements and publication of the decision in the next Case Reports.

### D. Case Report Headings

NAD/CARU's decisions in the Case Reports shall be published under the headings:

- Advertising Substantiated
- Advertising Referred to NARB
- Advertising Modified or Discontinued
- Administrative Closing
- Advertising Referred to Government Agency
- No Substantiation Received
- Compliance

### E. Annual Summary

The first issue of the Case Reports each calendar year shall include a summary, prepared by NAD/CARU, which includes the number, source and disposition of all complaints received and cases published by NAD/CARU during the prior year.

6

**2.10 Failure to Respond**

**A.** If an advertiser fails to file a substantive written response within the period provided in Section 2.5 above, NAD/ CARU shall release to the press and the public a "notice" summarizing the advertising claims challenged in the complaint, and noting the advertiser's failure to substantively respond.

**B.** If the advertiser fails to file a substantive written response within an additional 15 business days, NAD/CARU, may refer the file to the appropriate government agency and release information regarding the referral to the press, the public, and the media in which the advertising at issue has appeared, and shall report the referral in the next issue of the Case Reports.

**C.** If a challenger fails to file a reply within the time provided by Rule 2.6, or an advertiser fails to file a response within the time provided in Rule 2.7, the untimely document shall not be considered by NAD/CARU, or by any panel of the NARB.

**2.11 Expedited Proceeding**

A challenger may, with the consent of the advertiser, request that the NAD/CARU engage in an expedited review of the contested advertising. This request must be made in the challenger's initial challenge letter to NAD/CARU, which shall not exceed four double-spaced typewritten pages. Based on the complexity of the challenge, NAD/CARU shall determine whether the matter is appropriate for an expedited review. If a challenger's request for an expedited proceeding is accepted, the challenger automatically waives its right to reply to the Advertiser's substantive written response. The advertiser will have 15 business days in which to respond to NAD/CARU's inquiry. NAD/CARU will forward the advertiser's response to the challenger. Thereafter, NAD/CARU may, in its discretion, request additional information from either party. NAD/CARU will issue a summary decision within 15 business days after the close of the evidentiary record. If NAD/CARU determines that the advertising should be modified or discontinued, the advertiser may then request a full review (with any additional submissions permitted by these Procedures) and a detailed decision. In such a case, the advertiser will be required to discontinue the challenged advertising until the final decision is issued. In an expedited proceeding,

the parties' rights to appeal (as described in Sections 3.1A and 3.1B of these Procedures) attach only in the event that the advertiser requests a full review and after a detailed decision is issued on the merits.

**2.12 Request for Product**

When CARU's monitoring identifies an advertisement which may raise concerns under the Guidelines, but only physical inspection of the product or packaging can determine whether such concerns exist, CARU will request a sample of the product from the advertiser. If the advertiser complies with CARU's request within five business days, and inspection of the product reveals no questions of non-compliance with the Guidelines, no inquiry will be opened.

**2.13 CARU Expedited Procedure**

Notwithstanding 2.2 through 2.11 above, in instances of incorrect commercial placement or technical error, if the advertiser responds within five business days of receipt of an inquiry regarding non-compliance with CARU's Guidelines and the advertising is substantiated, or if within an additional five business days any violation of the Guidelines is remedied, no formal case will be opened, and the results will be published in the CARU Activity Report.

**3.1 Appeal**

**A.** When an advertiser does not agree to comply with NAD/CARU's decision on one or more issues involved in a case, the advertiser shall be entitled to panel review by the NARB. To appeal an NAD/CARU decision, an advertiser shall make a request for a referral to the NARB and specify any and all issues for its appeal in the Advertiser's Statement it prepares in response to NAD/CARU's decision pursuant to Section 2.8(A). All advertiser requests for an appeal to NARB shall be submitted together with a check made payable to the Council of Better Business Bureaus, Inc. in the amount of $1000 (for CBBB Members) or $2000 (for non-members). In such cases, NAD/CARU shall publish its decision and the Advertiser's Statement in the next Case Reports, under the heading "Advertising Referred to NARB".

**B.** Within ten business days after the date of receipt of a copy of NAD/CARU's final case decision, the challenger may request review by the NARB by

filing a letter, not to exceed 20 double spaced pages plus any relevant attachments from the NAD/CARU case record, explaining its reasons for seeking review. The letter should be addressed to the Chair, NARB, Attention: NARB Director, 70 West 36th Street, 13th Floor, New York, NY 10018. The challenger shall send a copy of this letter to the advertiser and to NAD/CARU. Within ten business days after receipt of the copy of the request for review, the advertiser may and NAD/CARU shall submit a response to the NARB Chair, not to exceed 20 double spaced pages plus any relevant attachments from the NAD/CARU case record. A copy of the advertiser's and NAD/CARU's responses shall be sent by the advertiser and NAD/CARU, respectively, to the other parties, except that portions of the case record that were submitted to NAD/CARU on a confidential basis shall not be sent to the challenger unless the advertiser consents. No other submissions shall be made to the NARB Chair. These letters, together with the relevant sections of the case record provided by the parties, will be reviewed by the NARB Chair, who within ten business days after the time for the last submission under this rule has expired shall (1) determine if there is no substantial likelihood that a panel would reach a decision different from NAD/ CARU's decision; or (2) proceed to appoint a review panel as outlined in Section 3.2. The NARB Chair shall return the record to NAD/CARU after (s)he makes his or her determination. With the exception of the time period within which a challenger must file a request for NARB review of an NAD/CARU decision, the NARB Chair reserves the right to extend the time intervals provided in this Section for good cause, notifying all interested parties of such extension.

**C.** When an advertiser appeals to the NARB pursuant to Section 3.1(A), or if the NARB Chair grants a complainant's request for NARB review pursuant to Section 3.1(B), the appellant shall pay a filing fee by check made payable to the Council of Better Business Bureaus, Inc. in the amount of $1000 (for a CBBB member) or $2000 (for a non-member). NAD/CARU shall prepare the relevant portions of the case record and forward them to the NARB within five business days of the issuance of the press release. The NARB shall thereafter make copies of and mail the case record to the parties, except that portions of the case record that were submitted to NAD/CARU on a confidential basis shall not be sent to the challenger unless the advertiser consents. The appellant shall pay for all NARB copying and transmittal costs incurred as a result of an appeal or request for appeal, pursuant to Sections 3.1 through 3.6 of these Procedures. Where the advertiser and the challenger both appeal, these costs shall be divided equally between them. In any event, NARB shall pay these costs for any party that can demonstrate economic hardship. The party appealing shall, within ten business days of receipt of the case record prepared by NAD/CARU, submit to the NARB Chair, addressed as indicated in Section 3.1(B), a letter not to exceed 30 double spaced pages explaining its position. The appellant shall send a copy of the letter to the opposing party and NAD/CARU who shall each have ten business days of receipt of which to submit a response, not to exceed 30 double spaced pages, to the NARB Chair, with copies to the other parties. No other submissions shall be made.

**D.** In the event that the advertiser shall exercise its right to an appeal under Section 3.1(A), the challenger shall have the right to appeal any additional issues considered by the NAD/CARU that have not been appealed by the advertiser. In the event that a challenger's request to appeal is granted by the NARB Chair under Section 3.1(B), the advertiser may appeal any additional issues considered by the NAD/CARU that have not been appealed by the challenger, notwithstanding that its time to file an appeal as of right has expired. The challenger or advertiser may exercise the right to appeal under this paragraph by submitting a letter to the NARB at the address listed in Section 3.1(B), requesting the appeal and specifying the additional issues it wishes to appeal. The cross-appellant shall also pay a filing fee by check made payable to the Council of Better Business Bureaus, Inc. in the amount of $1000 (for a CBBB member) or $2000 (for a non-member). In the case of the challenger, the letter shall be due within five business days of receipt of the final case decision with the advertiser's statement indicating the advertiser's election to appeal; in the case of the advertiser, the letter is due within five business days of the date of receipt of the NARB Chair's determination granting the challenger's request to appeal. Copies of these letters shall be sent by the issuing party to all of the other parties. The advertiser shall be deemed thereafter to be the appellant for purposes of the order of submissions.

**3.2 Content of Submissions to NARB**

The written submissions to NARB may not contain any factual evidence, arguments or issues that are not in the case record forwarded to NARB pursuant

to Section 3.1 C of these Procedures. In the event that the NARB Chair, after consultation with the parties, determines that a party has included evidence, facts or arguments outside this record in its submission to NARB the NARB Chair, may in his/her discretion:

(a) return the brief to the party with a request that it redact any information that NARB has identified as outside the record and resubmit its brief within 3 business days. If the party fails to submit a properly redacted brief within 3 business days it shall be deemed to have defaulted on its appeal; or

(b) remand the matter to NAD/CARU for a determination on whether the additional information constitutes "newly discovered evidence" sufficient to warrant NAD's reopening of the case under the "extraordinary circumstances" provisions of Section 3.8 of these Procedures. If NAD/CARU determines that it is not appropriate to reopen the case, NAD/CARU shall return the brief to the NARB Chair who shall handle any information outside the record in the manner provided by Section 3.2 (a) above.

### 3.3 Appointment of Review Panel

The Chair, upon receipt of an appeal by an advertiser, or upon granting a request to appeal by a challenger, shall appoint a panel of qualified NARB members and designate the panel member who will serve as panel Chair.

### 3.4 Eligibility of Panelists

An "advertiser" NARB member will be considered as not qualified to sit on a particular panel if his/her employing company manufactures or sells a product or service which directly competes with a product or service sold by the advertiser involved in the proceeding. An "agency" NARB member will be considered as not qualified if his/her employing advertising agency represents a client which sells a product or service which directly competes with the product or service involved in the proceeding. A NARB member, including a non-industry member, shall disqualify himself/herself if for any reason arising out of past or present employment or affiliation (s)he believes that (s)he cannot reach a completely unbiased decision. In addition, the

Executive Director shall inform the advertiser, challenger, and the Director of NAD/CARU of their right to object, for cause, to the inclusion of individual panel members, and to request that replacement members be appointed. Requests will be subject to approval by the NARB Chair. If the NARB Chair is unable to appoint a qualified panel, (s)he shall complete the panel by appointing one or more alternate NARB member(s).

### 3.5 Composition of Review Panel

Each panel shall be composed of one "public" member, one "advertising agency" member, and three "advertiser" members. Alternates may be used where required. The panel will meet at the call of its chair, who will preside over its meetings, hearings and deliberations. A majority of the panel will constitute a quorum, but the concurring vote of three members is required to decide any substantive question before the panel. Any panel member may write a separate concurring or dissenting opinion, which will be published with the majority opinion.

### 3.6 Procedure of Review Panel

**A.** As soon as the panel has been selected, the Executive Director will inform all parties as to the identity of the panel members. At the same time, (s)he will mail copies of all submissions under Section 3.1(C) to each of the panel members, and will, in like manner, send them any response or request submitted by any other party or parties. Within ten days after receiving copies of the appeal, the panel members shall confer and fix the time schedule that they will follow in resolving the matter.

**B.** The panel, under the direction of its chair, should proceed with informality and speed. If any party to the dispute before NAD/CARU requests an opportunity to participate in the proceedings before the panel, (s)he shall be accommodated. All parties to a matter before the panel shall be given ten days notice of any meeting at which the matter is to be presented to the panel. Such notice shall set out the date and place of the meeting, and the procedure to be followed.

**C.** The case record in NAD, CARU and/or NARB proceedings shall be considered closed upon the publication of the "final case decision" as described in Section 2.8. No factual evidence, arguments or

9

issues will be considered within the case record if they are introduced after that date.

**D.** The decision of the panel will be based upon the portion of the record before NAD/CARU which it has forwarded to the panel, the submissions under Section 3.1 (C), and any summaries of the record facts and arguments based thereon which are presented to the panel during its meeting with the parties. A party may present representatives to summarize facts and arguments that were presented to NAD/CARU, and members of the panel may question these persons. If the advertiser has declined to share any of its substantiation with the challenger, the panel will honor its request for confidentiality, even though the challenger may have instituted the appeal. The challenger will therefore be excluded from the meeting during the time when such confidential substantiation is being discussed by the panel with NAD/CARU and the advertiser. The panel will consider no facts or arguments if they are outside the facts presented to, or inconsistent with the arguments made before, NAD/CARU.

### 3.7 Timing and Reporting of Panel Decisions

When the panel has reached a decision, it shall notify the NARB Chair of its decision and the rationale behind it in writing and shall endeavor to do so within 15 business days. The Chair, upon receipt of a panel's decision, shall transmit such decision and rationale to NAD/CARU and then to the advertiser. The advertiser then has five business days to respond indicating its acceptance, rejection or any comments it may wish to make on the panel's decision and shall state whether or not it will comply with the panel's decision. Thereafter, the Chair shall notify other parties to the case of the panel's decision, incorporating therein the response from the advertiser, and make such report public. In the event that a panel has determined that an advertising claim has not been substantiated or is untruthful and/ or inaccurate, and the advertiser fails to indicate that the specific advertisement(s) will be either withdrawn or modified in accordance with the panel's findings within a time period appropriate to the circumstances of the case, the Chair will issue a Notice of Intent to the advertiser that the full record on the case will be referred to the appropriate government agency. If the advertiser fails to respond or does not agree in writing to comply with the decision of the panel within ten days of the issuance of the Notice of Intent, the Chair shall so inform the appropriate

government agency by letter, shall offer the complete NARB file upon request to such government agency, and shall publicly release his/her letter. The Chair and/or Executive Director of the NARB shall report to the NARB at its annual meeting on, among other things, the number, source and disposition of all appeals received by the NARB.

### 3.8 Closing a Case

When a case has been concluded with the publication of a NAD/CARU decision or, when a panel has turned over a decision to the Chair, and when the Chair has executed the procedures in Section 3.6 of these "Procedures," the case will be closed and, absent extraordinary circumstances, no further materially similar complaints on the claim(s) in question shall be accepted by NAD/CARU, except as provided for in Section 4.1.

### 3.9 Confidentiality of Panel Procedures

All panels, through the NARB Director, shall maintain a record of their proceedings, but a verbatim record is not required. All deliberations, meetings, proceedings and writings of a panel other than the written statement of its conclusions and the rationales behind them shall be confidential, with the sole exception of those which the Chair of the NARB determines must be made available to an agency of the government. A published NAD/CARU decision and an NARB Panel Report, in those cases referred to a panel, are the only permanent records required to be kept as to the basis of an inquiry, the issues defined, the facts and data presented, and the conclusions reached by NAD/ CARU and a NARB Panel, if one has been involved in the process.

### 4.1 Compliance

**A.** After an NAD, CARU or NARB panel decision requesting that advertising be "Modified or Discontinued" is published, together with an Advertiser's Statement indicating the advertiser's willingness to comply with NAD, CARU or the NARB panel's recommendations, or an advertiser agrees to modify or discontinue advertising pursuant to §2.12 CARU Expedited Procedure, NAD/CARU, either on its own or at the behest of a challenger or a third party, may request that the advertiser report back, within five (5) business days, on the status of the advertising at issue and explain the steps it has taken to bring the

advertising into compliance with the decision. Any evidence that NAD/CARU relies on as a basis for its request for a report on compliance shall be forwarded to the advertiser together with the request for a status report.

**B.** If, after reviewing the advertiser's response to a request for a status report on compliance, pursuant to Section 4.1, or, if the advertiser fails to respond, after NAD/CARU independently reviews the current advertising, NAD/ CARU determines that the advertiser, after a reasonable amount of time, has not made a bona fide attempt to bring its advertising into compliance with NAD, CARU or the NARB panel's recommendations and/or the representations with respect to compliance made in its Advertiser's Statement, NAD/CARU may refer the file to the appropriate government agency and release information regarding the referral to the press, the public, and to the media in which the advertising at issue has appeared, and shall report the referral in the next issue of the *Case Reports*. The amount of time considered reasonable will vary depending on the advertising medium involved.

**C.** If NAD/CARU determines that the advertiser has made a reasonable attempt to comply with an NAD, CARU or NARB panel decision, but remains concerned about the truthfulness and accuracy of the advertising, as modified, NAD/CARU will notify the advertiser, in writing, detailing these concerns. The advertiser will have ten business days after receipt of NAD/CARU's notice to respond, unless NAD/CARU expressly agrees to extend the advertiser's time to answer. Within 15 days of receipt of the advertiser's response, NAD/CARU will make a determination regarding the advertiser's compliance, and:

**(i)** if NAD/CARU concludes that the advertising is in compliance with NAD, CARU or the NARB panel's decision, NAD/CARU will notify the advertiser and close the compliance inquiry;

**(ii)** if NAD/CARU recommends that further modifications be made, to bring the advertisement into compliance with NAD, CARU or the NARB panel's original decision, NAD/CARU will notify the advertiser of its findings and any further recommendations for compliance.

(a) If the advertiser accepts NAD/CARU's compliance findings, and agrees to discontinue the advertising at issue until it makes the further modifications recommended by NAD/CARU, NAD/CARU shall report this in the next issue of the Case Reports and shall continue to monitor for compliance.

(b) If the advertiser indicates that it disagrees with NAD/CARU's compliance findings and refuses to make the further modifications recommended by NAD/CARU, the advertiser may, within five business days of receiving NAD/CARU's letter, submit a statement documenting its disagreement. Upon receipt of such statement, or in the event an advertiser fails to respond within five days, NAD/CARU:

(1) shall, where compliance with an NARB panel decision is at issue, refer the matter to the NARB Chair for review under Section 3.6 above; and

(2) may, where compliance with an NAD/CARU decision is at issue, refer the matter to the appropriate government agency and report this action to the press, the public, and any medium in which the advertising at issue appeared; and shall report its findings in the next issue of NAD Case Report.

## GENERAL PROVISIONS

### 5.1 Amendment of Standards

Any proposals to amend any advertising standards which may be adopted by NARB may be acted on by a majority vote of the entire membership of the NARB at any special or regular meeting, or by written ballot distributed through the United States mails, provided that the text of the proposed amendment shall have been given to the members 30 days in advance of the voting date Once NARB voting is completed and tallied, the NARC President shall take it to the NARC Board of Directors for their approval.

### 5.2 Use of Consultive Panels for Matters Other Than Truth and Accuracy, or Consistency with CARU's *Self-Regulatory Guidelines for Children's Advertising*

From time to time, NARB may be asked to consider the content of advertising messages in controversy for reasons other than truth and accuracy, or consistency with CARU's *Self-Regulatory*

*Guidelines for Children's Advertising*, or the NARC or the NARB may conclude that a question as to social issues relative to advertising should be studied. In such cases the following procedures shall be employed to deal with such issues:

**5.3 Consultive Panels**

The NARB Chair may consult regularly with the NARC President, the NARC Board of Directors or with the NARB to determine whether any complaints have been received, or any questions as to the social role and responsibility of advertising have been identified, which should be studied and possibly acted upon. If so, a consultive panel of five NARB members shall be appointed, in the same proportions as specified for adjudicatory panels in Section 3.4 above.

**5.4 Panel Procedures**

Consultive panels shall review all matters referred to them by the Chair and may consult other sources to develop data to assist in the evaluation of the broad questions under consideration. No formal inquiry should be directed at individual advertisers.

**5.5 Confidentiality**

All panel investigations, consultations and inquiries shall be conducted in complete confidence.

**5.6 Position Paper**

If a consultive panel concludes that a position paper should be prepared to summarize its findings and conclusions for presentation to the full NARB, the paper shall be written by one or more members of the panel, or by someone else under its direction. The contents of the paper should reflect the thinking of the entire panel, if possible, but any panel member may write a separate concurring or dissenting opinion, which will be published with the panel report, if it is published.

**5.7 Voting on Publication**

Any such report prepared by a consultive panel will be submitted to the NARB Chair, who will distribute copies to the full NARB for its consideration and possible action. The members of the NARB will be given three weeks from the date of such distribution within which to vote whether to publish the report or not. Their votes will be returned to the Executive Director of the NARB If a

majority of the NARB members vote for its publication the report will be distributed to NARC for its review and will be published only if a majority of NARC vote for its publication.

**5.8 Publication**

If a majority of the NARB and NARC vote for publication, the paper will be published promptly with appropriate publicity.

# TAB D

*Case #3247 (11/01/95)*
**CHURCH & DWIGHT CO., INC.**
**Arm & Hammer Dental Care Baking Soda Toothpaste**
*Partners & Shevak/New York, NY*

- **An advertiser has the responsibility to support any reasonable interpretation of its claims based on the context of an advertisement**

- **Without proof of efficacy, a measurable ingredient difference does not necessarily signify a meaningful difference.**

**Basis of Inquiry:** Television advertising for Church & Dwight Co., Inc.'s Arm & Hammer Dental Care baking soda toothpaste was brought to the attention of NAD by the Procter& Gamble Company, manufacturers of Crest toothpaste with baking soda.

The 30 second commercial, featuring a man and woman speaking to the camera, consisted of the following dialogue:

ANNOUNCER: Ask your dentist about Arm & Hammer Dental Care.

WOMAN: Our dentist gave us a reason to brush with Arm & Hammer Dental Care.

MAN: The reason, more baking soda.

(Camera close up on dental survey. One particular section of the survey is highlighted in bold print and states that: "2 Out of 3 Dentists Recommend Brushing With *Baking Soda Or A Baking Soda Toothpaste For Healthy Teeth And Gums.")*

ANNOUNCER: In fact 2 out of 3 dentists recommend baking soda for healthy teeth and gums. And only Dental Care's patented formula gives you more than 3 times more baking soda than Crest.

(The video bar graph shows Arm & Hammer Dental Care toothpaste having "3 times more baking soda" as compared to Crest with baking soda. A super below the graph states: "Comparison based on paste toothpaste only".)

MAN: Maybe that's why more dentists recommend Arm & Hammer than any other baking soda toothpaste.

WOMAN: For healthy teeth and gums.

ANNOUNCER: Ask your dentist about Arm & Hammer Dental Care. Its serious care for healthy teeth and gums, from the baking soda experts.

**Challenger's Position:** Procter & Gamble maintained that this television advertisement falsely claimed superiority to its Crest toothpaste for healthy teeth and gums purportedly due to the fact than the Arm & Hammer baking soda dentifrice contained three times as much baking soda than the challenger's product.

According to the challenger, the advertisement conveyed an "unmistakable" and unsubstantiated message based upon the logical progression of the commercial. That is:

"Our dentist gave us a reason to brush with Arm & Hammer dental care" — "The reason, more baking soda." — "...three times as much baking soda than Crest." - - "...that's why more dentists recommend Arm & Hammer than any other baking soda toothpaste."

Procter & Gamble insisted that a clear and unambiguous message was thus given to consumers; i.e., dentists recommend Arm & Hammer Dental Care over Crest because it contains three times the amount of baking soda.

The challenger vehemently objected that it was not given a comprehensive summary of the confidential survey used by the advertiser (as is required in the NAD/NARB Procedures to support its recommendation claim and, consequently, was not given a fair opportunity to analyze the advertiser's testing data.

Procter & Gamble called NAD's attention to a 1991 case between the same parties with regard to advertising for Arm & Hammer Dental Care toothpaste. In that case, the television commercial in question claimed that "Our dentist gave us a reason to switch toothpaste. Baking soda. He recommended it for healthier teeth and gums. And only one major toothpaste has it." An alternate version of the commercial used the claim that "Our dentists gave us a reason to try Arm & Hammer Dental Care. Baking Soda." Additionally, a series of newspaper inserts included the claim: "Dentists choose baking Soda. Shouldn't you ?"

In the 1991 case, the challenger argued that the advertiser submitted no scientific evidence to show that use of Dental Care rather than other toothpaste resulted in" healthier teeth and gums." Procter & Gamble also provided the results of a communications study which indicated that a majority of consumers believed that the advertiser was claiming that Arm & Hammer was "better than other toothpastes."

Consequently, Church & Dwight agreed to cease use of the words "switch" and "choose" and also agreed to NAD's recommendation that in reference "healthy" rather than" healthier" teeth and gums. NAD noted that such a change might not resolve the underlying comparative suggestions and that "...there is insufficient information to determine whether the modified advertising...would fully eliminate the concerns." Accordingly, in the case at hand, Procter & Gamble argued that the current advertising did not eliminate those concerns expressed by NAD in the 1991 case.

In the matter now before NAD, Procter & Gamble similarly contended that it has never been proven that the presence of baking soda in a toothpaste has any impact on the product's ability to clean teeth or protect against cavities beyond the benefits provided by any other toothpaste. The challenger referred to correspondence from the American Dental Association (submitted in the 1991 case) which intimated that baking soda had no therapeutic affect on either the teeth or gums. Procter & Gamble alleged that Arm & Hammer's own product brochure supported this premise. The challenger also expressed concern (and submitted a letter from the American Dental Association in support of its position) that too much bicarbonate in baking soda may "detrimentally affect tooth enamel".

According to Procter & Gamble, the claim of "3 times more baking soda than Crest" was tantamount to a superiority claim, especially in light of the context in which it was presented, which connected the "more baking soda" to superior dental recommendations. The challenger submitted the 1982 case of American Home Products Corp. v. FTC in support of its premise. In than case, the Commission concluded that "a claim of more pain reliever, which the advertisements explicitly made, would be read by consumers as a claim of more pain relief".

Procter & Gamble also cited an inconsistency with regard to the advertiser's characterization of its "dentists recommendation" claim. While the commercial's audio and video made reference to the dentists' recommendation as to brushing with baking soda or a baking soda toothpaste, the audio also refers to the same recommendation as being applicable to baking soda alone.

The challenger submitted the results of its own four week survey of dentists' recommendations of five different dennifrices that contain baking soda, including Crest and Arm & Hammer Dental Care. According to Procter & Gamble, the results indicated that dentists do not recommend Arm & Hammer Dental Care more than Crest with baking soda, nor do 2 out of 3 dentists recommend baking soda dentifrice.

The challenger acknowledged that Arm & Hammer Dental Care toothpaste does contain about 3 times more baking soda than its Crest paste product but the same is not true with respect to the gel product. Procter & Gamble stated that the video super ("Comparison based on paste toothpaste only") used by Church & Dwight was uninformative and "confusing double talk".

The challenger also dismissed the advertiser's argument that the phrase "Ask your dentist" absolved Church & Dwight from the consequences of its claim and that regardless of this "disclaimer", the message to consumers (i.e., dentists recommend Arm & Hammer Dental Care over Crest because it contains more baking soda) is clear and unambiguous.

**Advertiser's Position:** It was the position of Church & Dwight that its advertisement presented consumers with three facts, all of which were supported by reliable data. Those facts were as follows:

    1) Two out of three dentists recommend baking soda for healthy teeth and gums;

    2) Arm & Hammer Dental Care has three times more baking soda than Crest with baking soda, and;

    3) Dentists recommend Arm & Hammer Dental Care more than any other baking soda toothpaste.

In support of its "dentists' recommendation" claim, the advertiser submitted a confidential survey of dentists which showed that 72% of the dentists that were surveyed (on an unduplicated basis) recommend brushing with baking soda or baking soda toothpaste for healthy teeth and gums and than more dentists (42%) recommend Arm & Hammer than any other baking soda toothpaste. According to Church & Dwight, this survey fully substantiates both of these claims.

The advertiser's survey used a random sampling of dentists and asked various questions with regard to the recommendation of various forms of dental hygiene practices and products to their patients. Church & Dwight noted that the 72% recommendation response remained consistent over the past few years and "is identical to the 72% level found in the 1991 research". The advertiser maintained that dentists who recommend baking soda are also recommending baking soda toothpaste and its survey results grouped the two responses together.

In response to the challenger's contention that the survey likely asked dentists if they had "ever recommended" baking soda, the advertiser confirmed that the actual question posed to the participating dentists was whether they had recommended baking soda (as well as other practices and products) "within the last six months".

Church & Dwight asserted that its commercials did not make any claims of superior performance or about the relative efficacy of Arm & Hammer Dental Care and noted that the challenger did not provide any relevant data showing that consumers took away such a message. The advertiser argued that the commercial simply served to inform consumers that they should consult their dentists for a recommendation as to which toothpaste to use. The challenger alluded to language in the commercial which referred to "Our dentists gave us a reason" and suggested that consumers should "Ask your dentist".

Church & Dwight distinguished the <u>America Home Products</u> case cited by Procter &Gamble as "not relevant" to the manner before NAD. According to the challenger, in that case, the Second Circuit stated that analgesic pain relievers are different from other types of products because of the "difficulty for the average consumer to

evaluate the [efficacy and safety] claims through personal experience, and the consequent tenacity of advertisements about superiority."

The advertiser also submitted a comparative chart comparing the baking soda levels of all baking soda dentifrices that are sold in the United States. Church & Dwight maintained than 65% of Arm & Hammer Dental Care toothpaste is composed of baking soda as opposed to 20.5% for Crest and that this difference was greater than any competitive brand of toothpaste. Thus, according to the advertiser, the data supported the claim that "...only Dental Care's patented formula gives you 3 times more baking soda than Crest."

The advertiser contended than Procter & Gamble submitted no scientific data to support its allegation that high levels of bicarbonate in some baking soda toothpastes may detrimentally effect tooth enamel and that such a premise is strictly speculation. According to Church & Dwight, the documentation forwarded by the challenger to NAD does not focus on the effects of baking soda on tooth enamel but mistakenly comments only on "the effects of carbonate on apanine" (which is a mineral approximation of calcium). Hence, Church & Dwight contended that laboratory conditions created to form extremely high levels of carbonate are not at all analogous to the conditions of the oral cavity.

The advertiser also confirmed than although the "three times more baking soda" claim was true of all Arm & Hammer Dental Care paste toothpastes as compared to Crest products, that the same is not true of the gel toothpaste. However, Church & Dwight asserted that the limited nature of the comparison was clearly and conspicuously communicated by the super which stated "Comparison based on paste toothpaste only".

**Decision:** An advertiser has the responsibility to support any reasonable interpretation of its claims in an advertisement. Accordingly, NAD concluded that, in the context of this commercial as a whole, there existed a very real potential that consumers would interpret the advertiser's commercial as communicating than the reason why more dentists recommend Arm & Hammer Dental Care than Crest baking soda toothpaste was because it contained three times the amount of baking soda. Conversely, the survey submitted by the advertiser did not specify that this was the particular reason for the dentists recommendation.

NAD acknowledged that there may have been a number of reasons why dentists recommended Arm & Hammer baking soda over its competitors, including taste, abrasivity or even Arm & Hammer's historical association with baking soda products. It is quite possible that the amount of baking soda in the toothpaste may, in fact, have been a factor. Still, without any indication of a distinguishing reason for the dentists recommendation, NAD could not uphold the results of the survey with regard to this claim.

Neither party submitted communication data to support its position with respect to consumer interpretation of the advertisement. In the absence of such evidence NAD will use its expertise in determining how consumers may reasonably interpret a claim in its advertised context. From a review of the language of the commercial on its face, the advertiser is not only informing its audience than "more dentists recommend Arm &Hammer than any other baking soda toothpaste", but also suggesting a reason - i.e., because it contains more baking soda. This inference is made fairly evident by discerning two parts of the commercial. In the opening sequence, the man states exactly why his dentist told him to brush with Arm & Hammer Dental Care: "The reason, more baking soda." After this representation, the advertiser presented a visual comparison of Arm &Hammer Dental Care and Crest with Baking soda with the accompanying graphic on the Arm & Hammer side: "3 times more baking soda". In the next frame immediately following this comparison, the man states: "Maybe that's why more dentists recommend Arm & Hammer than any other baking soda toothpaste." The message no consumers seems quite clear. The reason why Arm & Hammer is recommended by dentists is because it contains more baking soda. Unfortunately for the advertiser, the survey that was submitted to NAD does not indicate that this (i.e, more baking soda) was the reason for the dentists' recommendation and, as such, the claim has not been substantiated.

The advertiser's survey did provide adequate support for two ancillary claims, namely: "2 out of 3 dentists recommend baking soda for healthy teeth and gums" and that "...more dentists recommend Arm & Hammer than any other baking soda toothpaste." While the challenger certainly raised a valid point by asking if the former claim relates exclusively to a baking soda toothpaste (as is stated in the commercial) or both baking soda and toothpastes containing baking soda (as seen in the dentists' survey than was shown in commercial), the survey did indicate that dentists were in fact recommending the use of baking soda and/or baking soda toothpaste.

Similarly, the survey also provided reliable evidence that dentists specifically recommended Arm & Hammer Dental Care more than any competitive brand of toothpaste with baking soda.

In addition, NAD determined that Church & Dwight clearly and conspicuously communicated to consumers (via graphic disclosure) that the "3 times more baking soda" comparison was applicable only to the paste form of the toothpaste and not the gel.

However, NAD does share the concern expressed by the challenger that, in the head-to-head comparative context of this advertisement, the fact that Arm & Hammer Dental Care does contain "3 times more baking soda" than the Crest may reasonably communicate to consumers that an expanded level of baking soda in its toothpaste would provide an advantageous benefit (as compared no Crest) to attaining "healthy teeth and gums."

An advertiser must be able to support all reasonable interpretations of its claims. An advertiser has a responsibility to provide consumers with both factual and appropriate information in delivering a product message. While NAD is, of course, not adverse to an advertiser constructively distinguishing its product from its competitors, it should not be done in such a way that may lead consumers into believing than the product will confer therapeutic benefits if that is not the case or that a quantitative difference will necessarily be a significant qualitative difference if performance superiority has not been shown.

Accordingly, in addition to the recommended discontinuance of the "reason to brush" claim, NAD cautions the advertiser that future use of its baking soda comparison should not be made in the context of suggesting an efficacious benefit (i.e., stain removal, healthy gums, etc.) to consumers unless the same can be supported by reliable substantiating data.

**Advertiser's Statement:** "Church & Dwight is gratified than the NAD has found the specific factual claims contained in the Commercial substantiated. We do not believe the advertising communicates the additional claim about which NAD has expressed concern., bun since we are no longer running the challenged Commercial it is not necessary to pursue this further. We continue to believe that comparison of ingredients may be particularly appropriate in advertising for these products and is not likely to communicate the additional claim which NAD has raised. However, we will take into account both of the areas of concern identified by NAD when developing our future advertising.

We at Church & Dwight appreciate the efforts of NAD in reviewing this matter and continue to support the NAD self-regulation process." (#3247 PCM, closed 10/4/95)

# TAB E

## PART 1

Westlaw.

197 Fed.Appx. 120                                                          Page 1
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351
**(Cite as: 197 Fed.Appx. 120)**

**H**
GlaxoSmithKline Consumer Healthcare, L.P. v.
Merix Pharmaceutical Corp.
C.A.3 (N.J.),2006.
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please use
FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
GLAXOSMITHKLINE CONSUMER
HEALTHCARE, L.P.
v.
MERIX PHARMACEUTICAL CORP., Appellant.
No. 05-4566.

Submitted pursuant to Third CircuitL.A.R. 34.1(a)
June 29, 2006.
Filed: June 29, 2006.

**Background:** Drug manufacturer brought action
against a competitor for false advertising under the
Lanham Act, the New Jersey Consumer Fraud Act.
The United States District Court for the District of
New Jersey, Dickinson R. Debevoise, J., 2005 WL
2230318, issued preliminary injunction against
competitor, and competitor appealed.

**Holding:** The Court of Appeals, Van Antwerpen,
Circuit Judge, held that court did not abuse its
discretion in issuing the preliminary injunction.

Affirmed.
West Headnotes
**Antitrust and Trade Regulation 29T** ☘383(2)

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(E) Enforcement and Remedies
            29TIII(E)7 Relief
                29Tk380 Injunction
                    29Tk383 Preliminary or Temporary
Relief, Grounds, Subjects, and Scope
                        29Tk383(2) k. Particular Cases.
Most Cited Cases
District court did not commit clear error in finding
that competitor's advertising claims falsely implied a

cure by characterizing its cold sore product as a "1
day treatment" and showing before and after photos
indicating that product sped healing rather than
merely relieved symptoms, that competitor's false
advertising about its product would damage and
divert sales of drug manufacturer's product, and that
manufacturer would suffer irreparable harm absent
the injunction; thus, district court did not abuse its
discretion in issuing the preliminary injunction
against competitor. Lanham Act, § 43(a), 15
U.S.C.A. § 1125(a).

On Appeal from the United States District Court for
the District of New Jersey. (D.C. Civil No. 05-cv-
00898). District Court Judge: Honorable Dickinson
R. Debevoise.

Kenneth A. Plevan, Skadden, Arps, Slate, Meagher &
Flom, New York, NY, for Appellee.
James S. Richter, Winston & Strawn, Newark, NJ,
for Appellant.

Before: BARRY, VAN ANTWERPEN and JOHN R.
GIBSON,[FN*] Circuit Judges.

> FN* Honorable John R. Gibson, United
> States Court of Appeals for the Eighth
> Circuit, sitting by designation.

OPINION OF THE COURT
VAN ANTWERPEN, Circuit Judge.
**\*\*1** Appellant Merix Pharmaceutical Corporation
("Merix"), defendant below, brings this interlocutory
appeal to challenge the preliminary injunction
entered against it following the motion of plaintiff-
appellee GlaxoSmithKline Consumer Healthcare,
L.P. ("Glaxo"). Glaxo sought the preliminary
injunction incident to its lawsuit against Merix for
false advertising under § 43(a) of the Lanham Act,
15 U.S.C. § 1125(a), and the New Jersey Consumer
Fraud Act, N.J.S.A. § 56:8-2. The District Court
granted the injunction, and for the reasons set forth
herein, we will affirm.

**I.**

Because we write only for the parties, our discussion
of the facts is limited to those necessary to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

adjudication of the case.   Glaxo produces and markets a number of over the counter ("OTC") pharmaceuticals, including <u>Abreva</u>.   <u>Abreva</u> is an FDA-approved, non-prescription medication that shortens the duration of the healing time for cold sores.   It has been publicly available since late 2000, and retails for roughly $15 to $18 a tube.   Merix markets its cold sore product, Releev, online and in drug stores for roughly $15 to $20 a tube.   Drug stores often stock Releev adjacent to or nearby <u>Abreva</u>.

Meryl Squires formed Merix after discovering that a blend of a common topical antiseptic, <u>benzalkonium chloride</u> and the herb Echinacea relieved the symptoms of the cold sores she frequently suffered.  Her friends who tried the compound agreed that it was helpful.   She obtained two patents on the substance, and ultimately marketed it as Releev.  Merix is a small company, with a total of four employees.   Merix started out selling Releev on the internet, and in June 2003, began retailing it in national drug store chains where it competed directly with Abreva.   Merix's annual revenues have recently run to several million dollars.

Glaxo brought the instant suit against Merix because it believed the claims Merix made about Releev were false and misleading, and Releev would thereby unfairly compete with Abreva.   This is not the first time Glaxo challenged Merix's claims about Releev.  In 2003, Glaxo informed the FDA of the claims, which resulted in the agency sending a warning letter to Merix.   In July 2004, Glaxo brought an advertising challenge against Merix before the National Advertising Division ("NAD") of the Better Business Bureau.   Participation in NAD proceedings is voluntary, and the **122** results are non-binding.  Merix participated.   The NAD found in favor of Glaxo on all issues presented;  Merix appealed to the NAD Review Board.   Glaxo abandoned the proceedings there and commenced the present action on February 16, 2005 in the United States District Court for the District of New Jersey.

As set forth by the District Court, Glaxo challenged, and sought a preliminary injunction against, a number of Merix's claims, including, *inter alia:*
"1. Releev has been "clinically proven": (a) to be a "1 Day Cold Sore Treatment" and (b) to "prevent outbreaks"[;]
2.  Releev is endorsed by the University of Chicago;
**2** 3.   Clinical research by Releev's Principal Clinical Investigator has been published;
4.  Releev uses the product name Vira Medx;

5.   The Releev package bears "before and after" photographs purportedly showing marked improvement after 1 day, after 3 days, and after 5 days."

App. 5. At the inception of the preliminary injunction hearing, counsel for Merix reported that Merix had altered its packaging and promotional material to remove the problematic claims, and pressed that Glaxo's motion for injunctive relief be denied as moot.   Its new claims, modified in time for the preliminary injunction hearing, consist of redesigned packaging that asserts:"*1 Day* Cold Sore Treatment Relieves Symptoms in Just a Day!"

Supp.App. 198.   The top line is displayed in a more prominent typeface than the second.   The packaging also offers "before and after" photos on the back.  The prospective purchaser is referred to them by an exhortation on the front of the package to "See actual Before and After Photos on back panel."   Three photos show a cold sore at one, three, and five days;  it is progressively improved.

The District Court concluded that both sets of claims-those prior to the preliminary injunction proceedings, and those made as a result of their institution-were false.   Indeed, it found that "[t]he only claim that Merix can truthfully make for RELEEV is that it provides relief from cold sore *symptoms.*"  App. 14 (emphasis added).   It concluded that the new set of claims still implied a *cure* by characterizing Releev as a "1 Day ... Treatment" and showing before and after photos indicating Releev speeds healing rather than merely relieving symptoms.   Without belaboring the point, Merix has essentially conceded, for purposes of proceedings on the preliminary injunction, that it could not prevail in its defense of its product claims.

With respect to the preliminary injunction, the District Court concluded that Glaxo had proved its case.   The Court found that Glaxo had a high likelihood of success on the merits where it would have to prove that the claims violated § 43(a) of the Lanham Act, <u>15 U.S.C. § 1125(a)</u>.<u>FN1</u>  **123** The District Court also concluded that Glaxo would suffer irreparable harm absent the injunction.   In particular, the Court concluded that Releev and Abreena competed head-to-head because they were the only two cold sore products selling in the $15 to $20 range, and stores placed them on shelves in close proximity to each other.   Accordingly, given the unanswered testimony of Glaxo Vice President Jeffrey Brown, Glaxo had lost, and would continue to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

197 Fed.Appx. 120                                                                                              Page 3
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351
**(Cite as: 197 Fed.Appx. 120)**

lose, sales to Releev because of Merix's false advertising. Furthermore, when customers found that Releev did not live up to its promises, its failures might also tar the reputation and goodwill of Abreva, which is the only other cold sore product in the same price range. To the extent the failure to seek interlocutory relief as soon as absolutely practicable weighs against a finding of irreparable harm, the District Court concluded that Glaxo should not have been faulted for initially attempting to resolve its dispute by gentler means. The District Court went on to complete its preliminary injunction analysis, holding that the injury to Merix of granting it did not outweigh the injury to Glaxo of withholding it, and that prevention of false advertising and promotion of lawful competition would serve the public interest.[FN2]

> FN1. The elements of a Lanham Act claim for false advertising are:
> "1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."
> *Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 872 (3d Cir.1992) (quoting *U.S. Healthcare v. Blue Cross of Greater Phila.,* 898 F.2d 914, 922-23 (3d Cir.1990)).

> FN2. The parties do not dispute the District Court's findings on these latter two issues, and we do not review them.

## II.

**\*\*3** The District Court had jurisdiction under 28 U.S.C. § § 1331 and 1367. We have jurisdiction to review grants or denials of preliminary injunctions as interlocutory matters pursuant to 28 U.S.C. § 1292(a)(1).[FN3] Examining the District Court's findings of fact, conclusions of law, and analysis, we discern neither error nor abuse of discretion. We will affirm for essentially the same reasons set forth by the learned Court in its September 13, 2005 opinion and order, and therefore do not recapitulate its analysis here.

> FN3. The test for a preliminary injunction requires the district court to consider four now-familiar factors:
> "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest."
> *Am. Civil Liberties Union of N.J. v. Black Horse Pike,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (citations and quotations omitted). We review orders granting or denying preliminary injunctions for abuse of discretion, but examine the underlying findings of fact for clear error and afford plenary review to questions of law. *Doe v. National Bd. of Medical Examiners,* 199 F.3d 146, 154 (3d Cir.1999).

We have only the following to add. The parties make much of the evidence adduced by Glaxo to support its claim of irreparable harm. Among other things, Merix argues both that it is speculative, and shows no injury that *post hoc* damages could not redress. Assuming, without deciding, that this evidence was less than optimal, we briefly note two points. First, Merix points to no evidence to rebut the testimony of Brown that Merix's false advertising about Releev would damage divert sales of Abreva. The District Court was justified in relying on it, and we discern no clear error in its factual finding in this respect; that is, we are not "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see United States v. Westinghouse Elec. Corp.,* 788 F.2d 164, 169 (3d Cir.1986) (no clear error where court relied on unrebutted testimony).

**\*124** Second, any other result would set an unworkably high bar for a district court's fact finding under these circumstances. Given the time-is-of-the-essence nature of preliminary injunction proceedings, courts and parties cannot develop the same depth in the factual record that they can at trial. *See U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers,* 431 F.2d 1046, 1048 (3d Cir.1970). "[T]he grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

197 Fed.Appx. 120                                                                                    Page 4
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351
**(Cite as: 197 Fed.Appx. 120)**

final hearing with the consequences of immediate irreparable injury." *Id.* In deciding a motion for a preliminary injunction, a district court must *weigh* the appropriate factors, rather than mechanically apply them. *See id.* ("delicate balancing"); *Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994).

Here, there is no denying the formidable strength of Glaxo's merits case. Merix concedes as much for purposes of this appeal in its summary of its argument in its brief. Br. of Appellant at 14. The District Court has made adequate-and uncontroverted-findings on the issue of irreparable injury to support its conclusion, and it properly considered and balanced those concerns pertinent to the interlocutory relief requested by Glaxo. Accordingly, the District Court did not abuse its discretion in issuing the preliminary injunction.

### III.

As just discussed, we will affirm for the reasons set forth herein and in the September 13, 2005 opinion of the District Court.

C.A.3 (N.J.),2006.
GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.
197 Fed.Appx. 120, 2006 WL 1792856 (C.A.3 (N.J.)), 2006-2 Trade Cases P 75,351

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

39 Fed.Appx. 751                                                                                    Page 1
39 Fed.Appx. 751, 2002 WL 1428264 (C.A.3 (Pa.))
**(Cite as: 39 Fed.Appx. 751)**

**C**

International Land Acquisitions, Inc. v. Fausto
C.A.3 (Pa.),2002.
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please use
FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
    United States Court of Appeals,Third Circuit.
    INTERNATIONAL LAND ACQUISITIONS, INC.,
                    Appellant,
                        v.
        Nicholas M. FAUSTO, Esquire.
                  **No. 01-2386.**

    Submitted Pursuant to Third Circuit LAR 34.1(a)
                  June 28, 2002.
                  Filed July 2, 2002.

Client brought action against attorney, based on
attorney's alleged negligence in action to set aside
confessed judgment. The United States District Court
For the Eastern District of Pennsylvania granted
attorney's motion for judgment as matter of law, and
client appealed. The Court of Appeals, Stapleton,
Circuit Judge, held that: (1) state trial court opinion
did not fall within exception to hearsay rule for
factual findings resulting from an investigation, and
(2) expert testimony was required under
Pennsylvania to support client's claim.

Affirmed.
West Headnotes
**[1] Evidence 157 318(1)**

157 Evidence
    157IX Hearsay
        157k315 Statements by Persons Other Than
Parties or Witnesses
            157k318 Writings
                157k318(1) k. In General. Most Cited
Cases
State trial court opinion, offered in federal legal
malpractice action to show attorney admitted that he
filed late petition to open confessed judgment and
failed to present adequate evidence of a meritorious
defense, was hearsay.

**[2] Evidence 157 332(1)**

157 Evidence
    157X Documentary Evidence
        157X(A) Public or Official Acts, Proceedings,
Records, and Certificates
            157k332 Judicial Acts and Records
                157k332(1) k. In General. Most Cited
Cases
State trial court opinion, offered in federal legal
malpractice action to show attorney admitted that he
filed late petition to open confessed judgment and
failed to present adequate evidence of a meritorious
defense, did not fall within exception to hearsay rule
for factual findings resulting from an investigation;
exception did not apply to judicial findings of fact.
Fed.Rules Evid.Rule 803(8)(C), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A 2011**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(C) Reception of Evidence
            170Ak2011 k. In General. Most Cited Cases
Attaching state trial court opinion to federal legal
malpractice complaint did not make opinion
admissible evidence.

**[4] Attorney and Client 45 129(2)**

45 Attorney and Client
    45III Duties and Liabilities of Attorney to Client
        45k129 Actions for Negligence or Wrongful
Acts
            45k129(2) k. Pleading and Evidence. Most
Cited Cases
Under Pennsylvania law, expert testimony was
required in legal malpractice action to show that
attorney was negligent in filing late petition to set
aside confessed judgment; although state court
denied petition, expert testimony was needed to show
how long it would take a reasonable attorney to
investigate the matter and to prepare necessary
petition, as well as what reasonable attorney would
have expected court to regard as "unreasonable
delay".

**[5] Attorney and Client 45 129(2)**

45 Attorney and Client
    45III Duties and Liabilities of Attorney to Client
        45k129 Actions for Negligence or Wrongful

39 Fed.Appx. 751
39 Fed.Appx. 751, 2002 WL 1428264 (C.A.3 (Pa.))
(Cite as: 39 Fed.Appx. 751)

Page 2

Acts

45k129(2) k. Pleading and Evidence. Most Cited Cases

Under Pennsylvania law, expert testimony was required in legal malpractice action to show that attorney was negligent in failing to take discovery in state court action to set aside confessed judgment; expert help was needed to determine what discovery was necessary when client claimed that its signature was unauthorized or obtained by fraud.

**[6] Attorney and Client 45 ☞129(2)**

45 Attorney and Client
   45III Duties and Liabilities of Attorney to Client
      45k129 Actions for Negligence or Wrongful Acts
         45k129(2) k. Pleading and Evidence. Most Cited Cases

Even if attorney was negligent in failing to conduct discovery in action to set aside confessed judgment, as required to support client's legal malpractice claim, expert testimony was required under Pennsylvania law to demonstrate that client would have won the case if attorney had not been negligent.

On Appeal From the United States District Court For the Eastern District of Pennsylvania (D.C. Civil Action No. 99-cv-05308). District Judge: Honorable Robert F. Kelly.

Before AMBRO, STAPLETON and CUDAHY,[FN*] Circuit Judges.

      FN* Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

*OPINION OF THE COURT*
STAPLETON, Circuit Judge.
**\*\*1** Plaintiff/Appellant International Land Acquisition ("ILA") brought this legal malpractice diversity action against Defendant/Appellee Nicholas A. Fausto. According to ILA, Fausto negligently represented ILA's interest in a state court case involving a judgment by confession. The District Court held a jury trial in the malpractice case. At the close of ILA's case, Fausto moved for judgment as a matter of law under Rule 50, which the District Court granted. ILA appeals that decision and the District Court's refusal to admit into evidence the state court's opinion declining to reopen the confessed judgment.

I.

ILA executed a Surety Agreement for a promissory note that provided in part:
Surety, and each of them if more than one, hereby irrevocably authorizes and empowers any attorney or Prothonotary or Clerk for any court of record, with or without declaration filed, to appear for and confess judgment against Surety, or any of them, for such sums for which Surety is or may become liable to Lender ....

Supp.App. at 177. Pursuant to that provision, on May 9, 1996, Madison Bank confessed judgment against ILA in the amount of $200,000.

In May or June of 1996, ILA hired Fausto to file a petition to strike or open the judgment on the grounds that the signatures to the Surety Agreement were not authorized or were obtained by fraud. On September 30, 1996, Fausto filed the petition with the Court of Common Pleas, Montgomery County, Pennsylvania on ILA's behalf. Madison Bank filed a response on October 28, 1996. On November 1, 1996, the state court entered an order directing discovery to be conducted within sixty days. On December 3, 1996, following oral argument on the petition, the state court entered an order denying the petition.

**\*753** On December 13, 1996, Fausto filed a motion for reconsideration on behalf of ILA. On January 6, 1997, the state court granted the motion for reconsideration and granted ILA an additional sixty days to conduct discovery.

The state court again denied the petition to reopen and ILA timely filed a notice of appeal. Pursuant to Pennsylvania Rule of Appellate Procedure 1925,[FN1] on November 28, 1997, the Court of Common Pleas filed an opinion in response to ILA's "statement of matters complained of."

      FN1. The rule states in part:
      (a) General rule. Upon receipt of the notice of appeal the judge who entered the order appealed from, if the reasons for the order do not already appear of record, shall forthwith file of record at least a brief statement, in the form of an opinion, of the reasons for the order, or for the rulings or other matters complained of, or shall specify in writing the place in the record where such reasons may be found.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Appx. 751                                                                                                    Page 3
39 Fed.Appx. 751, 2002 WL 1428264 (C.A.3 (Pa.))
**(Cite as: 39 Fed.Appx. 751)**

(b) Direction to file statement of matters complained of. The lower court forthwith may enter an order directing the appellant to file of record in the lower court and serve on the trial judge a concise statement of the matters complained of on the appeal no later than 14 days after entry of such order. A failure to comply with such direction may be considered by the appellate court as a waiver of all objections to the order, ruling or other matter complained of.
Pa. Rule App. Pro. 1925.

The state court first observed that it could only strike a confessed judgment "where there is a fatal defect or irregularity that appears on the face of the record, and, the confession of judgment clause and Complaint must be read together to determine if such defects exist." App. at 39 (citing *Parliament Industries Inc. v. William H. Vaughan & Co., Inc.*, 501 Pa. 1, 459 A.2d 720 (Pa.1983)). The court found that because "ILA failed to allege the existence of any defects present in either the confession of judgment clause or in the Complaint itself, it is clear that this Court properly denied their Petition to Strik App. at 40."

With regard to the petition to open the confessed judgment, the state court noted that a court should only open a confessed judgment "when the petitioner acts promptly, alleges a meritorious defense, and presents sufficient evidence that the defense creates an issue for the jury." The court stated:

**\*\*2** In the instant case, [ILA] did not file its Petitition to Open until more than four and one-half months had passed following entry of judgment, and at no point, either in the petition or at oral argument, did [ILA] provide an explanation for the lengthy delay. In fact, upon specific questioning by the undersigned as to the reason for the delay, counsel for [ILA] stated only that he had "no response." As such it is clear that [ILA's] Petition to Open was properly denied as it failed to satisfy or even address the first prerequisite to opening a confessed judgment, thereby rendering moot any alleged issues of material fact raised on appeal.

Nevertheless, this Court will briefly address [ILA's] contention that it has a meritorious defense which warrants opening the confessed judgment ... In the instant case, [ILA] did *allege* the existence of a meritorious defense, i.e., that the signatures on the Surety Agreement were not made by officers of the [ILA], and that those who signed the Agreement were not authorized to do so. However, despite several Orders directing that discovery be conducted

regarding [ILA's] Petition, and [ILA's] own acknowledgment that discovery was necessary to support the factual allegations **\*754** therein, [ILA] appeared before this Court, notwithstanding said Orders and over 15 months after judgment was confessed, without having conducted any discovery and without offering one shred of evidence in support of its alleged defense. Incredibly, upon the undersigned's questioning as to why no evidence was presented, counsel for [ILA] again had "no response."

App. at 42-43 (emphasis in original). On appeal, the Superior Court affirmed the trial court essentially for the reasons provided by it.

II.

ILA filed this suit against Fausto claiming Fausto was negligent in failing to get the confessed judgment open, and that it would have been able to defeat Madison Bank's claim on the merits if Fausto had not been negligent.

The District Court held a trial and ILA presented three witnesses, Robert Tassio, the Secretary of ILA, Robert Glinski, counsel to ILA, and Donald Wellington, President of ILA.

During direct, Tassio testified that the Court of Common Pleas had denied the petition to strike or reopen. When he was asked to explain why the petition had been denied, the District Court sustained an objection and suggested that the parties could stipulate as to the reasoning behind the state court's decision to deny the petition to oper the confessed judgment. ILA then attempted to have Tassio read a portion of the decision. Specifically, ILA requested that Tassio read the portion quoted above that contains the court's finding that Fausto had "no response" to its questioning about the delay in filing the petition and the delay in taking discovery. Fausto's counsel objected. The following interchange took place:

Mr. Bredt (ILA's counsel): Q: Mr. Tassio, could you take a look at that opinion, please. And beginning at the bottom of Page 5, could you read what the court has stated there?

**\*\*3** Mr. Lefco (Fausto's counsel): Objection, your Honor.

The Court: Why? This isn't the same as what he was asking him before.   ·

Mr. Lefco: Well-your Honor, this-I-that's a hearsay-this is a hearsay declaration, this is an out-of-court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statement by persons being offered for the truth of the matter stated.

It doesn't matter for purposes-I would submit-of this case, what the court said, other than the fact that Mr. Fausto's-the petition that he filed on behalf of ILA was denied.

Mr. Bredt: May I respond, your Honor?

The Court: Yes.

Mr. Bredt: This is a public record. This is-

The Court: What's that mean-

Mr. Bredt: Well-

The Court: -this is a public record?

Mr. Bredt: Its an opinion of the court. He got it-I mean-anybody could get this opinion, it is a public record and it is a hearsay exception.

The Court: Sustained-objection sustained.

Supp.App. at 47-48.    Later, the following conversation took place at a side bar:Mr. Bredt: Okay. We're going to stipulate that the Common Pleas Court of Montgomery County denied the petition to open and strike it and that the reason they did it, was because, one, it was filed late, four and a half months after the judgment and, two, that the defendant-Mr. Fausto-on behalf of the defendant did not present any meritorious evidence.

Mr. Lefco: Well, I won't stipulate that Mr. Fausto did or didn't, but I'll stipulate*755 that ILA didn't and then you can argue that-your know-that was his job.

Mr. Bredt: That's fine.

Supp.App. at 153.    Mr. Bredt presented this stipulation to the jury.Mr. Bredt: It has been stipulated that the Montgomery County Common Pleas Court denied the petition to open or strike judgment, that Mr. Fausto filed on behalf of International Land, that the reasons for the denial were twofold, one, it was filed four and a half months after the judgment was taken and, therefore, it was filed too late and, second of all, the defendant did not present any evidence in support of its alleged meritorious defense.

Mr. Lefco: When you say, the defendant, you mean, ILA?

Mr. Bredt: Right. And, thirdly, that the Superior Court affirmed the denial of the petition by the Montgomery Count Common Plays Court.

Supp.App. at 154.

At the close of ILA's case, Fausto moved for judgment as a matter of law under Rule 50. He argued that expert testimony was needed to establish both that he was negligent in filing the petition four and a half months after the confessed judgment and

that he could have presented adequate evidence of a meritorious defense. The District Court granted the defendant's motion, holding that "the plaintiff [could not] prevail without the testimony of an expert." Supp.App. at 173.

III.

A. *Evidentiary Issue*

ILA contends that the District Court erred when it decided not to admit into evidence the November 28, 1997, Montgomery County Court of Common Pleas opinion and that this is important despite the stipulation because the opinion evidenced implied admissions of Fausto that he filed the petition late without justification and that he took no discovery.

**4 According to ILA, there are two reasons why this evidence should have been admitted. First, ILA argues that the opinion contains an admission by a party opponent, thus making the statement non-hearsay under Rule of Evidence 801(d)(2). Second, ILA contends that it attached the state court opinion to its complaint and that the defendant's answer to the complaint acknowledges that the opinion speaks for itself. According to ILA, exhibits are permitted to be attached to pleadings and pleadings should be admitted into evidence.

When the District Court applies the appropriate legal standard, evidentiary rulings are subject to the trial judge's discretion and are therefore reviewed only for abuse of discretion. *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1213 (3d Cir.1995). Further, pursuant to Federal Rule of Civil Procedure 61, errors in the admission or exclusion of evidence cannot be grounds for reversal or a new trial if they constitute harmless error. *See id.* Finally, when a party fails to timely object to the trial court's evidentiary rulings during the proceedings, those rulings are reviewed under the plain error standard. *See id.* Notwithstanding these precepts, to the extent that the District Court's admission or exclusion of evidence was based on an interpretation of the Federal Rules of Evidence, we exercise plenary review. *See United States v. Furst*, 886 F.2d 558, 571 (3d Cir.1989).

Rule 103(a)(2) of the Federal Rules of Evidence provides that error may not be predicated upon a ruling which excludes evidence unless "the substance of the evidence was made known to the court by offer or was apparent from the context within which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Appx. 751
39 Fed.Appx. 751, 2002 WL 1428264 (C.A.3 (Pa.))
(Cite as: 39 Fed.Appx. 751)

questions were asked." Fed.R.Evid. 103(a)(2). Read literally, this rule *756 tends to suggest that there is no requirement that the offeror state the grounds relied upon for admissibility or that the offer of proof be timely, on the record, or stated with specificity. However, this rule has been applied differently in practice. "If in the trial court the offeror fails to specify any ground for admissibility, or specifies the wrong ground, he is trouble on appeal." Charles Alan Wright and Kenneth W. Graham, Jr., 21 Federal Practice and Procedure § 5040 at 210 (1977). A failure to advance a ground for the admission of evidence relegates the offering party to plain error review on appeal. See Fed.R.Evid. 103(d); see also United States v. Gambino, 926 F.2d 1355, 1363 n. 6 (3d Cir.1991) (noting that objecting to testimony on one ground does not preserve other grounds for objection on appeal); United States v. Field, 875 F.2d 130, 134 (7th Cir.1989) (holding that under Rule 103(a)(1) "[n]either a general objection to the evidence nor a specific objection on other grounds will preserve the issue on review").

At trial, ILA's sole argument for the admissibility of the state court's decision was that it fell within the public records exception to the hearsay rule, Rule 803(8).[FN2] That issue is preserved for review and we review the District Court's findings for an abuse of discretion. For the remaining arguments, we review the District Court's decision for plain error.


FN2. That rule states:
Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.
Fed. R. Evid. 803(8).

**5 [1] This record presents a double hearsay issue. First, the opinion is an out of court statement offered for the truth of the matter asserted. The state court judge was not there to testify as to his recollection of Fausto's actions in his courtroom. This out of court statement thus constitutes hearsay. Second, the court is recording the verbal or non-verbal response of Fausto. This is also hearsay that is being offered for the truth of what that response is—that he admit-that his filing was untimely and he took no discovery. ILA must be able to point to an applicable exclusion or exception for each of these levels of hearsay.

[2] ILA cannot cure the initial hearsay problem. See Nipper v. Snipes, 7 F.3d 415, 417 (4th Cir.1993) ("Rule 803(8)(C), on its face, does not apply to judicial findings of fact; it applies to 'factual findings resulting from an investigation made pursuant to authority granted by law.' Fed.R.Evid. 803(8)(C). A judge in a civil trial is not an investigator, rather a judge."); United States v. Jones, 29 F.3d 1549, 1554 (11th Cir.1994) (finding that judicial findings are inadmissible hearsay that cannot be corrected under 803(8)); Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F.Supp. 1125, 1185 (E.D.Pa.1980), aff'd in part and rev'd on other grounds in part sub nom. In re Japanese Elec. Prod. Antitrust Litig., 723 F.2d 238, 275 (3d Cir.1983), rev'd sub nom. Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that prior judicial findings were not admissible under Rule 803(8)(C), and that the trustworthiness analysis required under Rule 803(8)(C) would be unsuited to evaluating judicial *757 findings because a judge is not a proper witness under Rule 605).

Because ILA cannot overcome the first level of hearsay, we need not reach the question of whether Fausto's statements are an admission of a party opponent.

[3] Finally, ILA provides no support, and we find none, for the proposition that simply attaching the opinion to its complaint against Fausto would make it admissible evidence.


B. Rule 50 Motion

Under Rule 50, a District Court may grant judgment as a matter of law if a "party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). Our review of a trial court's grant of judgment as a matter of law is plenary. Mosely v. Wilson, 102 F.3d 85, 89 (3d Cir.1996).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

39 Fed.Appx. 751
39 Fed.Appx. 751, 2002 WL 1428264 (C.A.3 (Pa.))
**(Cite as: 39 Fed.Appx. 751)**

Page 6

Under Pennsylvania law, in order to establish a claim of legal malpractice, the plaintiff must show three basic elements: 1) employment of the attorney or other basis for a duty; 2) the failure of the attorney to exercise ordinary skill and knowledge; and 3) a causal nexus between the negligence and damage to the plaintiff. *See Kituskie v. Corbman, 552 Pa. 275, 714 A.2d 1027, 1029 (Pa.1998); Rizzo v. Haines, 520 Pa. 484, 555 A.2d 58, 66 (Pa.1989).* "The standard of care to which an attorney must adhere is measured by the skill generally possessed and employed by practitioners of the profession." *Gans v. Mundy, 762 F.2d 338, 341 (3d Cir.1985).* Plaintiffs must show "proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm." *Kituskie, 714 A.2d at 1030.* To demonstrate that he has suffered actual damages, a plaintiff must "prove that he had a viable cause of action against the party he wished to sue in the underlying case." *Id.* This concept is often referred to as proving the "case within a case." *Id.*

**\*\*6** In both bench and jury trials, the plaintiff must put on expert testimony to establish the relevant standard of care and whether the defendant complied with that standard. *See Lentino v. Fringe Employment Plans, 611 F.2d 474, 480-81 (3d Cir.1979)* (applying Pennsylvania law); *Rizzo, 555 A.2d at 66; see also Gans, 762 F.2d at 342* ("[T]he Letino expert evidence requirement devolves upon the plaintiff, not the defendant."). Only "where the matter under investigation is so simple, and the lack of skill so obvious, as to be within the range of the ordinary experience and comprehension of non-professional persons," are expert witnesses unnecessary. *Lentino, 611 F.2d at 480.*

ILA contends that Fausto was negligent in failing to timely file the petition and in failing to conduct discovery. It insists that Tassio's testimony regarding the hiring of Fausto to file the petition is enough to overcome the Rule 50 motion on the timeliness issue. Further, ILA argues that it need not present expert testimony on the discovery issue because Fausto did not conduct any discovery. Lastly, ILA contends that it met the burden of proving the case within the case by the testimony of Tassio and Wellington, which, according to ILA, established the merits of the underlying case. Like the District Court, we find these arguments unpersuasive.

[4] Whether Fausto negligently filed the petition late is to be judged in light of the skill generally

possessed and employed by practitioners of the profession. The fact that the state court denied ILA's petition because Fausto filed it late does not establish that he was negligent in doing so. ILA had to put on expert testimony to show how long it would take a reasonable attorney in Fausto's position to investigate **\*758** the matter and to prepare the necessary petition as well as what a reasonable attorney would have expected a court to regard as an "unreasonable delay." Contrary to ILA's suggestion, these are not matters that a jury should be asked to answer without the help of an expert in the practice of law.

[5] The same is true of the issues raised by the claim of negligence in the failure to take discovery. Lay people should not be asked to determine without expert help what discovery is necessary when the client is claiming that its signature was unauthorized or obtained by fraud.

[6] But even if we assume that ILA could establish malpractice for failure to conduct discovery without expert testimony, it would need expert testimony to demonstrate that it would have won the case within the case if Fausto had not been negligent, a matter that involves the law of suretyship, agency and corporate governance.

Because ILA presented no expert testimony establishing either the standard of care for an attorney or the fact that it would win the case within the case, it failed to meet its burden under the Pennsylvania standard.

IV.

The judgment of the District Court will be affirmed.

C.A.3 (Pa.),2002.
International Land Acquisitions, Inc. v. Fausto
39 Fed.Appx. 751, 2002 WL 1428264 (C.A.3 (Pa.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.