# TAB E

## PART 2

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

**H**

Schneck v. International Business Corp.
D.N.J.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.
Beverly SCHNECK, William Schneck, Plaintiffs,
v.
INTERNATIONAL BUSINESS MACHINES
CORPORATION, Defendant.
No. 92-4370 (GEB).

June 25, 1996.

GARRETT BROWN, JR., District Judge.
**\*1** This matter comes before the Court on the motion
of defendant, International Business Machines
Corporation ("IBM"), for summary judgment
pursuant to FED. R. Civ. P. 56 to dismiss the
Amended Complaint of Beverly Schneck and
William Schneck ("plaintiffs"). Defendant also
moves to exclude the testimony of plaintiffs' experts
*in limine.* For the reasons set forth in this
Memorandum Opinion, this Court will grant in part
and deny in part defendant's motion *in limine,* and
will grant defendant's motion for summary judgment.
Further, this Court will dismiss the above-captioned
action in its entirety.

## I. BACKGROUND

In September 1989, Beverly Schneck retired at age
63 following 15 years of work as a data processor at
Rutgers University. While an employee at Rutgers,
Mrs. Schneck operated the IBM Model 024 and
Model 026 card-punching machines, as well as the
IBM Model 3740/3760 data entry machines.
Plaintiffs allege that as a result of operating IBM's
machines, Mrs. Schneck developed bilateral carpal
tunnel syndrome ("CTS"). CTS is a parathesias,
pain, and numbness affecting some part of the
median nerve distribution of the hands. TABER'S
CYCLOPEDIC MEDICAL DICTIONARY 323
(17th ed.1993).

On September 17, 1992, plaintiffs commenced this
action in the Superior Court of New Jersey, Mercer
County. IBM filed a Notice of Removal on October
13, 1992, and an Answer to Plaintiffs' Amended
Complaint on October 19, 1992.

In their Amended Complaint, plaintiffs allege
generally that IBM is responsible for injuries Mrs.
Schneck sustained in the course of her employment at
Rutgers University as a result of data entry work.
Mrs. Schneck seeks to recover damages for personal
injuries allegedly suffered by her based on claims of
strict products liability (design defect and failure to
warn), implied and express warranty, and
negligence.[FN1] Mr. Schneck asserts a separate claim
for loss of consortium. In addition, plaintiffs assert
that they are entitled to punitive damages due to
IBM's alleged misconduct.

> FN1. Plaintiffs do not contest IBM's motion
> to dismiss the implied warranty, express
> warranty, and negligence counts of their
> Amended Complaint. See Plaintiffs' Brief
> at 8 n. 7. Accordingly, defendant's motion
> will be granted and these counts will be
> dismissed.

IBM now moves for summary judgment pursuant to
FED. R. CIV. P. 56. Specifically, IBM argues that
the following claims should be dismissed: (1) the
design defect claim, because plaintiffs can not prove
the existence of any specific design defect in the IBM
products allegedly used by plaintiff; (2) the failure to
warn claim, because (a) the testimony of plaintiffs'
experts is inadmissible under the relevant evidentiary
standards and should be excluded *in limine,* and (b)
there is no duty to warn about the physical
manipulation inherent in the use of certain objects,
which can in some persons and under some
circumstances cause CTS; (3) the punitive damages
claim, because such damages can not be awarded in
the absence of an award of compensatory damages;
and (4) the loss of consortium claim, because this
claim will be extinguished as a matter of law if this
Court grants IBM's motion with respect to the other
claims.

## II. DISCUSSION

### A. STANDARD OF REVIEW

**\*2** Summary judgment may be granted only if there
is no genuine issue as to any material fact and the
moving party is entitled to judgment as a matter of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 2

Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)

**(Cite as: Not Reported in F.Supp.)**

law. FED. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a summary judgment motion, the non-moving party receives the benefit of all reasonable doubts and any inferences drawn from the underlying facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the non-moving party bears the burden of proof at trial as to a dispositive issue, Rule 56(e) requires him to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324; *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Issues of material fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. DESIGN DEFECT

Plaintiffs allege in their Amended Complaint that a design defect in the IBM machines was a proximate cause of Mrs. Schneck's "injuries." A design defect claim is governed by the New Jersey Product Liability Act (the "Act"). N.J.S.A. 2A:58C-1 *et seq.* Under the Act, a manufacturer or seller of a product is liable in a design defect case "only if the *claimant proves by a preponderance of the evidence that the product causing the harm* was not reasonably fit, suitable or safe for its intended purpose because it ... was designed in a defective manner." N.J.S.A. 2A:58C-2 (emphasis added). The precise elements of the design defect claim are determined according to the existing common law. See Judiciary Committee Statement, N.J.S.A. 2A:58C-1.

Under New Jersey decisional law, to establish a prima facie case of strict liability using the theory of design defect, a plaintiff must establish: (1) that the product was defective; (2) that the defect existed when the product left the defendant's hands; and (3) that the defect was a proximate cause of the injury to a reasonably foreseeable user. *Jurado v. Western Gear Works,* 131 N.J. 375, 385, 619 A.2d 1312 (1993); *O'Brien v. Muskin Corp.,* 94 N.J. 169, 179, 463 A.2d 298 (1983).

The decision whether a product has been defectively designed ordinarily involves a "risk-utility analysis," under which a manufacturer is held liable only "if the danger posed by the product outweighs the benefits of the way the product was designed and marketed."

*Johansen v. Makita U.S.A., Inc.,* 128 N.J. 86, 95, 607 A.2d 637 (1992). There are seven factors which New Jersey Supreme Court has identified as being relevant to a risk-utility analysis:

1. The usefulness and desirability of the product-its utility to the user and to the public as a whole.

2. The safety aspects of the product-the likelihood that it will cause injury, and the probable seriousness of the injury.

3. The availability of a substitute product [that] would meet the need and not be as unsafe.

*3 4. The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

5. The user's ability to avoid danger by the exercise of care in the use of the product. 6. The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product or of the existence of suitable warnings or instructions.

7. The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*O'Brien,* 94 N.J. at 182, 463 A.2d 298 (quoting *Cepeda v. Cumberland Engineering Co.,* 76 N.J. 152, 174, 386 A.2d 816 (1978)).

Proof that a product is defective under New Jersey law requires more than a showing that the product caused an injury. "The necessity of proving a defect in the product as part of plaintiff's prima facie case distinguishes strict from absolute liability, and thus prevents the manufacturer from also becoming the insurer of a product." *Id.* at 179-80, 386 A.2d 816. Therefore, in a design defect case, "the plaintiff bears the burden of both going forward with the evidence and of persuasion that the product contained a defect. To establish a prima facie case, the plaintiff should adduce sufficient evidence on the risk-utility factors to establish a defect." *Id.* at 185, 386 A.2d 816. Simply put, the burden is on the plaintiff "to show that risk outweighed utility.' " *Fabian v. Minster Mach. Co., Inc.,* 258 N.J.Super. 261, 273, 609 A.2d 487 (App.Div.), *certif. denied,* 130 N.J. 598, 617 A.2d 1220 (1992).

When considering a dispositive motion, "the trial court should decide whether, viewing the evidence in the light most favorable to the plaintiff, the jury might conclude that the plaintiff had proved the existence of a defect." *O'Brien,* 94 N.J. at 185, 463 A.2d 298. In other words, the trial court must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

consider the seven risk-utility factors "in order to determine whether to preclude liability as a matter of law because 'the minds of reasonable men could not differ on whether the risks posed by a product outweigh its utility.' " *Johansen,* 128 N.J. at 96, 607 A.2d 637.

In the present matter, defendant contends plaintiffs have not satisfied each element in a prima facie case of design defect. Defendant's Brief at 13. Specifically, IBM argues that "plaintiffs fail to meet their burden of both stating how the IBM machines are defective and of supporting such statements with sufficient evidence." *Id.* Therefore, according to IBM, "plaintiffs have not, and indeed can not, demonstrate that the IBM machines create a risk of harm that outweighs their usefulness." *Id.* Consequently, IBM requests that this Court dismiss plaintiffs' design defect claim as a matter of law for failure to establish a material question of fact that any of the IBM machines are defectively designed. *Id.*

In support of its motion, IBM details how plaintiffs have allegedly failed to state how the IBM machines are defective. For example, IBM notes that plaintiffs' answers to interrogatories "provided no information regarding the so-called design defect allegedly responsible for Mrs. Schneck's alleged injuries." *Id.* at 14 (citing IBM Exh. HH, Plaintiffs' Supplemental Answers to Interrogatories Propounded by IBM, Nos. 33-35; IBM Exh. II, Plaintiffs' Answers to Supplemental Interrogatories Propounded by IBM, Nos. 48-55). Indeed, IBM points out that when asked to describe the alleged defective condition and how such condition caused or aggravated Mrs. Schneck's alleged injury, plaintiffs responded by stating that "[p]laintiffs are not experts in ergonomics and therefore cannot identify the precise defects in Defendant's product. * * * [W]e will provide an expert(s) report responsive to this question." *Id.* (citation omitted).

**\*4** Moreover, IBM maintains that the expert eventually retained by plaintiffs, Dr. Karl Kroemer, "has done nothing to clarify plaintiffs' position concerning the alleged design deficiencies in the IBM machines." *Id.* Indeed, IBM notes that [a]ll four ... sections [of Dr. Kroemer's "state of the art" report] are devoid not only of any reference to design defects in any of the IBM machines, but also of any identification of a design defect in *any* product, either IBM's or anyone else's; likewise, nowhere in the supplemental report does Dr. Kroemer disclose what design defect is allegedly present in any of the IBM machines. *See Kroemer*

*Dep.,* 07/22/94 at 84.1 to 85.13; 88.1-10; 89.3-10; 95.7 to 147.24. In point of fact, Dr. Kroemer's two-volume expert report *never* refers to any of the IBM machines.

Defendant's Brief at 15 (footnotes omitted).

Furthermore, IBM points to the following colloquy to demonstrate that Dr. Kroemer never discusses design deficiencies in any of the IBM machines:
Q: Were you asked to take a look at the IBM products that she [Mrs. Schneck] says that she used and she says caused her injury [and] to opine about whether or not they were state of the art?
A: I was satisfied with reading the brochures on the [IBM] 024 and 026 and especially to look at the keyboard as it is described therein.
Q: My question was, were you asked to give an opinion about whether or not those IBM products were state of the art?
A: I believe the 024 and 026 were deficient in their design?
Q: Well, that wasn't my question. My question was whether you were asked to give that opinion? SU1h
A: I was asked to give that opinion.

Q: Do you recall when you were asked to render that opinion?
A: Well, I believe the expectation to get such an opinion was present from the beginning of our discussions.
Q: And that would be back in 1993?
A: Yes, sir.
Q: *And did you provide any such opinion in writing to Mr. Lakind or Mr. Phillips?*
A *I may have expressed it in the content of a letter, but I have not submitted a report that states so in terms of a heading or something of that kind.*[FN2]

FN2. IBM notes that despite repeated, timely discovery requests, plaintiffs refused to produce this document ("draft report"), which supposedly outlines their expert's specific observations and opinions regarding the unproven design defects or deficiencies allegedly inherent in each of the IBM machines. Defendant's Brief at 15-16 n. 23. Although plaintiffs finally produced and sought to proceed on the basis of this draft report at the conclusion of Dr. Kroemer's testimony at the *in limine hearing, see*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 4
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

Testimony of Dr. Karl Kroemer, *Schneck v. IBM*, Civ. No. 92-4370, at 131-35 (D.N.J. Aug. 17,1995) (GEB) (*"Kroemer Tr."* ), this Court declined to allow "some earlier draft [to] come[ ] in at the 11th hour" after all parties and the Court had conducted the hearing based upon the final report which had been disclosed pursuant to the Court's direction. *Id.* at 137; *see also id.* at 138-39.

*Id.* at 16 (emphasis added) (quoting *Kroemer Dep.,* 07/22/94 at 150.19 to 152.2).

Finally, IBM notes that, by Dr. Kroemer's own admission, his opinion that the IBM machines are defective is based on little first-hand knowledge. *Id.* at 17. Indeed, defendant points out that Dr. Kroemer never visited Mrs. Schneck's work place, *Kroemer Dep.,* 07/22/94 at 149.16-19; he never reviewed Mrs. Schneck's medical records, *see id.* at 149.20-22; and he never observed the tasks that Mrs. Schneck performed at work, but only reviewed her description of the same given at her deposition. *See id.* at 149.23 to 150.2.

Consequently, according to IBM, "[a] close analysis of Dr. Kroemer's deposition testimony reveals that, although he believes the IBM machines are defectively designed, Dr. Kroemer never described the defect or proved its existence. Nor has Dr. Kroemer, or anyone else on plaintiffs' behalf, proposed an alternative design which they claim is 'safer' than the IBM machines." Defendant's Brief at 17. Therefore, IBM requests that plaintiffs' design defect claim be dismissed as a matter of law because Dr. Kroemer's opinion, "rendered without even inspecting plaintiff's work area, and the IBM machines themselves, simply can not establish a material question of fact regarding whether the IBM machines were defectively designed." *Id.*

**\*5** In response to IBM's motion, plaintiffs dispute defendant's contention that plaintiffs "have the burden to state how IBM keyboards are defective, and that [plaintiffs] have not done so." Plaintiffs' Brief at 9. Indeed, plaintiffs argue that New Jersey law is to the contrary. *Id.* (quoting *Moraca v. Ford Motor Co.,* 66 N.J. 454, 458, 332 A.2d 599 (1975) ("It is settled ... that in a products liability case the injured plaintiff is not required to prove a specific manufacturer's defect. If the proofs permit an inference that the accident was caused by some defect, whether identifiable or not, a jury issue as to liability is presented."); *Sabloff v. Yamaha Motor Co.,* 59 N.J. 365, 366, 283 A.2d 321 (1971)

"[W]henever facts permit an inference that the harmful event ensued from some defect (whether identifiable or not) in the product, the issue of liability is for the jury, and the plaintiff is not necessarily confined to the explanation his expert may advance.")).

In any event, according to plaintiffs, they have demonstrated numerous defects in the design of all keyboards, including those used by Beverly Schneck. *Id.* Specifically, plaintiffs contend that, in the course of his three-day deposition, Dr. Kroemer described the major causative factors of cumulative trauma disorders among keyboard users as "repetitiveness, force of exertion and limb posture." (IBM Exhibit V, at 127). With respect to limb posture, the Doctor testified that since 1970, it was known that it was important to "keep your wrists straight and to keep the arms and shoulders particularly as relaxed as possible." (IBM Exhibit V, at 133). *Id.* at 12. Further, plaintiffs maintain that Dr. Kroemer provided extensive testimony with regard to the anatomical implications of the conventional keyboard. *Id.* (quoting IBM Exhibit X, at 109) ("The arrangement of the keys on the keyboard was deficient, the number of keys on the keyboard was deficient and the fact that there was no provision for a hand or arm rests is another example of deficiency); *id.* (quoting IBM Exhibit X, at 109) ("The posture of the operator is decisively determined by the design of the keyboard including the enclosure. Given the three examples of deficiency that I have already mentioned all of these would contribute towards an unbecoming posture."). Finally, plaintiffs note that, in the course of his deposition, Dr. Kroemer elaborated upon each of the attributes of the keyboard which allegedly lead to the non-neutral positioning of the hand. *Id.* (quoting IBM Exhibit V, at 172).

This Court finds that plaintiffs' contentions are neither supported in law nor in fact. First, with respect to plaintiffs' reliance on *Moraca* and *Sabloff,* this Court notes that both cases involved manufacturing defect claims. More specifically, both cases employed the so-called "malfunction theory," which permits a plaintiff to "prove a defect either by circumstantial evidence[,] which would permit an inference that a dangerous and defective condition existed prior to sale, or by negating other causes in order to make it reasonable to infer that a dangerous condition existed while defendant had control of the product." *Consalo v. General Motors Corp.,* 258 N.J.Super. 60, 64, 609 A.2d 75

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 5
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

(App.Div.) (citations omitted), *certif. denied,* 130 N.J. 597, 617 A.2d 1220 (1992). The malfunction theory has been applied to manufacturing defect claims because evidence of such defects may be destroyed, lost, or otherwise unavailable to the plaintiff after the product-related accident. *See, e.g., Bardaft v. Flexible Flyer Co.,* 1995 WL 568483, at *4 (E.D.Pa. Sept.25, 1995); *Miller v. Allstate Ins. Co.,* 573 So.2d 24, 30 (Fla.Dist.Ct.App.1990), *review denied,* 581 So.2d 1307 (Fla.1991). However, this Court is unable to find any support for the extension of this theory to design defect claims. Nor would such an extension be prudent. Unlike manufacturing defect claims, evidence is still available to the plaintiff in a design defect case, even if the subject unit is lost or destroyed because the allegedly defective characteristic of the product is shared by all units in the same line. *O'Brien,* 94 N.J. at 181, 463 A.2d 298. Moreover, a court could not weigh a product's risks versus its utility if the design defect is indeterminate. *See, e.g., Jenkins v. Amchem Products, Inc.,* 256 Kan. 602, 886 P.2d 869, 890 (Kan.1994) ("Under the plaintiff's construction ... there would never be a need to show an alternative design because there is no need to show what about the design was defective. Clearly this is not a proper construction. While evidence of a safer alternative design is not required in all cases, there must be a specific claim concerning what aspect of the design was defective for a plaintiff to prevail on a strict liability design defect claim."), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995). For these reasons, this Court concludes that plaintiffs' reliance on *Moraca* and *Sabloff* is misguided.

**\*6** Moreover, this Court also finds that plaintiffs have not stated how the IBM machines are defective. While Dr. Kroemer discusses design defects in "conventional keyboards," his testimony fails to include any reference to or discussion of specific design defects in the IBM machines. Rather, Dr. Kroemer discusses three general "defects" of "the conventional keyboard." Plaintiffs' Brief at 12. According to Dr. Kroemer, the defects of the conventional keyboard are: too many keys; unergonomic arrangement of keys; and insufficient space to rests wrists. *Id.* However, all three alleged defects are sufficiently generic that Dr. Kroemer apparently feels he can testify about them without having ever examined the IBM machines used by Mrs. Schneck, inspected the workstation at which she used the IBM machines, or observed her keying techniques.

Despite Dr. Kroemer's failure to particularize a

specific defect in the IBM machines and failure to observe, inspect, and/or examine the IBM machines used by Mrs. Schneck, plaintiffs assert that "there can be no question that Dr. Kroemer has 'stated how,' in his view 'the IBM machines are defective.'" Plaintiffs' Brief at 13. Plaintiffs' bold assertion, without more, is not enough to create a triable issue of fact. *See Mid-State Fertilizer Co. v. Exchange Nat. Bank of Chicago,* 877 F.2d 1333, 1339 (7th Cir.1989) (noting that when an expert presents nothing but conclusions, such testimony will be insufficient to defeat a motion for summary judgment); *see also Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir.1977) (finding that the evidentiary rules regarding expert testimony at trial were "not intended ... to make summary judgment impossible whenever a party has produced an expert to support its position."). Therefore, plaintiffs have not met there burden under *N.J.S.A. 2A:58C-2* of demonstrating "by a preponderance of the evidence that *the product causing the harm* was not reasonably fit, suitable or safe for its intended purpose because it ... was designed in a defective manner." *N.J.S.A. 2A:58C-2* (emphasis added). Accordingly, plaintiffs' design defect claim must be dismissed as a matter of law.[FN3]

> FN3. Plaintiffs also contend that they are entitled to relief under the so-called "consumer expectation test." *See* Plaintiffs' Brief at 10. However, since the enactment of the Products Liability Act of 1987 (the "Act"), *N.J.S.A. 2A:58C-1 et seq.,* the consumer expectations test constitutes an absolute defense to liability. *Roberts v. Rich Foods, Inc.,* 139 N.J. 365, 377, 654 A.2d 1365 (1995) (citation omitted); *see id.* at 375, 654 A.2d 1365 (quotation omitted) ("The Act left intact 'the three theories under which a manufacturer or seller may be held strictly liable for harm caused by a product-defective manufacture, defective design, and defective warnings."). Thus, plaintiffs' suggestion that the consumer expectations test provides an independent basis for relief is without merit. Moreover, even assuming that this test remained viable, plaintiffs could not prove that the product design did not conform to a consumer's expectations because, as noted above, plaintiffs' expert cannot state how the IBM machines are defective.

## C. FAILURE TO WARN

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

As noted above, to establish a cause of action in strict liability for a defective product, a plaintiff must prove that the defect existed when the product left the defendant's control and that the defect caused injury to a reasonably foreseeable user. *Coffinan v. Keene Corp.,* 133 N.J. 581, 593, 628 A.2d 710 (1993) (citations omitted). In a failure-to-warn case, the alleged product defect is not a flaw in the structure or design of the product itself. Rather, "the defect is the absence of a warning to unsuspecting users that the product can potentially cause injury." *Id.* at 593-94, 628 A.2d 710 (citation omitted). Nevertheless, the same elements to establish a cause of action apply when a plaintiff's claim concerning a defective product is based on a failure to warn. *Id.* at 594, 628 A.2d 710 (citation omitted); *see also Whitehead v. St. Joe Lead Co. Inc.,* 729 F.2d 238, 246 (3d Cir.1984) (citing *Michalko v. Cooke Color & Chemical Corp.,* 91 N.J. 386, 394, 451 A.2d 179 (1982) (noting that the elements of a prima facie case of strict liability for failure to warn are proof (1) that the product without warnings was defective; (2) that the defect existed when the product was distributed under the control of the defendant; (3) that the defect proximately caused an injury to a reasonably foreseeable user)).

*7 In the present matter, defendant does not contest the fact that it has not issued a "warning" concerning any hidden or latent danger of injury that would arise out of the use of the IBM machines. Defendant's Brief at 19. Rather, IBM argues that it is entitled to summary judgment with respect to plaintiffs' failure-to-warn claim

because plaintiffs cannot prove the existence of a hidden or latent danger in any of the IBM products allegedly used by plaintiff or that such danger arose from the use of these products and caused injury: (a) because the testimony of plaintiffs' experts, Karl Kroemer, Laura Punnett, Sc. D., Laura Welch, M.D., and Samuel Glucksberg, Ph. D., is inadmissible under the relevant evidentiary standards and should be excluded *in limine;* or, in the alternative (in the event this Court finds the testimony to be admissible), (b) because plaintiffs have failed to proffer sufficient evidence for a jury to find for plaintiffs on this claim by a preponderance of the evidence.

*Id.* at 1, 19.

*I. Admissibility of Experts' Testimony*

A. *Daubert/Paoli II* Analysis

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court outlined the standards and reasoning that a district court must apply in determining whether expert scientific testimony is admissible at trial. The Third Circuit Court of Appeals has interpreted *Daubert* to characterize the district court's role as that of "gatekeeper." *In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 732 (3d Cir.1994) ("*Paoli II* "), *cert. denied sub nom.,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Both *Daubert* and *Paoli II* require the district court "to act as 'gatekeeper' and to assure that the scientific methodology upon which the expert opinion is founded is reliable, *i.e.,* that the expert's conclusion is based on good grounds (the methods and principles of science)." *Paoli II,* 35 F.3d at 732 (discussing *Daubert* ). This Court's analysis of the proffered expert testimony will be guided by the Third Circuit's discussion and interpretations of *Daubert* in *Paoli II.*

Rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify to scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. [FN4] *United States v. Velasquez,* 64 F.3d 844, 849 (3d Cir.1995) (citing *Paoli II,* 35 F.3d at 741-42). Because Federal Rule of Evidence 104(a) requires district courts to make preliminary determinations "concerning the qualification of a person to be a witness, [and]. .... the admissibility of evidence," a district court, when faced with a proffer of expert testimony, must make a preliminary determination as to all of these elements of Rule 702. *Id.* (citing *Daubert,* 113 S.Ct. at 2796). These preliminary determinations are intended to ensure the reliability of the expert testimony as well as its relevance. *Id.* (citing *Daubert,* 113 S.Ct. at 2795; *United States v. Downing,* 753 F.2d 1224, 1237(3d Cir.1995).

FN4. Rule 702 provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." FED. R. EVID. 702.

*8 The first requirement of Rule 702-that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                       Page 7
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

proposed witness be an expert-has been liberally construed in this circuit. *Velasquez,* 64 F.3d at 849 (citing *Paoli II,* 35 F.3d at 741). Indeed, the Third Circuit has "held that a broad range of knowledge, skills, and training qualify an expert as such," and has "eschewed imposing overly rigorous requirements of expertise." *Id.* (citing *Paoli II,* 35 F.3d at 741; *Hammond v. International Harvester Co.,* 691 F.2d 646, 653 (3d Cir.1982)) (permitting engineer with sales experience in automotive and agricultural equipment, who also taught high school automobile repair, to testify in products liability action involving tractors)).

The second requirement of Rule 702-that the expert testify to scientific, technical, or other specialized knowledge-is intended to ensure the reliability or trustworthiness of the expert's testimony. *Id.* (citing *Daubert,* 113 S.Ct. at 2795-96). In *Daubert,* the Supreme Court held that a district court, when presented with a proffer of expert "scientific" testimony, must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," by considering all relevant factors that may bear on the reliability of the proffered evidence [FN5] 113 S.Ct. at 2796-97; *Paoli II,* 35 F.3d at 742. Scientific evidence is deemed sufficiently reliable if the expert has "good grounds" for his or her testimony, i.e., the expert's opinions are "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.' " *Paoli II,* 35 F.3d at 742 (quoting *Daubert,* 113 S.Ct. at 2795). The Third Circuit has cautioned, however, against applying the reliability requirement too strictly, explaining that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. The ultimate touchstone [of admissibility] is helpfulness to the trier of fact." *Id.* at 744 (internal quotations and citation omitted).

FN5. According to the Third Circuit, courts should consider the following suggested factors, in addition to any other applicable factors, in making a preliminary determination regarding the reliability of scientific testimony:
(1) whether the method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the

relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; (8) the non-judicial uses to which the method has been put.
*Velasquez,* 64 F.3d at 849 n. 8 (citing *Paoli,* 35 F.3d at 742 n. 8).

The third requirement of Rule 702 is to ensure that the evidence is relevant or "fits" under the facts of the case. *Daubert,* 113 S.Ct. at 2795-96. There must be a valid connection between the expertise in question and the inquiry being made in the case. *Paoli II,* 35 F.3d at 743. When dealing with "scientific" evidence, this element is satisfied if there is a "connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Downing,* 753 F.2d at 1237; *see also Paoli II,* 35 F.3d at 742-43.

Finally, we note that Rule 403 requires the district court to consider whether the admission of proffered testimony might overwhelm or confuse the jury. As explained in *Paoli II:*
[A] district court cannot exclude a scientific technique as too confusing and overwhelming simply based on its conclusion that scientific techniques by their very nature confuse and overwhelm the jury. There must be something about the particular scientific technique such as its posture of mythic infallibility that makes it especially overwhelming. *Id.* at 746. Thus, "in order for a district court to exclude scientific evidence, there must be something particularly confusing about the scientific evidence at issue...." *Id.* With the foregoing framework in mind, the Court will reach the merits of defendant's motion *in limine.*

**\*9** (1) *Dr. Karl Kroemer*
(a) *Proffered Testimony*

Dr. Kroemer is an industrial engineer who is proffered by plaintiffs as their "state of the art" expert.[FN6] Plaintiffs have produced reports by Dr. Kroemer that purport to review the literature on "cumulative trauma disorders." [FN7] Dr. Kroemer concludes that "the relation between [cumulative trauma disorders] and design and use of keyboards as input devices was well established." [FN8] *Kroemer Report* at 40.

FN6. According to plaintiffs, a "state of the art" expert provides "all scientific data or

Not Reported in F.Supp.                                          Page 8
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

other pertinent information from which an inference could be drawn that a warning should have been issued." Plaintiffs' Brief at 32 n. 26.

FN7. Dr. Kroemer defines "cumulative trauma disorders" as "those disorders stemming from often repeated actions whose cumulative effects finally result in an injury." *Kroemer Report* at 1; *see id.* at 2-3.

FN8. Although Dr. Kroemer's conclusion includes a reference to keyboard design, Dr. Kroemer fails to articulate any defect in the design of the IBM machines to support plaintiffs' claim that they caused injury. *See supra* Section B, at 11-12. Therefore, to the degree that Dr. Kroemer is being offered to support plaintiffs' failure to warn claim, it is for the proposition that it was "well established" that typing itself causes "cumulative trauma disorders." *See Kroemer Report* at 40.

During the course of his deposition and *in limine* testimony, Dr. Kroemer was asked about the methodology he utilized in reaching his conclusion. First, with respect to his methodology for selecting the literature that serves as the basis for his conclusion, Dr. Kroemer provided the following description during an exchange with defense counsel:
Q: I guess what I want to know from you is, how did you decide what to include and what not to include in Exhibits 5 [*Kroemer Report* ] and 6 [*Kroemer Supp. Report* ]?
A: The general issue is the design and use of keyboard and related entry devices. So such papers would be included that directly or indirectly related to this topic. Secondly, I tried to apply some judgment as to the validity of any given publication and such that it would either be contributing towards an assessment of what was known at the time at that time or it would set certain highlights.
Q: So, as I understand it correctly, you look not only at the topic of what a paper was about, but also you read it and analyze its validity before including it in [Exhibit] 5 or 6?
Q: And therefore you made some judgments as to the validity or lack of validity of wh at the author or authors were saying in a particular article that was on a topic that dealt with design and use of keyboard and related entry devices?
A: Yes, sir.   Q: And I also take it then that if the author's statements were valid they would be

included in these summaries here, Exhibit [sic] 5 and 6, correct?
MR. PHILLIPS: Objection.
A: Valid only in the sense that they would shed a given light on a topic and perhaps regarding conclusions. But the term "valid," as I understand it, doesn't necessarily mean that I feel that the author would be correct.

*Kroemer Dep.,* 07/22/94 at 54.14 to 55.22. Following an objection by plaintiffs' counsel, however, Dr. Kroemer retracted his testimony and indicated that a paper or article would be included in his reports merely if it was "relevant." [FN9] *Id.* at 57.18 to 58.19. According to Dr. Kroemer, a publication was included in his report regardless of his views of whether the publication was correct from a scientific, engineering, or medical point of view," *Id.* at 58.20 to 60.1, although he did profess to exclude articles that were "purely journalistic." *Kroemer Dep.,* 09/15/94 at 73.5 to 74.22.

FN9. IBM asserts that Dr. Kroemer's testimony that scientific validity meant simply "shedding light on a notion", *see* Kroemer Dep., 07/22/94 at 57.22-23, "highlight[s] the unreliability of his testimony and of the methodology he used in preparing his reports. Defendant's Brief at 27 n. 37.

Subsequently, during the course of his *in limine* testimony, Dr. Kroemer was asked about the step(s) he took between the collection of the literature and actually rendering his conclusion:
*10 Q: And can you tell me, how did you get from the collection of articles, where some are in favor of that opinion, and some are against that opinion, and some are in between, how did you get from there, that body of literature, to that conclusion, what criteria did you use?
A: The criteria-
MR. MAIMON: Object to the form. Compound.
THE COURT: Sustained.
BY MR. D'AVANZO (CONTINUED):
Q: How did you-
MR. MAIMON: I have no objection to how do you-how did you get there, I-
MR. D'AVANZO: I'm going to amend the question.
THE COURT: Okay.
Q: How did you get from this body of literature, that was either supportive, or critical or non committal, or in between, with respect to your conclusion, that the relationship was well established?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 9
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

A: I wish you had left out-left out the last few words, of your question.

Q: Let met try it again. Let me withdraw. How did you get from this body of literature, to your conclusion?

A: Okay. Now, keep in mind that I worked for-the first years of my professional life, in a-in a research institute that had engineers, psychologists, and physiologist, mostly, Mds.

It was quite well established then, that typing was often associated with what we call now, CTDs.

So there was no question even, in the 50's, about it. Or in the 60's. The-the question is, what are the specific relations, and this is of course, a biomechanical problem, as far as I can judge. I cannot medical-judge it on a medical side, for example.

But whether you do unaccustomed farm work, or whether you do meat cutting, or whether you do keyboarding, it all involves in essence the same so to speak mechanical or biomechanical structures of the body.

So, as-as you put all that evidence together, it-it makes clear and imminent sense to say that the posture, the motion, the forces, the repetitions, the way-the frequency of-of doing it, is clearly related to an over exertion of-of parts of the human body.

Q: And can you tell me what-withdrawn. Is there a particular methodology that you utilized to go from the knowledge expressed in these articles, to your conclusion?

A: *The methodology would be-is it plausible according to what we know, about how the body reacts to repetitive exertions of that kind.*

Q: *And now, that-that criteria, or methodology that you followed, is that something that's normally followed by engineers and ergonomists? In making drawing conclusions from literature?*

A *Well, I don't know about others, but I would think that is a-a logical and-and-and reasonable way of going about drawing conclusions.*

*Kroemer Tr.* at 43-46 (emphasis added).

IBM submits that Dr. Kroemer's conclusion is unreliable because: (1) the steps he took to collect the literature that serves as the basis for his conclusion are flawed, *see* Defendant's Brief at 27-28; and (2) the step he took between the collection of the literature and actually reaching a conclusion are flawed.[FN10] *See Kroemer Tr.* at 44 ("How did you get from this body of literature, that was either supportive, or critical or non [-]committal, or in between, with respect to your conclusion, that the relationship was well established? And then get to

your conclusion?"). Having set forth Dr. Kroemer's methodology, this Court will now determine whether it satisfies *Daubert/Paoli II.*"[FN11]

FN10. In other words, defendant reasons that there must be some step(s) between the "mere" collection of literature, which was collected in this case regardless of conclusion, and actually reaching a conclusion. If such steps were taken, then the Court must determine whether this methodology satisfies *Daubert/Paoli II.* If not, then Dr. Kroemer's conclusion is inadmissible because it must be based on "subjective belief or unsupported speculation," rather than the "methods and procedures of science." *Paoli II,* 35 F.3d at 742; see *id.* at 745 (*Daubert* requires conclusions to be "supported by good grounds for each step in the analysis [because] ... any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.").

FN11. While defendant argues that Dr. Kroemer's methodology is selecting the literature that serves as the basis for his conclusion is unreliable, *see* Defendant's Brief at 27-28, this Court need not address this part of defendant's claim because, as discussed below, we find that the step taken by Dr. Kroemer between the collection of the literature and actually reaching his conclusion is unreliable. Therefore, because *Daubert* requires that an expert's conclusion must be supported by good grounds for each step in the analysis, our inquiry is complete as soon as one step is found to be unreliable.

**\*11 (b)** *Daubert /Paoli II Factors*
(i) *Does the Methodology Consist of a Testable Hypothesis*

Defendant does not contend that Dr. Kroemer's hypothesis that "the relation between [cumulative trauma disorders] and design and use of keyboards as input devices was well established" is not testable. Rather, defendant argues that based on Dr. Kroemer's "unscientific methodology and inability to point to a single study that shows that use or design of keyboards causes some injury (or, as is relevant to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

Page 10

this case, <u>carpal tunnel syndrome</u>), Dr. Kroemer's conclusions must be seen as unreliable." Defendant's Brief at 28.   Accordingly, this factor will weigh in favor of the admission of the proffered testimony.

### (ii) *Has the Methodology Been Subject to Peer Review?*

Dr. Kroemer testified at the *in limine* hearing that the particular reports at issue have not been subject to peer review.  *See Kroemer Tr.* at 41.   Moreover, Dr. Kroemer is not even sure whether his methodology for reaching his conclusion has been utilized by others.  *Id.* at 45-46.   This factor will weigh against the admission of the proffered testimony.

### (iii) *Is There a Known or Potential Rate of Error?*

This Court is unable to determine any known or potential rate of error in Dr. Kroemer's methodology. Thus, this factor will weigh against the admission of the proffered testimony.
(iv) *Were there Standards Controlling the Technique's Operation ?*

Apparently, Dr. Kroemer takes the conclusions of various articles he has collected and compares them with his understanding of how the body reacts to repetitive exertions of the kind described in the articles.   This hardly qualifies as a "standard" and, therefore, this factor will also weigh against the admissibility of Dr. Kroemer's proffered testimony.
(v) *Is the Methodology Generally Accepted?*

As noted above, Dr. Kroemer is unaware of any followers of his methodology.  *See Kroemer Tr.* at 4546.   Nor have plaintiffs pointed to any followers of Dr. Kroemer's methodology.   This factor will weigh against the admissibility of the proffered testimony.
(vi) *Is there a Relationship Between the Technique and Other Methods Establishing to be Reliable?*

In the absence of a clearly definable technique, this Court cannot determine the relationship of such a technique to methods that are established to be reliable.   Accordingly, this factor will weigh against the proffered testimony.
(vii) *The Qualifications of the Expert Based Upon the*

*Methodology?*

Defendant has not challenged Dr. Kroemer's qualifications.   Therefore, this factor will weigh in favor of the admission of the proffered testimony.
(viii) *Non-Judicial Uses*

In the absence of a clearly defined parameters, this Court can not determine whether Dr. Kroemer's methodology would have any application outside of the current judicial setting.   This factor will weigh against the admission of the proffered testimony.
*12 (ix) *Other Factors*

Dr. Kroemer has repeatedly recognized in his correspondence, his deposition testimony, and his academic writings how little scientists currently know about the hypothesized relationship between activities and "overuse disorders." [FN12]   *See* Defendant's Brief at 26-28;  Defendant's Reply Brief at 7. Moreover, Dr. Kroemer has failed to point to a single study that shows that use or design of keyboards causes some injury (or, as is relevant to this case, <u>carpal tunnel syndrome</u>).[FN13]   Yet, despite this uncertainty and lack of support in the literature, Dr. Kroemer indicates that the "relation" between "<u>cumulative trauma disorders</u>" and "design and use of keyboards" is "well established."    *Kroemer Report* at 40.   While Dr. Kroemer's opinion can not be deemed unreliable simply because it is novel or differs from that of other experts, Dr. Kroemer must explain what steps he took to overcome or discount these concerns and/or lack of support to arrive at such a firm position.   In the absence of such a showing, this Court must find that this factor also weighs against the admissibility of the proffered testimony.

FN12. Defendant notes that outside the litigation process, Dr. Kroemer has elected to use the term ODs (*i.e.,* overuse disorders) in place of more pejorative terms such as "repetitive stress injury" and "cumulative trauma disorder."   Defendant's Reply Brief at 7 n. 4.

FN13. Indeed, when Dr. Kroemer was asked during the first day of his deposition whether any of the examined literature concludes that keying causes cumulative trauma disorders, Dr. Kroemer responded, in relevant part, that:

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

my point of interest in this whole procedure is what are the ergonomic aspects of keyboards that may lead-that that have suspected symptoms or, in fact, may have been fact to [sic] lead to cumulative trauma disorders. If we then depart with the-depart from that ergonomic point of view, all we need to do is start, in fact, on page 1 of Exhibit No. 6 [*Kroemer Supp. Report* ] and read the synopsis of what Osler said in 1892. And if you read this, it says: The continuous and excessive use of muscles in performing a certain movement may be followed by an irregular, involuntary spasm, cramp and so forth. *How much more clearly can it be established .... that more than one hundred years ago that certain activities such as might be required on a keyboard can constitute a continuous and excessive use of muscles that result in a disorder. And that will be a typical example in the way of which I would try to answer your question in terms of what does [sic] ergonomists read out of that literature.*

*Kroemer Dep.*, 07/22/94 at 81.6 to 82.1 (emphasis added).


(x) *Conclusion*

The *Daubert/Paoli II* analysis weighs decisively in favor of excluding the proffered testimony. As noted above, *Daubert* requires "that the expert testify to scientific knowledge-conclusions supported by good grounds for each step in the analysis-mean[ing] that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Paoli II*, 35 F.3d at 745 (footnote omitted) (emphasis in original). In the face of Dr. Kroemer's unscientific methodology and inability to point to a single study that shows that use or design of keyboards causes some injury (or, as is relevant to this case, carpal tunnel syndrome), Dr. Kroemer's conclusions must be seen as unreliable.


(c) *Fit*

As noted above, the third requirement of Rule 702-that the evidence is relevant or "fits" under the facts of the case, must also be satisfied before an expert's proffered testimony may satisfy *Daubert*.

In the present matter, Dr. Kroemer has opined that use of a keyboard can cause "cumulative trauma disorders," which he defines as a "collective term for syndromes characterized by discomfort, impairment, disability or persistent pain in joints, muscles, tendons and other soft tissues, with or without physical manifestations." *Kroemer Report* at 2, Defendant's Brief, Exh. Y. Plaintiffs' opposition papers define Dr. Kroemer's opinion in even more general terms, stating that he will testify that "defects have adverse anatomical implications." Plaintiffs' Brief at 31. However, the jury in this case would not be asked to decide if Mrs. Schneck suffered "adverse anatomical implications." Mrs. Schneck claims that keyboard use caused her carpal tunnel syndrome. Dr. Kroemer has neither stated, nor offered any scientific research to prove, that keyboard use can cause the conditions claimed in this lawsuit. Indeed, plaintiffs' counsel admits that Dr. Kroemer cannot offer testimony on this issue. *See id.* at 32. Accordingly, this Court finds that Dr. Kroemer's testimony that "keyboards are defectively designed and that these defects have adverse anatomical implications," Plaintiff's Brief at 31, must be excluded because there is no "connection between the scientific research or test result to be presented, and particular disputed factual issues in the case." *Velasquez*, 64 F.3d at 850 (quoting *Downing*, 753 F.2d at 1237).

**\*13** (d) *Conclusion*

Based on the foregoing analysis, the Court will exclude Dr. Kroemer's testimony in its entirety.

(2) *Dr. Laura Punnett*

Laura Punnett, Sc. D., is an occupational epidemiologist and ergonomist. Plaintiffs offer her opinion to establish general causation between VDT (video display terminal) use and "musculoskeletal disorders." She was also asked to opine on causation with respect to plaintiff's individual claim. Dr. Punnett concludes, based on twenty studies[FN14] found in the open epidemiological literature, that such

FN14. While Dr. Punnett began her review with twenty studies, she relied on only eleven. IBM notes that Dr. Punnett considers the following studies to the top seven because they "were found to have no or only very minor methodological flaws

Not Reported in F.Supp.                                                Page 12
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

that might affect interpretation of their results:" *LA Times, Newsday, U.S. West, Knave, Nathan, Rossignol,* and *Souter.* *See* Exh. T, *Punnett Report* at 23. According to Dr. Punnett, the remaining four of the eleven "had relatively minor weaknesses, not serious enough to invalidate them completely or that only affected some of the findings:" *Hunting, Kamwendo, Maeda,* and *Starr. Id.*

literature provides reasonably convincing evidence that VDT work *per se,* whether measured in hours worked per week, years duration of employment, typing speed, or intensity of keying (data entry vs. interactive keying), is causally related to an elevated risk of <u>musculoskeletal disorders</u> [and related <u>soft-tissue disorders</u>].[FN15] *Punnett Report* at 24. With respect to Mrs. Schneck, Dr. Punnett concludes "that there is a reasonable certainty that Miss [sic] Schneck's disorders were proximally [sic] related to her work as a keypunch operator and to the failure of the keypunch machine manufacturer (*i.e.,* IBM) to warn of the possible hazards." *See* Exh. U, "*Addendum Report on Work-Relatedness of Musculoskeletal Disorders Re: Schneck v. IBM,*" dated March 21, 1994, at 5.

> FN15. Dr. Punnett defines such disorders as "a group of clinical syndromes including nerve compression disorders (such as carpal tunnel syndrome), tendon inflammations and related conditions (tenosynovitis, epicondylitis, bursitis of the shoulder, etc.), as well as non-specific pain or paresthesia and conditions that some clinicians describe as myositis, fibromyalgia, focal dystonia, and other diagnosis that are less well standardized." *Punnett Report* at 1. According to defendant, Dr. Punnett's definition fails to include any reference to, or discussion of, a scientifically defined disease entity. Defendant's Brief at 29 n. 39 (citations omitted).

(a) *General Causation*

In her study of causation of keyboard induced injury, Dr. Punnett posits eight criteria to be considered by epidemiologists in determining causality. *See* Lakind Aff. ¶ 107. Specifically, she discusses the concepts of: (1) random misclassification of exposure or of health status; (2) selection bias; (3) information or recall bias; (4) confounding; (5) temporal sequence of cause and effect; (6) strength of association; (7) exposure-response relationships; and (8) biological plausibility and external validity. *Id.; see Punnett Report* at 4-9.

Rather than argue that the set of criteria employed by Dr. Punnett in reaching her conclusion is unsound, IBM submits that Dr. Punnett's opinions should be excluded because *none* of the studies relied on addresses the issue of whether keyboard use can cause <u>carpal tunnel syndrome.</u> Defendant's Brief at 30; *see also* Defendant's Reply Brief at 9. This flaw, according to defendant, "necessarily results in an unreliable conclusion of cause and effect which could not possibly assist the trier of fact." Defendant's Brief at 30. Therefore, instead of focusing on whether Dr. Punnett's methodology is scientifically reliable, this Court must determine whether Dr. Punnett had good grounds to rely on the studies in question to draw the conclusion that VDT use causes <u>musculoskeletal disorders.</u> *See <u>Paoli II,</u>* 35 F.3d at <u>749; see also <u>DeLuca v. Merrell Dow Pharmaceuticals, Inc.,</u></u> 911 F.2d 941, 953 (3d Cir.1990) ("Rule 703 is satisfied once there is a showing that an expert's testimony is based on the type of data a reasonable expert in the field would use in rendering an opinion on the subject at issue.").

**\*14** The Third Circuit has made it clear that "it is the judge who makes the determination of reasonable reliance, and that for the judge to make the factual determination under <u>Rule 104(a)</u> that an expert is basing his or her opinion on a type of data reasonably relied upon by experts, the judge must conduct an independent evaluation into reasonableness." *Id.* at 748. Of course, "the judge can ... take into account the particular expert's opinion that experts reasonably rely on that type data, as well as the opinions of other experts as to its reliability, but the judge can also take into account other factors he or she deems relevant." *Id.*

According to IBM, the studies relied on by Dr. Punnett will not allow her draw a scientifically sound conclusion regarding the alleged causal relationship between "VDT work" and "an elevated risk of <u>musculoskeletal disorders</u>" because: (1) the studies discuss subjective symptoms rather than disease entities; (2) the studies have poorly conceptualized objectives; (3) all but one of the twenty studies are cross-sectional in design; (4) almost all of the cross-sectional studies are self-reported; (5) two of the top eleven studies have potential bias in subject selection; (6) all of the eleven top studies fail to take into account the fact that "<u>musculoskeletal disorders</u>" are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 13
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

not unique to office and manufacturing workers; and (7) these studies do not account for other possible causes. The foregoing flaws, according to defendant, "render [Dr. Punnett's] opinions regarding causation unreliable and unhelpful to the trier of fact." Defendant's Brief at 35.

In response to these criticisms, plaintiffs provide the affidavit of Dr. Stephen Zoloth ("Zoloth Aff."), attached to Lakind Aff. as Exh. Al. Dr. Zoloth is a professor of epidemiology and Public Health at Hunter College in New York, as well as the Director of the Hunter College Center for Occupational and Environmental Health. Zoloth Aff. ¶ 1. As part of his professional activities, Dr. Zoloth serves as a peer reviewer for the American Journal of Public Health and the American Journal of Industrial Medicine and regularly reviews articles submitted to these periodicals for publication. *Id.* ¶ 2. Dr. Zoloth submits that he is familiar with Dr. Punnett's Report, entitled "Evidence of Work-Relatedness of Musculoskeletal Disorders in Keyboard Operation and Data Entry Tasks," as well as the literature reviewed by Dr. Punnett therein. *Id.* ¶ 3.

With respect to IBM's criticisms of the studies relied on by Dr. Punnett, Dr. Zoloth provides the following response:

16. *Quality of the Studies*
First, it is important to note that Dr. Punnett's review is not restricted to just the 20 VDT studies. Indeed, the non-VDT studies which discuss the established ergonomic risk factors (force, repetition, awkward posture, ... ) which are also present in keyboard use, are important to consider. However, even focusing on just the VDT studies, it is clear that they are all either peer reviewed or government issued, and are all authored by reputable scientists. As such they are of sufficient quality to allow for Dr. Punnett's evaluation.

**\*15** 17. *Symptoms Reported*
To the extent that the researchers in the cited studies discussed symptoms reported by the subject populations, this is a proper and common feature of such occupational health studies. Of course, in the methods sections of various of the reports, the researchers discuss the symptom complexes being studied and how they relate to defined injuries and disorders.[FN16] Accordingly, they do not present an obstacle to Dr. Punnets evaluation. Rather, the studies' authors are assessing different symptomology to determine the prevalence of work-related musculoskeletal disorders [FN17] in the various populations. Again, this is entirely proper. Moreover, while symptomology may be viewed as a

surrogate for disease, it can also be seen as a precursor. This makes its consideration entirely proper.

FN16. Dr. Zoloth argues that "[t]he IBM lawyer is mistaken in asserting that epidemiology can only concern itself with 'disease entities.' While the symptom complexes reported in several of the studies represent distinct 'disease entities' (with specific I.C.D. codes), epidemiology does apply to many *real* non-disease entities (*e.g.*, low birth weight, suicide, violence ... )." Zoloth Aff. ¶ 17 n. 1.

FN17. According to Dr. Zoloth, "these symptom complexes are not only representative of distinct 'disease entities,' but are reportable on OSHA 200 logs, and are compensable under the Workers Compensation statutes of many states." Zoloth Aff. ¶ 17 n. 2

18. *Statistical Association v. Causation*
Within any particular study on any subject (within the field of epidemiology) the association of exposure and outcome is properly noted by the researcher. It is, however, within the larger scope of a comprehensive review-such as that performed by Dr. Punnett-that findings of causation are properly discussed. The tests for such conclusions are the well-established epidemiological criteria set out in the beginning of Dr. Punnett's report (pp. 4-10). Since she has followed these criteria, it is entirely proper for her-especially giver her qualifications and experience-to draw conclusions based upon such a review. Indeed, the studies, being of sufficient quality, properly lend themselves to such findings. While IBM's lawyers may review the studies and (assuming they follow the proper criteria) come to different conclusions, that does not mean that the studies do not support Dr. Punnett's conclusions. In fact, they do.

19. *Dr. Punnett Acknowledges the Limitation of the Studies in Her Review*
Any good and credible epidemiologist will be the first to admit that no study or review is perfect. In fact, it is expected of epidemiologists that they will fully and forthrightly address the weaknesses in their work. Dr. Punnett has properly done this. This in no way impairs her credibility. In fact, just the opposite is true. Moreover, it does not detract from the reliability of her work. Such acknowledgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

Page 14

simply puts into proper context the scope of the work and its limitations. None of those (properly) discussed by Dr. Punnett invalidate or weaken her conclusions.

20. *Cross-Sectional Design*

Cross-sectional studies are valid and generally accepted study designs in epidemiology and are properly considered in a review such as Dr. Punnett's. It is true that a *potential* limitation inherent in such a design is the subject of temporal relationship between exposure and outcome, if not properly considered and controlled for. The authors of the subject studies acknowledge this, as does Dr. Punnett, who adequately deals with this subject in the body of her report as well as in Table 1. Accordingly, it does not impair the ability to find a causal relationship in this context.

*16 21. *Self-Reporting*

Use of questionnaires to elicit information concerning the outcome variable in an occupational epidemiological study is standard and well accepted in the field. While IBM's lawyers point to the potential for over-reporting, there is just as great a likelihood of under-reporting, as active workers may choose not to report outcomes for fear of jeopardizing their employment. Moreover, and on a related note, one should consider that the "healthy worker effect" (sick/injured workers are selectively removed from the studies population) will mask the true effect of the exposure.

22. *Bias*

As noted above, no study is perfect or without any potential bias or confounding. IBM's lawyers point to Dr. Punnett's observation that two of the twenty VDT studys [sic] contain potential selection bias, and are critical of her using those studies as part of the bases for her conclusions. This criticism is not well founded. Firstly, as Dr. Punnett properly points out, selection bias can affect results in either direction. Moreover, there is no indication in these two studies whether this bias is active and to what extent. However, in all events, it would be improper to disregard the findings of these studies as advocated by IBM's lawyers. Rather, Dr. Punnett properly considers them-acknowledging their potential limitations-in viewing the whole picture presented by the entire literature.

23. *Confounding*

Again, no study is perfect or completely free of possible confounding. While many of the VDT studies control for some confounding factors some do not. Methodologically, this is properly noted and dealt with by Dr. Punnett in her report and in Table 2. Having done so, it is up to the reviewer to form a professional judgment as to whether or not the potential confounding precludes the drawing of conclusions. Dr. Punnett has done this. While IBM's lawyers may disagree with this conclusion, there is no reasoned basis to disregard Dr. Punnett's judgment.

Zoloth Aff. ¶¶ 16-23.

Based on the foregoing analysis, this Court finds that the studies relied upon by Dr. Punnett are of the type reasonably relied on by experts in the field to render a conclusion with respect to general causation. While none of the underlying studies actually concludes that VDT use causes musculoskeletal disorders, it is well settled that "epidemiology cannot prove causation; causation is a judgment issue for epidemiologists and others interpreting the epidemiological data." FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 157 (1994) ("REFERENCE MANUAL"); *see id.* at 126 ("Association is not *causation*. .... A strong association that is demonstrated consistently in a series of research projects leads a researcher to infer that a causal relationship exists. Even the best of studies do not demonstrate more than a high probability of a causal relationship between exposure to an agent and a disease."); *see also Diaz v. Johnson Matthey, Inc.,* 893 F.Supp. 358, 375 (D.N.J.1995) (JEI) (quotation and citations omitted) (" 'A cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists.'.... If conclusive evidence were necessary to admit ... [a] theory on general causation, we might as well be proceeding under the *Frye* general acceptance test rejected by *Daubert.*"). Here, Dr. Zoloth found that it was entirely proper for Dr. Punnett to reach her conclusion regarding general causation because the underlying studies were reliable and of the type that an expert would reasonably rely on to establish causation. *See* Zoloth Aff. ¶ 18. Accordingly, we find that Dr. Punnett had "good grounds" to rely on these studies to reach her conclusion and, therefore, defendant's motion to exclude her general causation testimony *in limine* is denied.

*17 (b) *Specific Causation*

With respect to Dr. Punnett's specific causation conclusion, IBM's sole argument for the exclusion of this testimony is as follows: "Without the benefit of these opinions, Dr. Punnett can not draw any causal connection between Mrs. Schneck's alleged injury

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 15
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

and her use of any of the IBM machines." Defendant's Brief at 35. However, because this Court has denied defendant's motion to exclude Dr. Punnett's general causation testimony, defendant no longer has any basis at this time to object to the admission of her specific causation conclusion. Accordingly, defendant's motion *in limine* to exclude Dr. Punnett's specific causation testimony is also denied.

(3) *Dr. Laura Welch*

Laura Welch, M.D., is a physician specializing in occupational medicine. Plaintiffs proffer the opinions of Dr. Welch on the issue of medical causation generally and with respect to plaintiff's individual claim. In her report, dated October 1993, Dr. Welch concludes "that repeated use of a keyboard ... can be a substantial contributing factor in the development of a <u>cumulative trauma disorder</u>, and that these disorders can be prevented and treated with early identification and work modifications, among other treatment." *Welch Report* at 11. Dr. Welch concludes, in a separate letter, dated July 16, 1993, that:
it is my opinion that her [plaintiff's] bilateral <u>carpal tunnel syndrome</u> is secondary to her many years of data processing. This is based on the medical diagnosis of bilateral <u>carpal tunnel syndrome</u> and the numerous studies that document an epidemiological association between prolonged repetitive work with or without the application of force of the hands and the association with <u>carpal tunnel syndrome</u>.

*Welch Letter* at 3. Having set forth Dr. Welch's conclusions with respect to general and specific causation, we now must determine whether she employed reliable methodologies in reaching these respective opinions.(a) *General Causation*
(i) *Methodology*

In her report, entitled *Musculoskeletal Disorders of the Hand and Arm, and their Association with Use of Keyboards or Work as a Supermarket Checker* ("Welch Report"), dated October 5, 1993, attached to Exhibits from the Deposition of Laura Welch, M.D., August 29-30, 1994, as Exh. B, Dr. Welch noted the following steps she took in reaching her general causation conclusion:
(1) Consideration of peer reviewed and government studies that discuss, *inter alia*, the association between ergonomic stress and <u>cumulative trauma disorders</u>. *See, e.g.,* Welch Report at 1 (referring to studies by Stock, Silverstein, Armstrong, and Fine).

(2) Consideration of the report of Laura Punnett, Sc.D., dated August 22, 1993 and entitled *"Evidence for Work-Relatedness of <u>Musculoskeletal Disorders</u> in Keyboard Operation and Data Entry Tasks." Id.* at 3 n. 1.
(3) Utilization of several criteria that are applied to epidemiological studies to determine if an association between an exposure and a disease can be considered causal; namely, (a) consistency-is the association repeated in several studies?; (b) biological plausibility-is the association between exposure and disease reasonable, given what is known about the disease?; and (c) strength of the association-the more risk the exposure gives for disease, the more an expert can be confident that the association is causal. *Id.* at 2.
**\*18** (4) Consideration of the role psychological factors play in the development of <u>cumulative trauma disorders</u>. *Id.* at 4-5.

Moreover, at the *in limine* hearing, Dr. Welch provided the following testimony with regard to the steps she took in reaching her general causation conclusion:
(1) While Dr. Welch was familiar with Dr. Punnett's work and conclusions, she did not review the studies Dr. Punnett relied on in detail and she reached her own conclusions about these studies. *See* Testimony of Laura S. Welch, M.D. at 8, August 22, 1995, *Schneck v. IBM,* Civ. No. 92-4370 (D.N.J.1995) (GEB) ("Welch Tr.").
(2) In order to search the literature and come up with the studies cited in the first five pages of her Report, Dr. Welch and an occupational medicine Fellow conducted "a literature review and identified some key studies in the initial section [of the Report]." Welch Tr. at 8-9.
(3) Databases such as Medline and Toxline were used to identify relevant articles. *Id.* at 9.
(4) The criteria utilized by the fellow for searching the databases for literature are "guidelines or processes that are recommended by the National Library of Medicine." *Id.* at 10.
(5) Dr. Welch described the search process as "more a skill than a method to use those databases [*e.g.,* Medline] to search the medical literature [and] look for particular linkages, in this case, say, to look at <u>musculoskeletal disorders</u> and keyboards." *Id.*
(6) Dr. Welch and the Fellow "were particularly interested in finding existing literature on natural history and outcomes on these [musculoskeletal] disorders, so looking for those, identifying which particular areas of interests we had, and then designing a search to find those. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                   Page 16
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

(7) There is no mention in Dr. Welch's Report or affidavit of the steps taken in conducting this literature search. *Id.*

(8) Although no epidemiological literature cited by Dr. Welch in her Report concludes that there is a causal connection between keyboard use and carpal tunnel syndrome, Dr. Welch "think[s] that the summation of the literature allows [her] to reach that conclusion and other people reach that conclusion." *Id.* at 11.

(9) Further, Dr. Welch contends that "there's plenty of literature that concludes that keyboard use can cause carpal tunnel syndrome." *Id.* at 12. Specifically, Dr. Welch cites Dr. Punnett's study, Harrison's Textbook on Internal Medicine, and a Letter to the Editor in the American Medical Association Journal. *Id.*

(10) Dr. Punnett's report is not peer reviewed, nor has it been published. *Id.* at 12-13.

(11) The Letter to the Editor included a response from the editors, which would be considered a consensus opinion. *Id.* at 13. Although Dr. Welch is not sure about what the internal process is for peer reviewing an editorial opinion, she believes that such an opinion would be in the category that she considers peer reviewed. *Id.*

\*19 (12) Dr. Welch concludes that while Harrison's Textbook for Internal Medicine does not expressly state that keyboard use causes carpal tunnel syndrome, such a conclusion is implied by the context of the pertinent passage. *Id.* at 16.

(13) In forming her opinion about causation, Dr. Welch relies upon epidemiological studies that show an association between generic ergonomic risk factors and upper extremity musculoskeletal disorders. *Id.* at 49-50.

(14) According to Dr. Welch, the set of 20 epidemiological studies Dr. Punnett discusses deal specifically with keyboard use and upper extremity musculoskeletal disorders. *Id.* at 50.

(15) Of these 20 studies, the majority of them are cross-sectional studies. *Id.* Further, these cross-sectional studies find that there is an association between keyboard use and upper extremity musculoskeletal disorders. *Id.*

(16) Dr. Welch notes that the fact that these studies show an association between keyboard use and upper extremity musculoskeletal disorders does not mean that keyboard use contributed to the cause of those disorders. *Id.* at 50-51.

(17) However, according to Dr. Welch, these studies must be viewed in the rest of epidemiology and the rest of medicine. *Id.* at 51. An expert "can look to other characteristics within the study to say, did the exposure precede the outcome. One of the criteria,

look at the cause in epidemiology, is temporal relationship. So you can look at the body of the literature, particular studies, characteristic-pick your studies to see how that was assessed." *Id.*

(18) Dr. Welch has in the past looked at the temporal relationship in the studies, "and also looked at it in the larger context of that larger body of literature looking at the relationship between the exposures and the disorders, as well as the biologic basis which would inform whatever's missing in terms of temporal relationship, the biomechanical data." *Id.*

(19) Although Dr. Welch discusses the biological plausibility reflected in the literature, she does not discuss the temporal relationship between cause and effect of those factors and those outcomes in her Report. *Id.* at 52, 66.

(20) The literature that Dr. Welch discusses is not only epidemiological, it is also investigational. *Id.* at 53.

(21) Dr. Welch's Report does not cite to any studies or literature where there was no association found between typing and carpal tunnel syndrome. *Id.* at 71. Dr. Welch notes that she "was not doing a complete review of the epidemiologic literature...." *Id.* Although Dr. Welch has looked at the literature and she is familiar with it, her Report was not intended to be a review of the epidemiologic literature on keyboards and cumulative trauma disorders. *Id.*

IBM submits that Dr. Welch's methodology in formulating her conclusion with respect to general causation is unreliable and will not assist the trier of fact. Specifically, IBM argues that Dr. Welch's testimony should be excluded *in limine* because: (1) her conclusions are based on the same epidemiological studies relied on by Dr. Punnett and Dr. Punnett's analysis of these studies; (2) her definition of "cumulative trauma disorders" is that it does not refer to a "scientifically defined disease entity"; (3) she fails to consider the exposure-response (i.e., dose-response) relationship as part of her review of the literature concerning the alleged cause and effect relationship between "the keyboard" and "cumulative trauma disorders"; and (4) she is unable to provide a threshold-from any study or from her own experience-for the number of keystrokes over a defamed period of time that must occur to increase a VDT user's risk of suffering from a specific disorder (e.g., carpal tunnel syndrome).

(ii) *Daubert/Paoli II* Factors

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 17
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

### (A) Does the Methodology Consist of a Testable Hypothesis

**\*20** Defendant does not contend that Dr. Welch's hypothesis that "repeated use of a keyboard ... can be a substantial contributing factor in the development of a cumulative trauma disorder, and that these disorders can be prevented and treated with early identification and work modifications, among other treatment," *see Welch Report at* 11, is not testable. Rather, defendant argues that "Dr. Welch's methodology in formulating her conclusions in unreliable and will not assist the trier of fact." *See* Defendant's Reply Brief at 11. Accordingly, this factor will weigh in favor of the admission of the proffered testimony.

### (B) Has the Methodology Been Subject to Peer Review?

According to the Reference Manual on Scientific Evidence, seven factors should be considered when an epidemiologist determines whether the association between an agent and a disease is causal. REFERENCE MANUAL at 160-61. These factors guide the epidemiologist in making a judgment about causation. They are:
1. strength of the association;
2. temporal relationship;
3. consistency of the association;
4. biologic plausibility (coherence with existing knowledge);
5. consideration of alternative explanations;
6. specificity of the association; and
7. dose-response relationship.

*Id.* at 161; *see also* Smith v. Ortho Pharmaceutical Corp., 770 F.Supp. 1561, 1575 (N.D.Ga.1991). These guidelines, known as Koch's postulates, were proposed first about 100 years ago by two infectious disease researches, Koch and Henle. REFERENCE MANUAL at 161.

As noted above, Dr. Welch considered many, if not all, of these postulates in reaching her general causation conclusion. Specifically, in her Report, Dr. Welch considered the strength of the association, consistency of the association, biologic plausibility, and possible alternative explanations. Furthermore, Dr. Welch's *in limine* testimony makes clear that while her Report does not consider temporal relationships, the studies discussed in her Report do not encompass the entire data she utilized when

formulating her general causation conclusion. Finally, while Dr. Welch's Report does not consider dose-response relationships,[FN18] the Reference Manual for Scientific Evidence points out that although such "[e]vidence of a dose-response relationship strengthens the conclusion that the relationship between an agent and disease is causal[,] ... a dose-response relationship is not necessary to infer causation." *Id.* at 164. Therefore, this Court finds that the methodology in question has been subject to peer review and this factor will weigh in favor of the admission of the proffered testimony.

> FN18. By exposure-response or dose-response, defendant seems to be referring to: (1) the threshold for the number of key strokes over a defined time period that must occur to heighten a user's risk of suffering a "cumulative trauma disorder"; (2) the threshold-from any study or from her own experience-for the number of keystrokes over a defined period of time that must occur to increase a VDT user's risk of suffering from a specific disorder (*e.g.*, carpal tunnel syndrome)"; or (3) the amount of force required in VDT use to increase the user's chance of sustaining a specific disorder." *See* Defendant's Brief at 38.

### (C) Is There a Known or Potential Rate of Error?

The rate of error in Dr. Welch's methodology is intimately connected to the rate of error of each of the studies upon which her conclusion rests. With respect to Dr. Welch's consideration of Dr. Punnett's Report, as well as the studies relied upon by Dr. Punnett, this Court has already determined that there are good grounds for relying on such studies. It follows, therefore, that the rate of error in these studies is not so high as to render invalid a conclusion with respect to general causation. However, this Court is unaware of the known or potential rate of error with respect to any other studies Dr. Welch relies on in reaching her conclusion. Accordingly, this factor will only weigh slightly in favor of the admission of the proffered testimony.

### (D) Were there Standards Controlling the Technique's Operation?

**\*21** Because Dr. Welch's underlying methodology followed standard procedures, the Court finds that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 18
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

she employed basic standards to control the operation of the technique. This factor will weigh in favor of the proffered testimony.

### (E) Is the Methodology Generally Accepted?

As the Court has noted in its analysis of previous factors, the underlying methodology utilized by Dr. Welch is a standard and generally accepted epidemiological methodology. This factor will weigh in favor of the admission of the proffered testimony.

### (F) Is there a Relationship Between the Technique and Other Methods Established to be Reliable?

The comments that the Court has made above speak to this factor. Dr. Welch's methodology closely resembles established and reliable methods. Accordingly, this factor will weigh in favor of the admission of the proffered testimony.

### (G) The Qualifications of the Expert Based Upon the Methodology?

Defendant does not challenge Dr. Welch's qualifications. Therefore, this factor will weigh in favor of the admission of the proffered testimony.

### (H) Non-Judicial Uses

It is without question that the methodology utilized by Dr. Welch has been used on a regular basis in non-judicial settings within the field of epidemiology. Thus, this factor will also weigh in favor of the proffered testimony.

### (I) Other Factors

First, we note that defendant asserts that Dr. Welch's general causation methodology is unreliable because "her conclusions are based on the same epidemiological studies relied on by [Dr.] Punnett and Dr. Punnett's analysis of the same." Defendant's Brief at 36; *see also* Defendant's Reply Brief at 11. As noted above, however, this Court has already found that Dr. Punnett had good grounds for relying on the studies she used in formulating her general causation conclusion. Thus, this factor will not weigh against the admission of Dr. Welch's proffered

testimony.

Second, defendant argues that "Dr. Welch's definition of 'cumulative trauma disorders' [is problematic because] .... it does not refer to a 'scientifically defined disease entity." ' *Id.* at 37. Defendant notes that when Dr. Welch was asked about her use of the "umbrella" term "cumulative trauma disorders" in formulating her general opinion that "[t]yping on a computer can cause medical conditions that are generally overall referred to as cumulative disorders," *see id.* (quoting *Welch Dep.,* 08/29/94 at 127.20-22), she stated that "I'm trying to save time here and say cumulative trauma disorder instead of carpal tunnel syndrome, de Quervain's, trigger finger, synovitis, tenosynovitis, a long list of disorders. [But] I think it's generally preferable to use the specific medical diagnosis." *Id.* (quoting Welch Dep., 08/29/94 at 128.4-9).

Noticeably absent from defendant's quotation of this passage, however, is the fact that Dr. Welch's statement was made in the context of "examining and treating an individual." *See* Welch Dep., 08/29/94 at 128.2-4. Moreover, the remainder of this exchange between defense counsel and Dr. Welch seems to focus primarily on specific diagnosis of individual patients. *See, e.g., id.* at 128.13-25. Therefore, it is difficult to discern what impact, if any, Dr. Welch's "time-saving efforts" had on her general causation methodology. Accordingly, this factor will not weigh against the admission of the proffered testimony.

### (J) Conclusion

*22 The *Dauber/Paoli II* analysis weighs in favor of admitting the proffered testimony. While defendant points to numerous "problems" associated with the steps Dr. Welch took in reaching her general causation conclusion, these alleged shortcomings are not significant enough to find that the methodology itself is unreliable. Accordingly, defendant's motion *in limine* to exclude the general causation testimony of Dr. Welch is denied.

### (b) Specific Causation

With respect to specific causation, IBM submits that Dr. Welch's specific causation conclusion is unreliable because she did not provide a consistent picture of how she approached her analysis of plaintiff's individual case, nor did she consider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 19
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

alternative causes. Specifically, defendant points out that when

asked whether she made an attempt to rule out contributing causes of Mrs. Schneck's alleged carpal tunnel syndrome other than the alleged use of the IBM machines, Dr. Welch initially stated that she did consider other potential contributing causes. *See Welch Dep.,* 08/30/94 at 350.25 to 351.25. Dr. Welch later stated her opinion that Mrs. Schneck's "keyboard use is a significant contributing cause and I didn't identify any others." *Id.* at 364.7-9. Dr. Welch was then questioned about plaintiff's non-work activities. *See id.* at 347.20 to 348.25, 360.9 to 361.19. Dr. Welch admitted that non-work activities would be "causality factors in musculoskeletal disorders." *Id.* at 362.4-10. When prompted, Dr. Welch stated that there was no reason for her failure to inquire into the plaintiff's non-work activities [FN19] when forming her conclusions. *See id.* at 369.13-18. In fact, Dr. Welch admitted that "it was an oversight that [she] didn't do [it] in the beginning." *Id.* at 369.19-23. Dr. Welch conceded that "[a]fter our conversation today I want to talk to her [Mrs. Schneck] more about the extent of her hobbies, activities, in determining whether that as well would have been a contributing cause." *Id.* at 364.18-21.

> FN19. These non-work activities, of which Dr. Welch was aware from the health screening questionnaire completed by the plaintiff, include activities such as needle point, knitting, painting, rug hooking, and gardening. *See Welch Dep.,* 08/30/94 at 347.20 to 348.25. Mrs. Schneck engaged in embroidery for 25 years. *See Schneck Dep.* at 80.5-7. She also took water color painting lessons. *See id.* at 80.11-18.

Defendant's Brief at 38-39. Therefore, according to defendant, Dr. Welch's testimony should be excluded *in limine* because "[t]he combination if these methodological flaws in the studies relied on by Drs. Welch and Punnett, in addition to the flaws and inconsistencies specific to the framework used by Dr. Welch, render her testimony unreliable and unhelpful to the trier of fact." *Id.* at 39.

The Third Circuit has found that "most of the *Daubert* factors-testability, general acceptance, peer review, and degree of production of errors, are of only limited help in assessing whether the methodolog[y] [of a physician] is reliable (*i.e.,* scientifically valid)." *Paoli II,* 35 F.3d at 758.

Instead, courts must consider whether: either (1) [the doctor] engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes and the doctor offered no good explanation as to why his or her conclusion remained reliable, or (2) the defendants pointed to some likely cause of the plaintiff's illness other than the defendants' actions and [the doctor] offered no reasonable explanation as to why he or she still believes that the defendants' actions were a substantial factor in bringing about that illness.

**\*23** *Id.* at 760.

In the present matter, this Court finds that while Dr. Welch did not rule out each and every alternative cause of plaintiff's illness before opining that plaintiff's "bilateral carpal tunnel syndrome is secondary to her many years of data processing," *see* Welch Letter at 3, Dr. Welch's opinion was based on a sufficient number of diagnostic techniques to be deemed reliable. Indeed, prior to rendering her opinion, Dr. Welch did the following: (1) examined Mrs. Schneck, IBM Exh. F to Deposition of Laura Welch, M.D.; (2) arranged for Mrs. Schneck to complete an 11 page questionnaire, wherein Mrs. Schneck was asked to provide detailed medical and work history information, Exhibit G to Deposition of Laura Welch, M.D.; (3) performed a Tinel's sign test, a Phalen's test, and obtained a medical history, IBM Exh. F to Deposition of Laura Welch, M.D.; (4) reviewed Mrs. Schneck's medical records, IBM Exh. H to Deposition of Laura Welch, M.D.; and (5) considered alternative causes. IBM Exh. H to Deposition of Laura Welch, M.D.

Moreover, with respect to defendant's assertion that Dr. Welch does not provide a consistent picture of how she approached her analysis of Mrs. Schneck's individual case, this Court finds that such criticism goes to the weight to which the testimony is entitled and can be appropriately addressed by rigorous cross-examination. Accordingly, this Court will deny defendant's motion *in limine* to exclude the specific causation testimony of Dr. Laura Welch.

*(4) Dr. Sam Glucksberg*

Dr. Glucksberg is a psychologist who is proffered for the purpose of giving expert testimony on the "use of language and comprehension." *See* Exh. OO, *Glucksberg Dep.* at 88.14-15. In short, Dr. Glucksberg is a "warnings" expert. Dr. Glucksberg issued a report in this case in which he stated his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 20
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

opinion that "adequate and timely warnings and instructions on the safe use of keyboards to users and to supervisors would significantly reduce the risk of repetitive stress injuries in the workplace." *See* Exh. PP, *Glucksberg Report* at 6. Defendant contends that Dr. Glucksberg's testimony should be excluded *in limine* because: (1) his opinions are outside his field of expertise and unreliable; and (2) his opinions are merely cumulative of opinions by plaintiffs' other experts and should be excluded.

### (a) Dr. Glucksberg's Opinions are Outside his Field of Expertise, Unreliable, and therefore Inadmissible

To determine whether a witness can be considered an expert, one must compare the "area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990) (quoting *Gladhill v. General Motors Corp.,* 743 F.2d 1049, 1052 (4th Cir.1984)). Furthermore, although an "expert may give his opinion on a particular matter within the scope of his expertise, that opinion must be based on facts." *Randolph v. Laeisz,* 896 F.2d 964, 967-68 (5th Cir.1990).

*24 In the present matter, Dr. Glucksberg suggests that warnings are necessary to provide product users with knowledge that would avoid or minimize the risk of injury. *See Glucksberg Report* at 4. He states that "users should be specifically warned about those [design] deficiencies and the risks that they pose for repetitive stress injuries." *Id.* However, he provides no foundation for the premise that there are "design deficiencies" that pose a risk of injury. Instead, he simply assumes this is so. Moreover, whether users should be warned is a legal issue. Dr. Glucksberg also opines that "[a]dequate warnings [and] instructions ... can reduce the incidence of repetitive stress injuries to people at risk." *Id.* at 5. This is a medical issue about which he is unqualified to render an opinion. Such an opinion should be given by a medical causation expert, not a psychologist. His opinion assumes there is, in fact, some evidence that has been shown to reduce this alleged risk; however, there is no evidence presented by Dr. Glucksberg to support this assumption. Dr. Glucksberg continues by stating that warnings should be given to "[s]pecify the nature and extent of the potential injuries, namely repetitive stress injuries." *Id.* This begs the question of whether there is evidence of a danger posed by the IBM machines to require such a warning.

Dr. Glucksberg simply assumes that there is scientific evidence of a danger posed by the product giving rise to a duty to warn and that effective remedial measures exist. It is undisputed that IBM did not provide plaintiff with the kind of warning plaintiffs claim they should have been given. This is not a case where the adequacy of a particular warning is at issue. Rather, the issue is whether the risk of harm even exists to necessitate a warning. Given Dr. Glucksberg's characterization of himself as an expert on the "use of language and its comprehension," his opinions are irrelevant to this case. Thus, IBM's motion to exclude Dr. Glucksberg's testimony *in limine* is granted.

### (b) Dr. Glucksberg's Opinions are Merely Cumulative of Opinions Presented by Plaintiffs' Other Experts and Should be Excluded

Where documentary or testimonial evidence is merely cumulative, it serves no purpose and, therefore, should be excluded. FED. R. EVID. 403; *see, e.g., Garden v. General Elec. Co.,* 1992 WL 184345, at *2 (D.N.J. July 6, 1992) (court refused to allow all of the tape recordings into evidence on the grounds that to do so would be a waste of time and present cumulative evidence); *DiNizio v. Burzynski,* 81 N.J.Super. 267, 274, 195 A.2d 470 (App.Div.1963) (not error to exclude testimony otherwise relevant which is repetitious of testimony or matter already in evidence and thus merely repetitious); *Angel v. Rand Express Lines, Inc.,* 66 N.J.Super. 77, 89, 168 A.2d 423 (App.Div.1961) (no error committed in sustaining defendants' objection to elicitation of testimony which was merely repetitious of hospital records).

*25 Dr. Glucksberg opines that warning or instructions are necessary to advise potential users of IBM's machines about the potential risks of sustaining "repetitive stress injuries". *See Glucksberg Report* at 4, 6. After citing to positions held by plaintiffs' other experts (*i.e.,* Drs. Pascarelli [FN20] and Kroemer), Dr. Glucksberg concludes that adequate warnings are "necessary" to eliminate or reduce the risk of injury to users of IBM's machines. *See id.* at 5.

FN20. This Court notes that Dr. Pascarelli was withdrawn by plaintiffs as an expert in this case and thus, not deposed. IBM objects to Dr. Glucksberg's reliance on withdrawn opinions, which are a nullity for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 21
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

purposes of this action.    Defendant's Brief at 42 n. 59.

In the report of Dr. Punnett, she asserts the importance of having warnings or instructions related to the alleged "proper" use of IBM machines. *See Punnett Report* at 25.    Dr. Punnett states:

[i]t is ... reasonable to conclude that it is necessary and appropriate to warn keyboard operators regarding all of these features of their work.    For example, these studies support the advisability that keyboard users be warned that the more rapidly they type and the more time that they spend keying, the greater the risk of musculoskeletal disorders.    Dr. Punnett further asserts this position by stating:

[a]ssuming that no adequate warnings were given to operators regarding the potential health effects of keyboard work under prevalent conditions of use, these epidemiologic data support the proposition that warnings were needed and should have been provided.    It also follows that, if warnings as to hours of operation, pace and repetitiveness of work, postures in operation, and related factors had been given and heeded, there most likely would have been fewer and/or less severe musculoskeletal disorders among said operators.

*Id.*

This Court finds that Dr. Glucksberg's opinions add nothing to plaintiffs' case beyond that which has already been proffered in the report of Dr. Punnett. Such repetition serves no useful purpose and is merely cumulative.    Accordingly, Dr. Glucksberg's opinions shall be excluded from evidence *in limine.*

Having determined that plaintiffs' experts proffered testimony is inadmissible in part under *Daubert/Paoli II,* we must now turn to plaintiffs' alternative arguments for the admissibility of said testimony. First, they argue that their experts' testimony has already survived a challenge under the "rigid" test handed down in <u>*Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)</u> and that is should be admitted with little problem under the "more lenient" *Daubert* test. *Id.* (citation omitted).    Second, they argue that the testimony is admissible because IBM's motion is "procedurally flawed." *Id.* The "flaw" they attempt to identify is the alleged failure of IBM "to come forward with affidavits or other admissible evidence to support the application for exclusion of plaintiffs' evidence." *Id.* Third, they claim that the evidence proffered by plaintiffs is of a kind which would permit this Court to "take judicial notice of the validity of [the] techniques" employed by their experts. *Id.* These arguments will be addressed seriatim.

B. *The Urbanski Admissibility Test is Inapplicable*

**\*26** Plaintiffs argue that since their experts' testimony has already been held admissible in an action against IBM "under the more rigorous standard announced in *Frye* ...," it should necessarily be admitted in the instant action.    Plaintiffs' Brief at 2;    *see* Lakind Aff. at 2;    *Urbanski v. IBM,* No. 19-C2-93-8285 (Minn.Dist.Ct. Dec. 22, 1994), attached as Exh. A to the Lakind Affidavit.    We disagree.    While the *Urbanski* court found that the proffered testimony "may meet [ *Frye's* ] requirements of reliability and trustworthiness," *Urbanski,* slip op. at 9 (citations omitted), such findings are by no means persuasive as to whether the experts in this case pass muster under *Daubert/Paoli II*. Plaintiffs suggestion that this Court is somehow bound by the Minnesota state court decision in *Urbanski* is wholly without merit.

C. *IBM's Motion for Summary Judgment is Not Procedurally Flawed*

It is well settled that, with respect to a motion for summary judgment, the moving party is not required to "support its motion with affidavits or other similar materials *negating* the opponent's claim." <u>*Celotex Corp., 477 U.S. at 323*</u> (emphasis in original).    The moving party does, however, "bear[ ] the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* The United States Supreme Court has expressly stated that it does not find an "express or implied requirement in ... [FED. R. CIV. P.] 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original).

This Court finds that IBM has properly supported its motion for summary judgment with the pleadings, answers to interrogatories, depositions, expert reports, and relevant decisions regarding summary judgment from other "RSI" actions.    *See* Certification of Counsel in Support of IBM's Motion for Summary Judgment;    *see also* IBM's Brief. While it is true that IBM has not "come forward with affidavits ... to support the application for exclusion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

of plaintiffs' evidence[,]" *see* Plaintiffs' Brief at 20, IBM has no obligation to do so, and its decision not to submit affidavits does not render its motion procedurally flawed. *See Celotex*, 477 U.S. at 323-24.

IBM's motion and accompanying exhibits successfully shift the burden to plaintiffs. *See id.* Plaintiffs must now "go beyond the pleadings and by ... [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.*

Finally, although not specifically stated, plaintiffs imply in their brief that the established burden of proof rules regarding summary judgment motions are somehow altered when the motion is based, at least in part, on the inadmissibility of expert testimony." *See* Plaintiffs' Brief at 20 (wherein plaintiffs argue that "[w]here as here the issue of causation turns, at least in part, upon the factual opinions of experts, it was incumbent upon IBM to come forward with affidavits ... to support the application for exclusion of plaintiffs' evidence .. ....") Plaintiffs fail, however, to offer any case law which supports such a position.[FN21] Similarly, plaintiffs fail to offer any reasons why the moving party should be required to submit affidavits in support of a motion for summary judgment based on the inadmissibility of expert testimony. Accordingly, plaintiffs have failed to prove the alleged "procedural flaw" in IBM's motion.

FN21. None of the cases cited by plaintiffs support the claim that IBM was required to submit affidavits in support of its motion for summary judgment. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (wherein the Court was called upon to determine the standard for admitting expert scientific testimony; although defendant Merrell Dow submitted affidavits in support of its motion, nowhere in its decision did the Supreme Court find that such affidavits were required by law); *Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co.*, 998 F.2d 1224 (3d Cir.), *cert. denied sub nom.*, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993) (court states, in dicta, that movant made no showing that evidence is not of type reasonably relied upon by others in the field; however, court did not state either in dicta or holding that showing

had to be in affidavit form"); *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941 (3d Cir.1990) (court does not state that an affidavit from the movant is necessary, but rather suggests that one would be helpful since the record contained virtually no relevant help from the parties or from qualified experts); *United States v. Dupee*, 569 F.2d 1061 (9th Cir.1978) (appeal of a federal conviction wherein the issue was whether, at trial, the defendant had offered any reasons for the exclusion of the originals of 151 money orders); and *United States v. Carranco*, 551 F.2d 1197 (10th Cir.1977) (appeal of federal conviction wherein the issue was whether the evidence (a freight bill) was properly admitted as a business record).

### D. *Plaintiffs' Experts' Testimony is Not Subject to Judicial Notice*

**\*27** Plaintiffs claim that the scientific techniques their experts rely on are subject to "judicial notice," and therefore, are not subject to *Daubert*. *See* Plaintiffs' Brief at 20. Specifically, plaintiffs argue that "[t]he scientific techniques, implied in this case, epidemiology, differential medical diagnosis, and product design evaluations, are based on 'well established propositions,' and 'are subject to judicial notice." ' *Id.* at 22 (citations omitted). Plaintiffs have not, and indeed can not, come forward with any authority to support this novel argument. In fact, in each case cited by plaintiffs, the proffered evidence was subjected to some type of judicial scrutiny and was not received into evidence without the requirements of formal proof. Plaintiffs' unsubstantiated argument, therefore, fails to defeat IBM's motion for summary judgment.

Plaintiffs rely solely on *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941 (3d Cir.1990), to support their claim that "a witness' testimony based on epidemiological studies ... [is] of the type of scientific evidence subject to "judicial notice." ' *See* Plaintiffs' Brief at 20 (citations omitted). Nowhere within the *DeLuca* decision did the Third Circuit set forth a per se rule instructing a court to take judicial notice of expert testimony based on epidemiological data. At most, *DeLuca* merely recognized that "epidemiology is a well-established branch of science and medicine, and epidemiological evidence has been accepted in numerous cases," *DeLuca*, 911 F.2d at 954, and that, in general, "[t]he reliability of expert testimony founded on reasoning from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 23
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

epidemiological data is .... a fit subject for judicial notice." *Id.* (citations omitted). *DeLuca* also recognized, however, that "[t]o the extent that the reliability of ... [an expert's testimony founded on reasoning from epidemiological date] is not susceptible to judicial notice, ... the district court ... must conduct a hearing and analysis consistent with the counsel provided in *Downing.*" *Id.*

Plaintiffs also argue that the reliability of a physician's testimony based on differential diagnosis is a proper subject for judicial notice. Such an argument ignores the fact that the testimony of a physician regarding causation is scientific testimony, the admissibility of which is subject to a *Daubert* analysis. As the court explained in *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1105 n. 14 (7th Cir.), *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994):

Mr. O'Conner also seems to argue that, because Dr. Scheribel is a ... physician, he is exempt from the requirements of *Federal Rules of Evidence 702* and 703. However, we do not distinguish the ... physician from other experts when the ... physician is offering testimony regarding causation.

Not one of the cases cited by plaintiffs supports their contention regarding judicial notice.[FN22]

> FN22. *See In re Paoli,* 35 F.3d at 753-68 (wherein the court devotes roughly 15 pages to a "Rule 702 analysis" of the admissibility of two physicians' testimony based on different diagnosis and fails to discuss or even mention the term "judicial notice"); *Mendes-Silva v. United States,* 980 F.2d 1482, 1485 (D.C.Cir.1993) (wherein the court did not take judicial notice of the physician's testimony but rather subjected the testimony to FED. R. EVID. 703 analysis); *Ambrosini v. Labarraque,* 966 F.2d 1464 (D.C.Cir.1992) (wherein the court of appeals remanded the case back to district court for a FED. R. EVID. 705 determination of the bases for the experts' opinions so that the court could ultimately determine whether the experts' affidavits were admissible under FED. R. EVID. 703); *Ferebee v. Chevron Chem. Co.,* 736 F.2d 1529 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984) (wherein a physician's testimony was deemed admissible, not because the Court took judicial notice of it, but because the

Court found the testimony to be based on well-founded methodologies); and *Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.,* 862 F.Supp. 1361, 1368 n. 11 (E.D.Pa.1994) (citing *Paoli* ) (court did not take judicial notice of the expert's testimony but rather conducted an admissibility analysis and found that "therein were sufficient facts upon which to base the opinion and that any flaws in the process are not so substantial to deprive Dr. Perez of good grounds for his ... conclusions"), *judgment aff'd. in part vacated in part by,* 63 F.3d 1267 (3d Cir.1995), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1264, 134 L.Ed.2d 212 (1996).

**\*28** Finally, plaintiffs argue that the testimony of their design defect expert is subject to judicial notice because his testimony is based on well established propositions and is, therefore, not novel. *See* Plaintiffs' Brief at 21-22. They attempt to support this proposition with a case from the United States District Court for the Northern District of New York, which interprets *Daubert* as solely applying to the admissibility of "novel scientific evidence." *See id.* at 21 (quoting *Lappe v. American Honda Motor Co.,* 857 F.Supp. 222, 228 (N.D.N.Y.1994), *aff'd,* 1996 WL 170209 (2d Cir.1996). However, this Court is not persuaded by the *Lappe* court's interpretation of *Daubert.* Indeed, we find that the Supreme Court made it clear that the trial court's responsibility to closely scrutinize proposed expert testimony is not limited to "novel" scientific techniques.

Although the *Frye* decision itself focused exclusively on "novel" scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence. *Daubert,* 113 S.Ct. at 2796 n. 11. This Court also finds that *Lappe* fails to support plaintiffs' proposition for the additional reason that the *Lappe* court did not discuss the issue of judicial notice.

E. Plaintiffs' "Circumstantial Evidence" is Inadmissible and, in any Event, Does not Establish Causation

(1) *IBM Documents and Admissions*

Plaintiffs' counsel's attempts to rely on IBM and its documents for proof of causation are misplaced. Plaintiffs' counsel puts forth no evidence supporting his assertion that IBM "in fact did consider the very

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00434-GMS    Document 314-3    Filed 04/16/2007    Page 25 of 39

Not Reported in F.Supp.                                                    Page 24
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

causation issues at the heart of this motion." [FN23] *See* Lakind Aff. At 13. The documents plaintiff's counsel proffers do not amount to an admission of a causal relationship between keyboard use and injury. If anything, they demonstrate that IBM was attempting to sort out the complex issue of what had commonly become known as "repetitive stress injury (RSI) or cumulative trauma disorders (CTDs)."

> FN23. Plaintiff's counsel's reference to Exhibits I and J are misplaced insofar as these documents, dated April 1984 and Spring 1983 respectively, do not consider whether "keyboard use" causes "carpal tunnely syndrome." These documents consider VDT use generally and musculoskeletal and other stress. In fact, these documents reflect that the studies available at the time showed that "the source of stress are common to many human situations-and that VDT related work is no different in this respect than many other activities." Exh. I at 14; Exh. J at 13.

*(2) OSHA 200 Logs*

Plaintiffs further argues that IBM has acknowledged the unsafe aspects of keyboard use because an "IBM health and safety professional" who outlined OSHA 200 logs at defendant's Boulder, Colorado facility concluded that over 35 % of all those injured at that particular site suffered injuries due to "keyboarding" or "typing." However, the OSHA 200 logs annexed as Exhibit M to the Lakind Affidavit establish nothing more than that claims were being made that musculoskeletal complaints were related to keyboard use. A review of the OSHA form shows that there is no indication on the form as to the cause of the injury. More significantly, this form does not appear to have been completed by personnel having authority to speak on behalf or bind IBM with respect to health and safety issues such as causal relationships between injuries and occupational exposure. Defendant also notes that plaintiffs' counsel is well aware of these facts since this issue has arisen previously in other "RSI" actions in other jurisdictions. Exh. 7 to IBM's Reply Brief, Affidavit of Martin J. Sepulveda [FN24] ("Sepulveda Aff. ") previously submitted in two "RSI" actions pending before the Honorable Stephen G. Crane, Supreme Court, New York County, addressing this very issue.

> FN24. Defendant notes that Martin J.

Sepulveda has been the Director of Occupational Health Services for IBM for the past 5 years.

**\*29** *(3) Employer Report Form*

Plaintiff's reliance on the Employer's Reports of Occupational Injury or Illness ("Employer Report Form") is similarly misplaced. These Forms, which are attached as Exh. N to the Lakind Affidavit, are just like the OSHA 200 logs, which are routinely filled out by low-level IBM personnel who merely write down on the form information provided to them by the claimant. *See* Exh. 7, Sepulveda Aff. As Justice Stephen G. Crane of the New York Supreme Court held earlier this year, these forms, which are part of an individual's workers' compensation file, provide "no finding of causation." Exh. 8 to IBM's Reply Brief, *Karolisyn-Morris v. IBM,* Index No. 14003/92, Memorandum Decision at 7 (Jan. 31, 1994). In addition, since both the OSHA 200 logs and the Employer Report Form merely reflect the recording of the hearsay statements of a complainant, they cannot be considered an admission by IBM, which in any event would have to be made by a corporate officer.

*(4) Exhibit 0*

Plaintiffs' counsel's attempt to proffer Exhibit O as evidence of an admission by IBM centers around a question and answer ("Q & A") found on Bates Stamped Page Number 100671447:

Q: Can a person get Carpal Tunnel Syndrome from intense keyboard use?

A: Yes, it is one of several ailments that is possible if all the conditions are present, e.g., repetitive motion, continuous impact and improper hand positioning. CTS can be prevented with proper workstation design and body positioning.

The very same page of Exhibit O contains that following Q & A which plaintiffs' counsel failed to point out to this Court:Q: Do VDT keyboards cause Carpal Tunnel Syndrome?

A: VDT keyboards per se do not cause such disorders.

This Court finds that the former Q & A does not speak to a causal relationship between keyboard use and carpal tunnel syndrome, but rather reflects IBM's position that ailments such as carpal tunnel syndrome are complex as are their etiologies. Along with keyboard use, the Q & A mentions workstation design and body positioning. The numerous issues

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 25
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

involved in a discussion of "CTDs" and "keyboard use" could fill volumes as is evident just from the number of documents submitted by both parties on this motion. The Q & A represents IBM's attempt to provide guidance on these issues in a manageable way.

Even if IBM's Q & A could be considered an admission, there is no scientific evidence to support a statement regarding a causal relationship between keyboard use and carpal tunnel syndrome. *See* IBM's Brief. Therefore, any such incorrect statement would be meaningless and could not defeat summary judgment. IBM has been confronted with this statement before in the context of other "RSI" cases and has maintained that there is no meaningful evidence that a person could get carpal tunnel syndrome from intense keyboard use. *See Haughie Dep.* at 119.5 to 120.22.
(5) *Exhibit P*

**\*30** Plaintiffs' counsel errs in citing from Exhibit P. Plaintiffs' counsel attributes to IBM a statement suggesting the use of wrist rests as a means of avoiding "RSI." However, the document from which plaintiffs quote is an advertisement from Betterways Ergonomic Resources of Boulder, Colorado, a document not authorized by IBM. Certainly, Betterways does not have authority to make statements nor admissions on behalf of IBM. Accordingly, Exhibit P fails to defeat IBM's motion for summary judgment.
(6) *Exhibit Q*

Exhibit Q is a memorandum from an IBM Safety department. Attached to the memo are several pages which provide suggestions for avoiding fatigue and discomfort in the office environment. *See Bates Stamped Page Numbers 1006072043-1006072051.* The attachments discuss issues such as: seating posture, posture, standing, sitting, vision comfort, visual display terminals and sitting, keyboard height, workplace setup, display height, footrests, and chairs. Missing from both the memo and its attachments are any statements by IBM regarding a causal relationship between use of IBM keyboards and carpal tunnel syndrome. IBM submits that this document merely reflects the fact that "CTDs" in the office environment, although gaining increasing attention in American industry, was a complex issue for which there was no single solution. This Court finds that plaintiffs' counsels' blank assertion that this constitutes an admission regarding causation is not

supported by any evidence and, therefore, can not defeat IBM's motion for summary judgment.
(7) *Exhibit R*

Similarly, Exhibit R fails to contain any admissions by IBM. Exhibit R merely discusses Australia's experience with repetitive strain injuries. Plaintiffs' counsel points to no language in Exhibit R which amounted to an admission concerning keyboard use and carpal tunnel syndrome. Indeed, the perception that workers were suffering injury due to keyboard operation ultimately proved to be false in Australia. An extensive study of this situation was conducted and the results published in the September 7, 1987 issue of *The Medical Journal of Australia.* That study, which looked at 3976 people who claimed to suffer "RSI" over a five year period concluded that: There is little evidence of a consistent dose-response relationship of RSI in occupational groupings to keystroke rate, age and job duration, and other authors have questioned the importance of posture.... The condition is not related uniquely to new technology....

Bruce Hocking, *Epidemiological Aspects of "Repetitive Strain Injury" in Telecom Australia,* 147 Med. J. Austl. 218 (Sept. 7, 1987). Accordingly, there is nothing for IBM to admit regarding "RSI" in Australia.(8) *Exhibit S*

Finally, with respect to Exhibit S, plaintiffs claim that IBM "recommended use of a palm rest and height adjustable keyboards, as well as employee education and changed worked practices." Exh. S to Lakind Aff. However, nowhere in Exhibit § does the word "recommended" appear. In point of fact, the words "available option" appear and they have a much different meaning than "recommended." Furthermore, the document mentions that IBM had "little experience in IBM Australia or worldwide with RSI with previous and current generations of equipment." *Id.* Therefore, plaintiffs' contention that this document arose out of IBM's "confront[ation with] repetitive stress injury problems among its Australian workforce ...." is incorrect. For these reasons, Exhibit § also can not defeat IBM's motion for summary judgment.

## 2. *Duty to Warn*

**\*31** Defendant also argues that even assuming this Court finds plaintiffs' experts' testimony admissible,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 26
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

plaintiffs' failure to warn claim would still fail because plaintiffs failed to demonstrate that there was a duty to warn. *See* Defendant's Reply Brief at 23 ("Until plaintiffs can come forward with some evidence of a causal relationship between keyboard use and carpal tunnel syndrome, their claims regarding the alleged consequences flowing from the absence of a warning are without merit.").

While "[a] manufacturer has a duty to warn such foreseeable users of all hidden or latent dangers that would arise out of a reasonably anticipated use of its product," *Campos v. Firestone Tire & Rubber Co., 98 N.J. 198, 206, 485 A.2d 305 (1984),* "there is no duty to warn about the physical manipulation inherent in the use of certain objects which can in some persons and under some circumstances cause CTS." *Finley v. NCR Corp.,* Civ. No. 92-5242, slip op. at 12 (D.N.J. Jan. 23, 1996) (JHR) (citing *Creamer v. IBM Corp.,* No. 89-1026, slip op. at 6-7 (3d Cir. May 18, 1989)); *see also Doll v. Digital Equipment Corp.,* 1996 WL 107111, at *3 (W.D.N.Y. Mar.6, 1996) (same); *Hopkins v. NCR Corp.,* 1994 WL 757510, at *9 (M.D.La.1994) (same), *aff'd,* 53 F.3d 1281 (5th Cir.1995). Thus, the threshold issue to consider is whether plaintiffs have proffered sufficient evidence to establish that the alleged "danger" is not simply the repetitive motion required to use defendant's products. If plaintiffs cannot make such a showing, then their failure to warn claim must be dismissed as a matter of law because defendant's would have no duty to warn against any such "danger." *Griesenbeck v. American Tobacco Co.,* 897 F.Supp. 815, 820 n. 3 (D.N.J.1995) ("[W]ithout a duty to warn, there cannot be any failure to warn.").

In the present matter, defendant does not contest the fact that it has not issued a "warning" concerning any hidden or latent danger of injury that would arise out of the use of the IBM machines. Defendant's Brief at 19. Rather, IBM contends that plaintiffs "have failed to proffer sufficient evidence from which a jury could find for plaintiffs by a preponderance of the evidence on the issues of the existence of a hidden or latent danger in the IBM machines and whether such danger was a proximate cause of plaintiff's alleged [CTS]." Defendant's Brief at 43. Indeed, according to IBM, even if this Court finds plaintiffs' experts' opinions admissible, such testimony, "at most, purports to show the existence of some vague danger surrounding the activity of typing or keying. Plaintiffs' experts fail, however, to articulate what it is-specifically-about these activities that is dangerous." *Id.* Therefore, IBM argues, this

Court must grant summary judgment because the only remaining "danger" alleged to exist "is simply the repetitive motion required to properly use an IBM machine, and there is no duty to warn of any such "danger." Defendant's Reply Brief at 24.

**\*32** To support its motion for summary judgment, IBM contends that there is no evidence in the plaintiffs' experts' opinions to establish: (1) a hidden or latent danger in the product; and (2) whether such danger was a proximate cause of plaintiffs' alleged carpal tunnel syndrome. With regard to the existence of a hidden or latent danger, and whether such danger could be avoided with a warning, IBM notes that Dr. Punnett gave the following response when asked at her deposition for the warning she believes should be given to keyboard users:
A: Okay. I don't know how much room there is on a label of [sic] what size the label is, but I think that is should indicate that repetitive or what is often referred to as *intensive* data entry work especially without breaks for increasing numbers of hours of operation per week for prolonged duration, especially with nonneutral postures, conveys the risk that I have already described.
Q: An elevated risk of musculoskeletal disorders?
A: Correct.

Defendant's Brief at 43-44 (quoting *Punnett Dep.,* 08/24/94 at 196.19 to 197.6). Further, IBM points out that when asked what she means by "intensive" use, Dr. Punnett could not give a quantitative measure. *Id.* at 44 (citing *Punnett Dep.,* 08/24/94 at 203.12 to 212.16).[FN25]

> FN25. IBM does note, however, that Dr. Punnett admits in her report that "no evidence is provided in these studies regarding the risk associated with operation for fewer than four hours per day compared with no operation at all." *Punnett Report* at 24.

Likewise, IBM asserts that plaintiffs' experts cannot offer specific remedial measures which, if followed, would avoid the alleged dangers surrounding the activity of typing or keying. For instance, IBM notes that when Dr. Punnett was asked at her deposition what advice she would give to a keyboard user to avoid the risk of getting "musculoskeletal disorders," she responded:
A: I do-I can't answer that question. I can make recommendations for reducing, but I don't know if the set of recommendations that I could make would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 27
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

be sufficient to bring the risk down to zero short of telling someone not to perform intensive date entry at all. I don't know what else would be sufficient.

Id. (quoting *Punnett Dep.,* 08/24/94 at 200.15-21). Therefore, IBM concludes that "plaintiffs' experts cannot set forth prospective measures adequate to ensure the 'safety of keyboard users' because they have been unable to define what the danger is and under what circumstances it exists. Simply, plaintiffs' experts have failed to establish the existence of a hidden or latent danger surrounding keyboard use and that such danger could be avoided with a warning, even if heeded by the user." *Id.*

With respect to specific causation, IBM argues that [t]he limitations on epidemiology's ability to prove individual causation stem from its general and statistical nature. Epidemiological studies are general in that they deal with sources of disease in groups of people rather than particular individuals. Being statistical, they quantify the probabilities, or risks, that members of a group will contract certain diseases under certain conditions. The only individual cause-and-effect relationship that epidemiological evidence can show is that the defendant's conduct increased the plaintiff's risk of injury to some statistically measurable extent. *It cannot answer the critical question whether the defendant's conduct actually injured the plaintiff.*

**\*33** *Id.* at 45 (quoting Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact,* 7 HARV. ENVTL. L. REV. 429, 436 (1983) (footnotes omitted)). In this case, according to IBM, plaintiffs' experts fail to establish a question of fact regarding whether the risk of harm was present in Mrs. Schneck's case and was of such a nature as to be a proximate cause of her alleged injury. *Id.*

Moreover, IBM argues that "[w]hile plaintiffs' experts claim that 'repetition,' 'force,' 'duration,' and 'posture' are risk factors which contribute to 'musculoskeletal disorders' and that these risk factors are present in the activity of typing, none of plaintiffs' experts have obtained information as to each of these factors regarding plaintiff's use of the IBM machines." Id. Specifically, IBM notes that although Dr. Kroemer discussed "repetitiveness," "force" and "posture," he did not tie these factors to Mrs. Schneck's alleged use of the IBM machines. *Id.* (citing *Kroemer Dep.,* 07/22/94 at 126.21 to 152.2). Further, IBM points out that "Dr. Welch also discussed "posture" and "repetitiveness" in general.

Her only link with Mrs. Schneck ... is that 'she [Mrs. Schneck] has repetition and awkward posture by nature as part of her work in doing keyboard operations." *Id.* (quoting *Welch Dep.,* 08/29/94 at 164.9-11).

In sum, according to IBM, plaintiffs' experts did not: (1) see the IBM machines; (2) test the IBM machines to see what "forces" are involved in their operation; (3) attempt to quantify the number of keystrokes per time unit plaintiff performed in order to justify any specific opinion regarding plaintiff's "repetitive" use of the IBM machines; or (4) observe plaintiff working at the IBM machines in order to support opinions concerning the movements and postures of plaintiff's arms and hands.

*Id.* at 46 (citing *Glucksberg Dep.* at 48.15 to 49.8; *Welch Dep.,* 08/30/94 at 342.17 to 347.14; *Punnett Dep.,* 08/24/94 at 42.2 to 45.12; *Punnett Dep.,* 08/25/94 at 12.15 to 35.5). Without this basic information, IBM argues that plaintiffs' expert opinions are "of little moment on the issue of specific causation in this case. IBM is left to assume that the 'danger' is simply the repetitive motion required to use the IBM machines. If this were the case, manufacturers would have a duty to warn about the physical manipulation inherent in the use of their products." *Id.* (citing *Hopkins, 1994 WL 757510, at \*9; Creamer,* slip op. at 6-7). Therefore, IBM concludes that it is entitled to summary judgment. *See id.* at 43 (citing *Daubert, 113 S.Ct. at 2798)* "[I]n the event the trial court concludes that the scintilla of [admissible] evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to ... grant summary judgment. ")).

**\*34** In an effort to avoid summary judgment, plaintiffs discuss the alleged significance of the absence of a warning on the IBM machines and the "open and obvious" defense. *See* Plaintiffs' Brief at 37-43. However, this Court finds that these issues are irrelevant because plaintiffs have failed to establish the necessity of a warning and IBM has not asserted the "open and obvious" defense.

Plaintiffs assert that "if at any time prior to a plaintiff's injury, the dangerous propensities of a product become known, a New Jersey court many not hold, as a matter of law, that a duty to warn does not exist." *Id.* at 38 (citing *Whitehead, 729 F.2d at 248).* As noted above, however, plaintiffs fail to offer any evidence of the alleged "dangerous propensities" of a keyboard. Instead, they assume the existence of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

such propensities as well as the existence of a duty to warn.

Further, plaintiffs assert that "[b]eyond doubt, had Mrs. Schneck been warned, she would have associated her initial symptoms ... with keyboard work, seen a Doctor, informed the Doctor of the warning, and been spared further injury." *Id.* at 39. Plaintiffs attempt to use this assertion to convince the Court that "the absence of a warning was ... the proximate cause of plaintiff's injury." *Id.* at 39-40. Once again, however, plaintiffs are assuming an as of yet unproven duty to warn. Until plaintiffs can come forward with some evidence of a causal relationship between keyboard use and <u>carpal tunnel syndrome,</u> their claims regarding the alleged consequences flowing from the absence of a warning are without merit.

Finally, plaintiffs seem to misinterpret IBM's reference to products involving extended manual manipulation. Despite plaintiffs' statement to the contrary, IBM does not suggest that "insofar as the danger of keyboard tasks derived from 'extended' use, that danger is obvious and no warning is necessary." *See* Plaintiffs' Brief at 40. On the contrary, IBM maintains that use of its keyboards is not "dangerous." IBM further maintains that
if plaintiffs are claiming that the "danger" is simply the repetitive motion required to properly use an IBM machine, then manufacturers of products involving extended manual manipulation would have a duty to warn about the proper use of their products. SONY would be required to warn about its remote controls. NIKE would be required to warn about its sporting equipment. Steinway would be required to warn about its pianos. "The list of 'defective' products would be endless."

Defendant's Reply Brief at 24 (quoting <u>Hopkins,</u> <u>1994 WL 757510, at *10).</u>

Based on the foregoing analysis, this Court finds that the issues raised by plaintiffs (the significance of the absence of a warning and the "open and obvious" defense) are irrelevant under the circumstances and, therefore, are insufficient to create a genuine issue of material fact. IBM has demonstrated that even if this Court were to find plaintiffs' experts' opinions admissible, such testimony, at most, purports to show the existence of some vague danger surrounding the activity of typing or keying. Plaintiffs' experts fail, however, to articulate what it is-specifically-about these activities that is dangerous. Thus, in the absence of such a showing, this Court must conclude

that the only remaining "danger" alleged to exist is simply the repetitive motion required to properly use an IBM machine. Since there is no duty to warn about the physical manipulation inherent in the use of certain objects which can in some persons and under some circumstances cause CTS, *Finley,* slip op. at 12 (citing *Creamer,* slip op. at 6-7); *Doll,* 1996 WL 1071110, at *3; <u>Hopkins, 1994 WL 757510, at *9,</u> this Court will grant defendant's motion for summary judgment with respect to plaintiffs' failure to warn claim.

### D. VARIOUS ISSUES RAISED BY THE LAKIND AFFIDAVIT

*35 To defeat summary judgment, plaintiffs "may not rest on the mere allegations or denials [in their pleading], but [their] response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing there is a genuine issue for trial." <u>FED. R. CIV. P. 56(e);</u> *see* <u>*Anderson v.* *Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).</u> The evidence proffered must be such that it can be reduced to a form that would be admissible at trial. *See* <u>Celotex,</u> <u>477 U.S. at 322-23.</u> IBM submits that the documents regarding warnings, instructions, and alternative keyboards, see Exhibits "AB," "AC," "AD," "AE," "AF," and "AG," annexed to the Lakind Affidavit, are inadmissible and cannot be reduced to a form that would be admissible at trial. Therefore, according to defendant, these documents fail to defeat IBM's motion for summary judgment.

This Court finds that the documents regarding instructions, warnings, and alternative keyboard products of other manufacturers are irrelevant to Mrs. Schneck's action against IBM and, hence, are irrelevant to the causation issues central to IBM's motion for summary judgment. Similarly, such evidence lacks probative value and is, therefore, inadmissible under <u>FED. R. EVID. 402.</u> Plaintiffs' counsel's attempt to introduce this evidence to prove that keyboards cause <u>musculoskeletal injury,</u> *see* Lakind Aff. at 19-24, is necessarily premised on the assumption that these other manufacturers concluded that use of their keyboards can cause <u>musculoskeletal</u> <u>injury</u> and that an on-product warning, package instruction, or alternative keyboard would be an effective way to identify and reduce that risk. Absent from plaintiffs' counsel's papers, however, is competent evidence of the reasons behind these other manufacturer's decisions. Therefore, it would be sheer speculation to infer from this evidence that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 29
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

those manufacturers had come to any conclusion about causation rather than they simply made a business decision in the hope that it would improve their defensive position in litigation involving their keyboards.[FN26]

> FN26. Even if evidence of a decision regarding causation were present, the conclusions of the manufacturers would be hearsay and therefore excludable nevertheless because IBM would have no opportunity to cross-examine those individuals responsible for the conclusions and decisions. The effect of admitting such evidence would be to allow opinion testimony without subjecting the witness to cross-examination and without qualifying him or her.

An issue similar to that presented to this Court was addressed in *In re Richardson-Merrell, Inc., Bendectin Prods. Liab. Litig.*, 624 F.Supp. 1212 (S.D.Ohio 1985), *aff'd*, 857 F.2d 290 (6th Cir.1988), *cert. denied*, 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989), a product liability case involving the prescription drug Bendectin. In *Richardson-Merrell*, the plaintiffs offered warning labels on nonprescription drugs manufactured by other manufacturers. *Id.* at 1231. The court excluded those labels as irrelevant:

The threshold requirement of relevancy simply was not met. The fact that warnings were placed on these three over-the-counter (nonprescription) drugs by manufacturers other than the defendant did not make the existence of a fact of consequence more or less probable.... [The evidence] is not germane to the single issue of whether Bendectin causes birth defects.

***36** *Id.* at 1230-31.

In this case, as in *Richardson-Merrell*, other manufacturer's warning labels have no probative value. If other manufacturers affixed warning labels to avoid product liability on the advice of their attorneys. rather than for some reason related to safety, then the labels say nothing about the alleged causal relationship between keyboards and musculoskeletal injury. Similarly, if other manufacturers inserted instructions in their packaging materials or manufactured alternative keyboards on the advice of counsel, then these actions say nothing about causation issues. Accordingly, they lack probative value and are inadmissible.

Even if the other manufacturers affixed such warning labels, included instructions with their packaging materials, or developed alternative keyboards based on an actual determination of risk and causation relating to their own keyboards, these activities would say nothing about the risks associated with IBM's keyboards. *See id.* at 1231 (excluding as irrelevant warning labels of other manufacturers because the "warnings on these drugs are ambiguous, at best, when attempting to infer the purpose for which the warnings were designed."). Absent the proper factual foundation demonstrating the purpose of the warnings, instructions, and alternative keyboards, not to mention the circumstances under which they are prepared, such evidence is wholly irrelevant. *Id.* Therefore, because the presence or absence of warnings and instructions on other manufacturer's keyboards and the presence of alternative keyboards do not prove or disprove a causal relationship between the IBM keyboard used by plaintiff and her injuries, they are irrelevant and inadmissible pursuant to FED. R. EVID. 401 and 402.

Moreover, this Court will not consider plaintiffs' evidence of warnings, instructions, and alternative keyboards for the further reason that it is inadmissible under FED. R. EVID. 403. Such evidence would unfairly prejudice IBM, confuse the issues, mislead the jury, and waste valuable time in the trial of collateral matter, justifying its exclusion under FED. R. EVID. 403 regardless of the form in which it is offered.

This evidence invites collateral dispute and unavoidable speculation over the motivations of other manufacturers in affixing warnings, issuing instructions, and developing alternative keyboards when in fact only IBM's conduct and keyboard are at issue here. Such digression and speculation will serve only to prejudice IBM and has the potential to prolong an already lengthy and convoluted litigation. Therefore, given the lack of probative value of this evidence, it is inadmissible and will not be considered by this Court as part of plaintiffs' opposition to IBM's motion for summary judgment.

Most importantly, evidence of other manufacturers' warnings, instructions, and alternative keyboards constitutes patently untrustworthy hearsay within hearsay unredeemed by any exception to the exclusionary rule. When documents are offered, the proponent must establish that both the document itself and the hearsay statements it contains fit within

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 30
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
**(Cite as: Not Reported in F.Supp.)**

an exception to the hearsay rule. *See* FED. R. EVID. 805. The documents regarding other manufacturer's warnings, instructions, and alternative keyboards are undisputedly out-of-court statements that plaintiffs will offer for the truth of the matter asserted, *i.e.,* that keyboards can cause injury. As out-of-court statements offered for the truth of the matters asserted, they are inadmissible hearsay. *See* FED. R. EVID. 803; *Richardson-Merrell,* 624 F.Supp. at 1232 ("The warnings are out-of-court statements offered to prove the truth of the matters asserted.... The warnings are in fact inadmissible hearsay.").

**\*37** The statements also contain an additional layer of hearsay. They contain the statements of unknown people about the risks of keyboard operation. Because IBM cannot cross-examine those people, those statements are inadmissible. *See Cedeck v. Hamiltonian Federal Sav. & L. Ass'n,* 551 F.2d 1136, 1138 (8th Cir.1977) (excluding as hearsay statements containing a reiteration of what some unknown person told the declarant); *Carden v. Westinghouse Elec. Corp.,* 850 F.2d 996, 1002 (3d Cir.1988) (following *Cedeck* ); *see generally* JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 245, at 95 (4th ed.1992).

This Court cannot accept this inadmissible evidence in support of plaintiffs' opposition to IBM's summary judgment motion because to do so would remove plaintiffs' burden of submitting admissible evidence in opposition to IBM's summary judgment motion. *See* Celotex, 477 U.S. at 322-23; *Lawyers Alliance for Nuclear Arms Control-Philadelphia Chapter v. Dep 't of Energy,* 766 F.Supp. 318 (E.D.Pa.1991). Allowing plaintiffs to introduce this evidence would in effect excuse them from establishing the qualifications of unidentified people to render expert testimony under FED. R. EVID. 702 and the factual foundation for those opinions under FED. R. EVID. 703. Admission of the "expert" opinions contained in the documents would thus deprive IBM of any opportunity to cross-examine the people rendering the opinions. The hearsay exclusionary rule mandates the exclusions of precisely this type of hearsay evidence. Therefore, this Court finds that these documents fail to defeat defendant's motion for summary judgment.

In sum, this Court finds that: (1) plaintiffs' design defect claim must be dismissed because plaintiffs can not prove the existence of any specific design defect in the IBM products allegedly used by plaintiff; and (2) plaintiffs' failure to warn claim must be dismissed because plaintiffs's have not presented of evidence

that IBM had a duty to warn. Moreover, the documents regarding warnings, instructions, and alternative keyboards, see Exhibits "AB," "AC," "AD," "AE," "AF," and "AG," annexed to the Laking Affidavit, are inadmissible and fail to defeat IBM's motion for summary judgment.

### E. Loss OF CONSORTIUM

Plaintiff William Schneck also seeks compensation for loss of consortium resulting from Beverly Schneck's alleged development of CTS. Compl. ¶ ¶ 29-31. Loss of consortium is a derivative claim which depends for its sustenance upon a viable tort claim of the spouse. *Reilly v. Prudential Property and Cas. Ins. Co.,* 653 F.Supp. 725 (D.N.J.1987). Because this Court has granted IBM's motion for smeary judgment on all of Beverly Schneck's claims, William Schneck, as her husband, has no foundation from which to derive a loss of consortium claim. Accordingly, the Court will dismiss the loss of consortium claim.

### F. PUNITIVE DAMAGES

Defendant also asserts that plaintiffs have failed to state a claim for punitive damages under Section 5 of the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1 et seq., which provides:
**\*38** Punitive damages may be awarded to the claimant only if the claimant proves, by a preponderance of the evidence, that the harm suffered was the result of the product manufacturer's or seller's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the safety of product users, consumers, or others who foreseeably might be harmed by the product. For the purposes of the section "actual malice" means an intentional wrongdoing in the sense of an evil-minded act, and "wanton and willful disregard" means a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences or such action or omission. *Punitive damages shall not be awarded in the absence of an award of compensatory damages.*

N.J.S.A. 2A:58C-5(a). Thus, the plain meaning of the statute is that punitive damages are not an independent claim, but rather one which requires a verdict of compensatory damages in favor of the plaintiffs before such damages can be considered or awarded. *See Hennan v. Sunshine Chemical*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)
(Cite as: Not Reported in F.Supp.)

Page 31

*Specialties, Inc.,* 133 N.J. 329, 342, 627 A.2d 1081 (1993). Therefore, since this Court has already granted IBM's motion for summary judgment with respect to all of plaintiff's other claims, plaintiffs' punitive damages claim must also be dismissed.


### III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part defendant's motion *in limine* to exclude the testimony of plaintiff's expert. Further, this Court will grant defendant's motion for summary judgment, and will dismiss the above-captioned action in its entirety. An appropriate Order is filed herewith.

For the reasons set forth in this Court's Memorandum Opinion,

IT IS this 25th day of June, 1996

ORDERED that defendant's motion *in limine* to exclude the testimony of Dr. Karl Kroemer be and is hereby GRANTED; and it is further

ORDERED that defendant's motion *in limine* to exclude the testimony of Dr. Laura Punnett be and is hereby DENIED; and it is further

ORDERED that defendant's motion *in limine* to exclude the testimony of Dr. Laura Welch be and is hereby DENIED; and it is further

ORDERED that defendant's motion *in limine* to exclude the testimony of Dr. Sam Glucksberg be and is hereby GRANTED; and it is further

ORDERED that defendant's motion for summary judgment be and is hereby GRANTED; and it is further

ORDERED that the above-captioned action be and is hereby DISMISSED in its ENTIRETY.

D.N.J.,1996.
Schneck v. International Business Corp.
Not Reported in F.Supp., 1996 WL 885789 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Thomas v. Better Business Bureau, of Mid-South
C.A.6 (Tenn.),2003.
This case was not selected for publication in the
Federal Reporter.NOT RECOMMENDED FOR
FULL--TEXT PUBLICATIONSixth Circuit Rule
28(g) limits citation to specific situations. Please see
Rule 28(g) before citing in a proceeding in a court in
the Sixth Circuit. If cited, a copy must be served on
other parties and the Court.Please use FIND to look
at the applicable circuit court rule before citing this
opinion. Sixth Circuit Rule 28(g). (FIND CTA6 Rule
28.)
United States Court of Appeals,Sixth Circuit.
Fred A. THOMAS, d/b/a Thomas Construction, Inc.,
Plaintiff-Appellant,
v.
BETTER BUSINESS BUREAU, OF THE MID-
SOUTH, Defendant-Appellee.
**No. 03-5464.**

Oct. 21, 2003.


Fred A. Thomas, Memphis, TN, pro se.

Before KEITH, MARTIN, and SUTTON, Circuit
Judges.

*ORDER*

**\*\*1** Fred A. Thomas, a pro se Tennessee resident,
appeals a district court judgment dismissing his civil
rights complaint filed pursuant to 42 U.S.C. § 1983.
This case has been referred to a panel of the court
pursuant to Rule 34(j)(1), Rules of the Sixth Circuit.
Upon examination, this panel unanimously agrees
that oral argument is not needed. Fed. R.App. P.
34(a).

Seeking monetary relief, Thomas, as the owner of
Thomas Construction, Inc., sued the Better Business
Bureau concerning complaints filed against his
construction company. The district court sua sponte
dismissed the complaint for lack of jurisdiction.

In his timely appeal, Thomas, on behalf of his
corporation, argues that the Better Business Bureau
should be stopped from reporting any information
about his company and that the Better Business
Bureau has violated his civil rights.

The court of appeals reviews de novo the district
court's dismissal of an action for lack of subject
matter jurisdiction. *Friends of Crystal River v.
United States Envtl. Prot. Agency,* 35 F.3d 1073,
1077-78 (6th Cir.1994). Fed.R.Civ.P. 12(h)(3)
permits sua sponte dismissals of suits over which the
district court does not possess subject matter
jurisdiction. *Rauch v. Day & Night Mfg. Corp.,* 576
F.2d 697, 701 (6th Cir.1978).

Thomas lacks standing to prosecute any claims on
behalf of his construction company. Although
Thomas may be the sole owner of Thomas
Construction, an action to redress injuries by a
corporation cannot be maintained by an owner in his
own name. *See Canderm Pharmacal, Ltd. v. Elder
Pharms., Inc.,* 862 F.2d 597, 602-03 (6th Cir.1988).
Thus, Thomas cannot maintain an action on behalf of
his corporation. As Thomas was representing the
interests of Thomas Construction, the complaint was
properly dismissed.

Furthermore, to state a claim under § 1983, a
plaintiff must allege that a defendant deprived him of
some right or privilege secured by the Constitution
and laws of the United States, and that the defendant
acted under color of state law. *Flagg Bros., Inc. v.
Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d
185 (1978). The Better Business Bureau is a private,
non-profit company. Private individuals and
companies do not act under color of state law.
**\*749***Lansing v. City of Memphis,* 202 F.3d 821, 828
(6th Cir.2000). The only exception to this rule is if
the actions of the private individual or corporation
are so approximate to a state action that the action
may fairly be attributed to the state. *Id.* Thomas's
allegations do not indicate that the Better Business
Bureau engaged in conduct which could be attributed
to the state. Therefore, Thomas did not allege a civil
rights action against the Better Business Bureau.

Accordingly, we affirm the district court's judgment.
Rule 34(j)(2)(C), Rules of the Sixth Circuit.

C.A.6 (Tenn.),2003.
Thomas v. Better Business Bureau, of Mid-South
79 Fed.Appx. 748, 2003 WL 22416900 (C.A.6
(Tenn.))

END OF DOCUMENT

79 Fed.Appx. 748                                                                                    Page 2
79 Fed.Appx. 748, 2003 WL 22416900 (C.A.6 (Tenn.))
**(Cite as: 79 Fed.Appx. 748)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1996 WL 529693 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

**H**

Thompson v. Glenmede Trust Co.
E.D.Pa.,1996.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
B. Ray THOMPSON, Jr., et al.
v.
GLENMEDE TRUST COMPANY, et al.
No. CIV. A. 92-5233.

Sept. 17, 1996.

*MEMORANDUM AND ORDER*
HUTTON, J.

### BACKGROUND

**\*1** This case originated with a 1990 stock buy-back transaction in which Oryx purchased approximately 25.3 million shares held by the trusts of which Glenmede Trust was trustee. Two years after this buy-back, the Thompson Family brought the present suit against the Glenmede Defendants,[FN1] alleging a loss of approximately $80 million as a result of the buy-back transaction. In 1994, this Court allowed the plaintiffs to expand their suit to include the Lawyer Defendants.[FN2] After four years of litigation and several attempts at settlement, this case is ready for trial. Now on the eve of trial, the Glenmede Defendants and the Lawyer Defendants submit the instant Motions in Limine to Dismiss the Causes of Action Abandoned by the Plaintiffs.

FN1. The "Glenmede Defendants" are the Glenmede Trust Company, the Glenmede Corporation, Thomas W. Langfitt, Albert E. Piscopo, Francis M. Richards, Jr., Karin E. Myrin, and Samuel Morris, Sr.

FN2. The "Lawyer Defendants" are Defendants F. John Hagele, James R. Ledwith, Richard C. Sorlien, Franklin B. Holland, Edward M. Watters, III, Erica L. Gut, Augustus S. Ballard, and Robert J. Weinberg.

### DISCUSSION

Under the Federal Rules of Evidence, evidence is deemed relevant and admissible if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401, 402. A court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. In other words, if the admission of evidence will lead to the litigation of collateral issues, which create side issues which may distract the jury from the main issues, the Court may exclude the evidence." *Blancha v. Raymark Indus.,* 972 F.2d 507, 516 (3d Cir.1992).

The Lawyer Defendants move the Court to preclude the presentation of, or reference in the presence of the jury to the course of discovery in this litigation. They also move the Court to preclude the plaintiffs from presenting any evidence, or making any reference to *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 602 A.2d 1277 (Pa.1992).

#### 1. Preclusion of Discovery Process

The Lawyer Defendants wish to preclude the introduction of evidence pertaining to the discovery process. The defendants are concerned that the plaintiffs will introduce discovery disputes at trial in an attempt to establish that Lawyer Defendants continued their fraud through a "coverup." Their concerns are premised on the plaintiffs belief that the Lawyer Defendants and/or their law firm intentionally redacted important information in the October 10, 1990 minutes of the Glenmede Board of Directors. The plaintiffs believe that this document discusses Pepper's request for a premium fee, and Glenmede's payment of a premium fee from the corpus of the Pew Charitable Trusts. The plaintiffs assert that relevant information in this document was redacted, which "constituted a continuation of the Lawyer Defendants' efforts to cover up their fraudulent involvement in the matters at issue in this case...." (Pls.' Br. at 6). Therefore, the plaintiffs argue that discussion of the discovery process at trial is highly probative of the Lawyer Defendants' fraud.

**\*2** The defendants maintain that the redactions were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 2
Not Reported in F.Supp., 1996 WL 529693 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

not part of a "coverup," and that they supplied the plaintiffs with an unredacted version of the document, soon after the plaintiffs brought the redactions to their attention.[FN3] Moreover, the defendants believe that any discussion of the discovery process will merely confuse the jury. They assert that by granting their motion, the Court will allow the jury to focus on the real issues in the case, and not be distracted by collateral issues.

> **FN3.** Furthermore, the defendants assert that the plaintiffs have not alleged that they have suffered prejudice because of the delay.

This Court is pursuaded by the defendants' arguments. It is unlikely that the redaction of this one document was part of continuing a scheme of fraud. Moreover, once the plaintiffs brought the redactions to the attention of the defendants, they received an unredacted version of the document. This does not appear to be behavior consistent with a party engaging in a "coverup." More importantly, allowing the parties to describe four years of discovery to the jury will detract from the issues in the case. During the past four years of litigation, all of the attorneys in this case have aggressively represented their clients. Presenting to a jury the nuances of discovery and the "hardball" tactics employed by the lawyers may confuse the jury. Rather than focus on the issues in the case, the jury may instead be misled by the irrelevant side issues of the discovery process. Therefore, the Court will not permit either party to refer to the discovery process in the presence of the jury at trial.

**2. Preclusion of Maritrans**

The Lawyer Defendants also move this Court to prevent the plaintiffs from presenting any evidence of, or making any reference at trial to evidence of or related to _Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,_ 602 A.2d 1277 (Pa.1992). They assert that this case is inadmissible as hearsay, and any discussion about the case are irrelevant, because none of the individual Lawyer Defendants was involved in the case. The Lawyer Defendants believe that discussing the case will only confuse and distract the jury.

The plaintiffs argue that _Maritrans_ is admissible under the public records exception to the hearsay rule. _See_ Fed.R.Evid. 803(8). Moreover, they contend that discussions of the Pennsylvania Supreme Court's opinion are relevant not "as res

_judicata_ of any issue in this case, but rather to establish a pattern of outrageous conduct involving conflict of interest, giving rise to punitive damages." (Pls.' Reply Br. at 6).

It is black letter law that a court decision is inadmissible as hearsay:
Rule 803(8)(C), on its face, does not apply to judicial findings of fact; it applies to "factual findings resulting from an investigation made pursuant to authority granted by law." Fed.R.Evid. 803(8)(C). A judge in a civil trial is not an investigator, rather a judge. In fact, a review of the advisory committee note to Rule 803 makes it plain that the drafters intended this portion of the rule to relate to findings of agencies and offices of the executive branch.

*3 _Nipper v. Snipes,_ 7 F.3d 415, 417 (4th Cir.1993) (citation omitted); _see also Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,_ 505 F.Supp. 1125, 1185 (E.D.Pa.1980) (judicial findings of fact are not admissible under Federal Rule of Evidence 803(8)), _aff'd in part and rev'd in part sub nom., In re Japanese Elec. Prod. Antitrust Litig.,_ 723 F.2d 238 (3d Cir.1983), _rev'd sub nom., Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,_ 475 U.S. 574 (1986). Therefore, when a party attempts to admit the findings of another court into evidence, the Court must exclude those findings pursuant to Federal Rule of Evidence 403. _Nipper,_ 7 F.3d at 418. "This is because judicial findings of fact 'present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.' " _Id._ (quoting _Zenith Radio Corp.,_ 505 F.Supp. at 1186).

In this case, the plaintiffs seek to introduce the decision of the Pennsylvania Supreme Court into evidence. Because they are not offering the opinion for _res judicata_ purposes, they must be introducing the opinion for its factual findings. These judicial findings, however, are not admissible because they are hearsay. _See Id.;_ _Zenith Radio Corp,_ 505 F.Supp. at 1186. Therefore, this Court must preclude the introduction of the _Maritrans_ decision into evidence.

An appropriate Order follows.

### ORDER

AND NOW, this 16th day of September, 1996, upon consideration of the Lawyer Defendants' Motion in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 529693 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

Limine to Preclude Certain Evidence, IT IS
HEREBY ORDERED that:

(1) All parties are precluded from presenting any
evidence of, or making any reference in the presence
of the jury to the course of discovery in this
litigation; and

(2) Plaintiffs are precluded from presenting any
evidence, or making any reference at trial to evidence
of or related to *Maritrans GP Inc. v. Pepper,*
*Hamilton & Scheetz,* 602 A.2d 1277 (Pa.1992).

E.D.Pa.,1996.
Thompson v. Glenmede Trust Co.
Not Reported in F.Supp., 1996 WL 529693 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.