UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DYSON TECHNOLOGY LIMITED and DYSON, INC., | ) ) | |
| | Plaintiffs, | ) ) |
| v. | | ) ) Civil Action No. 05-434 GMS |
| MAYTAG CORPORATION, | | ) ) REDACTED ) VERSION |
| | Defendant. | ) ) |

**AFFIDAVIT OF CHRIS STATHOPOULOS IN SUPPORT OF DEFENDANT HOOVER, INC.'S MOTION *IN LIMINE* TO BAR TESTIMONY FROM DYSON'S EXPERT WITNESS LAURA STAMM CONCERNING LEGAL CONCLUSIONS, AND ANY REFERENCE TO TRANSFER PRICING**

I, CHRIS STATHOPOULOS, being duly sworn, hereby depose and say:

1.    I am an attorney for Defendant/Counterclaim Plaintiff Hoover, Inc. ("Hoover"), in the above matter.  I have personal knowledge of the facts set forth in this affidavit, which is filed in support of Hoover's Motion *in Limine* to Bar Evidence from Dyson's Expert Witness Laura Stamm Concerning Legal Conclusions, and any Reference to Transfer Pricing.

2.    Attached hereto as Exhibit A is a true and correct copy of the Corrected report of Laura Stamm.

3.    Attached hereto as Exhibit B is a true and correct copy of referenced excerpts of the deposition of Laura Stamm.

4.    Attached hereto as Exhibit C are true and correct copies of referenced unpublished or non-Third Circuit cases.

FURTHER AFFIANT SAYETH NAUGHT

Chris Stathopoulos

County of Cook

State of Illinois

Sworn to and subscribed in my presence this 16 day of April 2007

Notary Public

SEAL



"OFFICIAL SEAL"
PEGGY A. HUFFORD
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 06/16/2008

2

# EXHIBITS A AND B
# HAVE BEEN REDACTED

# Exhibit C

2006 U.S. Dist. LEXIS 86329, *

RONALD CANTOR, IVAN SNYDER and JAMES A. SCARPONE, as TRUSTEES OF THE MAFCO LITIGATION TRUST, and as Successors in Interest to the Marvel Entertainment Group, Inc., et al., Plaintiffs, v. RONALD O. PERELMAN, et al., Defendants.

Civil Action No. 97-586-KAJ

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2006 U.S. Dist. LEXIS 86329

November 30, 2006, Decided

**PRIOR HISTORY:** Cantor v. Perelman, 2006 U.S. Dist. LEXIS 5210 (D. Del., Feb. 10, 2006)

**COUNSEL:** [*1] Lawrence C. Ashby, Esq., Philip Trainer, Jr., Esq., Tiffany Geyer Lydon, Esq., Ashby & Geddes, Wilmington, Delaware, for Plaintiffs. Of Counsel: Edward A. Friedman, Esq., Andrew W. Goldwater, Esq., Daniel B. Rapport, Esq., Jonathan Gottfried, Esq., Friedman Kaplan Seiler & Adelman LLP, New York, NY.

Thomas J. Allingham II, Esq., Anthony W. Clark, Esq., Paul J. Lockwood, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, Wilmington, Delaware, for Defendants.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent A. Jordan

**OPINION:**

**MEMORANDUM OPINION**

November 30, 2006
Wilmington, Delaware

**JORDAN, District Judge**

**I. INTRODUCTION**

Presently before me are two motions to exclude expert testimony. Defendants, Ronald O. Perelman, Mafco Holdings Inc., MacAndrews & Forbes Holdings Inc., Andrews Group Inc., William C. Bevins, and Donald G. Drapkin (collectively, "Defendants"), filed a Motion to Exclude the Expert Testimony of Bevis Longstreth, William H. Purcell, Andrew S. Carron, Jeffrey L. Baliban, and Portions of the Testimony of Justice Joseph T. Walsh, Ret. (Docket Item ["D.I."] 466.) Plaintiffs, Ronald Cantor, Ivan Snyder, and James [*2] A. Scar-

pone (collectively, "Plaintiffs"), filed a Motion to Exclude the Testimony of Lawrence A. Hamermesh and Certain Opinions of Robert W. Hotthausen. (D.I. 470.) Jurisdiction is proper under 28 U.S.C. § 1334. For the reasons that follow, both Motions will be granted in part and denied in part.

**II. BACKGROUND** n1

n1 The following background information is taken from the parties' submissions and does not constitute findings of fact.

Plaintiffs are the trustees of the MAFCO Litigation Trust, which was created according to the plan of reorganization in the bankruptcy cases of Marvel Entertainment Group, Inc. ("Marvel") and its affiliates, in order to pursue Marvel's claims against Defendants. (D.I. 471 at 7; see also D.I. 467 at 1.) Defendant Ronald O. Perelman ("Perelman") was the controlling shareholder and Chairman of the Board of Marvel. (D.I. 471 at 7.) Perelman's controlling share of Marvel stock was held by a chain of corporations wholly-owned by Perelman (the "Marvel [*3] Holding Companies"). (Id.) The other individual defendants, William C. Bevins and Donald G. Drapkin, served as directors of Marvel and, along with Perelman, comprised the entire board of directors of each of the Marvel Holding Companies. (D.I. 469 at A182; see also D.I. 471 at 7.)

In 1993 and 1994, Defendants caused the Marvel Holding Companies to issue three tranches of notes (the "Notes"), which raised $ 553.5 million. (D.I. 471 at 8.) The Notes were secured by pledges of the Marvel stock held by the Marvel Holding Companies. (D.I. 467 at 1.) In the Notes, the Marvel Holding Companies promised to prevent Marvel from engaging in certain forms of corporate financing (the "Restrictions"). (D.I. 471 at 8.) The Restrictions prohibited Marvel from issuing certain types of debt unless specific financial ratios were met, from

Case 1:05-cv-00434-GMS     Document 346     Filed 04/23/2007     Page 6 of 33

Page 2
2006 U.S. Dist. LEXIS 86329, *

issuing any preferred stock except under specified circumstances, and from diluting Perelman's majority share of Marvel voting stock. (D.I. 469 at A110-11; *see also* D.I. 467 at 1.) Plaintiffs allege that Defendants breached their fiduciary duties by including those Restrictions in the Notes and by using Marvel's corporate resources to sell the Notes. (D. [*4] I. 471 at 8.)

Plaintiffs filed their complaint on October 30, 1997. (D.I. 1.) The case was subsequently referred to Magistrate Judge Mary Pat Thynge. (D.I. 262.) Judge Thynge issued a report in the form of a Memorandum and Order on December 9, 2002, recommending that summary judgment for Plaintiffs be denied and that summary judgment for Defendants be granted in part. (D.I. 467 at 1; D.I. 384.) On February 18, 2004, I adopted Judge Thynge's report in all respects. (D.I. 467 at 1; D.I. 404.) On July 12, 2005, the United States Court of Appeals for the Third Circuit reversed the grant of summary judgment for Defendants With respect to the unjust enrichment claims and some of the damage claims, affirmed the denial of summary judgment for Plaintiffs, and remanded the case for further proceedings. *Cantor v. Perelman*, 414 F.3d 430, 442 (3d Cir. 2005). In accordance with the decision of the Third Circuit, I ordered the parties to identify any additional expert testimony on or before January 13, 2006, and to file any objections to such testimony no later than June 1, 2006. (D.I. 430 at 1-2.)

## III. STANDARD OF REVIEW

Motions to exclude expert testimony are committed [*5] to the court's discretion. *See Jaasma v. Shell Oil Co.*, 412 F.3d 501, 513 (3d Cir. 2005) (holding that the decision to admit or reject expert testimony is reviewed under an "abuse of discretion" standard). To be considered an abuse of discretion, the court's decision must be "arbitrary, fanciful, or clearly unreasonable." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002).

## IV. DISCUSSION

Federal Rule of Evidence 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 obligates judges to ensure that all expert testimony is relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d

238 (1999). [*6] An expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144, 118 S. Ct. 512, 139 L. Ed. 2d 508(1997) (noting failure of respondent to explain "how and why the experts could have extrapolated their opinions"); *cf. Kumho Tire*, 526 U.S. at 152 (an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (expert testimony "must be supported by appropriate validation"). The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999). Further, Rule 702 requires that expert testimony assist the trier of fact. In other words, it must "fit" the issues in the case by having a valid connection to the pertinent inquiry. *Daubert*, 509 U.S. at 591-92.

A. Proposed Testimony of Professor Lawrence [*7] A. Hamermesh and Justice Joseph T. Walsh, Ret.

Plaintiffs argue that the expert report of Professor Lawrence A. Hamermesh should be excluded because it merely provides his interpretation of Delaware corporate law. (D.I. 471 at 15-16.) Similarly, Defendants seek to exclude some of the testimony of Justice Joseph T. Walsh, Retired, on the grounds that it constitutes an impermissible legal opinion. (D.I. 467 at 10.) While Plaintiffs apparently concede that the testimony of both experts should either be admitted or excluded in their entirety (D.I. 478 at 25), Defendants attempt to distinguish the opinions offered by Professor Hamermesh and Justice Walsh (D.I. 467 at 11-13). Defendants contend that Professor Hamermesh only discusses whether Delaware law would permit the Marvel board of directors to dilute the position of a majority shareholder, whereas Justice Walsh also opines on whether Defendants breached their fiduciary duties. (*Id.* at 12.) Defendants claim that Professor Hamermesh's opinion is admissible because he addresses an issue of law that serves as a "fact" in this case. (*Id.*) On appeal, the Third Circuit held that Plaintiffs "should at least have the opportunity to [*8] establish through expert testimony what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." *Cantor*, 414 F.3d at 437. Defendants assert that Professor Hamermesh's legal opinion is a "fact" because it is necessary to construct the hypothetical bargaining described by the Third Circuit. (D.I. 467 at 12.) Defendants contend that, in analyzing the cost of a restriction that would prevent Marvel from diluting a majority shareholder, the board would have considered whether,

even without that restriction, it would have been permitted under Delaware law to dilute a majority shareholder. (*Id.*) For that reason, one of Defendants' other experts, Peter A. Fowler, relies on Professor Hamermesh's opinion in assessing the outcome of the hypothetical bargaining process. (D.I. 469 at A120, P 24.) Therefore, Defendants propose that both Professor Hamermesh and Justice Walsh should be permitted to testify as to the ability of a board of directors to dilute a majority shareholder, but not as to the law that governs Defendants' fiduciary duties. (D.I. 467 at 13.)

Each party appears to admit that [*9] their own expert offers a legal opinion regarding the proper interpretation of Delaware corporate law. (*Id.* at 12 (Defendants arguing that "Hamermesh's legal opinion is needed in order to construct the hypothetical bargaining"); D.I. 478 at 25 (Plaintiffs explaining that "Hamermesh and Walsh do have a significant disagreement concerning the proper interpretation of Delaware law").) The expert reports submitted by Professor Hamermesh and Justice Walsh confirm that they indeed focus on issues of law. Professor Hamermesh's report reviews the relevant case law (D.I. 469 at A170-72, PP 6-9), and concludes that "the practice and effect of Delaware corporate law as of the period from 1993 to 1996 largely duplicated the indirect effect of Section 4.09(a) of the indentures limiting Marvel's ability to issue shares to reduce the Marvel Holding Companies' ownership of Marvel voting stock to less than a majority" (*id.* at A172, P 10). Justice Walsh also conducted an analysis of Delaware case law (*id.* at A279-84, PP 9-18), but reached a different conclusion, namely that "where ... directors are motivated not by an intention to dilute control but by the desire to protect the interests [*10] of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control" (*id.* at A283, P 16). The Third Circuit has specifically instructed the district courts to "ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir. 2006). Since that is precisely the character of the proposed testimony of Professor Hamermesh and Justice Walsh, it cannot be admitted.

Part of the Third Circuit's holding in *Berckeley* is based on concern that an expert not "usurp the District Court's pivotal role in explaining the law to the jury." 455 F.3d at 217. But jury confusion is not the only rationale for the rule. The point of Rule 702 is to allow evidence that will assist the fact finder. Despite the outstanding qualifications of both Justice Walsh and Professor Hamermesh, I will not be assisted in my role as fact finder in this bench trial by hearing the law explained from the witness stand. The able attorneys on both sides of this case can articulate the law in their arguments

[*11] and post-trial briefing. This is simply not a case where the weight to be given proposed expert testimony is in question and hence determining admissibility might usefully be delayed. *Cf. Chase Manhattan Mortgage Corp. v. Advanta Corp.,* C.A. No. 01-507-KAJ, 2004 U.S. Dist. LEXIS 3933, 2004 WL 422681 at *9-10 (D. Del. Mar. 4, 2004) (denying motion to exclude expert testimony in a bench trial so that judgment on the weight, if any, to be given to that testimony could be made on a more complete record). There is no benefit to delaying decision on admissibility here.

Defendants have failed to establish that the general rule prohibiting experts from offering legal opinions should not be applied to Professor Hamermesh. In support of their argument that his testimony serves as a "fact" in this case, Defendants cite to *Askanase y. Fatjo,* 130 F.3d 657, 672-73 (5th Cir. 1997), for the proposition that "lawyers may testify as to legal matters when those matters involve questions of fact." (D.I. 467 at 12.) However, Defendants' reliance on *Askanase* is misplaced. In explaining what it meant by the phrase "questions of fact," the Fifth Circuit gave the example of a lawyer who was permitted [*12] to testify that the language in a boilerplate contract was standard. *Askanase,* 130 F.3d at 673. That example does not support Defendants' position that, in some circumstances, a lawyer can testify as to his interpretation of the law involved in the case. In contrast, the Fifth Circuit actually cautions that "if an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position." *Id.* That is exactly what the parties have done here.

Defendants also claim that the "law as fact" exception is demonstrated by decisions of the Delaware Court of Chancery that permitted experts to testify as to the likely outcome of related litigation. (D.I. 475 at 19-20 (citing *Onti, Inc. v. Integra Bank,* 751 A.2d 904, 931-32 (Del. Ch. 1999)); D.I. 481 at 19 (citing *In re The Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 743 (Del. Ch. 2005)).) Again, Defendants' argument is unpersuasive. The Chancery Court did not allow experts to simply explain the law. Rather, the experts offered opinions about likely outcomes based on factual assumptions. *See, e.g.,* [*13] *In re The Walt Disney Co. Derivative Litig.,* 907 A.2d at 744. That type of expert testimony is akin to that of Defendants' expert Peter A. Fowler, who explains how the law would affect the outcome of a hypothetical negotiation between Defendants and the Marvel board of directors. (D.I. 469 at A120-21, P 24; *id.* at A138-39.) Despite Defendants' contentions, Fowler can explain, without Professor Hamermesh's legal opinion, how any limit that Delaware law places on the ability of a board to dilute a majority shareholder would play a role in the negotiations. I will decide whether any such limitation

actually exists under Delaware law. Accordingly, I will grant Plaintiffs' Motion to exclude the testimony of Professor Hamermesh, and I will grant Defendants' Motion to exclude the testimony of Justice Walsh.

B. Proposed Testimony of Robert W. Halthausen

Plaintiffs assert that the opinion offered by Robert W. Halthausen for Defendants on the issue of damages should be excluded because it is not relevant. (D.I. 471 at 19-20.) According to Plaintiffs, Halthausen calculated damages based on the expected costs of Marvel's financial distress at the time the Notes were issued. [*14] (*Id.* at 21.) Plaintiffs contend that, in this case, damages should include any injuries that occurred subsequent to the issuance of the Notes. (*Id.* at 22.) More specifically, Plaintiffs believe that damages should be measured by the difference between the financial distress actually sustained by Marvel and that which it would have sustained "but for" Defendants' breach of fiduciary duty. (*Id.*)

n2 Even though Defendants only moved to exclude portions of Justice Walsh's testimony (D.I. 467 at 13), Plaintiffs concede that the opinions of Professor Hamermesh and Justice Walsh cannot be distinguished (D.I. 478 at 25). Therefore, both will be excluded in their entirety.

Regardless of whether Plaintiffs' proposed method of calculating damages is appropriate in this case, their theory depends on a finding that Marvel's subsequent financial distress was proximately caused by Defendants' conduct. (*id.* at 24 ("as long as the harm that Marvel sustained was proximately caused by the Indenture Covenants, its [*15] recovery is not limited by the extent to which such injury was 'expected' at the time that the defendants breached their duties").) In the course of arguing that the testimony of their own damages expert, William H. Purcell (*see infra* at 18-20), should be admitted, Plaintiffs stated that, "[t]o the extent defendants believe that there was some superseding or intervening cause why Marvel's equity became worthless, they can present evidence or cross-examine Purcell." (D.I. 478 at 12 n.5.) Since Plaintiffs admit that their theory of damages is dependent on proof of causation and that causation is an issue for trial, it would be inappropriate for me decide, at this stage in the proceedings, to apply their measure of damages and reject Defendants' approach. Accordingly, I will deny Plaintiffs' Motion to exclude the testimony of Halthausen.

C. Proposed Testimony of Bevis Longstreth

Defendants move to exclude the testimony of Bevis Longstreth on several grounds. First, Defendants contend that portions of Longstreth's initial expert report are inadmissible legal being. (D.I. 467 at 15.) In his initial report, Longstreth purported to answer eight questions submitted by Plaintiffs' [*16] counsel (D.I. 469 at A181, A205-07), and Defendants claim that his answers to five of those questions should not be admitted (D.I. 467 at 15-16). Defendants' position is that Longstreth attempted "to dress up legal conclusions as facts." (*Id.* at 19.) In response, Plaintiffs argue that Longstreth provided permissible testimony regarding the customs and practices of the directors of a Delaware corporation. (D.I. 478 at 21.)

Plaintiffs have identified a proper, if somewhat subtle and occasionally difficult, distinction. While a witness cannot testify as to the law governing a case, expert testimony concerning business customs and practices is allowed. *United States v. Leo,* 941 F.2d 181, 196 (3d Cir. 1991). However, given that the present case involves allegations that Defendants breached their fiduciary duties, it is important to note that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley,* 455 F.3d at 218.

In general, the portions of Longstreth's [*17] initial report that are being challenged by Defendants discuss the process by which a company such as Marvel would handle a transaction involving an interested director. (*See id.* at A181-85, A187.) This is permissible testimony concerning the business customs and practices of a corporation. On at least one occasion, though, Longstreth comes too close to offering a legal opinion. For example, he states that, "[a]s an independent director, it would be obvious to me that Perelman could not be expected to discharge his fiduciary duty to Marvel as both its controlling shareholder and as a director, while at the same time seeking to restrict Marvel's ability to conduct its affairs in order to sell the Notes and secure the net proceeds therefrom for himself personally, without any benefit to Marvel." (*Id.* at A184.) Testimony as to a breach of fiduciary duty will not be admitted. Nevertheless, Longstreth's initial report is still distinguishable from those submitted by Professor Hamermesh and Justice Walsh, which more plainly consist of legal opinions. Because this is a bench trial and I will not be influenced by a witness' view of the law, I will not exclude large portions of Longstreth's [*18] otherwise admissible testimony on the basis that a few statements in his initial report may address issues of law. I will rely on counsel for Defendants to renew their objection, if Longstreth's testimony at trial strays into the realm of purely legal opinion.

2006 U.S. Dist. LEXIS 86329, *

Defendants argue that even the portions of Longstreth's initial report that focus on business customs and practices should be excluded because the customs and practices of directors of Delaware corporations are defined by Delaware law. (D.I. 481 at 9.) This is certainly one of those instances where the line between admissible and inadmissible testimony may be difficult to determine. Nevertheless, and contrary to Defendants' assertion, the Third Circuit has held that it is permissible for an expert to testify, based on experience in the industry, as to how a company would operate under the law so long as "the expert ... [does] not give his opinion as to what was required under the law, or whether the defendant complied with the ... [law]." *Berckeley*, 455 F.3d at 218 (citing *Leo*, 941 F.2d at 197). Defendants claim that some of the customs and practices discussed in Longstreth's initial report [*19] are extremely similar to the requirements of Delaware corporate law. (D.I. 467 at 16-18.) However, Defendants have failed to identify any part of Longstreth's report in which he states that those customs and practices are required by law. That is a distinction with a meaningful difference, particularly where, as here, trial is to the bench and there is no risk of jury confusion. Indeed, the case law cited by Defendants is persuasive on this point. Defendants note that, in *In re The Walt Disney Derivative Litigation*, the Delaware Chancery Court acknowledged that an expert had simply couched an opinion about alleged breaches of fiduciary duties in terms of custom and practice. (D.I. 481 at 9 (citing *In re The Walt Disney Co. Derivative Litig.*, 907 A.2d at 740-41).) The Chancery Court therefore recognized what was less than helpful in the expert's opinion, even though the testimony was admitted at trial. *In re The Walt Disney Co. Derivative Litig.*, 907 A.2d at 740-41. Likewise in this case, Defendants raise an issue of weight, not admissibility. n3

n3 In the course of arguing that Longstreth's initial report contains inadmissible legal opinions, Defendants also assert that parts of his report are not relevant to the hypothetical negotiation that the Third Circuit permitted Plaintiffs to address on remand. (D.I. 467 at 19-20.) As discussed below, I will not exclude expert testimony for that reason. (*See infra* at 20-21.)

[*20]

Defendants' next argument is that Longstreth's initial and rebuttal reports should be excluded under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469(1993), because they are unreliable. (D.I. 467 at 21-22.) With respect to his initial report, Defendants claim that Longstreth provides no "objective, analytical process or methodology" to support his

opinions. (*Id.* at 22.) Yet, the only specific deficiency identified by Defendants in their opening brief is that Longstreth fails to explain why the Restrictions would create a "bet the ranch" situation that, "depending on future events that ... could not reasonably [be] anticipate[], might so restrict Marvel as to cause its demise." (*Id.* (quoting D.I. 469 at A186).) As would be expected, in their brief opposing Defendants' Motion, Plaintiffs explain the basis for that particular portion of Longstreth's report. (D.I. 478 at 14-16.) Defendants then respond by accusing Plaintiffs of focusing "on a snippet of his opinion that has at least some framework to it" (D.I. 481 at 5), an odd criticism since Plaintiffs were dealing with the snippet selected by Defendants. Defendants admit that, "[w] ere this the full [*21] extent of Longstreth's opinion, ... [they] would not have made this motion because, on this small point only, Longstreth has explained the basis for his conclusion, and cross-examination is, therefore, readily available." (*Id.*) Since that "small point" is the only part of Longstreth's initial report that Defendants address in any detail, their argument essentially consists of their conclusory assertion that "the remainder of his analysis, and his conclusion, are either speculative and unreliable or legal opinions." (*Id.*) I will not exclude Longstreth's initial report based on such a general allegation.

Defendants also contend that Longstreth's rebuttal report, which critiques Fowler's analysis of the hypothetical negotiation, is unreliable because it is based on Longstreth's *ipse dixit* assertions. (D.I. 467 at 22.) Again, Defendants have selected a small portion of his report and claim that it is unsupported. Defendants focus on the following statement from Longstreth's rebuttal report: "As to benefits, the wealth extraction from Marvel accrued solely to the benefit of Ronald O. Perelman. Nothing of benefit accrued to Marvel or its minority shareholders." (*Id.* at [*22] 23 (citing D.I. 469 at A210).) Since Plaintiffs' counsel informed Longstreth that the Marvel Holding Companies, which are owned by Perelman, received the entire $ 553.5 million from the Notes (D.I. 469 at A203), I do not find this statement to be so unreliable as to warrant excluding testimony based upon Longstreth's rebuttal report. n4 Defendants also argue that Longstreth's rebuttal opinion is unreliable because he failed to address Fowler's analysis of the financial alternatives to issuing the Notes. (D.I. 467 at 23.) However, Defendants have not established that, for a rebuttal expert's testimony to be admissible, it must address every factor taken into account by the opposing expert. Thus, if Longstreth did in fact fail to consider the alternatives set forth in Fowler's report, it is not an issue of admissibility, but one of the weight that should be given to Longstreth's opinion.

2006 U.S. Dist. LEXIS 86329, *

n4 I emphasize that I relate here only what I understand to be a factual assumption upon which Longstreth was relying; I am not stating any factual or legal conclusion of my own.

[*23]

I now turn to Defendants' more general proposition that both of Longstreth's reports are unreliable because they are supported only by his personal experience. (*Id.* at 24-25; D.I. 481 at 8.) Defendants contend that expert testimony is routinely excluded when it is based entirely on experience and judgment, and not an identifiable methodology. (D.I. 467 at 24-25; D.I. 481 at 8.) However, no such bright line rule exists. To the contrary, the Supreme Court has acknowledged that experts may base their testimony upon personal experience. *See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (explaining that the purpose of *Daubert* "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Particularly telling is the Advisory Committee's explanation of the 2000 Amendment to Rule 702:

> Nothing in this amendment is intended to suggest that experience alone--or experience in conjunction with other knowledge, skill, training or education-- may not provide a sufficient foundation [*24] for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

Fed. R. Evid. 702 advisory committee's note. Accordingly, Longstreth's experience as a corporate lawyer and his service on several boards of directors (D.I. 469 at A180) can form the basis for reliable expert testimony in this case.

Defendants also argue that Longstreth's experience-based opinions are unreliable because they do not satisfy any of the Third Circuit's modified *Daubert* factors. (D.I. 467 at 26.) However, Defendants' reading of the law is stricter than required. The Supreme Court explained that the *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire, 526 U.S. at 151.* Similarly, the Third Circuit has recognized that while the general requirement

of reliability set forth in *Daubert* applies to all expert testimony, the "list of specific factors would often be of little use in evaluating non-scientific expert testimony." *United States v. Davis, 397 F.3d 173, 178 (3d Cir. 2005).* [*25]

To support their position, Defendants point to several cases in which experience-based testimony was excluded as unreliable. (D.I. 467 at 26; D.I. 481 at 8.) That case law highlights a critical distinction. In *Oddi v. Ford Motor Co., 234 F.3d 136 (3d Cir. 2000)*, a case cited by Defendants, an engineer offered his expert opinion that the front bumper of a particular truck would have been able to sustain the impact of a guardrail if it had been strengthened with either bracketry or wedge supports. *Id.* at 158. The opinion was excluded because the expert "conducted no tests" and used "little, if any, methodology beyond his own intuition." *Id.* An important basis for that conclusion is that vehicle design is a testable hypothesis that can be demonstrated using an identifiable methodology. *See id.* (explaining that the expert could have, but did not, test the vehicle design under accident conditions or calculate the forces that could have been sustained by the truck bumper and guardrail at impact). In fact, the Third Circuit noted that "[a]lthough there may be some circumstances where one's training and experience will provide an adequate foundation [*26] to admit an opinion and furnish the necessary reliability to allow a jury to consider it, this is not such a case." *Id.*

An illustration of that distinction is *Berckeley*, in which the Third Circuit held that a former corporate lawyer could testify as to business customs and practices in the securities industry, based on her experience as counsel for the SEC. *455 F.3d at 218; see also Davis, 397 F.3d at 179* (holding that a police officer's opinion concerning the methods of operation of drug traffickers was sufficiently reliable based solely on his years of experience). Longstreth's opinion on the customs and practices of corporate directors is similar to the experience-based testimony that the Third Circuit has approved, because the opinions expressed are not subject to proof by a particular methodology.

Although Defendants have failed to establish that I should entirely exclude Longstreth's testimony, they have identified another portion of that proposed testimony with which I do have concern. After critiquing Fowler's analysis of the hypothetical negotiation, Longstreth opined that "the fee suggested by Mr. Fowler would have been flatly unacceptable [*27] to Marvel," and that "the consideration that Marvel would have required would likely have been in the order of magnitude of $ 150 million." (D.I. 469 at A212.) Other than his opinion that, given the risks to Marvel, Fowler's proposed fee was too low, Longstreth offers no basis for his conclusion that $ 150 million would be an appropriate amount. (*Id.*) In

2006 U.S. Dist. LEXIS 86329, *

fact, Longstreth admitted that it was a "ballpark judgment." (*Id.* at A312, 150:13-18.) Since I can discern no other grounds for the particular figure submitted by Longstreth, I have serious concerns about its reliability. On balance, however, I am persuaded that, in the particular circumstances of this bench trial, the testimony need not be excluded at this time. n5

> n5 Plaintiffs should be aware that they will not be permitted to establish a basis for Longstreth's opinion at trial unless they complied with the disclosure requirements of Fed. R. Civ. P. 26.

Finally, Defendants claim that Longstreth is not qualified [*28] to offer an opinion about the outcome of the hypothetical negotiation. (D.I. 467 at 28.) Defendants base their argument on what they believe to be an admission by Longstreth that he lacks the financial expertise to conduct such a financially complex negotiation. (*Id.*) But there is no such admission. When asked whether he would be a suitable candidate for the board to hire as a financial advisor on the negotiation, Longstreth explained that he would not, but only because he would be providing the legal advice, and he felt that the board should hire an independent financial expert. (D.I. 469 at A306, 32:14-23.) Longstreth never stated that he lacked the financial expertise necessary to assess the outcome of the hypothetical negotiation. Rather, Longstreth explained that, based on his experience giving both legal and financial advice, he is an expert in analyzing the "structures of a financing transaction." (*Id.* at A306, 32:2-13.) Therefore, Defendants have failed to demonstrate that Longstreth was unqualified to discuss the financial aspects of the hypothetical bargaining process. Accordingly, since I do not find any of Defendants arguments to be persuasive, I will deny Defendants' [*29] Motion to exclude Longstreth's testimony.

D. Proposed Testimony of William H. Purcell

Defendants seek to exclude testimony based upon the three expert reports of William H. Purcell, on the ground that his opinions are based entirely on experience and not on any particular methodology or objective criteria. (D.I. 467 at 28-29.) As previously discussed, merely asserting that an expert relied on personal experience in forming an opinion is insufficient to demonstrate that the opinion is inadmissible. (*See supra* at 14-16.) Since Defendants provide no further explanation as to why Purcell's initial expert report is unreliable, I will not exclude that report.

Defendants claim that Purcell's rebuttal report is inadmissible because he fails to provide an adequate basis for his opinion that, "*based on my experience as an in-*vestment banker, the target capital structure for a company such as Marvel would have been no more than 30% debt and at least 70% equity." (D.I. 467 at 29 (emphasis added by Defendants).) Defendants allege that Purcell simply "made up" that ratio, and it is inadmissible because it is not based on a "testable hypothesis" or "standards controlling the technique's [*30] operations." (*Id.* at 30-31.) However, Purcell's assessment of Marvel's likely capital structure in the absence of the Restrictions is supported by several principles of corporate finance set forth in his rebuttal report. (D.I. 469 at A254-55.)

In particular, Purcell's opinion rests on the principles that "it is best to finance long-term assets with long-term debt or equity," that "it is best to stretch out one's debt maturity schedule over as long a period of time as possible," and that "one should avoid over-reliance on short-term commercial paper or commercial bank debt." (*Id.*) Thus, though one may attack the soundness or applicability of the principles cited, it is not accurate to say Purcell provided an inadequate basis for his conclusion that Marvel should have had a higher percentage of equity than debt. Defendants also point out that Purcell admitted that the actual ratio "is an order of magnitude judgment." (*Id.* at A315, 125:15-25.) However, I will not exclude Purcell's testimony solely because he failed to explain how he determined that exact ratio. It is clear from Purcell's report that the ratio of 30% debt to 70% equity is an experience-based estimate given [*31] for purposes of comparison with Marvel's actual debt-to-equity ratio. (*See id.* at A259.)

Finally, Defendants argue that the measure of damages in Purcell's supplemental report should be excluded because it is simplistic and lacks the methodological rigor required by *Daubert.* (D.I. 467 at 32.) Critical to Purcell's damages calculation was that on November 12, 1996, a corporation wholly-owned by Perelman refused to invest funds in Marvel unless the Restrictions in the Notes could be amended. (D.I. 469 at A275.) Purcell calculated damages by multiplying the price that the common shares of Marvel closed at on November 11, 1996, the day before Perelman's announcement, by the number of outstanding shares prior to Marvel's bankruptcy petition in late December 1996. (*Id.*) Defendants criticize this calculation because it assumes that the drop in stock price and eventual bankruptcy is due entirely to the Restrictions, and, thus, it fails to account for other possible causes. (D.I. 467 at 32.) While Defendants may disagree with Purcell's method, they have not shown that it is so unsuitable as to render his testimony inadmissible. Again, the argument more properly goes to the weight [*32] of Purcell's opinion, not its admissibility. Accordingly, I will deny Defendants' Motion to exclude the testimony of Purcell.

2006 U.S. Dist. LEXIS 86329, *

E. Proposed Testimony of Andrew S. Carron and Jeffrey L. Baliban

Defendants move to exclude testimony based upon the expert reports of Andrew S. Carron and Jeffrey L. Baliban on the grounds that those reports were not timely submitted. (D.I. 467 at 34.) Defendants contend that, based on Plaintiffs' representations during a teleconference on September 9, 2005, the Scheduling Order (D.I. 430) of October 18, 2005 that allowed the parties to submit additional expert testimony was limited to testimony which addresses the issue of "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." (D.I. 467 at 34.) Thus, Defendants claim that because Carron and Baliban do not address that narrow issue, their reports are governed by the Scheduling Order of February 6, 2002 which required all expert testimony to be submitted by April 10, 2002. (Id. at 35.) Defendants argue that admitting the reports at this time would be prejudicial because they raise new theories of liability and remedy, [*33] and Defendants will not be able to make summary judgment motions on those issues. (D.I. 481 at 15.)

Defendants have failed to establish prejudice that would justify excluding the reports submitted by Carron and Baliban. Both reports were served by the deadline of January 13, 2006 for submitting additional expert testimony (see D.I. 459), as set forth in the Scheduling Order of October 18, 2006 (D.I. 430). In response, Defendants served rebuttal expert reports with respect to both Carron and Baliban. (D.I. 469 at A111; D.I. 472 at Ex. 7, P 2.) Defendants apparently also had the chance to depose Carron on April 7, 2006 (see D.I. 479 at B373) and Baliban on April 11, 2006 (see D.I. 469 at A297). Therefore, since Defendants have had a sufficient opportunity to

address any issues raised in the expert reports of Carron and Baliban, I will deny Defendants' Motion to exclude those reports.

V. CONCLUSION

Accordingly, I will grant Plaintiffs' Motion to exclude the testimony of Professor Lawrence A. Hamermesh, and I will deny Plaintiffs' Motion in all other respects. I will grant Defendants' Motion to exclude the testimony of Justice Joseph T. Walsh, Retired, and I will [*34] grant Defendants' Motion to the limited extent that proposed testimony by Bevis Longstreth as to breaches of fiduciary duty will not be permitted at trial. In all other respects, however, I will deny Defendants' Motion. An appropriate order will follow.

ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that Plaintiffs' Motion to Exclude Expert Testimony (D.I. 470) is GRANTED as to Professor Lawrence A. Hamermesh and DENIED in all other respects. It is further ORDERED that Defendants' Motion to Exclude Expert Testimony (D.I. 466) is GRANTED as to Justice Joseph T. Walsh, Retired, and is GRANTED to the extent that Bevis Longstreth will not be permitted to opine regarding breaches of fiduciary duty; Defendants' Motion is DENIED in all other respects.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

November 30, 2006
Wilmington, Delaware

914 F. Supp. 210, *; 1995 U.S. Dist. LEXIS 15696, **

**DORR-OLIVER INCORPORATED, Plaintiff, v. FLUID-QUIP, INC. and ANDREW FRANKO, Defendants.**

**No. 93 C 842**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**914 F. Supp. 210; 1995 U.S. Dist. LEXIS 15696**

**October 18, 1995, Decided**
**October 20, 1995, DOCKETED**

**COUNSEL:** [**1] For DORR-OLIVER INC, plaintiff: William Terry Rifkin, Mary Spaulding Burns, Rockey, Rifkin and Ryther, Chicago, IL. John P. Luther, Andrew L. Tiajoloff, Alfred H. Hemingway, Jr., Edward P. Kelly, John E. Lynch, Felfe & Lynch, New York, NY.

For FLUID-QUIP INC., defendant: Thomas W. Flynn, Thomas & Buckley, Chicago, IL. Bruce E. Peacock, Thomas W. Flynn, Matthew R. Jenkins, Biebel & French, Dayton, OH. Patricia Susan Smart, Attorney, Chicago, IL. For ANDREW FRANKO, defendant: Bruce E. Peacock, Thomas W. Flynn, Matthew R. Jenkins, Biebel & French, Dayton, OH. Patricia Susan Smart, Attorney, Chicago, IL.

For DORR-OLIVER INC, counter-defendant: William Terry Rifkin, Mary Spaulding Burns, Rockey, Rifkin and Ryther, Chicago, IL. John P. Luther, Andrew L. Tiajoloff, Alfred H. Hemingway, Jr., Felfe & Lynch, New York, NY.

For FLUID-QUIP INC., counter-claimant: Thomas W. Flynn, Thomas & Buckley, Chicago, IL. Bruce E. Peacock, Thomas W. Flynn, Matthew R. Jenkins, Biebel & French, Dayton, OH. Patricia Susan Smart, Attorney, Chicago, IL. John Bostjancich, Chicago, IL. For ANDREW FRANKO, PIC TEK INC., counter-claimants: Bruce E. Peacock, Thomas W. Flynn, Matthew R. Jenkins, Biebel & [**2] French, Dayton, OH. Patricia Susan Smart, Attorney, Chicago, IL. John Bostjancich, Chicago, IL.

**JUDGES:** Robert W. Gettleman, United States District Judge

**OPINION BY:** Robert W. Gettleman

**OPINION:**

[*211] **MEMORANDUM OPINION AND ORDER**

On April 15, 1995, the court issued a memorandum opinion and order finding against plaintiff Dorr-Oliver Incorporated ("Dorr-Oliver") on the issue of whether Dorr-Oliver had a trademark right in the name "clamshell" for its Dorr-Clone starch washing machine, but finding in Dorr-Oliver's favor on the issue of trade dress for that machine. The court concluded that Dorr-Oliver was entitled to relief of an equitable award of defendants' profits as a measure of unjust enrichment, prejudgment interest, and an injunction prohibiting defendants from further infringement on Dorr-Oliver's trade dress. The court also asked the parties to submit simultaneous briefs on the issue of relief.

In those briefs, both sides, in addition to addressing the issues identified by the court, asked for more than the court indicated it would award in this case. Dorr-Oliver asked for a mandatory injunction to compel defendants to "replace and/or modify all Fluid-Quip starch washers currently in [**3] use which embody the protected trade dress." This would be impossible, of course, since Fluid-Quip does not own these machines any more. Defendants asked the court to award plaintiff no monetary relief-- contrary to the court's ruling. The purpose of the briefing on relief was not to entertain the parties' wish list of remedies, but to address the scope of relief consistent with the court's August 15 opinion.

On the subject of money, Dorr-Oliver argues that Fluid-Quip's profits should not be reduced by extraordinary compensation paid to Fluid-Quip's shareholders, which Dorr-Oliver correctly points out in this case were in fact distributions of profits. Dorr-Oliver also correctly argues that Fluid-Quip should not be allowed to deduct its corporate income taxes (which would effectively result in Dorr-Oliver's paying a double tax on its award) or the attorneys' fees spent in unsuccessfully defending this litigation. According to Dorr-Olive, the disallowance of

914 F. Supp. 210, *; 1995 U.S. Dist. LEXIS 15696, **

Page 2

these deductions results in an award of $ 283,479 of Fluid Quip's profits and $ 53,597 in prejudgment interest.

Because the award in this action is equitable in nature and need not be an exact calculation of profits, the court [**4] has decided to award Dorr-Oliver the sum of $ 250,000 of Fluid Quip's profits, plus $ 50,000 in prejudgment interest through the date of this order. This reflects the disallowances of approximately $ 62,000 in extraordinary salary paid to Fluid Quip's shareholders, which the court finds to have been distributions of profits, approximately $ 73,000 in income taxes attributable to the profits on the infringing products, and a portion of the attorney's fees spent by defendants to litigate this action (keeping in mind that defendants successfully defended the trademark and Illinois Counterfeit Products Act counts).

With respect to costs, the court notes that plaintiff filed a bill of costs on October 11, 1995, and that defendants still have time to object to any of the items specified in the bill. If any such objection is filed, the court requests defendants to set the matter for a hearing.

Finally, as previously held in this court's August 15, 1995, opinion, Dorr-Oliver is entitled to injunctive relief. Defendants are permanently enjoined from manufacturing, advertising, distributing or selling clamshell starchwashers and from any further infringement of Dorr-Oliver's trade dress in [**5] the design of the outer housing of its clamshell starch washers.

ENTER: October 18, 1995

    Robert W. Gettleman

    United States District Judge

2006 U.S. Dist. LEXIS 54260, *

THE PROCTOR & GAMBLE COMPANY, Plaintiff, v. TEVA PHARMACEUTI-
CALS USA, INC., Defendant.

Civil Action No. 04-940-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2006 U.S. Dist. LEXIS 54260

August 4, 2006, Decided

SUBSEQUENT HISTORY: Motion granted by P&G v. Teva Pharms. USA, Inc., 2006 U.S. Dist. LEXIS 54300 (D. Del., Aug. 4, 2006)

COUNSEL: [*1] For The Procter & Gamble Company, Plaintiff: Frederick L. Cottrell, III, Steven J. Fineman, Richards, Layton & Finger, Wilmington, DE.

For Teva Pharmaceuticals U.S.A., Inc., Defendant: Adam Wyatt Poff, Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

JUDGES: Joseph J. Farnan Jr., UNITED STATES DIS-TRICT JUDGE.

OPINION BY: Joseph J. Farnan Jr.

OPINION:

## MEMORANDUM ORDER

Pending before the Court is Defendant Teva Pharmaceuticals USA, Inc.'s Motion To Preclude The Testimony Of Plaintiff's Patent Law Expert (D.I. 69). For the reasons discussed, the Motion will be granted in part and denied in part.

## I. BACKGROUND

In this patent infringement case, Defendant argues that Plaintiff's patent, U.S. Patent No. 5,583,122 ("the '122 patent") is invalid because of obviousness-type double patenting. Plaintiff submitted the Rebuttal Expert Report of Jerry D. Voight in response to Defendant's Expert Report of George R. Lenz, Ph.D., to address patent interference practices and whether the one-way or two-way test should be used for determining obviousness-type double patenting in this case. (D.I. 70 Ex. A). On July 6, 2006, Defendant filed the instant Motion to preclude [*2] Plaintiff from proffering Mr. Voight's testimony on any of the opinions set forth in his expert report. (D.I. 69). Defendant contends that Mr. Voight's testimony would exceed the scope permitted by the

Court because it will include legal conclusions and goes beyond the practices and procedures of the U.S. Patent and Trademark Office (PTO). (D.I. 69 at 3). In Response, Plaintiff contends that Mr. Voight's expert testimony is within the parameters permitted by the Court because it includes the workings of the PTO and the prosecution history in this case. (D.I. 74). Plaintiff's answering brief included an Amended Rebuttal Expert Report of Jerry D. Voight, removing certain legal conclusions, and now contends that Defendant's' concerns are moot. n1 (D.I. 74 Ex. A).

> n1 For the purposes of its review of this Motion, the Court considers only the Amended Rebuttal Expert Report of Jerry D. Voight (D.I. 74 Ex. A).

## II. DISCUSSION

A court has broad discretion to admit or exclude evidence under the Federal Rules [*3] of Evidence. Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 97 (3d Cir. 1983). Federal Rule of Evidence 702 states that

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

2006 U.S. Dist. LEXIS 54260, *

Fed. R. Evid. 702. The Rules of Evidence do not permit expert testimony as to legal conclusions. Salas by Salas v. Wang, 846 F.2d 897, 905 n.5 (3d Cir. 1988); see Fed. R. Evid. 704.

This Court excludes testimony by patent law experts on substantive issues of patent law. (D.I. 70 Ex. C, D); Revlon Consumer Prods. Corp. v. L'Oreal S.A., 1997 U.S. Dist. LEXIS 4117, at *9-10 (D. Del. March 26, 1997). Testimony by Mr. [*4] Voight must therefore be restricted to PTO practice and procedures and may not include legal conclusions or substantive issues of patent law.

In response to Defendant's Motion, Plaintiff's expert removed his legal opinions on two-way testing in the Amended Rebuttal Expert Report. (D.I. 74 Ex. A). Plaintiff agrees to refrain from soliciting Mr. Voight's opinion about which test for obviousness-type double-patenting should apply in this case. (D.I. 74 at 7). Despite Plain-

tiff's assurances, the Court concludes that section "V. Opinions and Basis Therefor," subsection "A. Legal Background for Opinions" of Mr. Voight's report must be stricken because it contains inadmissible legal conclusions. (D.I. 74, Ex. A at 10-11).

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED that Defendant Teva Pharmaceuticals USA, Inc.'s Motion To Preclude The Testimony Of Plaintiff's Patent Law Expert (D.I. 69) is **GRANTED** and section V., subsection A., of Mr. Voight's "Amended Rebuttal Expert Report" (D.I. 74 Ex. A at 10-11), is stricken.

August 4, 2006

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

Page 1

2006 U.S. Dist. LEXIS 54300, *

THE PROCTER & GAMBLE COMPANY, Plaintiff, v. TEVA PHARMACEUTI-
CALS USA, INC., Defendant.

Civil Action No. 04-940-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2006 U.S. Dist. LEXIS 54300

August 4, 2006, Decided

**PRIOR HISTORY:** P&G v. Teva Pharms. USA, Inc.,
2006 U.S. Dist. LEXIS 54260 (D. Del., Aug. 4, 2006)

**COUNSEL:** [*1] For The Procter & Gamble Company,
Plaintiff: Frederick L. Cottrell, III,Steven J. Fineman,
Richards, Layton & Finger, Wilmington, DE.

For Teva Pharmaceuticals U.S.A., Inc., Defendant:
Adam Wyatt Poff, Josy W. Ingersoll, Young, Conaway,
Stargatt & Taylor, Wilmington, DE.

**JUDGES:** Joseph J. Farnan Jr., UNITED STATES DIS-
TRICT JUDGE.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION:**

### MEMORANDUM ORDER

Pending before the Court is The Procter & Gamble
Company's Motion In Limine To Strike The "Expert
Report of Jesse David, Ph.D." (D.I. 66). For the reasons
discussed, the Motion will be granted.

### I. BACKGROUND

On June 19, 2006, Plaintiff filed its Motion In
Limine, contending that Dr. Jesse David's Expert Report
for Defendant should be excluded because it is untimely
and inadmissible under the Federal Rules of Evidence.
(D.I. 66). Defendant filed its answering brief on July 6,
2006, contending that the untimely filing did not preju-
dice Plaintiff and that the Report was admissible. (D.I.
68). Defendant asserts that Dr. David will testify as an
economist on commercial success, a secondary consid-
eration in Defendant's defense that U.S. Patent No.
5,583,122 ("the '122 patent") is obvious. [*2] Id. Plain-
tiff filed its reply in support of its Motion in Limine on
July 12, 2006.

### II. DISCUSSION

A court has broad discretion to admit or exclude
evidence under the Federal Rules of Evidence. Gumbs v.

Int'l Harvester, Inc., 718 F.2d 88, 97 (3d Cir. 1983). Fed-
eral Rule of Evidence 702 states:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to
> understand the evidence or to determine a
> fact in issue, a witness qualified as an ex-
> pert by knowledge, skill, experience,
> training, or education, may testify thereto
> in the form of an opinion or otherwise, if
> (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the
> product of reliable principles and meth-
> ods, and (3) the witness has applied the
> principles and methods reliably to the
> facts of the case.

Fed. R. Evid. 702. The Rules of Evidence do not permit
expert testimony as to legal conclusions. Watkins v. New
Castle County, 374 F. Supp. 2d 379, 393 (D. Del. 2005)
(citing Salas by Salas v. Wang, 846 F.2d 897, 905 n.5
(3d Cir. 1988)) ; see Fed. R. Evid. 704 [*3] .

Here, the Court concludes that Dr. David's Expert
Report would not assist a trier of fact and exceeds the
scope of his expertise as an economist. Under Rule 702,
the Court is obligated to ensure that any scientific testi-
mony or evidence admitted is relevant and reliable. Wat-
kins, 374 F. Supp. 2d at 391. Defendant contends that Dr.
David would limit his testimony to "the economic issues
raised in Dr. Smith's report, specifically the economic
import of the sales of the patented product on the issue of
obviousness." (D.I. 68). Dr. David's Expert Report con-
tains no statement limiting his testimony to obviousness
and instead states that Dr. David will offer an opinion on
the relevance of information related to commercial suc-
cess. (D.I. 66 Ex. A). In the Court's view, Dr. David's
Report focuses on case law related to commercial suc-
cess and discusses its applicability to the instant action,
and therefore, the Court concludes that Dr. David's Ex-
pert Report is a legal opinion that is inadmissible under

2006 U.S. Dist. LEXIS 54300, *

Rule 702 because it will not assist the Court in resolving a fact in issue. Accordingly, the Court will grant Plaintiff's Motion In Limine To Strike The "Expert Report of Jesse [*4] David, Ph.D." However, the Court will allow Defendant to submit a revised expert report from Dr. David that presents his opinions as an economist on the issue of commercial success. n1

> n1 Because Plaintiff's motion asserts a violation of the Court's Scheduling Order, the Court must apply the "Pennypack factors" to determine whether Plaintiff is unduly prejudiced or surprised or whether Defendant's actions are in bad faith or demonstrate a willing failure to comply with the Court's Order. ABB Air Preheater v. Regenerative Envtl. Equip. Co., 167 F.R.D. 668, 672 (D.N.J. 1996)(quoting Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904-905 (3d Cir. 1977)). Here, the Court concludes that neither prejudice nor bad faith exists.

Defendant filed Dr. David's Expert Report on April 12, 2006, well in advance of the bench trial scheduled for November 6, 2006, and in rebuttal to Plaintiff's secondary consideration evidence of commercial success. Id. at 672-73.

### ORDER [*5]

NOW THEREFORE IT IS HEREBY ORDERED that Plaintiff's Motion In Limine To Strike The "Expert Report of Jesse David, Ph.D." is **GRANTED.** Defendant is permitted to submit a revised expert report from Dr. David, consistent with this Memorandum Order, no later than September 1, 2006.

August 4, 2006

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

305 F.3d 1369, *; 2002 U.S. App. LEXIS 20658, **;
64 U.S.P.Q.2D (BNA) 1650

**EARL E. THOMPSON, SR., Plaintiff-Appellant, v. HENRY T. HAYNES, FLUID CONTROLS, INC., and MIGHTY CLEAN CORPORATION, Defendants-Appellees.**

**01-1392**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

305 F.3d 1369; 2002 U.S. App. LEXIS 20658; 64 U.S.P.Q.2D (BNA) 1650

**September 30, 2002, Decided**

**SUBSEQUENT HISTORY:** [**1] As Corrected October 15, 2002.

**PRIOR HISTORY:** Appealed from: United States District Court for the Northern District of Oklahoma. Judge Sven Erik Holmes.

**DISPOSITION:** Affirmed in part, vacated in part, and remanded.

**COUNSEL:** Frank J. Catalano, Frank J. Catalano, P.C., of Tulsa, Oklahoma, argued for plaintiff-appellant.

Stephen R. Ward, Gardere Wynne Sewell LLP, of Tulsa, Oklahoma, argued for defendants-appellees.

**JUDGES:** Before GAJARSA, LINN, and DYK, Circuit Judges.

**OPINION BY:** LINN

**OPINION:** [*1372]

LINN, Circuit Judge.

Earl E. Thompson, Sr. ("Thompson") appeals the judgment, pursuant to Fed. R. Civ. P. 54(b), of the United States District Court for the Northern District of Oklahoma (1) holding, on the counterclaims of defendants Henry T. Haynes, Fluid Controls, Inc., and Mighty Clean Corporation (collectively "Fluid Controls"), that Thompson's sale of his swivel devices constituted a willful violation of the Lanham Act, the Oklahoma Deceptive Trade Practices Act, and the common law pertaining to unfair competition; (2) awarding defendants a total of $ 2,239,141.52, representing Fluid Controls' lost profits on swivel sales, Thompson's profits on allegedly counterfeit swivels, and damages for an advertising campaign, all trebled and set off against unpaid [**2] royalties owed to Thompson by Fluid Controls; and (3) enjoining further unfair competition by Thompson. ("Judgment").

Because the district court did not err in awarding Thompson's profits to Fluid Controls or in holding that no correction of the inventorship of the United States Patent No. 5,284 was merited, and because the district court did not abuse its discretion in issuing an injunction or clearly err in finding Thompson's actions to be willful, we affirm in part. However, because the district court's award of damages based on lost sales was based on speculation, because an award of advertising damages was not merited, and because the district court improperly trebled the award of Thompson's profits, we vacate those portions of the award of damages and remand for further proceedings consistent with this opinion.

## BACKGROUND

In November of 1992, Thompson approached Fluid Controls with a fluid conducting swivel concept. In January of 1993, Thompson and Fluid Controls entered into an agreement to develop the concept and file a patent application. In the agreement, Fluid Controls' president, Henry T. Haynes ("Haynes"), and Thompson [**3] were described as the "joint patent applicants." The agreement provided that the patent, if issued, would be assigned to Fluid Controls. The agreement also provided for a royalty to be paid to each of the "patent owners," a phrase that apparently refers to Thompson and Haynes. The 5,284,298 patent, which listed Thompson and Haynes as co-inventors, issued on February 8, 1994 and was assigned to Fluid Controls.

Thompson v. Haynes, No. 95-CV-1139-H(M) (N.D. Okla. Apr. 18, 2001) [*1373] For a time, Thompson served as a distributor of the patented swivels, which were manufactured by Fluid Controls. These swivels were sold under the designation "Whirl-Jet." After disputes as to the discount at which Thompson was entitled to purchase the Fluid Controls swivels and as to attorney fees, Fluid Controls ceased making royalty payments to Thompson. Thompson then began to produce his own swivels, at least some of which he began to sell in May of 1994 to customers to which he had previously sold Fluid Controls swivels. Thompson filed a separate patent

305 F.3d 1369, *; 2002 U.S. App. LEXIS 20658, **;
64 U.S.P.Q.2D (BNA) 1650

application on an allegedly different swivel device; this application matured to U.S. Patent No. 5,531,380, issued on July 2, 1996.

In June 1994, one of Thompson's customers, Simpson Cleaning Systems, Inc. ("Simpson"), experienced [**4] installation problems with swivels manufactured by Thompson. Steve Pauley, the Simpson engineer overseeing the installation process, contacted Fluid Controls for assistance in solving the problem. When Fluid Controls' officials inspected the swivels, they discovered that the swivels were manufactured by Thompson. Fluid Controls sent a letter to Pauley informing him that the swivels infringed the '298 patent and suggesting that Simpson cancel any orders with Thompson and resubmit them directly to Fluid Controls. Thereafter, Simpson ceased doing business with Thompson and began purchasing directly from Fluid Controls.

Fluid Controls then warned its other customers about what it believed to be the unlicensed manufacture and sale of swivels that infringed the '298 patent. One such customer was Steel Eagle. Fluid Controls alleges that Thompson sold substitute swivels to Steel Eagle, although Thompson disputes this. Fluid Controls' officials believed that Steel Eagle's unsatisfactory experiences with the Thompson swivels caused Steel Eagle to rule out the use of Fluid Controls swivels in high-end cleaning devices.

Thompson sued Fluid Controls in the Northern District of Oklahoma for: [**5] (1) declaratory judgment of non-infringement of the '298 patent; (2) recovery of unpaid royalties under the agreement with Fluid Controls; (3) an injunction against interference with business relations; (4) damages for unfair business practices; (5) correction of inventorship of the '298 patent to remove Haynes as a co-inventor; (6) rescission of the agreement to assign the '298 patent to Fluid Controls; and (7) infringement of the '298 patent, on the theory that Thompson was the sole owner of all rights in the '298 patent. Fluid Controls counterclaimed for: (1) infringement of the '298 patent; (2) correction of inventorship of the '298 patent to remove Thompson as a co-inventor; (3) unjust enrichment; (4) violations of the Lanham Act and Oklahoma unfair competition law; and (5) declaratory judgment of invalidity of Thompson's '380 patent.

A bench trial was held in January of 1999. On May 25, 1999, the court issued partial findings of fact and conclusions of law. On Thompson's claims, the court, held as a matter of law that no correction of inventorship of the '298 patent was required and found that Thompson was entitled to an accounting for certain unpaid royalties. On Fluid Controls' [**6] counterclaims, the court found that Thompson had supplied his swivels to Simpson instead of the Fluid Controls swivels without informing Simpson of the substitution and concluded that Thompson had willfully violated the Lanham Act, the Oklahoma Deceptive Trade Practices Act, Okla. Stat. tit. 78, §§ 51-55 ("DTPA"), and the common law relating to unfair competition. The court also found that Thompson's actions resulted in lost sales of at least 100 [*1374] Fluid Controls swivels per month to Steel Eagle. Thompson v. Haynes, No. 95-CV-1139-H (N.D. Okla. May 25, 1999) ("Thompson"). The court did not address the remaining claims and counterclaims. The court concluded that Fluid Controls was entitled to injunctive relief, as well as damages, costs, and attorney fees. The court then referred the matter to a magistrate judge, acting as a special master, to complete the accounting.

Based on facts obtained after the trial that Thompson had not disclosed sales of his swivels to two customers, Hydro Tek and Elite Manufacturing, Fluid Controls moved for discovery sanctions against Thompson. The court referred Fluid Controls' motion for discovery sanctions to the same magistrate judge.

The special [**7] master issued a report on the accounting ten months later. Thompson v. Haynes, No. 95-CV-1139-H (M) (N.D. Okla. Mar. 28, 2000) ("Special Master's Report"). The special master found that Thompson should be awarded $ 76,673.98 for unpaid royalties, and that Fluid Controls should be awarded $ 605,526 in lost sales damages, $ 133,412.50 for Thompson's profits on swivel sales, and $ 33,000 in damages for an advertising campaign. Based on the district court's finding of willfulness, the special master recommended that the damages owing to Fluid Controls be trebled and that Fluid Controls be awarded attorney fees, limited to the fees incurred for the Lanham Act and DTPA claims on which it prevailed at trial. The master deferred making a recommendation on attorney fees pending segregation of the fees by claim.

On the sanctions motion, the magistrate judge found that Thompson had failed to meet his discovery obligations and recommended that Thompson be precluded from contesting in any way that his sales of swivels to Hydro Tek and Elite Manufacturing violated the Lanham Act and the DTPA. Thompson v. Haynes, No. 95-CV-1139-H (M) (N.D. Okla. Mar. 28, 2000) ("Sanctions Report [**8] ").

The district court adopted both reports. Thompson v. Haynes, 95-CV-1139-H (N.D. Okla. Sept. 5, 2000) ("Adopting Order"). In April of 2001, the court issued judgment pursuant to Rule 54(b). As recommended by the special master, the court awarded Fluid Controls damages for lost sales and for conducting an advertising campaign, as well as Thompson's profits, all of which were trebled and offset against the unpaid royalties for a final award to Fluid Controls of $ 2,239,141.52. Judg-

ment at 2. The court did not award attorney fees. In addition, the court entered a permanent injunction against further unfair competition by Thompson. Id. at 3.

Thompson challenges the district court's determination that his conduct constituted willful unfair competition. He further challenges the award of damages, the entry of a permanent injunction, and the district court's determination on inventorship. We have jurisdiction under 28 U.S.C. § 1295(a).

DISCUSSION

I

In deciding non-patent issues, such as trademark, trade dress and other unfair competition issues under § 43(a) of the Lanham Act, this Court applies regional circuit law. Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1359, 50 U.S.P.Q.2D (BNA) 1672, 1675 (Fed. Cir. 1999) [**9] (en banc in relevant part); Keystone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1447, 27 U.S.P.Q.2D (BNA) 1297, 1300 (Fed. Cir. 1993) (applying regional circuit law to a trade dress issue); Atari, Inc. v. JS & A Group, Inc., 747 F.2d 1422, 1439, 223 U.S.P.Q. (BNA) 1074, 1087 (Fed. Cir. 1984) (en banc) (recognizing the "freedom of the [*1375] district courts to follow the guidance of their particular circuits in all but the substantive law fields assigned exclusively to this court"). The Tenth Circuit accepts the district court's factual findings unless they are clearly erroneous and reviews the application of legal principles de novo. Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1555, 38 U.S.P.Q.2D (BNA) 1609, 1625 (10th Cir. 1996). In a suit under the Lanham Act, likelihood of confusion is a factual question reviewed for clear error. Heartsprings, Inc. v. Heartspring, Inc., 143 F.3d 550, 553, 46 U.S.P.Q.2D (BNA) 1481, 1483 (10th Cir. 1998); Cardtoons, L.C. v. Major League Baseball Players Ass'n, 95 F.3d 959, 967, 39 U.S.P.Q.2D (BNA) 1865, 1870 (10th Cir. 1996).

The issuance or denial of a permanent injunction [**10] is reviewed for an abuse of discretion. Harolds Stores, 82 F.3d at 1555, 38 U.S.P.Q.2D at 1625.

Review of a decision to enhance damages is for an abuse of discretion. United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1236, 53 U.S.P.Q.2D (BNA) 1929, 1940 (10th Cir. 2000); 15 U.S.C. § 1117(a) (2000).

The imposition of sanctions for a discovery violation is reviewed under an abuse of discretion standard. Ehrenhaus v. Reynolds, 965 F.2d 916, 920 (10th Cir. 1992).

The legal question of inventorship is reviewed without deference. Winbond Elecs. Corp. v. Int'l Trade

Comm'n, 262 F.3d 1363, 1370, 60 U.S.P.Q.2D (BNA) 1029, 1033 (Fed. Cir. 2001).

II

A

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (2000), creates a federal remedy for false representations or false designations of origin used in connection with the sale of a product. The statute provides civil liability for:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation [**11] of origin, false or misleading description of fact, or false or misleading representation of fact, which--

>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

The district court found that Thompson "substituted a device he named the 'SW-343' swivel as product in response to orders he received from customers for the '298 patented swivel," and that the customer that bought Thompson's substituted swivels "testified that he had no knowledge of the substitution and thought the substitute swivels were Defendants' swivels." Thompson at 12. The district court determined that this evidence of actual confusion established a likelihood of confusion, which provided the basis for the district court's holding that "Thompson's sales of substitute swivels constituted a false designation of origin, a false or misleading description of fact, and a false or misleading misrepresentation of fact in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125 [**12] (a)(1)." Id.

Thompson argues that the district court's determination was based on clearly erroneous fact-finding. Specifically, Thompson asserts that he informed Jim Schiavi, Simpson's purchasing agent, that he was substituting his own swivels for the Fluid Controls swivels he had been supplying. [*1376] Thompson directs our attention to records establishing that Schiavi cancelled one order,

Page 4

305 F.3d 1369, *; 2002 U.S. App. LEXIS 20658, **;
64 U.S.P.Q.2D (BNA) 1650

which was allegedly for Fluid Controls swivels, and sub-
stituted another order that Thompson asserts was for
swivels of his own manufacture. Thompson asserts that
Schiavi did this after Thompson informed him that he
wished to switch the swivels supplied. Thompson further
relies on his own testimony that he made no misrepresen-
tations to Simpson regarding the source of the swivels
and the testimony of Pauley, Simpson's research engi-
neer, that Thompson had made no such misrepresenta-
tions to him. Thompson argues that he never employed
the term "whirl jet," which Schiavi used in his purchase
order, for any of his own swivels. Thompson also asserts
that any evidence of confusion arising from the Simpson
transaction should not be used to infer confusion in other
sales of Thompson's swivels, because the Simpson
[**13] transaction was "unique."

Fluid Controls responds that none of the underlying
factual findings were clearly erroneous and asserts that
the evidence of actual confusion in the Simpson transac-
tion is the "best evidence" of confusion in the market-
place, citing Jordache Enterprises, Inc. v. Hogg Wyld,
Ltd., 828 F.2d 1482, 1484, 4 U.S.P.Q.2D (BNA) 1216,
1220-21 (10th Cir. 1987). Fluid Controls asserts that the
similar "SW-343-D" designation Thompson used,
Schiavi's note on the substituted purchase order specify-
ing "whirl jet" swivels, and Pauley's contact with Fluid
Controls after experiencing installation problems with
Thompson's swivels, show that the district court did not
clearly err in finding actual confusion.

The factual findings of the district court underlying
its finding of likelihood of confusion are not clearly er-
roneous. The evidence of record establishes that in April
of 1994, more than one month before Thompson asserts
that he first began supplying his "SW-343-D" swivels to
Simpson, Thompson sold Fluid Controls-manufactured
swivels to Simpson under the designation "SW-343."
Furthermore, Pauley testified that after experiencing
problems with the Thompson swivels, [**14] he con-
tacted not Thompson but Fluid Controls for help, asking
"why [Fluid Controls] had changed the design of the
swivel without notifying me." Trial Tr. at 710. Pauley
also stated that he was not aware, prior to discovering the
problems, that the swivels were manufactured by
Thompson. Thompson argues that this testimony estab-
lishes that Schiavi was informed of the substitution.
However, there is no testimony from Schiavi in the re-
cord, and the district court explicitly rejected Thomp-
son's testimony. Thompson at 4. We see no reason to
disturb this credibility determination.

Thompson argues that it was Fluid Controls' burden
to have Schiavi, Simpson's purchasing agent, testify that
he was confused as to the source of the swivels. Thomp-
son confuses the burden of persuasion in the unfair com-
petition counterclaim, which remains with Fluid Controls

throughout, Universal Money Ctrs., Inc. v. Am. Tel. &
Tel. Co., 22 F.3d 1527, 1530, 30 U.S.P.Q.2D (BNA)
1930, 1932 (10th Cir. 1994), with the burden of going
forward with the evidence--the burden of production--
that can shift back and forth. See Dir., Office of Work-
ers' Comp. Programs v. Greenwich Collieries, 512 U.S.
267, 272-74, 129 L. Ed. 2d 221, 114 S. Ct. 2251 (1994).
[**15] Fluid Controls met its burden of production on
the issue of confusion by establishing that Pauley, a rep-
resentative of the consumer of the swivels, made an "in-
correct mental association between the involved . . . pro-
ducers," Jordache Enters., 828 F.2d at 1484, 4
U.S.P.Q.2D at 1218 (quoting S.F. Arts & Athletics, Inc.,
v. United States Olympic Comm., 483 U.S. 522, 564, 3
U.S.P.Q.2D (BNA) 1145, 1163, [*1377] 97 L. Ed. 2d
427, 107 S. Ct. 2971 (1987) (Brennan, J., dissenting)).
Once Fluid Controls had established this, the burden of
going forward with the evidence shifted to Thompson to
rebut Fluid Controls' showing of actual confusion.
Thompson cannot maintain that Fluid Controls' ultimate
burden of persuasion made it unnecessary for him to
rebut Fluid Controls' evidence. Fluid Controls showed
that a representative of the customer was confused as to
the source of the swivels. No more was required for a
showing of actual confusion.

The district court's finding that "Thompson's substi-
tution of his SW-343 swivels in place of the Defendants'
patented '298 swivels was part of an intentional plan to
deceive consumers about the source of SW-343 swivels,"
Thompson at 5, was supported [**16] by the similarity
in the designations used, as well as the course of dealing
between Simpson and Thompson. Thus, the district
court's findings that Thompson's use of the "SW-343"
designation was intentionally misleading and willful, and
that the Simpson transaction represented an instance of
actual confusion, were not clearly erroneous.

Neither was the finding of likelihood of confusion
clearly erroneous. A likelihood of confusion exists
"when consumers make an incorrect mental association
between the involved commercial products or their pro-
ducers." Jordache Enters., 828 F.2d at 1484, 4
U.S.P.Q.2D at 1218 (quoting S.F. Arts, 483 U.S. at 564,
3 U.S.P.Q.2D at 1163 (Brennan, J., dissenting)). The
Tenth Circuit considers the following factors relevant to
a determination of whether a likelihood of confusion
exists:

> (a) the degree of similarity between the
> marks, including the marks' appearance,
> pronunciation, suggestion, and manner of
> display;

(b) strength or weakness of the plaintiff's mark;

(c) the intent of the alleged infringer in adopting its mark;

(d) similarities and differences of the parties' goods, services and marketing strategies; [**17]

(e) the degree of care likely to be exercised by purchasers of the goods or services involved; and

(f) evidence of actual confusion, if any.

Heartsprings, 143 F.3d at 554, 46 U.S.P.Q.2D at 1483. "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." Id. "The best evidence of a likelihood of confusion in the marketplace is actual confusion." Jordache Enters., 828 F.2d at 1487, 4 U.S.P.Q.2D at 1220-21.

In this case, the final factor, evidence of actual confusion, is strongly indicative of a likelihood of confusion. It is undisputed that Pauley, the engineer at Simpson who actually used both swivels, was not aware that the substituted swivels were produced by Thompson and contacted Fluid Controls for assistance with the Thompson swivels. With the exception of the degree of care exercised by consumers, regarding which we find no evidence in the record, the remaining factors all support a finding of likelihood of confusion. The designation Thompson applied to his swivels, SW-343-D, was very similar to the arbitrary SW-343 designation under which Thompson [**18] had previously sold the swivels manufactured by Fluid Controls. Furthermore, although Thompson characterized the SW-343 designation as a "generic term," Trial Tr. at 933, he has provided no evidence that the designation is "used to describe the relevant type or class of goods." First Sav. Bank, F.S.B. v. First Bank Sys., Inc., 101 F.3d 645, 654, 40 U.S.P.Q.2D (BNA) 1865, 1872 (10th Cir. 1996). With respect to intent, the district court found that Thompson's conduct was part of "an intentional plan to [*1378] deceive consumers." Thompson at 5. This is supported by the record, which reflects that the Fluid Controls and Thompson swivels were so similar that the engineer who was responsible for installing them did not recognize that they were different until he experienced problems adjusting them, and that Thompson sold both swivels in the same manner to the same customer. In sum, the district court weighed all the relevant factors as required, Heartsprings, 143 F.3d at 554,

46 U.S.P.Q.2D at 1483, and its finding of a likelihood of confusion is not clearly erroneous.

Here, in order to establish unfair competition under § 43(a) of the Lanham Act, it must be shown "(1) [**19] that defendant made material false or misleading representations of fact [concerning the origin] of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff." Cottrell, Ltd. v. Biotrol Int'l, Inc., 191 F.3d 1248, 1252, 52 U.S.P.Q.2D (BNA) 1194, 1196-97 (10th Cir. 1999) (citations omitted). Likelihood of confusion "forms the gravamen" for an action under § 43(a) of the Lanham Act. King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1089, 51 U.S.P.Q.2D (BNA) 1349, 1352 (10th Cir. 1999). Since Fluid Controls has established that it was injured by Thompson's misleading representations in connection with the sale of his swivels and that Thompson's conduct caused a likelihood of confusion as to the source of those swivels, the district court's conclusion of law that "Thompson's sales of substitute swivels constituted a false designation of origin, a false or misleading description of fact, and a false or misleading misrepresentation of fact in violation of Section 43 [**20] of the Lanham Act," Thompson at 12, was not erroneous.

The district court also committed no error in holding that Thompson's acts constituted a violation of the DTPA. The DTPA makes actionable deceptive trade practices, defined inter alia as "passing off goods . . . as those of another," or "knowingly making a false representation as to the source . . . of goods." DTPA § 53(A). An intent to deceive need not be shown to make out a claim under the DTPA. Id. § 53(B) (making evidence of a deceptive trade practice "prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition"); Id. § 53(A) (stating that "proof of intent . . . shall not be required"); Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 527 n.8, 4 U.S.P.Q.2D (BNA) 1497, 1508 n.8 (10th Cir. 1987) (holding that the Oklahoma legislature "did not make intent to deceive an element of proof of passing off"). The district court found that "Thompson passed off his products as those of Defendants and thus caused confusion in the marketplace, to Defendants' detriment." Thompson at 14. This finding is not clearly erroneous, and the district court did not err in concluding [**21] as a matter of law that Thompson had violated the DTPA.

Lastly, the district court held that Thompson had violated the common law of unfair competition. The Oklahoma courts have found unfair competition where "the acts of defendant are such as are calculated to deceive the ordinary buyer making his purchases under the

Page 6

305 F.3d 1369, *; 2002 U.S. App. LEXIS 20658, **;
64 U.S.P.Q.2D (BNA) 1650

ordinary conditions which prevail in the particular trade to which the controversy relates." Coalgate Abstract Co. v. Coal County Abstract Co., 1937 OK 202, 180 Okla. 8, 67 P.2d 37, 40, 33 U.S.P.Q. (BNA) 285, 287 (Okla. 1937) (quoting 63 C.J. at 399). Misuse of a distinctive term or symbol is not required. Bell v. Davidson, 1979 OK 66, 597 P.2d 753, 755, 205 U.S.P.Q. (BNA) 663, 665 (Okla. 1979) ("If ordinary words are used to palm off goods of one manufacturer, [*1379] dealer or vendor as those of another and to carry on unfair competition, their use may be enjoined by a court of equity to the same extent as a fully protected distinctive term or symbol."). The test is whether "the ordinary buyer, exercising ordinary intelligence and observation in business matters, will certainly or probably be deceived[;] a mere possibility of deception and confusion [is] insufficient." Carpet City, Inc. v. Carpet Land, Inc., 1958 OK 213, 335 P.2d 355, 358, 119 U.S.P.Q. (BNA) 185, 186 (Okla. 1958). [**22] Applying these standards, we conclude that the district court did not err in holding that Thompson's actions amounted to unfair competition.

**B**

The district court found that Fluid Controls was entitled to "an accounting of all gains, profits, and advantages derived from [Thompson's] unfair competition, as well as compensatory damages, interest and the costs of [the] suit." Thompson at 15. The court addressed four categories of damages: Thompson's profits on sales of his swivels; Fluid Controls' lost profits attributable to Thompson's acts of unfair competition; Fluid Controls' damages for conducting an advertising campaign to counteract the unfair competition; and Fluid Controls' attorneys' fees. We shall consider each category of damages in turn.

**i**

The court found that Thompson "caused 1472 swivels to be manufactured, of those 1250 were sold, leaving 222 remaining in inventory." Special Master's Report at 8. The court calculated the profit margin on the 1250 swivels actually sold using Fluid Controls' sale price, because Thompson's sale price was not apparent from the evidence submitted. Id. at 8-9. Using these figures, the court arrived at a damages figure of $ [**23] 133,412.50. Id. at 9. Based on its finding that Thompson's willful violations of federal and state law made the case exceptional, Thompson at 6, the court then trebled this figure. Judgment at 2.

Thompson argues that the Simpson transaction that led to the finding of likelihood of confusion was unique and that the district court erred in assuming that the remaining sales were made under similar conditions. Thompson states that the record evidence shows that Hydro-Tek was aware that there was no relationship between Thompson and Fluid Controls. Thompson also argues that there is no evidence that Elite was deceived by Thompson.

Fluid Controls responds that the district court did not err in assessing damages based on all of Thompson's sales. Fluid Controls argues that the district court order granting Fluid Controls' motion for sanctions precluded Thompson from "contesting in any way that his sales of swivels to Hydro-Tek and Elite Mfg. violated the Lanham Act and the Oklahoma Deceptive Trade Practices Act." Sanctions Order at 5.

We agree with Fluid Controls. We review the district court's grant of sanctions for a discovery violation for an abuse of discretion. Ehrenhaus, 965 F.2d at 920. [**24] Thompson essentially reargues the facts relating to the Hydro-Tek and Elite sales and explains his skepticism regarding Fluid Controls' motivation in requesting Thompson's customer list. However, this does not amount to a showing that the district court abused its discretion in precluding Thompson from challenging that the sales were Lanham Act and DTPA violations. The district court was "best qualified" to determine the appropriate sanction for a discovery violation, id., and in a case such as this, in which Thompson exhibited a "complete lack of attention to his obligation to provide complete and accurate information," Sanctions Order at 4, [*1380] we are unwilling to substitute our judgment for that of the district court without a clear showing that the court abused its discretion.

Nor do we discern any legal error or clearly erroneous fact finding in the court's calculation of Thompson's profits. It is evident that there was some confusion as to the number of swivels sold to various customers, but this confusion was engendered by Thompson's dilatory conduct in discovery. "A defendant whose wrongful conduct has caused the difficulty in assessing damages cannot complain that the [**25] damages are somewhat speculative." Brunswick, 832 F.2d at 526, 4 U.S.P.Q.2D at 1506.

However, we find that the district court erred in its assessment of exemplary damages. In its final judgment, the court added Thompson's profits to Fluid Controls' lost sales and corrective advertising costs, and trebled the resulting total. While 15 U.S.C. § 1117(a), which governs damages for violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), authorizes the trebling of Fluid Controls' damages, the court's identical treatment of Thompson's profits does not comport with the language of the statute. That provision recites:

> (a) When a violation of any right of the registrant of a mark registered in the Pat-

ent and Trademark Office, a violation under section 1125(a), (c), or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages [**26] sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a) (2000). By the terms of the statute, "damages" are to be treated separately from "profits." As for damages, the court may award up to three times actual damages, depending on the circumstances of the case. As for profits, however, the court is not authorized to award up to three times the amount proved. [**27] For profits, the court is constrained to award the amount proved, subject only to an adjustment, up or down, where the recovery would be otherwise unjust. The court may not, as it did here, simply lump profits together with damages and apply the same measure of enhancement to both. In its consideration of an award of profits on remand, the court must treat the enhancement of damages and profits separately, as specified by the statute, keeping in mind the further statutory instruction that the sum awarded "constitute compensation and not a penalty." Id.

2

The district court's award to Fluid Controls of $ 605,526 in lost sales, which it trebled along with the other amounts awarded, was based on a finding that "[Fluid Controls] lost sales of at least 100 [*1381]

swivels per month from June 1994 to present because of Mr. Thompson's sales of inferior quality swivels to Stell [sic] Eagle." Thompson at 6.

Thompson attacks this award as speculative. Thompson asserts that he never sold any of his own swivels to Steel Eagle, only those manufactured by Fluid Controls. Moreover, Thompson directs our attention to record evidence showing that Steel Eagle estimated its need at 150 swivels [**28] per year in June of 1994, and that Fluid Controls has sold its own swivels at approximately twice that rate to Steel Eagle since that time.

Fluid Controls responds that the court's determination was based on sufficient evidence and notes that in the Tenth Circuit, "evidence of the amount of damages may be circumstantial and inexact." Brunswick, 832 F.2d at 526, 4 U.S.P.Q.2D at 1506-07. The evidence Fluid Controls relies on is principally Haynes' testimony at trial, the relevant portion of which is reproduced below:

> Q. Now, would you also tell the Court with regard to -- with regard to Mr. Thompson's selling of his devices and attempts to sell his devices, has that caused your company any loss of sales?
>
> A. Well, the only known potential loss that I can think of would be the company of Steel Eagle, whereby they had a problem with one of Mr. Thompson's devices and they were very reticent about using our device, either, on their more prestigious machines, And I don't know, they probably produce a hundred a month of those machines and so forth. That's the only thing I can relate to.
>
> Q. Do you believe you have lost sales in that amount?
>
> A. I'm relatively [**29] sure -- I'm relatively sure of that. To what extent, I don't know.

Trial Tr. at 964-65. In addition, Fluid Controls directs our attention to testimony from Gary Holt ("Holt"), a sales representative for Fluid Controls, who testified that Steel Eagle was unsatisfied with inferior swivels it had allegedly purchased from Thompson but was pleased with swivels it had received from Fluid Controls. Fluid Controls also relies on a sales memorandum written by Holt, which records Steel Eagle's concern about how many "pirated swivels" it may have received.

305 F.3d 1369, *; 2002 U.S. App. LEXIS 20658, **;
64 U.S.P.Q.2D (BNA) 1650

This is too thin a reed on which to support an award of almost two million dollars. Haynes' testimony, which is the only support for the 100 swivels per month figure adopted by the district court, appears to be sheer speculation. Fluid Controls argues that this is simply the result of Haynes' equivocal speech patterns and that the district court was in a better position to accurately understand his testimony. However, there is little room to misinterpret Haynes' testimony. By his own admission, he is unsure of the number of lost sales. The figure of 100 swivels per month is unsupported by any documentary evidence of record and is undercut [**30] both by the estimate of Steel Eagle's requirements and the record evidence of ongoing sales by Fluid Controls to Steel Eagle. The premise underlying Haynes' argument--that problems with Thompson's devices caused Steel Eagle to decide not to employ Fluid Controls swivels on its high-end machines--is also illogical. Presumably a sophisticated manufacturer such as Steel Eagle knows that parts from different sources have different properties. Because Steel Eagle bought and incorporated Fluid Controls swivels into some of its products, the decision not to use those swivels in other products was in all likelihood the result of its own assessment of the suitability of the Fluid Controls swivels, rather than a result of Thompson's actions.

[*1382] Fluid Controls is correct that the amount of damages need not be proven exactly. However, the Supreme Court and the Tenth Circuit draw a distinction between proof of the fact of damages, which must be established with at least reasonable certainty, and the amount of damages, which may be estimated, provided it is not merely speculative. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563-64, 75 L. Ed. 544, 51 S. Ct. 248 (1931) [**31] ("There is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount."); Montreal Trading Ltd. v. Amax Inc., 661 F.2d 864, 868 n.1 (10th Cir. 1981) ("A party must show with some certainty that it suffered injury as a result of the defendants' actions, but once it shows injury, the amount of damages can be estimated."); King & King Enters. v. Champlin Petroleum Co., 657 F.2d 1147, 1157 (10th Cir. 1981) ("There must be reasonable evidence from which a jury can rationally infer the amount of damages."); Eccher v. Small Bus. Admin., 643 F.2d 1388, 1392 (10th Cir. 1981) ("The law clearly permits approximations as to the extent of damage, providing the fact of damage or lost profits is certain."). In this case, the proof that Fluid Controls has offered as to the fact of damages as a result of Thompson's conduct amounts to no more than speculation. An award of lost profits based on such evidence cannot be affirmed.

3

Thompson also challenges the district court's award to Fluid Controls of $ 33,000 as actual [**32] damages for conducting a corrective advertising campaign. Judgment at 2. Thompson argues that there is no need for such a campaign and characterizes the testimony on which the award was based as speculation. Thompson cites Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 195 U.S.P.Q. (BNA) 417 (10th Cir. 1977), for the proposition that damages for an advertising campaign may be awarded only where actual confusion resulting from wrongful conduct has been shown. Because the district court cited no actual confusion caused by Thompson, he argues, there was no basis for the award. Even if the award is upheld, Thompson argues, the trebling of the award must be vacated, because the court had no basis to enhance the award. Fluid Controls responds that the award was appropriate in view of Thompson's five-year advertising campaign; and that both the Lanham Act and the DTPA permit the enhancement of all damages, including damages for an advertising campaign.

We agree with Thompson and hold that the court's award of actual damages for an advertising campaign was clearly erroneous. Tenth Circuit precedent sanctions the award of damages for advertising campaigns [**33] in certain cases. Id. However, in those cases, the advertising of the party engaging in unfair competition is itself a source of marketplace confusion or damage. See id. at 1374-76, 195 U.S.P.Q. (BNA) at 425-26 (awarding damages for a future advertising campaign where defendant's "saturation" advertising had "deeply penetrated the public consciousness," causing public confusion); Ira M. Petersime & Son v. Robbins, 81 F.2d 295, 28 U.S.P.Q. (BNA) 148 (10th Cir. 1936) (allowing recovery of costs expended on an advertising campaign where defendant's disparaging advertising at a trade show "dampened the inclination of prospective customers to make purchases"). Here, in contrast, the court expressly found that "[Thompson's] ads themselves were not a source of marketplace confusion or damage to [Fluid Controls'] reputation or goodwill." Special Master's Report at 10. Furthermore, the court noted that Fluid Controls had written letters to its customers in which it [*1383] dissociated itself from Thompson and differentiated its product from his. The court based the award solely on the testimony of Fluid Controls' officers as to the type of advertising campaign that they [**34] believed necessary. Tenth Circuit precedent does not contemplate the award of damages to counteract an advertising campaign that itself caused no confusion, and we see no reason to extend that precedent to embrace such a situation.

4

Thompson also challenges the district court's award of attorneys' fees to Fluid Controls. Thompson argues

305 F.3d 1369, *; 2002 U.S. App. LEXIS 20658, **;
64 U.S.P.Q.2D (BNA) 1650

that the court's underlying determination of willfulness was unsupported by direct evidence, and thus cannot form the basis for an award of attorneys' fees.

The issue of attorneys' fees does not appear to be properly before us. The special master deferred making a recommendation as to attorneys' fees until Fluid Controls identified, which attorneys' fees were related to the Lanham Act and DTPA claims. Special Master's Report at 11. The order adopting the report expressly noted that "the appropriate amount of attorney fees to be awarded is still pending before the Special Master for determination." Adopting Order at 2 n.2. The Rule 54(b) judgment provided that the award of damages was "exclusive of . . . attorney fees," Judgment at 2, and the issue is not otherwise mentioned in that judgment. Because there has been no final determination [**35] as to attorneys' fees, we decline to consider the issue at this juncture.

C

In its Rule 54(b) judgment, the district court entered an injunction

> against all continued false designations of origin, false or misleading designations or representations of fact, passing off, and other unfair competition by Plaintiff, Earl E. Thompson, Sr., his agents, servants, employees, attorneys, and those controlling, controlled by, or in active concert or participating with Thompson involving the substitution of Thompson's products for Fluid Controls' products.

Judgment at 3. Thompson argues that the injunction is defective because the injunction does not enjoin specific activities, and because it is based solely on the Simpson transaction, which Thompson alleges was unique.

We discern no abuse of discretion in the issuance of the injunction. The wording properly covers the conduct underlying the determination of unfair competition, such as the use of "misleading designations" and "passing off." We have already considered and rejected Thompson's factual arguments related to the uniqueness of the Simpson transaction.

D

The district court disposed of the parties' respective claims [**36] for correction of inventorship by finding the proposition that "both Mr. Thompson and Mr. Haynes contributed in a significant manner to the conception of the '298 patent" to be supported by clear and convincing evidence. Thompson at 10. The district court

also found that neither party had presented "any evidence that supports the conclusion" that the other party should be removed as a joint inventor. Id.

As an initial matter, Thompson argues that the issue of inventorship is not properly before us, apparently because there was no mention of inventorship in the Rule 54(b) judgment. Fluid Controls responds that the district court found in that judgment that "[the court's] ruling in the partial findings and conclusions comprise [*1384] [sic] a final and separable resolution of all claims addressed therein," Judgment at 1, and that among the district court's conclusions of law in its partial findings and conclusions was that the joint ownership of Thompson and Haynes was "fully supported" and that no correction of inventorship was merited. Thompson at 10. We agree with Fluid Controls. Because the court's conclusion on inventorship was addressed in its partial findings of fact [**37] and conclusions of law, final judgment was entered on the inventorship claims by the Rule 54(b) judgment. Accordingly, the inventorship issue is properly before us for review.

Whoever invents patentable subject matter is entitled to a patent thereon. 35 U.S.C. § 101 (2000). "Conception is the touchstone to determining inventorship." Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473, 43 U.S.P.Q.2D (BNA) 1935, 1941 (Fed. Cir. 1997). "[Conception] is 'the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.'" Burroughs Wellcome Co. v. Barr Labs. Inc., 40 F.3d 1223, 1228, 32 U.S.P.Q.2D (BNA) 1915, 1919, (Fed. Cir. 1994) (quoting Hybritech Inc. v Monoclonal Antibodies Inc., 802 F.2d 1367, 1376, 231 U.S.P.Q. (BNA) 81, 87 (Fed. Cir. 1986)). "There is a presumption that the inventors named on an issued patent are correct, so misjoinder of inventors must be proven by clear and convincing evidence." Fina Oil, 123 F.3d at 1472, 43 U.S.P.Q.2D at 1941; see also Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980, 41 U.S.P.Q.2D (BNA) 1782, 1785 (Fed. Cir. 1997) [**38] (stating that "the burden of showing misjoinder or nonjoinder of inventors is a heavy one" (quoting Garrett Corp. v. United States, 190 Ct. Cl. 858, 422 F.2d 874, 880, 164 U.S.P.Q. (BNA) 521, 526 (Cl. Ct. 1970))); Price v. Symsek, 988 F.2d 1187, 1191, 26 U.S.P.Q.2D (BNA) 1031, 1033-34 (Fed. Cir. 1993). What is required is "corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention." Burroughs Wellcome, 40 F.3d at 1228, 32 U.S.P.Q.2D at 1919. "The determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case." Fina Oil, 123 F.3d at 1473, 43 U.S.P.Q.2D at 1941.

305 F.3d 1369, *; 2002 U.S. App. LEXIS 20658, **;
64 U.S.P.Q.2D (BNA) 1650

In this case, the burden on each party was to show facts supported by clear and convincing evidence that the other person listed as an inventor had not in fact contributed to the conception of the invention. The parties appear to have misapprehended this burden at trial: while the district court found that "the evidence . . . is clear and convincing that both Mr. Thompson and Mr. Haynes contributed in a significant manner to the conception of the '298 patent," it also [**39] found that neither party had "presented any evidence that supports the conclusion that [the other] should be removed as a joint inventor of the '298 patent." Thompson at 10. Without the latter evidence, both claims for correction of inventorship must fail. On appeal, Thompson argues that Haynes' alleged contributions are not reflected in the claims of the '298 patent and suggests that Fluid Controls' attorney, who prosecuted the '298 patent, had a conflict of interest rendering suspect his judgment that Haynes was an inventor. Haynes responds that Thompson's characterization of Haynes' contributions is unduly narrow. These arguments are insufficient to establish that the district court erred in refusing to correct the inventorship of the '298 patent.

Accordingly, we affirm the holding of the district court on this issue.

CONCLUSION

We affirm the district court's conclusion that Thompson's conduct was a violation of the Lanham Act, the DTPA, and the common law of unfair competition. We affirm the award to Fluid Controls of Thompson's [*1385] profits, but vacate the trebling of those profits. We also affirm the district court's issuance of a permanent injunction, and its conclusion on [**40] the issue of inventorship. However, we vacate the district court's award of damages in the form of Fluid Controls' lost sales and for an advertising campaign. The case is remanded for further proceedings consistent with this opinion.

AFFIRMED-IN-PART,       VACATED-IN-PART, AND REMANDED.

COSTS

No costs.

## CERTIFICATE OF SERVICE

I, Francis DiGiovanni, hereby certify that on April 16, 2007, copies of the foregoing document were served on the following counsel of record in the manner indicated:

**BY HAND DELIVERY AND E-MAIL:**

C. Barr Flinn
John W. Shaw
Adam Poff
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

**BY UNITED STATES MAIL AND E-MAIL:**

Garrard R. Beeney
Richard C. Pepperman, II
James T. Williams
Keith McKenna
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Steven F. Reich
Jeffrey S. Edelstein
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, NY 10004

_____
Francis DiGiovanni (#3189)