# TABS A-D

## REDACTED IN THEIR ENTIRETY

# TAB E

**Director, Transfer Pricing – A126I**

Job Description

| Apply Online |

Description

**THE CAREER OPPORTUNITY YOU'VE BEEN LOOKING FOR:**

Whirlpool Corporation is the world's leading manufacturer and marketer of major home appliances and consumer solutions, boasting a global market share some 40 percent larger than its largest competitor. The company holds the leading market share in North America and Latin America. Whirlpool is third in Europe but with the leading single brand in the Whirlpool brand itself. It also has the top position among Western companies doing business in Asia today.

Whirlpool is organized around a global business structure and platform. As a result of this global platform, the company is leveraging activities, practices and business processes on a worldwide basis to deliver a competitive advantage to each of the company's global businesses. Major business processes, from product development, procurement and supply chain management, to managing information system technologies and harnessing the power of the Internet to drive efficiencies in revenues, are all globally leveraged within the corporation. Furthermore, all major new product introductions are delivered by a global organization that serves each of the regional businesses. This has allowed Whirlpool to come to market faster, at a lower cost, with more innovation and more consumer focused value than ever before.

Central to the company's growth strategy is driving unmatched levels of consumer loyalty, enabled by innovation and leveraged by a portfolio of 12 major brands worldwide, including: Whirlpool, KitchenAid, Roper, Brastemp, Bauknecht, Consul and others. The company has 50 manufacturing and technology centers around the globe, and markets its brands in more than 170 countries.

**BRIEF OVERVIEW:**

This position is being created to provide strategic / tactical thought leadership to primary business and tax leadership on all areas that are impacted by Whirlpool's transfer pricing practices, policies, and procedures.

Qualifications

**IN THIS POSITION YOU'LL HAVE THE OPPORTUNITY TO:**

The mandate for this position is to drive change within Whirlpool Corporation to help build a successful, world-class tax organization. As with all Tax Directors at Whirlpool Corporation, this individual must be viewed as a respected business partner capable of delivering thoughtful, proactive advice to the senior leadership team and to business leaders around the world.

Key priorities and challenges include the following:

• Function as a business and tax leader for all transfer pricing projects, policies, and procedures within Whirlpool Corporation. This includes, but is not limited to, managing all transfer pricing documentation both in the US and overseas, and helping manage related tax audits and controversy as appropriate.

• Analyze current and future transfer pricing strategies to help mitigate risk, optimize efficiency, and facilitate future business operations, mergers, acquisitions, and the like. Provide timely and accurate tax advice to support business units and facilitate sound financial planning. Develop and maintain robust accounting controls as they relate to transfer pricing.

• Establish productive and value-adding relationships with tax advisors, outside vendors of tax-related services, the Internal Revenue Service and other taxing authorities. Ensure that the company is always receiving the highest quality tax counsel and service, and is always conducting itself with integrity and professionalism.

• Working with the VP and other Tax Directors, assist in developing and implementing a global tax strategy that maximizes consolidated Whirlpool financial results and supports our business unit objectives. This will include creative tax planning and tax structuring for Whirlpool's global legal entities.

**WHAT YOU NEED TO SUCCEED IN THIS POSITION:**
This individual should be a person of unquestionable integrity and a team player who has shown the ability and track record of winning the confidence and trust of colleagues and the respect of the broader business community.  This person should be a passionate, visionary leader capable of driving change and discipline throughout the organization - with the ability to serve as a business partner to the various division leaders, as well as the rest of senior management.

A deep technical background in transfer pricing is absolutely required to be successful in this role.  Equally important to your success, however, is the ability to work well with people at all levels of our organization; excellent communication skills, a working knowledge of GAAP and SAP; the ability to manage multiple projects; and a sincere drive to create change.

The most highly sought after candidates will be broad-based financial professionals with strong academic credentials and at least 4 years of transfer pricing experience in public accounting or industry.  Required education includes a Bachelor's degree with an emphasis in Accounting, Finance, or Economics, and a preference for candidates with a CPA and/or MBA.

**WHIRLPOOL LEADERSHIP REQUIREMENTS AND QUALIFICATIONS:**
Whirlpool prides itself on hiring great talent with the necessary leadership requirement and qualifications to achieve greatness. In this position, we are looking for a leader that possesses strong character and integrity, as well as confidence in their actions and decisions that will ultimately drive vital business decisions. The leader must have the ability to communicate strategies and solutions to colleagues and customers to achieve financial goals. With these attributes and practices, we believe that the leader will successfully provide extraordinary results and consistently drive change that will be key factors in Whirlpool's future successes.

| Profile | |
|---|---|
| **Job Field** | Tax |
| **Locations** | US-MI-Benton Harbor/St. Joseph |
| **Organization** | Global Finance |

| Additional Information | |
|---|---|
| **Posting Date** | 10/31/2006, 10:52 AM, Montreal, New York, Washington D.C. - (UTC -5:00) |

**Is Relocation Provided?**  Yes

 Do you know someone who would be great at this job?

Send This Job To A Friend

Return to the Job list

Apply Online

Powered by Taleo

# TAB F

Find job Director Of Taxes                                                                      Page 1 of 3



**EHRCWEB.ORG/JOBS**
**find a better job**

Home | Links | Contact Us | Press | Post a job | Bookm

Search jobs: _____  [ **Search** ]

· Ads by Google    Finance Job Description    Accounting Employment    Accounting Degree Job    Accounti

**Home** ❯ **Accounting & Finance** ❯ **Director-Of-Taxes**

# Director Of Taxes

### Details

**Country:** USA
**Location:** SC Anderson
**Total applied:** 40
Job ID FIN0806KF
Position Type Full-Time Employee
Company Name Techtronic Industries North America, Inc.
Location Anderson, SC
Salary Unspecified
Experience 5-10 Years Experience
Desired Education Level Bachelor of Science

## Director Of Taxes

**Staff Accountant Jobs**
Find a Staff Accountant Job Today Search Accounting Jobs and Apply
www.iHireAccounting.com

**Clerk job**
Find Part-Time & Full-Time Hourly Jobs at Top Companies Near You
www.SnagAJob.com

**Jobs in Accounting**
Search 1000's of Accounting Jobs- Post a Resume & Get Career Advice
careers.msn.com

**Accounting & Finance Jobs**
Entry-level to Executive Contract and Permanent Positions
www.HarveyNash.com

Ads by Google

Senior tax position

Company Information
Techtronic Industries North Am
sales and distribution company
portable electric power tools ar
garden equipment; an equal er
opportunity employer.

Job Description
This senior tax position for the
American operations will be re:
providing senior management
and timely tax information that
incorporated into the Company
decision making process.

Primary Responsibilities

Researching, planning and implementing income and operating tax strategies to minimize
Company's overall tax liability and reduce its audit exposures

Establish transfer pricing methodologies and protocols for all US subsidiaries

Direct the accurate and timely preparation of transfer pricing studies to ensure complianc
foreign tax law requirements.

Ensure proper application of GAAP tax accounting procedures

Establish income tax compliance and income tax accounting procedures

Establish internal controls and documentation for the income tax function

### Sr Fin Sys Analyst
FedEx Services coordinates sales, marketing and technology support for the global FedEx brand, ...

### Tax Manager (DN)
Position Type: Full Time Local CPA firm is looking to hire a seasoned Tax Manager. Candidates ...

### Medical Collections Specialist – Medicare
Position Type: Temporary Nashville based diaylsis company is needing a Medicare collections ...

### Regional Controller
Job Title: Regional Controller Company: LabCorp Location: Knoxville,TN Status: Full Time, E...

### Purchasing/Inventory Control Clerk
Position Type: Full Time Will maintain Bill of Materials on all parts, generation of monthly ...

Find job Director Of Taxes

**Internal Auditor (DN)**
Position Type: Full Time
Large, publicly traded
financial services firm has
an immediate need for ...

Responsible for directing and managing third party tax advisors.

Job Qualifications

Bachelor's Degree in Accounting, Finance, or Business Administration

Minimum 7 years work experience with public accounting firm or corporate tax departmen

General knowledge of FAS 109, US income tax code, state income tax laws, transfer pric
regulations, income tax audits and reviews.

Knowledge of business software applications, such as MS Office, SAP or Oracle based g
accounting programs.

- **Apply for Director Of Taxes**

**Corporate Staff
Accountant (bonus
Eligible)**
Position Type: Full Time
Prominent Nashville
corporation needs a
corporate staff accountant.
Must ...

Your email: _____        [ Notify me when this job is upd ]

Friend email: _____        [ Send this page to a friend ]

**Related jobs**

Secondary Market Processor
Secondary Market Processor We are recruiting for a Scondary Market Processor on a
basis. Will be receiving closing packets and make sure all documents have ...

**Compliance Officer
(JCD)**
Position Type: Full Time
Large financial services
institution with offices
located in East Memphis ...

Project Specialist -Service Engineering Paper
The Citi brand is recognized as the prominent financial-services company in the world.
the largest issuer of credit cards in the United States and the most ...

Retirement Plans Coordinator
Retirement Plans Coordinator Our client has a Full Time, permanent opening as Retire
Coordinator. Individual will ensure accurate and timely processing of ...

Audit Manager
Position Description: Eide Bailly LLP, a progressive top 25 regional consulting and cert
accounting firm is seeking an audit manager for its Aberdeen, SD, ...

**Buyer**
Position Type: Temporary
to Full Time A local
manufacturer is seeking a
purchasing associate to ...

Senior MIS Analyst - Ops Risk Compliance And Control
The Citi brand is recognized as the prominent financial-services company in the world.
the largest issuer of credit cards in the United States and the most ...

Controller - Construction
Award winning Residential/Commercial construction seeks Controller. An award winnir
residential and commercial construction companyin Sioux Falls seeks to add a ...

Analyst - Capacity Planning Paper
The Citi brand is recognized as the prominent financial-services company in the world.
the largest issuer of credit cards in the United States and the most ...

**Entry Level Staff
Accountant**
Position Type: Full Time
EXCLUSIVE ROBERT HALF
OPPORTUNITY. Growing
retail-based company is ...

Mortgage Office Manager
Position Type: Full Time Growing regional Mortgage Company seeks experienced Offi
Strong background in consumer credit and loan processing and demonstrated ...

Public Accounting Audit Manager
Position Type: Full Time Rapidly expanding regional accounting firm has a terrific oppo
experienced audit manager. This firm is gaining additional ...

Contract Manager Food & Beverage Sourcing
About Us Harrah's Entertainment means winning. And it's our employees who make th
experience possible for our guests. So it's only natural that we would ...

## Related press releases

### Courageous reform
There can be little doubt we are making progress when it comes to improving further ec
More young people and adults than ever are gaining good qualifications ever...

### Half of MG Rover workers want to return
Almost a year after the collapse of MG Rover, many former workers are paid less and v
worked for the firm, according to a report released today. Of the nea...

### Making ends meet
Earning some dosh to get through uni might seem unavoidable, but don't lose sight of tl
you are there: to get a degree. Earning shouldn't mean missing vital lectu...

### Young, successful, well paid: are they killing feminism?
Chiara Cargnel wants to have it all: a high-flying career and a successful marriage. So t
halfway there. At 26, she is an investment banker in London working ove...

### The earth man cometh
I am merely the conduit,' says Patrick Holden, director of the Soil Association, when I a:
sum up his achievement after 10 years in the job. 'The great thinkers, ...

### Battle at the coalface
In his television review Rupert Smith described the NUM miners leader Arthur Scargill a
little man who needed to be trodden on" (G2, March 23). I suppose he w...

### Hutton eases small firms' pension fears
The government will not force employers to contribute to workers' pensions without mal
minimise the impact on firms, the work and pensions secretary, John H...

### NHS hospital redundancies gather pace
A wave of redundancies across the NHS in England gathered force yesterday when a L
teaching hospital announced that nearly 500 posts will be axed in an attempt to di...

### Union warning over 'raw' stalls handlers
The Transport and General Workers Union (T&G) yesterday launched a fierce attack or
standard of the stalls handlers likely to be working at British racecourse...

### Minimum wage to rise to £5.35
The minimum wage will rise by 6% in October to £5.35, the government confirmed yest
cautioned that the days of big, inflation-beating rises may be over...

---

0.244

Archive: All jobs - Links

Copyright (c)2006 Ehrcweb.org/jobs - All rights reserved

# TAB G

# REDACTED IN ITS ENTIRETY

# TAB H

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2006 WL 3462596 (D.Del.)
(Cite as: Slip Copy)

**H**
**Cantor** v. Perelman
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Ronald **CANTOR**, Ivan Snyder and James A.
Scarpone, as Trustees of the Mafco Litigation Trust,
and as Successors in Interest to the Marvel
Entertainment Group, Inc., et al., Plaintiffs,
v.
Ronald O. PERELMAN, et al., Defendants.
**No. CIVA 97-586 KAJ.**

Nov. 30, 2006.

Lawrence C. Ashby, Philip Trainer, Jr., Tiffany
Geyer Lydon, Ashby & Geddes, Wilmington,
Delaware, for Plaintiffs, Edward A. Friedman,
Andrew W. Goldwater, Daniel B. Rapport, Jonathan
Gottfried, Friedman Kaplan Seiler & Adelman LLP,
New York, NY, of counsel.
Thomas J. Allingham II, Anthony W. Clark, Paul J.
Lockwood, Skadden, Arps, Slate, Meagher & Flom
LLP, Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION
JORDAN, J.

I. INTRODUCTION

*1 Presently before me are two motions to exclude
expert testimony. Defendants, Ronald O. Perelman,
Mafco Holdings Inc., MacAndrews & Forbes
Holdings Inc., Andrews Group Inc., William C.
Bevins, and Donald G. Drapkin (collectively,
"Defendants"), filed a Motion to Exclude the Expert
Testimony of Bevis Longstreth, William H. Purcell,
Andrew S. Carron, Jeffrey L. Baliban, and Portions
of the Testimony of Justice Joseph T. Walsh, Ret.
(Docket Item ["D.I."] 466.) Plaintiffs, Ronald Cantor,
Ivan Snyder, and James A. Scarpone (collectively,
"Plaintiffs"), filed a Motion to Exclude the
Testimony of Lawrence A. Hamermesh and Certain
Opinions of Robert W. Holthausen. (D.I.470.)
Jurisdiction is proper under 28 U.S.C. § 1334. For
the reasons that follow, both Motions will be granted
in part and denied in part.

II. BACKGROUND [FN1]

FN1. The following background information
is taken from the parties' submissions and
does not constitute findings of fact.

Plaintiffs are the trustees of the MAFCO Litigation
Trust, which was created according to the plan of
reorganization in the bankruptcy cases of Marvel
Entertainment Group, Inc. ("Marvel") and its
affiliates, in order to pursue Marvel's claims against
Defendants. (D.I. 471 at 7; see also D.I. 467 at 1.)
Defendant Ronald O. Perelman ("Perelman") was the
controlling shareholder and Chairman of the Board of
Marvel. (D.I. 471 at 7.) Perelman's controlling share
of Marvel stock was held by a chain of corporations
wholly-owned by Perelman (the "Marvel Holding
Companies"). (Id.) The other individual defendants,
William C. Bevins and Donald G. Drapkin, served as
directors of Marvel and, along with Perelman,
comprised the entire board of directors of each of the
Marvel Holding Companies. (D.I. 469 at A182; see
also D.I. 471 at 7.)

In 1993 and 1994, Defendants caused the Marvel
Holding Companies to issue three tranches of notes
(the "Notes"), which raised S553.5 million. (D.I. 471
at 8.) The Notes were secured by pledges of the
Marvel stock held by the Marvel Holding
Companies. (D.I. 467 at 1.) In the Notes, the Marvel
Holding Companies promised to prevent Marvel
from engaging in certain forms of corporate financing
(the "Restrictions"). (D.I. 471 at 8.) The Restrictions
prohibited Marvel from issuing certain types of debt
unless specific financial ratios were met, from issuing
any preferred stock except under specified
circumstances, and from diluting Perelman's majority
share of Marvel voting stock. (D.I. 469 at A110-11;
see also D.I. 467 at 1.) Plaintiffs allege that
Defendants breached their fiduciary duties by
including those Restrictions in the Notes and by
using Marvel's corporate resources to sell the Notes.
(D.I. 471 at 8.)

Plaintiffs filed their complaint on October 30, 1997.
(D.I.1.) The case was subsequently referred to
Magistrate Judge Mary Pat Thynge. (D.I.262.) Judge
Thynge issued a report in the form of a Memorandum
and Order on December 9, 2002, recommending that
summary judgment for Plaintiffs be denied and that
summary judgment for Defendants be granted in part.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(D.I. 467 at 1; D.I. 384.) On February 18, 2004, I adopted Judge Thynge's report in all respects. (D.I. 467 at 1; D.I. 404.) On July 12, 2005, the United States Court of Appeals for the Third Circuit reversed the grant of summary judgment for Defendants with respect to the unjust enrichment claims and some of the damage claims, affirmed the denial of summary judgment for Plaintiffs, and remanded the case for further proceedings. _Cantor v. Perelman,_ 414 F.3d 430, 442 (3d Cir.2005). In accordance with the decision of the Third Circuit, I ordered the parties to identify any additional expert testimony on or before January 13, 2006, and to file any objections to such testimony no later than June 1, 2006. (D.I. 430 at 1-2.)

### III. STANDARD OF REVIEW

*2 Motions to exclude expert testimony are committed to the court's discretion. _See Jaasma v. Shell Oil Co.,_ 412 F.3d 501, 513 (3d Cir.2005) (holding that the decision to admit or reject expert testimony is reviewed under an "abuse of discretion" standard). To be considered an abuse of discretion, the court's decision must be "arbitrary, fanciful, or clearly unreasonable." _Stecyk v. Bell Helicopter Textron, Inc.,_ 295 F.3d 408, 412 (3d Cir.2002).

### IV. DISCUSSION

Federal Rule of Evidence 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 obligates judges to ensure that all expert testimony is relevant and reliable. _Kumho Tire Co. v. Carmichael,_ 526 U.S. 137, 147 (1999). An expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation. _See Gen. Elec. Co. v. Joiner,_ 522 U.S. 136, 144 (1997) (noting failure of respondent to explain "how and why the experts could have extrapolated their opinions"); _cf. Kumho Tire,_ 526 U.S. at 152 (an expert must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant

field"); _Daubert v. Merrell Dow Pharms., Inc.,_ 509 U.S. 579, 590 (1993) (expert testimony "must be supported by appropriate validation"). The court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." _Heller v. Shaw Indus., Inc.,_ 167 F.3d 146, 153 (3d Cir.1999). Further, Rule 702 requires that expert testimony assist the trier of fact. In other words, it must "fit" the issues in the case by having a valid connection to the pertinent inquiry. _Daubert,_ 509 U.S. at 591-92.

### A. Proposed Testimony of Professor Lawrence A. Hamermesh and Justice Joseph T. Walsh, Ret.

Plaintiffs argue that the expert report of Professor Lawrence A. Hamermesh should be excluded because it merely provides his interpretation of Delaware corporate law. (D.I. 471 at 15-16.) Similarly, Defendants seek to exclude some of the testimony of Justice Joseph T. Walsh, Retired, on the grounds that it constitutes an impermissible legal opinion. (D.I. 467 at 10.) While Plaintiffs apparently concede that the testimony of both experts should either be admitted or excluded in their entirety (D.I. 478 at 25), Defendants attempt to distinguish the opinions offered by Professor Hamermesh and Justice Walsh (D.I. 467 at 11-13). Defendants contend that Professor Hamermesh only discusses whether Delaware law would permit the Marvel board of directors to dilute the position of a majority shareholder, whereas Justice Walsh also opines on whether Defendants breached their fiduciary duties. (_Id._ at 12.) Defendants claim that Professor Hamermesh's opinion is admissible because he addresses an issue of law that serves as a "fact" in this case. (_Id._) On appeal, the Third Circuit held that Plaintiffs "should at least have the opportunity to establish through expert testimony what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without compensation." _Cantor,_ 414 F.3d at 437. Defendants assert that Professor Hamermesh's legal opinion is a "fact" because it is necessary to construct the hypothetical bargaining described by the Third Circuit. (D.I. 467 at 12.) Defendants contend that, in analyzing the cost of a restriction that would prevent Marvel from diluting a majority shareholder, the board would have considered whether, even without that restriction, it would have been permitted under Delaware law to dilute a majority shareholder. (_Id._) For that reason, one of Defendants' other experts, Peter A. Fowler, relies on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Professor Hamermesh's opinion in assessing the outcome of the hypothetical bargaining process. (D.I. 469 at A120, ¶ 24.) Therefore, Defendants propose that both Professor Hamermesh and Justice Walsh should be permitted to testify as to the ability of a board of directors to dilute a majority shareholder, but not as to the law that governs Defendants' fiduciary duties. (D.I. 467 at 13.)

**\*3** Each party appears to admit that their own expert offers a legal opinion regarding the proper interpretation of Delaware corporate law. (*Id.* at 12 (Defendants arguing that "Hamermesh's legal opinion is needed in order to construct the hypothetical bargaining"); D.I. 478 at 25 (Plaintiffs explaining that "Hamermesh and Walsh do have a significant disagreement concerning the proper interpretation of Delaware law").) The expert reports submitted by Professor Hamermesh and Justice Walsh confirm that they indeed focus on issues of law. Professor Hamermesh's report reviews the relevant case law (D.I. 469 at A170-72, ¶¶ 6-9), and concludes that "the practice and effect of Delaware corporate law as of the period from 1993 to 1996 largely duplicated the indirect effect of Section 4.09(a) of the indentures limiting Marvel's ability to issue shares to reduce the Marvel Holding Companies' ownership of Marvel voting stock to less than a majority" (*id.* at A172, ¶ 10). Justice Walsh also conducted an analysis of Delaware case law (*id.* at A279-84, ¶¶ 9-18), but reached a different conclusion, namely that "where ... directors are motivated not by an intention to dilute control but by the desire to protect the interests of the corporation and its minority shareholders, they could properly cause the issuance of additional equity even if that issuance had the effect of diluting majority control" (*id.* at A283, ¶ 16). The Third Circuit has specifically instructed the district courts to "ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 217 (3d Cir.2006). Since that is precisely the character of the proposed testimony of Professor Hamermesh and Justice Walsh, it cannot be admitted.

Part of the Third Circuit's holding in *Berckeley* is based on concern that an expert not "usurp the District Court's pivotal role in explaining the law to the jury." 455 F.3d at 217. But jury confusion is not the only rationale for the rule. The point of Rule 702 is to allow evidence that will assist the fact finder. Despite the outstanding qualifications of both Justice Walsh and Professor Hamermesh, I will not be assisted in my role as fact finder in this bench trial by hearing the law explained from the witness stand.

The able attorneys on both sides of this case can articulate the law in their arguments and post-trial briefing. This is simply not a case where the weight to be given proposed expert testimony is in question and hence determining admissibility might usefully be delayed. *Cf. Chase Manhattan Mortgage Corp. v. Advanta Corp.,* C.A. No. 01-507-KAJ, 2004 WL 422681 at \*9-10 (D.Del. Mar. 4, 2004) (denying motion to exclude expert testimony in a bench trial so that judgment on the weight, if any, to be given to that testimony could be made on a more complete record). There is no benefit to delaying decision on admissibility here.

**\*4** Defendants have failed to establish that the general rule prohibiting experts from offering legal opinions should not be applied to Professor Hamermesh. In support of their argument that his testimony serves as a "fact" in this case, Defendants cite to *Askanase v. Fatjo,* 130 F.3d 657, 672-73 (5th Cir.1997), for the proposition that "[l]awyers may testify as to legal matters when those matters involve questions of fact." (D.I. 467 at 12.) However, Defendants' reliance on *Askanase* is misplaced. In explaining what it meant by the phrase "questions of fact," the Fifth Circuit gave the example of a lawyer who was permitted to testify that the language in a boilerplate contract was standard. *Askanase,* 130 F.3d at 673. That example does not support Defendants' position that, in some circumstances, a lawyer can testify as to his interpretation of the law involved in the case. In contrast, the Fifth Circuit actually cautions that "if an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position." *Id.* That is exactly what the parties have done here.

Defendants also claim that the "law as fact" exception is demonstrated by decisions of the Delaware Court of Chancery that permitted experts to testify as to the likely outcome of related litigation. (D.I. 475 at 19-20 (citing *Onti, Inc. v. Integra Bank,* 751 A.2d 904, 931-32 (Del. Ch.1999)); D.I. 481 at 19 (citing *In re The Walt Disney Co. Derivative Litig.,* 907 A.2d 693, 743 (Del. Ch.2005)).) Again, Defendants' argument is unpersuasive. The Chancery Court did not allow experts to simply explain the law. Rather, the experts offered opinions about likely outcomes based on factual assumptions. *See, e.g., In re The Walt Disney Co. Derivative Litig.,* 907 A.2d at 744. That type of expert testimony is akin to that of Defendants' expert Peter A. Fowler, who explains how the law would affect the outcome of a hypothetical negotiation between Defendants and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Marvel board of directors. (D .I. 469 at A120-21, ¶ 24; *id.* at A138-39.) Despite Defendants' contentions, Fowler can explain, without Professor Hamermesh's legal opinion, how any limit that Delaware law places on the ability of a board to dilute a majority shareholder would play a role in the negotiations. I will decide whether any such limitation actually exists under Delaware law. Accordingly, I will grant Plaintiffs' Motion to exclude the testimony of Professor Hamermesh, and I will grant Defendants' Motion to exclude the testimony of Justice Walsh.[FN2]

> FN2. Even though Defendants only moved to exclude portions of Justice Walsh's testimony (D.I. 467 at 13), Plaintiffs concede that the opinions of Professor Hamermesh and Justice Walsh cannot be distinguished (D.I. 478 at 25). Therefore, both will be excluded in their entirety.

B. Proposed Testimony of Robert W. Halthausen

Plaintiffs assert that the opinion offered by Robert W. Halthausen for Defendants on the issue of damages should be excluded because it is not relevant. (D.I. 471 at 19-20.) According to Plaintiffs, Halthausen calculated damages based on the expected costs of Marvel's financial distress at the time the Notes were issued. (*Id.* at 21.) Plaintiffs contend that, in this case, damages should include any injuries that occurred subsequent to the issuance of the Notes. (*Id.* at 22.) More specifically, Plaintiffs believe that damages should be measured by the difference between the financial distress actually sustained by Marvel and that which it would have sustained "but for" Defendants' breach of fiduciary duty. (*Id.*)

*5 Regardless of whether Plaintiffs' proposed method of calculating damages is appropriate in this case, their theory depends on a finding that Marvel's subsequent financial distress was proximately caused by Defendants' conduct. (*Id.* at 24 ("as long as the harm that Marvel sustained was proximately caused by the Indenture Covenants, its recovery is not limited by the extent to which such injury was 'expected' at the time that the defendants breached their duties").) In the course of arguing that the testimony of their own damages expert, William H. Purcell (*see infra* at 18-20), should be admitted, Plaintiffs stated that, "[t]o the extent defendants believe that there was some superseding or intervening cause why Marvel's equity became worthless, they can present evidence or cross-examine Purcell." (D.I. 478 at 12 n. 5.) Since

Plaintiffs admit that their theory of damages is dependent on proof of causation and that causation is an issue for trial, it would be inappropriate for me decide, at this stage in the proceedings, to apply their measure of damages and reject Defendants' approach. Accordingly, I will deny Plaintiff's Motion to exclude the testimony of Halthausen.

C. Proposed Testimony of Bevis Longstreth

Defendants move to exclude the testimony of Bevis Longstreth on several grounds. First, Defendants contend that portions of Longstreth's initial expert report are inadmissible legal opinions. (D.I. 467 at 15.) In his initial report, Longstreth purported to answer eight questions submitted by Plaintiffs' counsel (D.I. 469 at A181, A205-07), and Defendants claim that his answers to five of those questions should not be admitted (D.I. 467 at 15-16). Defendants' position is that Longstreth attempted "to dress up legal conclusions as facts." (*Id.* at 19.) In response, Plaintiffs argue that Longstreth provided permissible testimony regarding the customs and practices of the directors of a Delaware corporation. (D.I. 478 at 21.)

Plaintiffs have identified a proper, if somewhat subtle and occasionally difficult, distinction. While a witness cannot testify as to the law governing a case, expert testimony concerning business customs and practices is allowed. *United States v. Leo,* 941 F.2d 181, 196 (3d Cir.1991). However, given that the present case involves allegations that Defendants breached their fiduciary duties, it is important to note that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley,* 455 F.3d at 218.

In general, the portions of Longstreth's initial report that are being challenged by Defendants discuss the process by which a company such as Marvel would handle a transaction involving an interested director. (*See id.* at A181-85, A187.) This is permissible testimony concerning the business customs and practices of a corporation. On at least one occasion, though, Longstreth comes too close to offering a legal opinion. For example, he states that, "[a]s an independent director, it would be obvious to me that Perelman could not be expected to discharge his fiduciary duty to Marvel as both its controlling shareholder and as a director, while at the same time

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

seeking to restrict Marvel's ability to conduct its affairs in order to sell the Notes and secure the net proceeds therefrom for himself personally, without any benefit to Marvel." (*Id.* at A184.) Testimony as to a breach of fiduciary duty will not be admitted. Nevertheless, Longstreth's initial report is still distinguishable from those submitted by Professor Hamermesh and Justice Walsh, which more plainly consist of legal opinions. Because this is a bench trial and I will not be influenced by a witness' view of the law, I will not exclude large portions of Longstreth's otherwise admissible testimony on the basis that a few statements in his initial report may address issues of law. I will rely on counsel for Defendants to renew their objection, if Longstreth's testimony at trial strays into the realm of purely legal opinion.

**\*6** Defendants argue that even the portions of Longstreth's initial report that focus on business customs and practices should be excluded because the customs and practices of directors of Delaware corporations are defined by Delaware law. (D.I. 481 at 9.) This is certainly one of those instances where the line between admissible and inadmissible testimony may be difficult to determine. Nevertheless, and contrary to Defendants' assertion, the Third Circuit has held that it is permissible for an expert to testify, based on experience in the industry, as to how a company would operate under the law so long as "the expert ... [does] not give his opinion as to what was required under the law, or whether the defendant complied with the ... [law]." *Berckeley,* 455 F.3d at 218 (citing *Leo,* 941 F.2d at 197). Defendants claim that some of the customs and practices discussed in Longstreth's initial report are extremely similar to the requirements of Delaware corporate law. (D.I. 467 at 16-18.) However, Defendants have failed to identify any part of Longstreth's report in which he states that those customs and practices are required by law. That is a distinction with a meaningful difference, particularly where, as here, trial is to the bench and there is no risk of jury confusion. Indeed, the case law cited by Defendants is persuasive on this point. Defendants note that, in *In re The Walt Disney Derivative Litigation,* the Delaware Chancery Court acknowledged that an expert had simply couched an opinion about alleged breaches of fiduciary duties in terms of custom and practice. (D.I. 481 at 9 (citing *In re The Walt Disney Co. Derivative Litig.,* 907 A.2d at 740-41).) The Chancery Court therefore recognized what was less than helpful in the expert's opinion, even though the testimony was admitted at trial. *In re The Walt Disney Co. Derivative Litig.,* 907 A.2d at 740-41. Likewise in this case, Defendants raise an

issue of weight, not admissibility.[FN3]

> **FN3.** In the course of arguing that Longstreth's initial report contains inadmissible legal opinions, Defendants also assert that parts of his report are not relevant to the hypothetical negotiation that the Third Circuit permitted Plaintiffs to address on remand. (D .I. 467 at 19-20.) As discussed below, I will not exclude expert testimony for that reason. (*See infra* at 20-21.)

Defendants' next argument is that Longstreth's initial and rebuttal reports should be excluded under *Daubert v. Merrel Dow Pharms., Inc.,* 509 U.S. 579 (1993), because they are unreliable. (D.I. 467 at 21-22.) With respect to his initial report, Defendants claim that Longstreth provides no "objective, analytical process or methodology" to support his opinions. (*Id.* at 22.) Yet, the only specific deficiency identified by Defendants in their opening brief is that Longstreth fails to explain why the Restrictions would create a "bet the ranch" situation that, "depending on future events that ... could not reasonably [be] anticipate[d], might so restrict Marvel as to cause its demise." (*Id.* (quoting D.I. 469 at A186).) As would be expected, in their brief opposing Defendants' Motion, Plaintiffs explain the basis for that particular portion of Longstreth's report. (D.I. 478 at 14-16.) Defendants then respond by accusing Plaintiffs of focusing "on a snippet of his opinion that has at least some framework to it" (D.I. 481 at 5), an odd criticism since Plaintiffs were dealing with the snippet selected by Defendants. Defendants admit that, "[w]ere this the full extent of Longstreth's opinion, ... [they] would not have made this motion because, on this small point only, Longstreth has explained the basis for his conclusion, and cross-examination is, therefore, readily available." (*Id.*) Since that "small point" is the only part of Longstreth's initial report that Defendants address in any detail, their argument essentially consists of their conclusory assertion that "the remainder of his analysis, and his conclusion, are either speculative and unreliable or legal opinions." (*Id.*) I will not exclude Longstreth's initial report based on such a general allegation.

**\*7** Defendants also contend that Longstreth's rebuttal report, which critiques Fowler's analysis of the hypothetical negotiation, is unreliable because it is based on Longstreth's *ipse dixit* assertions. (D.I. 467 at 22.) Again, Defendants have selected a small portion of his report and claim that it is unsupported.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants focus on the following statement from Longstreth's rebuttal report: "As to benefits, the wealth extraction from Marvel accrued solely to the benefit of Ronald O. Perelman. Nothing of benefit accrued to Marvel or its minority shareholders." (*Id.* at 23 (citing D.I. 469 at A210).) Since Plaintiffs' counsel informed Longstreth that the Marvel Holding Companies, which are owned by Perelman, received the entire $553.5 million from the Notes (D.I. 469 at A203), I do not find this statement to be so unreliable as to warrant excluding testimony based upon Longstreth's rebuttal report. [FN4] Defendants also argue that Longstreth's rebuttal opinion is unreliable because he failed to address Fowler's analysis of the financial alternatives to issuing the Notes. (D.I. 467 at 23.) However, Defendants have not established that, for a rebuttal expert's testimony to be admissible, it must address every factor taken into account by the opposing expert. Thus, if Longstreth did in fact fail to consider the alternatives set forth in Fowler's report, it is not an issue of admissibility, but one of the weight that should be given to Longstreth's opinion.

> FN4. I emphasize that I relate here only what I understand to be a factual assumption upon which Longstreth was relying; I am not stating any factual or legal conclusion of my own.

I now turn to Defendants' more general proposition that both of Longstreth's reports are unreliable because they are supported only by his personal experience. (*Id.* at 24-25; D.I. 481 at 8.) Defendants contend that expert testimony is routinely excluded when it is based entirely on experience and judgment, and not an identifiable methodology. (D.I. 467 at 24-25; D.I. 481 at 8.) However, no such bright line rule exists. To the contrary, the Supreme Court has acknowledged that experts may base their testimony upon personal experience. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999) (explaining that the purpose of *Daubert* "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). Particularly telling is the Advisory Committee's explanation of the 2000 Amendment to Rule 702:
Nothing in this amendment is intended to suggest that experience alone-or experience in conjunction with other knowledge, skill, training or education-may not provide a sufficient foundation for expert testimony.

To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.

Fed.R.Evid. 702 advisory committee's note. Accordingly, Longstreth's experience as a corporate lawyer and his service on several boards of directors (D.I. 469 at A180) can form the basis for reliable expert testimony in this case.

*8 Defendants also argue that Longstreth's experience-based opinions are unreliable because they do not satisfy any of the Third Circuit's modified *Daubert* factors. (D.I. 467 at 26.) However, Defendants' reading of the law is stricter than required. The Supreme Court explained that the *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire,* 526 U.S. at 151. Similarly, the Third Circuit has recognized that while the general requirement of reliability set forth in *Daubert* applies to all expert testimony, the "list of specific factors would often be of little use in evaluating non-scientific expert testimony." *United States v. Davis,* 397 F.3d 173, 178 (3d Cir.2005).

To support their position, Defendants point to several cases in which experience-based testimony was excluded as unreliable. (D.I. 467 at 26; D.I. 481 at 8.) That case law highlights a critical distinction. In *Oddi v. Ford Motor Co.,* 234 F.3d 136 (3d Cir.2000), a case cited by Defendants, an engineer offered his expert opinion that the front bumper of a particular truck would have been able to sustain the impact of a guardrail if it had been strengthened with either bracketry or wedge supports. *Id.* at 158. The opinion was excluded because the expert "conducted no tests" and used "little, if any, methodology beyond his own intuition." *Id.* An important basis for that conclusion is that vehicle design is a testable hypothesis that can be demonstrated using an identifiable methodology. *See id.* (explaining that the expert could have, but did not, test the vehicle design under accident conditions or calculate the forces that could have been sustained by the truck bumper and guardrail at impact). In fact, the Third Circuit noted that "[a]lthough there may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it, this is not such a case." *Id.*

An illustration of that distinction is *Berckeley,* in which the Third Circuit held that a former corporate

Slip Copy
Slip Copy, 2006 WL 3462596 (D.Del.)
(Cite as: Slip Copy)

lawyer could testify as to business customs and practices in the securities industry, based on her experience as counsel for the SEC. 455 F.3d at 218; see also Davis, 397 F.3d at 179 (holding that a police officer's opinion concerning the methods of operation of drug traffickers was sufficiently reliable based solely on his years of experience). Longstreth's opinion on the customs and practices of corporate directors is similar to the experienced-based testimony that the Third Circuit has approved, because the opinions expressed are not subject to proof by a particular methodology.

Although Defendants have failed to establish that I should entirely exclude Longstreth's testimony, they have identified another portion of that proposed testimony with which I do have concern. After critiquing Fowler's analysis of the hypothetical negotiation, Longstreth opined that "the fee suggested by Mr. Fowler would have been flatly unacceptable to Marvel," and that "the consideration that Marvel would have required would likely have been in the order of magnitude of $150 million." (D.I. 469 at A212.) Other than his opinion that, given the risks to Marvel, Fowler's proposed fee was too low, Longstreth offers no basis for his conclusion that $150 million would be an appropriate amount. (Id.) In fact, Longstreth admitted that it was a "ballpark judgment." (Id. at A312, 150:13-18.) Since I can discern no other grounds for the particular figure submitted by Longstreth, I have serious concerns about its reliability. On balance, however, I am persuaded that, in the particular circumstances of this bench trial, the testimony need not be excluded at this time.[FN5]

> FN5. Plaintiffs should be aware that they will not be permitted to establish a basis for Longstreth's opinion at trial unless they complied with the disclosure requirements of Fed.R.Civ.P. 26.

**\*9** Finally, Defendants claim that Longstreth is not qualified to offer an opinion about the outcome of the hypothetical negotiation. (D.I. 467 at 28.) Defendants base their argument on what they believe to be an admission by Longstreth that he lacks the financial expertise to conduct such a financially complex negotiation. (Id.) But there is no such admission. When asked whether he would be a suitable candidate for the board to hire as a financial advisor on the negotiation, Longstreth explained that he would not, but only because he would be providing the legal advice, and he felt that the board should hire

an independent financial expert. (D.I. 469 at A306, 32:14-23.) Longstreth never stated that he lacked the financial expertise necessary to assess the outcome of the hypothetical negotiation. Rather, Longstreth explained that, based on his experience giving both legal and financial advice, he is an expert in analyzing the "structures of a financing transaction." (Id. at A306, 32:2-13.) Therefore, Defendants have failed to demonstrate that Longstreth was unqualified to discuss the financial aspects of the hypothetical bargaining process. Accordingly, since I do not find any of Defendants arguments to be persuasive, I will deny Defendants' Motion to exclude Longstreth's testimony.

### D. Proposed Testimony of William H. Purcell

Defendants seek to exclude testimony based upon the three expert reports of William H. Purcell, on the ground that his opinions are based entirely on experience and not on any particular methodology or objective criteria. (D.I. 467 at 28-29.) As previously discussed, merely asserting that an expert relied on personal experience in forming an opinion is insufficient to demonstrate that the opinion is inadmissible. (See supra at 14-16.) Since Defendants provide no further explanation as to why Purcell's initial expert report is unreliable, I will not exclude that report.

Defendants claim that Purcell's rebuttal report is inadmissible because he fails to provide an adequate basis for his opinion that, "based on my experience as an investment banker, the target capital structure for a company such as Marvel would have been no more than 30% debt and at least 70% equity." (D.I. 467 at 29 (emphasis added by Defendants).) Defendants allege that Purcell simply "made up" that ratio, and it is inadmissible because it is not based on a "testable hypothesis" or "standards controlling the technique's operations." (Id. at 30-31.) However, Purcell's assessment of Marvel's likely capital structure in the absence of the Restrictions is supported by several principles of corporate finance set forth in his rebuttal report. (D.I. 469 at A254-55.)

In particular, Purcell's opinion rests on the principles that "it is best to finance long-term assets with long-term debt or equity," that "it is best to stretch out one's debt maturity schedule over as long a period of time as possible," and that "one should avoid over-reliance on short-term commercial paper or commercial bank debt." (Id.) Thus, though one may attack the soundness or applicability of the principles

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3462596 (D.Del.)
(Cite as: Slip Copy)

cited, it is not accurate to say Purcell provided an inadequate basis for his conclusion that Marvel should have had a higher percentage of equity than debt. Defendants also point out that Purcell admitted that the actual ratio "is an order of magnitude judgment." (*Id.* at A315, 125:15-25.) However, I will not exclude Purcell's testimony solely because he failed to explain how he determined that exact ratio. It is clear from Purcell's report that the ratio of 30% debt to 70% equity is an experience-based estimate given for purposes of comparison with Marvel's actual debt-to-equity ratio. (*See id.* at A259.)

**\*10** Finally, Defendants argue that the measure of damages in Purcell's supplemental report should be excluded because it is simplistic and lacks the methodological rigor required by *Daubert.* (D.I. 467 at 32.) Critical to Purcell's damages calculation was that on November 12, 1996, a corporation wholly-owned by Perelman refused to invest funds in Marvel unless the Restrictions in the Notes could be amended. (D.I. 469 at A275.) Purcell calculated damages by multiplying the price that the common shares of Marvel closed at on November 11, 1996, the day before Perelman's announcement, by the number of outstanding shares prior to Marvel's bankruptcy petition in late December 1996. (*Id.*) Defendants criticize this calculation because it assumes that the drop in stock price and eventual bankruptcy is due entirely to the Restrictions, and, thus, it fails to account for other possible causes. (D.I. 467 at 32.) While Defendants may disagree with Purcell's method, they have not shown that it is so unsustainable as to render his testimony inadmissible. Again, the argument more properly goes to the weight of Purcell's opinion, not its admissibility. Accordingly, I will deny Defendants' Motion to exclude the testimony of Purcell.

### E. Proposed Testimony of Andrew S. Carron and Jeffrey L. Baliban

Defendants move to exclude testimony based upon the expert reports of Andrew S. Carron and Jeffrey L. Baliban on the grounds that those reports were not timely submitted. (D.I. 467 at 34.) Defendants contend that, based on Plaintiffs' representations during a teleconference on September 9, 2005, the Scheduling Order (D.I.430) of October 18, 2005 that allowed the parties to submit additional expert testimony was limited to testimony which addresses the issue of "what the defendants would have had to pay Marvel, after arm's length bargaining, for the restrictions defendants secured without

compensation." (D.I. 467 at 34.) Thus, Defendants claim that because Carron and Baliban do not address that narrow issue, their reports are governed by the Scheduling Order of February 6, 2002 which required all expert testimony to be submitted by April 10, 2002. (*Id.* at 35.) Defendants argue that admitting the reports at this time would be prejudicial because they raise new theories of liability and remedy, and Defendants will not be able to make summary judgment motions on those issues. (D.I. 481 at 15.)

Defendants have failed to establish prejudice that would justify excluding the reports submitted by Carron and Baliban. Both reports were served by the deadline of January 13, 2006 for submitting additional expert testimony (*see* D.I. 459), as set forth in the Scheduling Order of October 18, 2006 (D.I.430). In response, Defendants served rebuttal expert reports with respect to both Carron and Baliban. (D.I. 469 at A111; D.I. 472 at Ex. 7, ¶ 2.) Defendants apparently also had the chance to depose Carron on April 7, 2006 (*see* D.I. 479 at B373) and Baliban on April 11, 2006 (*see* D.I. 469 at A297). Therefore, since Defendants have had a sufficient opportunity to address any issues raised in the expert reports of Carron and Baliban, I will deny Defendants' Motion to exclude those reports.

### V. CONCLUSION

**\*11** Accordingly, I will grant Plaintiffs' Motion to exclude the testimony of Professor Lawrence A. Hamermesh, and I will deny Plaintiffs' Motion in all other respects. I will grant Defendants' Motion to exclude the testimony of Justice Joseph T. Walsh, Retired, and I will grant Defendants' Motion to the limited extent that proposed testimony by Bevis Longstreth as to breaches of fiduciary duty will not be permitted at trial. In all other respects, however, I will deny Defendants' Motion. An appropriate order will follow.

### ORDER

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that Plaintiffs' Motion to Exclude Expert Testimony (D.I.470) is GRANTED as to Professor Lawrence A. Hamermesh and DENIED in all other respects. It is further ORDERED that Defendants' Motion to Exclude Expert Testimony (D.I.466) is GRANTED as to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3462596 (D.Del.)
**(Cite as: Slip Copy)**

Justice Joseph T. Walsh, Retired, and is GRANTED to the extent that Bevis Longstreth will not be permitted to opine regarding breaches of fiduciary duty; Defendants' Motion is DENIED in all other respects.

D.Del.,2006.
Cantor v. Perelman
Slip Copy, 2006 WL 3462596 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB I

Westlaw.

Rev. Proc. 2006-9, 2005 WL 3465554 (IRS RPR)
(Cite as: Rev. Proc. 2006-9, 2005 WL 3465554 (IRS RPR))

**H**
Rev. Proc. 2006-9, 2005 WL 3465554 (IRS RPR)

Internal Revenue Service (I.R.S.)
IRS RPR
Revenue Procedure

Released: December 19, 2005

**Section 482.--Allocation of Income and Deductions Among Taxpayers**

This procedure explains the manner in which taxpayers may request an advance pricing agreement (APA) from the APA Program within the Office of the Associate Chief Counsel (International), the manner in which such a request will be processed by the APA Program, and the effect and administration of APAs. Rev. Proc. 2004-40 superseded.

**TABLE OF CONTENTS**

**Section 1: Purpose**

**Section 2: Principles of the APA Program**

**Section 3: Prefiling Conferences**

**Section 4: Content of APA Requests**

**Section 5: Taxpayer Disclosure Obligations**

**Section 6: Processing of APA Requests**

**Section 7: Competent Authority Consideration**

**Section 8: Rollback of TPM**

**Section 9: Small Business Taxpayer APAs**

**Section 10: Legal Effect of the APA**

**Section 11: Administering the APA**

**Section 12: Renewing the APA**

**Section 13: Disclosure**

**Section 14: Effect on Other Documents**

**Section 15: Effective Date**

**Section 16: Paperwork Reduction Act**

**Drafting Information**

SECTION 1: PURPOSE

*.01* This revenue procedure explains the manner in which taxpayers may request an advance pricing agreement ("APA") from the APA Program within the Office of the Associate Chief Counsel (International), the manner in which such a request will be processed by the APA Program, and the effect and administration of APAs. This revenue procedure updates and supersedes Revenue Procedure 2004-40, 2004-2 C.B. 50.

SECTION 2: PRINCIPLES OF THE APA PROGRAM

*.01* The APA Program provides a voluntary process whereby the Internal Revenue Service ("Service") and taxpayers may resolve transfer pricing issues under § 482 of the Internal Revenue Code ("Code"), the Income Tax Regulations ("the regulations") thereunder, and relevant income tax treaties to which the United States is a party in a principled and cooperative manner on a prospective basis. The APA process increases the efficiency of tax administration by encouraging taxpayers to come forward and present to the Service all the facts relevant to a proper transfer pricing analysis and to work towards a mutual agreement in a spirit of openness and cooperation. The prospective nature of APAs lessens the burden of compliance by giving taxpayers greater certainty regarding their transfer pricing methods, and promotes the principled resolution of these issues by allowing for their discussion and resolution in advance before the consequences of such resolution are fully known to taxpayers and the Service.

*.02* The APA Program's central goal is the prompt, proper, and fair resolution of APA requests and renewals consistent with the principles of sound tax administration.

*.03* The APA Program reserves the right not to accept an APA request or to terminate consideration of an APA request if the request or the continued

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

development of the case is contrary to the principles of sound tax administration.

*.04* An APA is an agreement between a taxpayer and the Service in which the parties set forth, in advance of controlled transactions, the best transfer pricing method ("TPM") within the meaning of § 482 of the Code and the regulations. The agreement specifies the controlled transactions or transfers ("covered transactions"), TPM, APA term, operational and compliance provisions, appropriate adjustments, critical assumptions regarding future events, required APA records, and annual reporting responsibilities.

(1) APAs are intended to supplement traditional administrative, judicial, and treaty mechanisms for resolving transfer pricing issues.

(2) Taxpayers formally initiate the process for APAs. Thereafter, APAs require discussions among the taxpayer, one or more associated enterprises, and one or more tax administrations, including the Service.

(3) Ordinarily, an APA is reached only on the proposed covered transactions. In some cases, however, the APA Program may require that the scope of the proposed covered transactions be expanded or contracted, or may determine that the TPM proposed by the taxpayer is not appropriate for some subset of the proposed covered transactions.

*.05* The taxpayer's participation in the APA process is entirely voluntary. In some cases, the Service may approach a taxpayer to discuss the advantages of an APA.

*.06* The APA Program is under the immediate supervision of a Director (the "APA Director") within the Office of the Associate Chief Counsel (International). The APA Director reports to the Associate Chief Counsel (International) who exercises general oversight over the APA Program. The APA Director, directly or by delegation, may take any action - not contrary to statute, regulation, or treaty - necessary to carry out the provisions of this revenue procedure. The APA Director may modify the provisions contained in this revenue procedure (for example, time limits or content of an APA request) if that modification would be consistent with sound tax administration.

*.07* Under the APA request procedure, the taxpayer proposes a TPM and provides data intended to show that the TPM constitutes the appropriate application

of the best method rule under the § 482 regulations. The Service, through an APA Team, evaluates the APA request by analyzing all relevant data and information submitted with the initial request and at any time thereafter.

*.08* Taxpayers may request a bilateral, multilateral, or, if appropriate, a unilateral APA. A bilateral or multilateral APA involves a request for an APA between the taxpayer and the Service, accompanied by a request for a mutual agreement between relevant competent authorities. A unilateral APA involves only an agreement between the taxpayer and the Service. Where possible, in the interest of sound tax administration and to ensure that no potential for double taxation results from an APA, an APA should be concluded on a bilateral or multilateral basis between the competent authorities through the mutual agreement procedure of the relevant income tax treaty or treaties.

*.09* The APA Policy Board establishes policy on matters of substantial genuine importance pertaining to the APA Program. It consists of the Associate Chief Counsel (International), the APA Director, the Director, International (Large and Mid-Size Business (LMSB) Operating Division), Treasury's International Tax Counsel, and other senior officials.

*.10* In a bilateral or multilateral case, the APA Program prepares a recommended negotiating position for the U.S. Competent Authority. The negotiating position serves as a basis for discussions with the relevant foreign competent authority or authorities under the mutual agreement article of the applicable income tax treaty or treaties. Prior to finalizing its recommendation, the APA Program, through the Team Leader (see section 6.03), conveys the substance of the APA Team's position to the taxpayer to provide an opportunity for the taxpayer to comment. The Team Leader, in coordination with other members of the APA Team, considers the merits of the taxpayer's timely received comments in finalizing the recommended position.

*.11* If the U.S. Competent Authority and the relevant foreign competent authority or authorities reach a mutual agreement, the taxpayer and the Service may execute one or more APAs consistent with that mutual agreement.

*.12* In appropriate cases, the TPM may be applied to tax years prior to those covered by the APA ("rollback" of the TPM, see section 8). The Service's policy is to use rollbacks whenever feasible based on the consistency of the facts, law, and available

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

records for the prior years. This policy does not apply to unilateral APA requests in which a rollback would decrease taxable income on a return filed for a taxable year not covered by the APA (see § 1.482-1(a)(3)).

.13 Filing an APA request does not suspend any examination or other enforcement proceedings. The APA Program will coordinate its activities with those of other Service proceedings to avoid duplicative information requests to the taxpayer, enhance the efficiency of Service operations, and reduce overall taxpayer compliance burdens.

SECTION 3: PREFILING CONFERENCES

.01 General Principles

A taxpayer may request a prefiling conference ("PFC") with the APA Program to discuss informally the suitability of an APA.

.02 Discussion Topics

cols = 2colWidth = 25

| | |
|---|---|
| Voice: | |
| Facsimile: | |

cols = 2colWidth = 25

| | |
|---|---|
| Voice: | |
| Facsimile: | |

.04 PFC May be Named or Anonymous

The taxpayer may request a PFC either on an identified or anonymous basis.

.05 Participation

If a taxpayer identifies itself, representatives of the Service Operating Division with responsibility for the taxpayer's return normally will participate in the PFC. Representatives from Appeals and the Division Counsel field offices may also attend. In the case of a PFC regarding a bilateral APA request, a Competent Authority analyst may attend. If a taxpayer initially requests a PFC on an anonymous basis but prior to the meeting chooses to identify itself, the meeting may be rescheduled to permit necessary Service personnel to attend. When

The taxpayer may use a PFC to clarify what information, documentation, and analyses are likely to be necessary for the Service to consider an APA request. Among the areas of discussion are the covered transactions, the potentially applicable TPMs, the probability of agreement among the competent authorities, and the APA Program's schedule and method for coordinating and evaluating the request. To provide for the efficient use of taxpayer resources, PFCs are recommended in order to ensure that the APA request is appropriate and focuses on relevant issues.

.03 Scheduling

A taxpayer or its representative may contact the APA Program Office in Washington, D.C. or California to schedule a PFC. The taxpayer or its representative should propose three alternative dates, and should generally allow two weeks before the first proposed date. The telephone and facsimile numbers are:

**Washington, DC**

(202) 435-5220

(202) 435-5238

**California**

(949) 360-3486

(949) 360-3446

requesting a PFC on an identified basis, the taxpayer must inform the APA Program whether transactions similar or related to those to be covered by the proposed APA are currently under consideration by a Service Operating Division, an Appeals Office, a Division Counsel, or an Associate Chief Counsel.

.06 Prefiling Submission

A taxpayer must send a brief prefiling submission to the relevant APA Program Office in Washington, D.C. or California that lists the persons attending the PFC for the taxpayer (first names only or job titles are sufficient if the PFC will be on an anonymous basis) and that outlines and describes the issues to be discussed. This brief submission should be provided at least one week in advance of the PFC. If the document is twenty pages or less, it may be sent by facsimile; but if it exceeds twenty pages, eight

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

copies (or if anonymous, only three copies) and one original should be delivered.

## SECTION 4: CONTENT OF APA REQUESTS

### .01 Introduction

A complete APA request is essential to a timely and efficient APA process. In the APA Program's experience, a complete APA request may save many months of case processing time and hundreds of hours of labor, as it allows the APA Team to narrow its focus immediately to the core issue or issues and avoids delays caused by the need to supplement the original APA request. The goal of completing a unilateral APA or a recommended negotiating position within 12 months (see section 6.01) is predicated in large part on the assumption that the taxpayer has submitted a complete APA request.

A complete APA request should provide the information specified below and all other information reasonably necessary to permit the APA Program to evaluate fully the taxpayer's proposed TPM. The level of detail required will depend on the particular facts and circumstances of each case and should be governed by relevancy and materiality considerations (keeping in mind that the request should provide enough information to allow the reader to concur that a matter is not relevant or material). The detailed information supporting the APA request should be tailored to the specific facts relating to the taxpayer, the proposed covered transactions, and relevant legal authority. It should also take into account discussions with the APA Program in any PFC.

An APA request will normally be considered not "substantially complete" for purposes of sections 4.07, 4.12, 6.01, and 6.03 unless the request contains the information required below (as may be modified by agreement of the parties).

### .02 General Principles

(1) For purposes of requesting an APA, each taxpayer that is a member of a consolidated group (as defined in Treasury Regulations §  1.1502-1) must comply with the provisions of §  1.1502-77.

(2) All materials submitted with the APA request become part of the APA Program's case file and will not be returned. Therefore, taxpayers should not submit original documents.

(3) The taxpayer must submit copies of any documents relating to the proposed TPM. All materials submitted must be properly labeled, indexed, and referenced in the request. Any previously submitted documents that the taxpayer wishes to associate with the request must be referenced.

(4) If the records or documents to be submitted are too voluminous for transmittal with the request, the taxpayer must describe the contents of such items in the request and confirm that the items will promptly be made available upon request.

(5) All documents submitted in a foreign language must be accompanied by an accurate English translation.

(6) All documents in the APA request that are available in electronic format should be submitted, on either a CD-ROM or diskette, along with the paper submission. Suitable formats include Microsoft Word, Excel, PowerPoint, and Adobe Portable Document Format. Other formats may be arranged on a case-by-case basis.

### .03 Factual, Legal, and Analytical Items for All Proposed APAs

Unless otherwise agreed, each APA request must include an appropriate discussion of the items set forth below.

(1) A comprehensive table of contents.

(2) The names, addresses, telephone and facsimile numbers, taxpayer identification numbers (if applicable), and both the Standard Industrial Classification (SIC) and the North American Industry Classification System (NAICS) codes reported on the most recently filed federal tax returns (if applicable) of (a) the organizations, trades, and businesses engaging in the proposed covered transactions, and (b) the controlling taxpayer of the parties, if the controlling taxpayer is not itself engaging in the proposed covered transactions.

(3) The controlling taxpayer's industry (for example, Heavy Manufacturing and Transportation) within LMSB; or if the taxpayer files its tax returns with the Small Business/Self-Employed (SB/SE) Operating Division, a statement to that effect.

(4) A properly completed Form 2848 (*Power of Attorney and Declaration of Representative*) for any person authorized to represent the taxpayer in connection with the request, disregarding if appropriate the line 3 instruction limiting the authorization to three future tax periods. If the taxpayer or the taxpayer's authorized representative retains any other person (for example, a law firm, accounting firm, or economic consulting firm) to assist the taxpayer in pursuing the APA request, the taxpayer must also provide a separate written authorization for disclosures to the person and such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

person's employees during the APA Program's consideration of the request, according to the instructions in § 301.6103(c)-1T (see also T.D. 9011, 2002-2 C.B. 356, 31 C.F.R. Part 10 (July 26, 2002)). Such written authorization may be made by completing Form 8821 (*Tax Information Authorization*), disregarding, if appropriate, the line 3 instruction limiting the authorization to three future tax periods.

(5) A description of the general history of business operations, worldwide organizational structure, ownership, capitalization, financial arrangements, principal businesses, the place or places where such businesses are conducted, and major transaction flows of the parties to the proposed covered transactions. The description must also identify any branches or entities disregarded for tax purposes (see § 301.7701-3) that are involved in the proposed covered transactions.

(6) A description and analysis of the transactions covered by the APA request, as well as the estimated dollar value of each proposed covered transaction for each year of the proposed term of the APA. The discussion must also describe how the proposed covered transactions relate to other controlled transactions that the taxpayer does not propose to cover.

(7) A statement addressing the extent to which the tested party has transactions involving commission sales and ordinary distribution sales (*i.e.*, buying and reselling). If the APA request involves both kinds of transactions, the taxpayer must propose a TPM and analyze the extent to which it is appropriate under the facts and circumstances to (a) test both kinds of transactions on an aggregated basis; (b) test the two kinds of transactions separately; or (c) exclude one of the two kinds of transactions from the APA.

(8) For each party to the proposed covered transactions, a detailed analysis of:

(a) the functions and economic activities performed;

(b) the assets employed;

(c) the economic costs incurred;

(d) the risks assumed;

(e) relevant contractual terms;

(f) relevant economic conditions; and

(g) relevant non-recognition transactions.

(9) Copies of the principal written agreement(s), if any,

setting forth the contractual terms for the covered transactions (within the meaning of § 1.482-1(d)(3)(ii), including without limitation the form of consideration charged or paid); and an explanation of any significant discrepancy between the applicable written agreement(s) and the economic substance of the covered transactions (including payment form) to date and as proposed for the APA.

(10) Representative financial and tax data of the parties to the proposed covered transactions for the last three taxable years (or more years if relevant to the proposed TPM), together with other pertinent data and documents in support of the TPM. This item may include (but need not be limited to) data from the following:

(a) Form 5471 (*Information Return of U.S. Persons With Respect To Certain Foreign Corporations*);

(b) Form 5472 (*Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business*);

(c) income tax returns;

(d) financial statements;

(e) annual reports to stockholders;

(f) other pertinent U.S. and foreign government filings (for example, customs reports or SEC filings);

(g) existing pricing, distribution, or licensing agreements;

(h) marketing and financial studies;

(i) documentation prepared in consideration of § 6662(e); and

(j) company-wide accounting procedures, budgets, projections, business plans, and worldwide product line or business segment profitability reports.

(11) The functional currency of the parties to the proposed covered transactions and their respective foreign currency exchange risks.

(12) The taxable year of each party to the proposed covered transactions.

(13) A description of significant financial accounting methods employed by the parties that have a bearing on any proposed TPM.

(14) An explanation of any relevant financial and tax

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

accounting differences between the U.S. and the foreign countries.

(15) A discussion of any relevant statutory provisions, tax treaties, court decisions, regulations, revenue rulings, or revenue procedures that relate to the appropriateness of the proposed TPM for the requested APA. For cases in which the taxpayer requests a rollback, the discussion should state whether the period of limitations for the rollback years has expired in the U.S. or in foreign countries, and if not, when the periods of limitations do expire.

(16) (a) A statement describing all previous and current issues at the examination, Appeals, judicial, or competent authority levels that relate to the proposed TPM, including an explanation of the taxpayer's and the government's positions and any resolution of the issues.

(b) If the taxpayer is requesting a rollback that involves any issues relevant to the proposed covered transactions that are unresolved and still under consideration by Appeals, the taxpayer must include with its APA request a waiver of its right to be present during communications between the Appeals Office and the APA Team members (as described in section 6.04). See Rev. Proc. 2000-43, 2000-2 C.B. 404. The following language satisfies this requirement:

> Waiver of *Ex Parte* Communication: [Name of taxpayer(s)] agrees to the participation of the Appeals Office in the consideration of this APA request, and hereby waives its right to be present during, or participate in, communications related to the APA request or the proposed covered transactions between the Appeals Office and the APA Team members.

(17) A statement describing any APAs with, or rulings by, foreign tax authorities relating to the proposed covered transactions (or any pending requests for such APAs or rulings) and, if requested, copies of such APAs or rulings.

(18) An economic analysis or study of the general industry pricing practices and economic functions performed within the markets and geographical areas covered by the APA request.

(19) A list of the taxpayer's competitors and a discussion of any uncontrolled transactions, lines of business or types of businesses comparable or similar to those addressed in the request.

(20) An explanation of the proposed TPMs, including any method used to convert results from one payment form to another (*e.g.*, to convert from a lump sum to a contingent payment such as a sales-based royalty), and an

analysis of why each proposed TPM is the best method within the meaning of § 1.482-1(c).

(21) A detailed presentation of the research efforts and criteria used to identify and select possible independent comparables. This presentation should include a list of potential comparables and an explanation of why each was either accepted or rejected. The taxpayer may request an APA even though no comparable uncontrolled prices, transactions, or companies can be identified. In such cases, a taxpayer must demonstrate that the proposed TPM otherwise satisfies the requirements of § 482 and this revenue procedure.

(22) Detailed financial data (and licenses or other agreements, if applicable) on the selected independent comparables in print and electronic formats. For example, if the proposed TPM uses the comparable uncontrolled price (CUP) method, the comparable pricing information should be included; if the TPM uses the comparable uncontrolled transaction (CUT) method, the comparable license agreements should be included; and if the TPM uses the comparable profits method (CPM), the annual and multiple year period results using the selected profit level indicator should be included. If pertinent, the taxpayer should demonstrate consideration of alternative measurements of profitability and return on investment (for example, gross profit margin or markup, ratio of gross income to total operating expenses, net operating profit margin, or return on assets).

(23) A detailed explanation of any adjustments to the selected comparables, such as: accounting for product line segregations; differences in accounting practices; differences relating to functions, assets employed, risks assumed, and costs incurred; volume or scale differences; and differing economic and market conditions.

(24) An illustration of the application of each proposed TPM by applying the TPM, in a consistent format, to the prior three taxable years' financial and tax data of the parties to the covered transactions. If historical data cannot be used to illustrate a TPM (for example, when the TPM applies to a new product or business), the request should include an illustration based on projected or hypothetical data, as well as a description of the source of the data. If coverage of three taxable years is inappropriate for any reason, the taxpayer should provide data for an appropriate period and explain why the period was chosen.

*.04 Specific Items for a Cost Sharing Arrangement*

In addition to the items in section 4.03, an APA request related to a cost sharing arrangement ("CSA") must include:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) A copy of (a) the documents forming or revising the CSA, (b) the documents relevant to the making available of any pre-existing intangible property to the CSA), including the documents relevant to the acquisition or licensing of any pre-existing intangible property that is made available to the CSA, for purposes of research in the intangible development area, and (c) a statement that the CSA conforms to the requirements of § 1.482-7(b).

(2) A specific description of intangible development costs for all participants under the CSA. Such description should include a description of the costs included and excluded (for example, costs of technology acquired from third parties; the treatment of stock-based compensation under the CSA; non-product specific development costs; costs associated with abandoned projects; costs associated with specific stages of product development; relevant labor, material, and overhead costs; and support and administrative costs); a description of any services performed for participants that will be included in intangible development costs (for example, contract research) and how those services would be taken into account; and, for a representative period, a breakdown of total costs incurred, and the costs borne by each participant, according to the CSA.

(3) The basis (as described in § 1.482-7(f)(3)(ii)) used to measure anticipated benefits, the projections used to estimate benefits, and why such basis and projections yield the most reliable estimate of reasonably anticipated benefits.

(4) The method used to calculate each participant's share of intangible development costs; the reason why that method can reasonably be expected to reflect that participant's share of anticipated benefits; and a statement of the circumstances under which the participants' shares of intangible development costs will be adjusted to account for changes in economic conditions, business operations and practices, and the ongoing development of intangibles under the CSA.

(5) The accounting method used to determine the costs and benefits of the intangible development (including the method used to translate foreign currencies).

(6) Each participant's sales, cost of sales, operating expenses, research and development costs, and operating profit (historical for the five most recently completed taxable years and projected for two taxable years) for the product area covered by the CSA.

(7) A description of any amounts to be received from non-participants for the use of covered intangibles (for example, as a royalty pursuant to a license agreement) and

how the participants would take into account such amounts.

(8) Representative internal manuals, directives, guidelines, and similar documents prepared for purposes of implementing or operating the CSA (for example, research and development committee meeting minutes, market studies, economic impact analyses, capital expenditure budgets, engineering studies, reports and studies of trends and profitability in the industry, and financial analyses for financing and cash flow purposes).

(9) A description of any prior research undertaken in the intangible development area; the identification of any pre-existing intangible property made available to the CSA; the amount of any buy-in or buy-out payment (as defined in § 1.482-7(g)(2)); a complete economic analysis to support the payment; the form of the payment, the method used to determine the amount of the payment (that is, the method used to value the pre-existing intangible property and to calculate any royalty, lump sum, or installment payments, including, if applicable, any conversion between different payment forms); and an explanation of any discrepancy between the proposed payment form and the payment form established in the documents listed in paragraph (1) above (see section 4.03(9)); and an analysis demonstrating that the method used constitutes the best method under § 1.482-1(c).

(10) The treatment of cost sharing and buy-in or buy-out payments for U.S. income tax purposes (for example, the source and character of those payments).

(11) Evidence of the participants' compliance with the reporting requirements under § 1.482-7(j) of the cost sharing regulations.

(12) For taxpayers requesting an APA that covers a CSA but does not cover the related buy-in transaction, or an APA that covers a buy-in transaction but does not cover the related CSA, the reasons why an APA limited in this manner is consistent with the principles of the APA process, as set forth in this revenue procedure. The APA Program will evaluate the requests to ensure their consistency with the principles of this revenue procedure and sound tax administration. If an APA request is limited to covering only buy-in payments, the APA must include a representation by the taxpayer, as a term and condition of the APA, that the CSA to which the buy-in payments relate meets the § 482 regulatory requirements for CSAs.

*.05 Critical Assumptions*

The taxpayer should propose and describe any relevant critical assumptions. A critical assumption is any fact the continued existence of which is material to the taxpayer's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proposed TPM, whether related to the taxpayer, a third party, an industry, or business and economic conditions. Critical assumptions might include, for example, a particular mode of conducting business operations, a particular corporate or business structure, a range of expected business volume, or the relative value of foreign currencies.

*.06 Contents of Annual Report*

Section 11.01 provides that the taxpayer must file an annual report for each taxable year covered by the APA. The taxpayer should propose in the request a list of items to be included in each report. Consideration should be given to all items listed in Appendix C to the APA Program's current Model APA.

*.07 Term and First Year of APA*

(1) The taxpayer must propose a term for the APA appropriate to the industry, products, and transactions involved. Although the appropriate APA term is determined on a case-by-case basis, a request for an APA should propose an APA term of at least five years unless the taxpayer states a compelling reason for a shorter term. Additionally, the APA Program strives to have at least three prospective years remaining in the term upon the execution of an APA (in the case of a unilateral APA) or completion of the APA Program's recommended negotiating position for Competent Authority (in the case of a bilateral or multilateral APA), except in unusual circumstances. Accordingly, taxpayers should anticipate that the APA Program may require their agreement to extend the proposed term of an APA if necessary to ensure such prospectivity.

(2) The taxpayer must file its APA request within the time prescribed by statute (including extensions) for filing its Federal income tax return for the first proposed APA year. If the taxpayer receives an extension to file its Federal income tax return, it must file its APA request no later than the actual filing date of the return. An APA request will be considered filed on the date the required user fee is paid (within the meaning of § 7502(a)), provided that a substantially complete APA request is filed with the APA Program within 120 days of the return due date (including extensions) for the first proposed APA year. Because of the need to begin the processing of the APA request in a manner that ensures appropriate prospectivity, the APA Director will consider extending the 120-day period pursuant to section 2.06 only in unusual circumstances. If the APA Program's evaluation of an APA request is delayed due to a lack of responsiveness or timeliness by the taxpayer subsequent to the filing of its request, the APA Director may deem the taxpayer's APA request to have been filed for

purposes of this paragraph on a date subsequent to its actual filing.

*.08 Request for Competent Authority Consideration*

(1) The taxpayer must state whether any of the parties to the proposed covered transactions are residents of or conduct activities in a treaty partner country or U.S. possession, and whether the taxpayer proposes an agreement among competent authorities (see section 7 for guidelines). For purposes of this revenue procedure, "competent authority" includes the Director, International (LMSB) and designated foreign competent authorities under income tax treaties to which the U.S. is a party, and also includes the Director, International (LMSB) acting as the U.S. Competent Authority with respect to a possession tax agency described in Rev. Proc. 89-8, 1989-1 C.B. 778, as well as a designated possession tax official within the meaning of that revenue procedure.

(2) If the APA request is unilateral and involves transactions with an entity in a treaty jurisdiction, the taxpayer must provide an explanation of why the request is not bilateral. See sections 2.08 and 7.06.

(3) If the taxpayer requests a bilateral or multilateral APA, the taxpayer's request must include the information described in section 4.05(a) and (b) and, in a separate document, section 4.05(n), of Rev. Proc. 2002-52, 2002-2 C.B. 242 (or its successor), or similar information pursuant to a request for relief under Rev. Proc. 89-8. The following wording satisfies section 4.05(n) of Rev. Proc. 2002-52:

[Name of taxpayer(s)] consents to the disclosure to the competent authority of [name of foreign country] and the competent authority's staff of any or all of the items of information set forth or enclosed in the [bilateral/multilateral] APA request for the taxable year(s) _____ [and accompanying rollback request for relief from economic double taxation of income for the taxable years _____], and any further submissions, within the limits contained in the [name of treaty].

*.09 Perjury Statement*

(1) The taxpayer must include in any APA request and supplemental submission a declaration in the following form:

Under penalties of perjury, I declare that I have examined this [APA request] [supplemental submission relating to this APA request] including accompanying documents, and, to the best of my knowledge and belief,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the [APA request] [supplemental submission] contains all the relevant facts relating to the [APA request] [supplemental submission], and such facts are true, correct, and complete.

(2) The declaration must be signed by the person or persons on whose behalf the request is being made and not by the taxpayer's representative. The person signing for a corporate taxpayer must be an authorized officer of the taxpayer who has personal knowledge of the facts, whose duties are not limited to obtaining letter rulings or determination letters from the Service, or negotiating APAs, and who is authorized to sign the taxpayer's income tax return pursuant to § 6062. The person signing for any non-corporate taxpayer must be an individual who has personal knowledge of the facts, and who is authorized to sign in accordance with § § 6061 or 6063, as applicable.

*.10 Signatures*

The taxpayer or the taxpayer's authorized representative must sign the APA request. If an authorized representative is to sign, the taxpayer and representative must satisfy the relevant instructions on signatures in Rev. Proc. 2005-1, 2005-1 I.R.B. 1 (or its successor).

*.11 Mailing, Deliveries, Copies, and Office Location*

(1) User fees (accompanied by an identifying cover letter that includes a justification of the fee amount) must be sent to:
    Internal Revenue Service
    Attn: CC:PA:LPD:DRU
    P.O. Box 7604
    Ben Franklin Station
    Washington, D.C. 20044The fee payment may also be hand delivered to the drop box at the 12th Street entrance of 1111 Constitution Avenue, N.W., Washington, DC.

(2) All other communications must be mailed or delivered as follows to (unless arranged otherwise, for example, mailing to the California office):
    Office of Associate Chief Counsel (International)
    Advance Pricing Agreement Program
    Attn: CC:INTL:APA; MA2-266
    1111 Constitution Avenue, N.W.
    Washington, D.C. 20224

(3) The taxpayer must provide the original and eight copies of its APA request and any supplemental materials submitted while the request is pending.

(4) The APA Program is located at:
    799 9th Street, N.W.

    Washington, D.C. 20001

*.12 User Fees.*

(1) A separate user fee is required for each APA request. For this purpose, an APA request means a substantially complete and timely-filed APA submission, as required by section 4, and includes all such APA submissions filed by the taxpayer within any single sixty-day period. The taxpayer, for purposes of the preceding sentence, includes all members of a controlled group as defined in Treasury Regulations § 1.482-1(i)(6).

(2) User fees shall be made payable to the United States Treasury.

(3) Except as provided in paragraphs (4), (5), and (7), the user fee for an APA request is $50,000.

(4) Except as provided in paragraph (5), the user fee for an APA renewal request is $35,000. For this purpose, an APA request will be considered an APA renewal request if its subject matter is substantially the same as in a previous APA request by the taxpayer.

(5) The user fee for a small business APA request is $22,500. For this purpose, an APA request will be considered a small business APA request if the taxpayer has gross income of less than $200 million or the aggregate value of the covered transactions does not exceed (i) $50 million annually, and (ii) $10 million annually with respect to covered transactions involving intangible property.

(6) For purposes of paragraph 5, the gross income of a taxpayer includes the gross income of all organizations, trades, or businesses owned or controlled directly or indirectly by the same interests controlling the taxpayer. Gross income must be computed for the last full (12-month) taxable year ending before the date the taxpayer filed the APA request. If the information on the taxpayer's gross income for the last full taxable year is not available, the taxpayer must use its projected gross income for the first twelve months of the APA term.

(7) The user fee to amend an APA request or to amend a completed APA is $10,000. For this purpose, a request to amend will be deemed to occur if a taxpayer requests changes to an APA request or to a completed APA that requires substantial additional work by the APA Team. Generally, no user fee will be imposed if substantial changes are requested by the Service or by a foreign competent authority.

(8) The APA Director may require a corrected user fee after submission of an APA request if the request does not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

meet the criteria for the user fee amount initially paid by the taxpayer. The taxpayer may either pay the corrected fee and continue the APA process or withdraw the request.

SECTION    5:    TAXPAYER    DISCLOSURE OBLIGATIONS

.01 Any information submitted by a taxpayer in connection with its APA request must be true, correct, and accurate (see section 4.09). If the APA Program determines that it needs additional information to analyze the APA request, the APA Program may require the taxpayer to provide such information.

.02 A taxpayer has an obligation to update on a timely basis all material facts and information that it submits in connection with its APA request. In addition, while an APA request is pending and after an APA is executed, a taxpayer is under a continuing duty to timely supplement its disclosures if the taxpayer discovers that information that it provided in connection with an APA request was false, incorrect, or incomplete in some material respect. If a taxpayer discovers such an error or omission after the APA is executed, the taxpayer must disclose the error or omission in its next-filed annual report (see section 11.01(1)).

.03 While the APA request is pending, the taxpayer should be prepared to update the financial data for the selected comparables as new or revised data become available.

.04 If a taxable year is completed while the APA request is pending, the taxpayer should be prepared to update its APA submission following the close of the taxable year by demonstrating the application of the proposed TPM to the taxpayer's actual financial results for that year.

.05 Failure by a taxpayer to provide all materials required by this revenue procedure in its APA request (see section 4), or requested by the APA Program while the request is pending, can cause significant delays in case processing and may result in rejection of the APA under section 6.10.

SECTION 6: PROCESSING OF APA REQUESTS

*.01 General*

The processing of an APA request follows one of two paths, depending on whether the request is for a bilateral or multilateral APA, or for a unilateral APA. The scheduling of due diligence, analysis, discussion, agreement, and drafting is designed to complete the

recommended U.S. negotiating position (bilateral or multilateral APA request), or a unilateral APA, within 12 months from the date the full request was filed. The filing of a full APA request includes not only the payment of a user fee, but also the receipt by the APA Program of the materials specified in sections 4.02 through 4.10. Significant analysis of the APA request will not begin until a substantially complete request has been filed.

*.02 Initial Contact*

After receiving an APA request, a representative of the APA Program will contact the taxpayer or its representative to discuss any preliminary questions the APA Program may have, or to ask for any additional information or documents necessary in order to initiate processing of the request. The taxpayer must supply the additional information and documents, accompanied by the perjury statement described in section 4.09, by the date specified by the APA Program, as extended for good cause.

*.03 Designation of Team Leader*

Upon the receipt of a substantially complete APA request, the APA Director will designate a Team Leader to oversee the APA Team's activities in processing the request. If a prefiling conference was held with the taxpayer, the Team Leader generally will be designated from among the APA Program staff attending the prefiling conference.

*.04 Formation of APA Team*

The Team Leader will organize the APA Team, which normally consists of the following personnel: the Team Leader, an APA Program economist and/or a Service Operating Division economist, an LMSB international examiner, a Division Counsel attorney, and, in bilateral or multilateral cases, a competent authority analyst. In appropriate cases, an LMSB international technical advisor, the international examiner's manager, and other Service Operating Division personnel familiar with the taxpayer may serve on the APA Team. If the APA or a rollback of the APA affects taxable years in Appeals, the appropriate Appeals Officer will be invited to participate. The APA Team Leader will assure that copies of the APA request are distributed to all Team members for review.

*.05 Function of APA Team*

The function of the APA Team is the following: (1) for a bilateral or multilateral APA, to develop, in consultation with the taxpayer and consistent with sound tax administration, a competent authority negotiating position that it can recommend for approval, and (2) for a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unilateral APA, to make best efforts, consistent with sound tax administration, to develop an APA that the APA Program can recommend for approval by the Associate Chief Counsel (International). The Service Operating Division field office responsible for the taxpayer's income tax return will be provided an opportunity to review and comment on the recommended U.S. competent authority negotiating position in the case of a bilateral or multilateral APA, and the proposed APA in the case of a unilateral APA.

*.06 Due Diligence and Analysis*

The APA Team will evaluate the taxpayer's APA request by discussing it with the taxpayer, verifying the data supplied, and requesting additional supporting data if necessary. The evaluation of the request will not constitute an examination or inspection of the taxpayer's books and records under § 7605(b) or other provisions of the Code.

*.07 Schedule for Discussion and Drafting*

(1) The APA Team will strive to arrange an initial meeting with the taxpayer to take place within 45 days from the assignment of an APA Team Leader (and following receipt of the substantially complete APA request). The function of the initial meeting is to review the taxpayer's facts, to discuss and clarify issues, and to reach agreement on the scope and nature of the APA Team's due diligence.

(2) In connection with the initial meeting, the APA Team and the taxpayer will agree on a Case Plan to which both Service and taxpayer personnel will be expected to adhere. The Case Plan will be signed by both an APA manager and an authorized official of the taxpayer (see section 4.09(2)). The Case Plan may identify issues raised by the APA Team's initial review of the APA request. Firm dates should be agreed upon for resolving all outstanding issues, and case milestones should be cited. Case milestones include: (a) submission of any necessary additional information by the taxpayer; (b) any planned site visits or interviews; (c) evaluation of the information by the Service; (d) meeting dates; and (e) presentation of the competent authority negotiating position or recommended agreement to the APA Director. To minimize delays caused by the need to coordinate different parties' schedules on short notice, the time and place of future meetings required for any steps in the case should be agreed upon at the initial meeting and established in the Case Plan.

(3) The time scheduled for completion of the case milestones will depend to some extent on the scope and complexity of the particular case. In the case of bilateral

or multilateral requests, the Service will seek to work with the competent authority of the treaty partner or partners, or the U.S. possession involved to minimize the time needed for competent authority resolution.

(4) Failures by either the taxpayer or the APA Team to meet case milestones will be addressed promptly. The APA Director will assist in remedying any difficulties to ensure a course of action to meet case milestones. Substantial or persistent failure by the taxpayer to comply with the Case Plan may be treated by the APA Program as a withdrawal of the APA request. In this event, if the taxpayer wishes to continue to pursue the APA, the taxpayer must re-file the request and pay a new user fee.

(5) In some circumstances, development of the case will suggest to both the APA Team and the taxpayer that they adjust some milestone dates. To preserve flexibility, the APA Team and the taxpayer may amend the Case Plan by written mutual agreement, consistent with the need to complete the case expeditiously.

(6) If a case is not completed by the date specified in the operative Case Plan, the APA Team Leader and the taxpayer must submit to the APA Director a joint status report (or separate status reports in the event of disagreement) explaining the substantive or procedural matters causing the delay and specifying how the parties propose to resolve the outstanding issues and complete the case within a reasonable time. If the case is not completed by the new target date, APA Program management will hold a status conference. The purpose of the status conference is to reach agreement on how the case will be resolved. The Associate Chief Counsel (International) may participate in this or subsequent conferences if the case is not resolved satisfactorily in a timely manner.

*.08 Execution*

Signature of an APA by the APA Director and the taxpayer will constitute agreement to the APA. For purposes of executing the APA, each taxpayer that is a member of a consolidated group (as defined in § 1.1502-1) must comply with the provisions of § 1.1502-77. The person signing the APA request on behalf of the taxpayer must satisfy the requirements of section 4.09(2).

*.09 Withdrawing the Request*

The taxpayer may withdraw the request at any time before the execution of the APA. The user fee generally will not be refunded if the taxpayer withdraws its APA request after the due diligence process has been initiated.

*.10 Rejecting the Request*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The APA Program may decline either to accept any APA request or to execute any APA after a request has been accepted. If the APA Program declines to execute an APA after the due diligence process has been initiated, the Service normally will retain the user fee, although the fee may be returned if the APA Program determines that such action would be appropriate under the circumstances. If the APA Program proposes to reject an APA request, the taxpayer will be granted one conference of right with the APA Director. Other conferences may be granted at the APA Director's discretion.

## SECTION 7: COMPETENT AUTHORITY CONSIDERATION

*.01* When any of the parties to a request are entitled to obtain assistance under the mutual agreement provision of a tax treaty between a foreign country and the United States, or under Rev. Proc. 89-8, the competent authorities may enter into agreements concerning the APA. Requests similar to APA requests that are initiated through treaty partners or possession tax agencies and submitted to the U.S. competent authority will be processed under this revenue procedure and Rev. Proc. 2002-52, as appropriate. In order to provide timely clarification of factual issues, minimize the potential for miscommunication, and assist in development of a multiple party agreement on a timely basis, the Service will generally initiate coordination among the taxpayer, the Service, and the competent authorities of treaty partners at the earliest possible stage of consideration of an APA request, including, where possible, the prefiling stage. In this manner, the U.S. and foreign competent authorities can develop a joint understanding of the case, which should facilitate negotiation and resolution of competent authority issues. The taxpayer should remain available throughout consideration of the request to assist the Service in reaching agreement with the foreign competent authority. Final agreement to the negotiated APA will be sought among the taxpayer, the Service, and the foreign competent authority. As a general matter, the taxpayer should submit APA requests and related correspondence simultaneously to the Service and to foreign competent authorities involved in the requests.

*.02* The purpose of a competent authority agreement is to avoid double taxation or taxation not in accordance with the relevant income tax treaty or treaties. If such an agreement is not acceptable to the taxpayer, the taxpayer may withdraw the APA request (see section 6.09). If the competent authorities are unable to reach an agreement, the taxpayer may withdraw its request or, at its discretion, the Service may negotiate and enter into a unilateral APA with the taxpayer (see section 7.06).

*.03* The taxpayer must cooperate with the Service and the U.S. competent authority, pursuant to the standards set forth in Rev. Proc. 2002-52 and any other applicable revenue procedures.

*.04* Taxpayers have an affirmative obligation to identify relevant concerns that may impact competent authority negotiation of an APA request. For example, it may be necessary for the Service to request sensitive confidential data (including material that may constitute a trade secret), which if disclosed, could harm the taxpayer's competitive position. If the taxpayer identifies such sensitive information, the Service will work with the taxpayer in developing a mechanism to permit consideration or verification by the treaty partner or partners of the information while still preserving its confidentiality.

*.05* When the competent authorities enter into an agreement covering an APA, the Service will, to the extent appropriate, agree to a mutual exchange of information with the foreign competent authority concerning any subsequent modifications, cancellation, revocation, requests to renew, evaluation of annual reports, or examination of the taxpayer's compliance with the terms and conditions of the APA. Bilateral APAs may provide for simultaneous filing of the annual report with the Service and with the foreign tax administration.

*.06* To minimize taxpayer and governmental uncertainty and administrative cost, bilateral or multilateral APAs are generally preferable to unilateral APAs when competent authority procedures are available with respect to the foreign country or countries involved. In appropriate circumstances, however, the Service may execute an APA with a taxpayer without reaching a competent authority agreement. The taxpayer must show sufficient justification for a unilateral APA. In some circumstances, procedures agreed upon with particular foreign competent authorities, or the requirements of proper relations with treaty partners, may preclude unilateral APAs.

*.07* Section 7.05 of Rev. Proc. 2002-52 provides in part that, if a taxpayer reaches a settlement on an issue pursuant to a written agreement, the U.S. competent authority will endeavor only to obtain a correlative adjustment from a treaty country and will not undertake any actions that would otherwise change such agreement. The restrictions imposed under section 7.05 of Rev. Proc. 2002-52 with respect to the discretion of the U.S. competent authority to negotiate correlative relief will not apply to a unilateral APA. However, a unilateral APA may hinder the ability of the U.S. competent authority to reach a mutual agreement that will provide relief from double taxation, particularly when a contemporaneous

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bilateral or multilateral APA request would have been both effective and practical (within the meaning of § 1.901-2(e)(5)(i)) to obtain consistent treatment of the APA matters in a treaty country. If there is a settlement with respect to taxable years prior to the first year subject to a unilateral APA based on rollback of the APA's TPM (as discussed in sections 2.12 and 8 of this revenue procedure), section 7.05 of Rev. Proc. 2002-52 will apply to the rollback years in the regular manner.

SECTION 8: ROLLBACK OF TPM

.01 Application of the TPM to tax years prior to those covered by the APA ("roll-back" of the TPM) may be an effective means of enhancing voluntary compliance and of using available resources to address unresolved transfer pricing issues. The taxpayer may request that the Service consider a rollback (a "rollback request") in connection with a particular APA request. Under regularly applicable procedures, the Service may determine that the same or a similar TPM as that agreed to in an APA should be applied to prior years even in the absence of a rollback request. When applying the TPM to prior years, adjustments may be made to reflect differences in facts, economic conditions, and applicable legal rules. Those adjustments may be made regardless of whether the taxpayer or the Service initiated the rollback request.

.02 The taxpayer may make a rollback request in its APA request or at any time prior to the execution of the APA. The principles set forth in section 2.12 generally will govern the Service's consideration of the request. The balance of prospectivity and retroactivity of the total number of years covered by the proposed overall agreement, and the status of any on-going examination, will also be given consideration in the Service's decision to entertain a rollback request. Rollbacks requested after submission of the APA request must be in writing and addressed to the APA Director.

.03 If a rollback request is submitted in connection with a bilateral or multilateral APA, the rollback request will be deemed to constitute an application for accelerated competent authority consideration as described in section 7.06 of Rev. Proc. 2002-52 (or its successor). The Office of Associate Chief Counsel (International), the Service Operating Division field office involved, and the U.S. Competent Authority will coordinate consideration of the request. The taxpayer's request must include all information required for accelerated competent authority consideration under Rev. Proc. 2002-52 (or its successor), subject to the rules set forth therein. The taxpayer's request can pertain to any years prior to the first year to be covered under the requested APA. As necessary to reach a competent authority agreement, the Service may require that the rollback be applied to one or more specified years

if accelerated competent authority is to be granted. In exercising its discretion over the conduct of accelerated competent authority consideration, the U.S. Competent Authority will seek to implement the policy concerning APA rollbacks stated in section 2.12.

.04 Rollback requests submitted in connection with a bilateral or multilateral APA and involving a taxable year under the jurisdiction of Appeals will be deemed to constitute an application for simultaneous Appeals and competent authority consideration. That application is described in section 8 of Rev. Proc. 2002-52 and is subject to the rules of that section. The Office of Associate Chief Counsel (International), Appeals, and the U.S. Competent Authority will coordinate consideration of the request. In exercising its discretion in a simultaneous Competent Authority-Appeals proceeding, the U.S. Competent Authority will seek to implement the policy concerning APA rollbacks stated in section 2.12. Taxpayers are encouraged to request accelerated competent authority consideration under section 8.03 above, in conjunction with an application for the simultaneous Appeals and competent authority process.

.05 Subject to the policy stated in section 2.12, the Service official with jurisdiction over the taxable year subject to the rollback has discretion as to whether the rollback is applied. That official may be either the Service Operating Division executive responsible for the taxpayer's income tax return, the National Chief of Appeals, the U.S. Competent Authority (for matters subject to competent authority negotiations), or the Division Counsel (for matters pending litigation). Except to the extent inconsistent with this revenue procedure, APA rollbacks will be implemented using regularly applicable procedures for resolving tax issues. Such procedures include but are not limited to closing agreements and other settlement documents and Forms 870 and 870AD.

SECTION 9: SMALL BUSINESS TAXPAYER APAs

.01 Special Provisions Available to Small Business Taxpayers

At the request of a small business taxpayer ("SBT"), the APA Program may apply any or all of the provisions in this section. A SBT is any U.S. taxpayer with total gross income of $200 million or less, as determined under section 4.12(6). In addition, SBT procedures will be available for APAs that cover small transactions described in section 4.12(5). Although transactions involving valuable intangible property or CSAs would not ordinarily be appropriate for these SBT procedures (because of the complexity of valuing such intangibles), the APA Program will consider employing special

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rev. Proc. 2006-9, 2005 WL 3465554 (IRS RPR)                    Page 14
(Cite as: Rev. Proc. 2006-9, 2005 WL 3465554 (IRS RPR))

procedures for such transactions on a case-by-case basis.

*.02 PFC Procedures*

(1) As set forth in the general rules above, a taxpayer contemplating an APA may request a PFC with the APA Program (see section 3). If a PFC is requested, the APA Program provides informal advice to the taxpayer regarding the taxpayer's proposal, but ordinarily does not begin significant due diligence until the taxpayer formally files an APA request and pays the appropriate user fee (see section 6.01). In the case of an SBT, however, the APA Program will commence its due diligence analysis earlier in the process to accelerate the conclusion of the APA negotiations.

(2) The APA Program and a SBT may hold a PFC to determine as early as possible the best method for the SBT's proposed covered transactions. The APA Program will need a detailed description of the underlying facts and the proposed TPM for the SBT's proposed covered transactions at least 60 days prior to the scheduled conference. The SBT may provide the information it maintains under § 6662(e) to satisfy this requirement. Prior to its prefiling submission, the SBT must consult with the APA Program to determine the information required to evaluate the SBT's covered transactions.

(3) An APA Team will evaluate the APA prefiling information to determine items of concern and the additional documentation needed to evaluate the request. The SBT will be advised of the APA Team's initial conclusions before the PFC so that it can address these items before or at the conference.

(4) At the PFC, the SBT and APA Program will agree on a schedule with the objective of finalizing the recommended negotiating position for a bilateral APA, or concluding a unilateral APA, within six months of the date the SBT files its APA request. The APA Program expects that performing this analysis earlier in the process should result in a reduced number of post-filing meetings and supplemental information requests.

*.03 Items Required for an SBT APA Request*

Before an SBT submits an APA request, the APA Program and the SBT may agree to reduce or eliminate specific items that would otherwise be required by section 4.

*.04 Locale and Number of Meetings for SBT APA Requests*

The APA Program will endeavor to hold meetings with the SBT at a location convenient to the SBT. To minimize the number of meetings, teleconferences will be employed whenever feasible.

*.05 Assistance in Economic Analysis*

At the SBT's request, the APA Program will assist the SBT in the selection and evaluation of comparables, as well as the computation of any appropriate adjustments to comparables.

*.06 APA*

For unilateral APA requests, a SBT should submit a proposed draft APA in a form substantially similar to the APA Program's current Model APA (see Announcement 2005-27, 2005-16 I.R.B. 918, 950). The electronic component of the APA request should include a "redline" version showing the differences between the Model APA and the SBT's proposed draft APA (see section 4.02(6)).

*.07 APA Program's Consideration of Other Alternative Procedures*

The APA Program may consider other procedures suggested by the SBT to reduce the SBT's administrative and financial burden, consistent with the objectives of the APA Program and the requirements of § 482.

SECTION 10: LEGAL EFFECT OF THE APA

*.01* An APA is a binding agreement between the taxpayer and the Service. See sections 2.01 - 2.04.

*.02* If the taxpayer complies with the terms and conditions of the APA, the Service will not contest the application of the TPM to the subject matter of the APA except as provided in this revenue procedure. The taxpayer remains otherwise subject to U.S. income tax laws and applicable income tax conventions.

*.03* An APA will have no legal effect except with respect to the taxpayer, taxable years, and transactions to which the APA specifically relates.

*.04* Unless provided otherwise by written agreement or regulations, the Service and the taxpayer may not introduce the APA or non-factual oral and written representations made in conjunction with the APA request as evidence in any judicial or administrative proceeding regarding any tax year, transaction, or person not covered by the APA. This paragraph does not preclude the Service and the taxpayer from agreeing to roll back the APA TPM, or the Service's use of any non-factual material otherwise discoverable or obtained other than in the APA process merely because the parties considered the same or similar material in the APA process.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

.05 Unless provided otherwise by written agreement or regulations, the Service and the taxpayer may not introduce a proposed, cancelled, or revoked APA, or any non-factual oral or written representations or submissions made during the APA process, as an admission by the other party, in any judicial or administrative proceeding regarding any taxable year of the requested APA term. This paragraph does not preclude the Service's use of any non-factual material otherwise discoverable or obtained other than in the APA process merely because the APA Program and the taxpayer considered the same or similar material in the APA process.

## SECTION 11: ADMINISTERING THE APA

### .01 Annual Reports

(1) For each taxable year covered by the APA, the taxpayer must file a timely and complete annual report describing its actual operations for the year and demonstrating compliance with the APA's terms and conditions. The report must include all items required by the APA, describe any pending or contemplated requests to renew, modify or cancel the APA, and report any adjustments made pursuant to section 11.02. In addition, the annual report must identify any material information submitted while the APA request was pending that the taxpayer discovers during the taxable year was false, incorrect, or incomplete. See section 5.02.

(2) The taxpayer must file an original and four copies of the annual report by the later of (a) 90 days after the time prescribed by statute (including extensions) for filing its federal income tax return for the year covered by the report, or (b) 90 days after the effective date of the APA. The Service and the taxpayer may agree to alternative filing dates. The taxpayer should file the original annual report and copies with the APA Director in Washington, D.C., as indicated in section 4.11. For bilateral or multilateral APAs, the Service may require the taxpayer to file simultaneously a copy of the annual report with the treaty partner or partners.

(3) The Service Operating Division or the APA Program Office will contact the taxpayer regarding an annual report if it is necessary to clarify or complete the information submitted in the annual report. The taxpayer must supply the additional information by the date specified.

(4) Any contact between the Service Operating Division, or the APA Program Office, and the taxpayer to clarify or complete the information in an annual report is not an examination or the commencement of an examination of the taxpayer for purposes of § 7605(b) or

any other Code provision.

(5) If a filed annual report contains incomplete or incorrect information, or reports an incorrect application of the TPM, the taxpayer must amend it within 45 days after becoming aware of the need to amend the report. The time may be extended for good cause.

(6) An annual report must contain the following declaration:

Under penalties of perjury, I declare that I have examined this annual report including accompanying documents, and, to the best of my knowledge and belief, this annual report contains all the relevant facts relating to the annual reporting requirements pursuant to the APA, and such facts are true, correct, and complete.

[If applicable: An adjustment to conform taxable income and other relevant items to reflect the results reported herein has been reported to the appropriate responsible Service Operating Division personnel.]

[If applicable: An amended income tax return to conform taxable income and other relevant items to reflect the results reported herein [has been] [will be] filed with the appropriate Internal Revenue Service Center.]

(7) The taxpayer must sign the declaration in compliance with sections 4.09 (Perjury Statement) and 4.10 (Signatures).

(8) Failure to file a timely, complete, or accurate annual report may be grounds for canceling or revoking the APA under sections 11.06.

### .02 APA Primary Adjustments, Secondary Adjustments, and Revenue Procedure Treatment

(1) APA Primary Adjustments. The APA provides the TPM for determining the proper amount of the taxpayer's gross or net income, deductions, credits, or allowances with respect to the APA's covered transactions. In general, the taxpayer's actual covered transactions during an APA year, as reported in its books and records, should comply with the TPM and be clearly reflected on the taxpayer's timely-filed original return for the year. Under some TPMs, however, the taxpayer may have to wait until the close of the taxable year to determine whether the intercompany prices it actually paid or received complied with the TPM (for example, a comparable profits method providing for a particular operating margin range). If the taxpayer's actual covered transactions do not comply with the TPM, the taxpayer must nonetheless report its taxable income in an amount consistent with the TPM (an "APA primary adjustment") on either a timely-filed original return or an amended return. The generally applicable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Code rules, including additions to tax, penalties and interest, apply with respect to an APA primary adjustment. When the taxpayer makes an APA primary adjustment, an appropriate correlative adjustment will also be made with respect to the related foreign entity affected by the APA primary adjustment. See § 1.482-1(g)(2). To the extent the APA covers years for which federal income tax returns were filed prior to, or no later than 60 days after, the effective date of the APA, the taxpayer must file, unless otherwise agreed to in the APA, an amended return or returns that reflect any required primary adjustment and pay any tax due because of such adjustments, within 120 days of entering into the APA. The generally applicable Code rules will apply with respect to the primary adjustment with respect to the APA years for which federal income tax returns were filed before the APA was executed, except: (a) the computation of any required estimated tax installments for the taxable year will not take into account the primary adjustment and related secondary adjustments (see section 11.02(2)); and (b) the taxpayer will not be subject to the failure to pay penalties under § § 6651 and 6655, or the failure to make timely deposit of taxes penalty under § 6656, by reason of the primary adjustment and related secondary adjustments.

(2) Secondary Adjustments. Absent an election of the APA revenue procedure treatment described in section 11.02(3), an APA primary adjustment requires a secondary adjustment to conform the taxpayer's accounts. The secondary adjustment may result in additional tax consequences. See § 1.482-1(g)(3).

(3) APA Revenue Procedure Treatment. If a taxpayer makes an APA primary adjustment, the taxpayer and its related foreign entity may elect APA revenue procedure treatment and avoid the possible adverse tax consequences of a secondary adjustment that would otherwise follow the APA primary adjustment. Under APA revenue procedure treatment, consistent with the principles of Rev. Proc. 99-32, 1999-2 C.B. 296, the taxpayer will be permitted to establish an account receivable from, or payable to, its related foreign entity in the amount of the APA primary adjustment as of the last day of the taxable year to which the APA primary adjustment applies. The account will not bear interest and must be paid within 90 days of the later of (a) the date for timely filing (with extensions) of the federal income tax return for the taxable year to which the APA primary adjustment applies, or (b) the APA's effective date. The account must be paid within the 90 day period to receive revenue procedure treatment. Payment must be in the form of money, a written debt obligation payable at a fixed date and bearing interest at an arm's length rate as provided in § 1.482-2(a)(2), or through an accounting entry offsetting such account against an existing *bona fide*

debt between the U.S. taxpayer and the related foreign entity. The taxpayer must document the payment or offset of the account, and disclose it in the APA annual report for the year of the payment.

(4) The Service will give effect to an APA primary adjustment, secondary adjustment, and payment under APA revenue procedure treatment, if applicable, for all U.S. income tax purposes. The tax treatment of any such adjustment or payment depends on the facts and circumstances of the adjustment or payment. For example, if a taxpayer's APA primary adjustment involves the reporting of an additional royalty expense for a transaction with a related foreign entity, the Service will deem a payment in the nature of a royalty in the amount of the APA primary adjustment to have been made by the taxpayer to the related foreign entity. This deemed payment may be subject to U.S. withholding tax, and interest would accrue on the tax required to be withheld from the due date of the taxpayer's federal income tax return without regard to extensions. Similarly, a taxpayer's APA revenue procedure treatment may involve the recharacterization of a dividend paid by its foreign subsidiary as a payment of an account receivable established in connection with an APA primary adjustment. Any foreign tax withheld from the payment may be treated as a noncompulsory payment ineligible for the foreign tax credit, unless the taxpayer exhausts all effective and practical remedies, including invocation of competent authority procedures, to obtain consistent treatment that would eliminate the foreign tax liability. See § 1.901-2(e)(5).

(5) If the Service proposes a tax adjustment or the taxpayer files an amended return that does not require an APA primary adjustment, generally applicable Code rules will apply.

(6) If the taxpayer requests a bilateral or multilateral APA, the U.S. Competent Authority will discuss the principles of this section with the appropriate foreign competent authority to seek substantially identical treatment of the taxpayer's related foreign entity.

*.03 Examination*

(1) With respect to the application of § 482 to the covered transactions, the Service will limit the examination of a taxpayer's income tax return for a tax year covered by an APA to the requirements described in the next paragraph and will not reconsider the TPM.

(2) For the year under examination, the Service may require the taxpayer to establish: (a) compliance with the APA's terms and conditions; (b) validity and accuracy of the annual report's material representations; (c)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

correctness of the supporting data and computations used to apply the TPM; (d) satisfaction of the critical assumptions; and (e) consistent application of the TPM.

(3) The Service Operating Division must inform the APA Director if the taxpayer has not satisfied any requirement in the prior paragraph. After consulting with the appropriate Service Operating Division personnel, the Associate Chief Counsel (International) may decide to apply the terms of the APA, or revise (see section 11.05), cancel, or revoke (see section 11.06) the APA.

(4) The Service Operating Division may audit and propose adjustments to the taxpayer's operating results as determined under the TPM without affecting the APA's validity or applicability. The taxpayer may agree with the proposed adjustments in the same manner as any other adjustment, and the Service Operating Division will assess any resulting additional tax or refund any resulting overpayment of tax. If the taxpayer does not agree with the proposed adjustment, the taxpayer may contest it through the normal administrative and judicial procedures. The taxpayer must include the audit adjustments as finally determined for the purpose of applying the TPM and, as necessary, make any APA primary, secondary and correlative adjustments under section 11.02. APA revenue procedure treatment under section 11.02(3) is unavailable for audit adjustments.

*.04 Record Retention*

(1) The taxpayer must maintain books and records sufficient to enable the Service Operating Division to examine whether the taxpayer has complied with the APA. The taxpayer's compliance with this paragraph fulfills the record-keeping requirements of § § 6038A and 6038C as applied to the covered transactions.

(2) Upon examination, the Service Operating Division may submit a written request to the taxpayer requiring the submission of requested information or the translation of specific documents within 30 days, as extended for good cause. The fact that a foreign jurisdiction may impose a penalty upon the taxpayer or other person for disclosing the material will not constitute reasonable cause for noncompliance with the Service Operating Division's request.

*.05 Revising the APA*

(1) An APA may be revised by agreement of the parties, consistent with the principles set forth herein and the interests of sound tax administration. The Associate Chief Counsel (International) may agree to revise an APA in lieu of canceling or revoking it. If the parties agree to revise the APA, the revised APA will indicate its effective date.

(2) If the parties agree to revise a bilateral or multilateral APA, the Team Leader will submit the revised APA to the U.S. Competent Authority to obtain the consent of the foreign competent authority. If the foreign competent authority refuses to accept the revised APA, or if the competent authorities cannot agree on a revised APA acceptable to all parties, the APA Director and the taxpayer may agree to: (a) apply the existing APA, if appropriate; (b) apply the revised APA or agree to further revisions; or (c) request the Associate Chief Counsel (International) to cancel the APA as of an agreed date. If the APA Director and the taxpayer cannot agree on how to proceed, the Associate Chief Counsel (International) will cancel the APA pursuant to section 11.06.

*.06 Revoking or Canceling the APA*

(1) The Associate Chief Counsel (International) may revoke an APA due to fraud or malfeasance (as defined in § 7121), or disregard (as defined in § 6662(b)(1) and (c)) by the taxpayer in connection with the APA, including, but not limited to, fraud, malfeasance, or disregard involving (a) material facts in the request or subsequent submissions (including an annual report) or (b) lack of good faith compliance with the APA's terms and conditions.

(2) The Associate Chief Counsel (International) may cancel an APA due to the taxpayer's misrepresentation, mistake as to a material fact, failure to state a material fact, failure to file a timely annual report, or lack of good faith compliance with the terms and conditions of the APA.

(3) Unless the parties agree to revise the APA, the Associate Chief Counsel (International) will cancel an APA in the event of a failure of a critical assumption, or a material change in governing case law, statute, regulation, or a treaty (as described in section 11.07).

(4) For purposes of this section 11.06(1) and (2) the Associate Chief Counsel (International) will consider facts as material if, for example, knowledge of the facts could reasonably have resulted in an APA with significantly different terms and conditions. In regard to annual reports, the Associate Chief Counsel (International) will consider facts as material if, for example, knowledge of the facts would have resulted in (a) a materially different allocation of income, deductions, or credits than reported in the annual report, or (b) the failure to meet a critical assumption.

(5) The Associate Chief Counsel (International) may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

waive cancellation if the taxpayer can satisfactorily show good faith and reasonable cause and agrees to make any adjustment proposed to correct for the misrepresentation, mistake as to a material fact, failure to state a material fact, or noncompliance.

(6) If the Associate Chief Counsel (International) revokes an APA, the revocation relates back to the first day of the APA's first taxable year. The Service may: (a) determine deficiencies in income taxes and additions thereto; (b) deny relief under Rev. Proc. 99-32, 1999-2 C.B. 296; (c) allow the taxpayer relief under Rev. Proc. 99-32, but determine the interest on any account receivable established under Rev. Proc. 99-32, section 4.01, without mutual agreement or correlative relief; (d) revoke the APA as an "egregious case" under Rev. Rul. 80-231, 1980-2 C.B. 219. so as to deny the taxpayer a foreign tax credit; and (e) not make available the unilateral relief provisions of Rev. Proc. 2002-52 (see section 12.07). The Service will seek to coordinate any action concerning revocation of a bilateral or multilateral APA with the foreign competent authority.

(7) If the Associate Chief Counsel (International) cancels an APA, the cancellation normally relates back to the beginning of the year in which the critical assumption failed, or the beginning of the year to which the misrepresentation, mistake as to a material fact, failure to state a material fact, or noncompliance relates. If, however, the cancellation results from a change in case law, statute, regulation, or treaty, the cancellation normally relates back to the beginning of the year that contains the effective date of the change in case law, statute, regulation, or treaty.

(8) As of the effective date of the cancellation, the APA has no further force and effect with respect to the Service and the taxpayer for U.S. income tax purposes. The Service will seek to coordinate any action concerning the cancellation of a bilateral or multilateral APA with the foreign competent authority.

*.07 Change in Case Law, Statute, Regulation, or Treaty*

If applicable U.S. case law, statutes, regulations, or treaties change the federal income tax treatment of any matter covered by the APA, the new case law, statute, regulation, or treaty provision supersedes inconsistent terms and conditions of the APA.

SECTION 12: RENEWING THE APA

*.01* A taxpayer may request renewal of an APA using the procedures for initial APA requests. To expedite the preparation and evaluation of an APA renewal request, however, taxpayers are encouraged to request a prefiling conference to discuss with the APA Program the suitability of streamlined submission requirements. Taxpayers are encouraged to file the renewal request nine months before the expiration of the APA term.

*.02* The APA Program will endeavor to expedite the processing of a renewal APA. Expedited processing will be most likely where the taxpayer demonstrates that the following conditions exist: (a) substantially the same law and policy applied to the existing APA; (b) no substantial differences exist between the taxpayer's proposed TPM and the TPM under the existing APA; (c) no material changes occurred in the taxpayer's facts or circumstances since the parties entered into the existing APA; and (d) for a bilateral APA, a rollback or closed year considerations did not influence the TPM in the existing APA.

*.03* If the conditions in the prior paragraph exist, the APA Team begins its evaluation of the renewal APA by considering the continuing applicability of the existing APA, using updated comparables as appropriate. The APA Team will focus on any changed facts and circumstances. While the APA Team will endeavor to streamline the renewal process, certain cases may require additional analysis. That is, experience and insight gained from applying the TPM to actual data (for example, APA annual reports) may provide insight that indicates the need to modify the TPM. The APA Program will use its best efforts to advise the taxpayer at a prefiling conference whether a streamlined APA renewal process will be achievable.

SECTION 13: DISCLOSURE

*.01* An APA, any background information related to the APA, and the taxpayer's APA request for that APA, are return information and are confidential. See § § 6103, 6105, 894, and 7852(d).

*.02* An APA, any background information related to the APA, and the taxpayer's APA request, are not "written determinations," and they are not open to public inspection. See § 6110.

*.03* The Secretary must prepare an annual report for public disclosure. See § 521(b) of the Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. 106-170, 113 Stat. 1860. 1925. That report includes specifically designated information concerning all APAs, but in a form that does not identify taxpayers or their trade secrets or proprietary or confidential business or financial information.

*.04* An APA, any annual reports, and any factual information contained in the background files is subject to exchange of information under income tax treaties or tax

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rev. Proc. 2006-9, 2005 WL 3465554 (IRS RPR)
(Cite as:  Rev. Proc. 2006-9, 2005 WL 3465554 (IRS RPR))

information exchange agreements in accordance with the terms of such treaties and agreements (including terms regarding relevancy, confidentiality and the protection of trade secrets). In cases where the exchange of information would be discretionary, information may be exchanged to the extent consistent with sound tax administration and the practices of the relevant foreign competent authority, including where relevant the existence and application by the foreign competent authority of rules similar to those described in sections 10.04 and 10.05.

SECTION 14: EFFECT ON OTHER DOCUMENTS

Rev. Proc. 2004-40, 2004-2 C.B. 50, is superseded.

SECTION 15: EFFECTIVE DATE

This revenue procedure will apply to all APA requests, including requests for renewal, received on or after February 1, 2006. By agreement, this revenue procedure may apply to any APA resulting from an APA request pending on such date.

SECTION 16: PAPERWORK REDUCTION ACT

The collections of information contained in this revenue procedure have been reviewed and approved by the Office of Management and Budget in accordance with the Paperwork Reduction Act (44 U.S.C. 3507) under control number 1545-1503.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid control number.

The collections of information are in sections 3.06, 4, 5, 8.03, 11.01, 11.02(1), 11.04, 11.05 and 12.01. This information is required to provide the Service sufficient information to evaluate and process the APA request or request for renewal of an existing APA, or to determine whether the taxpayer is in compliance with the terms and conditions of an APA. This information will be used to evaluate the proposed TPM, and the taxpayer's compliance with the terms and conditions of any APA to which it is a party. The collections of information are required to obtain an APA. The likely respondents are business or other for-profit institutions.

The estimated total annual reporting and/or recordkeeping burden is 8200 hours.

The estimated average burden for an APA prefiling conference is 10 hours; the estimated average burden for an APA request is 50 hours; and the estimated average burden for preparation of an annual report by a party to an APA is 15 hours. The estimated number of respondents and/or recordkeepers is 230.

The estimated annual frequency of responses is one request or report per year per applicant or party to an APA, except that a taxpayer requesting an APA may also request a prefiling conference.

Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law. Generally tax returns and tax return information are confidential, as required by § 6103.

DRAFTING INFORMATION

The principal authors of this document are various members of the Advance Pricing Agreement Program of the Office of Associate Chief Counsel (International). For further information regarding this revenue procedure, please contact Mr. Craig A. Sharon or Mr. Craig R. Gilbert at (202) 435-5220 (not a toll-free number).

Rev. Proc. 2006-9, 2005 WL 3465554 (IRS RPR)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.